# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of

FaulknerUSA International Group

For an Order to Conduct Discovery for

Use in Foreign Proceedings

Case No. 15 Misc._____

## DECLARATION OF MAX MAILLIET IN SUPPORT OF
## APPLICATION OF FAULKNERUSA
## FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, Max Mailliet, under penalties of perjury, pursuant to 28 U.S.C. § 1746, do hereby declare:

1. I am over the age of 18, otherwise *sui juris*, and the facts set out in this declaration are derived from my own knowledge or from information provided to me by others. Where the facts are within my own knowledge, I confirm that they are true. Where the information is provided to me by others, I state the source of my knowledge and confirm that it is true to the best of my information and belief.

2. I am a lawyer admitted to practice as an "Avocat à la Cour" under the laws of Luxembourg and I am registered with the Luxembourg bar. I make this application on behalf of myself and FaulknerUSA International Group, a limited liability company organized and existing under the laws of Texas (the "**Applicant**" or "**FaulknerUSA**").

3. The Applicant seeks assistance from The United States District Court for the Southern District of New York (the "**District**") to obtain documentary and testimonial evidence from certain institutions (collectively "**Discovery Targets**" or "**Financial Institutions**") found in the District. Specifically, the Applicant seeks evidence regarding U.S. Dollar-denominated wire transactions between onshore and offshore persons or entities. This evidence is for use in civil proceedings, described more fully below, in Luxembourg and other foreign countries as assets and relevant entities are identified and located.



## FACTUAL BACKGROUND

### Underlying arbitration award

4.  I have been provided by the Applicant with a copy of a final arbitration award conducted under the rules of the International Chamber of Commerce ("**ICC**") and seated in Abu Dhabi in the United Arab Emirates, obtained by the Applicant against Shaheen Business & Investment Group also known as SBIG SA ("**SBIG**" or the "**Company**" or the "**Debtor**")). A, to my knowledge, true and correct copy of the Arbitration Award ("**Award**") is attached hereto as Exhibit 1.

5.  The Award grants the Applicant the principal sum of $1,500,000 with 9% simple interest, which has been accruing since December 16, 2007. The Award granted $219,790.17 in legal costs as well.

6.  Based upon my review of the Award, in connection with my work preparing a Luxembourg judicial liquidation application in respect to the Company and the representations made to me by the Applicant, the background to the arbitration is briefly as follows:

    i.   On October 4, 2007 FaulknerUSA entered into a Memorandum of Understanding ("MOU") with the Company to explore real estate investments in Dubai. The terms of the MOU required each party to make a capital contribution of $1.5 million, which FaulknerUSA duly wired to SBIG's Swiss bank account on October 24, 2007.

    ii.  The Company failed to abide by its obligations to match FaulknerUSA's funding consideration and create an LLC in Dubai. As a result, the MOU expired on December 7, 2007. Despite numerous requests, the Company and its CEO, Khaled Mohammad Abdul Qader Shaheen ("**Khaled Shaheen**"), failed to return FaulknerUSA's contribution.

    iii. The Applicant initially sought redress through litigation brought in the United States District Court for the Western District of Texas (Case A-10-CA-051). In those proceedings, the defendant SBIG successfully sought to have the case

dismissed because of lack of jurisdiction, in arguing that the dispute was more appropriately resolved through arbitration.

iv.    The Western District of Texas Court duly dismissed the case on September 28, 2010 and the matter was referred to international arbitration under the rules of the ICC.

v.    The Applicant on January 7, 2013 filed a Claimant's Request for Arbitration that designated the Company as the respondent.  Arbitration was commenced with an evidentiary hearing on January 15, 2014.

vi.    As described in detail in the Award, despite being continuously notified of this arbitration, the Company neither participated in the proceedings nor responded to numerous notifications from FaulknerUSA and the arbitrator and in fact, all together declined to acknowledge the arbitral tribunal or to engage in the arbitration process.

vii.    On October 16, 2014, an Abu Dhabi-based ICC Tribunal issued the Award.

## Current proceedings

7.    My services have been retained in Luxembourg by the Applicant in order to enforce the Award against SBIG in Luxembourg and, if possible, retain local counsel in other jurisdictions where assets of SBIG or Khaled Shaheen may be identified, to enforce the Award.

8.    To date, enforcement in Luxembourg has been significantly hampered because of the fact that the SBIG, as a legal entity, is essentially moribund insofar as it has not had a registered office in Luxembourg since February 2014.

9.    In addition, the directors and supposed shareholders of SBIG – Khaled Shaheen, Reyad Shaheen, Akram Shaheen, Manal Shaheen, and Ahed Muhammed Sukhon – are not domiciled or resident in Luxembourg.  It is currently believed that all of these individuals are residents of Jordan.

10.    The Applicant therefore has instructed me to apply to bring about the judicial liquidation of its judgment debtor SBIG in accordance with Article 203 of the

amended Luxembourg law dated August 10, 1915 on commercial companies ("Luxembourg Liquidation Law").

11. To that end, on June 26, 2015, I applied in writing to the relevant State Prosecutor's office to seek the liquidation of the Company. A copy of the letter is attached hereto as Exhibit 2. As more is learned concerning the financial dealings and misdealing's of the Company, further filings and proceedings pursuant to the Luxembourg Liquidation Law will be issued.

### Affiliated and Offshore Entities

12. Apart from SBIG in Luxembourg, the Applicant's investigations have revealed and identified the following entities as being affiliated with SBIG or otherwise necessitating further enquiries by the Applicant (the "Related Parties):

(i)    Shaheen Business & Investment Group: An alternative name for SBIG used in several jurisdictions.

(ii)    Vantage Holdings S.A: which was incorporated as a subsidiary of SBIG according to Luxembourg corporate filings.

(iii)    Infra Holdings S.A: which was incorporated as a subsidiary of SBIG according to Luxembourg corporate filings.

(iv)    Millennium for the Trade of Raw Materials and Mineral Oils: A Jordanian based entity thought to be owned by Khaled Shaheen according to press articles.

(v)    Tharwa Investments: A British Virgin Islands based company thought to be owned by Khaled Shaheen. A Jordanian based company of the same name is thought to be solely owned by Khaled Shaheen and may be an alter ego or successor of SBIG.

(vi)    Fourwinds Capital Management: A subsidiary of Tharwa Investments according to a press article dated March 15, 2015.

(vii)  Ocean Eight Inc.: A Panamanian company directed by Khaled Shaheen and his wife Manal Shaheen (aka Manal Alawad).

(viii) Ole Holdings: The former name of SBIG and possibly an alter ego or successor of the same.  Ole Holdings is registered in the British Virgin Islands.

(ix) Infra (MENA) Limited:  A Jersey based company directed by Khaled Shaheen which may be an alter ego or successor to the SBIG subsidiary Infra Holdings.

(x)      Khaled Shaheen – The presumed beneficial owner and original CEO of the Company

(xi)     Reyad Shaheen – The brother of Khaled Shaheen as well as a previous director of the Company  and a presumed shareholder of SBIG subsidiaries.

(xii)      Manal Shaheen – The wife  of Khaled Shaheen and a director of the Company.

(xiii)      Ahed Muhammed Sukhon – The former Senior Vice President of the Company  and the former director of Ocean Eight Inc.

13.  SBIG additionally maintains an established history of registering apparent sister companies in a number of jurisdictions, including Jordan, the United Kingdom, British Virgin Islands, the Cayman Islands and Luxembourg.  Indeed, Ole Holdings – a potential sister company to SBIG - is known to be registered in the British Virgin Islands.

14.  SBIG has not disclosed any assets that might be used to satisfy the Award. Rather, the Company  has sought to thwart the Applicant's efforts to seek legal redress in the United States, all the while failing to engage in arbitration proceedings to which it was a party.

15. Bearing on the necessity of the current application, SBIG's chairman and CEO, Khaled Shaheen, was, according to publicly available information, sentenced to three years imprisonment by Jordan's State Security Court in 2010 on charges of corruption and embezzlement. In what became one of the largest scandals in the country's history, Khaled Shaheen had, according to publicly available information, attempted to bribe officials from the Jordan Petroleum Refinery Company to award his company Infra MENA a $2.1 billion renovation contract, all the while keeping his interest in Infra MENA concealed from the public.

16. According to publicly available information, in August 2011, Khaled Shaheen was indicted in Jordan on money laundering charges in relation to a second bribery scandal relating to a feasibility study of the Disi Water Conveyance Project. According to media reports, Jordanian officials signed a contract to undertake the study at a cost of $1.95 million and to supervise funding on a related $60 million project. According to the the reports, the contracting entity submitted requests to the Jordanian officials that any funds be deposited in a Swiss bank account in the name of SBIG. The case was later allegedly settled out of court.

17. Given SBIG's apparent opaque financial dealings in the past and practice of transacting in and through third party jurisdictions such as Switzerland, this Application represents the best means of targeting or gathering evidence in the possession, custody, or control of the New York Banks located in this District. The evidence sought through this Application is for use in enforcement proceedings in, at least, Luxembourg, and is highly relevant thereto.

18. Indeed, even publicly available information relating to the structure and management of the group of entities to which SBIG and the Related Parties belong, namely, The Shaheen Business & Investment Group ("SBIG Group") provides initial support for these conclusions. Many of the Related Parties share common directors or engage in common business. Also, in several cases, the same email address was used to establish the unique corporate websites of specific Related Parties. Thus, it appears that the Related Parties are more accurately described as separate divisions of one entity than separate entities.

19. The evidence sought through the Application will be crucial to uncovering the amount and location of funds held abroad or otherwise transferred through the intermediary financial institutions. That is, by better understanding the flow of funds to or from offshore jurisdictions, the Applicant hopes to be able to comprehensively understand the scope of the Company's asset profile, and thereafter present this understanding to courts in Luxembourg and in other jurisdictions.

20. There is no expectation that any of the New York Banks from whom discovery is sought will be a party in the Luxembourg proceedings and, as such, this Application constitutes the only practical and timely method for obtaining the evidence needed for use there.

21. The evidence sought would be of material interest in furthering the proceedings in Luxembourg and would be admissible in those proceedings. I am otherwise unaware of any way it would otherwise circumvent any evidentiary restrictions in Luxembourg.

## 28 U.S.C. § 1746 VERIFICATION

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on (date): September 8, 2015

By: _____

Max Mailliet

# EXHIBIT 2

*Part I*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DATE FILED: 5/26/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 17 MISC 174

IN RE THE APPLICATION OF FRONTLINE
SHIPPING LIMITED,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

Civil Action No. 17-Misc.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____ 5/26/17
DATE FILED: _____

## [PROPOSED] ORDER GRANTING *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

This matter comes before the Court by an *ex parte* application for discovery pursuant to 28 U.S.C. § 1782 (the "Application") filed by Frontline Shipping Ltd. ("Frontline"). Having reviewed the Application, Frontline's Memorandum of Law, the Declaration of Christopher M. Walker, dated May 19, 2017 and exhibits thereto, and the Declaration of Michael J. Frevola, dated May 24, 2017, the Court is satisfied that the production of documentation is warranted pursuant to 28 U.S.C. § 1782, and the Court hereby ORDERS as follows:

1.     The Application is GRANTED

2.     Authorizing Frontline to issue and serve subpoenas on Bank of America N.A.; Bank of China; The Bank of NY Mellon; Barclays Bank PLC; BNP Paribas; Citibank N.A.; Commerzbank AG; Credit Agricole CIB; Deutsche Bank AG; HSBC Bank (USA) NA; JPMorgan Chase Bank, N.A.; Societe Generale; Standard Chartered Bank; UBS AG; and Wells Fargo Bank, N.A. (collectively, the "New York Banks"), for the production of the following documents:

A. Copies of any orders, instructions or wire transfers received from a payor/transferor bank to a payee/transferee bank for the benefit or credit of, or with any reference to Emirates Trading Agency L.L.C. a/k/a ETA Dubai, for the period April 24, 2012 to present.

B. Copies of any orders, instructions or wire transfers received from a payor/transferor bank to a payee/transferee bank for the benefit or credit of, or with any reference to any of the following Related Parties (as further described in Frontline's Memorandum of Law) for the period April 24, 2012 to present:

      i.    E.A.S.T. International Limited;

      ii.    ETA Ascon Group;

      iii.    ETA Ascon Star Group;

      iv.    ETA Ascon Holding L.L.C.;

      v.    ETA Ship Management Co. India Ltd.;

      vi.    West Asia Maritime Ltd.;

      vii.    Emirates Ports Services LLC;

      viii.    Associated Construction & Investments LLC;

      ix.    Star Maritime Pte. Ltd.;

      x.    National Shipping Company;

      xi.    Western Shipping and Trading Ltd.;

      xii.    Bustan International Pvt. Ltd.;

xiii.  Saudi ETA;

xiv.  United Shippers Limited;

xv.  USL Shipping DMCEST; and

xvi.  Pioneer Ship Management.

C.  For the period beginning April 24, 2012 to the present, identify any bank accounts in the name of and/or held beneficially for Emirates Trading Agency L.L.C. a/k/a ETA Dubai and the Related Parties, and provide the full records thereof, specifically including copies of present and historical account balance information, and records of incoming and outgoing payments.

D.  For the period beginning April 24, 2012 to the present, identify any accounts, loans, lines of credit or other funding arrangements to Emirates Trading Agency L.L.C. a/k/a ETA Dubai and the Related Parties.

3.  The New York Banks shall produce the documents requested in their respective subpoenas within twenty-one (21) days of service of the subpoena and as required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York.

4.  Until further Order by this Court, the New York Banks shall preserve documents and evidence, electronic or otherwise, in their possession, custody or control that contain information potentially relevant to the subject matter of Frontline's document request as listed in this Order.

#50904364_v1

3

5.    The Court shall retain jurisdiction over the matter for the purpose of enforcing this

Order and assessing any supplemental request for discovery assistance that may be requested by

Applicant.

6.    A copy of this Order shall be served with each discovery demand.

SO ORDERED

Dated: New York, New York

      May 2⟨·⟩, 2017

_____
UNITED STATES DISTRICT JUDGE *Part I*

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEP 05 2017

IN RE THE APPLICATION OF DS-RENDITE
FONDS NR. 108 VLCC ASHNA GMBH & CO.
TANKSCHIFF KG,

Civil Action No. 17-Misc. $\partial 7\omega$.

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

## [PROPOSED] ORDER GRANTING *EX PARTE* APPLICATION
## FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

This matter comes before the Court by an *ex parte* application for discovery pursuant to 28

U.S.C. § 1782 (the "Application") filed by DS-Rendite Fonds Nr. 108 VLCC Ashna GmbH & Co

Tankschiff KG ("DS-Rendite"). Having reviewed the Application, DS-Rendite's Memorandum

of Law, the Declaration of Daniel Jones, dated July 26, 2017 and exhibits thereto, and the

Declaration of Michael J. Frevola, dated July 26, 2017, the Court is satisfied that the production

of documentation is warranted pursuant to 28 U.S.C. § 1782, and the Court hereby ORDERS as

follows:

1.      The Application is GRANTED

2.      Authorizing DS-Rendite to issue and serve subpoenas on Bank of America N.A.;

Bank of China; The Bank of NY Mellon; Barclays Bank PLC; BNP Paribas; Citibank N.A.;

Commerzbank AG; Credit Agricole CIB; Deutsche Bank Trust Company Americas; HSBC Bank

(USA) NA; JPMorgan Chase Bank, N.A.; Societe Generale; Standard Chartered Bank; UBS AG;

and Wells Fargo Bank, N.A. (collectively, the "New York Banks"), for the production of the

following documents:

A. Copies of any orders, instructions or wire transfers received from a payor/transferor bank to a payee/transferee bank for the benefit or credit of, or with any reference to Essar Shipping Limited or Essar Shipping and Logistics Limited, for the period January 1, 2014 to present.

B. Copies of any orders, instructions or wire transfers received from a payor/transferor bank to a payee/transferee bank for the benefit or credit of, or with any reference to any of the following Related Parties (as further described in DS-Rendite's Memorandum of Law) for the period January 1, 2014 to present:

    i.    Energy Transportation International Limited;

    ii.    Essar Global Fund Ltd.

    iii.    Essar Ports & Shipping Mauritius Ltd.

    iv.    Essar Ports & Shipping HoldCO Ltd.

    v.    Essar Ports & Shipping Jersey Ltd.

    vi.    Essar Ports & Shipping Ltd.

    vii.    Energy II Ltd.

    viii.    Arkay Logistics Ltd.

    ix.    Essar Oilfields Services Ltd.

    x.    Essar Oilfields Services India Ltd.

    xi.    Essar Shipping DMCC

C. For the period beginning January 1, 2014 to the present, identify any bank accounts in the name of and/or held beneficially for Essar Shipping Limited, Essar Shipping and Logistics Limited, or the Related Parties, and provide the full records thereof,

#52741470_v1

2

specifically including copies of present and historical account balance information, and records of incoming and outgoing payments.

D. For the period beginning January 1, 2014 to the present, identify any accounts, loans, lines of credit or other funding arrangements to Essar Shipping Limited, Essar Shipping and Logistics Limited, or the Related Parties.

3.       The New York Banks shall produce the documents requested in their respective subpoenas within twenty-one (21) days of service of the subpoena and as required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York.

4.       Until further Order by this Court, the New York Banks shall preserve documents and evidence, electronic or otherwise, in their possession, custody or control that contain information potentially relevant to the subject matter of DS-Rendite's document request as listed in this Order.

5.       The Court shall retain jurisdiction over the matter for the purpose of enforcing this Order and assessing any supplemental request for discovery assistance that may be requested by Applicant.

6.       A copy of this Order shall be served with each discovery demand.

SO ORDERED

Dated: New York, New York

_____ , 2017

_____

UNITED STATES DISTRICT JUDGE

#52741470_v1

3

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-19-17

**17MISC 18**

IN RE THE APPLICATION OF NAVIG8
CHEMICALS POOL INC.,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

Civil Action No. 17-Misc. _____

### [PROPOSED] ORDER GRANTING *EX PARTE* APPLICATION
### FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

This matter comes before the Court by an *ex parte* application for discovery pursuant to 28

U.S.C. § 1782 (the "Application") filed by Navig8 Chemicals Pool Inc. ("Navig8"). Having

reviewed the Application and Navig'8 supporting memorandum, the declarations of Sarah Jane

Choudhry, dated January 18, 2017, and Michael J. Frevola, dated January 18, 2017, as well as the

exhibits thereto, the Court is satisfied that the production of documentation is warranted pursuant

to 28 U.S.C. § 1782, and the Court hereby ORDERS as follows:

    1.    The Application is GRANTED.

    2.    Authorizing Navig8 to issue and serve subpoenas on Bank of America N.A.; Bank

of China; Bank of NY Mellon; Barclays Bank PLC; BNP Paribas; Citibank N.A.; Commerzbank

AG; Credit Agricole CIB; Deutsche Bank AG; HSBC Bank (USA) NA; JPMorgan Chase Bank,

N.A.; Societe Generale; Standard Chartered Bank; UBS AG; and Wells Fargo Bank, N.A.

(collectively, the "New York Banks"), for the production of the following documents:

        A.    Copies of any orders, instructions or wire transfers received from a payor/transferor

            bank to a payee/transferee bank for the benefit or credit of, or with any reference to

            NuTek (HK) Pvt Ltd., for the period January 1, 2013 to present.

B.  Copies of any orders, instructions or wire transfers received from a payor/transferor bank to a payee/transferee bank for the benefit or credit of, or with any reference to any of the following entities or individuals that are related parties to Nu Tek (HK) Pvt. Ltd.:

  i.  Nu Tek India Limited;

  ii.  Inder Sharma, and

  iii.  Murugaiyan Karthikeyan

for the period January 1, 2013 to present.

C.  For the period beginning January 1, 2013 to the present, identify any bank accounts in the name of and/or held beneficially for Nu Tek (HK) Pvt. Ltd, Nu Tek India Limited, Inder Sharma, or Murugaiyan Karthikeyan, and provide the full records thereof, specifically including copies of present and historical account balance information, and records of incoming and outgoing payments.

D.  For the period beginning January 1, 2013 to the present, identify any accounts, loans, lines of credit or other funding arrangements to Nu Tek (HK) Pvt. Ltd, Nu Tek India Limited, Inder Sharma, or Murugaiyan Karthikeyan.

3.    The New York Banks shall produce the documents requested in their respective subpoenas within twenty-one (21) days of service of the subpoena and as required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York.

4.    Until further Order by this Court, the New York Banks shall preserve documents and evidence, electronic or otherwise, in their possession, custody or control that contain

#49297673_v1

information potentially relevant to the subject matter of the Navig8's document request as listed in this Order.

     5.     The Court shall retain jurisdiction over the matter for the purpose of enforcing this Order and assessing any supplemental request for discovery assistance that may be requested by Applicant. *This order is without prejudice to any*

*Objections to a motion to quash or modify any subpoena*

     6.     A copy of this Order shall be served with each discovery demand. *served pursuant to it.*

SO ORDERED

Dated: New York, New York
     January **19**, 2017

UNITED STATES DISTRICT JUDGE

#49297673_v1

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**15 MISC 0372**

IN RE APPLICATION OF

GAZPROMBANK OJSC

Case No. 15 Misc.

REQUEST FOR DISCOVERY PURSUANT TO 28
USC § 1782

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/8/15

### ORDER GRANTING *EX PARTE* APPLICATION
### FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

This matter comes before the Court by an *ex parte* application for discovery pursuant to

28 U.S.C. § 1782 (the "**Application**") by Gazprombank (Open Joint Stock Company) (the

"**Applicant**"). Having reviewed the Application, its supporting memorandum, the Declarations

of Warren E. Gluck, dated November 18, 2015 and Fernando Beltranena, dated November 13,

2015, as well as the exhibits thereto, the Court is satisfied that requested discovery is warranted

pursuant to 28 U.S.C. § 1782 and the Application is GRANTED. It is hereby ordered that:

1. The Applicant is authorized to issue and serve subpoenas on: (i) Citibank, N.A.; (ii) The

   Bank of New York Mellon Corporation; (iii) Société Générale; (iv) HSBC Bank USA,

   N.A.; (v) BNP Paribas USA; (vi) JPMorgan Chase Bank, N.A.; (vii) Deutsche Bank

   Trust Co. Americas; (viii) Credit Agricole CIB; (ix) Wells Fargo Bank, N.A.; (x) UBS

   AG; (xi) Bank of America, N.A.; (xii) Standard Chartered; (xiii) The Bank Of China;

   (xiv) Commerzbank AG; and (xv) Royal Bank of Scotland PLC (collectively, "**New**

   **York Banks**") for the production of the following documents: copies of all wire transfer

   records processed by the New York Banks, as intermediary banks, where Igor

   Vladimirovich Bitkov, Irina Vyacheslavovna Bitkova, Anastasia Igorevna Bitkova,

Vladimir Pavlovich Bitkov, Andres Adami, Maria Elena Garcia Palencia, MIRGIB
Investments S.A., Reiki S.A., IBIS Invest S.I.A., IBIS Investment; IBIS International;
Beckton Enterprises Limited; Intra-consultants Limited; Silvertown Services Limited;
BKT Service; Finca La Cruz; Lesmarket; North-West Timber Company; Nemansky Pulp
and Paper Mill; Igor Fernando Benitez Fernandez; Kamenogorsk Offset Paper Mill; and
PI & PM Limited is an originator, beneficiary, or is otherwise referenced in the wire
transfer, as well as documentation concerning accounts in the names of these entities, as
available for the period beginning October 24, 2007 to the present.

2. The Court shall retain jurisdiction over the matter for the purpose of enforcing this Order,
as appropriate, and assessing any supplemental request for discovery assistance by the
Applicant.

3. A copy of this Order shall be served with each discovery demand.

SO ORDERED.

Dated: New York, New York
       November 18, 2015

Victor Marrero
UNITED STATES DISTRICT JUDGE

2

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**15 MISC 285**

IN RE APPLICATION OF
FAULKNER USA INTERNATIONAL GROUP

REQUEST FOR DISCOVERY PURSUANT TO
28 USC § 1782

Case No. - 15 Misc. _____

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/11/2015

[~~PROPOSED~~] ORDER GRANTING *EX PARTE* APPLICATION
FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

This matter comes before the Court by an *ex parte* application for discovery pursuant to

28 U.S.C. § 1782 (the "**Application**") FaulknerUSA International Group, (the "Applicant")

("**Applicant**"). Having reviewed the Application, its supporting memorandum, the Declarations

of Warren E. Gluck, dated September 8, 2015 and Max Mailliet, dated September 8, 2015, as

well as the exhibits thereto, the Court is satisfied that requested discovery is warranted pursuant

to 28 U.S.C. § 1782 and the Application is GRANTED. It is hereby ordered that:

1. The Applicant is authorized to issue and serve subpoenas on

    (i) Citibank, N.A.; (ii) The Bank of New York Mellon Corporation; (iii) Société

    Générale; (iv) HSBC Bank USA, N.A.; (v) BNP Paribas USA; (vi) JPMorgan Chase

    Bank, N.A.; (vii) Deutsche Bank Trust Co. Americas; (viii) Credit Agricole CIB; (ix)

    Wells Fargo Bank, N.A.; (x) UBS AG; (xi) Bank of America, N.A.; (xii) Standard

    Chartered; (xiii) The Bank Of China; (xiv) Commerzbank AG; and (xv) Royal Bank of

    Scotland PLC (collectively, "**New York Banks**") for the production of the following

    documents: copies of all wire transfer records processed by the New York Banks, as

    intermediary banks, where Shaheen Business & Investment Group, Vantage Holdings

S.A., Infra Holdings S.A. Millenium for the Trade of Raw Materials and Mineral Oils,

Tharwa Investments, Four Winds Capital Management, Ocean Eight Inc., Ole Holdings

and Infrad (Mena) Limited, Khaled Shaheen, Reyad Shaheen, Menal Shaheen, or Ahed

Muhammed Sukhon, is an originator, beneficiary, or is otherwise referenced in the wire

transfer, as well as documentation concerning accounts in the names of these entities, as

available  for the period beginning January 1, 2007 to the present.

2. The Court shall retain jurisdiction over the matter for the purpose of enforcing this Order,

as appropriate, and assessing any supplemental request for discovery assistance by the

Applicant.

3. A copy of this Order shall be served with each discovery demand.

SO ORDERED.

Dated: New York, New York
  September  11, 2015

UNITED STATES DISTRICT JUDGE

2

937146220_v1

# EXHIBIT 7



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE THE APPLICATION OF
THE SWIFTHOLD FOUNDATION,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

Civil Action No. 15-Misc.

**[PROPOSED] ORDER GRANTING *EX PARTE* APPLICATION**
**FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

This matter comes before the Court by an *ex parte* application for discovery pursuant to

28 U.S.C. § 1782 (the "**Application**") filed by The Swifthold Foundation ("**Applicant**").

Having reviewed the Application, its supporting memorandum, the Declarations of James H.

Power, dated May 21, 2015 and Martin Stuart Caller, dated May 21, 2015, as well as the exhibits

thereto, the Court is satisfied , as a preliminary matter, that the requested discovery is warranted pursuant to 28 ~~that requested discovery is warranted pursuant to 28 U.S.C. § 1782~~

U.S.C. § 1782 and the Application is GRANTED. It is hereby ordered that:

1.  The Swifthold Foundation is authorized to issue and serve subpoenas on

    Bank of America N.A.; Barclays Bank PLC; BNP Paribas SA; Citibank N.A.;

    Commerzbank AG; Deutsche Bank Trust Co. Americas; HSBC Bank (USA)

    N.A.; JPMorgan Chase Bank, N.A.; Royal Bank of Scotland PLC; Societe

    Generale; Standard Chartered Bank; The Bank of NY Mellon; UBS AG; and

    Wells Fargo Bank, N.A. (the "**New York Banks**") for the production of the

    following documents:

        A. Copies of all wire transfer records processed by the New York

           Banks, as intermediary banks, where The Fast Trading Group,

commonly referred to as "Fast Trading" ("**Fast Trading**"); or Fast Trading and Contracting Company; or Fast Global Trading Group, is an originator, beneficiary, or is otherwise referenced in the wire transfer *for the period beginning January 1, 2008 to the present.*

B. Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where the beneficiary owner of Fast Trading, Sheikh Fahad bin Ahmad Bin Mohammed Al-Thani, a/k/a Fahad Ahmad Bin Mohammed Al-Thani; a/k/a Fadh Ahmad Al-Thani, is an originator, beneficiary, or is otherwise referenced in the wire transfer *for the period beginning January 1, 2008 to the present.*

C. Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where the alleged parent/holding company of Fast Trading, Inprogramme S.A., is an originator, beneficiary, or is otherwise referenced in the wire transfer *for the period beginning January 1, 2008 to the present.*

D. Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where the following entities and/or individuals who may be related to Fast Trading is an originator, beneficiary, or is otherwise referenced in the wire transfer *for the period beginning January 1, 2008 to the present*:

    i.    David Michael Doherty;

        ii.    Millville Limited;[1] and

        iii.   Dockhold Ltd.

2.     The Swifthold Foundation is authorized to issue and serve a subpoena on Cantor Insurance Group, LP, a subsidiary of Cantor Fitzgerald, for the production of all documents (to the extent they are not legally privileged documents) relating to any investigation Cantor Insurance Group, LP may have conducted on Fast Trading, Sheikh Fahad bin Ahmad Bin Mohammed Al-Thani, or any Fast Trading Group entity, as referenced in the letter addressed to John Owen of The Swifthold Foundation and dated July 6, 2009.

3.     The New York Banks and Cantor Insurance Group, LP shall produce the documents requested in their respective subpoenas within twenty-one (21) days of service of the subpoena and as required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York. If requested, the Applicant shall grant the New York Banks and Cantor Insurance Group, LP a reasonable extension of time.

4.     Until further Order by this Court, the New York Banks and Cantor Insurance Group, LP shall preserve documents and evidence, electronic or otherwise, in their possession, custody, or control that contain information potentially relevant to the subject matter of the Applicant's document requests as described in this Order.

---

[1] David Michael Doherty (of Ireland) is also listed as an officer for Millville Limited and Dockhold Ltd. in online publicly available data. https://opencorporates.com/officers/69092431 and https://opencorporates.com/companies/gb/03356392 (last visited on May 20, 2015), which is strong evidence that those entities are owned by Sheikh Fahad bin Ahmad Bin Mohammed Al-Thani and suitable entities to seek to add to an amended judgment.

3

A JN

before it. The Court is mindful of the fact that the state of foreign proceedings is often in flux and therefore reserves the right to revise this Order. If any subpoenaed party moves to quash, or otherwise objects to, this Order, determination of the appropriateness of this relief is subject to full reconsideration.

5. The Court shall retain jurisdiction over the matter for the purpose of enforcing this Order, as appropriate, and assessing any supplemental request for discovery assistance by The Swifthold Foundation.

6. A copy of this Order shall be served with each discovery demand.


SO ORDERED.

Dated: New York, New York
May 2015

PART I

UNITED STATES DISTRICT JUDGE


4

# EXHIBIT 8

Case 1:18-mc-00044-JGK-P Document 4-1 Filed 02/06/18 Page 34 of 372
Case 1:15-mc-00078-P Document 1-5 Filed 03/31/15 Page 1 of 9
Part 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**15 MISC 0078**

IN RE THE APPLICATION OF GAC MARINE
S.A, BRANCH OFFICE IN TURKMENISTAN,

REQUEST FOR DISCOVERY PURSUANT
TO 28 U.S.C. § 1782.

Civil Action No. 15-Misc. _____

DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/15

**[PROPOSED] ORDER GRANTING *EX PARTE* APPLICATION
FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

This matter comes before the Court by an *ex parte* application for discovery pursuant to

28 U.S.C. § 1782 (the "**Application**") filed by GAC Marine S.A, Branch Office in Turkmenistan

("**Applicant**"). Having reviewed the Application; its supporting memorandum, the Declarations

of Michael J. Frevola, dated March 23, 2015 and George Constantine Lambrou, dated March 19,

2015, as well as the exhibits thereto, the Court is satisfied that requested discovery is warranted

pursuant to 28 U.S.C. § 1782, and the Court hereby ORDERS as follows:

1.      The Application is GRANTED.

2.      Applicant is authorized to issue and serve subpoenas on Bank of America N.A.;

        Barclays Bank PLC; BNP Paribas SA; Citibank N.A.; Commerzbank AG;

        Deutsche Bank Trust Co. Americas; HSBC Bank (USA) N.A.; JPMorgan Chase

        Bank, N.A.; Royal Bank of Scotland PLC; Societe Generale; Standard Chartered

        Bank; The Bank of NY Mellon; UBS AG; and Wells Fargo Bank, N.A. (the "**New**

        **York Banks**") for the production of the following documents:

        A.      For the period beginning January 1, 2012 to the present, copies of all wire

                transfer records processed by the New York Banks, as intermediary or

correspondent banks, where any of the following entities that may be adverse to Applicant in the foreign proceedings (the **"Discovery Subjects"**) is an originator, beneficiary, or is otherwise referenced in the wire transfer:

  i)      Caspian Energy Projects LLC;

  ii)     United Shipbuilding Corporation OJSC;

  iii)    Rosshelf OJSC;

  iv)     Caspian Energy Management LLC;

  v)      Caspian Energy Group;

  vi)     Astrakhan Shipbuilding Production Association; and

  vii)    Crane Marine Contractor LLC.

B.     For the period beginning January 1, 2012 to the present, identify any bank accounts in the name of and/or held beneficially for any of the Discovery Subjects, and provide the full records thereof, specifically including copies of present and historical account balance information, and records of incoming and outgoing payments.

C.     For the period beginning January 1, 2012 to the present, identify any accounts, loans, lines of credit or other funding arrangements to any of the Discovery Subjects, and provide full records thereof.

2.     The New York Banks shall produce the documents requested in their respective subpoenas within twenty-one (21) days of service of the subpoena and as required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York.

3.    The New York Banks shall preserve documents and evidence, electronic or

otherwise, in their possession, custody, or control that contain information

potentially relevant to the subject matter of the Applicant's document request.

4.    The Court shall retaining jurisdiction over the matter for the purpose of

enforcement this Order, as appropriate, and assessing any supplemental request

for discovery assistance by Applicant.

5.    A copy of this Order shall be served with each discovery demand.


SO ORDERED.

Dated: New York, New York
       March 25, 2015

                                              _____
                                              UNITED STATES DISTRICT JUDGE


3

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

:

IN RE:                                                  :

                                                        :

APPLICATION OF HORNBEAM CORP.                           :

                                                        :

-------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 12/24/2014

14 Misc. 424 (Part 1)

<u>ORDER</u>

VERNON S. BRODERICK, United States District Judge:

     Hornbeam Corporation ("Hornbeam") applies *ex parte* for an Order pursuant to 28

U.S.C. § 1782 authorizing it to obtain discovery from banks and professional service providers

within the Southern District of New York for future use in foreign litigation. (Doc. 1.) For the

reasons stated below, Hornbeam's Application is GRANTED.

### I.    <u>Background</u>[1]

     In 2001, Vadim Shulman ("Shulman"), Igor Kolomoisky ("Kolomoisky"), and Genady

Bogolubov ("Bogolubov") entered into a joint venture to purchase a steel factory in Warren,

Ohio. (*See* Campanile Decl. ¶¶ 30-35, 48-54.)[2] They formed Warren Steel Holdings, LLC

("Warren Steel"), a Delaware entity, to own the factory. (*Id.* ¶ 36.) Their initial intention was to

dismantle the factory, move it to Ukraine, and resume its operations there, but in 2006, Shulman,

Kolomisky, and Bogolubov changed their plans and decided to resume operations at the plant in

Ohio rather than dismantle it. (*Id.* ¶¶ 48, 55-56.) To facilitate this endeavor, they incorporated

Halliwel Assets Inc. ("Halliwel"), a British Virgin Islands ("BVI") business company. (*Id.* ¶ 58.)

Halliwel is the sole member of Warren Steel. (*Id.*) In turn, Shulman, Kolomoisky, and

---

[1] The following is only a brief summary of background information to provide some context for this Order. I make no findings of fact.

[2] "Campanile Decl." refers to the Declaration of Fabrizio N. Campanile in Support of *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782. (Not filed on ECF.)

Bogolubov each ultimately own a one-third interest in Halliwel through intermediaries they control. (*Id.* ¶ 61.) Shulman is the ultimate beneficial owner of Hornbeam, which owns Shulman's one-third stake in Halliwel. (Shulman Decl. ¶ 1.)[3]

At some point, Shulman's relationship with Kolomisky became severely strained by a business dispute. (*Id.* ¶ 26; *see also* Campanile Decl. ¶¶ 122-27.) Shulman alleges that Kolomoisky and Bogolubov began to engage in self-dealing and breached the joint venture agreement by causing Warren Steel to accept loans secured by Warren Steel's assets and revenues from entities ("the Related Parties") controlled by Kolomoisky and Bogolubov and their allies. (*See* Campanile Decl. ¶¶ 9-16; Shulman Decl. ¶¶ 30-33.) In all instances, the same person—Mordecai Korf ("Korf"), the president of Warren Steel—executed the loan documents on behalf of both the lender, a Related Party, and the borrower, Warren Steel. (Campanile Decl. ¶ 13.) In short, Kolomisky and Bogolubov have allegedly taken control of Halliwel for their own purposes and endeavored to harm Shulman by saddling Warren Steel with debt and obtaining a priority security interest in its assets.

Hornbeam has previously initiated two actions in the BVI related to this dispute. First, in August 2014, Hornbeam sought an *ex parte* injunction against Halliwel and others to enjoin an extraordinary general meeting of Halliwel's shareholders at which a restructuring of Warren Steel's debt was expected to be approved. (Fay Decl. ¶¶ 8a-8d.)[4] The injunction was granted but then dismissed as moot when it was discovered that the restructuring had already been approved at another time. (*Id.* ¶¶ 8d-8e.) Second, in October 2014, Hornbeam applied for the appointment of a liquidator of Halliwel under the BVI Insolvency Act; the application was later

---

[3] "Shulman Decl." refers to the Declaration of Vadim Nathan Shulman in Support of *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782. (Doc. 3-1.)
[4] "Fay Decl." refers to the Declaration of Michael John Fay in Support of *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782. (Doc. 3-2.)

voluntarily withdrawn, due in part to a "lack of adequate disclosure regarding the underlying claims." (*Id.* ¶¶ 8g-8k.) Hornbeam now intends to initiate proceedings in the BVI based upon a cause of action under the BVI Business Companies Act for oppression of minority shareholders. (*See* Campanile Decl. ¶¶ 128-140; Fay Decl. ¶¶ 9-22.)

Hornbeam filed the instant *ex parte* Application on December 19, 2014. (Doc. 1.) Hornbeam requests that I authorize it to issue subpoenas to twelve banks—Bank of America N.A.; Bank of NY Mellon; BNP Paribas S.A.; Citibank N.A.; Commerzbank AG; Deutsche Bank AG; HSBC Bank (USA) NA; JP Morgan Chase Bank N.A.; Royal Bank of Scotland PLC; Standard Chartered Bank; UBS AG; Wells Fargo Bank, N.A. (collectively, the "New York Banks" or "Banks")—for the production of documents. Hornbeam's original request sought "[c]opies of any orders, instructions or wire transfers received from a payor/transferor bank to a payee/transferee bank for the benefit or credit of, or with any reference to": Warren Steel; Halliwel; the Related Parties; four individuals and entities that Hornbeam intends to sue in the BVI, including Kolomisky and Bogolubov; eight entities that Kolomisky, Bogolubov, and Korf allegedly use as conduits to invest money in the United States; and four entities allegedly involved with the initial purchase of the steel factory.[5] (Doc. 1 at 8-11.) The original request also sought "the full records" of any bank accounts belonging to most of the foregoing individuals and entities. (*Id.* at 10.) Hornbeam also wishes to subpoena White & Case LLP, KPMG LLC, and PricewaterhouseCoopers LLP (collectively, the "Professional Service Providers") for documents relating to the structure, valuation, and past transactions of the Related Parties and Warren Steel. (*Id.* at 11-12.)

After reviewing the materials in support of the Application, I ordered Hornbeam's

---

[5] With respect to most of these entities and individuals, Hornbeam sought records only for those transactions in which the Banks "acted as intermediary banks." (*See* Doc. 1 at 8-11.)

counsel to appear at a hearing on December 23, 2014 to discuss, inter alia, whether the requested discovery was unduly burdensome and whether there was a sufficient nexus between the underlying dispute and the entities from and about which discovery was requested. (*See* Doc. 4.) At the hearing, counsel explained that discovery was sought from the New York Banks only because they serve as intermediaries for wire transfers of funds from outside the United States to within the United States, and not because the subject individuals or entities were likely to maintain accounts at the Banks. Although counsel did not know which of the New York Banks had actually processed transactions for the subject individuals and entities, counsel stated, on the basis of his experience, that these were the Banks most likely to provide such services.[6]

Counsel represented that the New York Banks routinely receive and comply with similar subpoenas issued pursuant to 28 U.S.C. § 1782. In response to subpoenas containing similar language, the Banks have searched their electronic transaction databases for the relevant terms and have timely provided counsel with simple electronic spreadsheets listing basic information relating to any wire transfers that satisfy the search parameters. Counsel provided examples of subpoenas issued and spreadsheets produced in other cases for my inspection at the hearing. Counsel explained that similar spreadsheets would satisfy the substance of Hornbeam's discovery requests in this case.

I advised counsel at the hearing that I was not prepared to grant the Application at that time. I explained that Hornbeam's proposed order appeared to request many more documents with a broader scope than the spreadsheets that counsel represented would be satisfactory. I advised counsel to revise the language of Hornbeam's proposed order to describe more narrowly and more precisely the material that would satisfy the substance of its requests. *See Schmitz v.*

---

[6] Counsel also indicated that they did not include other banks that provide such services, such as Chinese banks, because they are not aware of any transactions involving China or its currency.

4

*Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79, 85 (2d Cir. 2004) (expressing a "preference for narrowly tailored discovery orders where possible," in lieu of the outright rejection of applications under § 1782). Shortly after the hearing, counsel provided me with a revised proposed order. The revised proposed order requests only "wire transfer record[s]" for transactions in which the New York Banks served as intermediaries, (Revised Proposed Order ¶¶ 2A-2F),[7] rather than requesting "[c]opies of any orders, instructions or wire transfers" pertaining to such transactions. The revised proposed order also omits any request for account information or records.

## II.    **Analysis**

I conduct the following analysis on the basis of the record currently before me, mindful that the state of the relevant foreign proceedings may be "continually in flux" and that I may need to revisit my rulings if "appropriate circumstances arise in the future." *Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6, 8 (2d Cir. 2014) (summary order). I also reserve the right to revise my conclusions if any subpoenaed party moves to quash the subpoena or vacate this Order and presents additional evidence bearing on the factors that inform my exercise of discretion.

When reviewing an application for discovery related to a foreign proceeding under 28 U.S.C. § 1782, I must first determine whether I have the authority to grant the request. I am authorized to grant a § 1782 request if: (1) the person from whom discovery is sought resides or is found in the district where the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or an "interested person." *Schmitz*, 376 F.3d at 83. The proceeding before a foreign or

---

[7] This document is not filed on ECF.

international tribunal need not be ongoing or imminent; a dispositive ruling must merely be within "reasonable contemplation."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004).

Based upon the papers submitted, the threshold requirements are satisfied here.  The Banks and Professional Service Providers from which Hornbeam seeks discovery are located within the Southern District of New York.  (*See* Doc. 3 ¶ 4.)  Hornbeam initiated two legal proceedings in the BVI related to the underlying dispute over Warren Steel, and it intends to initiate further proceedings once it obtains additional information.  The material Hornbeam seeks to discover is potentially critical to those proceedings because it is relevant to whether Kolomisky and Bogolubov controlled the Related Parties or provided the funds that the Related Parties loaned to Warren Steel.  Evidence that Kolomisky and Bogolubov controlled or funded the entities that obtained a security interest in Warren Steel's assets would "provide critical . . . support" to Hornbeam's anticipated claim that it has been oppressed and discriminated against as the minority shareholder in Halliwel.  (Fay Decl. ¶ 14.)  Hornbeam therefore seeks evidence for use in foreign proceedings in which a dispositive ruling is within reasonable contemplation.  *See In re Wilhelm*, 470 F. Supp. 2d 409, 411 (S.D.N.Y. 2007); *In re Servicio Pan Americano de Proceccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) ("Section 1782 may be invoked even where foreign legal proceedings are not even underway . . . .").  Finally, Hornbeam is plainly an interested person in the foreign proceedings it expects to initiate.

"[O]nce the statutory requirements are met, a district court is free to grant discovery in its discretion."  *In re Application for an Order Permitting Metallgesellschaft AG To Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997).  To determine whether to exercise my discretion to grant the request, I must consider four factors:  (1) whether the person from whom discovery is

sought is not a participant in the foreign proceeding and is therefore outside the foreign tribunal's
jurisdictional reach; (2) the nature of the foreign tribunal and its receptivity to judicial assistance
by U.S. federal courts; (3) whether the request conceals an attempt to circumvent foreign
evidence-gathering rules; and (4) whether the request is unduly intrusive or burdensome. *See
Intel*, 542 U.S. at 264-65; *Mare Shipping*, 574 F. App'x at 8.

First, the New York Banks and Professional Services Providers are not expected to be
parties to any future BVI litigation. Especially in light of the BVI's relatively restrictive
discovery practices, which are largely limited to obtaining documents from parties to the
litigation, (*see* Fay Decl. ¶¶ 25-27), there is no reason to believe that documents in the possession
of the New York Banks or Professional Service Providers would be within the jurisdictional
reach of the BVI courts. *In re Application of OOO Promnefstroy for an Order To Conduct
Discovery for Use in a Foreign Proceeding*, Misc. No. 19-99, 2009 WL 3335608, at *5
(S.D.N.Y. Oct. 15, 2009). This factor weighs in favor of granting Hornbeam's Application. *See
Intel*, 542 U.S. at 264.

Second, Hornbeam has provided the declaration of a respected practitioner of BVI law
that there is no legal barrier to the use of documents obtained under 28 U.S.C. § 1782 in BVI
proceedings. (Fay Decl. ¶ 28.) Hornbeam need not "affirmatively show" that the BVI courts are
receptive to U.S. judicial assistance; the burden is on the opponent of a § 1782 request to prove
that the foreign court would reject the evidence obtained through § 1782. *OOO Promnefstroy*,
2009 WL 3335608, at *7. The BVI courts are at least not obviously unreceptive to my
assistance. *Cf. In re Microsoft Corp.*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006) (relying on
foreign tribunal's express objection to conclude that it was not receptive to the assistance of the
U.S. federal courts). Under these circumstances, I should err on the side of permitting the

requested discovery.  *See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100-01 (2d Cir. 1995).

Third, Hornbeam's request does not conceal an attempt to circumvent foreign evidence-gathering rules.  As an initial matter, nothing is "conceal[ed]"; Hornbeam is forthright that BVI discovery rules, like most countries', are less permissive than those in the United States.  (*See* Fay Decl. ¶¶ 25-27.)  In any event, there is no requirement under § 1782 that the requested material be discoverable under the rules governing the litigation in the foreign jurisdiction.  *See Intel*, 542 U.S. at 261; *Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 98 (2d Cir. 2009) (summary order).  Because there is no reason to believe that Hornbeam's effort to obtain materials not discoverable in the BVI through § 1782 would undermine "principles of comity" or "cooperation" with the BVI, this factor weighs in favor of—or at least not against—granting Hornbeam's Application.  *See In re Microsoft*, 428 F. Supp. 2d at 196.

Fourth, I conclude that the discovery Hornbeam seeks is not unduly intrusive or burdensome.  Although I was initially concerned that Hornbeam's requests to the New York Banks were significantly overbroad, counsel provided assurances and examples of the Banks' routine compliance with previous similar requests.  Counsel then narrowed Hornbeam's requests to exclude unnecessary "orders" and "instructions" pertaining to wire transfers and irrelevant account information.  Therefore, I am persuaded that the wire transfer spreadsheets Hornbeam seeks from the New York Banks are a "specific, discrete set of documents that are easily identifiable."  *In re Berlamont*, No. 14-mc-00190, 2014 WL 3893953, at *2 (S.D.N.Y. Aug. 4, 2014).  I may also weigh the probative value of the requested materials in considering whether the requests are unduly burdensome.  *See In re Application Pursuant to 28 U.S.C. Section 1782 of Okean B.V. & Logistic Solution Int'l To Take Discovery of Chadbourne & Parke LLP*, --- F.

Supp. 3d ----, 2014 WL 5090028, at *9, *13 (S.D.N.Y. 2014). The requested documents may be highly probative because they may establish that Kolomisky and/or Bogolubov controlled or funded the Related Parties that allegedly obtained a security interest in Warren Steel's assets. Finally, although requests for privileged material may be unduly intrusive, and § 1782 "expressly shields privileged material," *In re Microsoft*, 428 F. Supp. 2d at 196, Hornbeam's requests to the Professional Service Providers expressly exclude privileged documents. For these reasons, on the basis of the existing record, I conclude that Hornbeam's requests are not unduly intrusive or burdensome.

Because all of the factors guiding my exercise of discretion weigh in favor of granting Hornbeam's Application, I choose to do so.

### III.    Operative Provisions of the Order

For the foregoing reasons, Hornbeam's *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782, (Doc. 1), is GRANTED. It is hereby ordered that:

1.    Hornbeam Corporation is authorized to issue and serve subpoenas on Bank of America N.A., Bank of NY Mellon, BNP Paribas SA, Citibank N.A., Commerzbank AG, Deutsche Bank AG, HSBC Bank (USA) NA, JPMorgan Chase Bank N.A., Royal Bank of Scotland PLC, Standard Chartered Bank, UBS AG, and Wells Fargo Bank, N.A. (collectively, the "**New York Banks**") for the production of the following documents:

    A.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where Warren Steel Holdings LLC, commonly referred to as "Warren Steel" ("**Warren Steel**"), is an originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>.

    B.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where Halliwel Assets Inc., commonly referred to as "Halliwel" ("**Halliwel**"), is an originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>.

    C.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where any of the following entities and/or individuals that allegedly have provided loans to Warren Steel (the "**Related Parties**") is an

originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>:

      i.    Divot Enterprises Limited;
     ii.    5251 36th Street LLC;
    iii.    CC Metal and Alloys LLC;
    iv.    Felman Trading, Inc.;
     v.    Mordechai Korf, also Motti Korf;
    vi.    Optima Acquisitions, LLC;
   vii.    Optima Fixed Income LLC;
  viii.    Optima Group LLC;
    ix.    Optima International of Miami, Inc.;
     x.    Optima Ventures, LLC;
    xi.    Querella Holdings Limited; or
   xii.    Felman Production, LLC.

D.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where any of the following entities and/or individuals that allegedly will be adverse to Hornbeam in the contemplated foreign proceedings is an originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>:

      i.    A Marigold Trust Company Limited;
     ii.    Panikos Symeou;
    iii.    Igor Kolomoisky, a/k/a Igor Kolomoiskiy; or
    iv.    Genady Bogolubov, a/k/a Gennadiy Bogolyubov.

E.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where any of the following entities and/or individuals that allegedly are used by Kolomoisky and/or Bogolubov and/or Korf as conduits to invest money in the United States is an originator, beneficiary, or is otherwise referenced in the wire transfer <u>for the period beginning January 1, 2006 to the present</u>:

      i.    Georgian American Alloys, Inc.;
     ii.    Privat Intertrading a/k/a ZAO Privat Intertrading;
    iii.    Privat Group;
    iv.    Haftseek Investments Ltd.;
     v.    GM Georgian Manganese Holdings Ltd.;
    vi.    Georgian Manganese, LLC;
   vii.    Optima Industrial Management, LLC; or
  viii.    Vartsikhe 2005, LLC

F.    Copies of all wire transfer records processed by the New York Banks, as intermediary banks, where any of the following entities and/or individuals that were associated with the original purchase of the steel factory currently operated

by Warren Steel is an originator, beneficiary, or is otherwise referenced in the
wire transfer <u>for the period beginning January 1, 2001 to the present</u>:

      i.     Akiva Sapir;
     ii.    Plama Limited;
    iii.    Instrad Limited; or
    iv.    CSC Ltd.

2.     Hornbeam Corporation is authorized to issue and serve subpoenas on White & Case LLP,
KPMG LLC, and PricewaterhouseCoopers LLP (collectively, the "**Professional Service
Providers**"), for the production of the following, to the extent they are not legally
privileged documents:

A.    Each Related Party's Articles of Incorporation and By Laws, including any
amendments thereto, as well as all Documents and Communications concerning
the same.

B.    Any Corporate Resolutions, Minutes, Due Diligence Reports or other materials
concerning any loan or line of credit extended to Warren Steel from January 1,
2006 to the present.

C.    Each Related Party's Corporate Organization Chart, as well as all Documents and
Communications concerning the same.

D.    All Documents and Communications, concerning any transaction, loan,
agreement, contract, invoice or understanding with Warren Steel from January 1,
2006 to the present.

E.    All Documents and Communications, concerning any transaction, loan,
agreement, contract, invoice or understanding with a Related Party from January
1, 2006 to the present.

F.    All Documents and Communications concerning all loans and credit transactions
to which Warren Steel is a party from January 1, 2006 to the present.

G.    All Documents and Communications concerning all loans and credit transactions
to which any of the Related Party is a party from January 1, 2006 to the present.

H.    Documents and Communications that are or are concerning internal or external
valuations, appraisals, liquidation analyses, fairness or solvency opinions, or other
documents concerning the value of the liabilities of Warren Steel from January 1,
2006 to the present.

I.    Documents and Communications that are or are concerning internal or external
valuations, appraisals, liquidation analyses, fairness or solvency opinions, or other

documents concerning the value of the liabilities of any of the Related Parties from January 1, 2006 to the present.

      J.      Communications concerning, referencing, describing, discussing, from or to (including carbon copies and blind carbon copies) Warren Steel from January 1, 2006 to the present.

3.      The New York Banks and the Professional Service Providers shall produce the documents requested in their respective subpoenas within twenty-one (21) days of service of the subpoena and as required under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York.

4.      Until further Order by this Court, the New York Banks and the Professional Service Providers shall preserve documents and evidence, electronic or otherwise, in their possession, custody, or control that contain information potentially relevant to the subject matter of Hornbeam's document request as described in this Order.

5.      The Court shall retain jurisdiction over the matter for the purpose of enforcing this Order, as appropriate, and assessing any supplemental request for discovery assistance by Hornbeam.

6.      A copy of this Order shall be served with each discovery demand.

SO ORDERED.

Dated:      December 24, 2014
              New York, New York

Vernon S. Broderick
United States District Judge

# EXHIBIT 10

16-12925-scc    Doc 27    Filed 11/23/16    Entered 11/23/16 09:38:29    Main Document

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re:

PLATINUM PARTNERS VALUE
ARBITRAGE FUND L.P. (IN
PROVISIONAL LIQUIDATION),[1] *et al.*,

Debtors in
Foreign Proceedings.

-----------------------------------------------------------x

: Chapter 15
:
:
: Case No. 16-12925 (SCC)
:
: (Jointly Administered)
:
:
:
:
:

## ORDER GRANTING RECOGNITION AND RELIEF IN AID OF A FOREIGN MAIN PROCEEDING PURSUANT TO SECTIONS 1504, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE

Matthew James Wright and Christopher Barnett Kennedy, duly appointed joint official liquidators ("**Petitioners**" or "**Liquidators**") of Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) ("**Master Fund**") and the duly appointed joint official liquidators of Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) ("**International Fund**" and together with Master Fund, the "**Funds**"), both Funds in liquidation by way of the Financial Services Division of the Grand Court of the Cayman Islands (the "**Grand Court**") (cause nos. FSD 131 of 2016 (AJJ) (Master Fund) and 118 of 2016 (AJJ) (International Fund)) as a result of the Grand Court's orders (the "**Liquidation Orders**") made pursuant to petitions for the winding up of the Funds under, as applicable, sections 92 and 104 of the Companies Law of the Cayman Islands (2016 Revision) (the "**Companies Law**") and section

---

[1] The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, follow in parentheses: Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) (1954) and Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) (2356).  The registered office of the International Fund is c/o The R&H Trust Co. Ltd., Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman KY1-1103, Cayman Islands. The Master Fund's registered address is c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands.

36 of the Exempted Limited Partnership Law, 2014 ("**ELP Law**") (collectively, the "**Cayman Liquidations**"), by its United States counsel, Holland & Knight LLP, filed Official Form Petitions, the *Verified Petition for Recognition of Foreign Insolvency Proceedings and Application for Additional Relief, Pursuant to Sections 1504, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "**Verified Petition**,"[2] and, together with the Official Form Petitions, the "**Petition**"), and the accompanying Kennedy Declaration, Leontsinis Declaration, and Gluck Declaration, seeking relief pursuant to chapter 15 of the Bankruptcy Code; and upon due consideration of the Petition, Kennedy Declaration, Leontsinis Declaration and the Gluck Declaration, together with all exhibits thereto, in support of the Petition, and hearing no objections thereto, and a hearing having been held on November 21, 2016 the evidence put on the record at the Hearing; and appropriate and timely notice of the filing of the Petition and the Hearing thereon having been given by the Liquidators, pursuant to section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all purposes; and having been updated pursuant to Section 1518 of the Bankruptcy Code, and no other or further notice being necessary or required; and no objections or other responses having been filed that have not been overruled, withdrawn or otherwise resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court makes the following findings of fact and conclusions of law:

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated February 1, 2012.

---

[2] Capitalized terms used, but not otherwise defined herein shall have the meanings given to them in the Verified Petition.

B.      Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410 (2) because there is an action pending against the Funds within this judicial district, and the Court may enter a final order consistent with Article III of the United States Constitution.

C.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

D.      The Liquidators are the "foreign representatives" of the Funds pursuant to 11 U.S.C. § 101(24).

E.      The chapter 15 cases of the Funds were properly commenced pursuant to 11 U.S.C. §§ 1504, 1509 and 1515.

F.      The Liquidators have satisfied the requirements of 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

G.      The Cayman Liquidations are "foreign proceedings" pursuant to 11 U.S.C. § 101(23).

H.      The Cayman Liquidations are entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

I.       The Cayman Liquidations are pending in the Cayman Islands, the country where the Funds' center of main interests is located, and accordingly the Cayman Liquidations are foreign main proceedings pursuant to 11 U.S.C. § 1502(4), and are entitled to recognition as foreign main proceedings pursuant to 11 U.S.C. § 1517(b)(1).

J.      The Liquidators are entitled to all of the relief provided under 11 U.S.C. § 1520 and 1521 without limitation.

K.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to 11 U.S.C. §§ 1507, 1517, 1520 and 1521.

3

Case 1:18-mc-00044-JGK   Document 1-1   Filed 02/06/18   Page 54 of 372

**NOW, THEREFORE, IT IS HEREBY**

1.      **ORDERED**, that the Petition is granted as set forth herein;

2.      **ORDERED**, that the Cayman Liquidations are recognized as foreign main proceedings pursuant to 11 U.S.C. §§ 1517(a) and (b)(1);

3.      **ORDERED**, that all persons and entities (other than the Liquidators and their expressly authorized representatives and agents) are hereby enjoined, except as provided in 11 U.S.C. §§ 555 through 557, 559 through 562, 1520 and 1521 or as modified herein, from:

(1)      executing against the Funds' property or assets;

(2)      taking or continuing any act to obtain possession of, or exercise control over, the Liquidators (with respect to the Funds), the Funds, or any of the Funds' property or assets;

(3)      taking or continuing any act to create, perfect or enforce a lien or other security interest, set-off or other claim against the Liquidators (with respect to the Funds), the Funds or any of the Funds' property or assets as of the date of the filing of the Petition, or otherwise seeking the issuance of or issuing any restraining notice or other process or encumbrance with respect to the Funds or any of the Funds' property or assets; and

(4)      transferring, relinquishing or disposing of any property of the Funds to any person or entity other than the Liquidators;

and it is further

4.      **ORDERED**, that 11 U.S.C. § 1520(a) shall be effective with respect to the Cayman Liquidations; and it is further

5.      **ORDERED**, that 11 U.S.C. § 1521(a)(1-3) shall be effective with respect to the Cayman Liquidations and/or the stay, as provided for by Section 97(1) of the Companies Law, shall be effective in the United States of America pursuant to 11 U.S.C. § 1507; and it is further

6.      **ORDERED**, that the Liquidators or any third person acting pursuant to the Liquidators' instructions or agreement may transfer funds or property belonging to the Funds

4

into or out of the United States of America in accordance with their respective obligations to the Funds or under the Cayman Liquidations; and it is further

7.    **ORDERED**, that the Liquidators are hereby authorized to examine witnesses, take evidence, and seek the production of documents within the territorial jurisdiction of the United States concerning the assets, affairs, rights, obligations or liabilities of the Funds, the Funds affiliates and the Funds' subsidiaries by:

   a.  issuing discovery requests to intermediary banks that process U.S. dollar-denominated wire transfers and maintain records of such transfers;

   b.  upon written request, obtaining turnover of any and all documents, records, filings, or other information, however stored, including but not limited to emails that are property of, concern or were made or issued on behalf of the Funds, from any person or entity subject to this Court's jurisdiction; and

   c.  upon service of this order, prohibiting all persons and entities subject to the jurisdiction of this Court from destroying, secreting, altering, deleting or otherwise disposing of any electronic data, documents, records, filings, or other information, however stored, concerning or relating to the assets, affairs, rights, obligations or liabilities of the Funds; and it is further

8.    **ORDERED**, that the Liquidators are authorized to operate the business of the Funds that is the subject of Cayman Liquidations and may exercise the powers of a trustee under and to the extent provided by 11 U.S.C. §§ 1520 and 1521; and it is further

9.    **ORDERED**, that the Liquidators are hereby granted authority to assert claims of the Funds against parties that are subject to jurisdiction in the United States of America; and it is further

10.    **ORDERED**, that the administration or realization of all or part of the assets of the Funds within the territorial jurisdiction of the United States of America is hereby entrusted to the Liquidators and the Liquidators are hereby established as the exclusive representatives of the Funds in the United States of America; and it is further

Case 1:18-mc-02944-JGK Document 1-1 Filed 02/06/18 Page 56 of 372

11.     **ORDERED**, that this Court retains jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through these chapter 15 cases, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court; and it is further

12.     **ORDERED**, that, notwithstanding Bankruptcy Rule 7062, made applicable to these chapter 15 cases by Bankruptcy Rule 1018, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and upon its entry, this Order shall become final and appealable.

Dated:

November 22, 2016
New York, New York

/S/ Shelley C. Chapman
Honorable Shelley C. Chapman
United States Bankruptcy Judge

# EXHIBIT 11

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                             :    Chapter 15

In re:                                 :

                                    :    Case No. 15- 13252 (SMB)

NITON FUND SPC,                  :

                                    :

                   Debtor in a       :

                   Foreign Proceeding.  :

                                    :

-------------------------------------------------------x

### ORDER GRANTING RECOGNITION AND RELIEF IN AID OF A FOREIGN MAIN PROCEEDING PURSUANT TO 11 U.S.C. §§ 105(a), 1504, 1507, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE

Matthew James Wright and Christopher Barnett Kennedy, duly appointed joint official liquidators and foreign representatives ("**Petitioners**" or "**Liquidators**") of Niton Fund SPC ("**Niton**") for and on behalf of the Short Term Shipping Fund Segregated Portfolio (the "**Short Term Fund**"), a company in liquidation under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Cayman Court**"), case no. FSD 0117/2015 (NRLC) (the "**Cayman Liquidation**"), pursuant to section 124 of the Cayman Islands Companies Law (2013 Revision) (the "**Cayman Companies Law**") by its undersigned United States counsel, Holland & Knight LLP, filed an Official Form Petition, this Verified Petition (together, the "**Petition**"), the accompanying Declaration of Matthew James Wright executed on December 1, 2015 (the "**Wright Declaration**"), the Declaration of Stephen Leontsinis, executed on November 16, 2015 (the "**Leontsinis Declaration**"), and the Declaration of Warren E. Gluck, executed on December 3, 2015 (the "**Gluck Declaration**"), seeking relief pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**").

Upon due consideration of the Petition, Wright Declaration, Leontsinis Declaration and the Gluck Declaration, together with all exhibits thereto, in support of the Petition, and a hearing

having been held on January 12, 2015 the evidence put on the record at the Hearing; and appropriate and timely notice of the filing of the Petition and the Hearing thereon having been given by the Liquidators, pursuant to section 1514 of the Bankruptcy Code and Rule 2002 of the Federal Rules of Bankruptcy Procedure; and such notice having been adequate and sufficient for all purposes; and no other or further notice being necessary or required; and no objections or other responses having been filed that have not been overruled, withdrawn or otherwise resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court makes the following findings of fact and conclusions of law:

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501.

B.      Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410 (3) because Niton has property in the United States and within this judicial district.

C.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

D.      The Liquidators are the "foreign representatives" of Niton pursuant to 11 U.S.C. § 101(24).

E.      This chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504, 1509 and 1515.

F.      The Liquidators have satisfied the requirements of 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

G.      The Cayman Liquidation is a "foreign proceeding" pursuant to 11 U.S.C. § 101(23).

H.      The Cayman Liquidation is entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

I.      The Cayman Liquidation is pending in the Cayman Islands, the country where Niton's center of main interests is located, and accordingly the Cayman Liquidation is a foreign main proceeding pursuant to 11 U.S.C. § 1502(4), and is entitled to recognition as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1).

J.      The Liquidators are entitled to all of the relief provided under 11 U.S.C. § 1520 without limitation.

K.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to 11 U.S.C. §§ 1507, 1517, 1520, and 1521.

**NOW, THEREFORE, IT IS HEREBY**

1.      **ORDERED**, that the Cayman Liquidation is recognized as a foreign main proceeding pursuant to 11 U.S.C. §§ 1517(a) and (b)(1);

2.      **ORDERED**, that 11 U.S.C. § 1520(a) shall be effective with respect to the Cayman Liquidation; and it is further

3.      ~~**ORDERED**, that 11 U.S.C. § 1521(a)(1-4) shall be effective with respect to the Cayman Liquidation and/or the stay, as provided for by Section 97(1) of the Companies Law, shall be effective in the United States pursuant to 11 U.S.C. § 1507; and it is further~~**[SMB: 1/13/16]**

4.      **ORDERED**, that **pursuant to 11 U.S.C. § 1521(a)(4),** the Liquidators are hereby authorized to examine witnesses, take evidence, and seek the production of documents within the territorial jurisdiction of the United States concerning the assets, affairs, rights, obligations or liabilities of Niton by: **[SMB: 1/13/16]**

a.  issuing discovery requests to intermediary banks that process U.S. dollar-denominated wire transfers and maintain records of such transfers with respect to the Discovery Subjects (defined in the Petition) so as to ascertain information concerning Niton's assets and transactions prior to the commencement of the Cayman Liquidation and critical information concerning Niton's claims against third parties

b.  upon written request served by Niton, through its counsel Holland & Knight LLP, obtaining turnover of any and all documents, records, filings, or other information, however stored, including but not limited to emails, from any person or entity subject to this Court's jurisdiction, including but not limited to the Discovery Subjects; and

c.  upon service of this order ~~upon~~ by Niton, through its counsel Holland & Knight LLP, all persons and entities subject to the jurisdiction of this Court **are prohibited** from destroying, secreting, altering, deleting or otherwise disposing of any electronic data, documents, records, filings, or other information, however stored, concerning or relating to the assets, affairs, rights, obligations or liabilities of Niton ; and it is further **[SMB: 1/13/16]**

5.  **ORDERED**, that the Liquidators are hereby granted authority to assert claims of Niton against parties that are subject to jurisdiction in the United States.

6.  **ORDERED**, that **pursuant to 11 U.S.C. § 1521(a)(5),** the administration or realization of all or part of the assets of Niton within the territorial jurisdiction of the United States is hereby entrusted to the Liquidators and the Liquidators are hereby established as the exclusive representatives of Niton in the United States; and it is further**[SMB: 1/13/16]**

7.      **ORDERED**, that this Court retains jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court; and it is further

8.      **ORDERED**, that a copy of this Order shall be served by overnight courier or by hand delivery upon the U.S. Trustee **and all known creditors within the territorial jurisdiction of the U.S.**; and it is further **[SMB: 1/13/16]**

9.      **ORDERED**, that such service shall be good and sufficient service and adequate notice for all purposes.

**Dated:** New York, New York

**January** 13th**, 2016**

                                        **/s/ STUART M. BERNSTEIN**
                                        **United States Bankruptcy Judge**
                                        **Southern District of New York**

# EXHIBIT 12

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                        :      Chapter 15
In re:                                  :
                                        :      Case No. 15-11352 (SCC)
LAWNDALE GROUP S.A.,                    :
                                        :
              Debtor in a               :
              Foreign Proceeding.       :
                                        :
                                        :
---------------------------------------------------------x

### ORDER GRANTING RECOGNITION AND RELIEF IN AID OF A FOREIGN MAIN PROCEEDING PURSUANT TO 11 U.S.C. §§ 105(a), 1504, 1507, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE

1.      A hearing having been held before the United States Bankruptcy Court of the Southern District of New York on July 6, 2015 (the "**Hearing**"), to consider the Verified Petition and Official Form Petition (collectively, with all exhibits thereto, the "**Petition**") of John David Ayres, the duly appointed liquidator and foreign representative ("**Petitioner**" or "**Liquidator**") of Lawndale Group S.A. ("**Lawndale**" or the "**Foreign Debtor**"), a company undergoing liquidation before the Commercial Division of the High Court of Justice, British Virgin Islands (the "**BVI Court**"), claim number 2013/0165 (the "**BVI Liquidation**"), pursuant to the Insolvency Act of 2003 of the British Virgin Islands (the "**2003 Act**"), for entry of an Order pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"): (i) recognizing the BVI Liquidation of Lawndale as a foreign main proceeding, or in the alternative, a foreign non-main proceeding, pursuant to chapter 15 of the Bankruptcy Code, and the Petitioner as Lawndale's foreign representative under sections 1509 and 1517 of the Bankruptcy Code; (ii) granting automatic relief pursuant to section 1520 of the Bankruptcy Code; (iii) granting other and additional relief pursuant to Sections 1507 and 1521(a)

and (b) of the Bankruptcy Code, including authorizing Petitioner to examine witnesses, take evidence, and seek the production of documents concerning the assets, affairs, rights, obligations or liabilities of Lawndale; and (iv) granting authority to assert claims against parties that are subject to jurisdiction in the United States, including but not limited to claims predicated upon schemes to commit fraudulent conveyances, alter ego, or veil-piercing claims; and upon the Court's review and consideration of the Petition, and the accompanying Declarations of John Ayres, executed on May 19, 2015 (the "**Ayres Declaration**"), the Declaration of Robert Christie, executed on May 18, 2015 (the "**Christie Declaration**"), and the Declaration of Michael J. Frevola, executed on May 21, 2015 (the "**Frevola Declaration**"), together with all exhibits thereto, in support of the Petition, and the evidence put on the record at the Hearing; and appropriate and timely notice of the filing of the Petition and the hearing thereon having been given by the Petitioner, pursuant to section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all purposes; and no other or further notice being necessary or required; and no objections or other responses having been filed; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court makes the following findings of fact and conclusions of law:

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501.

B.    Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410 (3) because Lawndale has property in the United States and within this judicial district.

C.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

D.    Petitioner is the "foreign representative" of Lawndale pursuant to 11 U.S.C. § 101(24).

Case 1:18-mc-00041-LGK    Document 4-1    Filed 02/06/18    Page 66 of 372

E.      This chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504, 1509, and 1515.

F.      Petitioner has satisfied the requirements of 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

G.      The BVI Liquidation is a "foreign proceeding" pursuant to 11 U.S.C. § 101(23).

H.      The BVI Liquidation is entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

I.      The BVI Liquidation is pending in the British Virgin Islands, the country where Lawndale's center of main interests is located, and accordingly the BVI Liquidation is a "foreign main proceeding" pursuant to 11 U.S.C. § 1502(4), and is entitled to recognition as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1).

J.      The Liquidator is entitled to all the relief provided pursuant to 11 U.S.C. 1520, without limitation.

K.      The Liquidator is entitled to all the relief pursuant to 11 U.S.C. §1521 ordered by this Court.

L.      The Liquidator is entitled to relief pursuant to 11 U.S.C. §§ 1507 and 1521, as ordered by this Court.

M.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to 11 U.S.C. §§ 1507, 1517, 1520, and 1521.

**NOW, THEREFORE, IT IS HEREBY**

1.    **ORDERED**, that the BVI Liquidation is granted recognition pursuant to 11 U.S.C. § 1517(a); and it is further

2.    **ORDERED**, that the BVI Liquidation is hereby recognized as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1); and it is further

3.    **ORDERED**, that all persons and entities (other than Petitioner or his expressly authorized representatives and agents) are hereby enjoined, except as provided in 11 U.S.C. §§ 555 through 557, 559 through 562, 1520 and 1521 or as modified herein, from:

(1)    executing against Lawndale's property or assets within the territorial jurisdiction of the United States;

(2)    taking or continuing any act to obtain possession of, or exercise control over, Petitioner (with respect to Lawndale), Lawndale or any of its property or assets within the territorial jurisdiction of the United;

(3)    taking or continuing any act to create, perfect or enforce a lien or other security interest, set-off or other claim against Petitioner (with respect to Lawndale), Lawndale or any of its property or assets within the territorial jurisdiction of the United States as of the date of the filing of the Petition, or otherwise seeking the issuance of or issuing any restraining notice or other process or encumbrance with respect to Lawndale or any of its property or assets;

(4)    transferring, relinquishing or disposing of any property of Lawndale to any person or entity other than Petitioner;

and it is further

4.    **ORDERED**, that 11 U.S.C. § 1520(a) shall be effective with respect to the BVI Liquidation; and it is further

5.    **ORDERED** that Petitioner or any third person acting pursuant to Petitioner's instructions or agreement may transfer funds or property belonging to Lawndale into or out of the United States in accordance with their respective obligations to Lawndale or under the BVI Liquidation; and it is further

4

6.      **ORDERED**, that Petitioner is authorized to operate the business of Lawndale that is the subject of BVI Liquidation and may exercise the powers of a trustee under and to the extent provided by 11 U.S.C. §§ 1520 and 1521; and it is further

7.      **ORDERED**, that Petitioner is hereby authorized to examine witnesses, take evidence, and seek the production of documents concerning the assets, affairs, rights, obligations or liabilities of Lawndale by:

a.  issuing discovery requests regarding the affairs of Lawndale, the United States Counterparties (as defined in the Petition), and the Related Persons and Entities (as defined in the Petition), as all such information is required in the BVI Liquidation;

b.  issuing discovery requests to intermediary or correspondent banks located in the Southern District of New York that process United States Dollar wire transfers and maintain records of such transfers to ascertain the location and movement of Lawndale's assets prior to and immediately after the commencement of the BVI Liquidation;

c.  Upon written request served by the Foreign Debtor, through its counsel Holland & Knight LLP, obtaining turnover of any and all documents, records, filings, or other information belonging to Lawndale, however stored, including but not limited to emails, from any person or entity subject to this Court's jurisdiction, including but not limited to Lawndale's former legal advisors and Lawndale's related entities; and

d.  Upon written request served by the Foreign Debtor, through its counsel Holland & Knight LLP, enjoining all persons and entities subject to the jurisdiction of this

Court from destroying, secreting, altering, deleting or otherwise disposing of any documents, records, filings, or other information, however stored, concerning or relating to the affairs of Lawndale; and it is further

8. **ORDERED**, that Lawndale is granted authority to assert claims against parties that are subject to jurisdiction in the United States, including but not limited to claims predicated upon fraudulent conveyance or veil-piercing.

9. **ORDERED**, that the administration or realization of all or part of the assets of Lawndale within the territorial jurisdiction of the United States is hereby entrusted to Petitioner and Petitioner is hereby established as the exclusive representative of Lawndale in the United States; and it is further

10. **ORDERED**, that this Court retains jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court; and it is further

11. **ORDERED**, that a copy of this Order shall be served by United States mail, first-class postage prepaid, by overnight courier, by electronic mail, or by hand delivery where practicable, upon all known creditors and all other parties against whom relief is sought (or their counsel or registered agent for service of process), including any such parties (or counsel) that have addresses outside the United States; and it is further

12. **ORDERED**, that notice of the Petition in the form attached as Exhibit B thereto shall be served upon all known creditors and all other parties against whom relief is sought (or

6

Case 1:18-mc-00041-UA    Document 4-1    Filed 02/06/18    Page 70 of 372

their counsel or registered agent for service of process), including any such parties (or counsel) that have addresses outside the United States; and it is further

13.    **ORDERED**, that such service shall be good and sufficient service and adequate notice for all purposes.

Dated: New York, New York
       July 6, 2015

_____/S/ Shelley C. Chapman_____
United States Bankruptcy Judge
Southern District of New York

# EXHIBIT 13

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
In re                                                          :
                                                               :
PIONEER FREIGHT FUTURES COMPANY          :    Chapter 15
LIMITED,                                                       :
                                                               :
                                                               :
Debtor in a Foreign Proceeding.              :    Case No. 13-12324 (JMP)
---------------------------------------------------------------- x

## ORDER GRANTING RECOGNITION OF A FOREIGN
## MAIN PROCEEDING AND RELATED RELIEF

This matter came before the Court upon the verified petition of Mark Richard Byers and

Mark McDonald, in their capacity as joint liquidators (the "Petitioners") of Pioneer Freight

Futures Company Limited (the "Company") and as duly authorized foreign representatives as

defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code") in the

above-captioned case, for the entry of an order granting recognition of a foreign main proceeding

(the "Verified Petition").  The Court has reviewed and considered, among other things, (i) the

Verified Petition and its accompanying memorandum of law, (ii) the statement of Mark Richard

Byers, in his capacity as Joint Liquidator of the Company, made pursuant to section 1515 of the

Bankruptcy Code, (iii) the declaration of Scott Cruickshank, foreign counsel to the Petitioners

and (iv) the arguments and testimony presented at the hearing held on August 22, 2013.  Based

on the foregoing, the Court finds and concludes as follows:

1.    The Petitioners have demonstrated that:

(a)    the Company is subject to a foreign proceeding within the meaning of
section 101(23) of the Bankruptcy Code;

(b)    the Company is subject to a foreign main proceeding within the meaning
of section 1502(4) of the Bankruptcy Code;

     (c)       the Petitioners, as joint liquidators of the Company, are foreign representatives, as defined by section 101(24) of the Bankruptcy Code;

     (d)       the above-captioned Chapter 15 case was properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code; and

     (e)       the Chapter 15 Petition satisfies the requirement of section 1515 of the Bankruptcy Code.

2.      The relief requested is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States and warranted pursuant to sections 1520 of the Bankruptcy Code.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1410.

NOW, THEREFORE, IT IS HEREBY:

ORDERED, that the Company's liquidation proceeding pending before the Commercial Division of the High Court of Justice, British Virgin Islands, Eastern Caribbean Supreme Court (the "BVI Proceeding") is granted recognition pursuant to section 1517(a) of the Bankruptcy Code; and it is further

ORDERED, that the BVI Proceeding is granted recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code; and it is further

ORDERED, that all relief afforded to a foreign main proceeding, a foreign debtor subject to such foreign main proceeding and the foreign representatives of such a foreign debtor automatically upon recognition pursuant to section 1520 of the Bankruptcy Code is granted to the BVI Proceeding, the Company and the Petitioners respectively, including, without limitation, the protections afforded by section 362 of the Bankruptcy Code; and it is further

ORDERED, that this Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, and requests for any additional relief in this

Chapter 15 case and all adversary proceedings in connection herewith properly commenced and within the jurisdiction of this Court; and it is further

ORDERED, that this Order shall be served by overnight mail on or before August 27, 2013, upon (a) the Company and (b) the U.S. Trustee; and it is further

ORDERED, that service in accordance with this Order shall be deemed good and sufficient service and adequate notice for all purposes.

Dated: New York, New York
August 23, 2013



/s/ James M. Peck
_____
Honorable James M. Peck
United States Bankruptcy Judge

3

# EXHIBIT 14

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                                    :
In re:                                              :        Chapter 15
                                                    :
FARENCO SHIPPING CO. LTD.,                          :        Case No. 11-14138(REG)
                                                    :
            Debtor in a                             :
            Foreign Proceeding.                     :
                                                    :
                                                    :
--------------------------------------------------------x

### ORDER GRANTING PROVISIONAL RELIEF PENDING HEARING ON PETITION FOR RECOGNITION AS A FOREIGN MAIN PROCEEDING PURSUANT TO 11 U.S.C. §§ 1519 and 1521

On September 6, 2011 at 10:30 a.m. this Court held a hearing ("**Provisional Relief Hearing**") in connection with the Order to Show Cause and TRO issued on September 1, 2011 ("**TRO**") and in connection with certain other provisional relief previously requested by the petitioner on behalf of Farenco Shipping Co. Ltd. ("**Farenco BVI**" or the "**Foreign Debtor**") but not included in the TRO of September 1, 2011.

Nicholas Francis James Carter, duly appointed liquidator and foreign representative ("**Petitioner**" or "**Liquidator**") of Farenco BVI, a company undergoing liquidation before the Commercial Division of the High Court of Justice (the "**BVI Court**"), case number 2011/0051 (the "**BVI Liquidation**"), applied to this Court for an entry of an Order pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the "**Bankruptcy Code**"): (i) maintaining the injunctive relief given by the TRO dated September 1, 2011; and ii) granting other and additional relief pursuant to sections 1507, 1519 and 1521of the Bankruptcy Code.

Upon the Court's review and consideration of the application, and the accompanying Declarations of Nicholas Francis James Carter executed on August 29, 2011, of Ray Ng executed on August 31, 2011, and James H. Power executed on August 31, 2011, together with all exhibits

thereto, attesting to the need for provisional relief, as well as the arguments set forth on the record at the Provisional Relief Hearing, and it appearing that sufficient notice has been provided; and after due deliberation and sufficient cause appearing thereof, this Court finds and concludes that a showing has been made as follows:

A.      There is a substantial likelihood that Petitioners will be able to demonstrate that the BVI Liquidation is a foreign main or non-main proceeding pursuant to section 1517 of chapter 15 of title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code"), that Petitioner is the duly appointed foreign representative of Farenco BVI pursuant to section 101(23) and 1502(4) of the Bankruptcy Code, and that Farenco BVI and Petitioner, in his capacity as foreign representative of Farenco BVI, is entitled to protections afforded by sections 1520 and 1521 of the Bankruptcy Code;

B.      The continuation of any action against Farenco BVI should be provisionally enjoined, to the extent provided herein, pursuant to sections 105(a) and 1519 of the Bankruptcy Code and Fed. R. Bankr. P. 7065(b), to permit the expeditious and economical administration of Farenco's BVI estate in the BVI Liquidation, and such relief will not cause undue hardship or any hardship to parties in interest or is outweighed by the benefits;

C.      There is a material risk that Farenco BVI will suffer cognizable injury for which it will have no adequate remedy at law and therefore it is necessary that the Court enter this Order;

D.      The interests of the public will be served by this Court's entry of this Order;

E.      Petitioner, in connection with his representation of Farenco BVI, and Farenco BVI is provisionally entitled to the protections and rights afforded pursuant to section 1519(a)(l)-(3) of the Bankruptcy Code including, the relief referred to in section 1521(a)(3), (4), (7), to the extent provided herein; and

F.      Venue is proper in this District pursuant to 28 U.S.C. § 1410.

**NOW THEREFORE IT IS HEREBY ORDERED,** that pending a hearing on recognition, that all persons and entities subject to this Court's jurisdiction **and with notice of this Order** are provisionally enjoined from:

A.      executing against Farenco BVI's property or assets;

B.      taking or continuing any act to obtain possession of, or exercise control over, Petitioner (with respect to Farenco BVI), Farenco BVI or any of its property or assets;

C.      taking or continuing any act to create, perfect or enforce a lien or other security interest, set-off or other claim against Petitioner (with respect to Farenco BVI), Farenco BVI or any of its property or assets, or otherwise seeking the issuance of**,** or issuing**,** any restraining notice or other process or encumbrance with respect to Farenco BVI or any of its property or assets;

D.      transferring, relinquishing or disposing of any property of Farenco BVI to any person or entity other than Petitioner;

E.      destroying, secreting, altering, deleting or otherwise disposing of any documents, records, filings, or other information, however stored, concerning or relating to the affairs of Farenco BVI;

**AND FURTHER,** pending a hearing on recognition, it is **PROVISIONALLY ORDERED** that:

a.  The relief set forth in the TRO dated September 1, 2011 shall continue unless otherwise ordered by this Court;

b.  Petitioner or any third person acting pursuant to Petitioner's instructions or agreement may transfer funds or property belonging to Farenco BVI into or out of the United States in accordance with their respective obligations to Farenco BVI or under the BVI Liquidation;

c.  Petitioner is authorized to operate, if applicable, and wind up the affairs and the business of Farenco BVI that is the subject of BVI Liquidation and may exercise the powers of a trustee under and to the extent provided by 11 U.S.C. § 1520;

d.  Petitioner is hereby authorized, on an expedited basis, to examine witnesses, take evidence, seek production of documents, serve requests to admit and deliver information to the BVI Court concerning the assets, affairs, rights, obligations or liabilities of Farenco BVI. The provisional relief ~~shall~~ **may** include:

3

i. Obtaining discovery from and/or in relation to the affairs of Farenco Shipping Pte Ltd. (Singapore) and Farenco Transportation Co. Ltd. and their associates as all such information is required in the BVI Liquidation under the law of the United States; and

ii. Obtaining discovery from intermediary banks in New York that process U.S. dollar wire transfers to ascertain the location and movement of Farenco BVI assets prior to and at anytime after the commencement of the liquidation of Farenco BVI; and

iii. Obtaining discovery, on an expedited basis, from Farenco BVI's former U.S. counsel including, but not limited to, copies of attorney files and suitable reproductions of any and all documents, records, filings, or other information, however stored, including but not limited to emails; and

iv. Obtaining discovery from any person or entity subject to this Court's jurisdiction that may possess or have access to information concerning Farenco BVI's business and trading operations, bank accounts, officers and directors, any of Farenco BVI's related-companies, email accounts, or any other information that could assist the Liquidator in identify assets, records, books, documents, and/or creditors of the Foreign Debtor.

e. the administration or realization of all or part of the tangible and intangible assets of Farenco BVI within the territorial jurisdiction of the United States is hereby entrusted to Petitioner and Petitioner is hereby established as the exclusive representative of Farenco BVI in the United States; and it is further

ORDERED, that a copy of this Order shall be served by electronic mail or by hand delivery upon all of former U.S.-based counsel for Farenco BVI in the U.S. Actions, and by hand to Farenco Shipping Pte. Ltd.'s and Farenco Transportation Co. Ltd.'s registered agent in New York; and by international registered mail to all known creditor(s); and it is further

ORDERED that such service shall be good and sufficient service and adequate notice; and it is further

ORDERED, that the Petition and supporting papers shall also be made available by Petitioner upon request to Holland & Knight LLP, 31 West 52nd Street, New York, New York 10019 (Attn.: James Power, Esq.), as counsel to Petitioner; and it is further

ORDERED, that pursuant to Fed. R. Bankr. P. 7065, the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure be, and the same hereby are, waived; and it is further

ORDERED, that any party in interest may make a motion seeking relief from, or modification of, this Order, by filing a motion on not less than two (2) business day's notice to the United States counsel for Petitioner, seeking an order for such relief, and any such request shall be the subject matter of a hearing scheduled by the Court**; and it is further**

ORDERED, that, any motion seeking relief from or modification of this Order must be made in writing describing the basis therefore and be filed with this Court electronically in accordance with General Order M-182 by registered users of the Court's electronic case filing system, and by all other parties in interest, on a 3.5 inch disc or CD-ROM, preferably in Portable Document Format (PDF) format, Word Perfect, or any other Windows-based word processing format, with hard copy to the Chambers of the Honorable Robert E. Gerber, and served upon counsel to Petitioner, Holland & Knight LLP, 31 West 52nd Street, New York, New York 10019 (Attn.: James H. Power, Esq.), so as to be received at least one business day prior to any hearing on such motion.

Dated: New York, New York
**September 7, 2011**

*/s/ Robert E. Gerber*
United States Bankruptcy Judge
Southern District of New York

# EXHIBIT 15

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                        :

In re:                        :      Chapter 15
                         :

TRANSFIELD ER CAPE LIMITED (BVI),   :      Case No. 10-16270 (MG)
                         :

            Debtor in a           :
            Foreign Proceeding.    :
                         :
                         :
---------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 1504, 1515, 1517, 1520 AND 1521 RECOGNIZING FOREIGN PROCEEDING AND GRANTING FURTHER RELIEF

A hearing having been held before the United States Bankruptcy Court of the Southern District of New York on January 13, 2010 (the "Hearing") to consider the Verified Petition and Official Form Petition (collectively, the "Petition") of Casey McDonald, Bob Yap Cheng Ghee and Patrick Cowley, duly appointed Joint Liquidators and foreign representatives ("Petitioners" or "Joint Liquidators") of Transfield ER Cape Limited (BVI) ("TERC" or the "Foreign Debtor")), a company undergoing liquidation before the Commercial Division of the High Court of Justice (the "BVI Court"), case number BVIHCV2010/21 (the "BVI Liquidation"), pursuant to the Insolvency Act of 2003 of the British Virgin Islands (the "2003 Act"), for entry of an Order pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the "Bankruptcy Code"): (i) recognizing the BVI Liquidation of TERC as a foreign main proceeding, or in the alternative, a foreign non-main proceeding pursuant to chapter 15 of the Bankruptcy Code; (ii) granting automatic relief pursuant to section 1520 of the Bankruptcy Code; (iii) granting other and additional relief pursuant to sections 1507 and 1521(a) and (b) of the Bankruptcy Code; and upon the Court's review and consideration of the Petition, and the accompanying Declarations of Casey McDonald executed on November 19, 2010 and of Sandie

Corbett, executed on November 19, 2010, together with all exhibits thereto, in support of the

Petition, and the evidence put on the record at the Hearing; and appropriate and timely notice of

the filing of the Petition and the hearing thereon having been given by Petitioners, pursuant to

section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all

purposes; and no other or further notice being necessary or required; and no objections or other

responses having been filed that have not been overruled, withdrawn or otherwise resolved; and

all interested parties having had an opportunity to be heard at the Hearing; and after due

deliberation and sufficient cause appearing therefore, the Court makes the following findings of

fact and conclusions of law:

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334, and 11 U.S.C. §§ 109 and 1501.

B.      Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C.

§ 1410.

C.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(P).

D.      Petitioners are "persons" pursuant to 11 U.S.C. § 101(41) and are the "foreign

representatives" of  TERC pursuant to 11 U.S.C. § 101(24).

E.      This chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504,

1509, and 1515.

F.      Petitioners have satisfied the requirements of 11 U.S.C. § 1515 and Rule

1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

G.      The BVI Liquidation is a "foreign proceeding" pursuant to 11 U.S.C. § 101(2).

H.      The BVI Liquidation is entitled to recognition by this Court pursuant to 11 U.S.C.

§ 1517.

2

I.      The BVI Liquidation is pending in the British Virgin Islands, the country where TERC's center of main interests is located, and accordingly the BVI Liquidation is a "foreign main proceeding" pursuant to 11 U.S.C. § 1502(4), and is entitled to recognition as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1).

J.      Petitioners are entitled to all the relief provided pursuant to 11 U.S.C. § 1520 without limitation.

K.      Petitioners are entitled to relief pursuant to 11 U.S.C. §§ 1507 and 1521 as ordered by this Court.

L.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to 11 U.S.C. §§ 1507, 1517, 1520, and 1521.

**NOW, THEREFORE, IT IS HEREBY**

1.      **ORDERED**, that the BVI Liquidation is granted recognition pursuant to 11 U.S.C. § 1517(a); and it is further

2.      **ORDERED**, that the BVI Liquidation is hereby recognized as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1); and it is further

3.      **ORDERED**, that all persons and entities (other than Petitioners their expressly authorized representatives and agents) are hereby enjoined, except as provided in 11 U.S.C. §§ 555 through 557, 559 through 562, 1520 and 1521 or as modified herein, from:

(1)      executing against TERC's property or assets;

(2)      taking or continuing any act to obtain possession of, or exercise control over, Petitioner (with respect to TERC), TERC or any of its property or assets;

(3)      taking or continuing any act to create, perfect or enforce a lien or other security interest, set-off or other claim against Petitioners (with respect to TERC), TERC or any of its property or assets, including, without limitation, enforcing the Attachment Orders (defined below) with respect to any funds that are not included among the Attached

3

Funds (defined below) as of the date of the filing of the Petition, or otherwise seeking the issuance of or issuing any restraining notice or other process or encumbrance with respect to TERC or any of its property or assets;

(4)     transferring, relinquishing or disposing of any property of TERC to any person or entity other than Petitioners;

and it is further

4.     **ORDERED**, that 11 U.S.C. § 1520(a) shall be effective with respect to the BVI Liquidation; and it is further

5.     **ORDERED** that the actions styled (i) *China Earth Shipping Inc. v. Transfield ER Cape Limited,* Index No. 650621-2010 (N.Y. Sup. Ct.) (the "China Earth" Action); (ii) *China Sun Shipping Inc. v. Transfield ER Cape Limited* Index No. 650622-2010 (N.Y. Sup. Ct.) (the "China Sun Action"); (iii) *Constellation Energy Commodities Group Inc. v. Transfield ER Cape Ltd. and Transfield ER Ltd.* 10-cv-4434 (S.D.N.Y.) (SHS) (the "Constellation Action"); (iv) *Jade Navigation S.A. v. Transfield ER Cape Ltd.,* 10-cv-4899 (S.D.N.Y.) (AKH) (the "Jade Action"); and (v) *TMT Bulk Co. Ltd. v. Transfield ER Cape Ltd. and Transfield ER Ltd.,* 10-cv-5110 (S.D.N.Y.) (JSR) (the "TMT Action") (collectively the "U.S. Actions") are stayed; and it is further

6.     **ORDERED** that Petitioners or any third person acting pursuant to Petitioner's instructions or agreement may transfer funds or property belonging to TERC into or out of the United States in accordance with their respective obligations to TERC or under the BVI Liquidation; and it is further

7.     **ORDERED** that, given that all orders of attachment previously entered in the US Actions have been vacated and the relevant actions dismissed, J.P. Morgan Chase Bank, N.A. shall turn over the $866,377.36 and any further sums that it currently holds as a result of the

4

orders of attachment previously granted in the U.S. Actions (the "Funds") to the Petitioners for distribution in the BVI Liquidation; and it is further

8.      **ORDERED**, that Petitioners are authorized to operate the business of TERC that is the subject of BVI Liquidation and may exercise the powers of a trustee under and to the extent provided by 11 U.S.C. § 1520; and it is further

9.      **ORDERED**, that Petitioners are hereby authorized to examine witnesses, take evidence, seek production of documents, and deliver information concerning the assets, affairs, rights, obligations or liabilities of TERC, as such information is required in the BVI Liquidation under the law of the United States; and it is further

10.     **ORDERED**, that the administration or realization of all or part of the assets of TERC within the territorial jurisdiction of the United States is hereby entrusted to Petitioners and Petitioners are hereby established as the exclusive representatives of TERC in the United States; and it is further

11.     **ORDERED**, that this Court retains jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court; and it is further

12.     **ORDERED**, that a copy of this Order shall be served by United States mail, first class postage prepaid or any appropriate equivalent where service is taking place outside the United States, via international courier service, by electronic mail or by hand delivery, where practicable, upon all of TERC's known creditors and investors and other parties in interest in this chapter 15 case, wherever located; and it is further

13.     **ORDERED**, that such service shall be good and sufficient service and adequate

notice for all purposes.

Dated: New York, New York
      January 13, 2011


                     **/s/Martin Glenn**
                         MARTIN GLENN
             United States Bankruptcy Judge

# EXHIBIT 16

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| Saad Investments Finance Company (No.5) Limited | Case No. 09-13985 (KG) |
| Debtor in a Foreign Proceeding. | **Ref. No. 97** |

## ORDER AUTHORIZING DISCOVERY PURSUANT
## TO BANKRUPTCY CODE SECTION 1521(a)(4)

Upon consideration of the *Motion of the Foreign Representative for Authorization of Discovery Pursuant to Bankruptcy Code Section 1521(a)(4)* (the "Motion")[1]; and the Court having jurisdiction to consider the Motion, and it appearing that sufficient notice of the Motion has been given; and after due deliberation; and good and sufficient cause appearing therefor; it is hereby

ORDERED that the Motion is hereby GRANTED; and it is further

ORDERED that the Foreign Representatives may pursue discovery within the jurisdiction of the United States concerning Foreign Debtor SIFCO5 pursuant to Bankruptcy Code Section 1521(a)(4); and it is further

ORDERED that the Court shall retain jurisdiction over all matters arising from or relating to the interpretation or implementation of this order.

Dated: August __14__, 2014
Wilmington, Delaware

~~The Honorable~~ Kevin Gross
United States Bankruptcy Judge

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings as ascribed to the m in the Motion.

{786.001-W0032335.}

# EXHIBIT 17

Case 1:18-mc-00044-JGK   Document 1-1   Filed 02/06/18   Page 91 of 372

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

-------------------------------------------------------x
                                            :
In re:                                      :       Case No. 16 - Misc. -
                                            :
FURSTENBERG FINANCE SAS and                 :
MARC BATAILLON                              :
                                            :
REQUEST FOR DISCOVERY PURSUANT              :
TO 28 U.S.C. § 1782.                        :
                                            :

-------------------------------------------------------x

### *EX PARTE* APPLICATION
### FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Applicants Furstenberg Finance SAS ("**Furstenberg**") and Marc Bataillon ("**Bataillon**") (collectively, the "**Applicants**"), by and through its undersigned counsel, Holland & Knight LLP, along with its Memorandum of Law and the Declaration of Luxembourg lawyer Romain Sabatier (the "**Sabatier Declaration**") dated February 5, 2016, in support, submit this *ex parte* application for discovery pursuant to 28 U.S.C. § 1782 (the "**1782 Application**").

Applicants seek an order from this court (the "**Court**") authorizing them to issue and serve subpoenas for testimony and the production of documents, electronically stored information ("**ESI**") and business records of Litai Assets LLC ("**Litai**"), a company headquartered and operating in Pompano Beach, Florida, within the Southern District of Florida (the "**District**"). The Applicants also seek the same discovery from Jan-Eric Samuel ("**Samuel**"), in his capacity as the Chairman and CEO of Litai, who maintains records and correspondence concerning Litai and its relationship to Jean-Michel Paul ("**JMP**"). These records and correspondence are located within the official and personal email accounts and other ESI of Litai.

Litai is in possession of information that will be relevant in the reasonably contemplated foreign criminal and civil proceedings (the "**Foreign Proceedings**") against JMP for violations of the Luxembourg Companies Law based on his fraud, misuse of corporate assets and managerial misconduct as a director of Acheron Portfolio Corporation Luxembourg S.A. ("**APC**"), while also serving as the undisclosed owner, beneficial owner, or controller of Litai. As detailed below, there is initial evidence JMP used his position as a director of APC to enrich Litai, an entity he is believed to covertly own, beneficially own and control.

Applicants Bataillon and Furstenberg were and are minority shareholders of APC, respectively. Sabatier Declaration ¶ 16. Furstenberg is currently a minority shareholder of APC. *Id.* Bataillon is a former minority shareholder of APC and is currently a shareholder of a Luxembourg company called Ahmose S.A. ("**Ahmose**"). *Id.* Bataillon traded his shares of APC for shares of Ahmose. Sabatier Declaration ¶ 16. Furstenberg also traded its Class B shares of APC for Ahmose shares, but remains the owner of Class A APC shares. *Id.* Ahmose was founded by Samuel and is managed by JMP and Acheron Capital Limited ("**ACL**"). *Id.* Upon information and belief, Ahmose was designed to provide a tax efficient mechanism for APC shareholders such as Applicants to receive APC dividends. Pursuant to Ahmose's articles of incorporation, the directors of Ahmose were selected by ACL, which JMP controls. Sabatier Declaration ¶ 20.

APC is a public limited liability company ("*société anonyme*") incorporated in Luxembourg. Sabatier Declaration ¶ 13. APC owns a sub-portfolio of life insurance policies purchased through three trusts (the "**Trusts**"). *Id.* ¶ 18. APC issues two classes of listed shares, Class A and Class B. Sabatier Declaration ¶ 14. JMP is a "Class A" director of APC. *Id.* ¶ 15.

ACL is a London-based entity that manages the Trusts that hold APC's policies. Sabatier Declaration ¶ 19. JMP is the founder of ACL and is described on its website as the person

"primarily responsible for devising and modelling the investment strategy" of ACL. *See* http://www.acheroncapital.co.uk/team/ (last visited January 28, 2016). Since 2009, APC has paid ACL in excess of $10 million in "management fees." Sabatier Declaration ¶ 23.

The Trusts holding APC's policies entered into a servicing agreement (the "**Servicing Agreement**") with Litai. Sabatier Declaration ¶ 28. Litai is an administrator involved in "managing 5,000 life insurance policies." *Id.* ¶ 27. Since 2009, Litai has received 70% of APC's servicing business, and servicing fees of more than $7.5 million. *Id.* ¶ 32. Litai appears to be a highly profitable company. Sabatier Declaration ¶ 33. According to its website, Litai's office is located in Pompano Beach, Florida, and its mailing address is in Pompano Beach as well. *See* http://www.litaiassets.com/contact/ (last visited January 25, 2016).

As noted earlier, Samuel is the Chairman and CEO of Litai. Upon information and belief, he is a close friend and business associate of JMP. Sabatier Declaration ¶ 26. For example, Samuel is an officer of Tomson PTE. Ltd., a holding company in Singapore that is beneficially owned by JMP. *Id.* Samuel is also a shareholder and the founder of Ahmose. *Id.* Upon futher information and belief, prior to working at Litai, Samuel had no previous experience in the life insurance, life settlement and servicing industries.

Applicants and other shareholders of APC were not informed about the relationship between APC and Litai. APC has only disclosed that: (1) ACL is the investment advisor to the Trusts, and (2) Litai services APC's life insurance policies. Sabatier Declaration ¶ 34. What has not been disclosed to APC shareholders is that JMP secretly owns Litai. Initial allegations of this improper relationship between JMP and Litai have emerged and led a director of APC to resign in 2010. Sabatier Declaration ¶ 36, Ex. A.

The relationship between Litai, Samuel and JMP extends to other businesses, as JMP has actively promoted real estate opportunities on behalf of a Litai affiliate. Sabatier Declaration ¶ 37.

Applicants have information and belief that the Servicing Agreement contains unusual and non-commercial terms which serve to APC's detriment. Moreover, JMP's concealment of his apparent ownership interest is *prima facie* indicia of an improper business relationship. Sabatier Declaration ¶ 31.

Via discovery sought in this case from Litai and Samuel, in particular, document discovery, ESI and testimony concerning the JMP-ACL-Samuel-Litai relationship, the Applicants will be able to present conclusive evidence to the Luxembourg court in the Foreign Proceedings regarding JMP's ownership, beneficial ownership and control of Litai. Sabatier Declaration ¶¶ 42-48.

This evidence will be offered directly to the investigating judge presiding over the criminal Foreign Proceedings to be commenced by the Applicants. Sabatier Declaration ¶ 41. Clearly, the Foreign Proceedings, as well as other contemplated civil proceedings, are adjudicative in nature because they will turn on proving that through his concealed ownership of Litai, JMP has abused his role as a director of APC to the detriment of APC and its shareholders. Such abuse would be a violation of a number of criminal laws in Luxembourg. Sabatier Declaration ¶ 42.

Pursuant to 28 U.S.C. § 1782 (the "**Statute**"), an applicant may be granted discovery in the United States in aid of a reasonably contemplated foreign proceeding if: (i) the applicant is an interested party to the contemplated foreign proceeding; (ii) the individual or entity from which information is sought resides or is found within the judicial district; and (iii) the information is located within the United States. If the Statute's requirements are met, the district court must

exercise its discretion in light of the Statute's goals. In addition, the district court must consider the discretionary factors listed by the Supreme Court to determine whether the requested discovery is warranted.

The relief sought through this 1782 Application is authorized by the Statute and has been routinely granted in this District and in other courts in relation to similar section 1782 applications, as well as applications for discovery in support of foreign insolvencies and domestic litigation.

As more specifically described in the Applicants' Memorandum of Law in Support of an *ex parte* Application for Discovery Pursuant to 28 U.S.C. § 1782, assistance is appropriate here because Litai and Samuel each: (i) "resides" or is "found" within this District; (ii) the Applicants are interested persons to the contemplated Foreign Proceedings; (iii) the Foreign Proceedings are reasonably contemplated to be commenced before a "foreign or international tribunal" in Luxembourg; and (iv) the information obtained will be in support of the Foreign Proceedings.

Moreover, granting this Application will further the twin goals of the Statute of providing efficient means of assistance to participants in international litigation in our federal courts, while also encouraging foreign courts by example to provide similar means of reciprocal assistance to our courts.

Finally, each of the four discretionary factors identified by the Supreme Court weighs in favor of granting this Application.

WHEREFORE, pursuant to 28 U.S.C. § 1782, Applicant requests that this Court enter an Order authorizing Applicants to issue and serve subpoenas on Litai for the production of business records, deposition testimony, ESI and any other electronic communications relating to any communications between Litai, Samuel (in his capacity as Chairman and CEO of Litai or in

relation to Litai) and Jean-Michel Paul, and any communications between Litai and Acheron

Capital Limited and/or Acheron Portfolio Corporation Luxembourg S.A.

Dated: February 8, 2016

Respectfully submitted,

By:  _/s/ Philip E. Rothschild_

Philip E. Rothschild, Esq.
HOLLAND & KNIGHT LLP
515 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 525-1000
Fax: (954) 463-2030
phil.rothschild@hklaw.com

Warren E. Gluck, Esq.
(pro hac vice admission pending)
HOLLAND & KNIGHT LLP
31 W. 52nd St.
New York, NY 10019
Tel: (212) 513-3200
Fax:(212) 385-9010
warren.gluck@hklaw.com

*Attorneys for Furstenberg Finance SAS and Marc Bataillon*

# EXHIBIT 18

Case 1:18-mc-00044-JGK Document 4-1 Filed 02/06/18 Page 98 of 372

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

-------------------------------------------------------x
                                    :

In re:                               :     Case No. 16-misc-

                                   :

FURSTENBERG FINANCE SAS and  :
MARC BATAILLON               :

                                   :

REQUEST FOR DISCOVERY PURSUANT  :
TO 28 U.S.C. § 1782.                :

                                   :

-------------------------------------------------------x

**DECLARATION OF ROMAIN SABATIER IN SUPPORT OF**
**_EX PARTE_ APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

I, Romain Sabatier, hereby declare, under penalty of perjury under the laws of the

United States of America, that the following is true and correct to the best of my knowledge and

belief:

**Introduction**

1.      I am a partner of NautaDutilh Avocats Luxembourg S.à r.l., a Luxembourg-based

law firm. I advise corporate clients as well as hedge funds, private equity firms and financial

institutions on all aspects of Luxembourg corporate law. I also have experience litigating before

the trial and appellate courts of Luxembourg and handle cross-border and domestic cases with an

emphasis on complex shareholder disputes, acquisition agreements, financing agreements and

commercial contracts.

2.      My practice in Luxembourg primarily focuses on corporate, securities and

structuring advice on financial restructuring matters or traditional M&A transactions.

3.      I have been a member of the Luxembourg bar since 2007. I obtained my law

degree from the Free University of Brussels (_Université libre de Bruxelles_) in 2002. I also hold a

Master in Private Law from the University of Aix-Marseille III (France) (1997) and an LL.M. in

U.S. Legal Studies from the University of Connecticut School of Law (1999).

    4.    I respectfully submit this declaration (the "**Declaration**") in support of the request

of Marc Bataillon ("**Bataillon**") and Furstenberg Finance SAS ("**Furstenberg**," collectively,

"**Applicants**") for an order from this court pursuant to 28 U.S.C. § 1782 (the "**1782**

**Application**") authorizing them to issue and serve subpoenas for documents, electronically

stored information ("**ESI**") and testimony located in this district in the possession and control of

Litai Assets LLC ("**Litai**"), a Florida-based administration company.  The Applicants also seek

the same discovery from Jan-Eric Samuel ("**Samuel**"), in his capacity as the Chairman and CEO

of Litai, who maintains records and correspondence concerning Litai and its relationship to Jean-

Michel Paul ("**JMP**"), found on various media within the official and personal email accounts,

and other ESI of Litai.

    5.    In addition, the Applicants seek documents, ESI and testimony concerning the

relationship between Acheron Portfolio Corporation Luxembourg S.A. ("**APC**"),  Acheron

Capital Limited ("**ACL**"), which is the manager of the two United States trusts that form APC's

principal assets, APC Class A director and ACL's sole owner JMP, Litai, and Samuel.

    6.    This evidence requested in the 1782 Application is sought in connection with

reasonably contemplated criminal and civil litigation in Luxembourg, which Applicants will

commence themselves, or will otherwise cause to be commenced by the general meeting of

shareholders.

    7.    Specifically, initial evidence has emerged that Litai, which services the

underlying life-policy agreements that form the corpus of the APC's primary assets and receives

substantial fees for such services, is in fact covertly owned and controlled by JMP, who is also a

2

Class A director of APC. This conflict of interest and "double dipping" by JMP was neither disclosed to nor authorized by APC shareholders.

8.     Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my own personal knowledge or based upon my review of relevant documents. To the extent matters stated in this Declaration are statements of legal opinion, such statements represent my view of the law of Luxembourg as a practicing Luxembourg attorney.

9.     As set forth below, the information and testimony sought will be utilized in reasonably contemplated criminal and civil proceedings against JMP under Luxembourg law, proceedings Applicants will bring or cause to be brought.

10.     In particular, a shareholder, creditor or any third party who is a aware of a criminal offense under the Commercial Companies Act of 10, August 1915 ("**the Luxembourg Companies Law**"), may file a criminal complaint with an investigating judge and potentially start a civil action for damages. Assuming that the evidence obtained from Litai confirms JMP's unauthorized and undisclosed abuse of his position as a director of APC, then such evidence will be submitted to the investigating judge by the Applicants.

11.     Additionally, while Luxembourg's corporate law somewhat differs from the corporate law of the United States, at the general meeting, the shareholders may take action against a director in connection with wrongful acts in the performance of official duties. The information obtained from the granting of this 1782 Application will be presented to the general meeting of shareholders by the Applicants. The shareholders will then either bring an action against JMP or decline to do so, giving rise to circumstances where Applicants may do so.

12. Of course these actions are to be supported and buttressed by the evidence obtained via this 1782 Application – to wit, the business records, ESI and deposition testimony of Litai and Samuel concerning the relationship between Litai, APC, ACL and JMP.

**Relevant Parties and Background**

13. APC is a Luxembourg "*société anonyme*" incorporated on June 27, 2007. It is a public limited liability company governed by the laws of the Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register under number 129880, with its registered office at 37 Rue d'Anvers, L-1130 Luxembourg.

14. The Class A shares (ISIN Code LU0327662697) and the Class B shares (ISIN Code LU0338952244) of APC are both listed on the Official List of the Luxembourg Stock Exchange.

15. Each of these two share classes track the performance of a sub-portfolio of life insurance settlement policies, including those policies for those of advanced age or who are suffering from life threatening diseases.

16. Applicants Bataillon and Furstenberg were and are minority shareholders of APC, respectively. Furstenberg is currently a minority shareholder of APC. Bataillon is a former minority shareholder of APC and is currently a shareholder of a Luxembourg company called Ahmose S.A. ("**Ahmose**"). Bataillon traded his shares of APC for shares of Ahmose. Furstenberg also traded its Class B shares of APC for Ahmose shares, but remains the owner of Class A APC shares. Ahmose was founded by Samuel, and also managed by JMP and ACL. I understand Ahmose was designed to provide a tax efficient mechanism for APC shareholders such as the Applicants to receive APC dividends.

4

17.     JMP is a "Class A director" on APC's board and also controlled Ahmose via ACL.  He is a Belgian national residing in London and owns 100% of ACL.

18.     The life insurance policies beneficially held by APC are purchased via three trusts based in the United States: the Lorenzo Tonti 2006 Trust (the "**Tonti Trust**"), the Acheron Portfolio Trust (the "**Acheron Trust**"), and the Avernus Portfolio Trust (the "**Avernus Trust**") (collectively, the "**Trusts**").

19.     The Trusts are managed by ACL, a U.K. Financial Conduct Authority-regulated investment manager.  Its registration number with the U.K. Companies House is 05588630.  The registered office of ACL is 20-22 Bedford Row, London W1CR 4JS. The staff of ACL work out of 1 Great Cumberland Place, 6th Floor, Suite 2, London WH 7AL.

20.     Pursuant to Ahmose's articles of incorporation, the directors of Ahmose were selected by ACL, which JMP controls.

21.     JMP is listed on ACL's website as the company's founder and the person "primarily responsible for devising and modelling the investment strategy."  *See* http://www.acheroncapital.co.uk/team/ (last visited January 28, 2016).  JMP, in his activities as owner of ACL, is also subject to the UK Financial Conduct Authority.

22.     ACL manages the activities of the Acheron Trust and the Tonti Trust via two investment advisory agreements signed by it and APC.

23.     ACL's revenues, which are modest but continuously growing, are almost entirely contingent on the management fees generated pursuant to these agreements.   In the financial statement issued in 2009 by APC, ACL is described as its "portfolio management advisor." Since 2009, APC has paid ACL in excess of $10 million in "management fees."

24.     APC has paid to JMP (through ACL) management fees in the amount of:

2009: $1,549,527.29

2010: $1,639,564.80

2011: $1,772,844.12

2012: $1,858,412.76

2013: $1,880,544.96

2014: $1,904,529.00

25.     Litai, one of the targets of discovery in this case, is a United States company based in Florida with an office address at 1180 SW 36th Avenue, Suite 100, Pompano Beach, FL 33069, and a separate mailing address at 43 South Pompano Beach Parkway #112, Pompano Beach, FL 33069.

26.     Samuel, the other discovery target, is the chairman and CEO of Litai.  Upon information and belief, he does not have prior experience in the life insurance business.  Samuel is also a shareholder and founder of Ahmose, and is believed to be a close friend and business associate of JMP.  For example, Samuel is an officer of Tomson PTE. Ltd., a holding company in Singapore that is beneficially owned by JMP.

27.     Litai characterizes itself as a company engaged in the business of "managing over 5,000 life insurance policies."

28.     Litai services the policies in the Trusts on behalf of APC pursuant to a servicing agreement that ran from 2009 to 2014, though, upon information and belief, it was recently renegotiated and still is in force (the "**Servicing Agreement**").

29.     Litai's business is understood to be, in essence, one of administrative management of the policies that are the *res* of APC.  With respect to the insurance policies that

constitute the property of the Trusts, it retains the paperwork associated with the policy, creates

cash flow projections for premium remittances and monitors deaths of beneficiaries, among other

managerial responsibilities.  Litai is listed in the aforementioned 2009 financial statement of

APC as a "policies servicer."

30.     APC paid JMP (via Litai) "portfolio servicing fees" under the Servicing

Agreement in the amounts of:

> 2009: $1,549,527.29
>
> 2010: $1,639,564.80
>
> 2011: $1,609,334.16
>
> 2012: $1,513,765.10
>
> 2013: $1,550,784.00
>
> 2014: $1,858,093.00

31.     The Applicants have information and belief that the Servicing Agreement

contains unusual and non-commercial terms which serve to APC's detriment.  Moreover, JMP's

concealment of his apparent ownership interest is *prima facie* indicia of an improper business

relationship.

32.     Litai appears to be the foremost business partner in terms of servicing APC's

policies.  According to a 2009 declaration by JMP, APC has contracted with Litai to service in

excess of 70% of its existing policies.

33.     Litai appears to be a very profitable entity that has billed APC substantially.

34.     It is understood that the only disclosures given to APC and Ahmose investors of

the relationship between Litai and APC were that: (1) ACL is the investment advisor to the

Trusts; and (2) Litai is the "policies servicer" of APC.

35.     What was not disclosed was that JMP secretly and covertly owns and controls Litai.

36.     A former member of the Board of Directors of APC, Eric Kalfon, has confirmed to Applicants via email that he resigned from the APC Board in 2010 due to JMP's undisclosed and unauthorized "effective control of Litai."  *See* Email from Eric Kalfon to Erich Bonnet on November 13, 2015.  A true and correct copy of this email in French, as well as an English translation of the same, is attached as Exhibit A.

37.     In addition, JMP has appeared to be making a concerted effort to promote the business of Litai, as well as investment opportunities offered by entities affiliated with Litai. The JMP-Litai covert ownership allegation is further supported by the unusual appointment of Samuel as Litai's Chairman and CEO.  Samuel, also the founder of Ahmose, is JMP's friend, but does not have any life insurance (or any insurance) experience.

38.     The Applicants believe that the subpar performance of APC and Ahmose is due in part to the fees paid to Litai, for JMP's and ACL's benefit, but to the detriment of the shareholders.  APC, Ahmose and their shareholders (such as Applicants) have suffered damages as a result.  Moreover, Applicants believe that JMP has engaged in criminal misconduct under the Luxembourg Companies Law and will bring the evidence obtained via this 1782 Application directly to the Luxembourg investigating judge in respect of these reasonably contemplated criminal proceedings to be commenced by Applicants.

39.     Accordingly, I have been asked to explain to this Court, in general terms, the relevant substantive Luxembourg law.

40. A shareholder, creditor or any third party who is aware of a criminal offence and has suffered a loss may file a criminal complaint directly with an investigating judge (*juge d'instruction*), and potentially start a civil action for damages.

41. The evidence obtained via the requested discovery from Litai would be directly presented to the Luxembourg investigating judge, in support of the criminal complaint to be filed by the Applicants, thereby commencing criminal legal proceedings in Luxembourg and civil actions for damages. Luxembourg has an inquisitorial legal system, and as such the investigating judge is a member of the criminal court of Luxembourg who will independently investigate the matter in view of continuing the through prosecution. Filing of a complaint before the investigating judge formally starts a legal action ("*action publique*") and interrupts the criminal statute of limitations.

42. Here, assuming that information initially obtained – that JMP directly or indirectly owns and controls Litai, and that the APC-Litai relationship improperly favours Litai - - is borne out through the requested discovery, it is apparent that JMP would be subject to prosecution under the above-stated Luxembourg Companies Law provisions, because he would have used APC and Ahmose's assets for personal gain and exercised his power and voting rights for the same wrongful purpose. Indeed, directors such as JMP may incur criminal liability under Articles 162-172 of the Luxembourg Companies Law dated 10 August 1915, as amended. The list of criminal offenses includes, *inter alia*, misuse of corporate assets (Article 171-1 of the Act), pursuant to which *de jure* and *de facto* directors can be sanctioned by a prison term of one to five years and/or a fine of EUR 500 to EUR 25,000 if they acted in bad faith and undertook either of the following actions:

(a) used the company's assets or credit, knowing such use was contrary to the company's interests, for personal gain or for the benefit of another company or undertaking in which the director has a direct or indirect stake; or

(b) exercised their powers or voting rights, knowing such use was contrary to the company's interests, for personal gain or for the benefit of another company or undertaking in which the director has a direct or indirect stake.

43.    Under the relevant Luxembourg protocols, Applicants may directly bring a criminal complaint against JMP, and present evidence in support of that complaint to the investigating judge.

44.    Additionally, akin to analogous corporate law in the United States, Luxembourg's Companies Law and relevant precedent also provides for a variety of circumstances where shareholders of a company may take action against directors and managers, and otherwise compel the company to take legal action.

45.    In this case, the information obtained herein, via various machinations under Luxembourg corporate law, will be presented to the general meeting of shareholders of APC and/or Ahmose, who will be requested to take action to against JMP for mismanagement.

46.    Directors can be held liable not only for fraud but also for mismanagement of the company's affairs.

47.     The following are, *inter alia*, regarded as managerial misconduct or a violation of the Luxembourg Companies Law:[1] concluding agreements that are blatantly unfavourable to the company, failing to attend board meetings without a valid reason for missing them, making risky investments, granting advantages to third parties for no consideration, as well as the non-disclosure of conflict of interests.

48.     Here, it is obvious and apparent that if JMP utilized his director's position to cause APC and/or the trusts to enter into an unfavourable contract with Litai, a company he beneficially owns or controls, this would constitute substantial managerial misconduct and the Luxembourg courts would admit the evidence obtained from this application as evidence.

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under the laws of the United States of America this ⎵ day of February, 2016.

Romain Sabatier, Avocat

NautaDutilh Avocats Luxembourg S.à r.l.
2, rue Jean Bertholet
L-1233 Luxembourg

---

[1] *See* Y. DE CORDT, Ph. LAMBRECHT, J. MALHERBE, Ph. MALHERBE, *Droit des sociétés. Précis*, 4th edition, Bruylant, 2011, p. 660.

11

# EXHIBIT A

**From:** ekalfon@noos.fr [mailto:ekalfon@noos.fr]
**Sent:** vendredi 13 novembre 2015 08:32
**To:** Erich Bonnet <ebonnet@smartlenders-am.com>
**Subject:** Re: souvenirs

Hello Eric

*Hello Eric*

Oui absolument

*Yes absolutely*

Bonne journée et à bientôt

*Have a nice day and speak to you later*

Eric

Envoyé de mon iPhone

Le 12 nov. 2015 à 17:51, Erich Bonnet <ebonnet@smartlenders-am.com> a écrit :

Bonsoir Eric

*Good evening Eric*

Je te contacte car je voudrais avoir confirmation d'une information qui date un peu.

*I am getting in touch with you because I would like to have confirmation of something that dates back a little.*

Nous étions ensembles dans le Board d'Acheron Portfolio Corp Lux en 2010.

*We were on the board together of Acheron Portfolio Corp Lux in 2010.*

Nous avons tous les deux quitté le Board cette année là.

*We both quit the board that year.*

Peux-tu me confirmer que tu avais quitté le Board en raison du conflit d'intérêt que selon toi représentait le contrôle effectif par Jean Michel Paul de Litaï, la société qui assure le servicing des polices d'assurance décès gérées par Acheron Capital Limited ?

*Can you please confirm to me that you quit the board owing to the conflict of interest that Jean-Michel Paul's effective control of Litai, the company that services the life insurance policies managed by Acheron Capital Limited, represented ?*

Amicalement

*Sincerely yours,*

Erich

Erich Bonnet

**Smart Lenders Asset Management Limited**

10-12 Emerald Street, London WC1N3QA  direct: 020 7440 9996  www.smartlenders-am.com

Smart Lenders Asset Management Limited is authorised and regulated by the Financial Conduct Authority (FCA), FRN 563498.

Smart Lenders Asset Management Limited, Company Number 7699506, is a Limited Company registered in England with Registered Office at Stag House, Old London Road, Hertford SG137LA, United Kingdom.

This message is for the named person's use only. It serves purely for information purposes, and is not an offer or financial promotion.  It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any transmission errors. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. Message transmission is not guaranteed to be secure. Any information contained herein is subject to Smart Lenders Asset Management Limited's Standard Terms and Conditions of Business which are available upon request.   Smart Lenders Asset Management Limited and its affiliates do not assume any liability whatsoever for the content of this email, or make any representation or warranties, as to the accuracy or completeness of any information contained in this email. The investment products and services of Smart Lenders Asset Management Limited are only available to qualified investors and eligible counterparties. This document does not constitute an offer to buy or sell shares or units in any vehicle or funds managed or advised by Smart Lenders Asset Management Ltd. Past performance should not be seen as an indication of future performance. There is no guaranty on the capital invested.

# EXHIBIT 19

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

-----------------------------------------------------------x
:
In re: : Case No. 16 - Misc. -
:
FURSTENBERG FINANCE SAS and :
MARC BATAILLON :
:
REQUEST FOR DISCOVERY PURSUANT :
TO 28 U.S.C. § 1782. :

-----------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF AN
## _EX PARTE_ APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

I.     JURISDICTION AND VENUE ............................................................................4

II.    FACTUAL BACKGROUND AND CONTEMPLATED FOREIGN
       PROCEEDINGS .....................................................................................................5

III.   ARGUMENT .........................................................................................................10

       A.    28 U.S.C. § 1782 PROVIDES FOR DISCOVERY IN AID OF THE
             REASONABLY CONTEMPLATED FOREIGN ACTIONS ...............................10

       B.    THE APPLICANTS SATISFY THE STATUTORY REQUIREMENTS OF 28
             U.S.C. § 1782. ................................................................................................11

             1.    Furstenberg Finance SAS and Marc Bataillon, the Applicants, are
                   "interested person[s]" to the Foreign Proceedings......................................13

             2.    Discovery is sought for use in the contemplated Foreign Proceedings,
                   which will be held before one or more foreign tribunal. ..........................15

             3.    Litai and Samuel have possession, custody and/or control of the
                   discovery sought, and each resides in or should be deemed found within
                   this District..............................................................................................17

             4.    No Other Factors Weigh Against Allowing Discovery .............................17

       C.    THE APPLICANTS ALSO SATISFY INTEL'S DISCRETIONARY
             FACTORS.......................................................................................................18

IV.    CONCLUSION......................................................................................................21

## PRELIMINARY STATEMENT

Applicants Furstenberg Finance SAS ("**Furstenberg**") and Marc Bataillon ("**Bataillon**") (collectively, the "**Applicants**"), by and through its undersigned counsel, Holland & Knight LLP, submit this Memorandum of Law in support of their *ex parte* application for discovery pursuant to 28 U.S.C. § 1782 (the "**1782 Application**").

Applicants seek an order from this court (the "**Court**") authorizing them to issue and serve subpoenas for testimony and the production of documents, electronically stored information ("**ESI**") and business records of Litai Assets LLC ("**Litai**"), a company headquartered and operating in Pompano Beach, Florida, within the Southern District of Florida (the "**District**"). The Applicants also seek the same discovery from Jan-Eric Samuel ("**Samuel**"), in his capacity as the Chairman and CEO of Litai, who maintains records and correspondence concerning Litai and its relationship to Jean-Michel Paul ("**JMP**"), found on various media within the official and personal email accounts and other ESI of Litai and Samuel.

Litai and Samuel are in possession of information that will be relevant in the reasonably contemplated foreign criminal and civil proceedings (the "**Foreign Proceedings**") against JMP for violations of the Luxembourg Companies Law based on his fraud, misuse of corporate assets and managerial misconduct as a director of Acheron Portfolio Corporation Luxembourg S.A. ("**APC**"), while also serving as the undisclosed owner, beneficial owner, or controller of Litai. As detailed below, there is initial evidence JMP used his position as a director of APC to enrich Litai, an entity he is believed to covertly own, beneficially own and control.

Applicants Bataillon and Furstenberg were and are minority shareholders of APC, respectively. Furstenberg is currently a minority shareholder of APC. Bataillon is a former minority shareholder of APC and is currently a shareholder of a Luxembourg company called

Ahmose S.A. ("**Ahmose**").  Bataillon traded his shares of APC for shares of Ahmose.

Furstenberg also traded its Class B shares of APC for Ahmose shares, but remains the owner of

Class A APC shares.  Ahmose was founded by Samuel, and also managed by JMP and Acheron

Capital Limited ("**ACL**"), and upon information and belief, was designed to provide a tax

efficient mechanism for APC shareholders such as Applicants to receive APC dividends.

Pursuant to Ahmose's articles of incorporation, the directors of Ahmose were selected by ACL,

which JMP controls.

APC is a public limited liability company ("*société anonyme*") incorporated in

Luxembourg.  APC owns a sub-portfolio of life insurance policies purchased through three trusts

(the "**Trusts**").  APC issues two classes of listed shares: Class A and Class B.  JMP is a "Class

A" director of APC.

ACL is a London-based entity that manages the Trusts that hold APC's policies.  JMP is

the founder of ACL and is described on its website as the person "primarily responsible for

devising and modelling the investment strategy" of ACL.  *See*

http://www.acheroncapital.co.uk/team/ (last visited January 28, 2016).  Since 2009, APC has

paid ACL in excess of $10 million in "management fees."

The Trusts holding APC's policies entered into a servicing agreement (the "**Servicing**

**Agreement**") with Litai.  Litai is a policies administrator involved in "managing 5,000 life

insurance policies."  Since 2009, Litai has received 70% of APC's servicing business, as well as

servicing fees of more than $7.5 million.  Litai appears to be a highly profitable company.

According to its website, Litai's office is located in Pompano Beach, Florida, and its mailing

address is in Pompano Beach as well.  *See* http://www.litaiassets.com/contact/ (last visited

January 25, 2016).

As noted earlier, Samuel is the Chairman and CEO of Litai.  Upon information and belief, he is also a close friend and business associate of JMP.  For example, Samuel is an officer of Tomson PTE. Ltd., a holding company in Singapore that is beneficially owned by JMP.  Upon further information and belief, prior to working at Litai, Samuel had no previous experience in the life insurance, life settlement and servicing industries.

Applicants and other shareholders of APC were not informed about the relationship between APC and Litai.  APC has only disclosed that: (1) ACL is the investment advisor to the Trusts; and (2) Litai services APC's life insurance policies.  What has not been disclosed to APC shareholders is that JMP secretly owns Litai.  Initial allegations of this improper relationship between JMP and Litai have emerged and led a director of APC to resign in 2010.

The relationship between Litai, Samuel and JMP extends to other businesses, as JMP has actively promoted real estate opportunities on behalf of a Litai affiliate.

Applicants have information and belief that the Servicing Agreement contains unusual and non-commercial terms which serve to APC's detriment.  Moreover, JMP's concealment of his apparent ownership interest in Litai is *prima facie* indicia of an improper business relationship.

Via discovery sought in this case from Litai and Samuel, in particular, document discovery, ESI and testimony concerning the JMP-ACL-Litai-Samuel relationship, the Applicants will be able to present conclusive evidence to the Luxembourg court regarding JMP's covert and beneficial ownership and control of Litai.

This evidence will be offered directly to the investigating judge presiding over the criminal Foreign Proceedings, as well as potential civil proceedings, to be commenced by Applicants.  Clearly, the Foreign Proceedings are adjudicative in nature because they will turn on

proving that through his concealed ownership of Litai, JMP has abused his role as a director of APC to the detriment of APC and its shareholders. Such abuse would be a violation of a number of criminal laws in Luxembourg.

Pursuant to 28 U.S.C. § 1782 (the "**Statute**"), an applicant may be granted discovery in the United States in aid of a reasonably contemplated foreign proceeding if: (i) the applicant is an interested party to the contemplated foreign proceeding; (ii) the individual or entity from which information is sought resides or is found within the judicial district; and (iii) the information is located within the United States. If the Statute's requirements are met, the district court must exercise its discretion in light of the Statute's goals. In addition, the district court must consider the discretionary factors described by the Supreme Court to determine whether the requested discovery is warranted.

The relief sought through this 1782 Application is authorized by the Statute and has been routinely granted in this District and in other courts in similar § 1782 applications, as well as applications for discovery in support of foreign insolvencies and domestic litigation.

Assistance is appropriate here because Litai and Samuel each: (i) "resides" or is "found" within this District; (ii) the Applicants are interested persons to the contemplated Foreign Proceedings; (iii) the Foreign Proceedings are reasonably contemplated to be commenced before a "foreign or international tribunal" in Luxembourg; and (iv) the information obtained will be in support of the Foreign Proceedings. Accordingly, this 1782 Application should be granted.

## I.    JURISDICTION AND VENUE

Jurisdiction and venue are proper pursuant to the Statute, as this 1782 Application seeks the discovery of documents, ESI and business records that are located (i) within the United States and this District; and (ii) in the possession, custody, or control of Litai and Samuel, and each are

residing within the District.  Further, such documents, ESI and business records are sought to assist the Applicants in the Foreign Proceedings.

## II.  FACTUAL BACKGROUND AND CONTEMPLATED FOREIGN PROCEEDINGS

The facts giving rise to this *ex parte* 1782 Application are set forth in detail in the Declaration of  Luxembourg lawyer Romain Sabatier, dated February 5, 2016 (the "**Sabatier Declaration**") and the exhibit thereto.

The Applicants were and are minority shareholders of APC, a public limited liability company ("*société anonyme*") incorporated in Luxembourg.  Sabatier Declaration ¶ 16. Furstenberg is currently a minority shareholder of APC, while Bataillon is a former minority shareholder of APC.  *Id.*  Bataillon is currently a shareholder of a Luxembourg company called Ahmose.  *Id.*  Bataillon traded his shares of APC for shares in Ahmose.  *Id.*  Furstenberg traded his Class B shares of APC for Ahmose shares, but remains the owner of Class A APC shares. Sabatier Declaration ¶ 16.  Ahmose was founded by Samuel and previously managed by directors nominated by ACL.  *Id.*  Upon information and belief, Ahmose was designed to provide an efficient tax mechanism for APC shareholders such as Applicants to receive APC dividends.

APC lists Class A and Class B shares on the Official List of the Luxembourg Stock Exchange.  Sabatier Declaration ¶ 14.  JMP  is a "Class A Director" on APC's board.  *Id.* ¶ 17.

Each Class of shares track the performance of a sub-portfolio of life insurance settlement policies.  *Id.* ¶ 15.  Most of the beneficiaries are those of advanced age and/or in poor health.  *Id.*. These policies are purchased by APC via three United States-based trusts: the Lorenzo Tonti Trust, the Acheron Portfolio Trust and the Avernus Portfolio Trust.  Sabatier Declaration ¶ 18.

The Acheron Trust and Tonti Trust are managed by ACL, an investment manager headquartered in the United Kingdom and subject to the regulation of the U.K. Financial

Conduct Authority. *Id.* ¶ 19. ACL manages the policies in the two Trusts via investment advisory agreements. Sabatier Declaration ¶ 22. JMP is both a Class A Director of APC and 100% owner of ACL. *Id.* ¶ 17.

According to ACL's website, JMP is the founder and person "primarily responsible for devising and modelling the investment strategy" of ACL. *See* http://www.acheroncapital.co.uk/team (last visited February 3, 2016). ACL's increasing revenues are almost entirely derived from the management fees it receives from the Trusts. Sabatier Declaration ¶ 23.

APC has paid to JMP (through ACL) management fees in the amount of:

2009: $1,549,527.29

2010: $1,639,564.80

2011: $1,772,844.12

2012: $1,858,412.76

2013: $1,880,544.96

2014: $1,904,529.00

Sabatier Declaration ¶ 24.

Litai is a United States company based in Florida engaged in the business of "managing over 5,000 life insurance policies." *Id.* ¶ 25. Litai services the policies in the 2 Trusts per the Servicing Agreement with APC that ran from 2009 to 2014, an agreement that is believed to have been renegotiated and still is in force. Sabatier Declaration ¶ 28. According to a declaration filed by JMP in 2009, APC has given in excess of 70% of its servicing business to Litai alone. *Id.* ¶ 32. Litai's website states that its office is located in Pompano Beach, Florida

and its mailing address is in Pompano Beach, Florida as well.  *See*

http://www.litaiassets.com/contact/ (last visited January 25, 2016).

The Chairman and CEO of Litai is Samuel.  He is believed to be a close friend and business associate of JMP.  Sabatier Declaration ¶ 26.  As just one example of the closeness of this relationship, Samuel is an officer of Tomson PTE. Ltd., a holding company in Singapore that is beneficially owned by JMP.  *Id.*  Prior to assuming his management role at Litai, Samuel had never worked in the United States, and possessed no experience in the life settlement, life insurance or claims processing industries.  *Id.*

APC paid Litai the following "portfolio servicing fees" under the Servicing Agreement:

2009: $1,549,527.29

2010: $1,639,564.80

2011: $1,609,334.16

2012: $1,513,765.10

2013: $1,550,784.00

2014: $1,858,093.00

Sabatier Declaration ¶ 30.

The only disclosures to shareholders of the relationship between ACL and Litai was that (1) ACL is the investment advisor to the Trusts, and (2) that Litai is the "policies servicer" for APC.  Sabatier Declaration ¶ 34.  As such, neither the Applicants, nor any other shareholders of APC, have been informed that JMP is "double dipping" by exercising secret beneficial ownership and control over Litai.

Litai appears to be a profitable company.  Sabatier Declaration ¶ 33.  Applicants have information and belief that the Servicing Agreement contains unusual and non-commercial terms

which serve to APC's detriment.  Moreover, JMP's concealment of his apparent ownership interest is *prima facie* indicia of an improper business relationship.

Initial evidence concerning the improper relationship between JMP, ACL and Litai emerged when Eric Kalfon, a former member of APC's board of directors, confirmed he resigned from the board in 2010.  Sabatier Declaration ¶ 36.  It was later disclosed by Mr. Kalfon that this was due to JMP's undisclosed and unauthorized control of Litai.  Sabatier Declaration ¶ 36, Ex. A.  JMP has also made a concerted effort to promote investment opportunities involving affiliates of Litai to other APC shareholders.  *Id.* ¶ 37.

The Applicants have reason to believe that the subpar performance of APC can be attributed in part to servicing fees it paid to Litai.  These fees have benefitted JMP, as he owns and controls Litai, while causing damage to the shareholders of APC.

As discussed further in the Sabatier Declaration, this "double dipping" by JMP through his undisclosed ownership of Litai, could constitute criminal misconduct under the Luxembourg Companies Law.  Sabatier Declaration ¶¶ 7, 42.  Such a conflict of interest can constitute, *inter alia*, a misuse of corporate assets, fraud, and managerial misconduct under the Luxembourg Companies Law.  Sabatier Declaration ¶¶ 42-48.

Accordingly, the Applicants plan to file criminal proceedings, and potentially civil proceedings, in Luxembourg against JMP.  Similar to United States law, Luxembourg's Companies Law permits shareholders of a company to take action against directors and managers, and otherwise compel the company to take legal action.  Sabatier Declaration ¶ 44.  Under the Luxembourg Companies Law, any shareholder, creditor or third party who is generally aware of a criminal action, or has suffered a loss may file a complaint.  *Id.* ¶ 40.

In relation to this action, the Applicants request the discovery sought by this 1782 Application to formally start a legal action against JMP ("*action publique*").  *Id.* ¶ 41.  The evidence obtained via the requested discovery from Litai and Samuel would be directly presented to the Luxembourg investigating judge, in support of the criminal complaint to be filed by the Applicants, thereby commencing criminal legal proceedings in Luxembourg and civil actions for damages.  Sabatier Declaration ¶ 41.  Luxembourg has an inquisitorial legal system and the investigating judge is a member of the criminal court of Luxembourg who will independently investigate the matter in view of continuing the prosecution.  *Id.*

The discovery sought is designed to prove that JMP, through his secret ownership or control of Litai, and his position on the board of directors of APC, sits on both sides of the Servicing Agreement.  This would constitute both fraud and "substantial managerial misconduct" under Luxembourg law.  Sabatier Declaration ¶¶ 42, 48.  One element of proving this charge is the decision by a director to execute agreements that are "blatantly unfavourable to the company."  *Id.* ¶ 47.

Another element of proving managerial misconduct under the Luxembourg Companies Law is a "non-disclosure of conflict of interests."  Sabatier Declaration ¶ 47.  This would occur when JMP declined to inform Applicants and all other shareholders of APC that he owned or controlled the companies that both *managed and serviced* APC's life insurance policies.  Sabatier Declaration ¶ 48.

The information received through the discovery requested in this 1782 Application will be presented to the investigating judge and courts in Luxembourg, and if need be, other relevant courts in aid of the civil and criminal actions against JMP.

## III.   ARGUMENT

### A.   *28 U.S.C. § 1782 PROVIDES FOR DISCOVERY IN AID OF THE REASONABLY CONTEMPLATED FOREIGN ACTIONS*

The basis for this *ex parte* Application is 28 U.S.C. § 1782 ("**Section 1782**"). Title 28,

U.S.C. § 1782 "is the product of congressional efforts, over the span of [more than] 150 years, to

provide federal-court assistance in gathering evidence for use in foreign tribunals." *Application*

*of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d

1262, 1269-70 (11th Cir. 2014) (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S.

241, 247 (2004)).

"As a starting point … Courts, including those in the Southern District of Florida,

commonly grant such [Section 1782] ex parte applications." *In re Alianza Fiduciaria, S.A.*, No.

13-81002-MC, 2013 WL 6225179, at *2 (S.D. Fla. Oct. 24, 2013) (citing *In re Clerici*, 481 F.3d

1324, 1331-32 (11th Cir. 2007)). As this Court observed elsewhere: "[t]here is nothing

inappropriate about an ex parte application under [Section 1782]. In fact, in the Court's

experience, *most applications filed in this district are submitted on an ex parte basis*." *In re*

*Application of Alves Braga*, 789 F. Supp. 2d 1294, 1303 (S.D. Fla. 2011) (emphasis added); *see*

*also In re Wilson (Eng'g) Ltd.*, No. 10-20839-MC, 2011 WL 1115359, at *1 fn. 3 (S.D. Fla.

March 24, 2011) ("Section 1782 applications are routinely filed and decided ex parte…"; noting

further that the target of the Section 1782 application "offered no legal authority to support his

belief that he had a due process right to an adversarial hearing before a subpoena can be issued").

Section 1782 authorizes a District Court, upon the application of an "interested person,"

to order a person or entity residing in the district to give testimony or produce documents for use

in a foreign proceeding. Specifically, Section 1782 states that:

> The District Court of the district in which a person resides or is
> found may order him to give his testimony or statement or to

> produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusations.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a); *see also In re Clerici*, 481 F.3d 1324, 1331-32 (11th Cir. 2007).

Whether to grant this Application for discovery pursuant to the Statute is within this Court's discretion. *In re Clerici*, 481 F.3d at 1331 (quoting *U.K. v. U.S.*, 238 F.3d 1312, 1319 (11th Cir. 2001) ("Because Congress has given the district courts such broad discretion in granting judicial assistance to foreign countries, this court may overturn the district court's decision only for abuse of discretion.")) (internal citations omitted).

The Applicants are requesting discovery for reasonably contemplated criminal proceedings, and this Court and the Eleventh Circuit have on numerous occasions previously granted Section 1782 discovery for use in such proceedings.  *See, e.g., Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1273 (11th Cir. 2014) (granting Section 1782 discovery to a company wishing to pursue a criminal action against its former employees in Ecuador); *Weber v. Finker*, 554 F.3d 1379, 1385 (11th Cir. 2009) (permitting Section 1782 discovery to applicant that was defendant in criminal proceedings in Switzerland); *In re Wilson (Eng'g) Ltd.*, 2011 WL 111, 4311 at *5 (Section 1782 relief given to applicant seeking discovery in future criminal proceedings in Colombia).

**B.** ***THE APPLICANTS SATISFY THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782.***

The Supreme Court and Eleventh Circuit have interpreted Section 1782 as having a broad application. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004); *see also In*

*re Clerici*, 481 F.3d at 1331. "The history of Section 1782 reveals Congress' wish to strengthen

the power of district courts to respond to requests for international assistance." *Lo Ka Chun v.*

*Lo To*, 858 F.2d 1564, 1565 (11th Cir. 1988). In determining that Section 1782 authorizes a

federal district court to provide discovery assistance, the Supreme Court specifically rejected the

multiple limitations that Intel attempted to read into the interpretation of the statute. *Intel*, 542

U.S. at 256. Instead, the Supreme Court adopted a broad and liberal interpretation of the Statute

and provided guidelines for the future application of the statute by federal district courts. *Id.*

Consistent with this mandate from the Supreme Court, the discretion afforded to courts in the

Eleventh Circuit is so broad that it even extends to use of evidence obtained under Section 1782

to a *later domestic proceeding*. *See Glock v. Glock, Inc.*, 797 F.3d 1002, 1006 (11th Cir. 2015)

(emphasis added).

As will be detailed point by point below, the Applicants satisfy each of the requirements

of the Statute and those set forth by the Eleventh Circuit in *Clerici*. *Id.* In *Clerici*, the Eleventh

Circuit stated of Section 1782 that:

> A district court has the authority to grant an application for judicial
> assistance if the following statutory requirements in § 1782(a) are
> met: (1) the request must be made "by a foreign or international
> tribunal," or by "any interested person" (2) the request must seek
> evidence, whether it be the "testimony or statement" of a person or
> the production of "a document or other thing"; (3) the evidence
> must be "for use in a proceeding in a foreign or international
> tribunal"; and (4) the person from whom discovery is sought must
> reside or be found in the district of the district court ruling on the
> application for assistance.

481 F.3d at 1331-32 (footnotes and citations omitted).

Numerous precedents in this District and the Eleventh Circuit show that the Court can

enter an Order allowing discovery for use in *contemplated* foreign proceedings. *See Application*

*of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d

12

1262, 1269-70 (11th Cir. 2014) (emphasis added) (holding that Section 1782 may be utilized to gather evidence for use in contemplated foreign proceedings). As noted above, such contemplated foreign proceedings may qualify under Section 1782 even if they are criminal in nature, as is the case here. *Id.* at 1273.

The Applicants are interested persons to the Foreign Proceedings as (1) direct parties to the criminal proceedings to be filed, and (2) as current and former shareholders of a company that may have overpaid fees to Litai, who had a director with a concealed conflict of interest serving on its board. Litai and Samuel are an entity and an individual, respectively, in possession, custody and/or control of the discovery requested, and each resides or should be deemed found within this District. Finally, the documents, records, ESI and testimony sought are for use in the contemplated criminal Foreign Proceedings overseen by an investigating judge in Luxembourg.

> 1. ***Furstenberg Finance SAS and Marc Bataillon, the Applicants, are "interested person[s]" to the Foreign Proceedings.***

The Applicants, as current and former minority shareholders in APC, respectively, and plaintiffs with direct standing in the Foreign Proceedings, are clearly "interested person[s]" as that term is used in Section 1782.

In the Eleventh Circuit, "interested person" has been defined expansively. For example, plaintiffs in forthcoming lawsuits in a foreign country will be considered "interested person[s]" for the purposes of Section 1782. *In re Application of PQ Corp. For Ex Parte Order to Obtain Discovery for Use in Foreign Proceedings*, No. 6:13-mc-9-Orl-36KRS, 2013 WL 3270407, at *4 (M.D. Fla. June 26, 2013) (citing *Intel*, 542 U.S. at 256); *see also In re Pimenta*, 942 F. Supp. 2d 1282, 1286-87 (S.D. Fla. Apr. 17, 2013) ("interested person[s]" are those who will file forthcoming probate proceedings in Brazil*); Ex rel Application of Winning (HK) Shipping Co.*

*Ltd.*, No. 09-22659-MC, 2010 WL 1796579, at *4 (S.D. Fla. Apr. 30, 2010) (party initiating prospective arbitration is an "interested person" under the Statute).

Moreover, both individuals and corporations qualify as "person[s]" under Section 1782, as the United States Code defines a "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. Similar to the specific facts in this case, in the Eleventh Circuit, shareholders of a corporation have the right to seek discovery related to criminal or civil proceedings abroad involving that corporation or its officers. *Weber v. Finker*, 554 F.3d 1379, 1382 (11th Cir. 2009). In *Weber*, the applicant, a shareholder of a Cypriot corporation, requested discovery under Section 1782 from both the corporation and its CEO as part of proceedings related to corporate fraud and mismanagement in Cyprus. *Id.* at 1381. The court granted this relief, which affirms that a shareholder can be an interested person in a foreign proceeding involving the corporation and its officers, which is what is requested by the Applicants in the instant Application . *Id.* at 1382.

Further, the Supreme Court's specific holdings in *Intel* highlights the broad applicability of this standard. The Court recognized the definition of an interested party to be any person who "possess[es] a reasonable interest in obtaining [judicial] assistance." *Intel*, 542 U.S. at 256*; see also In re Req. for Assistance from Ministry of Legal Affairs of Trin. & Tobago*, 648 F. Supp. 464, 466 (S.D. Fla. 1986) ("An application may be made by any interested person. The legislative history supports this view."), *aff'd*, 848 F.2d 1151 (11th Cir. 1988), *abrogated in part on other grounds by Intel*, 542 U.S. 241 (2004).

Here, the Applicants will likely be using the information sought from Litai and Samuel as part of upcoming criminal Foreign Proceedings against JMP for violations of the Luxembourg Companies Law. The Applicants are the direct parties to those criminal proceedings. Moreover,

the Applicants are current and former shareholders of APC, and thus a party to the Servicing

Agreement, which may have been unfair to APC as a result of JMP's concealed ownership of

Litai.  Samuel likely aided and abetted such concealed ownership by serving as the nominal CEO

and Chairman of Litai.  As such, the Applicants clearly possess a reasonable interest in obtaining

the assistance requested, since they are shareholders and former shareholders in a corporation

that contemplate Foreign Proceedings in Luxembourg against one of the corporation's directors.

> **2.      *Discovery is sought for use in the contemplated Foreign Proceedings, which will be held before one or more foreign tribunal.***

The Applicants seek discovery "for use in a proceeding in a foreign or international

tribunal," as required by the Statute.  *Clerici*, 481 F.3d at 1332 (quoting 28 U.S.C. § 1782(a)).

In *Intel*, the Supreme Court confirmed a low threshold for satisfying the "foreign or

international tribunal" requirement by concluding that the Directorate General (i.e., a

governmental investigative body and not a court) is a "tribunal" for the purposes of satisfying the

requirements of the Statute.  The Court also stated that "[t]he term 'tribunal'… includes

investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as

well as conventional civil, commercial, criminal, and administrative courts."  *Intel*, 542 U.S. at

248.

Applicants will directly commence criminal legal proceedings in Luxembourg, in

conjunction with a civil action for damages.  Luxembourg has an inquisitorial legal system, and

the investigating judge who receives the discovery requested by the Applicants is a member of

the criminal court.  Sabatier Declaration ¶ 41.  The judge will independently investigate any

charges against JMP.  *Id.*  Finally, a complaint before this judge formally starts a legal action and

tolls the statute of limitations.  *Id.*  Accordingly, given his adjudicative powers and

responsibilities within the legal system of the country, the investigating judge in Luxembourg is a "foreign tribunal" under Section 1782.

With respect to the status of the proceedings where granting Section 1782 relief is appropriate, as the Supreme Court in *Intel* explained, "the 'proceeding for which discovery is sought under §1782(a) must be within reasonable contemplation, but need not be 'pending' or 'imminent'." *Id* at 243. Specifically, *Intel* also rejected the previous view that a proceeding must be "imminent- very likely to occur and very soon to occur." *Id.* at 259. *See also Weber v. Finker*, 554 F.3d 1379, 1385 (11th Cir. 2009) ("Section 1782 does not require that every document discovered be actually used in the foreign proceeding. Quite the opposite, Section 1782 expressly provides that the district court should grant discovery under the Federal Rules of Civil Procedure … The Magistrate Judge did not err by granting discovery 'for context,' when such discovery is allowed under Rule 26(b)(1)"), *cert. denied*, 130 S. Ct. 59 (2009).

Since *Intel*, several district courts in Florida, as well as the Eleventh Circuit, have followed the Supreme Court's ruling that the Statute allows for discovery assistance to proceedings which have not yet been filed. *See, e.g., Application of Consorcio Ecuatoriano*¸ 714 F.3d 1262, 1270-71 (11th Cir. 2014) (foreign proceedings are reasonably contemplated, and not speculative, even before action has been started); *In re NRC Holding Ltd.*, No. 14-MC-61962, 2015 WL 541770, at *2 (S.D. Fla. Feb. 10, 2015) (same).

The Applicants seek discovery in reasonably contemplated *criminal* Foreign Proceedings, and the Eleventh Circuit, this Court and other District Courts in Florida have each granted such discovery on many occasions. *See, e.g., Application of Consorcio Ecuatoriano*, 747 F.3d at 1275; *In re Wilson (Eng'g) Ltd.*, 2011 WL 111, 4311 at *5; *In re Request from Czech Repub. Pursuant to Treaty*, No. 3:08-mc-001-J-33TEM, 2008 WL 179263, at *2 (M.D. Fla. Jan. 17,

2008) (granting Section 1782 request in part because the "foreign proceedings are criminal in nature and conducted by the [foreign] state").

Finally, the physical and electronic documents - including business records, emails, other ESI and other types of information - as well as the testimony requested by the Applicants - clearly fall within the Statute's discovery scope, which authorizes a court to authorize any person within the district to "give his testimony or statement or to produce a document or other thing …." *In re Application of Mesa Power Grp., LLC*, 878 F. Supp. 2d 1296, 1302 (S.D. Fla. 2012).

> **3.      Litai and Samuel  have possession, custody and/or control of the discovery sought, and each resides in or should be deemed found within this District.**

Litai, including Samuel in his capacity as Chairman and CEO of Litai, "resides" or is "found" in this District.  For purposes of Section 1782, a company is found where it is incorporated or headquartered.  *See Application of Consorcio Ecuatoriano*, 747 F.3d at 1269 (finding that a company that an office and does business in Miami is therefore "found in the district of the district court ruling on the application for assistance").  Applicants seek the testimony and production of documents by Litai and Samuel.  Litai is headquartered in this District, lists a mailing address in this District, and maintains the records requested within the United States and Florida.  Samuel, as the chairman and CEO of a resident company, can be compelled to provide discovery upon request by a court sitting in this District.  All of these facts satisfy the requirement of the Statute that the target "resides" or is "found" in this District.

> **4.      No Other Factors Weigh Against Allowing Discovery**

In addition to satisfying the requirements of *Clerici*, there are no other factors which would argue against allowing the discovery.  481 F.3d at 1331-32.  In a number of cases, such as *Application of Consorcio Ecuatoriano*, the Eleventh Circuit emphasized that the goals of Section

1782 should be considered in deciding motions brought under the Statute.  *Id.* at 1269.  The goals

of Section 1782 are:

> providing an efficient means of assistance to participants in
> international litigation and encouraging foreign countries to
> provide reciprocal assistance to our courts.

*In re Pimenta*, 942 F. Supp. 2d 1282, 1289 (S.D. Fla. 2013) (quoting *Euromepa, S.A. v. R.*

*Esmerian, Inc.*, 154 F.3d 24, 28 (2d Cir. 1998) (citations omitted)).  Both these aims will be

fulfilled by granting the requested discovery.  The discovery sought will assist and be used by

Applicants in the Foreign Proceedings and other contemplated civil proceedings.  It will assist

the Applicants in determining which elements of the Luxembourg Companies Law are

implicated.  In terms of concerns of international comity, it will also encourage foreign courts by

example to provide similar means of assistance to our courts.

     For these reasons, the 1782 Application should be granted because the Applicants have

both met the express requirements of the Statute and the discovery will achieve the goals sought

through enactment of the Statute.  *Clerici*, 481 F.3d at 1335; *Pimenta*, 942 F. Supp. 2d at 1289-

90.

## C.    *THE APPLICANTS ALSO SATISFY INTEL'S DISCRETIONARY FACTORS*

     In *Intel*, the Court identified, in addition to the Section 1782 statutory requirements, four

discretionary factors that bear consideration in ruling on a Section 1782 application.  While the

factors are not exhaustive nor mandatory, the Court held that the following questions should be

considered: (1) whether the person from whom discovery is sought is a participant in the foreign

proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway

abroad, and the receptivity of the foreign government, court, or agency to federal-court judicial

assistance; (3) whether the Section 1782(a) request conceals an attempt to circumvent foreign

proof-gathering limits or other policies of a foreign country or the United States; (4) whether the

discovery requests are unduly intrusive or burdensome.  *Intel*, 542 U.S. at 264-65; *In re Clerici*, 481 F.3d at 1334 (applying discretionary factors in the Eleventh Circuit).

With respect to the first *Intel* factor, granting the Applicants' request for relief is consistent with the guidance provided by, since Litai and Samuel will not be parties to, nor participants in, the Foreign Proceedings.  As such, the Applicants would be unable to obtain discovery from Litai or Samuel in Luxembourg.  *See also In re Application of Setraco Nigeria Ltd.¸* No. 3:13-mc-16-32MCR, 2013 WL 3153902, at *2 (M.D. Fla. June 19, 2013) (discovery target Bank of America would not be a party to contemplated actions in Nigeria, so this factor weighs in favor of Section 1782 applicant); *Intel*, 542 U.S. at 264 (holding that "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach … their evidence, available in the United States, may be unobtainable absent § 1782 aid").

With respect to the second *Intel* factor, the nature of the Foreign Proceedings do not implicate any factor or policy that would weigh against granting the Applicants' request.  Specifically, the contemplated criminal proceedings in Luxembourg do not conflict with "the nature of the foreign tribunal … and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."  *In re Clerici*, 481 F.3d at 1334 (quoting *Intel*, 54 U.S. at 264-65).  Rather, an order granting this 1782 Application will serve to provide the necessary evidence that Luxembourg law requires to move the case from the investigatory stage to formal proceedings.  Further, Luxembourg is a signatory to the Hague Convention, which weighs in favor of granting the application in this District.  *See In Matter of Application of O'Keeffe*, No. 15-mc-80651, 2015 WL 5092806, at *3 (S.D. Fla. Aug. 27, 2015).

The nature of the Foreign Proceedings – international business transactions and potential self-dealing schemes, fraud and misuse of corporate resources – weighs in favor of the

Applicants' request.  The discovery sought here is precisely the type of evidence that can lead the judge to determine whether sufficient evidence exists to continue the prosecution of JMP once formal proceedings are commenced.  Finally, there are no statutes or case law indicating that a Luxembourg court would be unreceptive to assistance from a United States federal court.

Nor would granting the assistance requested by the Applicants offend any foreign jurisdiction or constitute a circumvention of foreign proof-gathering rules, and therefore satisfies the third *Intel* factor.  There is no requirement that Applicants exhaust all discovery processes prior to filing this 1782 Application.  *See In Matter of Application of O'Keeffe*, No. 15-mc-80651, 2015 WL 5092806, at *4 (S.D. Fla. Aug. 27, 2015).  Further, there is no evidence that the Applicants have "tried to circumvent foreign proof-gathering restrictions or other policies" of Luxembourg.  *See In re O'Keeffe*, 2015 WL 5092806, at *4.  Rather, the Applicants are instead "relying upon a discovery procedure that is available to [them] under United States law ... ."  *Id.*

Finally, the requests from the Applicants satisfy the fourth *Intel* factor, as the discovery sought is neither unduly intrusive nor burdensome.  As discussed above, the key information relevant to the Foreign Proceedings is located in this District, since Litai is headquartered and receives its communications in this District, and Samuel, in his capacity as chairman and CEO of Litai, is similarly subject to discovery regarding Litai matters.  *See In re Application of FG Wilson*, No. 10-20839 CIV, 2011 WL 1114311, at *4 (S.D. Fla. Jan. 4, 2011) (request is not intrusive nor burdensome when it is limited to subjects relevant to the involvement of a single person in anticipation of the filing of criminal proceedings).

Litai likely maintains these records as a core part of its business, and it may search easily for and produce them at low cost and insignificant inconvenience.

# IV. CONCLUSION

In summary, consistent with precedent cited above, the facts in the present matter clearly satisfy the requirements of the Statute as well as the discretionary factors, and granting the requested discovery would further the Statute's goals; thus, this Application should be granted.

Dated:       February 8, 2016

By:        /s/ *Philip E. Rothschild*

Philip E. Rothschild, Esq.
HOLLAND & KNIGHT LLP
515 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 525-1000
Fax: (954) 463-2030
phil.rothschild@hklaw.com

Warren E. Gluck, Esq.
(pro hac vice admission pending)
HOLLAND & KNIGHT LLP
31 W. 52nd St.
New York, NY 10019
Tel: (212) 513-3200
Fax:(212) 385-9010
warren.gluck@hklaw.com

*Attorneys for Furstenberg Finance*
*SAS and Marc Bataillon*

21

# EXHIBIT 20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-mc-60266-Bloom**

In re:
 FURSTENBERG FINANCE SAS and
 MARC BATAILLON

                    Applicants

_____/

**ORDER GRANTING *EX PARTE* APPLICATION**
**FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

This cause is before the Court by an *ex parte* Application for Discovery pursuant to

28 U.S.C. § 1782 (the "1782 Application") by Furstenberg Finance SAS and Marc Bataillon

(collectively, the "Applicants"). Having reviewed the 1782 Application, its supporting

memorandum of law, and the Declaration of Roman Sabatier, dated February 5, 2016, as well as

the exhibit thereto, the Court is satisfied that requested discovery is warranted pursuant to 28

U.S.C. § 1782 and the Application is **GRANTED**. It is

**ORDERED and ADJUDGED** that:

1. The Applicants are authorized to issue and serve subpoenas upon Litai Assets LLC

    ("Litai") for business records, deposition testimony, electronically stored information

    and any other electronic communications relating to any communication between Litai,

    Jan-Eric Samuel (in his capacity as Chairman and CEO of Litai or in relation to Litai) and

    Jean-Michel Paul, and any communications between Litai, Acheron Capital Limited

    and/or Acheron Portfolio Corporation Luxembourg S.A.

2. The Court shall retain jurisdiction over the matter for the purpose of enforcing this Order,

    as appropriate, and assessing any supplemental request for discovery assistance by the

    Applicants.

3.   A copy of this Order shall be served with each discovery demand.


DONE AND ORDERED in chambers in Miami, Florida this 9th day of  February, 2016.


_____
BETH BLOOM
UNITED STATES DISTRICT JUDGE


Copies to:
Counsel of Record

# EXHIBIT 21

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 0:16-mc-60266-bb

In re: Application of FURSTENBERG FINANCE
SAS and MARC BATAILLON For an Ex Parte
Order Granting DISCOVERY PURSUANT TO 28
U.S.C. 1782

_____/

## MOTION TO QUASH,
## MOTION FOR PROTECTIVE ORDER,
## AND INCORPORATED MEMORANDUM OF LAW

Litai Assets LLC ("Litai"), pursuant to Federal Rule of Civil Procedure 45 and Local

Rule 26.1, moves this Court to: (1) quash the Subpoena to Produce Documents, Information, or

Objects or to Permit Inspection of Premises; and (2) quash the Subpoena to Testify at a

Deposition in a Civil Action issued by Furstenberg Finance SAS and Marc Bataillon

(collectively, the "Applicants") (collectively, the "Subpoenas") that were served pursuant to 28.

U.S.C. §1782 and this Court's ex parte order of February 9, 2016 [DE 7]; and in support states as

follows:

## RELEVANT FACTS

The present Application purports to be brought by a shareholder in Acheron Portfolio

Corporation Luxembourg S.A. ("Acheron"), a company publicly traded on the Luxemburg stock

exchange. Acheron's business is to purchase and hold through various trusts life insurance

policies from particular individuals. The individuals receive a payment up front, and thereafter

the trusts – through contracts with third party service providers -- manage the insurance policies,

including paying the premiums and collecting the benefits.

The Applicants hope to develop evidence that one of Acheron's directors, Dr. Jean-Michel Paul, holds a secret ownership interest in one of the third party service providers -- Litai Assets, LLC, a Delaware company doing business in Florida. The Applicants claim that the Acheron-Litai contract has paid Litai too much money, depressing the performance of the Acheron funds, and thereby harming their returns. The Applicants claim that if they find evidence that Dr. Paul has a secret ownership interest in Litai, they will then file civil and criminal lawsuits against Dr. Paul in Luxemburg. *See* DE-1 at 3-4.

The Subpoenas should be quashed because the Applicants cannot meet the mandatory requirements of Section 1782. In particular, the Applicants are not "interested persons" within the meaning of the statute, and there is no "reasonable contemplated" proceeding in Luxemburg that would justify discovery.

In fact, the Application's shortcomings are numerous:

### A. Factual Reasons Why Applicants Fail To Satisfy Section 1782

First, the Application is based solely on hearsay – the declaration of Mr. Romain Sabatier (the "Sabatier Dec."), a Luxemburg attorney who has no personal knowledge of the facts at issue. No declaration is submitted by either one of the Applicants.

Second, it appears that neither one of the Applicants are shareholders of Acheron. Accordingly, they do not have any standing to sue Acheron or its directors and are not "interested persons" under Section 1782. *See* Paul Dec. at ¶¶ 4-8; Mertz Dec. at ¶¶ 23-24; Beissel Dec. at ¶¶ 11-13.

Third, even if they are shareholders, they have no standing to sue Acheron's directors for alleged mismanagement relating to the Litai contract. Article 59, §1 of the Companies Law provides that directors can be "*liable* _to the company_ ... *for any misconduct in the management of the company's affairs.*" (emphasis added). Thus, a shareholder cannot sue a director for

mismanagement.  Rather, a shareholder may only ask the company, acting through a majority vote at a general meeting of shareholders, to file such a claim.  *See* Beissel Dec. at ¶¶ 14-17.

Fourth, there is no derivative action in Luxembourg and an individual shareholder does not have the right to initiate such action in the event that the general meeting acting for the company refuses to proceed.  *See* Beissel Dec. at ¶ 16.

Fifth, shareholders also lack standing to sue Acheron's directors for alleged misuse of corporate assets relating to the Litai contract.  An action for misuse of company assets can be brought only (i) by the company itself or (ii) by an individual shareholder if such shareholder suffered a personal damage, independent and distinct from that suffered by the company itself.[1] A shareholder who claims only to have suffered its *pro rata* share of the damage borne by the company has no individual standing and will not be able to file a lawsuit.  The Applicants here do not claim to have suffered individual damage.  Rather, they claim that all shareholders have suffered the same damage as a result of the allegedly high fees paid to Litai.  *See* Sabatier Dec. at ¶ 38.  As a result, the Applicants have no standing to file a lawsuit for misuse of corporate assets. *See* Beissel Dec. at ¶¶ 23-28.

Sixth, the shareholders and Acheron have already "discharged" or released the directors relating to allegations of wrongdoing during the time period at issue.  By way of background, at every annual general meeting of shareholders of Acheron held in the years 2010 to 2015, the annual accounts and the work performed by the directors are presented to the shareholders for approval. Acheron has done this each year for the financial years ended 31st December 2009 to 31st December 2014, respectively. At each meeting the shareholders approved the directors'

---

[1] See in this respect Trib. Arr. Luxembourg, 10 November 2000, R. n°49599; Court of Appeal, 15 February 2012, Pas., 36, p.71; Court of Appeal, 23 April 2015, r. n°38763.

actions and "discharged" them from any liability for acts taken in those years.  *See* Paul Dec. at
¶¶ 9-12; Beissel Dec. at ¶¶ 18-21; Mertz Dec. at ¶ 11, 23.

The granting of the Discharges to the directors of Acheron had two consequences: (i) the
directors were liberated from the risk of facing civil liability claims from the company (Acheron)
on the basis of decisions taken during the financial year for which the annual accounts have been
approved, whether for mismanagement (Article 59, §1 of the Companies Law) or for a breach of
the provisions of the Companies Law, including in case of misuse of corporate assets (Article 59,
§2 and Article 171-1 of the Companies Law) and (ii) through the granting of the discharge,
Acheron waived its right to act against the directors for decisions taken by the latter during such
financial years.  The Discharges fully cover the period during which the Litai agreement was
initially entered into, being 2009, and renegotiated in 2014.  *See* Beissel Dec. at ¶¶ 18-21; Mertz
Dec. at ¶¶ 11, 23.

## B.    Factual Inaccuracies In The Application

In addition to all the factual reasons set forth above as to why the Applicants are not
"interested persons" and cannot use the information they seek in any "foreign proceedings," the
Application also suffers from numerous factual inaccuracies.

First, the Applicants claim they will seek redress from Dr. Paul for contract entered into
between Acheron and Litai in 2009.  However, Dr. Paul was not on Acheron's board in 2009 and
so did not vote to approve that Litai contract.  And as a matter of Luxembourg law, Dr. Paul
cannot be sued for mismanagement due to Acheron entering into the Servicing Agreement in
2009 since Dr. Paul was not a director of Acheron at the time of the negotiation and/or execution
of such agreement. *See* Paul Dec. at ¶¶ 4, 31; Beissel Dec. at ¶ 22; Mertz Dec. at ¶ 5.

In contrast, representatives of the Applicants – in particular Mr. Erich Bonnet – were on
the board of Acheron at the time and did vote to approve the Litai contract.  While the

Application alleges that Mr. Bonnet and another board member, Mr. Eric Kalfon, resigned in 2010 due to an alleged conflict of interest presented by the Litai contract, neither claimed there was any such conflict at the time they resigned, something they were required to do by Luxemburg law. In fact, if there were any wrongdoing, the failure of Mr. Bonnet and Mr. Kalfon to raise that in 2009, or in 2010 when they resigned, would result in their being liable for the wrongdoing as directors, with no liability going to Dr. Paul, who was not a director. *See* Paul Dec. at ¶¶ 18-22; Beissel Dec. at ¶¶ 29-31; Mertz Dec. at ¶ 6-7.

Second, both Mr. Bonnet and Mr. Kalfon continued to acquire Acheron stock after they resigned. In fact, Mr. Bonnet's company, Furstenberg Capital S.C.A. – apparently an affiliate of one of the Applicants – made significant purchases of Acheron stock in 2010 and thereafter. Certainly Mr. Bonnet would not have acquired more Acheron stock in 2010 (after he resigned) if he had resigned out of concern that the Litai contract was unfavorable to Acheron. *See* Paul Dec. at ¶¶ 25-26; Mertz Dec. at ¶ 11.

Third, when Acheron renewed its contract with Litai in 2014, Dr. Paul, who was then on the Acheron board, recused himself from participating in that process. His only role was, after the terms had been preliminarily agreed, negotiating an additional discount for Acheron. *See* Paul Dec. at ¶¶ 32-44; Mertz Dec. at ¶¶ 14-19

Fourth, what Litai charges Acheron is significantly lower that what Acheron's other service providers charge, and lower than the market rates. In fact, the positive performance of Acheron can be attributed, in part, to the superb contract the Board negotiated with Litai and the consistent operational performance of Litai. In other words, the Applicants – to the extent they are shareholders of Acheron – have benefited from Acheron's favorable contract with Litai, and not suffered any damage from it. *See* Paul Dec. at ¶¶ 37, 42; Mertz Dec. at ¶¶ 20-22.

Fourth, the Applicants' allegations are simply wrong.  Where Applicants state, without any evidence, that, between 2009 and 2014, Litai had been paid nearly $10 million, the actual amount was far less.   In paragraph 30, Mr. Sabatier alleges what amounts have been paid to Litai.  That list, however, is the amount that had been paid to all of Acheron's servicers, not just Litai.  The amounts paid to Litai are a much smaller subset.  In paragraph 30, Mr. Sabatier also lists certain amounts paid to Acheron Capital as management fees.  However, the first two figures in paragraph 30 are the exact same as the first two figures in paragraph 24, even though they refer to different fees.  Thus it appears that in an effort to support their erroneous conclusion, Applicants haphazardly pasted tables from Acheron's annual reports, failed to check that they had pasted them correctly, and drew implausible conclusions.  *See* Paul Dec. at ¶ 41; Mertz Dec. at ¶¶ 20-22.

Finally, the fundamental premise of the Application is incorrect.  Dr. Paul does not own or control Litai.  Mr. Samuel is Litai's sole owner.  *See* Paul Dec. at ¶ 30; Samuel Dec. at ¶¶ 2-4.

In sum, the Application is a pure fishing expedition, launched in the hopes of finding evidence to support claims (a) they cannot bring, (b) based upon contracts the Applicants themselves approved and that have benefitted them financially, and (c) that the Applicants have already discharged or released pursuant to Luxemburg law.


**ARGUMENT**

**A.     The Subpoenas Should Be Quashed Because The Applicants Do Not
Satisfy The Mandatory Requirements For Section 1782.**

Section 1782 provides that a federal district court "may order" a person residing or found in the district to give testimony or produce documents "for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person."  28 U.S.C. § 1782

(2012).  The Eleventh Circuit holds that Section 1782 has four prima facie requirements that must be met before a district court is authorized to grant an application for discovery under the statute:

> (1)   the request must be made "by a foreign or international tribunal," or by "any interested person";
>
> (2)   the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing";
>
> (3)   the evidence must be "for use in a proceeding in a foreign or international tribunal"; and
>
> (4)   the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance.

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,* 747 F.3d 1262, 1270 (11th Cir. 2014); *In re Clerici 481 F.3d 1324, 1331 (11th Cir. 2007).*

Here, the Applicants fail to meet two of the four threshold requirements.  In particular, the Applicants do not qualify as "interested persons" and the information they seek is not "for use in a proceeding in a foreign or international tribunal."

Even if the threshold requirements are met, a district court is not required to grant a discovery application. S*ee, e.g., Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). ("We caution, however, that § 1782(a) authorizes, but does not require a federal district court to provide judicial assistance to foreign or international tribunals or to 'interested person[s]' in proceedings abroad.").

Here, the Application should also be denied because it is nothing more than a fishing expedition undertaken in the off chance they get lucky and find something to support the filing of a lawsuit they otherwise have no proof to support.  That is an impermissible use of Section 1782 and an additional ground to quash the subpoenas.

I.      **The Applicants Are Not "Interested Persons" Within The Meaning of The Statute.**

The Applicants allege that they seek to discover evidence to support claims that shareholders of Acheron might bring against the board members of Acheron.  The problem is the Applicants are not shareholders of Acheron and, as such, are not "interested persons."  *See, e.g., RTI Ltd. v. Aldi Marine Ltd.*, 523 Fed. Appx. 750, 751-52 (2d Cir. 2013) ("we conclude that the present factual record does not support a finding that RTI is an "interested person" with respect to the relevant foreign proceedings.").

In *RTI Ltd.,* the Second Circuit rejected an application where the applicant had "not shown that it enjoys significant participation rights, but instead that its sister corporations do." *Id.*   Here, as explained below, the Applicants are not shareholders of Acheron and their affiliation with companies who are shareholders does not make either one of them an "interested person." *Id.*

A.      **The Applicants Admit Bataillon Is Not An Acheron Shareholder**

Applicant Marc Bataillon is not a shareholder of Acheron.  In fact, it is admitted in the Application that he is not a shareholder of Acheron.  *See* Sabatier Dec. at 16.   Instead, Mr. Bataillon is a shareholder in Ahmose S.A. ("Ahmose"), a company that holds a minority stake in Acheron's Class B shares. Mr. Bataillon, as a shareholder of Ahmose, has no ability to file a suit against Acheron either in his own capacity or on behalf of Ahmose.   In other words, Mr. Bataillon is a minority shareholder of a minority shareholder of Acheron.  He is so far removed from Acheron, and its Board, that he would be unable to bring a lawsuit in Luxembourg of the kind he alleges to be contemplating herein.  *See* Paul Dec. at ¶¶ 4-8; Mertz Dec. at ¶¶ 23-24; Beissel Dec. at ¶¶ 11-13.

### B.   Furstenberg Finance Is Not An Acheron Shareholder

A certain amount of mystery surrounds the other Applicant, which is listed on the Civil Cover Sheet as "Furstenberg Finance S.C.A." residing in Luxemburg.  A review of the official website showing all companies organized and existing in Luxembourg does not reveal any entity by the name of Furstenberg Finance SCA.  *See* Paul Dec. at ¶¶ 4-8; Mertz Dec. at ¶¶ 23-24; Beissel Dec. at ¶¶ 11-13.

The caption of the Application itself lists the company as Furstenberg Finance <u>S.A.S.</u>, not <u>S.C.A.,</u> but neither the allegations in the Application or in the supporting declaration state anything further about that company, including where it is organized.  A review of the same Luxembourg website also reveals no company named Furstenberg Finance S.A.S. registered in Luxembourg.  *See* Paul Dec. at ¶¶ 4-8; Mertz Dec. at ¶¶ 23-24; Beissel Dec. at ¶¶ 11-13.

Acheron's own corporate records reveal no shareholders by the name of Furstenberg Finance S.A.S.  There is a Furstenberg entity that is or at least was a shareholder of Acheron.  That entity is Furstenberg <u>Capital</u> S.C.A.  However, Furstenberg Capital S.C.A. is not one of the Applicants.  The Application provides no explanation of the relationship, if any, between Furstenberg Capital S.C.A. and Furstenberg Finance S.A.S.

Moreover, Furstenberg Finance S.A.S. has not submitted any evidence that it owns any Acheron shares or, if it does, when it purchased them.  *See* Paul Dec. at ¶¶ 4-8; Mertz Dec. at ¶¶ 23-24; Beissel Dec. at ¶¶ 11-13.

The only allegations that have been made regarding Furstenberg Finance S.A.S.'s ownership of shares are in the Sabatier Declaration, which states that "Furstenberg also traded its Class B shares of APC [APC is defined as Acheron] for Ahmose shares, but remains the owner of Class A APC shares" with "Furstenberg" being defined as "Furstenberg Finance S.A.S." Sabatier Dec. ¶¶ 4 & 16.  The statement that Furstenberg Finance S.A.S. (a) traded Class B

Acheron shares for Ahmose shares, or (b) is a shareholder of Ahmose, is incorrect. It was Furstenberg _Capital_ S.C.A. that traded its Acheron shares for Ahmose shares. *See* Paul Dec. at ¶ 8 & Ex. 5. Thus, page 12 of the minutes of the meeting of the Ahmose shareholders in which this transaction occurred – the one referenced by Mr. Sabatier – demonstrate that it was Furstenberg Capital S.C.A. that traded its Acheron shares for Ahmose shares. *Id.*

The only Furstenberg entity that owns shares in Ahmose is Furstenberg Capital S.C.A., but Furstenberg Capital S.C.A. is not an Applicant here (perhaps because, as explained below, it has voted to "discharge" or "release" the directors of the company from any claims on numerous occasions).

In sum, other than hearsay statements of the Applicants' attorney, there has been no evidence presented demonstrating that Applicant Furstenberg Finance S.A.S. is a shareholder of Acheron and Ahmose, and the evidence available publicly suggests that (a) the company does not exist in Luxemburg, and (b) if it is incorporated somewhere else, appears not to be a shareholder of Acheron.

  **C. The Acheron Shareholders Have Already Released Any Possible Claims They Have Against The Acheron Board, Including Dr. Paul.**

In Luxemburg, at the annual shareholder meetings, the shareholders are asked if they know of any wrongdoing by the board and, if not, to vote to "discharge" or "release" the directors of the company from any claims. In 2015, Furstenberg Capital SCA voted to discharge all Acheron directors from any claims of wrongdoing. Moreover, Ahmose, the entity in which Applicant Bataillon holds a minority share, also voted in 2014 to discharge all Acheron directors from any claims of wrongdoing. The annual discharge of the board means all the shareholders forego any claims they may have against Acheron's directors. *See* Paul Dec. at ¶¶ 9-12; Beissel

Dec. at ¶¶ 18-21; Mertz Dec. at ¶ 11, 23.

Thus, with the shareholders having released all possible claims, the Applicants are not "interested persons" within meaning of Section 1782.

## II.     No Proceedings Are Reasonably Contemplated

The Applicants also fail to meet the mandatory requirement that the evidence is "for use in a proceeding in a foreign or international tribunal."  Here, the Applicants admit there is no such proceeding but rather argue that they seek the evidence for use in a proceeding that they are "reasonably contemplating."  When the Eleventh Circuit first addressed the issue of "reasonably contemplated" proceedings, it held that the "district judge should satisfy himself that a proceeding is very likely to occur. If the judge doubts that a proceeding is forthcoming, or suspects that the request is a 'fishing expedition,' the district court should deny the request." *In Re Request for Assistance for Ministry of Legal Affairs of Trinidad and Tobago,* 848 F.2d 1151, 1156 (11th Cir. 1988).[2]  More recently, the Eleventh Circuit reaffirmed that "a district court must insist on reliable indications of the likelihood that proceedings will be instituted within a reasonable time."  *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,* 747 F.3d 1262, 1270 (11th Cir. 2014).

The Applicants here have not shown, and cannot show, any reliable indications that any proceedings will be instituted.  In that regard, this case is on all fours with *In re Certain Funds, Accounts, and/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Group LLC*, , 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014).[3]  There, Fortress Investment Group, the applicant, had

---

[2] *Abrogated on other grounds by Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004).

[3] *Aff'd sub nom. Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015).

invested hundreds of millions of dollars in a series of debt instruments and notes from two Saudi Arabian business conglomerates-the Saad Group and Ahmad Hamad Algosaibi and Brothers Company ("AHAB"). As Fortress explained it, as a result of the largest fraud in Saudi Arabian history, "billions of dollars in net worth in major, longstanding businesses evaporated overnight without any rational explanation." *Id.* These defaults triggered a series of international judicial proceedings, both in Saudi Arabia and the Cayman Islands.

In addition to those existing proceedings, Fortress – based on the declaration from its Managing Director responsible for legal issues – testified it had retained legal counsel (Jones Day) to "investigate and prosecute" certain "tort and breach of contract claims against those responsible for the faulty financial reports that misled investors, including KPMG, PricewaterhouseCoopers ("PwC"), and other accounting firms that audited the financial statements included in the prospectus. *Id.* To support their planned claims against KPMG and PwC, the Petitioners filed the 1782 applications seeking "to conduct discovery against KPMG and PwC, whose member firms provided auditing, review, and other services… to Saad Group and AHAB entities in the years leading up to their collapse."

Judge Buchwald ruled that retaining "counsel to investigate and prosecute their claims in the planned proceedings" was not sufficient in that case to mean that the planned action was "within reasonable contemplation" for purposes of the Section 1782 petition. *Id.* The Court explained that "the concerns about misuse of the discovery process are particularly pronounced in this case, since petitioners have had an opportunity to initiate judicial proceedings abroad but have failed to do so." *Id.* at *7.

The exact same is true here. The Applicants have had an opportunity to initiate judicial proceedings since at least 2010, when they claim they resigned from the Acheron Board due to the alleged conflict of interest they claim arises from the Litai contract. The fact that the

Applicants have failed to initiate proceedings for more than five years strongly indicates that litigation is not reasonably contemplated. Moreover, not only did they fail to initiate proceedings, they continued acquiring significant amounts of stock in Acheron and then voted in 2015 to discharge Acheron's directors from any liability.

Judge Buchwald noted that "courts must guard against efforts by parties to engage in fishing expeditions before actually launching litigation."[4] She went on to explain the need to guard "against the potential that parties may use § 1782 to investigate whether litigation is possible in the first place, putting the cart before the horse. The latter situation is not an appropriate one for a court to compel discovery." *Id.*

That is exactly what is happening here. The Applicants have no evidence that Dr. Paul has any ownership interest in Litai. They are seeking to use Section 1782 to engage in a fishing expedition to see if litigation is even possible in the first place. That is not a permissible use of Section 1782.

The *Certain Funds* Court concluded that was exactly what was happening there and held: "because we are concerned that this action is more akin to a fishing expedition, we conclude that petitioners may not rely on their planned proceedings to satisfy the statutory requirement that the material be for 'use' in a foreign proceeding." *Id.* at *7. This Court should reach the same result.

Fortress appealed Judge Buchwald's decision, but the Second Circuit affirmed, emphasizing that the "applicant must have more than a subjective intent to undertake some legal action, and instead <u>must provide some objective indicium</u> that the action is being contemplated."

---

[4] *In re Certain Funds, Accounts, and/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Group LLC*, 14 CIV. 1801 NRB, 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014) *aff'd sub nom. Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015).

*Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.,* 798 F.3d 113, 123 (2d Cir. 2015). The Court further held that, "[a]t a minimum, a § 1782 applicant must present to the district court some <u>concrete basis</u> from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Id.*[5]

Simply put, after the Second Circuit's decision in *Certain Funds*, the "**burden is not satisfied because the petitioner has retained counsel and is discussing the possibility of initiating litigation**." *In re Asia Mar. P. Ltd.*, 15-CV-2760 VEC, 2015 WL 5037129, at *4-5 (S.D.N.Y. Aug. 26, 2015) (emphasis added). There, the Court noted that the "Petitioner was unable to locate Arma's assets through other means prior to making the present application," which "demonstrates that attachment proceedings cannot be commenced unless discovery reveals that Arma has assets against which Petitioner may proceed." That meant that the "Petitioner does not "contemplate" bringing … proceedings so much as it hopes to discover assets against which it can bring … proceedings." *Id.* Therefore, the court concluded, "the contemplated proceedings here are purely speculative." *Id.*[6]

The same thing is true here. The Applicants cannot commence any lawsuit against Dr. Paul unless their fishing expedition happens to turn up favorable evidence for them. As Judge

---

[5] *Accord, e.g., In re Letter of Request from the Crown Prosecution Serv. of the U.K.,* 870 F.2d 686, 692 (D.C.Cir.1989) (R.B. Ginsburg, J.) (describing the "decisive" question as whether there was "sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially").

[6] Following *Certain Funds*, courts have become much more vigilant in policing applicants' attempts to use Section 1782 to develop evidence that will enable them to file lawsuits. *See, e.g., In re MT BALTIC SOUL Produktentankschiff-Ahrtsgesellschaft mgH & Co. KG,* 15 MISC. 319 LTS, 2015 WL 5824505, at *2 (S.D.N.Y. Oct. 6, 2015) (Noting that "Petitioners' request has every indication of being an archetypal fishing expedition" and holding, therefore, that "Petitioners have provided no such concrete basis here for a determination that the discovery is actually being sought in aid of a contemplated foreign adjudicative proceeding.").

Buchwald held, that "situation is not an appropriate one for a court to compel discovery." *Id.*[7]

The Southern District of Florida follows the same approach as the Southern District of New York. Recently, in *Matter of Application of O' Keeffe*, No. 15-MC-80651, 2015 WL 5092806, at *10 (S.D. Fla. Aug. 27, 2015), the court noted that the "Eleventh Circuit instructs that courts should also consider whether the application is 'made in bad faith', 'for the purpose of harassment', or is part of a 'fishing expedition.'" *Id.*, (*quoting In re Kivisto,* 521 Fed. Appx. at 888). Specifically, the Eleventh Circuit has instructed:

> We expect "the district [court] [to] **carefully examine** and give **thoughtful deliberation** to any request for assistance submitted by an 'interested person'" **and "deny the request"** when it "suspects that the request is a 'fishing expedition' or a vehicle for harassment."

*In re Kivisto,* at 889 (affirming denial of Section 1782 application, and quoting *Ministry of Legal Affairs of Trinidad and Tobago,* 848 F.2d 1151, 1156 (11th Cir. 1988)).

In *O'Keeffe*, the Court also refused to allow the 1782 discovery, noting that the applicant was proceeding only "on information and belief" that it might find evidence, and was therefor "seeking to throw a large net into a very large ocean, with no real proof that any fish are present…" *Id. See also, e.g., In Re Green Dev. Corp. S.A. De C.V.,* No. CV CCB-15-2985, 2016 WL 640791 (D. Md. Feb. 18, 2016) (denying 1782 application where the court concluded it was "sheer speculation" that the target may have responsive information).

The same is true here. The Applicants have presented absolutely no evidence that Dr. Paul has any ownership interest in Litai. In contrast, both Dr. Paul and Mr. Samuel (the ultimate owner of Litai) have submitted sworn declarations confirming that Dr. Paul has no ownership

---

[7] Here, the fishing expedition is ever more egregious. Whereas the applicants in the cases cited above were seeking evidence to enable the applicants themselves to file claims, the Applicants here are not even doing that. Rather, they are seeking evidence to present to the other shareholders of Acheron in the hope of convincing these other shareholders to file a claim. *See* Beissel Dec. at ¶ 15.

interest in Litai.

The lack of evidence presented, and the legal inability of the Applicants to bring any foreign claims, is in stark contrast to *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,* 747 F.3d 1262, 1270 (11th Cir. 2014), where the Eleventh Circuit reaffirmed that "a district court must <u>insist</u> on <u>reliable indications</u> of the likelihood that proceedings will be instituted within a reasonable time."

In *JAS Forwarding*, JAS Forwarding filed an arbitration claim against Conecel for non-payment of invoices. In examining the amounts due, Conecel discovered that two of its employees engaged in a scheme with certain employees of JAS Forwarding in Miami to create fraudulent invoicing. In addition to defending the arbitration, Conecel sought to implement criminal proceedings in Ecuador against those two employees. To substantiate its application, Conecel submitted the declaration of its own Legal and Compliance Director, Mr. Teodoro Maldonado Guevara, who had personal knowledge of that matters. Mr. Guevara explained in detail the investigation Conecel's auditors had undertaken and how that investigation revealed the role that two of its own employees had taken in collusion with JAS Forwarding employees in Miami. Conecel sought documents from JAS Forwarding in Miami not only to substantiate its own audit findings, but also because Ecuadorian law required Conecel, when it filed suit against those employees, to present all available evidence as part of its complaint. It was based on this – the declaration of a compliance officer with personal knowledge and an audit of Conecel's books that revealed the fraudulent invoicing – that the District Court and the Eleventh Circuit found that there were "<u>reliable indications</u> of the likelihood that proceedings will be instituted within a

reasonable time."[8]

In stark contrast to Conecel, the Applicants here have provided no "reliable indications that proceedings will be instituted within a reasonable time." The Applicants here have not even presented any evidence from anyone with personal knowledge. Moreover, the most the Applicants here can do is present any evidence they obtain to the general meeting of the shareholders of Acheron in the hope they will decide to pursue an action against Dr. Paul, despite the fact that those same shareholders have already discharged Dr. Paul for any liability for the acts allegedly in question here.[9]

### III. The Applicants Have Failed To Establish That The Discovery They Seek Is "For Use" In A Foreign Proceeding.

To satisfy the third statutory requirement, an applicant for a § 1782 order must establish that the discovery sought is "for use in a proceeding before a foreign tribunal." Here again the *Certain Funds* case provides guidance given the similarities of the facts. There, the Court held that the "**key question**" is not simply whether the information is for use in a proceeding, but rather "**whether the Funds will actually be able to use the information in the proceeding**." *Certain Funds,* 798 F.3d at 123 (emphasis added).

Because the applicants there held only a 20% stake in the party pursuing the foreign action, the applicants would be unable to direct that party's conduct in the foreign action (because to direct the action required a 25% stake). "Consequently, the Funds are not in a

---

[8] As the Eleventh Circuit noted, "CONECEL's detailed application, accompanied by two declarations and a memorandum of law, sought evidence from JAS USA relating primarily to the invoicing and calculation of rates charged to CONECEL. The application was also accompanied by a sample air waybill purporting to show that JAS USA's Miami office was involved in the provision and invoicing of transport services to CONECEL." *Id.* The declarations themselves can be found at DE 1 in *In re: Application of Consorcio Ecuat, et al* District Court Docket No: 1:10-mc-22320-DLG

[9] The Applicants' claim that they also contemplate some sort of criminal action suffers from the same defects and is improper under Luxembourg law. *See* Beissel Dec. at ¶¶ 41-58.

position to direct the Delegate [the Party to the foreign action] to consider their evidence or submit that evidence to the tribunal." *Id.* The Court explained:

> Even assuming that the Funds have the ability to submit information to the Delegate, who can then decide whether or not to use that information, that does not establish that the information is "for use" in a foreign proceeding; it establishes, at best, that the Funds can furnish information in the hope that it might be used. That is no different from a third party providing information to a private litigant that it believes might be useful in a lawsuit, or a witness approaching a prosecutor's office claiming to have knowledge of a crime. Such information might be relevant or interesting to the recipient, but it is not "for use" in any proceeding in which the recipient is a party unless the recipient takes some further, independent action to introduce it.

*Id.*

The same is true here.

The only thing an Acheron shareholder can do is present the information to the general meeting of the Acheron shareholders and request action on it. If refused, the shareholders would have no ability to proceed either directly against the Acheron Board (because it does not claim to suffer any injury distinct from any other shareholder) nor to proceed derivatively on behalf of Acheron against its Board. *See* Beissel Dec. at ¶¶ 14-17. Thus Acheron shareholders have no ability to use the information in any foreign proceeding.

The same applies to Applicant Bataillon. He is not a shareholder of Acheron. He is a shareholder of a company called Ahmose, which is a shareholder of Acheron. He would have to present the information he found to Ahmose, and ask Ahmose to present it to the Acheron Board, asking the Board to file an action against Dr. Paul. *See* Beissel Dec. at ¶ 11. That also is not seeking evidence for use in a foreign proceeding. It is seeking evidence to present to other shareholders in the hopes of instituting a foreign proceeding. [10]

---

[10] The Applicants' claim that they also contemplate some sort of criminal action suffers from the same defects and is improper under Luxembourg law. *See* Beissel Dec. at ¶¶ 41-58.

## IV.    Request For Oral Argument

Litai believes that oral argument may assist the Court and hereby requests oral argument on these Motions pursuant to Local Rule 7.1(b). The Court may have additional concerns not addressed in this Motion and the undersigned estimates that thirty (30) minutes is sufficient to address any questions and/or concerns of this Court.

## V.    Conclusion

Litai respectfully requests the Court enter an order quashing the subpoenas in their entirety.[11]

Respectfully submitted,

**AXS Law Group**
*Attorneys for the Respondents*
1850 Purdy Avenue
Miami, Florida 33139
Telephone:  (305) 389-3646

By:   /s/ *Jeffrey W. Gutchess*
**Jeffrey W. Gutchess**
Florida Bar No. 702641
jeff@axslawgroup.com

**Daniel Tropin**
Florida Bar No. 100424
dan@axslawgroup.com

---

[11] The parties have agreed to a briefing schedule whereby counsel for Applicant shall file the Response Brief by April 18th.

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on counsel for Applicant via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Jeffrey W. Gutchess*_____

# EXHIBIT 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

```
-----------------------------------------------------X
                                                      )
In re:                                                )   Case no. 16 – Misc. - 60266
                                                      )
FURSTENBERG FINANCE SAS and                           )
MARC BATAILLON                                        )
                                                      )
                                                      )
-----------------------------------------------------X
```

## DECLARATION OF YVES MERTZ

I, Yves Mertz, hereby declare under penalty of perjury of the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.     I make this declaration in support of Litai Asset LLC ("Litai") and Jan-Eric Samuel's Objection to Applicants Furstenberg Finance SAS and Marc Bataillon's ("Applicants") *Ex Parte Application for Discovery Pursuant to 28 U.S.C. § 1782* filed on February 9, 2016.

2.     I am currently the Chairman of the Board of Directors of Acheron Portfolio Corporation Luxembourg S.A. ("Acheron or APC"). I have been a member of the Board of Directors of Acheron (the "Board") since February 24, 2010.

3.     Many of the documents sought by the Applicants' subpoena served upon Litai on February 10, 2016 are confidential and contain propriety pricing and trade secrets. Acheron is a publicly traded company. As the Chairman of the Board, I have a responsibility to our shareholders, and a legal duty, to keep confidential information from reaching those who seek to unfairly profit from it. It is my understanding that Erich Bonnet is the ultimate beneficial owner of Furstenberg Finance SAS and controls and/or manages Furstenberg Capital SCA and Furstenberg Sàrl, (the Furstenberg companies). Mr. Bonnet, through these entities, actively traded

80422194v5

Acheron stock after his resignation from the Board. As such, providing the Applicants with information not available to the public could be damaging to our shareholders.

4.     In addition, Erich Bonnet, directly or through representatives of the "Furstenberg" companies he controls, has sought from the Company in other occasions, exactly the same kind of information concerning the Litai servicing agreement from Acheron pursuant to Luxembourg law. In this context, Mr. Bonnet was provided the proper and correct answers to his questions concerning the agreement according to Luxembourg law and he is not entitled to any additional information. (See Declaration of Arendt and Medernach S.A., ¶ 8).

5.     Jean-Michel Paul was not a member of the Board in 2009 when Litai entered into a Servicing Agreement with Acheron Portfolio Trust and Lorenzo Tonti Trust, pursuant to which Litai was retained to service life insurance policies (the "Servicing Agreement") for a term of five years.

6.     In contrast, Erich Bonnet and Eric Kalfon were both members of the Board in 2009, followed the contract negotiations, and specifically voted to approve the Servicing Agreement. (Ex. 1 - Resolution of the Board).  Neither had previously raised any issues concerning the fairness of the Servicing Agreement. Certainly Eric Kalfon did not raise the issue in his resignation. (Ex.2 - Resignation of Eric Kalfon dated September 25, 2010).  Erich Bonnet also failed to raise any issues in his resignation on behalf of Furstenberg Investissement Sprl. (Ex. 3 - Resignation of Eric Bonnet dated July 20, 2010).

7.     To the extent that there is a cause of action against the Board for approving the contract it would be Erich Bonnet and Eric Kalfon who would be liable, particular as they never disclosed their misgivings at the next annual shareholders meeting, as is provided for by Luxembourg law. (See for more details Declaration of Arendt & Medernach S.A.).

8.      As far as I can tell the only person who has sworn a declaration concerning the allegations of underhanded dealings or conflict of interest in this case is the Applicant's Luxembourg counsel, who clearly has no knowledge of the facts.

9.      I understand that the Applicants have complained about two matters relating to the Litai contract.  First, that Litai is receiving above market rates.  This is incorrect.  The rates were significantly lower than the market and in line and lower than what Acheron had disclosed it was expecting paying in its Listing Prospectus.  The rate difference is clearly set forth in a Board resolution and was acknowledged by Erich Bonnet and Eric Kalfon when they signed the resolution as Board members. (Ex. 1 - Board Resolution approving the Servicing Agreement signed by Kalfon and Bonnet).

10.     The second issue raised by the Applicants are of certain supposedly hidden, non-commercial provisions within the Servicing Agreement. These provisions were clearly noted and explained in the Board's resolution that was signed by both Erich Bonnet and Eric Kalfon. (Ex. 1). These provisions are quite beneficial to Acheron, and hardly represent "double dipping," as they ensure a lower price charged by Litai in exchange for the performance of certain tasks by ACL that Litai cannot duplicate.

11.     Indeed, my records indicate that one of the Furstenberg affiliates, Furstenberg Capital S.C.A., continued to increase its shareholding position directly after the resignations of Erich Bonnet and Eric Kalfon, which calls into question the truthfulness of the asserted reason for resignation.  Further, it appears that the Furstenberg companies, Ahmose (which M Bataillon is a shareholder of) and Mr. Kalfon have never voted against a discharge of the Board of Acheron at the annual general meetings of shareholders of Acheron.  In fact, a Furstenberg company, Furstenberg Capital S.C.A., voted in favor of discharge as recently as last year. (Ex. – 4 General

Meeting of the Shareholders June 22, 2015). As our counsel has explained to me, a validly granted annual discharge of the board means that Acheron, acting through its general meeting of shareholders, waived any civil claims it may have against Acheron's directors for the financial year for which the discharge has been sought.

12. With respect to the foregoing, I can confirm in my capacity as director and current chairman of the board of directors of Acheron that the annual accounts that were presented to the general meeting of shareholders of Acheron at any time during my directorship did not contain any omission or incorrect statement that would not reflect the real financial situation of Acheron ; instead, such accounts provided a true and fair view of the accounting situation of Acheron and were prepared in full compliance with Luxembourg law and the applicable accounting standards.

13. Jean-Michel Paul did not become a member of the Board of Acheron until December 2010.

14. In 2013, the Board undertook a process to either replace, or renew, the Litai Servicing Agreement which was to expire in the following year. Mr. Paul informed the Board of Acheron that he would not take any part in the process of replacing Litai or amending the Servicing Agreement, explaining that he was both a friend of, and had business relationships with, the owner of Litai, Mr. Jan-Eric Samuel, and wanted to avoid any appearance of impropriety. (Ex. 5).

15. Acheron appointed Acheron Capital Ltd. to solicit quotes and other data from many life insurance servicers, including Litai, to potentially replace the Servicing Agreement. The bidding process was competitive and, given the large number of policies involved, many applications were received. The Acheron Board tasked two of its members to review each bid

independently. One of these members was chosen because he was a former auditor at a Big 4 accounting firm, and we trusted his methodology and insight.

16.     As part of their independent review, one of these two Board members visited Litai, investigated their IT infrastructure and their competence to service the number of policies in this bid. Litai's capabilities exceeded our service requirements and the cost to Acheron was lower than every other service provider investigated for every scenario we could envisage.

17.     A review of the quotes provided by the various service providers was prepared for the Acheron Board by one of the two directors appointed to evaluate Litai and submitted to the Board at a meeting on December 9, 2013.

18.     Upon consideration of the report and all responsive life insurance service providers, the Acheron Board, without any input from Jean-Michel Paul, decided to pursue renewal of its contract with Litai.

19.     The renewal of the Litai contract involved months of discussions and negotiations with Litai. Ultimately, after negotiating an even lower price for Litai's service, the Board determined Litai provided the better value in terms of services and prices. The contract that was entered is similar in almost all respects to the Servicing Agreement approved by Erich Bonnet and Erich Kalfon in 2009.

20.     Publicly available information clearly refutes Applicants' allegation that the servicing contract with Litai is harming Acheron by charging above-market rates. As established above, specific pricing information is confidential and I cannot divulge specific figures herein. However, I reference a recent trade publication from July of 2014 which discussed abusive charges by policy servicers that reached into the thousands of dollars per policy. As examples of reasonable rates, the article highlighted two asset servicing groups similar to Litai, and stated that

one received an average of $750 per year to service each policy and could charge as high as $1300 and another's ranged between $750 and $1200. (Ex. 6). In Acheron's public listing prospectus, our servicing rates for class A and B shares are listed to be between $200 and $400. (Ex. 7). All of Acheron's servicing partners fall within these bounds. Thus, Acheron receives substantial and material savings from its contract with Litai when compared to industry standards."

21.     Since 2008, Acheron has used a diversified group of service providers, of whom Litai is only one of three. Of our three providers, Litai is by far the least expensive and provides Acheron with the best service. The rates negotiated with Litai, or any of our service providers, are confidential and their disclosure could harm both Acheron and our service partners. However, I can say that the Applicants grossly overstate the payments made to Litai in the period from 2009 to 2014 to such an extent that the source of all their allegations against Acheron must be significantly discounted. Should the Court require greater details on Acheron's service contracts and our providers, we will provide this information unredacted to the Court for in camera review. Of course knowledge of the rates we are charged to service the policies would be of immense value to any of our competitors, both now and in the future.

22.     Because of our competitive bidding process and strong negotiation leverage, Acheron has, contrary to Applicants assertions, performed significantly better than the reference Life Settlement Index. Since 2008, audited financial reports show that APC shares' Net Assets Value (NAV) are growing, with Class A growing at an average of about 7% per year over that period and Class B growing as well. Litai's lower costs and superior service are part of the reason we can deliver returns significantly above the industry standard.

23.     From my review of the shareholder meeting minutes and various other records of the corporation, it is not clear that either of the Applicants are currently shareholders of Acheron. Indeed, the Applicants have failed to document they owned shares of Acheron, which may be intentional.  The Civil Cover Sheet filed in the Southern District of Florida on February 9, 2015 lists one of the Plaintiffs as Furstenberg Finance S.C.A., a company organized in Luxembourg. (Ex. 8).   I have reviewed the official website showing all companies organized and existing in Luxembourg, and Furstenberg Finance SCA does not appear. (Ex. 9 – Translation Included).   To my knowledge, there are two Furstenberg companies, Furstenberg Capital S.C.A. (which has its registered office in Luxembourg) and Furstenberg Finance SAS (which has its registered office in France).  I am not familiar with Furstenberg Finance SAS which is listed as the interested party in all of Applicants' pleadings, except the Civil Cover Sheet, but as Chairman of APC, I do not have any information to suggest that it is currently a shareholder of Acheron or Ahmose SA. Furstenberg Capital S.C.A. owns shares of Acheron and, in my understanding, Ahmose SA, but has voted consistently to discharge the Acheron Board at every General Shareholder Meeting. Thus, neither of the Furstenberg entities that I know exists should have the ability to bring a civil lawsuit in Luxembourg against members of the board of directors or Acheron based on the allegations set out in the Discovery Request.

80422194v5

24. With respect to applicant Mr. Bataillon, it is admitted in the Application that he is not a shareholder of Acheron. Instead he owns shares of Ahmose SA, a separate company which itself owns shares of Acheron. Accordingly, Bataillon is not a shareholder and would have no right to bring any civil claim against members of the board of directors or Acheron based on the allegations set out in the Discovery Request.

Dated: 23 *Mars*, 2016

Yves MERTZ

Director

Name:
Title: Luxembourg,

Acheron Portfolio Corporation (Luxembourg) SA
37, rue d'Anvers
L-1130 LUXEMBOURG
contact@acheronportfolio.lu

# EXHIBIT 1

REDACTED

Acheron Portfolio Corporation (Luxembourg) S.A.
*Société Anonyme*
(the « **Company** »)
Registered office:
14 rue du Marché aux Herbes, L-1728 Luxembourg
R.C.S. Luxembourg: B129880

## CIRCULAR RESOLUTIONS OF THE BOARD OF DIRECTORS

The undersigned:

- Ms Claudia Schweich
- Mr Renaud Labye
- Mr Marcel Stephany
- Mr Erich Bonnet
- Mr Lindsay Thomas Sharp
- Mr Eric Kalfon
- Mr Alain Jean René Reinhold
- Mr Thierry Grosjean

### Third resolution

The Directors hereby unanimously acknowledge the following key terms of the AP Trust Servicing Agreement:

The Directors further approve the AP Trust Servicing Agreement and resolve to instruct and authorise Mr. Robert H. Edelstein, as trustee of the AP Trust, to execute the AP Trust Servicing Agreement with such changes thereto as may be approved by any two directors of the Company.

### Fourth resolution

## Fifth resolution

The Directors hereby unanimously acknowledge the following key terms of the Lorenzo Tonti 2006 Trust Servicing Agreement:

The Directors further approve the Lorenzo Tonti 2006 Trust Servicing Agreement and resolve to instruct and authorise Mr. Robert H. Edelstein, as trustee of the Lorenzo Tonti 2006 Trust, to execute the Lorenzo Tonti 2006 Trust Servicing Agreement with such changes thereto as may be approved by any two directors of the Company.

| Director | Date | Signature |
|---|---|---|
| • Ms Claudia Schweich | October 15, 2009 | |
| • Mr Renaud Labye | October 15, 2009 | |
| • Mr Marcel Stephany | October___, 2009 | |
| • Mr Erich Bonnet | October 14, 2009 | |
| • Mr Lindsay Thomas Sharp | October___, 2009 | |
| • Mr Eric Kalfon | October 14, 2009 | |
| • Mr Alain Jean René Reinhold | October 14, 2009 | |

3391125-V1

- Mr Thierry Grosjean    October 1⅟₂ , 2009



| Director | Date | Signature |
|---|---|---|
| • Ms Claudia Schweich | October___, 2009 | |
| • Mr Renaud Labye | October___, 2009 | |
| • Mr Marcel Stephany | October 15, 2009 | |
| • Mr Erich Bonnet | October 14, 2009 | |
| • Mr Lindsay Thomas Sharp | October 22, 2009 | |
| • Mr Eric Kalfon | October 14, 2009 | |
| • Mr Alain Jean René Reinhold | October 14, 2009 | |

3391125-V1

# EXHIBIT 2

Monsieur Eric Kalfon
10 rue Oswaldo Cruz
75016 Paris
France

**Acheron Portfolio Corporation**
A l'attention d'Yves Merz
5 avenue Gaston Diderich
L 1420 Luxembourg

Le 25 Septembre 2010

Monsieur le Président,

Comme annoncé en début de séance du conseil du 22 septembre dernier, je vous
confirme que je démissionne de ma position de membre du conseil d'administration
d' Acheron à compter de ce jour.

Je vous prie de recevoir, Monsieur, l'expression de ma sincère considération.

Eric Kalfon

Translation Chairman Exhibit 2,

Resignation letter from Mr Eric Kalfon to Acheron Portfolio Corporation:

Monsieur le President

Mister the President

Comme annoncé en début de séance du conseil du 22 septembre dernier, je vous confirme que je démissionne de ma position du conseil d'administration d'Acheron à compter de ce jour.

As announced at the beginning of the meeting of the Board on September 22nd, I hereby confirm that I resign of my position on the board of Acheron as of this day.

Je vous prie de recevoir, Monsieur, l'expression de ma sincère considération

Please acknowledge, Sir, the expression on my sincere consideration

Case 1:18-mc-00041-JGK   Document 4-1   Filed 02/06/18   Page 178 of 372

# EXHIBIT 3

Acheron Portfolio Corporation (Luxembourg) SA
5, avenue Gaston Diderich
L-1420 Luxembourg

Attn Board of Directors


Paris, July 20, 2010


Dear Board Members,


Please accept this as official notice of my resignation from the position of Board Member of
Acheron Portfolio Corporation with immediate effect.

Best regards,


Erich Bonnet
On behalf of Furstenberg Investissement

# EXHIBIT 4

# Acheron Portfolio Corporation

**ACHERON PORFOLIO CORPORATION (LUXEMBOURG) S.A.**
*Société anonyme*
Registered office : 37 rue d'Anvers  L-1130 Luxembourg
RCS Luxembourg  B129880

SUMMARY OF THE DECISIONS TAKEN BY THE ORDINARY GENERAL MEETING OF THE
SHAREHOLDERS HELD AT THE REGISTERED OFFICE
ON JUNE 22nd, 2015

RESOLUTION A1

Consideration of the Board of Directors' and independent auditor's reports on the Company's consolidated financial statements. Approval of the Company's consolidated financial statements for the year ended December 31, 2014:

- agree                                41 557 479
- abstain from voting                          –
- disagree                                     –

The resolution is adopted.

RESOLUTION A2

Consideration of the Board of Directors' and independent auditor's reports on the Company's annual accounts. Approval of the Company's annual accounts as at December 31, 2014:

- agree                                41 557 479
- abstain from voting                          –
- disagree                                     –

The resolution is adopted.

RESOLUTION A3

Allocation of results as stated in the Directors' report:

- agree                                41 557 479
- abstain from voting                          –
- disagree                                     –

The resolution is adopted.

1/2

# Acheron Portfolio Corporation

MINUTES OF THE GENERAL MEETING OF THE SHARHOLDERS HELD ON JUNE 30TH, 2014

## RESOLUTION A4

Discharge to the members of the Board of Directors for the exercise of their mandate throughout the year ended December 31, 2014:

- agree             41 557 479
- abstain from voting          –
- disagree             –

The resolution is adopted.

## RESOLUTION A5

Approval of a Director's fee for the financial year 2014 as stated in the Directors' report:

- agree             41 557 479
- abstain from voting          –
- disagree             –

The resolution is adopted.

## RESOLUTION A6

Authorization to the Board of Directors to appoint one or more of its members as the Company's attorney-in-fact:

- agree             41 557 479
- abstain from voting          –
- disagree             –

The resolution is adopted.

# EXHIBIT 5

# **a**C Acheron Portfolio Corporation

**ACHERON PORFOLIO CORPORATION (LUXEMBOURG) SA**

**REDACTED**

*Société anonyme*
Registered office : 5 avenue Gaston Diderich  L-1420 Luxembourg
RCS Luxembourg  B129880

MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS OF THE COMPANY HELD ON
13 NOVEMBER 2013 INITIALED FROM LUXEMBOURG AT 17:00 PM (LUXEMBOURG TIME)
AT THE COMPANY'S REGISTER OFFICE IN LUXEMBOURG

2. SERVICER AGREEMENT WITH LITAI ASSETS LLC FOR AVERNUS PORTFOLIO TRUST TO BE AGREED

JMP explains Board members that the servicer agreement with Litaï will end on September
2014 and that a servicer agreement for Avernus Portflio Trust is needed.
In view of renewing the service agreement, Acheron Capital collected data on firms active in
the servicing of life insurance policies.

JMP is explaining the Board that he estimates preferable not to be involved in the
negotiations with Litaï.

After due and careful consideration, it is UNANIMOUSLY RESOLVED to mandate
to review existing agreement and to make proposal for renewing the agreement.

Acheron Capital will forward any available data to

3. Renewal of the current servicer agreement with Lorenzo Tonti Trust and Acheron
   Portfolio Trust

As per above

# EXHIBIT 6

# Pipeline | Life Settlements Report

NEWS, INFORMATION & ANALYSIS OF THE SECONDARY MARKET FOR LIFE INSURANCE

## NEWS

Ritchie said Coventry servicing agreement could have impacted sale.

Judge lifts order halting Life Assets Trust portfolio sale.

Judge dismisses Sun Life racketeering suit against Imperial.

Lincoln's challenging trustee in Grill lawsuit.

## BRIEF

Binday case losses put at $49.3M. Fortress premium-retention bill dies in Delaware. Appellate court sides with investor in premium overpayment case. Traded Policies Fund investors had June deadline to decide on options. Livoti suspended from appearing before the SEC. Juliano to leave Fortress. COO named for merged AVS.

## LEGISLATIVE UPDATE

The Life Settlements Report tracks proposals to regulate life settlements through state legislatures across the country.

## INDEX



LIFE SETTLEMENTS INDEX VS. S&P 500 INDEX

SOURCE: AA-Partners; indexes are set to 100 in Dec 2006

# Ritchie says Coventry drag on failed deal

## Similar provisions said to be impacting AIG portfolio

BY DONNA HOROWITZ

**Coventry First LLC**, which is embroiled in a dispute over its servicing agreement with **American International Group Inc.**, negotiated what appears to be similar provisions with a **Ritchie Capital Management LLC** affiliate that gave Coventry priority in buying life insurance policies in the Ritchie portfolio and a lock on the servicing business.

Just as the Coventry provisions were said to be a drag on the AIG portfolio by a potential buyer, similar provisions for the Ritchie portfolio could have impacted the sales price of policies in the portfolio or even affected if they could have been sold at all, according to a preliminary Ritchie private placement memorandum from 2006 obtained by The Deal.

Last year, at least one potential buyer of the AIG life settlement portfolio backed off after learning that any new owner would be required to retain Coventry as the servicer, a person familiar with the situation previously said.

The Fort Washington, Pa.-based life settlement provider also was said to have control over policy documents such as medical records on insured persons as well as the right to buy policies should they go on sale.

Similarly, Coventry had the right to continue to service policies that were to be sold and the first right of offer if Ritchie planned to sell any policies in its $1.157 billion portfolio, the placement memorandum said.

RRLST III LP, a Bermuda issuer and affiliate of the Wheaton, Ill.-based hedge fund, planned to raise $165 million in senior notes and $136 million in junior notes to fund the purchase of a 598-policy portfolio originated by Coventry and owned by two Ritchie entities, the placement memorandum said. The senior notes received a preliminary A3 rating from **Moody's Investors Service** in October 2006 while the junior notes were to be unrated.

RRLST planned to buy the policies from Ritchie Risk-Linked Strategies Trading Ltd. and Ritchie Risk-Linked Strategies Trading II, Irish entities that had bought the policies from Coventry.

The proposed securitization fell through after Coventry was sued by former New York Attorney General Eliot Spitzer in October 2006 for an alleged bid-rigging

RITCHIE *continued on page 4 >*

# Life Assets portfolio sale can proceed

BY DONNA HOROWITZ

A New York state judge has lifted a temporary restraining order halting the sale of the **Life Assets Trust SA** life settlement portfolio after the trust defaulted on a $234 million loan.

The Luxembourg-domiciled trust had gone to court to hold up a sale of the portfolio after the lender, the New York branch of **Portigon AG**, had begun foreclosure proceedings. Portigon, the successor to German bank WestLB AG, had scheduled an auction for May 21, but called it off after the trust obtained a court order May 19 stopping the sale.

Judge Marcy Friedman of the Supreme Court of the State of New York in Manhattan, who issued the temporary restraining order, vacated it during a June 17 hearing. She heard oral arguments on a motion by the trust for a preliminary injunction, which would have continued to delay the auction.

Her decision was not available until June 24 when The Deal obtained a 30-page transcript of the hearing from the court. Principals and their attorneys on both sides of the case have refused to respond to repeated requests for comment.

As far as what happens next, Friedman said her law clerk would give the parties a date for a discovery

PORTIGON *continued on page 5 >*

# NEWS

**< RITCHIE** *from page 1*

scheme. Coventry paid almost $12 million to settle the case in 2009, without admitting wrongdoing.

The placement memorandum spells out the servicing deal Coventry cut with Ritchie. The potential impact on the Ritchie portfolio has parallels to the AIG situation. Coventry and AIG currently are in talks to resolve their differences over Coventry's servicing contract. The AIG portfolio, with $17.6 billion in face value, is the largest life settlement portfolio in the market.

AIG has written down the value of its portfolio by more than $1.7 billion during the last four years because maturities haven't kept up with projections. The insurer reported May 5 that it took an additional $42 million impairment in the first quarter.

To sell the portfolio, market players have said AIG either will need to pay Coventry to release it from its servicing agreement or take a loss in the value of the portfolio if it goes to market with the requirement that Coventry be kept on as the servicer. Either way, there would be a cost.

The placement memorandum for the Ritchie securitization spelled out its servicing agreement with Coventry.

"Under each Policy Purchase Agreement, the Servicer has a right of first offer in respect of any proposed sale or other transfer of Life Settlement Policies and, absent a default under the Servicing Agreement, has the right to continue to service any Life Settlement Policies that are sold or transferred," the placement memorandum said.

"Moreover, the Servicer retains these rights even if the Servicer is terminated (except for the right to continue servicing the Life Settlement Policies after they are sold or transferred.) These rights may adversely affect the price at which we can sell Life Settlement Policies or our ability to sell Life Settlement Policies at all," the placement memorandum added.

Coventry had 14 days to exercise its right of first offer related to any proposed sale or trans-



**COVENTRY CEO ALAN BUERGER**

fer of policies from the date the collateral agent gave notice that the policies were to be sold.

In addition, Coventry had the right to purchase all of the policies in the portfolio when and if the number of such policies fell below 10% of the original number of policies in the portfolio on the date the securities were issued if the proceeds of such a purchase would be enough to repay all outstanding securities.

Coventry was required to pay a purchase price for the policies equal to the value of all cash flows with respect to such policies discounted by the then-current 10-year Treasury note yield plus 300 basis points.

The document specifically said that neither the backup servicer, **U.S. Bank National Association**, nor the backup tracking agent, **AVS Underwriting LLC**, was entitled to the same rights as Coventry. The backup tracking agent's role was to monitor when benefits were payable under each policy.

"Neither the Backup Servicer or the Backup Tracking Agent will have the right of first offer with respect to Life Settlement Policies being sold nor will they have the right to continue in their respective capacities after the Life Settle-

ment Policies are sold," the placement memorandum said.

An effort to sell 57 policies by AIG fell through last year, The Deal previously learned. It is not known if the drag of the Coventry servicing agreement was to blame.

In the Ritchie deal, Coventry was to be paid 13 basis points monthly based on face value for servicing Ritchie's portfolio, a rate that competitors in the market say is far beyond what they earn.

"That's outlandish," said Tom Moran, CEO of **Asset Servicing Group LLC** of Oklahoma City, Okla.

He said his company gets an average of $750 per year to service each policy, which entails paying premiums, calling insured persons or their representatives to inquire about the insured persons' health and collecting death benefits.

He said a fee of 13 basis points seems high, particularly on large policies. For a policy with $1 million in face value, such a rate would equate to $1,300 a year. For a policy with $5 million in face value, that fee would amount to $6,500 a year. For a small policy of $100,000, the fee only would be $130, however.

Ryan Danz, principal of **Torrey Pines Services LLC** of San Diego, which was one of the main servicers of the **Fortress Investment Group LLC** portfolio, said he charges between $750 and $1,200 a year to service each policy, with a discount as the number of policies goes up.

As to what he thinks about a rate based on 13 basis points, he said: "We could never get that. It was a deal done a long time ago, a different landscape. No one is getting that deal again. It was the deal of the century."

Mario Coniglio, COO of **MLF LexServ LP**, a Bethesda, Md.-based servicing company, said his company doesn't publish its price list, but he said it also does not get 13 basis points.

As to whether his company, owned by **Maple Life Financial LLC** and **Cantor Fitzgerald**, has an agreement with any of its clients tying it to any future owner, he responded: "Absolutely

CONTINUED >

# EXHIBIT 7

Prospectus

# ACHERON PORTFOLIO CORPORATION (LUXEMBOURG) S.A.

**A public limited company (*société anonyme*)**
**organized under the laws of the Grand Duchy of Luxembourg**
**(the "Company")**

**47,446,946 class A shares**

**and**

**17,696,098 class B shares**

This prospectus (the "**Prospectus**") provides information in relation to the listing on the Official List of the Luxembourg Stock Exchange and admission to trading on the regulated market of the Luxembourg Stock Exchange (the "**Listing**") which is a regulated market for the purposes of directive 2004/39/EC of 47,446,946 class A shares with a par value of US$ 1 each (the "**A Shares**") and 17,696,098 class B shares with a par value of US$ 1 each (the "**B Shares**") (the A Shares and the B Shares are referred together to as the "**Shares**") issued by the Company.

Investors should note that the Company will be subject to risks of a nature and degree not normally encountered in relation to listed securities and additional to those inherent in any equity investment. Investors should in particular note that an investment in the Company is likely to be illiquid for a significant period of time (see "*Risk Factors*" on page 13 of the Prospectus).

To determine the tax implications of investing in the Shares in the light of each investor's circumstances, particularly regarding dividends, capital gains and Buy-Backs, prospective investors are urged to consult with their own tax advisors prior to making any investment.

This Prospectus has been approved by the *Commission de Surveillance du Secteur Financier* ("**CSSF**"), which is the Luxembourg competent authority among others for the purposes of the law of 10 July 2005 *relative aux prospectus pour valeurs mobilières* (the "**Prospectus Law**") implementing the Prospectus Directive in Luxembourg. This Prospectus constitutes a "Prospectus" for the purposes of article 5.3 of the Prospectus Directive and the Prospectus Law.

The Company accepts responsibility for the information contained in this Prospectus. To the best of the knowledge and belief of the Company (which has taken all reasonable care to ensure that such is the case), the information contained in this Prospectus is in accordance with the facts and does not omit anything likely to affect the import of such information.

Neither the Listing, nor the approval of the document by the CSSF shall constitute a warranty or representation by the CSSF or the Luxembourg Stock Exchange as to the competence of service providers or any other party connected with the Company, the adequacy of the information contained in this Prospectus, or the suitability of the Company for investment purposes.

**Date: 5 November 2008**

which payable monthly in arrears at an annual rate of no more than 1.5% of the net asset value which, for purposes of calculating the management fee, is the sum of the fair market value of all assets held by the A Share Class or B Share Class respectively minus all its liabilities (calculated prior to the deduction of the said fee). The Investment Manager is also entitled to be reimbursed for all agreed transaction fees and any reasonable out-of-pocket expenses properly incurred by it in the performance of its duties and responsibilities under the Investment Management Agreements. The fees are due by the Trusts and payable by the Trusts. The amounts may originate from the Company through a capital contribution to the Trusts.

6.    **Trustee Fees**

The Trustee which is appointed by the Board will receive an annual fee as agreed upon in writing with the Company. The fee currently amounts to US$ 10,000 plus further US$ 5,000 that are payable to the Trustee's assistant. The fees are payable by the Trusts. The amounts may originate from the Company through a capital contribution to the Trusts.

7.    **Director Fees**

Each Director shall be paid an annual remuneration for his or her services at a rate to be determined from time to time by the Directors. Currently, the remuneration amounts to EUR 2,000 per year. However, Messrs. Bonnet, Kalfon and Sharp do not receive any remuneration. Messrs. Reinhold and Stephany receive an additional amount of up to EUR 5,000. Reasonable travel costs and business expenses that the Directors incur in the course of providing services to the Company will be reimbursed. All Directors will be entitled to be reimbursed by the Company for any reasonable out-of-pocket expenses directly incurred in connection with their attendance at Board meetings.

8.    **Actuaries Fees**

The actuarial fees will be determined on a case-by-case basis and will vary significantly depending on the number of Policies held by the Company. The fees are payable by the Trusts. The amounts may originate from the Company through a capital contribution to the Trusts.

9.    **Tracking and Servicing Fees**

The Tracking and Servicing Agent's fee is currently estimated to amount to between US$ 200 and US$ 400 per Policy per year for the Portfolio held by the Acheron Portfolio Trust and to approximately US$ 350 per Policy per year for the Portfolio held by the Lorenzo Tonti 2006 Trust. The fees are payable by the Trusts. The amounts may originate from the Company through a capital contribution to the Trusts.

73

# EXHIBIT 8

JS 44 (Rev. 12/12) (Modified by FLSD - April 29, 2013)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**I. (a) PLAINTIFFS** FURSTENBERG FINANCE SCA and MARC BATAILLON

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff Luxembourg
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Broward
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Philip E. Rothschild, c/o Holland & Knight, LLP, 515 E. Las Olas Blvd., Suite 1200, Fort Lauderdale, FL 33301  (954)525-1000

Attorneys *(If Known)*

**(d)**Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☒ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | PERSONAL PROPERTY | LABOR | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | SOCIAL SECURITY | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | Habeas Corpus: | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | FEDERAL TAX SUITS | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | Other: | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | IMMIGRATION | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (See VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)** *(See instructions):*

a) Re-filed Case ☐YES ☒NO  b) Related Cases ☐YES ☒NO

JUDGE _____ DOCKET NUMBER _____

**VII. CAUSE OF ACTION** Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
Ex-Parte Application for Discovery pursuant to 28 U.S.C. § 1782

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case) N/A

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

DATE
February 8, 2016

SIGNATURE OF ATTORNEY OF RECORD

*Philip E. Rothschild*

Case 1:19-mc-00044-JGK Document 4-1 Filed 02/06/18 Page 193 of 372

# EXHIBIT 9

/2016                          Bienvenue sur le site du Registre de Commerce et des Sociétés

# Registre de Commerce
# et des Sociétés

Registre de Commerce
et des Sociétés
Luxembourg



Accueil > **Recherche**

## *Recherche d'une personne immatriculée*

| | |
|---|---|
| **Numéro RCS** | *(B123456)* |
| **Dénomination** furstenberg | |
| **Rechercher** | |

**En savoir plus**

Guide utilisateur : Recherche

.iste des personnes répondant aux critères

20 ▼  **résultats**

| Dénomination | Numéro RCS |
|---|---|
| Furstenberg Capital S.C.A. | B150655 |
| Furstenberg S.à r.l. | B150636 |

·sion : 4.1.29                                                    Copyright © RCSL gie | Aspects légaux

3/23/2016

Bienvenue sur le site du Registre de Commerce et des Sociétés

Business and Companies' Register

# Registre de Commerce
## et des Sociétés

Registre de Commerce
et des Sociétés
Luxembourg



home/search

Accueil > **Recherche**

## *Recherche d'une personne immatriculée*

RCS number

**Numéro RCS**                              *(B123456)*

**En savoir plus**

Guide utilisateur : Recherche

**Dénomination**   furstenberg
**Name**

**Rechercher**      Search

Liste des personnes répondant aux critères          List of entities responding to the criteria

20 ▼  **résultats**   Results

RCS number

| **Dénomination** Name | **Numéro RCS** |
|---|---|
| Furstenberg Capital S.C.A. | B150655 |
| Furstenberg S.à r.l. | B150636 |

Version : 4.1.29

Copyright © RCSL gie | Aspects légaux

# EXHIBIT 23

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

```
---------------------------------------------------------X
                                          )
In re:                                    )    Case no. 16 – Misc. - 60266
                                          )
FURSTENBERG FINANCE SAS and               )
MARC BATAILLON                            )
                                          )
                                          )
---------------------------------------------------------X
```

## DECLARATION OF JEAN-MICHEL PAUL

I, Jean-Michel Paul, hereby declare under penalty of perjury of the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      I make this declaration in support the Motion to Quash the subpoenas that were served pursuant to an *Ex Parte Application for Discovery Pursuant to 28 U.S.C. § 1782* filed on February 9, 2016 (the "Discovery Application") filed by Furstenberg Finance SAS and Marc Bataillon's ("Applicants").

2.      The Applicants claim that they are shareholders in Acheron Portfolio Corporation Luxembourg S.A. ("Acheron") and that they seek discovery from a third party, Litai Assets LLC ("Litai"), to support claims they plan to bring against me, in my role as a director of Acheron, based upon their unfounded allegation that I have held a secret ownership interest in Litai since 2009, when Litai first contracted with Acheron.

3.      I submit this Declaration to explain the following:

   a)   The Applicants have no ability and no standing to file a claim against me in my capacity as a director of Acheron because (i) as indicated in the Discovery Application, Applicant Bataillon is not a shareholder of Acheron, (ii) according

to the Civil Cover Sheet the primary applicant is a Luxembourg entity. However, neither Furstenberg Finance SAS, the name used in the Discovery Application, nor Furstenberg Finance SCA, the name used in the civil cover sheet, exist in Luxembourg and are not the Luxembourg companies referred to as a shareholder of Acheron, (iii) there is one Luxembourg entity that is a shareholder of Acheron and Ahmose, as claimed, Furstenberg Capital SCA, but Furstenberg Capital SCA is not one of the Applicants herein and, in any case, has resolved at the annual general meetings of shareholders of Acheron that took place in 2011, 2012, 2013, 2014, and 2015 to grant a "discharge" to the directors of Acheron for the exercise of their duties during the immediately preceding financial years, thereby agreeing to release members of the board of directors of Acheron (the "Board"), of any civil claims it may have had against the Board (including me) for such financial years.

b)  The Applicants have not submitted any valid, probative, or admissible evidence of the alleged wrongdoing. Rather, they have submitted solely hearsay evidence from a young lawyer in Luxembourg who has no first hand knowledge of anything. As a result, almost all of the allegations are incorrect and easily shown as false, as I explain in detail below.

c)  The Application is merely a fishing expedition by the Applicants who are hoping to find evidence to continue a campaign of harassment that they have started in Luxembourg and that has multiplied to at least four proceedings there, and multiple boardroom contests.

**The Applicants Are Not Shareholders of Acheron**

4.      I have been a member of the Board of Directors of Acheron Portfolio Corporation Luxembourg S.A. ("Acheron") since December 2010. As such, I have knowledge of certain of Acheron's shareholders and its corporate structure.

5.      Marc Bataillon himself states he is not a shareholder of Acheron but a shareholder in Ahmose S.A. ("Ahmose"), a company that holds a minority stake in Acheron's Class B shares. While Ahmose, as a minority shareholder of Acheron, may under some very limited circumstances have the ability to file an action against Acheron, Mr. Bataillon, as a shareholder of Ahmose, has no ability to file a suit against Acheron either in his own capacity or on behalf of Ahmose, due to a lack of standing as further explained in the declaration made by the law firm Arendt & Medernach.

6.      In other words, Mr. Bataillon is a minority shareholder of a minority shareholder in one class of Acheron stock. He is so far removed from Acheron, and its Board, that he would be unable to bring a lawsuit in Luxembourg of the kind he alleges to be contemplating herein.

7.      The other Applicant, Furstenberg Finance SCA, also is not a shareholder of Acheron. In fact, a search through the information publicly available at the Trade and Companies Register of Luxembourg – where the Application states the entity resides – does not reveal any entity by that name.

8.      There is one Luxembourg incorporated "Furstenberg" entity that is a shareholder in Acheron and Ahmose as claimed in the Application. The name of that entity is Furstenberg Capital SCA. Furstenberg Capital SCA, however, is not one of the Applicants. Furstenberg Capital SCA traded its Class B shares of APC for Ahmose shares in 2012 as evidenced by the

notarized minutes of a shareholders' meeting of Ahmose held on August 31st 2012. These minutes also show that no other Furstenberg company traded their shares of APC for Ahmose (Ex. 5).

<u>**Furstenberg Capital SCA Released Any Potential Claims**</u>

9.      Moreover, in Luxembourg, at the annual shareholder meetings, the shareholders are asked if they know of any wrongdoing by the Board and, if not, to vote to "discharge" or "release" the directors of the company from any civil claims that could be filed by the company against the directors on the grounds of mismanagement or breach of the articles of association of the company or the companies' law, for acts taken during the financial year for which the accounts are approved at the annual shareholder's meeting.

10.     At the annual general meetings of shareholders of Acheron that took place in 2011, 2012, 2013, 2014, and 2015, Furstenberg Capital SCA with other shareholders present at the meetings and holding together a majority or, indeed, unanimity of the votes, voted to discharge all Acheron directors from any civil claims of wrongdoing. See the Declaration of the Acheron Chairman who presided over these meetings as evidence.

11.     As our General Counsel has explained to me, a validly granted annual discharge of the Board means the general meetings of shareholders foregoes any civil claims shareholders may have against Acheron's directors in relation to the financial years for which the annual accounts are approved (further details are provided in this respect in the Arendt Declaration), and any action cannot be against one director, but must be against the whole Board.

12.     With respect to the foregoing, I can confirm in my capacity as director of Acheron that the annual accounts that were presented to the general meeting of shareholders of Acheron at any time during my directorship did not contain any omission or incorrect statement that would not reflect the real financial situation of Acheron; instead, such accounts provided a true and fair

view of the accounting situation of Acheron and were prepared in full compliance with Luxembourg law and the applicable accounting standards.

**<u>Mr. Erich Bonnet</u>**

13.    The individual who controls Furstenberg Capital SCA, Furstenberg sarl, Furstenberg Finance SAS, and Fursternberg Investissement sprl, and who is behind the filing of the Application, is Mr. Erich Bonnet.

14.    Mr. Bonnet was a director of Acheron until July 2010 and, through Furstenberg Capital SCA, has been a shareholder of Acheron until the annual meeting of shareholders of Acheron held in 2015 and, to the best of my knowledge, since.

15.    In his personal capacity as a director in 2009 and subsequently as the permanent representative of Furstenberg Investment sprl on the Board, Mr. Bonnet had full knowledge of the contract between Acheron and Litai. Only from 2015 did he email the Board questioning the Litai servicing contract.

16.    He also has not submitted a declaration supporting the Application.

17.    Instead, the only document written by Mr. Bonnet is an email exchange that he initiated with Mr. Eric Kalfon, dated November 12, 2015. In his email, Mr. Bonnet asks Mr. Kalfon: "Can you please confirm to me that you quit the board owing to the conflict of interest that Jean-Michel Paul's effective control of Litai, the company that services the life insurance policies managed by Acheron Capital Limited, represented?" In response, Mr. Kalfon states "Yes."

18.    The problem is that as directors of Acheron, both Mr. Bonnet and Mr. Kalfon voted in 2009 to approve the contract between Acheron and Litai, not to reject it. (In fact, the Litai contract was unanimously approved by the Board. (see Circular Resolutions of the Board

dated October 2009, Chairman's Declaration Ex. 1). I, on the other hand, was not on the Board of Acheron at the time of this vote.

19. Second, and pursuant to Luxembourg law, directors are required, upon their resignation from a company such as Acheron, to announce at the next annual general meeting of shareholders any corporate wrong-doing that led to their resignation in case such wrong-doing constitutes a breach of the articles of association of the company or a breach of Luxembourg law. By so doing, a director can avoid joint and several civil liability for the wrongdoing detailed in their resignation, subject to a number of additional conditions laid out in the Luxembourg companies' law.

20. As members of the Board Mr. Kalfon and Mr. Bonnet were obligated to report any such potential wrong-doing or illegal transactions to the general meeting of shareholders. Failure to report such wrongdoing would be grounds for liability against them. Thus, the failure of Mr. Bonnet and Mr. Kalfon to report any potential wrongdoing or illegal transactions upon their resignation in 2010 is strong evidence that they never believed there was any wrongdoing or illegal transactions.

21. In fact, if their email exchange five years later was true, the silence in their resignations would mean that they abrogated their duties to Acheron and could be liable for the very wrong-doing they allege between Litai and Acheron.

22. A review of the Board Meeting Minutes from the meeting held on September 22, 2010 in which Mr. Kalfon's resignation was announced and the contents of his letter of resignation dated September 25, 2010, does not reveal any motivating force behind his resignation, nor mention misconduct or illegality on the part of the Board. (Board Meeting

Minutes of September 22, 2010 Ex. 1; Resignation of Eric Kalfon – Chairman's Declaration Exhibit 2).

23.　　Similarly, the resignation of Furstenberg Investment sprl, represented by Erich Bonnet, from the Board in July of 2010, does not mention any cause for his actions, nor mention misconduct or illegal activity on the part of the Board. (Chairman's Declaration Ex. 3).

24.　　In addition to voting to approve the Litai engagement in 2009, and not raising any issues of wrongdoing when they resigned, both Mr. Kalfon and Mr. Bonnet continued to acquire shares of Acheron thereafter.

25.　　Mr. Kalfon acquired a significant amount of Acheron shares in July 2010, just a month prior to his resignation. In addition, directly after Eric Kalfon resigned in September 2010 there was to be a shareholder vote of Acheron. Mr. Kalfon wrote in November of 2010: "Let's make it simple: I give my proxy to JM (Jean-Michel Paul) and I completely trust him." (Ex. 2 – Translation Included).

Again, this is uncharacteristic for a person who had just resigned due to my alleged self-dealing.

26.　　Mr. Bonnet made a major investment in Acheron shares through Furstenberg days after his resignation from Acheron, which might not have been allowed had he remained on the Board. Mr. Bonnet also invested millions of dollars in Acheron throughout 2011, making at least three separate purchases of large quantities of Acheron stock on the Luxembourg stock market. This is a surprising decision given Applicants' statement that he resigned due to grievous problems with Acheron's corporate governance.

27.　　Further, in 2012, Mr. Bonnet appointed me as Executive Director and Compliance Officer of his UK regulated investment management company, SB Partners (since renamed Smart Lenders). I remained in this position of authority until I resigned in July 2014. (Ex. 3).

28.     Again, it seems incredible to believe that Mr. Bonnet thought I was dishonest but asked me to be the compliance officer of his regulated company.

**Response to Other Allegations**

29.     One top of all this, the facts contradict the very foundation of the Applicants' claim that Acheron's contract with Litai is in any way improper.

30.     First and foremost, I am not the owner of, nor do I "control" Litai Assets LLC ("Litai"). I have never owned any equity in that company. I have never run or managed that company.

31.     As stated above, Acheron's contract with Litai in 2009 was negotiated and approved by Acheron's board when I was not a member of that Board (but Applicant Bonnet was).

32.     When the need to amend the 2009 Litai contract was brought before the Board in 2013, as that contract was coming up for renewal, I recused myself from taking a role as a Board member in choosing the next servicer. I explained to my colleagues that I was both a friend of, and had business relationships with, the owner of Litai, Mr. Jan-Eric Samuel, and wanted to avoid any appearance of impropriety.

33.     The 2013 Acheron Board of Directors Minutes lists my recusal following the announcement of the pending expiration of the Litai contract.

34.     In preparation for the expiration of the Litai contract, Acheron Capital Ltd. ("ACL") requested new written bids from firms active in the servicing of life insurance policies. Those service providers who submitted a bid were assured that this would be a competitive process. In addition, publicly available servicing price information was gathered.

35.     Upon receipt of multiple bids, two Board members, one of whom was a former auditor at one of the Big Four accounting firms, were tasked with reviewing each entry. Each bid was independently analyzed and, ultimately, a recommendation was made to the Board.

36.     After one of these two Board members visited Litai and verified its operational ability to service the many insurance policies contemplated in the bid, these directors were confident that Litai was a strong candidate. This finding was consistent with the reports of the independent auditors for Acheron, who have visited Litai annually, and other previous visits of Directors of Acheron.

37.     According to the two Board members' report, Litai offered a price below market and possessed superior operational performance. I believe the Chairman of the Board concluded that Litai was the best offer of all in any scenario reviewed.

38.     Ultimately, upon review of the recommendations made to the Board, Acheron's Board voted to renew the service contract with Litai. I remained uninvolved in the decision-making process.

39.     To ensure Acheron received the best possible price, the Board tasked me to contact Litai and negotiate, if possible, a last additional discount than the low bid that was on offer. Litai ultimately agreed to an even lower price for Acheron.

40.     Ultimately, the price Acheron obtained was well within or lower than the range disclosed in its 2008 Listing Prospectus. It was a fraction of the alternative viable offers received and a fraction of publicly available prices. Savings to Acheron from the Litai contract compared to any of these were material and significant.

41.     Acheron uses other service providers, beyond Litai, though Litai provided a very good price. What Acheron pays per policy to Litai is a fraction of what it pays another servicer

that it currently employs alongside Litai. Where Applicants state, without any evidence, that, between 2009 and 2014, Litai had been paid nearly $10 million, Acheron's accounting records show that the total amount was actually much less than this. The details of Acheron's agreement with Litai, and the rates negotiated by our Board, are confidential and could be used to harm Litai in future negotiations and by Acheron's competitors to negotiate even lower rates. Ultimately, this would most likely translate into higher prices for Acheron. Regardless, it is sufficient to say that the amounts quoted by the Applicants are significantly overstated, such that the accuracy of any of their information must be called into immediate question. Furthermore, to support their erroneous conclusion, Applicants haphazardly pasted tables from Acheron's annual reports and drew implausible conclusions. The numbers cited in Romain Sabatier's Declaration in paragraphs 24 and 30 are alleged totals of management fees paid by Acheron to ACL and servicing fees made by Acheron to all servicers. Because Acheron uses multiple servicers, Applicants' statement that all of the servicing fees went to Litai is patently incorrect. Furthermore, the first two rows of figures in paragraph 24 of the Sabatier Declaration are the exact same as the first two rows in paragraph 30, even though they refer to different fees. This only further reveals the recklessness with which Applicants constructed their allegations. I fear that this lawsuit may be an attempt to get precisely this kind of confidential, insider information about how Acheron conducts its business, so I cannot publicly disclose more information about the specific rates paid to Litai. Of course, should the Court wish to have more details, I am confident Acheron will provide whatever is requested should the privacy of Acheron's information be protected.

42. The positive performance of Acheron can be attributed, in part, to the superb contract the Board negotiated with Litai and the consistent operational performance of Litai.

**The Start of Hostilities**

43. As a Director and 40% minority shareholder of Furstenberg Sarl (GP), a company majority owned and controlled by Mr. Bonnet, I made a number of complaints in 2014 and 2015. This led, among other things, to significant changes in the Furstenberg Capital SCA (LP) valuation imposed by the external independent auditor of that company.

44. Ultimately, by letter date May, 26, 2015, I resigned my position as Executive Director of Furstenberg Sarl. My resignation letter contained an extensive list of the problems and irregularities in both Furstenberg Sarl. and Furstenberg Capital SCA, including liquidity issues, governance and lack of transparency in decision-making. As I and the another board member noted in our resignation letters, resources of both companies had been diverted, corporate formalities were being ignored, and Furstenberg Capital SCA was facing a threat of having its assets foreclosed on by its bank. (Ex. 4 - Resignation letter dated May 26, 2015).

45. I had been advised by Luxembourg Counsel, and it is my understanding, that this is the proper way to resign under Luxemburg law when improprieties in the management are known.

46. Following my resignation from the board of Mr. Bonnet's company, Mr. Bonnet retaliated against me by, after failing to amend these improprieties, refusing to honor the bylaws of Ahmose SA, a company in which two companies I own are shareholders, and which entitled ACL to put forth the names of the persons among whom Directors of that company have to be selected. Mr. Bonnet's refusal to honor that agreement led to the filing of an action in June 2015 by Tomson Pte Ltd ("Tomson") and ACL, claimants seeking to enforce those rights against Ahmose SA as defendant, which was voluntarily joined by Marc Bataillon and Furstenberg Capital S.C.A., in the Luxemburg courts.

47. In response, Mr. Bonnet (along with Applicant Marc Bataillon) caused their companies, Furstenberg Capital S.C.A and Ahmose (claimants) to file an action in Luxemburg

against Carlo Toller, a Director of ACL and Ahmose, and Tomson Pte and Acheron Capital Ltd (defendants), complaining that the Defendants allegedly postponed shareholders meeting, did not disclose conversation with, and advice of lawyers, and had written letters to the bank of Ahmose to warn them of the illegal composition of its Board.

48. Finally, a third action was instituted by Tomson against Furstenber Sarl. and Mr. Bonnet in October 2015 in Luxemburg. Tomson's claim is based upon its ownership of 40% of the shares of Furstenberg Sarl. and the governance issues related to my resignation letter. Further suits based on my resignation letter and ensuing developments could be filed against Mr. Bonnet by shareholders of Furstenberg Capital S.C.A. and Ahmose.

Dated: 24th March, 2016                                  _____
                                                        Jean-Michel Paul

Case 1:16-mc-00041-JGK   Document 4-1   Filed 02/06/18   Page 209 of 272

EXHIBIT 1

# Acheron Portfolio Corporation

REDACTED

**ACHERON PORFOLIO CORPORATION (LUXEMBOURG) sa**
*Société anonyme*
Registered office : 5 avenue Gaston Diderich  L-1420 Luxembourg
RCS Luxembourg  B129880

---

BOARD OF DIRECTORS LUXEMBOURG SEPTEMBER 22nd 2010  -  MINUTES

Before the discussion starts, few general questions were discussed between board members:
-- Eric Kalfon said he wanted to resign at the end of the meeting when Bob Edelstein would have been nominated as Director. He was told that should not be a problem.

# EXHIBIT 2

80416219v1

**From:** Kalfon, Eric [mailto:ekalfon@svpglobal.co.uk]
**Sent:** 15 November 2010 15:05
**To:** Carlo Toller
**Cc:** Jean-Michel Paul; slm@milopatrimoine.com
**Subject:** RE : Proxy for APC Lux EGM

faisons simple
je donne mon proxy à JM et lui fais toute confiance

1

Translation of the email of Mr. Eric Kalfon at SVP to Carlo Toller at Acheron Capital 11/15/2010


Faisons simple
Let's make it simple


Je donne proxy a JM et lui fais toute confiance
I give proxy to JM and I trust him entirely

EXHIBIT 3

 

BANK OF ENGLAND
**PRUDENTIAL REGULATION
AUTHORITY**

(http://www.fca.org.uk/) (http://www.bankofengland.co.uk/pra/pages/default.aspx)

The Financial Services Register (ShPo_HomePage)

Home (ShPo_HomePage) > Search results (https://register.fca.org.uk/shpo_searchresultspage?search=Jean-Michel+Paul) > Individual Details > Jean-Michel Jean-Marie Louis Sebastien Paul

| Search by company, person, product, reference number or postcode | Search the Register |
|---|---|

Advanced Search by business type and current status

# Doctor Jean-Michel Jean-Marie Louis Sebastien Paul

**Status: Active**                                    **(Reference number JJP01054)**

This is an individual (and some firms) that can perform some tasks in an authorised firm. These individuals and firms are known as 'approved persons' and the tasks as 'controlled functions'.

### Report a scam or firm

See what to do if you have been scammed (http://www.fca.org.uk/consumers/scams/what-to-do-if-you-are-scammed) or think you have been contacted by fraudsters.

Basic Details

### Contact us

**Commonly known as:**

Jean-Michel

**Previous names:**

Doctor Jean-Michel Jean-Marie Louis Sebastien Paul

Contact the FCA (http://www.fca.org.uk/site-info/contact) for firm or consumer queries and Register help.

Contact the PRA (http://www.bankofengland.co.uk/pages/contact) for prudential queries about banks, building societies, credit unions, insurance firms.

**Controlled functions - current**

Controlled functions are the tasks that an individual (and some firms) must be approved for so they can perform them in an authorised firm.

| Controlled Functions | Firm Name | Start Date | Restriction | Suspension / Restriction Start Date | Suspension / Restriction End Date |
|---|---|---|---|---|---|
| CF1 Director | Acheron Capital Ltd (/ShPo_FirmDetailsPage?id=001b000000MfdJrAAJ) | 16/02/2006 | | | |
| CF3 Chief Executive | Acheron Capital Ltd (/ShPo_FirmDetailsPage?id=001b000000MfdJrAAJ) | 16/02/2006 | | | |
| CF11 Money Laundering Reporting | Acheron Capital Ltd (/ShPo_FirmDetailsPage?id=001b000000MfdJrAAJ) | 16/02/2006 | | | |
| CF30 Customer | Acheron Capital Ltd (/ShPo_FirmDetailsPage?id=001b000000MfdJrAAJ) | 01/11/2007 | | | |

History

**Controlled functions - previous**

Controlled functions are the tasks that an individual (and some firms) must be approved for so they can perform them in an authorised firm.

| Controlled Functions | Firm Name | Start Date | End Date | Restriction | Suspension / Restriction Start Date | Suspension / Restriction End Date |
|---|---|---|---|---|---|---|
| CF1 Director | Smart Lenders Asset Management Limited (/ShPo_FirmDetailsPage?id=001b000000NMZO9AAP) | 23/05/2012 | 21/07/2014 | | | |
| CF1 Director | 2006 Acquisition Limited (/ShPo_FirmDetailsPage?id=001b000000MfI8zAAF) | 12/11/2004 | 07/03/2006 | | | |
| CF8 Apportionment and Oversight | Acheron Capital Ltd (/ShPo_FirmDetailsPage?id=001b000000MfdJrAAJ) | 16/02/2006 | 31/10/2007 | | | |
| CF10 Compliance Oversight | Acheron Capital Ltd (/ShPo_FirmDetailsPage?id=001b000000MfdJrAAJ) | 16/02/2006 | 27/01/2014 | | | |
| CF10 Compliance Oversight | Smart Lenders Asset Management Limited (/ShPo_FirmDetailsPage?id=001b000000NMZO9AAP) | 23/05/2012 | 21/07/2014 | | | |
| CF11 Money Laundering Reporting | Smart Lenders Asset Management Limited (/ShPo_FirmDetailsPage?id=001b000000NMZO9AAP) | 23/05/2012 | 21/07/2014 | | | |
| CF21 Investment Adviser | Acheron Capital Ltd (/ShPo_FirmDetailsPage?id=001b000000MfdJrAAJ) | 16/02/2006 | 31/10/2007 | | | |
| CF21 Investment Adviser | Sciens Capital Limited (/ShPo_FirmDetailsPage?id=001b0000 00MfGwSAAV) | 01/07/2003 | 01/02/2005 | | | |
| CF27 Investment Management | Acheron Capital Ltd (/ShPo_FirmDetailsPage?id=001b000000MfdJrAAJ) | 16/02/2006 | 31/10/2007 | | | |
| CF27 Investment Management | 2006 Acquisition Limited (/ShPo_FirmDetailsPage?id=001b000000MfI8zAAF) | 01/02/2005 | 07/03/2006 | | | |

© Financial Conduct Authority

# EXHIBIT 4

The Board of Managers of Furstenberg S.àr.l.

The shareholders of Furstenberg S.àr.l.

REGISTERED MAIL and EMAILED

Tuesday 26th May 2015

Dear Shareholders, Dear Managers,

We would like to inform you that we are hereby handing in our resignation with immediate effect as Managers of Furstenberg S.àr.l., which is itself the sole Manager of Furstenberg Capital SCA.

This resignation is due to the fact that we feel that under the current circumstances, we are no longer able to perform our duties to the shareholders. In accordance with article 59 second paragraph of the law of 10 August 1915 as amended on commercial companies, we would like to set out certain issues at the level of the Board of Managers of Furstenberg S.àr.l., which given that Furstenberg S.àr.l. is the sole Manager of Furstenberg Capital SCA, automatically apply to that entity as well.

The main issues that we have identified are the following:

A.  At the level of the Furstenberg S.àr.l. (the "S.àr.l."):

1. We are concerned by:
- Pressing liquidity issues. The S.àr.l. has very little cash left and is owed close to 400k Euro by the SCA. We understand the S.àr.l. itself owes money to third parties.
- The resources of the S.àr.l. are not or have not in the past been used for its exclusive benefits and for the SCA's exclusive benefits, and a clear segregation of resources such as working time for the employee with affiliated companies has been elusive .
- The S.àr.l. has had a number of governance issues in handling matters, such as information being asked before Conseil de Gerance meetings not being provided neither before nor during, or voting taking place on the basis of power of attorneys that are not produced during meetings nor afterwards.

2. We are of the opinion that:
- The resources of the S.àr.l. have been used by other entities and for other purposes, depriving the S.àr.l of resources it paid for and making errors more likely.
- The S.àr.l. would be in default if its obligations were now called.
- An informed collegial decision making process is no longer the norm, effectively removing the necessary checks and balance.

3. We recommend, or have recommended but have not been followed, that the S.àr.l :
- restore checks and balance at the Conseil de Gerance.

- has clearly dedicated resources not shared with related parties.
- balance its liquidity commitments.
- be transparent on its decisions and demonstrate how they benefit its clients and the S.àr.l.

B. At the level of the Furstenberg Capital SCA (the "SCA")

1. We are concerned by the facts that:
- The SCA owes considerable amounts to the bank (approximately 6M Euro gross, 3M Euro net) and to other parties (about 500k Euro).
- The SCA has serious liquidity issues. Banks have asked for immediate payments twice during the course of the last three months. Third party personal guarantees had to be given in order to avoid or postpone a bank driven liquidation of assets.
- The SCA had to stop distributions to investors and is unlikely to be able to restart such distributions in the near future.
- The SCA had to stop foreign exchange hedging for two compartments despite its commitment to do so. A shareholder had to advance money to another compartment to avoid the hedging of one compartment being stopped by the bank.
- There are valuation issues: a set of positions valued at no or little value, has been reported by the auditor to be potentially worth about 2.5M Euro. At the opposite, other positions, if they had to be sold, would likely on the basis of brokers' quotes be at a loss compared to the last valuations used as allowed by the articles.
- There is a lack of planning and actions to meet the statutory date for the end of the compartments: as per representations made to investors at the onset of the fund, assets should have started to be sold 18 months after inception. While assets have been self-liquidating progressively, few have been actively sold.
- The recent decision made by the Manager to oppose the liquidation of an intermediate SPV compromises the SCA's ability to dispose of the underlying listed assets in a timely manner.

2. We are of the opinion that:
- Assets are not being disposed of in a timely fashion with a view to meet the December 2016 deadline for the compartments assets to be sold or self-liquidated.
- Positions should be liquidated whenever possible and listed securities put up for sale, at the appropriate price.
- It is risky and with little benefit, to postpone resolution of the liquidity and debt issues.
- Foreign exchange hedging should be restored for interested investors as quickly as possible.

3. We recommend, or have recommended, but have not been followed, that the SCA:
- Apply valuation for all positions in line with resale/market value given the looming compartments' expiration.
- Actively sell positions whenever possible provided the valuations make sense. This process should start with listed securities, and positions should be made more sellable whenever possible. Liquidating positions would enable the SCA to pays its creditors.

- Repay the bank, restart foreign exchange hedging (for shareholders that want this) and distributions.

Considering that the way the S.àr.l. and the SCA are currently managed is, in our opinion, in contradiction with their corporate interest and thus in contradiction with the interests of the investors in the SCA, and that there seems to be no willingness at the level of the board of Managers, on which we represent a minority of the Board members, to change the current state of affairs and to revert to a collegial management in the best interest of the investors, we would like to inform the shareholders that, as set out above, we are hereby resigning with immediate effect from our office of Managers of Furstenberg S.àr.l.

Yours sincerely,

Jean-Michel Paul
as representative of Tomson Pte Ltd

Jean-Michel van Lippevelde

Case 1:18-mc-00041-JGK   Document 4-1   Filed 02/06/18   Page 222 of 372

**Francis KESSELER**
notaire
B.P. 186
L-4002 ESCH / ALZETTE

**AHMOSE S.A.**

**Société anonyme**

**Siège social : 1, rue de Steinfort,**

**L-8371 Hobscheid**

**R.C.S. Luxembourg : B 146129**

ASSEMBLEE GENERALE EXTRAORDINAIRE du 31 août 2012
Numéro

In the year two thousand and twelve, on the thirty-first of August.

Before Maître **Francis Kesseler,** notary residing in Esch-sur-Alzette.

Was held an extraordinary general meeting of the shareholders (the **Meeting**) of **AHMOSE S.A.**, a *société anonyme* organised and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 1, rue de Steinfort, L-8371 Hobscheid, Grand Duchy of Luxembourg, registered with the Luxembourg Register of Commerce and Companies under number B 146129, incorporated pursuant to a deed of Maître Henri HELLINCKX, notary residing in Luxembourg, dated 29 April 2009, published in the *Mémorial C, Recueil des Sociétés et Associations* under number 1113 of 5 June 2009, page 53412 (the **Company**).

The Articles of Incorporation have been lastly amended pursuant to a deed of the same notary on 1st March 2011, published in the *Mémorial C, Recueil des Sociétés et Associations* under number 1637 of 21 July 2011, page 78873.

The Meeting is chaired by Ms Sofia AFONSO-DA CHAO CONDE, *private employee*, with professional address in L-4050 Esch/Alzette, 5, rue Zénon Bernard,

The chairman appointed as secretary, Mrs Sophie HENRYON, *private employee*, with professional address in L-4050 Esch/Alzette, 5, rue Zénon Bernard,

The Meeting elected as scrutineer Madame Maria SANTIAGO-DE SOUSA, *private employee*, with professional address in L-4050 Esch/Alzette, 5, rue Zénon Bernard,

(The chairman, the secretary and the scrutineer are collectively referred to as the **Board of the Meeting**).

The Board of the Meeting having thus been constituted, the chairman declares that:

I.  the Company is currently held by its sole shareholder (the **Sole Shareholder**), hereby  represented by Madame Sofia Afonso-Da Chao Conde, by virtue of a proxy given in Hanoi, on 2 August 2012 (the **Proxy**). Such Proxy after having been signed *ne varietur* by the Board of the Meeting and the undersigned notary, shall remain attached to the present minutes;

II.  as it appears from the attendance list, the entire share capital of the Company is represented at the present Meeting so that the Meeting can validly decide on all the items of the agenda of which the participants have been beforehand informed;

III.  the agenda of the Meeting is the following:

1.  waiver of the convening notices;

2.  authorization given to the board of directors of the Company to issue class A, B, C, D, E, F, G, H, I, J of shares of the Company within the scope of the authorized capital for a maximum amount of five hundred million United States dollars (USD 500,000,000.-), including the issued share capital, for a period of five (5) years as from the date of publication of the present deed, without reserving to the existing shareholders a preferential right to subscribe for shares;

3.  election of the directors of the Company from a list of names proposed by Acheron Capital Limited;

4.  subsequent amendment of the second paragraph of article 10 of the articles of association of the Company to reflect the above resolutions and which shall henceforth read as follows:

"**Art.10.** *[…] The directors shall be elected from a list of names proposed by Acheron Capital Limited at a simple majority of the votes validly cast. Any director may be removed at any time with or without cause by the general meeting of shareholders at a simple majority of the votes validly cast. […]."*

5.  reduction of the Company's corporate capital by an amount of fifty thousand United States dollars (USD 50,000.-) by off-setting losses brought forward, the withdrawal and the subsequent cancellation by the Company of all of its class A, B, C, D, E, F, G, H, I, J shares and acknowledgement that, as a consequence thereof, the share capital of the Company is set at zero United States dollar (USD 0.-);

6. subsequent increase of the share capital of the Company from its current amount of zero United States dollar (USD 0.-), to an amount of five million ninety-four thousand one hundred thirty-five United States dollars (USD 5,094,135.-) by way of the creation and issue of (i) five million ninety-four thousand one hundred thirty-five (5,094,135) class A ordinary shares, (ii) five million ninety-four thousand one hundred thirty-five (5,094,135) class B ordinary shares, (iii) five million ninety-four thousand one hundred thirty-five (5,094,135) class C ordinary shares, (iv) five million ninety-four thousand one hundred thirty-five (5,094,135) class D ordinary shares, (v) five million ninety-four thousand one hundred thirty-five (5,094,135) class E ordinary shares, (vi) five million ninety-four thousand one hundred thirty-five (5,094,135) class F ordinary shares, (vii) five million ninety-four thousand one hundred thirty-five (5,094,135) class G ordinary shares, (viii) five million ninety-four thousand one hundred thirty-five (5,094,135) class H ordinary shares, (ix) five million ninety-four thousand one hundred thirty-five (5,094,135) class I ordinary shares, (x) five million ninety-four thousand one hundred thirty-five (5,094,135) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) each (together the **New Shares**);

7. subscription for and payment of the New Shares to be issued by the Company as described in item 6 above;

8. subsequent amendment of first four paragraphs of article 5 of the articles of association of the Company to reflect the above resolutions and which shall hence forth read as follows:

*"**Art. 5.** The subscribed capital is set at five million ninety-four thousand one hundred thirty-five United States dollars (USD (5,094,135.-) consisting of five million ninety-four thousand one hundred thirty-five (5,094,135) class A ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class B ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class C ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class D ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class E ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class F ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class G ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class H ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class I ordinary shares, five million ninety-four thousand one hundred thirty-five*

(5,094,135) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) each.

Any reference made hereinafter to the "shares" shall be construed as a reference to all the above class of shares or to a specific class of shares, depending on the context and as applicable.

The authorized capital of the Company, including the issued share capital, is set at five hundred million USD (USD 500,000,000.-) consisting of five hundred million (500,000,000) class A ordinary shares, five hundred million (500,000,000) class B ordinary shares, five hundred million (500,000,000) class C ordinary shares, five hundred million (500,000,000) class D ordinary shares, five hundred million (500,000,000) class E ordinary shares, five hundred million (500,000,000) class F ordinary shares, five hundred million (500,000,000) class G ordinary shares, five hundred million (500,000,000) class H ordinary shares, five hundred million (500,000,000) class I ordinary shares, five hundred million (500,000,000) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) each.

During the period of five years, from the date of publication of this deed, the board of directors is hereby authorized to issue class A, B, C, D, E, F, G, H, I, J shares, to such persons and on such terms as it shall see fit and specifically to proceed to such issue without reserving for the existing Shareholders a preferential right to subscribe to the class A shares issued. [...]."

9. amendment of the books and registers of the Company in order to reflect the above changes with power and authority to any lawyer and/or employee of Loyens & Loeff Luxembourg to proceed individually, on behalf of the Company with the registration of the above changes in the relevant existing registers of the Company and creation of the new register(s), as the case may be;

10. powers and authorisations; and

11. miscellaneous.

IV. After the foregoing agenda was duly examined and after deliberation, the Meeting unanimously resolves as follows:

## FIRST RESOLUTION

The entirety of the Company's corporate capital being represented at the present Meeting, the sole shareholder waives the convening notice and

considers himself as duly convened and declares having perfect knowledge of the agenda which has been communicated to him in advance.

### SECOND RESOLUTION

The Meeting creates an authorised capital and authorizes the board of directors of the Company to issue class A, B, C, D, E, F, G, H, I, J of shares of the Company within the scope of the authorized capital for a maximum amount of five hundred thousand United States dollars (USD 500,000,000.-), including the issued share capital, for a period of five (5) years as from the date of publication of the present deed, without reserving to the existing shareholders a preferential right to subscribe for shares.

### THIRD RESOLUTION

The Meeting approves the election of the directors of the Company from a list of names proposed by Acheron Capital Limited.

### FOURTH RESOLUTION

The Meeting resolves to amend the second paragraph of article 10 of the articles association of the Company which shall hence forth read as follows:

*"Art.10. [...] The directors shall be elected from a list of names proposed by Acheron Capital Limited at a simple majority of the votes validly cast. Any director may be removed at any time with or without cause by the general meeting of shareholders at a simple majority of the votes validly cast. [...]."*

### FIFTH RESOLUTION

The Meeting approves the reduction of the Company's corporate capital by an amount of fifty thousand United States dollars (USD 50,000.-) by off-setting the losses brought forward, the withdrawal and the subsequent cancellation by the Company of all of its class A, B, C, D, E, F, G, H, I, J shares and acknowledgement that, as a consequence thereof, the share capital of the Company is set at zero United States dollars (USD 0.-).

As a consequence of the above, and instead of repaying the share capital amount of fifty thousand United States dollars (USD 50,000.-) to the Sole Shareholder, this amount will be used to offset the losses of sixty one thousand United States dollars (USD 61,000,-) brought forward from previous financial years.

### SIXTH RESOLUTION

The Meeting resolves to subsequently increase the share capital of the Company from its current amount of zero United States dollars (USD 0.-), to an amount of five million ninety-four thousand one hundred thirty-five United States dollars (USD 5,094,135.-) by way of the creation and issue of (i) five

million ninety-four thousand one hundred thirty-five (5,094,135) class A ordinary shares, (ii) five million ninety-four thousand one hundred thirty-five (5,094,135) class B ordinary shares, (iii) five million ninety-four thousand one hundred thirty-five (5,094,135) class C ordinary shares, (iv) five million ninety-four thousand one hundred thirty-five (5,094,135) class D ordinary shares, (v) five million ninety-four thousand one hundred thirty-five (5,094,135) class E ordinary shares, (vi) five million ninety-four thousand one hundred thirty-five (5,094,135) class F ordinary shares, (vii) five million ninety-four thousand one hundred thirty-five (5,094,135) class G ordinary shares, (viii) five million ninety-four thousand one hundred thirty-five (5,094,135) class H ordinary shares, (ix) five million ninety-four thousand one hundred thirty-five (5,094,135) class I ordinary shares, (x) five million ninety-four thousand one hundred thirty-five (5,094,135) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) each.

## SEVENTH RESOLUTION

The Meeting resolves to accept and record the following subscriptions to and full payment of the share capital increase as follows:

### *Subscription – Payment*

Thereupon,

(a)  **Condor Alternative Fund Ltd**, an entity governed by the laws of the Cayman Islands, having its registered office at 87 Mary Street, George Town, Grand Cayman, Cayman Islands, registered with the Cayman Islands trade register under number 103520, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to twelve million five hundred twenty thousand ninety (12,520,090) New Shares of the Company consisting of one million two hundred fifty-two thousand nine (1,252,009) class A ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class B ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class C ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class D ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class E ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class F ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class G ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class H ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class I ordinary shares, one million two hundred fifty-two thousand nine (1,252,009) class J ordinary shares, with a nominal

value equal to ten of United States dollars (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of one million two hundred fifty-two thousand nine (1,252,009) class B shares in ACHERON PORTFOLIO CORPORATION (LUXEMBOURG) S.A., a public limited liability company (*société anonyme*) governed by the laws of the Grand Duchy of Luxembourg, having its registered office at 5, Avenue Gaston Diderich, L-1420 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Register of Commerce and Companies under number B 129880 (**APC**), said contribution in kind being fully allocated to the share capital of the Company.

(b) **Marc Bataillon**, born in Nantes (France) on March 9th, 1968, having its address at 20 Eaton Place, London SW1X 8AE, United Kingdom, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to eleven million one hundred thirty-six thousand nine hundred ten (11,136,910) New Shares of the Company consisting of one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class A ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class B ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class C ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class D ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class E ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class F ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class G ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class H ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class I ordinary shares, one million one hundred thirteen thousand six hundred ninety-one (1,113,691) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of one million one hundred thirteen thousand six hundred one (1,113,691) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(c) **Mosie N Sutton**, born in Jerusalem (Israel) on December 8th, 1989, having its address at1578 east 5th street, Brooklyn NY 11230 USA, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to one hundred fifteen thousand (115,000) New Shares

of the Company consisting of eleven thousand five hundred (11,500) class A ordinary shares, eleven thousand five hundred (11,500) class B ordinary shares, eleven thousand five hundred (11,500) class C ordinary shares, eleven thousand five hundred (11,500) class D ordinary shares, eleven thousand five hundred (11,500) class E ordinary shares, eleven thousand five hundred (11,500) class F ordinary shares, eleven thousand five hundred (11,500) class G ordinary shares, eleven thousand five hundred (11,500) class H ordinary shares, eleven thousand five hundred (11,500) class I ordinary shares, eleven thousand five hundred (11,500) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of eleven thousand five hundred (11,500) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(d)  **Miro I Sutton**, acting as duly authorized custodian of, and having the power to bind for the purpose hereof, Mr. Isaac Meir Sutton born, in New York (USA) on March 5th, 2011, having its address at 1578 east 5th street, Brooklyn NY 11230 USA, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to sixty-nine thousand (69,000) New Shares of the Company consisting of six thousand nine hundred (6,900) class A ordinary shares, six thousand nine hundred (6,900) class B ordinary shares, six thousand nine hundred (6,900) class C ordinary shares, six thousand nine hundred (6,900) class D ordinary shares, six thousand nine hundred (6,900) class E ordinary shares, six thousand nine hundred (6,900) class F ordinary shares, six thousand nine hundred (6,900) class G ordinary shares, six thousand nine hundred (6,900) class H ordinary shares, six thousand nine hundred (6,900) class I ordinary shares, six thousand nine hundred (6,900) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) each and to fully pay up such New Shares by way of a contribution in kind consisting of six thousand nine hundred (6,900) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(e)  **Isaac Sutton**, acting as duly authorized custodian of, and having the power to bind for the purpose hereof, Mrs. Norma Lenora Sutton born in New York (USA) on July 18th 1995, having its address at 1578 east 5th street, Brooklyn NY 11230 USA, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to thirty thousand (30,000) New Shares of the Company consisting of three thousand (3,000)

class A ordinary shares, three thousand (3,000) class B ordinary shares, three thousand (3,000) class C ordinary shares, three thousand (3,000) class D ordinary shares, three thousand (3,000) class E ordinary shares, three thousand (3,000) class F ordinary shares, three thousand (3,000) class G ordinary shares, three thousand (3,000) class H ordinary shares, three thousand (3,000) class I ordinary shares, three thousand (3,000) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) each and to fully pay up such New Shares by way of a contribution in kind consisting of three thousand (3,000) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(f) **Tomson Pte. Ltd.** (formerly Oriental Caravan.com), an entity governed by the laws of Singapore, having its registered office set at 111 North Bridge Road, 8-10 Peninsula Plaza Singapore 179098, registered by the Singapore trade register under number 99907653N, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to one million seventy thousand eight hundred eighty (1,070,880) New Shares of the Company consisting of one hundred seven thousand eighty-eight (107,088) class A ordinary shares, one hundred seven thousand eighty-eight (107,088) class B ordinary shares, one hundred seven thousand eighty-eight (107,088) class C ordinary shares, one hundred seven thousand eighty-eight (107,088) class D ordinary shares, one hundred seven thousand eighty-eight (107,088) class E ordinary shares, one hundred seven thousand eighty-eight (107,088) class F ordinary shares, one hundred seven thousand eighty-eight (107,088) class G ordinary shares, one hundred seven thousand eighty-eight (107,088) class H ordinary shares, one hundred seven thousand eighty-eight (107,088) class I ordinary shares, one hundred seven thousand eighty-eight (107,088) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of one hundred seven thousand eighty-eight (107,088) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(g) **Acheron Capital Ltd**, a limited liability company incorporated under the laws of Great Britain, having its registered office set at 20-22 Bedford Row, London WC1R 4JS, registered in the trade register of England under number 05588630, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to five hundred fifty-one thousand five hundred forty (551,540) New Shares of the Company consisting in fifty-five

thousand one hundred fifty-four (55,154) class A ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class B ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class C ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class D ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class E ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class F ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class G ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class H ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class I ordinary shares, fifty-five thousand one hundred fifty-four (55,154) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of fifty-five thousand one hundred fifty-four (55,154) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(h)   **Jan-Eric Samuel**, born in Troyes (France) on August 19th 1965, residing in 10 Anson Road, #41-14, 079903 Singapore, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe for two million five hundred eighty-one thousand one hundred eighty (2,581,180) New Shares of the Company consisting of two hundred fifty-five thousand one hundred eighteen (258,118) class A ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class B ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class C ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class D ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class E ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class F ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class G ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class H ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class I ordinary shares, two hundred fifty-five thousand one hundred eighteen (258,118) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of two hundred fifty-five thousand one hundred eighteen (258,118) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(i)   **Titan Equity Group LLC**, a limited liability company organised and existing under the laws of New York (USA), having its registered office set at

Address is 1250 Broadway, Suite 1203, New York, NY 10001, registered under the tax ID number 20-2917687, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to two million nine hundred forty-one thousand seven hundred fifty (2,941,750) New Shares of the Company consisting of two hundred ninety-four thousand one hundred seventy-five (294,175) class A ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class B ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class C ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class D ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class E ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class F ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class G ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class H ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class I ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of two hundred ninety-four thousand one hundred seventy-five (294,175) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(j) **Regency Equity Group LLC**, a limited liability company organised and existing under the laws of New York (USA), having its registered office set at Address is 1250 Broadway, Suite 1203, New York, NY 10001, registered under the tax ID number 20-2917255, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to two million nine hundred forty-one thousand seven hundred fifty (2,941,750) New Shares of the Company consisting in two hundred ninety-four thousand one hundred seventy-five (294,175) class A ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class B ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class C ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class D ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class E ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class F ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class G

ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class H ordinary shares, two hundred ninety-four thousand one hundred seventy-five (294,175) class I ordinary shares, class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of two hundred ninety-four thousand one hundred seventy-five (294,175) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(k)   **Furstenberg Capital SCA**, a *société en commandite par actions* organised and existing under the laws of the Grand Duchy of Luxembourg, having its registered office set at 5, avenue Gaston Diderich, L-1420 Luxembourg, registered with the Luxembourg Register of Trade and Companies under number B 150655, duly represented for the purpose hereof by Madame Sofia Afonso-Da Chao Conde, declares to subscribe to fifteen million five hundred forty-eight thousand five hundred fifty (15,548,550) New Shares of the Company consisting of one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class A ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class B ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class C ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class D ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class E ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class F ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class G ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class H ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class I ordinary shares, one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of one million five hundred fifty-four thousand eight hundred fifty-five (1,554,855) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(l)   **Middlegate Securities Ltd.** (Profit Sharing Plan FBO Isaac Sutton), an entity governed by the laws of [New York (USA)], having its registered office set at 1576 east 5th street, Brooklyn NY 11230 USA, registered under

number id # 13-3760819, duly represented for the purpose hereof by Madame Sofía Afonso-Da Chao Conde, declares to subscribe to txo hundre fifty-eight thousand (258,000) New Shares of the Company consisting of twenty-five thousand eight hundred (25,800) class A ordinary shares, twenty-five thousand eight hundred (25,800) class B ordinary shares, twenty-five thousand eight hundred (25,800) class C ordinary shares, twenty-five thousand eight hundred (25,800) class D ordinary shares, twenty-five thousand eight hundred (25,800) class E ordinary shares, twenty-five thousand eight hundred (25,800) class F ordinary shares, twenty-five thousand eight hundred (25,800) class G ordinary shares, twenty-five thousand eight hundred (25,800) class H ordinary shares, twenty-five thousand eight hundred (25,800) class I ordinary shares, twenty-five thousand eight hundred (25,800) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New Shares by way of a contribution in kind consisting of twenty-five thousand eight hundred (25,800) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

(m) **Isaac Sutton,** acting as trustee of **The Isaac C M Sutton 1999 Investment Trust**, a trust set up in the United States of America, having its registered office set at 1576 east 5th street, Brooklyn NY 11230 USA, registered under number id # 13-3760819, duly represented for the purpose hereof by Madame Sofía Afonso-Da Chao Conde, declares to subscribe to one million one hundred seventy-six thousand seven hundred (1,176,700) New Shares of the Company consisting of one hundred seventeen thousand six hundred seventy (117,670) class A ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class B ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class C ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class D ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class E ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class F ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class G ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class H ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class I ordinary shares, one hundred seventeen thousand six hundred seventy (117,670) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) and to fully pay up such New

Shares by way of a contribution in kind consisting of one hundred seventeen thousand six hundred seventy (117,670) class B shares in APC, said contribution in kind being fully allocated to the share capital of the Company.

Pursuant to article 26-1 of the law of 10 August 1915 on commercial companies, as amended, the value of the above contributions in kind has been assessed in an auditor's report issued by Grant Thornton Lux Audit S.A., a *société anonyme* organized and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 83, Pafebruch, L-8308 Capellen, Luxembourg.

This auditor's report shall remain annexed to this deed to be submitted with this deed to the formality of registration, and the conclusion of which reads as follows:

"**D. CONCLUSION**

Based on our work, no facts came to our attention, which will make us believe that the total value of the contribution in kind is not at least corresponding to the number of shares and the nominal value of the Company's shares to be issued."

As a result of the above subscriptions and payments, a total amount of five million ninety-four thousand one hundred thirty-five United States dollars (USD 5,094,135.-) has been paid and is at the disposal of the Company, evidence of which has been proved to the undersigned notary who expressly acknowledges it."

**EIGHTH RESOLUTION**

The Meeting resolves to replace the three first paragraphs of article 5 of the articles association of the Company by the following four new paragraphs which shall hence forth read as follows:

"*Art. 5. The subscribed capital is set at five million ninety-four thousand one hundred thirty-five United States dollars (USD (5,094,135.-) consisting of five million ninety-four thousand one hundred thirty-five (5,094,135) class A ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class B ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class C ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class D ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class E ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class F ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class G ordinary shares, five million ninety-four*

*thousand one hundred thirty-five (5,094,135) class H ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class I ordinary shares, five million ninety-four thousand one hundred thirty-five (5,094,135) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) each.*

*Any reference made hereinafter to the "shares" shall be construed as a reference to all the above class of shares or to a specific class of shares, depending on the context and as applicable.*

*The authorized capital of the Company, including the issued share capital, is set at five hundred million USD (USD 500,000,000.-) consisting of five hundred million (500,000,000) class A ordinary shares, five hundred million (500,000,000) class B ordinary shares, five hundred million (500,000,000) class C ordinary shares, five hundred million (500,000,000) class D ordinary shares, five hundred million (500,000,000) class E ordinary shares, five hundred million (500,000,000) class F ordinary shares, five hundred million (500,000,000) class G ordinary shares, five hundred million (500,000,000) class H ordinary shares, five hundred million (500,000,000) class I ordinary shares, five hundred million (500,000,000) class J ordinary shares, with a nominal value equal to ten United States cents (USD 0.10) each.*

*During the period of five years, from the date of the publication of this deed, the board of directors is hereby authorized to issue class A, B, C, D, E, F, G, H, I, J shares, to such persons and on such terms as it shall see fit and specifically to proceed to such issue without reserving for the existing Shareholders a preferential right to subscribe to the class A shares issued. [...]."*

### NINTH RESOLUTION

The Meeting resolves to amend the books and registers of the Company, in order to reflect the above changes with power and authority to any lawyer and/or employee of Loyens & Loeff Luxembourg to proceed individually, with full power of substitution, on behalf of the Company with the registration of the above changes in the relevant existing registers of the Company and creation of the new register(s), as the case may be.

### TENTH RESOLUTION

The Meeting resolves to empower and authorise any manager of the Company to sign all documents or do all acts necessary or useful in connection with the above resolutions.

There being no further business on the Agenda, the Meeting was thereupon closed.

**EXPENSES**

The expenses, costs, fees and charges of any kind whatsoever which will have to be borne by the Company as a result of the present deed are estimated at approximately four thousand two hundred euro (€ 4,200.-).

<u>ATTESTATION</u>

The Notary acting in this matter declares that he has checked the existence of the conditions set out in Articles 26 of the Law on Commercial Companies and expressly attests that they have been complied with.

**DECLARATION**

The undersigned notary, who understands and speaks English, states herewith that on request of the appearing persons, the present deed is worded in English, followed by a French version and, in case of discrepancies between the English and the French text, the English version will prevail.

Whereof the present deed was drawn up in Esch/Alzette, on the day named at the beginning of this document.

The document having been read to the Board of the Meeting, said Board of the Meeting signed together with the notary the present deed.

**SUIT LA TRADUCTION FRANCAISE:**

L'an deux mille douze, le trente et un août.

Par-devant Maître **Francis Kesseler**, notaire de résidence à Esch-sur-Alzette.

S'est tenue une assemblée générale extraordinaire (l'**Assemblée**) de **AHMOSE S.A.**, une société anonyme régie par les lois du Grand-Duché de Luxembourg, ayant son siège social au 1, rue de Steinfort, L-8371 Hobscheid, Grand-Duché de Luxembourg, immatriculée au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 146129, constituée suivant acte de Maître Henri HELLINCKX, notaire de résidence à Luxembourg, en date du 29 avril 2009 publié au Mémorial C, Recueil des Sociétés et Associations numéro 1113 du 5 juin 2009, page. 53412 (la **Société**).

Les statuts de ladite société ont été modifiés en dernier lieu par un acte du même notaire en date du 1$^{er}$ mars 2011, publié au *Mémorial C, Recueil des Sociétés et Associations* Numéro 1637 du 21 juillet 2011, page 78873.

L'assemblée est présidée par Madame Sofia Afonso-Da Chao Conde, employée privée, ayant son adresse professionnelle à Esch/Alzette

Le président a nommé Madame Sophie HENRYON, employée privée, ayant son adresse professionnelle à Esch/Alzette, comme secrétaire.

L'Assemblée a élu Madame Maria SANTIAGO-DE SOUSA, employée privée, ayant son adresse professionnelle à Esch/Alzette, comme scrutateur.

Le président, le secrétaire et le scrutateur constituent le bureau de l'Assemblée (le **Bureau**).

Le Bureau ainsi constitué, le président déclare que :

I.      La Société est actuellement détenue par son actionnaire unique (l'**Actionnaire Unique**), ici représenté par Madame Da Chao Conde, en vertu d'une procuration donnée à Hanoi, le 2 août 2012 (la **Procuration**). Cette Procuration, après avoir été signée *ne varietur* par le Bureau et le notaire instrumentant, restera annexée au présent acte;

II.     Il ressort d'une liste de présence, que le capital social est entièrement représenté à la présente Assemblée, l'Assemblée pouvant ainsi valablement délibérer sur l'ordre du jour, préalablement communiqué aux participants qui ont de ce fait été dûment informés;

III.    L'ordre du jour de l'Assemblée est le suivant;

1.      la renonciation aux formalités de convocation ;

2.      autorisation donnée au conseil d'administration de la Société d'émettre des actions de classe A, B, C, D, E, F, G, H, I, J de la Société dans la limite du capital social autorisé pour un montant maximum de cinq cent millions de dollars américains (USD 500.000.000,.-), incluant le capital social émis, pour une durée de cinq (5) années à compter de la date de publication du présent acte, sans qu'un droit préférentiel de souscription ne soit réservé aux actionnaires existants;

3.      élection des administrateurs de la Société à partir d'une liste de noms fournie par Acheron Capital Limited ;

4.      modification du deuxième paragraphe de l'article 10 des statuts de la Société afin de refléter les résolutions mentionnées ci-dessus et qui seront libellées comme suit:

« *art. 10*. [...] *Les administrateurs seront élus à partir d'une liste de noms fournie par Acheron Capital Limited, à une majorité simple des voix*

- 17 -

*valablement exprimées et comptabilisées. Chaque administrateur est révocable à tout moment, avec ou sans cause par l'assemblée générale des actionnaires à une majorité simple des voix valablement exprimées. [...]. »*

5. réduction du capital social de la Société d'un montant de cinquante mille dollars américains (USD 50,000.-) par une compensation des pertes antérieures, d'un retrait et d'une annulation ultérieure par la Société de toutes ses actions de classe A, B, C, D, E, F, G, H, I, J et reconnaissance en conséquence, que le capital social de la Société est fixé à zéro dollar américain (USD 0.-);

6. subséquente augmentation du capital social de la Société dont le montant s'élève à zéro dollar américain (USD 0.-) à un montant de cinq millions quatre-vingt-quatorze mille cent trente-cinq dollars américains (USD 5.094.135,-) par le biais d'une création et d'une émission de (i) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe A, (ii) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe B, (iii) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe C, (iv) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe D, (v) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe E, (vi) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe F, (vii) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe G, (viii) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe H, (ix) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe I, (x) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune (ci-après dénommées ensembles les **Nouvelles Actions**);

7. la souscription et le paiement des Nouvelles Actions qui seront émises par la Société comme décrit au point 6. ci-dessus;

8. modification de l'article 5 des statuts de la Société afin de refléter les résolutions mentionnées ci-dessus et qui seront libellées comme suit:

*«**Art. 5.** Le capital social souscrit est fixé à cinq millions quatre-vingt-quatorze mille cent trente-cinq dollars américains (USD 5.094.135,-) représenté par cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe A, cinq millions quatre-vingt-quatorze*

*mille cent trente-cinq (5.094.135) actions ordinaires de classe B, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe C, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe D, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe E, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe F, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe G, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe H, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe I, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune.*

*Toute référence « aux actions » ci-après, s'entendra comme une référence aux classes d'actions mentionnées ci-dessus ou à une classe d'action spécifique, selon ce qui s'appliquera dans le cas d'espèce.*

*Le capital social autorisé est fixé à cinq cent millions de dollars américains (USD 500.000.000,-) représenté par cinq cent millions (500.000.000) actions ordinaires de classe A, cinq cent millions (500.000.000) actions ordinaires de classe B, cinq cent millions (500.000.000) actions ordinaires de classe C, cinq cent millions (500.000.000) actions ordinaires de classe D, cinq cent millions (500.000.000) actions ordinaires de classe E, cinq cent millions (500.000.000) actions ordinaires de classe F, cinq cent millions (500.000.000) actions ordinaires de classe G, cinq cent millions (500.000.000) actions ordinaires de classe H, cinq cent millions (500.000.000) actions ordinaires de classe I, cinq cent millions (500.000.000) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune.*

*Durant une période de cinq années, à compter de la date de publication de cet acte, le conseil d'administration est autorisé par les présentes dispositions, à émettre des actions de classe A, B, C, D, E, F, G, H, I, J, au profit des personnes et à des conditions qu'il juge appropriées, et plus spécifiquement, à procéder à cette émission sans qu'aucun droit préférentiel de souscription aux actions de classe A ne soit réservé aux actionnaires existants. [...].»*

9. modification des livres comptables et du registre des actionnaires de la Société afin de refléter les modifications ci-dessus avec pouvoir et autorité donnés à tout avocat et/ou employé de Loyens & Loeff Luxembourg afin de procéder pour le compte de la Société à l'enregistrement des modifications ci-

dessus dans les registres existants de la Société et créer le(s) nouveau(s) registre(s), suivant les circonstances;

    10. pouvoirs et autorisations; et

    11. divers.

IV.    Après avoir dûment examiné les questions fixées à l'ordre du jour et après délibération, l'Assemblée a pris, à l'unanimité, les résolutions suivantes:

**PREMIERE RESOLUTION**

Le capital social de la Société étant entièrement représenté à la présente Assemblée, l'Actionnaire Unique renonce à l'avis de convocation et considère avoir eu parfaitement connaissance de l'ordre du jour qui lui a été communiqué par avance.

**DEUXIEME RESOLUTION**

L'Assemblée décide la création d'un capital autorisé et autorise le conseil d'administration de la Société à émettre des actions de classe A, B, C, D, E, F, G, H, I, J de la Société dans la limite du capital social autorisé pour un montant maximum de cinq cent millions de dollars américains (USD 500.000.000,-), incluant le capital social émis, pour une durée de cinq (5) années à compter de la date de publication du présent acte, sans qu'un droit préférentiel de souscription ne soit réservé aux actionnaires existants.

**TROISIEME RESOLUTION**

L'Assemblée approuve la nomination des administrateurs de la Société à partir d'une liste de noms fournie par Acheron Capital Limited.

**QUATRIEME RESOLUTION**

L'Assemblée décide de modifier le deuxième paragraphe de l'article 10 des statuts de la Société comme suit:

*« **art. 10**. […] Les administrateurs seront élus à partir d'une liste de noms fournie par Acheron Capital Limited, à une majorité simple des voix valablement exprimées et comptabilisées. Chaque administrateur est révocable à tout moment, avec ou sans cause par l'assemblée générale des actionnaires à une majorité simple des voix valablement exprimées. […]. »*

**CINQUIEME RESOLUTION**

L'Assemblée approuve la réduction du capital social de la Société d'un montant de cinquante mille dollars américains (USD 50,000.-) par une compensation des pertes reportées, un retrait et une annulation ultérieure par la Société de toutes ses actions de classe A, B, C, D, E, F, G, H, I, J et

reconnaissance du fait qu'en conséquence de cela, le capital social de la Société est fixé à zéro dollar américain (USD 0.-).

Compte tenu de ce qui précède, et au lieu de rembourser le montant du capital social de cinquante mille dollars américains (USD 50,000.-) à l'Actionnaire Unique, ce montant sera utilisé pour compenser les pertes d'un montant de soixante-et-un mille dollars américains (USD 61.000,-), ayant été reportées des exercices précédents.

**SIXIEME RESOLUTION**

L'Assemblée prend la résolution d'augmenter subséquemment le capital social de la Société dont le montant s'élève à zéro dollar américain (USD 0.-) à un montant de cinq millions quatre-vingt-quatorze mille cent trente-cinq dollars américains (USD 5.094.135,-) par le biais de la création et de l'émission de (i) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe A, (ii) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe B, (iii) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe C, (iv) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe D, (v) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe E, (vi) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe F, (vii) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe G, (viii) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe H, (ix) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe I, (x) cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune.

**SEPTIEME RESOLUTION**

L'Assemblée prend la résolution d'accepter et d'enregistrer les souscriptions suivantes et le paiement intégral du capital social de la manière suivante:

***Souscription - Paiement***

Dès lors,

(a) **Condor Alternative Fund Ltd**, une entité régie par les lois des Iles Caïmans, dont le siège social se situe au 87 Mary Street, George Town, Grand Cayman, immatriculée au registre du commerce des Iles Caïmans sous

le numéro 103520, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à douze millions cinq cent vingt mille quatre-vingt-dix (12.520.090) Nouvelles Actions de la Société, représentées par un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe A, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe B, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe C, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe D, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe E, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe F, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe G, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe H, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe I, un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par un million deux cent cinquante-deux mille neuf (1.252.009) actions ordinaires de classe B détenues dans le capital social de ACHERON PORTFOLIO CORPORATION (LUXEMBOURG) S.A., une société anonyme régie par les lois du Grand-Duché de Luxembourg, immatriculée au Registre du Commerce et des Sociétés de Luxembourg sous le numéro B 129880 (**APC**), ledit apport en nature étant entièrement affecté au capital social de la Société.

(b) **Marc Bataillon**, né à Nantes (France), le 9 mars 1968, ayant son adresse professionnelle au 20 Eaton Place, Londres SW1X 8AE, Royaume Uni, dûment représenté aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à onze millions cent trente-six mille neuf cent dix (11.136.910) Nouvelles Actions de la Société, représentées par un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions de classe A, un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe B, un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe C, un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe D, un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe E, un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe F, un million cent treize mille six cent quatre-vingt-onze

(1.113.691) actions ordinaires de classe G, un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe H, un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe I, un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par un million cent treize mille six cent quatre-vingt-onze (1.113.691) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(c) **Mozie N Sutton**, née à Jérusalem (Israël), le 8 décembre 1989, ayant son adresse professionnelle au 1576 east 5th street, Brooklyn NY 11230 Etats-Unis d'Amérique, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à cent quinze mille (115.000) Nouvelles Actions de la Société, représentées par onze mille cinq cents (11.500) actions de classe A, onze mille cinq cents (11.500) actions ordinaires de classe B, onze mille cinq cents (11.500) actions ordinaires de classe C, onze mille cinq cents (11.500) actions ordinaires de classe D, onze mille cinq cents (11.500) actions ordinaires de classe E, onze mille cinq cents (11.500) actions ordinaires de classe F, onze mille cinq cents (11.500) actions ordinaires de classe G, onze mille cinq cents (11.500) actions ordinaires de classe H, onze mille cinq cents (11.500) actions ordinaires de classe I, onze mille cinq cents (11.500) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par onze mille cinq cents (11.500) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(d) **Miro I Sutton**, agissant en qualité de dépositaire habilité, et ayant le pouvoir d'engager aux fins des présentes, Monsieur Isaac Meir Sutton, né à New York (Etats Unis d'Amérique), le 5 mars 2011, résidant au 1576 east 5th street, Brooklyn NY 11230 Etats-Unis d'Amérique, dûment représenté aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à soixante-neuf mille (69.000) Nouvelles Actions de la Société, représentées par six mille neuf cents (6.900) actions de classe A, six mille neuf cents (6.900) actions ordinaires de classe B, six mille neuf cents (6.900) actions ordinaires de classe C, six mille neuf cents (6.900) actions ordinaires de classe D, six

mille neuf cents (6.900) actions ordinaires de classe E, six mille neuf cents (6.900) actions ordinaires de classe F, six mille neuf cents (6.900) actions ordinaires de classe G, six mille neuf cents (6.900) actions ordinaires de classe H, six mille neuf cents (6.900) actions ordinaires de classe I, six mille neuf cents (6.900) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par six mille neuf cents (6.900) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(e) **Isaac Sutton**, agissant en qualité de dépositaire habilité, et ayant le pouvoir d'engager aux fins des présentes, Madame Norma Lenora Sutton née à New York (Etats Unis d'Amérique), le 18 juillet 1995, résidant au 1576 east 5th street, Brooklyn NY 11230 Etats-Unis d'Amérique, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à trente mille (30.000) Nouvelles Actions de la Société, représentées par trois mille (3.000) actions de classe A, trois mille (3.000) actions ordinaires de classe B, trois mille (3.000) actions ordinaires de classe C, trois mille (3.000) actions ordinaires de classe D, trois mille (3.000) actions ordinaires de classe E, trois mille (3.000) actions ordinaires de classe F, trois mille (3.000) actions ordinaires de classe G, trois mille (3.000) actions ordinaires de classe H, trois mille (3.000) actions ordinaires de classe I, trois mille (3.000) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par trois mille (3.000) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(f) **Tomson Pte. Ltd.** (anciennement dénommé Oriental Caravan.com), une entité régie par les lois de Singapour, dont le siège social se situe 111 North Bridge Road, 8-10 Peninsula Plaza Singapore 179098, immatriculée au registre du commerce de Singapour sous le numéro 99907653N, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à un million soixante-dix mille huit cent quatre-vingt (1.070.880) Nouvelles Actions de la Société, représentées par cent sept mille quatre-vingt-huit (107.088) actions de classe A, cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe B, cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe C, cent sept mille quatre-vingt-huit

- 24 -

(107.088) actions ordinaires de classe D, cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe E, cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe F, cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe G, cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe H, cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe I, cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par cent sept mille quatre-vingt-huit (107.088) actions ordinaires de classe B détenues dans le capital social de **APC**, ledit apport en nature étant entièrement affecté au capital social de la Société.

(g) **Acheron Capital Ltd**, une société à responsabilité limitée, constituée selon les lois de Grande-Bretagne, dont le siège social est situé au 20-22 Bedford Row, London WC1R 4JS, immatriculée au registre du commerce d'Angleterre sous le numéro 05588630, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à cinq cent cinquante-et-un mille cinq cent quarante (551.540) Nouvelles Actions de la Société, représentées par cinquante-cinq mille cent cinquante-quatre (55.154) actions de classe A, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe B, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe C, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe D, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe E, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe F, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe G, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe H, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe I, cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par cinquante-cinq mille cent cinquante-quatre (55.154) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(h) **Jean Eric Samuel**, né à Troyes (France), le 19 août 1965, résidant au 10 Anson Road, #41-14, 079903 Singapour, dûment représenté aux fins des

présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à deux millions cinq cent quatre-vingt-un mille cent quatre-vingt (2.581.180) Nouvelles Actions de la Société, représentées par deux cent cinquante-huit mille cent dix-huit (258.118) actions de classe A, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe B, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe C, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe D, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe E, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe F, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe G, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe H, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe I, deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par deux cent cinquante-huit mille cent dix-huit (258.118) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(i) **Titan Equity Group LLC,** une société à responsabilité limitée, régie par les lois de l'Etat de New York (Etats unis d'Amérique), dont le siège social se situe au 1250 Broadway, Suite 1203, New York, NY 10001, immatriculée sous le numéro fiscal 20-2917687, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à deux millions neuf cent quarante-et-un mille sept cent cinquante (2.941.750) Nouvelles Actions de la Société, représentées par deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions de classe A, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe B, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe C, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe D, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe E, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe F, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe G, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe H, deux cent quatre-vingt-quatorze mille cent soixante-quinze

(294.175) actions ordinaires de classe I, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(j) **Regency Equity Group LLC,** une société à responsabilité limitée, régie par les lois de l'Etat de New York (Etats unis d'Amérique), dont le siège social se situe au 1250 Broadway, Suite 1203, New York, NY 10001, immatriculée sous le numéro fiscal 20-2917255, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à deux millions neuf cent quarante-et-un mille sept cent cinquante (2.941.750) Nouvelles Actions de la Société, représentées par deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions de classe A, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe B, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe C, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe D, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe E, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe F, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe G, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe H, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe I, deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par deux cent quatre-vingt-quatorze mille cent soixante-quinze (294.175) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(k) **Furstenberg Capital SCA,** une société en commandite par actions régie par les lois du Grand-Duché de Luxembourg, dont le siège social se situe au 5, avenue Gaston Diderich, L-1420 Luxembourg, immatriculée au Registre du Commerce et des Sociétés de Luxembourg sous le numéro B

150655, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à quinze millions cinq cent quarante-huit mille cinq cent cinquante (15.548.550) Nouvelles Actions de la Société, représentées par un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions de classe A, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe B, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe C, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe D, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe E, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe F, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe G, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe H, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe I, un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par un million cinq cent cinquante-quatre mille huit cent cinquante-cinq (1.554.855) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(l) **Middlegate Securities Ltd.** (Profit Sharing Plan FBO Isaac Sutton), une entité régie par les lois de l'Etat de New York (Etats Unis d'Amérique), immatriculée sous le numéro 13-3760819, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à deux cent cinquante-huit mille (258.000) Nouvelles Actions de la Société, représentées par vingt-cinq mille huit cents (25.800) actions de classe A, vingt-cinq mille huit cents (25.800) actions ordinaires de classe B, vingt-cinq mille huit cents (25.800) actions ordinaires de classe C, vingt-cinq mille huit cents (25.800) actions ordinaires de classe D, vingt-cinq mille huit cents (25.800) actions ordinaires de classe E, vingt-cinq mille huit cents (25.800) actions ordinaires de classe F, vingt-cinq mille huit cents (25.800) actions ordinaires de classe G, vingt-cinq mille huit cents (25.800) actions ordinaires de classe H, vingt-cinq mille huit cents (25.800) actions ordinaires de classe I,

vingt-cinq mille huit cents (25.800) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par vingt-cinq mille huit cents (25.800) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

(m) **Isaac Sutton,** agissant en qualité de fiduciaire de **The Isaac C M Sutton 1999 Investment Trust**, une fiducie conclue aux Etats Unis d'Amérique, dont les bureaux sont situés au 1576 east 5th street, Brooklyn NY 11230, et enregistrée sous le numéro 13-3760819, dûment représentée aux fins des présentes par Madame Sofia Afonso-Da Chao Conde, déclare souscrire à un million cent soixante-seize mille sept cents (1.176.700) Nouvelles Actions de la Société, représentées par cent dix-sept mille six cent soixante-dix (117.670) actions de classe A, cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe B, cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe C, cent dix-sept mille six cent soixante-dix (117.670)actions ordinaires de classe D, cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe E, cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe F, cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe G, cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe H, cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe I, cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune et libérer entièrement ces Nouvelles Actions par un apport en nature représenté par cent dix-sept mille six cent soixante-dix (117.670) actions ordinaires de classe B détenues dans le capital social de APC, ledit apport en nature étant entièrement affecté au capital social de la Société.

Conformément à l'article 26-1 de la loi du 10 août 1915 sur les sociétés commerciales, telle que modifiée, la valeur des apports en nature a été évaluée dans un rapport d'auditeur émis par Grand Thornton Lux Audit S.A., une société anonyme régie par les lois du Grand-Duché de Luxembourg, dont le siège social se situe au 83, Pafebruch, L-8308 Capellen à Luxembourg.

Ledit rapport est annexé au présent acte pour être soumis aux formalités de l'enregistrement, et sa conclusion prend la teneur suivante:

."D. CONCLUSION

Based on our work, no facts came to our attention, which will make us believe that the total value of the contribution in kind is not at least corresponding to the number of shares and the nominal value of the Company's shares to be issued."

As a result of the above subscriptions and payments, a total amount of five million ninety-four thousand one hundred thirty-five United States dollars (USD 5,094,135.-) has been paid and is at the disposal of the Company, evidence of which has been proved to the undersigned notary who expressly acknowledges it."

## HUITIEME RESOLUTION

L'Assemblée décide de remplacer les trois premiers alinéas actuels de l'article 5 des statuts de la Société par les quatre alinéas suivants:

«Art. 5. Le capital social souscrit est fixé à cinq millions quatre-vingt-quatorze mille cent trente-cinq dollars américains (USD 5.094.135,-) représenté par cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe A, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe B, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe C, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe D, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe E, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe F, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe G,  cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe H, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe I, cinq millions quatre-vingt-quatorze mille cent trente-cinq (5.094.135) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune.

Toute référence « aux actions » ci-après, s'entendra comme une référence aux classes d'actions mentionnées ci-dessus ou à une classe d'action spécifique, selon ce qui s'appliquera dans le contexte.

Le capital social autorisé est fixé à cinq cent millions de dollars américains (USD 500.000.000,-) représenté par cinq cent millions (500.000.000) actions ordinaires de classe A, cinq cent millions (500.000.000) actions ordinaires de classe B, cinq cent millions (500.000.000) actions ordinaires de classe C, cinq cent millions (500.000.000) actions ordinaires de classe D, cinq cent millions

*(500.000.000) actions ordinaires de classe E, cinq cent millions (500.000.000) actions ordinaires de classe F, cinq cent millions (500.000.000) actions ordinaires de classe G, cinq cent millions (500.000.000) actions ordinaires de classe H, cinq cent millions (500.000.000) actions ordinaires de classe I, cinq cent millions (500.000.000) actions ordinaires de classe J, ayant une valeur nominale de dix centimes de dollars américains (USD 0,10) chacune.*

*Durant une période de cinq années, à compter de la date de publication de cet acte, le conseil d'administration est autorisé par les présentes dispositions, à émettre des actions de classe A, B, C, D, E, F, G, H, I, J, au profit des personnes et à des conditions qu'il juge appropriées, et plus spécifiquement, à procéder à cette émission sans qu'aucun droit préférentiel de souscription aux actions de classe A ne soit réservé aux actionnaires existants.[…]»*

## NEUVIEME RESOLUTION

L'Assemblée décide de modifier les livres comptables et le registre des actionnaires de la Société afin d'y faire figurer les modifications ci-dessus avec pouvoir et autorité donnés à tout avocat et/ou employé de Loyens & Loeff Luxembourg afin de procéder pour le compte de la Société à l'enregistrement des modifications ci-dessus dans les registres existants de la Société et créer le(s) nouveau(s) registre(s), le cas échéant.

## DIXIEME RESOLUTION

L'Assemblée décide d'habiliter et d'autoriser tout directeur de la Société à signer tous les documents ou à effectuer tous les actes nécessaires à l'accomplissement ou en relation avec les résolutions ci-dessus.

Aucune question n'étant plus à l'ordre du jour, l'Assemblée a été levée.

## ESTIMATION DES FRAIS

Les dépenses, frais, honoraires et charges, de quelque nature que ce soit, qui incomberont à la Société en raison du présent acte sont estimés à environ quatre mille deux cents euros (€ 4.200,-).

## CONSTATATION

Le notaire instrumentant déclare avoir vérifié l'existence des conditions énumérées à l'article 26 de la loi sur les sociétés commerciales et en constate expressément l'accomplissement.

## DECLARATION

Le notaire soussigné qui comprend et parle anglais, déclare par la présente qu'à la requête de la parties comparantes ci-dessus, le présent acte

est rédigé en langue anglaise suivi d'une version française, et qu'en cas de divergences entre le texte anglais et français, la version anglaise fera foi.

**<u>DONT ACTE</u>**

Fait et passé à Esch/Alzette, à la date en tête des présentes.

Et après lecture faite à l'Assemblée, ladite Assemblée a signé ensemble, avec le notaire, le présent acte.

# EXHIBIT 24

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

-----------------------------------------------------------X
                  )

**In re:**                      )    **Case no. 16 – Misc. - 60266**
                  )

**FURSTENBERG FINANCE SAS and**   )
**MARC BATAILLON**             )
                  )

           **Debtors.**        )
-----------------------------------------------------------X

## <u>DECLARATION OF JAN-ERIC SAMUEL</u>

I, Jan-Eric Samuel, hereby declare under penalty of perjury of the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      I make this declaration in support the Motion to Quash the subpoenas that were served pursuant to an *Ex Parte Application for Discovery Pursuant to 28 U.S.C. § 1782* filed on February 9, 2016 (the "Discovery Application") filed by Furstenberg Finance SAS and Marc Bataillon ("Applicants").

2.      I am the sole, 100%, owner of Litai Assets LLC ("Litai"), through a holding company, which I own 100%.

3.      I have been the sole owner of Litai since its incorporation.

4.      Jean-Michel Paul does not have, and has never had, any ownership interest in or control over Litai.

5.      Many of the documents called for in Applicants' Subpoena contain sensitive and confidential business information, including pricing and proprietary information and servicing techniques that are highly coveted by others and could cause harm to Litai if disclosed.

6.      The documents being sought by Applicants in the Subpoena will not establish that Jean-Michel Paul has or had any ownership interest in, or control over, Litai, because he never had any such interest or control.

Dated:  March 23, 2016                              Jan-Eric Samuel

# EXHIBIT 25

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

```
--------------------------------------------------------X
                                                        )
In re:                                                  )    Case no. 16 – Misc. - 60266
                                                        )
FURSTENBERG FINANCE SAS and                             )
MARC BATAILLON                                          )
                                                        )
                                                        )
                                                        )
--------------------------------------------------------X
```

## DECLARATION OF ARENDT & MEDERNACH S.A.

I, Pierre Beissel, hereby declare as a duly authorized representative of the Luxembourg law firm Arendt & Medernach S.A., making this declaration under penalty of perjury of the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.     This declaration is made (the "**Declaration**") in support of Litai Assets LLC ("**Litai**") and Jan-Eric Samuel's ("**Mr. Samuel**" and, together with Litai, "**Respondents**") Objection to Applicants Furstenberg Finance SAS ("**Furstenberg**") and Marc Bataillon's ("**Mr. Bataillon**" and, together with Furstenberg, the "**Applicants**") *Ex Parte Application for Discovery Pursuant to 28 U.S.C. § 1782* (the "**Discovery Request**") filed on February 9, 2016.

2.     I, Pierre Beissel, am a partner at Arendt & Medernach S.A., a law firm based in Luxembourg. I have been a member of the Luxembourg Bar since 1999 and, for the record, of the New York Bar since 2001.   I am head of the firm's Private Equity & Real Estate business unit and a member of the Corporate Law, Mergers & Acquisitions practice of Arendt & Medernach S.A. I regularly advise private equity firms, hedge funds and real estate funds on funds structuring and formation as well as on the structuring and financing of international buy-out transactions,

joint ventures, corporate reorganisations and corporate governance matters. I am an active member of the Luxembourg Private Equity Association and of the American Bar Association. I am currently a member of the Luxembourg Bar Council.

3.      I hold a Master's degree in law, a *diplôme de juriste conseil d'entreprise* (*DJCE*) and a *diplôme d'études supérieures spécialisées in business law* (*DESS droit des affaires*) from the Université Montpellier I (France), as well as a Master of Laws degree (LL.M.) from Cornell Law School (U.S.A.).

4.      Arendt & Medernach S.A. has been retained by the Respondents to provide an analysis of the Discovery Request under the laws of Luxembourg and comment on how those laws affect Applicants' contemplated lawsuit.

5.      The Applicants, through their Discovery Request, seek documents and other discovery from the Respondents to support a lawsuit they "reasonably contemplate" filing in Luxembourg.  As my analysis provides herein, this request should be denied because any lawsuit contemplated upon the arguments contained within the Discovery Request would not be permitted under the laws of Luxembourg, due to both a lack of standing and merits. I will then point out that the Discovery Request is used as a means of bypassing provisions of Luxembourg law on proof-gathering procedures. By way of introduction in the next four paragraphs, I will first provide certain elements of context that may shed some light on the motives of the Applicants.

6.      At the annual general meeting of shareholders of APC held on 22 June 2015 (the "**AGM**"), a number of queries were addressed to the board of directors of APC on the basis of article 7(1) of the law of 24 May 2011 on the exercise of certain rights of shareholders in listed companies (the "**Law of 2011**") which provides that[1] *"each shareholder has the right to ask*

---

[1] Free translation from French.

*questions regarding items listed in the agenda of a general meeting. The company answers questions so raised by shareholders within the limits of the measures it can take to verify the identity of the shareholders, to preserve the good order of the general meetings and their preparation and to protect confidentiality and its commercial interests*".

7.      Four questions were raised by a representative of one of the holders of class A shares of APC, namely Furstenberg Capital S.C.A., a Luxembourg partnership limited by shares, the general partner and sole manager of which is Furstenberg S.à r.l., a Luxembourg company whose share capital was at the time, and is currently, 60% held by Furstenberg. Hence, it appears from the information publicly available that Furstenberg and Furstenberg Capital S.C.A. are affiliates and structurally under common control[2].

8.      More specifically, the second question of Furstenberg Capital S.C.A. was, according to a letter subsequently addressed by such company's Luxembourg legal counsel to APC on 29 July 2015, to "clarify and explain all existing relationships between the members of the board of directors of [APC], whether it is of capitalistic, lineage, or any other nature whatsoever, and the servicer Litai Assets LLC". In a letter dated 6 August 2015 and sent in response by our firm, acting as Luxembourg legal counsel to APC, it was noted that (i) such question did not relate to any item of the agenda of the AGM, thus falling outside the scope of article 7(1) of the Law of 24 May 2011, but also that (ii) at the AGM, Furstenberg Capital S.C.A. (via its counsel) was advised that all transactions between APC and related parties had been disclosed in APC's annual and consolidated accounts in accordance with all applicable legal requirements and IFRS reporting standards. To the best of our knowledge, the above exchange was not followed by any further request in Luxembourg with respect to the same subject matter,

---

[2] Note : subject to the existence of a shareholders' agreement, which is not "publicly available" information.

whether by Furstenberg Capital S.C.A. or any of its affiliates that we know of. Indeed, APC and its board of directors did act in compliance with article 7(1) of the Law of 24 May 2011 at the AGM and Furstenberg Capital S.C.A. or any of its affiliates that hold shares of APC have no further recourse under the Law of 24 May 2011, other than to raise the question again at a future general meeting of shareholders at which such question will relate to one of the items listed on the meetings' agenda.

9.     As is apparent from the wording of article 7(1) of the Law of 2011, the Luxembourg legislator aimed at (i) favoring the orderly conduct of general meetings of shareholders, by limiting the scope of questions asked by shareholders to item listed on the agenda of a meeting and (ii) striking a balance between, on the one hand, the right of shareholders of listed companies to ask questions on the conduct of the business of such companies and, on the other, the legitimate interest of listed companies to provide answers without suffering disproportionate harm due to, for instance, disclosure of sensitive, privileged or otherwise confidential information. Against this background, there is a concern that Furstenberg, may be seeking to harass the relevant parties by seeking the same information they requested at the AGM through the discovery procedure that has been initiated by the Discovery Request, thereby engaging in a so-called "fishing expedition". Should this be the case, it is our understanding that the Applicants would be making a wrongful use of the U.S. discovery procedure, since they would use such procedure to circumvent the aforementioned provisions of Luxembourg law which are aimed at protecting the legitimate interests of listed companies and, arguably, their shareholders, creditors, employees or other interested parties.

**Lack of standing of the Applicants under Luxembourg law**

10.     As previously indicated, the Applicants claim that they "reasonably contemplate" filing a lawsuit in Luxembourg against Mr. Jean-Michel Paul ("**Mr. Paul**") for breach of certain provisions of the Luxembourg law of 10 August 1915 concerning commercial companies, as amended (the "**Companies Law**").  More specifically, it is stated in the Sabatier Declaration that (i) criminal legal proceedings, together with a civil action for damages, would be filed on the grounds of a misuse of corporate assets (n° 42 *et seq.* of the Sabatier Declaration) and that (ii) the Applicants may commence a civil lawsuit on the ground of mismanagement of APC (n°46 *et seq.* of the Sabatier Declaration).  As explained below, neither of the Applicants have any standing or any ability to file these "contemplated" proceedings.

*Non-shareholders have no standing to assert any civil claims in this instance*

11.     As expressly disclosed in the Sabatier Declaration, Mr. Bataillon is neither a shareholder nor (except if such fact was omitted from the Sabatier Declaration, which we assume is not the case) a creditor of APC and Mr. Bataillon merely holds shares of Ahmose, being in our understanding one of the minority shareholders of APC. As will be further explained below, only the general meeting of shareholders of APC would have standing to file a civil lawsuit against Mr. Paul on the grounds of mismanagement. Furthermore, only the general meeting of shareholders of APC would have standing to file a civil lawsuit against Mr. Paul on the grounds of misuse of corporate assets for a damage suffered by APC as a result of such (alleged) wrongdoings; a creditor or third party could only file a civil lawsuit against Mr. Paul on the grounds of misuse of corporate assets if such third party or creditor can demonstrate a direct and personal damage. However, there is no single element of the Sabatier Declaration that would demonstrate the

5

existence of such a direct and personal damage suffered by Mr. Bataillon who, therefore, lacks standing.

12. The same holds true with respect to Furstenberg which, regardless of whether it is indeed a minority shareholder of APC (as the Sabatier Declaration claims) or merely a creditor of APC or a third party, would have no standing to file a civil lawsuit against Mr. Paul on the grounds of mismanagement, for which only the general meeting of shareholders of APC would have standing. Similarly, Furstenberg would have no standing to file a civil lawsuit against Mr. Paul on the grounds of misuse of corporate assets, absent any direct and personal damage suffered by it as a result of such (alleged) wrongdoing.

13. On a separate note and as indicated in the declarations made by both Mr. Paul (the "**Paul Declaration**") and the chairman of the board of directors of APC (the "**APC Declaration**") in support of the objection filed against the Discovery Request, it appears from the information publicly available in Luxembourg that there is no Luxembourg company named Furstenberg Finance S.C.A., although the Civil Cover Sheet filed in the Southern District of Florida on February 9, 2015 lists one of the Plaintiffs as Furstenberg Finance S.C.A., a company organized in Luxembourg. A company that claims to be a Luxembourg company but does not exist under Luxembourg law would have no standing to file a civil lawsuit before Luxembourg courts.

*On the grounds of mismanagement*

14. Regarding allegations of mismanagement, Article 59, §1 of the Companies Law provides that directors of a company such as APC shall be "*liable to the company[3], in accordance with general law, for the execution of the mandate given to them and for any misconduct in the*

---

[3] Emphasis added.

*management of the company's affairs*". Indeed, each of the directors has a due diligence obligation with respect to the management of a company; Article 59, §1 of the Companies Law provides in this respect that a director is personally and individually liable for wrongful acts committed by him or her. Consequently, a director is not liable for a wrongful act committed by another director. An action under Article 59, §1 of the Companies Law is contractual in nature and, as a result, the company must establish not only the wrongful act committed but also the damage and the causal connection (*relation causale*) between the fault and the damage suffered.

15.     Neither the creditors, nor a shareholder *ut singuli*, as an individual, but only the company (*i.e.* APC in the case at hand) acting through a majority vote at a general meeting of shareholders, has a right to invoke the liability under article 59, §1 of the Companies Law.

16.     There is no derivative action in Luxembourg and an individual shareholder does not have the right to initiate such action in the event that the general meeting acting for the company refuses or neglects to proceed.

17.     As a result, the Applicants would have no standing to file a lawsuit against Mr. Paul for mismanagement of APC's affairs, since only the general meeting of shareholders of APC would be in a position to do so.

*Any hypothetical civil liability has been "discharged"*

18.     Furthermore, even if the Applicants were to bring the above matter to the agenda of a general meeting of shareholders of APC (the Sabatier Declaration being conveniently silent as to how the Applicants would achieve this), it should be noted that, according to summary of the annual general meetings of shareholders of APC available from APC's website or made available to us by APC, it appears that the general meeting of shareholders of APC granted discharge (the

"**Discharges**") to the board of directors of APC at every annual general meeting of shareholders of APC held in the years 2010 to 2015, and approving the annual accounts of APC, and the work performed by the directors of APC, for the financial years ended 31st December 2009 to 31st December 2014, respectively. By way of background, the above summaries need to be published on the website of APC pursuant to a legal obligation arising from Article 11 (2) of the Law of 2011.

19.     The Discharges therefore fully cover the period during which we understand (based on the Paul Declaration and the APC Declaration) that (i) the servicing agreement between APC and Litai (the "**Servicing Agreement**") was initially entered into, being 2009, and (ii) the Servicing Agreement was renegotiated and prolonged, being 2014.

20.     By way of background, the purpose of the discharge given by the shareholders' meeting, following the approval of the annual accounts, is to sanction the actions and decisions taken by the directors during the financial year of which the accounts have been approved. The granting of the Discharges to the directors of APC had two consequences: (i) the directors were liberated from the risk of facing civil liability claims from the company (APC) on the basis of decisions taken during the financial year for which the annual accounts have been approved, whether for mismanagement (Article 59, §1 of the Companies Law) or for a breach of the provisions of the Companies Law, including in case of misuse of corporate assets (Article 59, §2 and Article 171-1 of the Companies Law) and (ii) through the granting of the discharge, APC waived its right to act against the directors for decisions taken by the latter during such financial years.  The shareholder discharge remains a valid defense to actions against the directors even if the majority shareholders change at a later date.

8

21.     A discharge will be considered to have been validly given if the following conditions are met: (i) the annual accounts do not contain any omission or incorrect statement hiding the real financial situation of the Company, (ii) the decision has been validly taken by the annual shareholders' meeting following the approval of the annual accounts and (iii) if a discharge is sought for a breach of the provisions of the articles of association of a company, that such breach was mentioned in the convening notice to the general meeting. Neither of these is challenged in the Sabatier Declaration, and it is our understanding from both the Paul Declaration and the APC Declaration that the annual accounts that were presented to the general meeting of shareholders of Acheron at any time during the period for which the Discharges were granted did not contain any omission or incorrect statement that would not reflect the real financial situation of Acheron but, instead, that such accounts provided a true and fair view of the accounting situation of Acheron and were prepared in full compliance with Luxembourg law and the applicable accounting standards.

*Luxembourg law provides no civil claims against non-directors for the alleged facts*

22.     Finally, it is expressly noted in the Sabatier Declaration (n°28 of the Sabatier Declaration) that the Servicing Agreement was initially entered into in 2009 and that Mr. Paul would have used his position as director of APC to cause APC […] to enter into an unfavourable contract with Litai, which would constitute a substantial managerial misconduct (n°48 of the Sabatier Declaration). It is, in our view, of the utmost importance to stress that Mr. Paul was first appointed as a director of APC pursuant to resolutions of the general meeting of shareholders of APC taken on 27 December 2010 *i.e.* that Mr. Paul was not a director of APC at any point in time during the period running from the incorporation of APC on 27 June 2007 until 27 December

9

2010. Hence, and as a matter of Luxembourg law, Mr. Paul cannot be sued for mismanagement due to APC's entering into the Servicing Agreement in 2009 on the basis of Article 59, §1 of the Companies Law, since Mr. Paul was not a director of APC at the time of the negotiation and/or execution of such agreement.

*Applicants lack standing to claim a misuse of corporate assets*

23.     Article 171-1 of the Companies Law, which prohibits misuses of corporate assets, provides as follows[4] :

*Shall be subject to a jail term of one to five years and a fine of 500 euros to 25,000 euros, or either one of these penalties, the legally appointed or de facto directors, who, in bad faith,*

-       *will have made a use of the assets or the credit of the company which they knew was contrary to its interests, for personal purposes or for the benefit of another company or undertaking in which they were directly or indirectly interested;*

-       *will have made a use of the power they had or the votes they could cast, in that capacity, which they knew was contrary to the company's interests, for personal purposes or for the benefit of another company or undertaking in which they were directly or indirectly interested.*

24.     A civil action for damages against directors who contravened Article 171-1 of the Companies Law could be brought against directors of APC on the basis of Article 59, §2 of the Companies Law, which provides that directors[5] *"shall be jointly and severally liable both towards the company and any third parties for damages resulting from the violation of [the Companies Law] or the articles of association of the company. They shall be discharged from such liability, with respect to violations to which they were not a party, provided that no misconduct is*

---

[4] Free translation from French.
[5] Free translation from French.

*attributable to them and that they have reported such violation to the first general meeting held after they had acquired knowledge thereof".*

25. An action on the basis of Article 59, §2 of the Companies Law could be brought to the Luxembourg courts either (i) by the company itself (*i.e.* by a majority decision of its general meeting of shareholders) or (ii) by any interested third parties including, in limited circumstances, by an individual shareholder. However, recent Luxembourg case law has consistently and clearly ruled[6] that an individual shareholder of a company has no standing to file a lawsuit under Article 59, §2 of the Companies Law if such shareholder cannot demonstrate that it suffered a personal damage, independent and distinct from that suffered by the company itself. In this context, a shareholder who can only claim that it indirectly suffered its *pro rata* share of the damage borne by the company shall have no individual standing and will not be able to file a lawsuit; only the company, acting through a majority decision of its general meeting of shareholders, shall in such case have standing to file a claim against the director(s).

26. It is stated in the Sabatier Declaration (n°38 of the Sabatier Declaration) that APC, Ahmose and their shareholders have suffered damages as a result of [the unfavorable terms of the Services Agreements]; it therefore appears from the Declaration that the Applicants' damage would merely be the indirect consequence of the – alleged, but not otherwise evidenced – damage or loss in value suffered by APC and would by no means be "distinct and individual" from such damage. As a result and as explained above, the Applicants would have no standing to file a lawsuit against Mr. Paul or any of the directors of APC for misuse of corporate assets. This holds true with respect to Furstenberg, assuming Furstenberg is indeed a minority shareholder of APC

---

[6] See in this respect Trib. Arr. Luxembourg, 10 November 2000, R. n°49599; Court of Appeal, 15 February 2012, Pas., 36, p.71; Court of Appeal, 23 April 2015, r. n°38763.

as set out in the Sabatier Declaration[7], but is even more apparent in the case of Bataillon, who is neither a shareholder nor (except if such fact was omitted from the Declaration, which we assume is not the case) a creditor of APC and who merely holds shares of Ahmose, being one of the minority shareholders of APC.

27.     Against this background, only APC, acting through its general meeting of shareholders, could file such a lawsuit. In the event that the Applicants would be in a position to make a proposal in this respect to the general meeting of shareholders (through means which, as indicated above, are not detailed in the Sabatier Declaration), one must recall that the general meeting of shareholders of APC granted the Discharges to the board of directors of APC at every annual general meeting of shareholders of APC held in the years 2010 to 2015, and approving the annual accounts of APC for the financial years ended 31st December 2009 to 31st December 2014, respectively, and that the general meeting of shareholders of APC could therefore not file a claim against APC's directors on the basis of Article 59, §2 of the Companies Law for such period. Reference is made to the above developments (under n°18 to 21) with respect to the Discharges.

28.     In addition and as previously indicated, it is important to stress that Mr. Paul was first appointed as a director of APC on 27 December 2010 and was therefore not a legally appointed director of APC at any point in time during the period running from the incorporation of APC on 27 June 2007 until 27 December 2010, during which we understand that the initial Servicing Agreement was negotiated and entered into. Hence and as a matter of Luxembourg law, Mr. Paul could not be sued for an alleged misuse of corporate assets or otherwise for a breach of Article 59, §2 of the Companies Law with respect to the Servicing Agreement initially executed in 2009, since both articles provide for criminal or civil sanctions for offenses committed by

---

[7] According to the information made available to us by APC, Furstenberg attended annual general meetings of shareholders of APC in the years 2010 and 2013, but APC is not in a position to verify whether Furstenberg is still holding shares of APC and no evidence of this has been provided in support of the Sabatier Declaration.

individuals in their capacity as (*de jure* or *de facto* in the case of Article 171-1 of the Companies Law) directors of a Luxembourg company.

### *The Applicant's failure to disclose any wrongdoing suggests there was none*

29.     On a separate note, it should be stressed that (i) Mr. Erich Bonnet was a director of APC from 2 October 2007 until 16 October 2009, at which point he was replaced in such capacity by the company Furstenberg Investissements S.p.r.l. (of which he became the permanent representative on 12 November 2009, thereby incurring the same liability as an individual director pursuant to the Companies Law); subsequently, (ii) Furstenberg Investissements S.p.r.l. remained a member of the board of directors of APC until its resignation on 20 July 2010. Similarly, Eric Kalfon was a director of APC from 2 October 2007 until his resignation on 25 September 2010.

30.     Pursuant to the terms of Article 59, §2 of the Companies Law and on the understanding that the Servicing Agreement was negotiated and entered into during the directorship of Messrs. Bonnet and Kalfon, in the event that, as the Applicants claim, APC's entering into such agreement would have constituted a violation of the Companies Law, both Mr. Bonnet and Mr. Kalfon would be jointly and severally liable, with the other directors of APC at the time, for said violation of Luxembourg law. Indeed,unlike under Article 59 § 1, referred to in paragraph 14, the liability of directors under article 59, §2 of the Companies Law is joint and several among all of the directors, and all such directors are presumed liable in case of violation of the Companies Law and/or the articles of association of a company.

31.     Joint and several liability can be avoided by a director only if and to the extent that (i) the director was not personally involved in the breach, (ii) he/she did not commit any wrongdoing and (iii) he/she reported the breach at the next general meeting of shareholders (such

conditions being cumulative). In the exchange of e-mails between Mr. Erich Bonnet and Mr. Eric Kalfon that took place in November 2015, which is appended to, and are claimed to support some of the allegations made in, the Sabatier Declaration, Mr. Eric Kalfon pretends that he resigned from his position as a member of the board of directors of APC in 2010 owing to the "conflict of interest" arising from Mr. Paul's alleged control of Litai. One might infer from the terms of such exchange that Mr. Erich Bonnet was also aware of such alleged "conflict" in 2010 at the latest. If, as the foregoing suggests, both Mr. Erich Bonnet and Mr. Eric Kalfon were aware of what they claim (several years later) to be a breach of the Companies Law which occurred when they were both board members of APC, it would however appear that they never reported any such breach to the general meeting of shareholders of APC. Should this be the case, both Mr. Erich Bonnet and Mr. Eric Kalfon would incur joint and several liability with the other board members of APC who negotiated the Servicing Agreement and authorized APC to enter into such agreement in 2009, in the event that a lawsuit would be successfully brought against such directors for misuse of corporate assets. Assuming that Mr. Erich Bonnet is aware of such fact, this may be an indication that he has no intention of using any information gathered through the Discovery Procedure in order to file a lawsuit in Luxembourg and is using the Discovery Procedure for other, undisclosed purposes.

### Lack of merits of the Applicants' claims under substantive provisions of Luxembourg law

- *On the grounds of mismanagement*

32.    As indicated above (under n°22), Mr. Paul cannot be sued under Luxembourg law for mismanagement under Article 59, §1 of the Companies Law for any (alleged) damage suffered

14

by the Company in connection with the negotiation, approval and/or execution of the initial Servicing Agreement that occurred in or before 2009, since he was not a director of APC at such time and therefore falls outside the scope of such legal provision.

33.     We understand from the Paul Declaration, that when a process was engaged by APC in 2013 to renew its service agreement with a U.S. servicer of life policies in advance of the expiry of the initial Servicing Agreement (the "**Renewal Process**"), Mr. Paul informed the board of directors of APC at the board meeting approving the Renewal Process that he would refrain from voting on such matter. We further understand from the Paul Declaration that Mr. Paul's only involvement in said process was limited to negotiating a further discount from Litai, following a decision taken by the board of directors of APC to renew the Servicing Agreement (a decision in which we understand that Mr. Paul was not involved).

34.     Based on the Paul Declaration and the APC Declaration, it further appears that a number of statements of facts made in the Sabatier Declaration with respect to the commercial terms of the Servicing Agreement are incorrect in that, contrary to what is stated in the Sabatier Declaration, (i) the fees paid by APC to Litai under the Servicing Agreement do not exceed market rates but are, actually, competitive and arguably below such market rates, (ii) the Servicing Agreement entered into in 2009 did not contain non-commercial terms that would have been economically detrimental to APC or (iii) Litai possessed superior operational performance compared to a number of competitors (the "**Corrected Facts**").

35.     In light of the foregoing, (i) on the understanding that Mr. Paul had no involvement in the negotiation or approval of the Servicing Agreement, other than to negotiate a reduction in the amount of the fees payable thereunder and (ii) considering the Corrected Facts and assuming for the purposes hereof that they are true, correct and complete in all material respects, we are of

the view, based on the case law and other legal sources known to us, that a lawsuit against Mr. Paul for breach of the provisions of Article 59, §1 Luxembourg in connection with the transactions referred to herein would be without merit.

### On the grounds of misuse of corporate assets

36.     Provisions of Luxembourg law that prohibit criminal offences, such as Article 171-1 of the Companies Law on misuse of corporate assets (full text above under n°23), are of strict interpretation, meaning that a Luxembourg judge could not construe such provision extensively; the purpose of such rule of interpretation is to ensure that an individual cannot be condemned for an act that is not clearly and unequivocally prohibited by criminal law. Furthermore, it should be noted that the conditions laid out in Article 171-1 of the Companies Law are cumulative and that an individual can only be condemned for misuse of corporate assets if all conditions set out in such article are met, *i.e.* if (i) use has been made of the assets or credit of the company (or their powers) by (ii) a legally appointed or de facto director (iii) in a way that he knew (in bad faith) was contrary to the company's interests and (iv) for the benefit of another company or undertaking in which he/she was directly or indirectly interested.

37.     Considering the foregoing and the information provided in the Paul Declaration and the APC Declaration, we take the view that a claim against Mr. Paul for misuse of corporate assets under the Companies Law would lack merits, on the following grounds (using the above numbering for ease of reference):

38.     (i) and (ii): it is not challenged that some use has been made of the assets or credit of APC under the Servicing Agreement, since a consideration was and is obviously paid by APC to Litai for the provision of services under the Servicing Agreement. However and as already

indicated, any decision to use the assets or credit of APC was not made by, nor as a result of any corporate resolution of, Mr. Paul in its capacity as director of APC when the Servicing Agreement was initially entered into in 2009 since Mr. Paul was not a director of APC at the time. With respect to the renewal of the Services Agreement in 2014, it can in our view hardly be argued that any such use was made by Mr. Paul as a director of APC since, as indicated in the Paul Declaration and the APC Declaration and mentioned above, Mr. Paul had no involvement in the overall Renewal Process other than to eventually negotiate a further discount from Litai, following a decision to renew the Servicing Agreement by the board of directors of APC and to which Mr. Paul did not take part;

39.     (iii): there is no specific legal definition of the corporate interest of a company under Luxembourg law. Depending on the context and the authors, the corporate interest is at times (i) deemed to correspond to the interest of the shareholders and, according to others (ii) seen in the broader context as the interest of stakeholders (shareholders, but also creditors, employees or interested parties generally). Whether or not a transaction is in the corporate interest of a Luxembourg company is a matter that needs to be assessed primarily from a business or commercial perspective, by the management body of such a company, rather than from a strict legal standpoint. As is apparent from the wording of Article 171-1 of the Companies Law, a misuse of corporate assets needs to be intentional ("*faute intentionnelle*") and a director can therefore only be found guilty of such a misuse of corporate assets if he or she, in bad faith (*i.e.* knowingly) performed an action that was contrary to the company's corporate interest. Conversely, a director who acts in good faith and enters into a transaction that is not detrimental or economically benefits the company that he or she manages should not meet this criterion and should not be found guilty of misuse of corporate assets. In the case at hand and applying

17

substantially the same reasoning as for Article 59, §1 (see under n°35), (i) on the understanding that Mr. Paul had no involvement in the negotiation or approval of the Servicing Agreement, other than to negotiate a reduction in the amount of the fees payable thereunder (an action which, by nature, should benefit APC) and (ii) considering the Corrected Facts and assuming for the purposes hereof that they are true, correct and complete in all material respects, we are of the view, based on the case law and other legal sources known to us, that a Luxembourg court should not rule that Mr. Paul's actions were contrary to APC's corporate interest and that a claim to the contrary would lack merits.

40.    (iv) : for the purposes hereof, we are not in a position to assess whether or not Mr. Paul is the owner of Litai, as this is a matter of U.S. law on which we cannot opine and for which we have no independent public source of inquiry. We nevertheless understand and trust that satisfactory confirmation will be provided to the court in this respect, simultaneously herewith, in the Paul Declaration and the declaration of Mr. Samuel coming in support of the objection filed against the Discovery Request. We must admit that we have been surprised to read a number of assertions in the Sabatier Declaration (e.g. that APC "paid [Mr. Paul servicing fees] (via Litai)" (n°30 of the Sabatier Declaration), that Mr. Paul "[concealed] his apparent ownership interest [in Litai]" (n°31 of the Sabatier Declaration), that "what was not disclosed was that JMP secretly and covertly owns and controls Litai" (n°35 of the Sabatier Declaration)) although no supporting evidence was provided by Mr. Sabatier to support them, other than vague "allegations" from a former director of APC first put into writing some five years after his resignation. We are of the view that this type of unsupported allegations are improper in an affidavit, such as the Sabatier Declaration, which should in principle only cover matters of Luxembourg law, and may call into question the overall reliability of said declaration.

**The Discovery Request is used as a means of circumventing Luxembourg proof-gathering procedures**

*Avoidance of Luxembourg law procedure for investigations in criminal law matters*

41.     Pursuant to articles 1 and 16 of the Luxembourg Code of Criminal Procedure (*Code d'Instruction Criminelle* or "**CIC**") criminal proceedings in Luxembourg are initiated by the public prosecutor and criminal investigations are conducted by the judicial police under the direction and supervision of the public prosecutor and, as the case may be, by an investigating magistrate (*juge d'instruction*) appointed in accordance with articles 49 *ff.* CIC.

42.     Any person having knowledge of facts that may constitute a criminal offence may, pursuant to articles 11 and 23 CIC, file a criminal complaint either with the judicial police or the public prosecutor, the latter being in charge of taking all necessary steps based on the facts reported in such complaint.

43.     Any person that considers itself being the victim of a criminal offence (*i.e.* having suffered a prejudice resulting from such criminal offence) can, pursuant to Article 56 CIC file a criminal complaint together with a civil action for damages (*plainte pénale avec constitution de partie civile*) with the competent investigating magistrate. Such a complaint results in the opening of a criminal investigation, unless the investigating magistrate holds the civil action for damages inadmissible. The investigating magistrate's decision is subject to appeal.

44.     It should be noted that, in order for such a civil action for damages in the context of criminal proceedings to be admissible, the plaintiff must have suffered an actual (and not only potential) personal prejudice which directly (and not only indirectly) results from the alleged

criminal offence. Any plaintiff having not suffered a damage meeting these criteria cannot initiate criminal proceedings in Luxembourg, but can merely file a simple complaint with the judicial police or the public prosecutor and will not, at any stage be allowed to intervene in the criminal proceedings nor request that payment of damages be ordered (*e.g.* damages to be granted to a third party victim).

45.     Luxembourg has an inquisitorial legal system which, in substance, means that the investigations conducted by the judicial police, the public prosecutor or the investigating magistrate are effected in a neutral manner, *i.e.* with the sole objective of ascertaining the truth, and thus aim at discovering both incriminating and exonerating facts in an impartial manner.

46.     For the purpose of their investigation, the judicial authorities can have recourse to a wide range of investigative measures including, but not limited to, the searching for and the seizing of all objects that could be useful as evidence, including all relevant documentary evidence, the hearing of witnesses and the appointment of experts. To the extent that investigative measures need to be conducted in a foreign jurisdiction, the investigating magistrate can, and regularly does, request, by the way of letters rogatory, the competent foreign judicial authorities to conduct, on his behalf, such investigative measures in their jurisdiction.

47.     In this context, Luxembourg and the United States of America are bound by a Treaty on Mutual Legal Assistance dated 13 March 1997 pursuant to which the contracting parties have agreed to provide mutual legal assistance in connection with the investigation and prosecution of offenses […] and in forfeiture and restitution proceedings related to criminal offenses (the "**MLAT**", available at : http://www.state.gov/documents/organization/76194.pdf). According to Article 1 (2) of the MLAT, the "assistance" that the contracting parties have pledged to provide to each other is defined extensively and shall include (as further detailed in the Treaty):

- taking the testimony or statements of persons;

- providing documents, records, and articles of evidence;

- transferring persons in custody for testimony or other purposes;

- locating or identifying persons and items;

- serving documents;

- executing request for searches and seizures;

- immobilizing assets;

- assisting in proceedings related to forfeiture and restitution; and

- any other form of assistance not prohibited by the laws of the Requested State.

48.    Pursuant to the MLAT, a Luxembourg investigating magistrate can thus seek assistance from the competent U.S. authorities that by law are responsible for investigations, prosecutions, or proceedings related to criminal offenses being, for the United States, "prosecutors, investigators with criminal law enforcement jurisdictions, and agencies or entities with specific statutory or regulatory authority to refer matters for criminal prosecution" (Article 1(6) of the Treaty).

49.    Given the very wide scope of investigative measures permitted to be requested pursuant to the MLAT, any documentary or other evidence that could be obtained by the Applicants through the Discovery Request could thus also be requested and obtained by a Luxembourg investigating magistrate through the appropriate channels in compliance with international law and in compliance with the procedure specifically agreed upon for such purpose under an international treaty between Luxembourg and the United States of America.

50.    It should be noted that a plaintiff having validly filed a civil action for damages has the right to request that the investigating magistrate proceeds with such investigative measures

that such plaintiff deems appropriate and useful. A refusal by the investigating magistrate to proceed with such investigative measures is subject to appeal.

51.     In light of the above and considering that (i) under Luxembourg law, the conduct of proof-gathering procedures in criminal matters falls within the power, responsibility and discretion of the investigating judge and that (ii) based on the MLAT, the Luxembourg investigating magistrate would have extensive means of seeking assistance from the U.S. authorities to gather any evidence deemed necessary or useful in the context of criminal proceedings in Luxembourg, we take the view that the Applicants' Discovery Request is being used as a means of bypassing and circumventing internal Luxembourg procedural laws and general principles regarding the collection of evidence in criminal matters.

52.     The granting of the Discovery Request, given the fact that the alleged purpose of the Discovery Request seems to be to obtain documentary evidence that could be filed together with a potential criminal complaint in Luxembourg, would also, in our view, defeat both the terms and the general intent of the MLAT, pursuant to which Luxembourg and the United States of America have agreed to provide mutual legal assistance in criminal matters subject to, and in compliance with, their respective procedural criminal laws and policies. It is our understanding that one of the goals of Section 1782 is to "[encourage] foreign countries to provide reciprocal assistance to [U.S.] courts"; should the discovery be granted. Such goal can however be considered as being fully reached by the MLAT that in a very extensive manner allows such a reciprocal assistance without there being any need to grant discover requests under Section 1782 filed by persons with doubtful standing and whose ultimate objectives are unclear. It should be noted that on a very regular basis, request for assistance under the MLAT are issued both by the U.S. and the Luxembourg authorities.

53.     In this context, it should also be noted that pursuant to Luxembourg internal procedural law, no such civil law discovery requests for the sole purpose of obtaining information to be used in potential criminal proceedings would be allowed and such "discovery" and collection of documentary evidence would be of the sole competence of the investigating judicial authorities which are required by law to conduct their investigations in an entirely impartial manner.[8]

54.     Finally, in our view, the granting of the Discovery Request could seriously risk jeopardizing a fair and impartial criminal investigation and trial in Luxembourg in a situation where a criminal complaint would be filed, as the Applicants would have the possibility to decide to submit to the investigating authorities only such documentary evidence obtained through the Discovery Request that they deem incriminating whilst withholding such evidence that they deem exonerating. As the defendants in such a criminal case, which are not the same persons as the Respondents, will not necessarily have knowledge of the documentary evidence produced pursuant to the Discovery Request, in case the investigating magistrate deems that, on the basis of the documentary evidence available, no further investigations in the U.S. are necessary or in case the request for assistance under the MLAT would not result in the production of at least all the documentary evidence obtained by the Applicants through the Discovery Request, the defendants would risk in practice not to fully benefit from the impartial investigation principle which is a fundamental principle of Luxembourg criminal procedural law and which is guaranteed by the exclusive investigating power granted to the public prosecutor and the investigating magistrate, prohibiting any investigations conducted by other persons through procedures initiated in the civil courts.

---

[8] See Court of Appeal, 11 January 2012, r. n°37535.

*Availability of Luxembourg discovery and investigative procedures in civil law matters*

55. Titles XV *et seq.* of the Luxembourg New Code of Civil Procedure (*Nouveau Code de Procédure Civile* or "**NCPC**"), which comprises articles 348 to 480 NCPC, provide the legal framework for investigative measures in civil lawsuits. Pursuant to article 348 NCPC, any facts that need to be ascertained by judges in order to rule a civil lawsuit can be the subject of any legally admissible investigative measure, whether at the request of the parties or by decision of the judges themselves. Article 349 further provides that any such measures can be requested at any point of the trial, if a judge considers that he or she does not hold sufficient information to rule the case.

56. In addition, article 350 NCPC provides that, should there be any legitimate reason to preserve or establish *before any trial*[9] evidence of facts, when the outcome of the trial may be dependent upon such evidence, any legally admissible investigative measures may be requested by any interested party, either upon *ex parte* application or in *inter partes* summary proceedings. Such a procedure is, in our understanding, not dissimilar in nature to the U.S. discovery procedure, since it enables a potential claimant to obtain evidence in advance of any trial.

57. Considering the foregoing and seeing as the Applicants have lodged the Discovery Request with a view to, allegedly, start "reasonably contemplated criminal and civil litigation in Luxembourg", and that the evidence they seek to obtain relates primarily to contractual arrangements entered into by APC and alleged wrongdoings of APC's directors, one may wonder why the Applicants do not make use of a set of Luxembourg law procedures available to them in order to gather such evidence.

---

[9] Emphasis added.

24

58.     We would also stress, for the purposes hereof and as may be gathered from the above provisions of the NCPC, that evidence of facts can be brought at any stage of a civil lawsuit in Luxembourg. Hence, and contrary to what may be implied from the Discovery Request lodged by the Applicants, gathering the evidence that they seek to obtain from the U.S. discovery procedure would not be a prerequisite to filing a civil lawsuit in Luxembourg.

Against this background, it appears that the extraordinary relief sought by the Applicants to receive an *ex parte* order for discovery before formally commencing (civil or, as detailed above, criminal) legal proceedings in Luxembourg is not only unnecessary but also contrary to Luxembourg procedural rules and fundamental principles of Luxembourg law. One may question in this context whether the Applicants' true intentions are indeed to commence "reasonably contemplated lawsuit(s)" in Luxembourg or whether, instead, the Applicants are actually using the U.S. discovery procedure to obtain – possibly privileged – information on APC for some other, covert purpose.

Dated: March 23 , 2016

For Arendt & Medernach S.A.
Name: Pierre Beissel
Title:   Partner and authorized representative

# EXHIBIT 26

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-mc-60266-Bloom**

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON,

                                      Applicants.

_____/


**APPLICANTS' MEMORANDUM OF LAW IN OPPOSITION
TO LITAI ASSETS LLC'S MOTIONS TO QUASH AND FOR A PROTECTIVE ORDER
<u>and</u>
CROSS-MOTION TO COMPEL PRODUCTION WITH INCORPORATED
<u>MEMORANDUM OF LAW</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

I.      RELEVANT FACTS AND LUXEMBOURG CRIMINAL LAW ...............................4

      **A.**    Applicants Are Current and Former Shareholders of APC and Have Standing to File Criminal Complaints against JMP in Luxembourg .....................................4

      **B.**    Applicants' 1782 Application Clearly Seeks Evidence for use in a to-be-filed Criminal Proceeding ..................................................................................5

      **C.**    Applicants Reasonably Contemplate Filing the Luxembourg Criminal Proceedings ..................................................................................................6

      **D.**    Litai's Factual Objections Are Conclusory, Go Precisely to the Dispute at Issue, and are otherwise without Merit .......................................................7

            i.     The Allegations of JMP's Covert Litai Ownership/Control Are Founded ...........................................................................................7

            ii.    That JMP Was Not a Board Member of APC in 2009 is Irrelevant ...........7

            iii.   Litai's Contentions on the Litai-APC Contract are both Misleading and the Very Subject of the Luxembourg Criminal Proceedings ...............8

            iv.   Litai's Waiver Arguments do not Apply to Criminal Proceedings............10

      **E.**    The Evidence Obtained In this Action will be Admissible and Does Not Circumvent Luxembourg Discovery or Criminal Complaint Procedures .............10

      **F.**    JMP Began Deleting Emails after Litai was Served with the Subpoenas.............11

ARGUMENT ..............................................................................................................12

      **A.**    Applicants Are Interested Persons ......................................................................14

      **B.**    The Evidence is "For Use" In Reasonably Contemplated Criminal Proceedings ....................................................................................................15

            i.     The Criminal Proceedings are Reasonably Contemplated........................15

            ii.    Litai's Merits Based Arguments Are Not Properly Before this Court......16

      **C.**    The Discretionary Factors All Weigh in Applicants' Favor ...................................17

      **D.**    Applicants Are Entitled to Their Attorneys' Fees .................................................20

Applicants Furstenberg Finance SAS ("**FS**") and Marc Bataillon ("**Bataillon**") (collectively, the "**Applicants**"), by and through their undersigned counsel, Holland & Knight LLP, submit this memorandum of law and the Declaration of Romain Sabatier, dated April 18, 2016 (the "**Second Sabatier Decl.**", attached as Exhibit A), the Declaration of Erich Bonnet, dated April 17, 2016 (the "**Bonnet Decl.**", attached as Exhibit B), the Declaration of Marc Bataillon, dated April 17, 2016 (the "**Bataillon Decl.**", attached as Exhibit C), the Declaration of Charles Meeus, dated April 15, 2016 (the "**Meeus Decl.**", attached as Exhibit D), and the declaration of Alain Reinhold, dated April 18, 2016 (the "**Reinhold Decl.**", attached as Exhibit E), and incorporate the content of the originating Section 1782 Application documents (the "**1782 Application**") previously filed in the matter, in opposition to Litai Assets LLC's ("**Litai**") Motions to Quash and for a Protective Order (the "**Motion to Quash**") (Doc. #10), and in support of its motion to compel discovery.[1]

Applicants respectfully request that this Court deny Litai's Motion to Quash, confirm its previous order authorizing discovery (Doc. #7), and toward mooting any potential argument that the Luxembourg criminal proceedings against Jean-Michel Paul ("**JMP**") are not reasonably contemplated, Applicants further request this Court issue a protective order confirming its grant of discovery, but limiting its further use until the Luxembourg criminal actions against JMP are filed.

## PRELIMINARY STATEMENT

Litai, a non-party company based within the Southern District of Florida, with information relevant to this dispute, moves to quash the subpoenas served by Applicants pursuant to this Court's order authorizing Section 1782 discovery. Motion to Quash, at 1. Litai's purported interest in this proceeding is limited to its compliance with the subpoenas for documents and testimony that were authorized by this Court on two ultimately simple issues. (Doc. # 7 at 1).

---

[1] Because Applicants' subpoenas are narrowly tailored to the issues of JMP's ownership and control of Litai, and the contract between Litai and APC, Applicants address only their right to § 1782 discovery, reserving all other rights. Assuming § 1782 Discovery is upheld, Applicants are hopeful all scope issues/objections can be resolved by counsel.

All the statutory requirements under 28 U.S.C. § 1782 for taking discovery in support of criminal proceedings in Luxembourg against JMP are met in this case, while the Section 1782 discretionary factors similarly all support relief. But Litai, and its controlling mind, JMP, are very sophisticated. In the absence of any credible argument that would support quashing the subpoena seeking evidence for use in a Luxembourg criminal proceeding, Litai chose to focus its entire opposition on Luxembourg civil law in a blatant attempt to confuse the issues at bar.[2] Moreover, Litai does not contest that former Acheron Portfolio Corporation Luxembourg S.A. ("**APC**") shareholders such as Bataillon have standing to bring criminal actions against JMP in Luxembourg and their <u>flat-out-wrong</u> assertion that Applicant FS is not a current and former shareholder could have been resolved with a phone call or email.[3] Litai's motion to quash should be denied and the Applicants' cross motion to compel compliance with the subpoenas should be summarily granted.

Under the circumstances, Applicants' attorneys' fees preparing this opposition and motion to compel should also be awarded because (i) Litai's arguments are both substantially unjustified and ignore the clear basis of this 1782 Application, and (ii) JMP, Litai's declarant, began <u>destroying evidence</u> days after Litai was served with the subpoenas at issue. After reviewing Litai's Motion to Quash, Applicants formally requested that Litai withdraw its motion and comply with the subpoenas - Litai has refused to do so.

As detailed herein and in the accompanying Declarations, each and every argument submitted by Litai is either untrue, misstates law, or is wholly irrelevant.

- *__First__*, Applicant FS is a company in good standing and is a current shareholder of APC, and Marc Bataillon is an undisputed former shareholder of APC.

---

[2] Litai's choice to deliberately obfuscate the issues at bar does not entitle them to a second bite at the apple, and Applicants would object to any reply by Litai that goes beyond the scope of the motion it filed.

[3] In particular, during one of the conversations that occurred between counsel relating to the scheduling of Litai's motion. It should also be noted that the name of FS is correct in all pleadings. To the extent the undersigned firm's secretarial staff made a typo in respect of the suffix of Furstenberg Finance on a civil cover sheet (SCA instead of SAS), this is not appropriate for motion practice and similarly counsels in favor of an attorneys' fees award.

- **_Second_**, the basis of this 1782 Application is to obtain evidence for Applicants to use in a criminal, not a civil proceeding against JMP in Luxembourg,[4] in this regard:

  - o  FS, as a current and former shareholder of APC, and Bataillon, as a former shareholder of APC, have undeniable and uncontested standing to commence a criminal action against JMP in Luxembourg;

  - o  That JMP was not a board member of APC in 2009 is irrelevant, as he later became a board member, and in any event (i) he had an obligation to disclose his interest at that time, and (ii) the Litai-APC contract was then renegotiated while JMP was a director; and

  - o  The right to bring a criminal action cannot be waived, and it is not possible to waive a right when relevant facts are concealed - moreover, the first time Applicants learned of JMP's concealed interest in Litai was the summer of 2015.

- **_Third_**, the only Litai arguments that even touch upon Luxembourg criminal actions appear at the end of the Beissel Declaration (Doc. # 14) and posit objections based upon: (i) avoidance of proof-gathering mechanisms; (ii) objections related to discovery treaties; and (iii) one-sided presentation of evidence to the Luxembourg courts, which arguments are so frivolous they could not be included in Litai's memorandum of law without implicating Rule 11.

- **_Fourth_**, Litai's self-serving contentions that JMP is not a direct shareholder and did not wrongly prejudice APC are the very issues to be proved in the Luxembourg criminal courts and belied by the simultaneous allegation that JMP recused himself from negotiations with Litai due to a conflict of interest.  Indeed, the purpose of this 1782 Application is to demonstrate JMP's maintains covert ownership and control of Litai and conceals the same.

- **_Fifth_**, originating _ex parte_ 1782 applications are routinely (if not invariably) brought solely upon the declaration of the applicants' foreign lawyer because foreign law is relevant.  All of Mr. Sabatier's statements in his originating declaration were based upon his review of relevant documents including the email from Mr. Eric Kalfon to Mr. Bonnet confirming that Mr. Kalfon resigned from APC's board of directors due to JMP's undisclosed interest in Litai.  In any event, Applicants' declarations are included herein.

- **_Sixth_**, Applicants' intention to bring criminal proceedings against JMP in Luxembourg is not subject to meaningful debate:

---

[4]  Applicants are well aware of relevant Luxembourg civil law in relation to actions against directors of companies by shareholders and the company itself.  *See* Second Sabatier Decl. ¶ 6.  The sole reason that civil actions in Luxembourg were even referenced in the 1782 Application, with the caveat "potential," was that Applicants wanted to inform the court, so there would be no surprises, that after the relevant evidence was submitted to the Luxembourg criminal court, Applicants intended to share the evidence with other APC shareholders, such that the shareholder body as a whole may decide to bring civil claims.  Such a secondary use of properly obtained documents is permitted.  *See Glock v. Glock Inc.*, 797 F.3d 1002, 1008 (11th Cir. 2015) (allowing the use of evidence obtained by 28 U.S.C. § 1782 in later civil proceedings after being used in the foreign proceeding).

3

- o Since learning of JMP's undisclosed interest in Litai in mid-2015, they commenced intensive investigation to prove the allegations, including the filing of this action;

- o All of the discovery sought herein is tailored to the precise issues of JMP's concealed ownership and control of Litai and the Litai-APC contract which will be at issue in the Luxembourg criminal proceedings; and

- o As stated under oath herein, Applicants are more than happy for the discovery in this case to be conditioned by a protective order that restricts further use of the information disclosed until Applicants file a Luxembourg criminal proceeding against JMP.  In sum, there can be no genuine issue that the Luxembourg criminal proceedings against JMP are reasonably contemplated and this is not a fishing expedition.

Finally, only _after_ Applicants agreed to the briefing schedule in this matter, they learned a very disturbing fact.  Within approximately one week after Litai and Jan-Eric Samuel ("**Samuel**") were served with the subpoenas in this matter, JMP, Litai's declarant in this matter and the subject of the to-be-filed criminal proceedings in Luxembourg, began deleting emails.  While this obviously goes to JMP's credibility as a declarant in this matter, it also suggests that Litai's otherwise off-point objection may be a delay tactic for further spoliation.

For these reasons, and those set forth below, Litai's Motion to Quash should be denied, the Litai discovery should be compelled, and Applicants' attorneys' fees and costs should be awarded.

## I.    RELEVANT FACTS AND LUXEMBOURG CRIMINAL LAW

### A.    Applicants Are Current and Former Shareholders of APC and Have Standing to File Criminal Complaints against JMP in Luxembourg

1.    Applicant FS is both a current and former shareholder of APC.  Mr. Erich Bonnet is the 94% ultimate beneficial owner of FS.  Bonnet Decl. ¶ 3.  FS was founded in 2008 and is his family holding company.  _Id._

2.    In 2008, Mr. Bonnet purchased 2,005,835 APC class A shares.  _Id._ ¶ 4.  FS acquired these shares from Mr. Bonnet in 2009.  _Id._  At the end of 2009, Mr. Bonnet purchased an additional 200,000 shares in his own name.  _Id._  Another entity, Furstenberg Investissements sprl ("**FI**"), which was 100% owned by FS, acquired the initial block of 2,005,835 shares from FS.  Bonnet Decl. ¶ 4.  However, FI was liquidated in 2013, and prior to its liquidation, the APC shares were

4

repurchased by FS, and therefore became an asset of FS.  *Id.* ¶ 4.  At the same time, FS acquired the 200,000 shares that Mr. Bonnet still owned.  *Id.*  Some of the APC shares owned by FS were redeemed by APC via a compulsory repurchase at the beginning of 2014, and some of these shares were sold by FS at the end of 2015 on the Luxembourg stock market.  *Id.*  To be clear: FS, an Applicant in this matter, currently holds 1,562,854 APC class A shares, which are held in a Banque Pictet account.  *See* Bonnet Decl. ¶ 4, Exhibits A and B.

3.  Applicant Marc Bataillon is an undisputed former shareholder of APC.  Bataillon Decl. ¶ 2.

4.  It is undisputed and undisputable that current and former shareholders of Luxembourg companies have standing to bring criminal actions against that company's directors under Luxembourg law.  Second Sabatier Decl. ¶¶ 5, 14.

### B.  *Applicants' 1782 Application Clearly Seeks Evidence for use in a to-be-filed Criminal Proceeding*

5.  The clear and overriding purpose of the discovery sought in the 1782 Application, future criminal proceedings, is set forth in the following excerpts from it:

- Via discovery sought in this case from Litai and Samuel, in particular, document discovery, ESI and testimony concerning the JMP-Acheron Capital Limited ("**ACL**")-Litai-Jan-Eric Samuel relationship, the Applicants will be able to present conclusive evidence to the Luxembourg court regarding JMP's covert and beneficial ownership and control of Litai.  Doc #1, at 4.  This evidence will be offered directly to the investigating judge presiding over the criminal foreign proceedings, as well as potential civil proceedings, to be commenced by Applicants.  *Id.*  Clearly, the Foreign Proceedings are adjudicative in nature because they will turn on proving that through his concealed ownership of Litai, JMP has abused his role as a director of APC to the detriment of APC and its shareholders.  Such abuse would be a violation of a number of criminal laws in Luxembourg.  (Doc. # 1 at 4).

- Accordingly, the Applicants plan to file criminal proceedings, and potentially civil proceedings, in Luxembourg against JMP.  *Id.* at 2.

- Under the Luxembourg Companies Law, any shareholder, creditor or third party who is generally aware of a criminal action or has suffered a loss may file a complaint.  (Doc # 4, 1782 Application Memorandum of Law, at 10).

- In relation to this action, the Applicants request the discovery sought by this 1782 Application to formally start a legal action against JMP ("*action publique*").  The evidence obtained via the

requested discovery from Litai and Samuel would be directly presented to the <u>Luxembourg investigating judge, in support of the criminal complaint to be filed by the Applicants, thereby commencing criminal legal proceedings in Luxembourg.</u>  *Id.* at 11

- Luxembourg has an inquisitorial legal system and the investigating judge is a member of the criminal court of Luxembourg who will independently investigate the matter in view of continuing the prosecution.  *Id.*  The information received through the discovery requested in this 1782 Application will be presented to the <u>investigating judge</u> and courts in Luxembourg, and <u>if need be</u>, other relevant courts in aid of the civil and criminal actions against JMP.  (Doc. #4, at 11).

- The Applicants are requesting discovery for reasonably contemplated <u>criminal proceedings</u>, and this Court and the Eleventh Circuit have on numerous occasions previously granted Section 1782 discovery for use in such proceedings   *Id.* at 13

- Here, the Applicants will likely[5] be using the information sought from Litai and its nominal CEO Samuel as part of upcoming criminal foreign proceedings against JMP for violations of the Luxembourg Companies Law.  (Doc. # 1, at 2; Doc. # 4, at 16).

### C.    *Applicants Will Be Filing the Luxembourg Criminal Proceedings*

6.    Applicants have pooled their resources to investigate the allegations that JMP covertly owns and controls Litai since they were first informed of the same.  Bataillon Decl. ¶ 4. In connection with this investigation, Applicants have interviewed potential witnesses in Europe and obtained the initial evidence submitted herein.  *Id.* ¶ 6; Bonnet Decl. ¶ 13.  This includes obtaining statements from Mr. Kalfon and  another former administrator of APC, Reinhold.  *Id.*; Reinhold Decl. ¶ 3.    Moreover, Applicants have engaged United States counsel to assist in obtaining crucial evidence from Litai, and Luxembourg counsel to assist them in preparing the criminal complaint against JMP once the Litai evidence has been obtained.  Bataillon Decl. ¶ 6.

7.    Both Applicants have stated under oath their unequivocal intent to file the criminal proceedings in Luxembourg against JMP and both have voluntarily offered that the discovery in this matter be subject to a confidentiality order that restricts its use until the criminal proceedings against JMP are filed in Luxembourg.  Bataillon Decl. ¶ 8; Bonnet Decl. ¶ 14.

---

[5] The word "likely" was utilized to express the caveat that in the event that the discovery wholly exonerates JMP or prevents a criminal proceeding from being filed in good faith, Applicants will not file such a criminal proceeding.

**D.** **Litai's Factual Objections Are Conclusory, Go Precisely to the Dispute at Issue, and are otherwise without Merit**

        **i.**     <u>The Allegations of JMP's Covert Litai Ownership/Control Are Founded</u>

8.     Applicants first learned of JMP's covert ownership of Litai in or about mid-2015 from Mr. Kalfon, a former board member of APC, and from another employee of APC.  This was later confirmed to Mr. Bonnet by Mr. Kalfon, a former board member of APC.  *See* Bonnet Decl. ¶ 7.  As set forth in the 1782 Application, Mr. Kalfon confirmed to Mr. Bonnet in writing the that the reason Mr. Kalfon resigned from APC's board was because of JMP's covert ownership and control of Litai.  *Id.*; First Sabatier Decl. ¶ 36 & Ex. A.

9.     Mr. Reinhold has since also confirmed his understanding of a non-arm's length relationship between JMP and Litai such that the term "independent contractor" was inappropriate, as he set forth in an email prior to his resignation.  *See* Reinhold Decl. ¶¶ 7-10.

10.     Moreover, Litai's opposition tries to have it both ways.  On the one hand, it contends that Applicants' allegations concerning JMP's improper and undisclosed relationship are baseless. (Doc. # 10 at 4-6).  In this regard, they submit heavily lawyered and conclusory statements from Samuel and JMP that JMP is not a <u>titular</u> owner of Litai.  (*See* Doc. #s 12, 13). On the other hand, they go to great length to allege that (i) JMP was not a board member in 2009 when the Litai contract was first executed, and (ii) that JMP recused himself in the contract renewal.  (Doc. # 10 at 4-)5.  As such, Litai's opposition admits that a conflict in respect of JMP and Litai that was not disclosed to APC's shareholders exists.

11.     Under the circumstances, it is clear that Applicants' allegations have substantial basis, and the discovery sought from Litai is clearly relevant to the criminal complaint that they will file against JMP in Luxembourg.

        **ii.**     <u>That JMP Was not a Board Member of APC in 2009 is Irrelevant</u>

12.     The fact that JMP was not a director at the time the initial Litai contract was signed is irrelevant because JMP did not disclose his controlling and beneficial ownership in Litai at the

time he became a director of APC. Second Sabatier Decl. # 10. Good corporate practice would require a director having a conflict with respect to a particular arrangement entered into before he took office to disclose it as soon as he takes office, otherwise this would go against that director's duty of care and loyalty (*Trib. Arr. Luxembourg, 13 Mai 2002, Mme XX No. 66466 and 66486*) and cuts across the whole purpose of having conflicts of interest rules. *Id.* Moreover, as Litai admits, the Litai contract was re-negotiated, with additional and new terms, after the point at which JMP became a director of APC. Motion to Quash, at 4. Therefore, JMP is absolutely criminally liable as a director of APC in connection with the contract renegotiation based upon his undisclosed interest in Litai. Second Sabatier Decl. ¶ 10.

13. Second, while JMP allegedly recused himself from the renewal negotiations, JMP still failed to disclose his controlling and beneficial interest to the shareholders, which is something a normal, loyal, and diligent director placed in like circumstances would have never done and characterizes bad faith on the part of JMP, which is another requirement imposed by Article 171-1 of the Luxembourg Companies Act. *Id.* ¶ 11. The fact that JMP did not allegedly participate in the renewal decision making process does not mean that he could not have otherwise influenced such renewal or the conditions of such renewal. *Id.*

14. Moreover, what creates serious criminal liability concerns JMP's role in negotiating or advising Litai in respect of these renewal negotiations, including but not limited to, any resulting provisions that call for penalties in the event Litai is terminated from its role, or other provisions that are unfavorable to APC. *Id.*

iii. *Litai's Contentions on the Litai-APC Contract are both Misleading and the Very Subject of the Luxembourg Criminal Proceedings*

15. As an initial matter, the question of whether the Litai contract is fair is not for this Court to decide (certainly without evidence). Rather, the issue of whether the terms of the Litai-APC contract misused corporate assets or are improperly beneficial to Litai is precisely the matter that will be ruled upon and investigated by the Luxembourg Criminal Court in connection with the

8

Applicants' criminal complaint. Second Sabatier Decl. ¶ 12. The purpose of this exercise is to gather evidence of the contracts themselves, including the real parties in interest, as well as the negotiations (written and oral) that led to the Litai-APC agreements, to present it to the Luxembourg Criminal Court. *Id.* Nevertheless, Applicants do take the opportunity to correct some major inaccuracies in Litai's response.

16.    First, Mr. Bonnet possesses certain confidential knowledge concerning what he now knows to be a significantly detrimental contract provision, the existence of which he learned while serving on APC's board (at a time when he was unaware of JMP's covert ownership of Litai). Bonnet Decl. ¶ 10. Mr. Bonnet is happy to share this information with the Court *in camera* or within a sealed declaration so as not to violate his duties of confidentiality. *Id.*

17.    Second, in paragraph 10 of the Yves Mertz declaration (Doc. # 11), a separate "**_non-commercial provision_**" is referenced. (emphasis added). Mr. Mertz attempts to explain this away by stating that this provision was entered into "in exchange for the performance of certain tasks" by Acheron Capital Limited (an entity which is 100% owned and controlled by JMP) that Litai cannot duplicate. However, Acheron Capital Limited does not have sufficient capabilities in this regard and the provision represents a wrongful benefit to another 100% JMP controlled company, which benefit is financed by APC. Bonnet Decl. ¶ 10.

18.    Third, it is important for the Court to understand that APC largely owns "fractional" interests in life insurance policies. *Id.* ¶ 11. The point is that other investors own the remaining interests in those same policies, but the work to be done in terms of administering those whole policies by Litai is the same. *Id.* This means that when Litai's Motion to Quash misleadingly discusses the "cost" of servicing APC's policies, these figures are not accurate in relation to real cost. *Id.* For example, at paragraph 9 of the Mertz Declaration (Doc. # 11), the price comparison made is simply not relevant because the comparison is to whole, not fractional policies. Bonnet Decl. ¶ 11. Similarly, at paragraph 20, Mr. Mertz utilizes a newspaper article which states that servicing fees range from $750 to $1,300 per year per policy with other servicers, whereas Litai's

9

fees are between $200 to $400 on the same basis. However, APC owns <u>fractional</u> interests in policies, and therefore the question of whether Litai is improperly benefiting turns on how much it is charging the other fractional interest holders. *Id.* It may be that Litai's servicing fees are far higher than the standard rate. *Id.* This is precisely what the discovery will reveal. *Id.* ¶ 11.

<i>iv.</i>     <u><i>Litai's Waiver Arguments do not Apply to Criminal Proceedings</i></u>

19.     Litai spends a great deal of time alleging that Applicants waived any right to bring action against JMP by virtue of their participation in the APC shareholders meetings. Motion to Quash, at 3, 10.

20.     As an initial matter, the Applicants could not have condoned a conflict of interest of which they were unaware. Second Sabatier Decl. ¶ 15. The Applicants only became aware of rumors surrounding JMP's interest in Litai in or about the summer of 2015, <u>after</u> FS had participated in APC shareholder meetings. Bonnet Decl. ¶ 7.

21.     More importantly, even if there were a waiver (and assuming such waiver is valid), such waiver would <u>only</u> apply to civil claims, not to a criminal complaint. Luxembourg case law is consistently clear on that topic: a director cannot escape criminal liability on the basis of a waiver given by the shareholders (*Trib. Arr. Luxembourg, 23 December 2015, Docket No. 145 724 and 174 725, p. 25*); Second Sabatier Decl. ¶ 15.

**E.**     ***The Evidence Obtained In this Action will be Admissible and Does not Circumvent Luxembourg Discovery or Criminal Complaint Procedures***

22.     Litai's assertion that this exercise is designed to circumvent Luxembourg proof-gathering mechanisms and otherwise will result in an unfairly one-sided application to the Luxembourg Criminal Court is wholly without merit. The Luxembourg Criminal Court will consider any evidence presented to it, whether or not the evidence was obtained via a prosecutor or the Criminal Court itself. Second Sabatier Decl. ¶ 13. Under Luxembourg criminal law, an investigating magistrate (*juge d'instruction*) is required to gather both incriminating evidence and exculpatory evidence, so Mr. Beissel's allegation that the Applicants' 1782 Application "*could*

10

*seriously risk jeopardizing a fair and impartial […] investigation*" is irrelevant. Indeed, any piece of evidence obtained via the Applicants' 1782 Application would be submitted to the Luxembourg investigating magistrate who would have to balance such evidence against other exculpatory evidence, assuming such evidence can be gathered. *Id.*

23.     Further, there is no obligation to utilize the procedures of the Luxembourg Criminal Court, which are incidentally only available *after* a criminal complaint is filed. *Id.* All criminal complaints, by their *ex parte* nature, are "one-sided." Second Sabatier Decl. ¶ 13. That is the nature of a criminal complaint in Luxembourg. *Id.* In the event that the Luxembourg Criminal Court believes that the underlying, and inherently one-sided complaint merits investigation and/or prosecution, JMP will have every opportunity to present defensive evidence. *Id.*

24.     Finally, Litai's complaint that JMP will (unfairly) not have access to the evidence obtained is unfounded. *Id.* Whether or not JMP has a right to receive copies of the evidence obtained, the Applicants will <u>agree</u> to provide this access. Bonnet Decl. ¶ 14.; Bataillon Decl. ¶ 8.

### F.     *<u>JMP Began Deleting Emails after Litai was Served with the Subpoenas</u>*

25.     As noted above, service of the subpoenas issued in this matter upon Litai and Samuel occurred the final week of February 2016. (Doc. # 9). Beginning from at least the first week of March 2016, it is apparent that JMP started deleting emails. Meeus Decl. ¶¶ 4-8. Applicants learned about this disturbing behavior from two sources, only one of whom, Mr. Meeus, could submit a declaration in this matter due to privilege issues.

26.     The reason Applicants became aware of the evidence spoliation was because (as JMP is evidently unaware), when "read receipts" of an email are requested and a party subsequently deletes that email, the other party is <u>informed</u> of the deletion. Meeus Decl. ¶¶ 6-10.

27.     Accordingly, Applicants are only specifically aware of what is likely a small subset of the evidence spoliation by JMP in relation to this matter, where the relevant deleted email happens to have contained a "read receipt."

11

28.     Mr. Meeus has been employed since August 1, 2010 by a company of which JMP is shareholder and was also director. *Id.* ¶ 3.  This business relationship naturally involved sending emails to JMP and vice versa. *Id.*  On March 1, 2016, he received four email notifications from JMP from his email address at JPaul@acheroncapital.com. *Id.*

29.     The substance of each notification was that JMP had deleted two earlier emails sent to him in 2011 and 2012 that concerned Furstenberg.  Meeus Decl. ¶ 4. Moreover, as Mr. Meeus confirms, this is the <u>first time</u> JMP has deleted emails, and the notifications of deletion all just happen to relate to "Furstenberg." *Id.* ¶ 9.

30.     The clear inference is as follows: shortly after Litai, an allegedly independent company, and Samuel, Litai's Chairman, were served with a subpoena relating to criminal allegations against JMP, Litai and/or Samuel informed JMP of the subpoena and JMP began deleting emails.  Given the admitted and alleged Litai-Samuel-JMP relationship, this disturbing evidence gives rise to significant concerns as to whether (i) Litai and/or Samuel have engaged in similar conduct, and (ii) Litai's facially deficient Motion to Quash is merely a delay tactic to further spoliate evidence.

## ARGUMENT

Applicants have satisfied all the statutory and discretionary factors under Section 1782, and the Court properly acted within its discretion in ordering discovery.  (Doc. # 7).  The Eleventh Circuit has explained:

> A district court has the authority to grant an application for judicial assistance if the following statutory requirements in § 1782(a) are met: (1) the request must be made "by a foreign or international tribunal," or by "any interested person"; (2) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing"; (3) the evidence must be "for use in a proceeding in a foreign or international tribunal"; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance.

*In re Clerici*, 481 F.3d  1324, 1331-32 (11th Cir. 2007) (quoting 28 U.S.C. § 1782) (footnote omitted).  Movants do not challenge the second and fourth factors.  (Doc. # 10 at 7).  Rather, their

challenge is limited to whether Applicants are "interested persons" and whether the information sought is for use in a "reasonably contemplated" foreign proceeding. Both of these challenges are wholly without merit.

Turning to the discretionary factors, the Eleventh Circuit has also provided clear guidance:

Once the prima facie [i.e., statutory] requirements are satisfied, the Supreme Court in *Intel* noted these factors to be considered in exercising the discretion granted under § 1782(a): (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," because "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is otherwise "unduly intrusive or burdensome."

*Id.* at 1334 (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 263-64 (2004)). Here, each of these factors clearly support Applicants' 1782 discovery request. Litai's argument that this discovery exercise is a "fishing expedition" because neither allegation of JMP's covert ownership nor the allegation that the Litai contract is detrimental to APC are proved is both untrue and flies in the face of clear case-law which counsels U.S. courts against delving into the merits of the foreign dispute in question.

As to Litai's half-hearted "contravention of foreign proof-gathering restrictions" argument that is not explained in its memorandum but only at the end of Beissel Declaration, it is both incorrect as a matter of Luxembourg law, and impossible as a matter of United States law. Section 1782 is intended to supplement available discovery by providing foreign litigants with a more expeditious way to obtain evidence than resorting to the Hague or MLAT treaties. If Mr. Beissel's argument were correct, then no 1782 discovery would *ever* be available to foreign litigants in Hague Convention or MLAT treaty countries. Congress intended precisely the opposite. *See Weber v. Finker*, 554 F.3d 1379 (11th Cir. 2009) (upholding 1782 discovery in respect of Swiss criminal and Cypriot civil proceedings and noting the applicant did not have to bring her request

under discovery treaty between the United States and Switzerland because § 1782 is designed for this very purpose and discussing interaction between 1782 and discovery treaties in detail); *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 460 (2d Cir. 2014) (upholding request for discovery of evidence to submit in Swiss criminal proceedings over express objection that resort to Hague Convention/MLAT was the only recourse).

Applicants also take this opportunity to point out that as detailed below, all of the cases relied upon by Litai either <u>support</u> Applicants' argument or are easily distinguishable.

### A. *Applicants Are Interested Persons*

As noted above, Litai devotes its entire argument toward demonstrating that Applicants are not interested persons in respect of a Luxembourg civil actions against JMP, but completely ignore the primary basis of Applicants' argument – a <u>criminal</u> action against JMP in Luxembourg. (*See* 1782 Application, Doc. # 1 at 2-4). Both the Eleventh and the Second Circuits have held that private parties to criminal proceedings in civil law countries such as Luxembourg are interested persons within the meaning of 28 U.S.C. §1782. *See, e.g., In re Application of Consorcio Ecuatoriano de Telecomunicaciones S.A*, 747 F.3d 1262, 1268 (11th Cir. 2014) ("*Consorcio*"); *Weber v. Finker*, 554 F.3d 1379, 1384 (11th Cir. 2009); *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 458 (2d Cir. 2014) (rejecting argument a Swiss investigating magistrate is not a "foreign or international tribunal" for purposes of Section 1782).

In conjunction with the facts that (i) that FS is a current shareholder of APC, (ii) both Applicants are undisputed former shareholders of APC, and (iii) both current and former shareholders have standing to commence criminal proceedings in Luxembourg against company directors (undisputed), it is clear that Applicants are "interested persons" within the meaning of 28 U.S.C. § 1782. *C.f., RTI Ltd. v. Aldi Marine Ltd.*, 523 Fed. Appx. 750, at *1 (2d Cir. 2013) (sister

14

companies of interested persons do not have standing - cited by Litai based on the incorrect statement that FS is not a shareholder of APC).

**B. The Evidence is "For Use" In Reasonably Contemplated Criminal Proceedings**

In relation to this prong, Litai's somewhat disjointed papers attempt to make the following points: (i) the proceedings are not "reasonably contemplated" and (ii) the proposed proceedings are without merit due to: (a) the issues of waiver; (b) JMP's covert ownership of Litai being unsupported; and (c) the Litai-APC contract is in fact fair.

*i. The Criminal Proceedings are Reasonably Contemplated*

Turning first to the issue of whether the Luxembourg criminal proceedings are reasonably contemplated by Applicants, they have more than met the relevant burden. The foreign proceeding for which a court may authorize discovery under § 1782 need not be "pending or imminent." *Intel*, 542 U.S. at 259 (2004) (internal quotation marks omitted). Rather, the statute only requires that foreign proceedings "be within reasonable contemplation." *Id.* (emphasizing that the question is whether the evidence sought "is eventually to be used in such a proceeding").

In *Consorcio*, the Eleventh Circuit held:

> In light of [the § 1782 applicant's] facially legitimate and detailed explanation of its ongoing investigation, its intent to commence a civil action against its former employees, and the valid reasons for [the § 1782 applicant] to obtain the requested discovery under the instant section 1782 application before commencing suit we can discern no error in the district court's determination that [the § 1782 applicant] foreign civil proceedings . . . were "within reasonable contemplation."

747 F.3d 1262, 1271 (11th Cir. 2014). So too here. Although "[t]he future proceedings must be more than speculative," the touchstone is simply whether the district court has "sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially." *Id.* at 1270 (internal quotation marks omitted).

In this case, as detailed above, Applicants have commenced a detailed ongoing investigation, have taken multiple steps in furtherance of the criminal proceedings ranging from witness interviews, obtaining US and Luxembourg counsel, and filing this very action. Applicants

15

have also presented sworn declarations regarding their intent to bring the Luxembourg criminal proceedings and undertake to condition use of the discovery on the commencement of the Luxembourg criminal proceedings. *See* Bonnet Decl. ¶¶ 12-14; Bataillon Decl. ¶¶ 4-8.

All of this distinguishes this matter from *In re Certain Funds,* an extra-circuit case that Litai spends more than four pages describing, yet manages to omit the most important details. *Certain Funds, Accounts, &/or Inv. Vehicles v. KPMG L.L.P.*, 798 F.3d 113, 115 (2d Cir. 2015). In *Certain Funds*, creditors of an entity in liquidation initially sought evidence for use by the entity's liquidator in bringing actions against third parties (wrongful transferees). *Id.* In passing, the same creditors mentioned that they were also considering bringing direct actions against fraudulent transferees in London. When confronted with a court that did not consider the creditors "interested persons" because it was the liquidator not the creditors who would bring the action, the creditors backpedaled and focused on the secondary English litigation, which argument the Second Circuit found to be too little, too late. Even then, the Second Circuit left open the possibility of a successful renewed application concerning the English litigation. *Id.* at 119-122, 124-25.

This facts of this matter are exactly the opposite of *Certain Funds*. Applicants are direct parties to the Luxembourg criminal proceedings, and as set forth in Sections I-A and B above, there can be no meaningful dispute that Applicants sought the discovery in question precisely for use in the Luxembourg criminal proceedings from the outset. For *Certain Funds* to apply, Applicants would have to now switch and seek discovery for civil proceedings in Luxembourg.

ii.     *Litai's Merits Based Arguments Are Not Properly Before this Court*

As noted above, Litai makes a series of merits-based arguments that do not hold water. As to the issue of waiver, the law is clear in Luxembourg that (i) the right to bring criminal actions cannot be waived and (ii) waivers based on concealed facts are never valid in any event. *See* Second Sabatier Decl. ¶ 15. As to the issue of JMP's covert ownership of Litai, Applicants have more than met their burden to take discovery on the very issue by submitting the Kalfon resignation email, the Bonnet Declaration and the Reinhold Declaration. Moreover, Litai's own opposition

16

admits and acknowledges an undefined conflict of interest pursuant to which JMP allegedly abstained from the contract renewal negotiations. Motion to Quash, at 5. Finally, as to the issue of the Litai contract itself, the Bonnet Declaration describes the commercially unfavorable terms, and Litai's slight-of-hand in relation to the distinction between reasonable policy rates and the fact that APC maintained <u>fractional</u> interests in the same policies. Bonnet Decl. ¶ 11.

Litai's merits-based arguments also miss the mark in a fundamental way. Time and again, courts in the Eleventh Circuit, this District, and others, have cautioned against making determinations on the merits of a the very foreign proceeding for which the discovery in question is sought. *See Consorcio*, 747 F.3d at 1268 ("We emphasize, however, that this appeal is not about whether JASE actually overbilled CONECEL, with or without the collusion of CONECEL's former employees; or whether CONECEL owes JASE any money under the contracts between the parties; or, finally, whether any other underlying dispute among the parties and related persons has merit. Like the district court, we have no occasion to address any of these issues, which will likely be resolved in various tribunals in Ecuador.").[6]

C. **The Discretionary Factors All Weigh in Applicants' Favor**

It is equally clear that all of the discretionary factors applicable to this 1782 Application weight in Applicants' favor. Curiously, the principal case that Litai relies upon for its arguments regarding the discretionary factors, *In Re Application of O'Keeffe,* No. 15-mc-80651, 2015 WL 5092806, at *2 (S.D. Fla Aug. 27, 2015), largely supports Applicants' position.

---

[6] Courts in other districts have concluded that Section 1782 applications should be granted without an examination of the underlying merits of the contemplated or pending litigation. *See, e.g., In re Velga*, 746 F. Supp. 2d 27, 37 n. 10 (D.D.C. 2011) (rejecting the content of a declaration that addressed the *underlying merits* of the claims against it in the foreign proceedings, it held that "the merits of the claims and defenses raised in foreign proceedings *are matters better left for the foreign tribunals to resolve*—the only issue before this Court is the propriety of the discovery sought within its jurisdiction." *Id.* (emphasis added). *See also Chevron Corp. v. Stratus Consulting, Inc.*, 2010 WL 3923092, at *5 (D. Colo. Oct. 1, 2010) ("[T]he Court intends to avoid any analysis of the merits of the underlying litigation … [it] restricts its adjudication to the legal issues of privilege in this discovery proceeding, without intruding into the merits that are committed to the jurisdiction of the Ecuadorian trial court.")

First, Litai itself is not a party to the 1782 Application. *See O'Keeffe*, 2015 WL 5092806, at \*3 ("Adelson does not dispute that the first Intel factor has been satisfied. The Court notes that Zukov is not a participant in the Hong Kong proceeding. Accordingly, the first factor weighs in favor of granting O'Keefe's Application.").

Second, Litai has not disputed that the evidence obtained here would be admissible in the Luxembourg criminal proceedings and the unrebutted Sabatier Declarations confirm that this evidence would consider all evidence, no matter how obtained. *Id.* at \*3-4.

Third, *O'Keeffe* confirms that there is no requirement that foreign proof gathering mechanisms be exhausted in the local jurisdiction. *Id.* at \*4. Here, as set forth in the Second Sabatier Declaration, pre-action discovery is not available in Luxembourg (via an MLAT or otherwise), while at the same time documentary evidence of the criminal complaint must be submitted at the time of the complaint. *See also Consorcio*, 747 F.3d at 1271 (citing *Intel* and noting that in civil law countries, documentary evidence must be attached to initiating civil and criminal pleadings - rather than undermine Applicants' right to discovery, the fact that the foreign proceedings have not yet been brought because the discovery at issue is necessary strengthens their right).

Moreover, though these are concerns that relate solely to JMP and not Litai (and their inclusion in Litai's Motion to Quash is suspicious): (i) criminal complaints are always filed *ex parte* and JMP will have every opportunity to defend himself in Luxembourg; and (ii) JMP's ability to participate to review this discovery is a non-issue as Applicants will undertake to provide JMP or his counsel copies of the evidence obtained. *See* Bonnet Decl. ¶ 8; Bonnet Decl. ¶ 14.

As to the fourth discretionary factor, whether the request is unduly burdensome and, as the Eleventh Circuit considers, whether it is in fact part of a bad faith "fishing expedition," the facts of this case clearly support the requested relief, whereas the facts of *O'Keeffe* (as well as *In Re Maritime Pacific*, 2015 WL 5031729, at \*1 (S.D.N.Y. Aug. 26, 2015)) are completely inapposite.

Here, Applicants seek information in Litai's possession and in the possession of Litai's Chairman and CEO, as to whether JMP maintains covert ownership and control of Litai in violation of Luxembourg law. The matter is capable of easy proof via a review of emails between Litai/Samuel and JMP concerning Litai and two depositions of a Litai Rule 30(b)(6) witness and Samuel. As described in detail in the 1782 Application, the accompanying Declarations and of course Litai's admissions concerning JMP's conflict of interest, Applicants allege that JMP placed Samuel, a friend and colleague with no insurance experience, as Chairman and CEO of Litai, an insurance policy administrator, to conceal and protect JMP's ownership. Another APC employee later confirmed this contention's accuracy.

Similarly, evidence concerning the Litai-APC contract and negotiations is sought wherein initial unfavorable and non-commercial clauses have been identified, a "non-commercial" provision concerning JMP's other wholly owned entity, ACL, has been admitted, and JMP allegedly (but not conclusively) recused himself from the negotiations. Evidence concerning JMP's actual role and commercial realities of the Litai agreement will be placed before the Luxembourg Criminal Court. Moreover, all of the discovery and activity concerns recent events.

By contrast, in *O'Keeffe*, the applicant sought non-documentary evidence concerning allegations that a billionaire, Mr. Sheldon Adelson, had uttered words that would qualify him as "foul mouthed" to the prospective witness more than 26 years ago. 2015 WL 5092806 at *7. Hence the application was denied because such aged discovery is never permitted. *Id.* at *7-9. Similarly, in *Asia Maritime Pacific,* the discovery was denied because it sought vague and unspecified information in relation to a "potential" pre-judgment security action an unspecified jurisdiction in relation to a "contemplated" London arbitration. 2015 WL 5037129, at *4-5. Moreover, the subtext of that case was the applicant's attempt to avoid the Second Circuit prohibition on Section 1782 discovery in relation to foreign arbitrations. *Id.* at *4 n. 8.

Under the circumstances, this case is much more akin to *Consorcio*, where the applicant sought evidence to prove both a systematic overbilling scheme and collusion in that scheme by its

19

own employees. The discovery sought is from a company with its principal place of business and operations in Florida and there can be no question of the Applicants' good faith because the Applicants have volunteered to condition the use of the discovery in question on the filing of a criminal proceeding against JMP in Luxembourg.

### D. Applicants Are Entitled to Their Attorneys' Fees

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, when a motion to compel is granted the court "must," after giving an opportunity to be heard, require the party whose conduct necessitated the motion to pay the movant's reasonable expenses, unless the opposing party's non-disclosure was substantially justified. Fed. R. Civ. P. 37(a)(5)(A)(ii). In this case, Litai deliberately submitted a non-responsive brief on civil, not criminal actions because in view of the Eleventh Circuit's binding *Consorcio* decision, there is no legitimate objection to the Luxembourg criminal proceeding discovery sought. Moreover, Litai made no attempt to confirm FS's share ownership before filing its motion, and there has never been a dispute concerning Mr. Bataillon's status as former APC shareholder.

Applicants' counsel communicated these issues to Litai's counsel and formally requested that the objection be withdrawn. In conjunction with the evidence spoliation by Litai's declarant, the circumstances surrounding the same, and the inference that Litai's objection is a delay tactic, it is difficult to imagine a case where attorneys' fees are more warranted.

### CONCLUSION

For the foregoing reasons, Litai's motion to quash should be denied, Applicants' motion to compel granted, and Applicants' attorneys' fees assessed against Litai.

Dated: April 18, 2016 Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ *Philip E. Rothschild*
Philip E. Rothschild, Esq.
HOLLAND & KNIGHT LLP
515 East Las Olas Boulevard

20

Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 525-1000
Fax: (954) 463-2030
Email: phil.rothschild@hklaw.com

*/s/ Warren E. Gluck, Esq.*
HOLLAND & KNIGHT LLP
31 W. 52nd St.
New York, NY 10019
Tel: (212) 513-3200
Fax:(212) 385-9010
Email:  warren.gluck@hklaw.com

*Attorneys for Furstenberg Finance SAS and
Marc Bataillon*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on April 18, 2016, a true and correct copy of the foregoing

was sent via electronic mail through the Court's CM/ECF system to the individuals listed below.

By:____*/s/ Phil Rothschild*

## SERVICE LIST

Jeffrey W. Gutchess, Esq.
jeff@axslawgroup.com
Daniel Tropin, Esq.
dan@axslawgroup.com
Lauren Quattromani, Esq.
lauren@axslawgroup.com
AXS Law Group
1850 Purdy Avenue
Miami, Florida 33139
*Attorneys for the Respondents*

# EXHIBIT 27

**EXHIBIT "A"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

---------------------------------------------------------x
                                            :
In re:                                      :        Case No. 16 Misc. 60266
                                            :
FURSTENBERG FINANCE SAS and                 :
MARC BATAILLON                              :
                                            :
REQUEST FOR DISCOVERY PURSUANT              :
TO 28 U.S.C. § 1782.                        :
                                            :
---------------------------------------------------------x

### DECLARATION OF ROMAIN SABATIER
### IN OPPOSITION TO LITAI ASSETS LLC's MOTION TO QUASH AND IN
### SUPPORT OF APPLICANTS' MOTION TO COMPEL

I, Romain Sabatier, hereby declare as a duly authorized representative of the

Luxembourg law firm NautaDutilh Avocats Luxembourg S.à r.l., under penalty of perjury under

the laws of the United States of America, that the following is true and correct to the best of my

knowledge and belief:

### Introduction

1.      I respectfully submit this declaration in opposition to Litai Assets LLC's ("**Litai**")

Motion to Quash, and in support of Applicants Furstenberg Finance SAS and Marc Bataillon

(collectively, the "**Applicants**") motion to compel compliance with the subpoenas for documents

and deposition testimony of Litai that were served pursuant to an *Ex Parte* Order of this Court

issued February 9, 2016, authorizing discovery pursuant to 28 U.S.C. § 1782.

2.      I have carefully reviewed the documents that comprise Litai's motion to quash

and find the statements of Luxembourg law to be wholly irrelevant to the matter at hand.

3.      It is clear from the Applicants' 1782 Application and my first declaration in this

matter that the primary purpose of this discovery is in support of <u>criminal</u> proceedings to be

commenced under Luxembourg law.



4.      It is also clear to me that Litai and its Luxembourg counsel have chosen to ignore the primary purpose of the 1782 Application – to obtain evidence for the Applicants for use in a criminal proceeding in Luxembourg – and instead focus on problems associated with taking the requested discovery in respect of a civil action under Luxembourg law against Jean-Michel Paul ("**JMP**").

5.      I believe Litai's obfuscatory focus on the civil law of Luxembourg was done intentionally to confuse this Court, because there is no reasonable argument that the Applicants do not have standing to bring a <u>criminal</u> action in Luxembourg, or that the evidence sought herein cannot be used in that action.

6.      To be clear: the Applicants are well-aware of the restrictions on civil actions against JMP and Acheron Portfolio Corporation Luxembourg S.A. ("**APC**")  in Luxembourg based upon the size of their current and former holdings.  The sole reason that there is any reference to any civil action in Luxembourg in the 1782 Application, which reference is generally caveated by the word "potential," was to inform the Court that the Applicants, <u>once the criminal complaint is filed</u>, intend to share the information obtained with the other shareholders of APC which, as a group, <u>would</u> have a right to take civil action, as Litai admits.

7.      Absent the absolute and unconditional intention of the Applicants to commence <u>criminal</u> proceedings in Luxembourg, this 1782 Application would not have been filed.  As such, each and every argument concerning civil actions in Luxembourg contained in the declaration of Pierre Beissel (the "**Beissel Declaration**") is irrelevant and should be disregarded.  I further note that Mr. Beissel is a corporate lawyer, not a litigator, and does not profess to have any experience in the subject of civil or criminal litigation in Luxembourg.

8.      To the extent that Litai's motion to quash and the Beissel Declaration even touch upon the issue of Luxembourg criminal actions, these arguments, as set forth below, are easily dispensed:

2



(i)     JMP was only a Director During the Litai Contract Renewal Negotiations, not when the <u>Initial</u> Litai Contract was signed;

(ii)    JMP Recused Himself from the Renewal Negotiations;

(iii)   Litai's Terms were Beneficial to APC and therefore, the Criminal Allegations against JMP  Lack Merit;

(iv)    This action Avoids Luxembourg Proof Gathering Mechanisms and the Criminal Complaint will be One-Sided; and

(v)     The Applicants Lack Standing to Pursue any Action.

9.      I address each of these incorrect arguments in turn.

10.     First, the fact that JMP was not a director at the time the initial Litai contract was signed is irrelevant because JMP did not disclose his controlling and beneficial ownership in Litai at the time he became a director of APC.  Good corporate practice would require a director having a conflict with respect to a particular arrangement entered into before he took office to disclose it as soon as he takes office, otherwise this would go against that director's duty of care and loyalty (*Trib. Arr. Luxembourg, 13 Mai 2002, Mme XX No. 66466 and 66486)* and cut across the whole purpose of having conflicts of interest rules.  Moreover, as Litai admits, the Litai contract was re-negotiated, with additional and new terms, after the point at which JMP became a director of APC.  Therefore, JMP is absolutely criminally liable as a director of APC in connection with the contract renegotiation based upon his undisclosed interest in Litai.

11.     Second, while JMP allegedly recused himself from the renewal negotiations, JMP still failed to disclose his controlling and beneficial interest to the shareholders, which is something a normally loyal and diligent director placed in like circumstances would have never done and characterizes bad faith on the part of JMP, which is another requirement imposed by Article 171-1 of the Luxembourg Companies Act.  The fact that JMP did not allegedly

3



participate in the renewal decision making process does not mean that he could not have
otherwise influenced such renewal or the conditions of such renewal. For the record, article 171-
1 of the Luxembourg Companies Act provides as follows:

> "*A penalty of imprisonment of between one year and five years and a fine of between 500*
> *and 25,000 euros or one of such penalties shall be imposed on de facto or de iure*
> *company officers who, acting in bad faith,*
>
> > — *make use of the property or credit of the company that they know to be contrary to*
> > *its interests for personal purposes or to favor another company or undertaking in*
> > *which they have a direct or indirect interest;*
>
> > — *make use of powers they possess or votes at their disposal in that capacity, that*
> > *they know to be contrary to the company's interests for personal purposes or to*
> > *favor another company or undertaking in which they have a direct or indirect*
> > *interest."*

Moreover, what creates serious criminal liability concerns JMP's role in negotiating or advising
Litai in respect of these renewal negotiations, including but not limited to, any resulting
provisions that call for penalties in the event Litai is terminated from its role, or other provisions
that are unfavorable to APC. Moreover, I believe that any decision JMP took to recuse himself
from the renewal negotiations is inconsistent with JMP's simultaneous claim that his does not
beneficially own or control Litai. In short, there is clearly a reason JMP allegedly recused
himself from the contract negotiations. Of course, obtaining evidence of JMP's interest in Litai
and his role in the Litai-APC contract is precisely the purpose of this 1782 Application.

      12.    Third, the Applicants deny that the Litai contract is fair and the question of
whether this is correct is not for this Court to decide. Rather, the issue of whether the terms of
the Litai-APC contract misuse corporate assets or are improperly beneficial to Litai is precisely
the matter that will be ruled upon and investigated by the Luxembourg Criminal Court in

4



connection with the Applicants' criminal complaint. The purpose of this exercise is to present evidence of the contracts themselves, as well as the negotiations (written and oral) that led to the Litai-APC agreements, to the Luxembourg Criminal Court.

13.     Fourth, Litai's assertion that this exercise is designed to circumvent Luxembourg proof-gathering mechanisms and otherwise will result in an unfairly one-sided application to the Luxembourg Criminal Court is wholly without merit. The Luxembourg Criminal Court will consider any evidence presented to it, whether or not the evidence was obtained via a prosecutor or the Criminal Court itself. I should also stress that under Luxembourg criminal law, an investigating magistrate (*juge d'instruction*) is required to gather both incriminating evidence and exculpatory evidence, so the allegation that the Applicants' 1782 Application "*could seriously risk jeopardizing a fair and impartial [...] investigation*"[1] is wholly irrelevant. Indeed, any piece of evidence obtained via the Applicants' 1782 Application would be submitted to the Luxembourg investigating magistrate who would have to balance such evidence against other exculpatory evidence, assuming such evidence can be gathered.

14.     Further, there is no obligation to utilize the procedures of the Luxembourg Criminal Court, which are incidentally only available *after* a criminal complaint is filed. Rather, the very purpose of this 1782 Application is to make a criminal complaint that is grounded on evidence that Litai has in its possession and control. I should also note that all criminal complaints, by their *ex parte* nature, are "one-sided." That is the nature of a criminal complaint in Luxembourg. In the event that the Luxembourg Criminal Court believes that the underlying, and inherently one-sided complaint merits investigation and/or prosecution, JMP will have every opportunity to present defensive evidence. Additionally, while it is matter of United States law, Mr. Beissel complains that JMP will not have access to the evidence obtained from this 1782 Application. I understand that (i) as a party that is to be named in a foreign proceeding, JMP has the right to receive copies of the evidence obtained and be present for any depositions, and (ii)

---

[1] See Beissel Declaration, p. 23, item 54.

5

whether or not JMP is entitled to this as a matter of right, the Applicants will agree to provide this access.

15.    Fifth, Litai's objections regarding standing are also wholly without merit. Furstenberg Finance SAS is a current shareholder of APC. I respectfully refer the Court to the Declaration of Erich Bonnet in this respect (the "**Bonnet Declaration**"). I have reviewed the Bonnet Declaration and consider that there is no legitimate question of Furstenberg Finance SAS's status as a current shareholder. Moreover, Applicant Marc Bataillon is unquestionably a former shareholder of APC. His participation in this 1782 Application solely relates to the to-be-filed criminal action in Luxembourg, and Litai has not disputed that former shareholders have standing to bring criminal actions against a director of APC under these circumstances. For the avoidance of doubt I reiterate herein that both current and former shareholders such as Applicants have standing to bring criminal actions against JMP.

16.    Finally, Litai spends a great deal of time alleging that the Applicants waived any right to bring action against JMP by virtue of their direct or indirect participation in the APC shareholders meetings. As an initial matter, the Applicants could not have condoned a conflict of interest of which they were unaware, and as set forth in the accompanying Declarations, the Applicants only became aware of rumors surrounding JMP's interest in Litai in the summer of 2015. More importantly, even if there were a waiver (and assuming such waiver is valid, i.e., that the conditions imposed by Luxembourg law in order for a waiver to be upheld have been observed), such waiver would only apply to civil claims, and not the criminal complaint the Applicants will soon file in Luxembourg. Luxembourg case law is consistently clear on that topic: a director cannot escape criminal liability on the basis of a waiver given by the shareholders (*Trib. Arr. Luxembourg, 23 December 2015, Docket No. 145 724 and 174 725, p. 25*).

6

Case 1:18-mc-00041-JGK Document 47-1 Filed 03/06/18 Page 315 of 372

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under the laws of the United States of America this /8 day of April, 2016.

_____
Romain Sabatier

NautaDutilh Avocats Luxembourg S.à r.l.
2, rue Jean Bertholet
L-1233 Luxembourg

7

# EXHIBIT 28

Case 1:18-mc-00041-JGK   Document 4-1   Filed 02/06/18   Page 317 of 372

# EXHIBIT "B"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-mc-60266-Bloom**

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON,

Applicants.

_____/

**DECLARATION OF ERICH BONNET**
**IN OPPOSITION TO LITAI ASSETS LLC's MOTION TO QUASH AND IN**
**SUPPORT OF APPLICANTS' MOTION TO COMPEL**

I, Erich Bonnet, hereby declare, under penalty of perjury under the laws of the United

States of America, that the following is true and correct to the best of my knowledge and belief:

**Introduction**

1. I respectfully submit this declaration in opposition to Litai Assets LLC's ("**Litai**")

Motion to Quash, and in support of Applicants Furstenberg Finance SAS ("**FS**") and Marc

Bataillon (collectively, the "**Applicants**") motion to compel compliance with the subpoenas for

documents and deposition testimony of Litai that were served pursuant to an *Ex Parte* Order of

this Court issued February 9, 2016, authorizing discovery pursuant to 28 U.S.C. § 1782.

2. I make this Declaration to correct the many inaccuracies in Litai's motion to

quash. These inaccuracies principally relate to (i) the status of FS as a shareholder; (ii) the

timing of my knowledge of Jean-Michel Paul's ("**JMP**") covert ownership in Litai; (iii) the

commercial terms of the Litai contract; and (iv) FS's intention to commence file a criminal

complaint against JMP. I correct only the most glaring inaccuracies in Litai's opposition, and

any failure to mention a specific statement by Litai herein does not constitute my acceptance of

that statement.

*Furstenberg Finance SAS is a Shareholder of Acheron Portfolio Corporation*

3.     I am the 94% ultimate beneficial owner of FS.  FS was founded in 2008 and is my family holding company.  A statement of the FS' standing is attached hereto as Exhibit A.  I am authorized to make this declaration on behalf of FS and the contents of this declaration are based upon personal knowledge or my review of the documents that are relevant to this case.

4.     In 2008, I purchased 2,005,835 Acheron Portfolio Corporation Luxembourg S.A. ("**APC**") class A shares.  FS acquired these shares from me in 2009.  At the end of 2009, I purchased an additional 200,000 shares in my own name.  Another entity, Furstenberg Investissements sprl ("**FI**"), which was 100% owned by FS, acquired the initial block of 2,005,835 shares from FS.  FI was liquidated in 2013, and prior to its liquidation, the APC shares were bought by FS and therefore became an asset of FS.  At the same time, FS acquired the 200,000 shares that I still owned.  Some of the APC shares owned by FS were redeemed by APC via a compulsory repurchase at the beginning of 2014 and some of these shares were sold by FS at the end of 2015 on the Luxembourg stock market.  FS currently holds 1,562,854 APC class A shares, which are custodied in a Banque Pictet account.  Attached hereto as Exhibit B is a true and correct copy of a Pictet Bank evidencing FS's current ownership of these shares. Documentation concerning all transactions is available should the court require it.

### When I Learned of JMP's Covert Ownership of Litai

5.     While it is true that I was a director of APC from 2008 to 2010, at no time during that period did I know or suspect that JMP was the covert owner of Litai.

6.     Contrary to Litai's contention, I never stated that I resigned from the APC board due to JMP's conflict of interest.  I had no idea about JMP's conflict of interest at that time.  The reason that I resigned from the board was that another entity in the Furstenberg family, Furstenberg Capital SCA, was considering purchasing a block of shares in APC and I did not want to be in any way subjected to the argument of wrongful insider behavior.  Should the Court request it, I can produce numerous contemporaneous emails concerning my resignation which cite the contemplated share purchase as the exclusive reason for the resignation.

2

7.     I only learned about JMP's undisclosed and covert beneficial ownership and control of Litai in or about the summer of 2015, when I was discussing APC/Litai with a former employee of ACL. Later, in December 2015, Mr. Kalfon, a former member of the APC Board of Directors, disclosed to me that the reason he determined to resign from APC's board was due to JMP's undisclosed and covert beneficial ownership and control of Litai.

8.     Contrary to Litai's insinuations, the fact that both I and the entities I controlled continued to trade in APC shares until 2015 supports the fact that I only learned of JMP's covert ownership until that time. Since I learned of JMP's covert control and ownership of Litai, the only trading action I have taken in respect of APC shares is to sell some at the end of 2015 for the reason that I am dissatisfied with the performance of the shares.

## The Commercial Terms of The Litai Agreement

9.     I am advised that the merits of whether the terms of the Litai-APC agreement unfairly advantage Litai is a determination that will be made by the Luxembourg Criminal Court, and that contrary to Litai's submissions, is not to be decided in this Court.

10.     However, I do take this opportunity to correct several glaring inaccuracies in Litai's opposition, and to further state I possess certain confidential knowledge concerning what I now know to be a significantly detrimental contract provision, the existence of which I learned while serving on APC's board (at a time when I was unaware of JMP's covert ownership of Litai). I am happy to share this information with the Court *in camera* or within a sealed declaration so as not to violate my duties of confidentiality.   Moreover and additionally, in paragraph 10 of the Yves Mertz declaration, a separate "***non-commercial provision***" is referenced. (emphasis added). Mr. Mertz attempts to explain this away by stating that this provision was entered into "in exchange for the performance of certain tasks" by Acheron Capital Limited (100% owned and controlled by JMP) that Litai cannot duplicate. I now know that Acheron Capital Limited does not have sufficient capabilities in this regard and the

3

provision simply represents a wrongful benefit to yet another 100% JMP controlled company, which benefit is financed by APC, in relation to the Litai-APC agreement.

11. Next, it is important for the Court to understand that APC largely owns "fractional" interests in life insurance policies. The point is that other investors own the remaining interests in those same policies, but the work to be done in terms of administering those whole policies by Litai is the same. This means that when Litai's opposition misleadingly discusses the "cost" of servicing APC's policies, these figures are not accurate in relation to real cost. For example, at paragraph 9 of the Mertz Declaration, the price comparison made is simply not relevant because the comparison is to whole, not fractional policies. Similarly, at paragraph 20, Mr. Mertz utilizes a newspaper article which states that servicing fees range from $750 to $1,300 per year per policy with other servicers, whereas Litai's fees are between $200-$400 on the same basis. However, APC owns fractional interests in policies, and therefore the question of whether Litai is improperly benefiting turns on how much it is charging the other fractional interest holders. It may be that Litai's servicing fees are far higher than the standard rate. Of course, the purpose of this discussion is not to prove to this Court whether JMP committed a crime by both failing to disclose his beneficial ownership and control in Litai and that the Litai contract was not commercially sound, but rather that these are the precise issues to be decided by the Luxembourg Criminal Court and they have substantial merit.

### FS's Intention to File Criminal Proceedings against JMP

12. I can state that without any qualification or equivocation, that FS intends to and will file a criminal complaint against JMP in the Luxembourg Criminal Court. The purpose of this application is to obtain evidence concerning both JMP's covert ownership in Litai, as well as the Litai-APC negotiation process, to present to the Luxembourg Criminal Court.

13. I am not certain how FS can demonstrate its intention to file a criminal complaint against JMP in the Luxembourg Criminal Court beyond the above statement, filing this action, and obtaining the support and advice of Luxembourg counsel. This is certainly not a fishing

4

expedition with no purpose. Rather, it is based upon actionable intelligence received from both a former employee of ACL and a former board member of APC whom I know. Moreover, as further evidence that my investigation of this matter continues and of my intent to file this criminal complaint, I refer the Court to the accompanying declaration of Alain Reinhold, whose testimony I also plan to present to the Luxembourg Criminal Court. The Reinhold Declaration is presented not only for its content, but to demonstrate that FS is absolutely determined to present its complaint to the Luxembourg Criminal Court, utilizing all available sources as evidence. In this regard, it should be clear that the clearest and most convincing evidence is within Litai's possession and control in the United States. Litai and its Chairman Jan-Eric Samuel have all data relating to the nominal and beneficial ownership of Litai, the actual control of Litai and the decision making processes, as well as the specific negotiations that occurred between Litai and APC in relation to the Litai-APC contract.

14.    In sum, I do not believe that FS's intent to bring the criminal proceedings against JMP is subject to meaningful dispute. Moreover, as proof of FS's good faith and current intent, I am advised that it is possible for this Court to issue a protective order governing the discovery obtained in this case. While as noted above, it is FS's intention to share the evidence obtained in this case with the other shareholders of APC after the criminal filing is made, and the evidence is public, FS is happy to agree that no evidence obtained in this proceeding may be utilized or shared with any third party unless and until the proceedings in Luxembourg Criminal Court against JMP are filed.

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under the laws of the United States of America this 17th day of April, 2016.

Erich Bonnet

5

Case 1:18-mc-00044-JGK   Document 4-1   Filed 02/06/18   Page 323 of 372

# EXHIBIT A

Case 1:18-cc-00206-DB Document 1-C-2 Entered on FLSD Docket 04/19/2026 Page 8 of 11
https://www.infogreffe.fr/controle

N° de gestion 2009B22452

*Extrait Kbis*

**EXTRAIT D'IMMATRICULATION PRINCIPALE AU REGISTRE DU COMMERCE ET DES SOCIETES**
à jour au 15 avril 2016

## IDENTIFICATION DE LA PERSONNE MORALE

| | |
|---|---|
| *Immatriculation au RCS, numéro* | 509 674 479 R.C.S. Paris |
| *Date d'immatriculation* | 26/12/2008 |
| *Dénomination ou raison sociale* | **FURSTENBERG FINANCE** |
| *Forme juridique* | Société par actions simplifiée |
| *Capital social* | 6 711 800,00 EUROS |
| *Adresse du siège* | 22 rue de la Paix 75002 Paris |
| *Activités principales* | Holding et prestations de serices |
| *Durée de la personne morale* | Jusqu'au 25/12/2107 |
| *Date de clôture de l'exercice social* | 31 décembre |

## GESTION, DIRECTION, ADMINISTRATION, CONTROLE, ASSOCIES OU MEMBRES

### Président

| | |
|---|---|
| *Nom, prénoms* | Beyssen Arnaud |
| *Date et lieu de naissance* | Le 02/01/1974 à Paris 12ème (75) |
| *Nationalité* | Française |
| *Domicile personnel* | 8 rue Pérignon 75007 Paris |

### Commissaire aux comptes titulaire

| | |
|---|---|
| *Dénomination* | FIDUCIAIRE D'EXPERTISE COMPTABLE D'ANALYSE ET DE CONSEILS |
| *Forme juridique* | Société à responsabilité limitée |
| *Adresse* | 9/11 avenue de l'Alma LA VARENNE ST HILAIRE 94210 Saint-Maur-des-Fossés |
| *Immatriculation au RCS, numéro* | 420 304 214 Créteil |

### Commissaire aux comptes suppléant

| | |
|---|---|
| *Dénomination* | GROUPE INTERNATIONAL FIDUCIAIRE POUR L'EXPERTISE ET LE COMMISSARIAT AUX COMPTES |
| *Forme juridique* | Société à responsabilité limitée |
| *Adresse* | 73 boulevard Haussmann 75008 Paris |
| *Immatriculation au RCS, numéro* | 351 818 042 Paris |

## RENSEIGNEMENTS RELATIFS A L'ACTIVITE ET A L'ETABLISSEMENT PRINCIPAL

| | |
|---|---|
| *Adresse de l'établissement* | 22 rue de la Paix 75002 Paris |
| *Activité(s) exercée(s)* | Holding et prestations de services. |
| *Date de commencement d'activité* | 10/12/2008 |
| *Origine du fonds ou de l'activité* | Création |
| *Mode d'exploitation* | Exploitation directe |

## OBSERVATIONS ET RENSEIGNEMENTS COMPLEMENTAIRES

| | |
|---|---|
| *- Mention n° 1 du 08/12/2009* | CETTE SOCIETE DEJA CONSTITUEE SOUS LA FORME Société civile SE TRANSFORME EN Société par actions simplifiée A COMPTER DU 04082009 |

1 QUAI DE CORSE
75198 PARIS CEDEX 04

N° de gestion 2009B22452

Le Greffier



FIN DE L'EXTRAIT

Case 1:13-mc-00044-JCK Document 4-1 Filed 02/06/18 Page 326 of 372

# EXHIBIT B



PICTET & CIE (EUROPE) S.A.
SUCCURSALE DE PARIS

34, avenue de Messine
75008 Paris - France
TÉL +33 (0) 1 56 88 71 00
FAX +33 (0) 1 56 88 71 01

www.pictet.com

Paris, 13 April 2016

We, hereby, would like to confirm the holdings in the following stocks:
Account ▓▓▓▓▓▓▓ FURSTENBERG FINANCE.

**ACHERON PORTFOLIO 'A' ( LU0327662697)**

- 13 April 2016 :        1'562'469,- shares

Yours faithfully,
Pictet & Cie (Europe) S.A.

Pictet & Cie (Europe) S.A., société anonyme de droit luxembourgeois
Siège social: 15A, avenue J. F. Kennedy, 1855 Luxembourg
Succursale de Paris: 34, avenue de Messine, 75008 Paris - France
SIREN: 451 734 115, R.C.S. Paris - TVA n° FR 31 451 734 115

# EXHIBIT 29

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

-------------------------------------------------------x
                                  :

In re:                            :     Case No. 16 Misc. 60266
                                  :

FURSTENBERG FINANCE SAS and    :
MARC BATAILLON              :
                                  :

REQUEST FOR DISCOVERY PURSUANT  :
TO 28 U.S.C. § 1782.            :

-------------------------------------------------------x

### DECLARATION OF MARC BATAILLON
### IN OPPOSITION TO LITAI ASSETS LLC's
### MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER

     I, Marc Bataillon, hereby declare, under penalty of perjury under the laws of the United

States of America, that the following is true and correct to the best of my knowledge and belief:

### Introduction

     1.     I make this declaration in opposition to Litai Assets LLC's ("**Litai**") Motion to

Quash the subpoenas for documents and deposition testimony of Litai that were served pursuant

to an *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782 filed by Applicants

Furstenberg Finance SAS ("**FS**") and Marc Bataillon (collectively, the "**Applicants**") on

February 8, 2016 and granted by an Order of this Court on February 9, 2016, and in support of

Applicants' cross motion to compel.

     2.     I am an applicant in this matter and a former shareholder of Acheron Portfolio

Corporation Luxembourg S.A. ("**APC**").

     3.     I learned about the allegations that Jean-Michel Paul ("**JMP**") covertly owns and

controls Litai on or about the summer of 2015 from Mr. Erich Bonnet, the ultimate beneficial

owner of Applicant FS.

4.     Since that time, I have worked to investigate these allegations, sharing expenses with FS both in Europe and in the United States, to prepare evidence sufficient to file a criminal complaint against JMP in the Luxembourg Criminal Court.

5.     During this investigation, both FS and I concluded that the most direct way to determine whether JMP covertly owns and controls Litai, and the nature of the Litai-APC contract negotiations, was to obtain the relevant evidence directly from Litai.  That is of course the purpose of this Application - it is the sole purpose of this Application, and the discovery sought is narrowly tailored to this specific goal.

6.     I am not certain how I can demonstrate my intention to file a criminal complaint against JMP in the Luxembourg Criminal Court beyond the above statement, filing this action, and obtaining the support and advice of Luxembourg and United States counsel.  This is certainly not a fishing expedition with no purpose.  Rather, it is based upon actionable intelligence received from both a former employee of ACL and a former board member of APC.  Moreover, as further evidence that my investigation of this matter continues and of my intent to file this criminal complaint, I refer the Court to the accompanying declaration of Alain Reinhold, whose testimony I also plan to present to the Luxembourg Criminal Court.  The Reinhold Declaration is presented not only for its content, but to demonstrate that FS is absolutely determined to present its complaint to the Luxembourg Criminal Court, utilizing all available sources as evidence.

7.     Nevertheless, it should be clear that the most concrete evidence concerning the ownership and control of Litai evidence is within Litai's possession and control in the United States.  Litai and its Chairman Jan-Eric Samuel have all data relating to the nominal and beneficial ownership of Litai, the actual control of Litai and its decision making processes, as well as the specific negotiations that occurred between Litai and APC in relation to the Litai-APC contract.

2

8.      In sum, I do not believe that my intent to bring the criminal proceedings against JMP in Luxembourg is subject to meaningful dispute.  Moreover, as proof of my good faith and absolute intent to bring the Luxembourg criminal proceedings against JMP, I am advised that it is possible for this Court to issue a protective order governing the discovery obtained in this case. While as noted above, it is my intention to share the evidence obtained in this case with the other shareholders of APC after the criminal filing is made, and the evidence is public, I am happy to agree that no evidence obtained in this proceeding may be utilized or shared with any third party unless and until the proceedings in Luxembourg Criminal Court against JMP are filed.

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under the laws of the United States of America this 17th day of April, 2016.

_____
Marc Bataillon

# EXHIBIT 30

# EXHIBIT "D"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-mc-60266-Bloom**

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON,
                    Applicants.
_____/

**DECLARATION OF CHARLES MEEUS IN OPPOSITION TO**
**LITAI ASSETS LLC's**
**MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER**

I, Charles Meeus, hereby declare, under penalty of perjury under the laws of the United

States of America, that the following is true and correct to the best of my knowledge and belief:

**Introduction**

1.      I make this declaration in opposition to Litai Assets LLC's ("**Litai**") Motion to

Quash the subpoenas for documents and deposition testimony of Litai that were served pursuant

to an *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782 filed by Applicants

Furstenberg Finance SAS and Marc Bataillon on February 8, 2016 and granted by an Order of

this Court on February 9, 2016.

2.      I am a Belgian citizen, professionally residing at 62, avenue de la Liberté, L-1930

Luxembourg, Grand Duchy of Luxembourg.   I have been employed since August 1, 2010 by a

company of which Mr Jean-Michel Paul ("**JMP**") is shareholder and was also director.  This

business relationship naturally involved sending emails to JMP and vice versa.

3.      On March 1, 2016, I received four email notifications from JMP from his email

address JPaul@acheroncapital.com.  True and correct copies of the email notifications are

attached hereto as Exhibit A.



4.     The substance of each notification was that JMP had deleted two earlier emails I had sent to him in 2011 and 2012 that concerned Furstenberg.

5.     On November 2, 2011, I sent JMP an email with the subject line "Furstenberg Capital SCA/SARL - Conseil de gérance du 25 novembre 2011."

6.     On March 1, 2016, I received two email notifications that JMP had deleted this email.

7.     On January 4, 2012, I sent JMP an email with the subject line "Furstenberg Capital SCA - Conseil de gérance du 20 janvier 2012."

8.     On March 1, 2016, I received two email notifications that JMP had also deleted this email.

9.     Since I began my business relationship with JMP in August 2010, this is the first time I have received such deletion notifications.

10.     It is my understanding that when a "read receipt" is requested on an email, and the recipient of that email subsequently deletes that email after it has been delivered, the sender of the email is provided notifications such those described herein.

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under the laws of the United States of America this 15th day of April, 2016.

Charles Meeus

2

## Charles Meeus FU

| | |
|---|---|
| **From:** | Jean-Michel Paul <JPaul@acheroncapital.com> |
| **To:** | Charles Meeus |
| **Sent:** | 01 March 2016 12:55 |
| **Subject:** | Not read: Furstenberg Capital SCA/SARL - Conseil de gérance du 25 novembre 2011 |

Your message

  To: Jean-Michel Paul
  Subject: Furstenberg Capital SCA/SARL - Conseil de gérance du 25 novembre 2011
  Sent: Wednesday, November 02, 2011 10:22:10 AM (UTC) Dublin, Edinburgh, Lisbon, London

 was deleted without being read on Tuesday, March 01, 2016 11:51:55 AM (UTC) Dublin, Edinburgh, Lisbon, London.

1



## Charles Meeus FU

| | |
|---|---|
| **From:** | Jean-Michel Paul <JPaul@acheroncapital.com> |
| **To:** | Charles Meeus |
| **Sent:** | 01 March 2016 13:00 |
| **Subject:** | Not read: Furstenberg Capital SCA/SARL - Conseil de gérance du 25 novembre 2011 |

Your message

To: Jean-Michel Paul
Subject: Furstenberg Capital SCA/SARL - Conseil de gérance du 25 novembre 2011
Sent: Wednesday, November 02, 2011 10:22:10 AM (UTC) Dublin, Edinburgh, Lisbon, London

was deleted without being read on Tuesday, March 01, 2016 11:51:55 AM (UTC) Dublin, Edinburgh, Lisbon, London.

1



**Charles Meeus FU**

| | |
|---|---|
| **From:** | Jean-Michel Paul <JPaul@acheroncapital.com> |
| **To:** | Charles Meeus |
| **Sent:** | 01 March 2016 12:55 |
| **Subject:** | Not read: Furstenberg Capital SCA - Conseil de gérance du 20 janvier 2012 |

Your message

  To: Jean-Michel Paul
  Subject: Furstenberg Capital SCA - Conseil de gérance du 20 janvier 2012
  Sent: Wednesday, January 04, 2012 8:20:13 AM (UTC) Dublin, Edinburgh, Lisbon, London

 was deleted without being read on Tuesday, March 01, 2016 11:51:56 AM (UTC) Dublin, Edinburgh, Lisbon, London.

1



**Charles Meeus FU**

| | |
|---|---|
| **From:** | Jean-Michel Paul <JPaul@acheroncapital.com> |
| **To:** | Charles Meeus |
| **Sent:** | 01 March 2016 13:00 |
| **Subject:** | Not read: Furstenberg Capital SCA - Conseil de gérance du 20 janvier 2012 |

Your message

To: Jean-Michel Paul
Subject: Furstenberg Capital SCA - Conseil de gérance du 20 janvier 2012
Sent: Wednesday, January 04, 2012 8:20:13 AM (UTC) Dublin, Edinburgh, Lisbon, London

was deleted without being read on Tuesday, March 01, 2016 11:51:56 AM (UTC) Dublin, Edinburgh, Lisbon, London.



1

# EXHIBIT 31

# EXHIBIT "E"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-mc-60266-Bloom**

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON,

              Applicants.

_____/

**DECLARATION OF ALAIN REINHOLD**
**IN OPPOSITION TO LITAI ASSETS LLC's**
**MOTION TO QUASH AND IN SUPPORT OF MOTION TO COMPEL**

I, Alain Reinhold, hereby declare, under penalty of perjury under the laws of the United
States of America, that the following is true and correct to the best of my knowledge and belief:

**Introduction**

1.      I respectfully submit this declaration in opposition to Litai Assets LLC's ("**Litai**")
Motion to Quash the subpoenas for documents and deposition testimony of Litai that were served
pursuant to an *Ex Parte* Application for Discovery Pursuant to 28 U.S.C. § 1782 filed by
Applicants Furstenberg Finance SAS and Marc Bataillon (collectively, the "**Applicants**") on
February 8, 2016 and granted by an Order of this Court on February 9, 2016.

2.      Until June 30, 2008, I was employed by ADI, a company managed by Erich
Bonnet. I entered retirement on July 1, 2008 and with effect from that date I have been without
family ties or alliance with any of the parties.

3.      I was appointed an Administrator of Acheron Portfolio Corporation ("**APC**" or
the "**Company**") in early 2008. Along with other APC administrators, I resigned on December
24, 2010 due to differences of opinion with Acheron Capital Limited ("**ACL**"), the Investment
Manager of APC, regarding APC's risk management practices.



4. During the second half of 2008, APC's prospectus was updated to indicate that ACL had been appointed the Investment Manager for APC and for the trusts holding APC's policies (the "**Trusts**").

5. The initial draft of a servicing agreement between Litai and APC encapsulated the direct and/or indirect involvement of ACL in Litai's business (the "**Servicing Agreement**"). The draft Servicing Agreement included an unusual provision, as it linked the establishment of prices for Litai as the servicer to ACL continuing to serve as the Investment Manager for the Trusts and APC.

6. The Board of APC explicitly observed this link and immediately judged it to be both commercially unacceptable and in violation of the rules of best execution imposed by the laws of Luxembourg.

7. My understanding of the link (contractual or financial, direct or indirect) between Litai, JMP and ACL was established by an email from JMP to APC's Board of Directors dated November 9, 2009. In this email, JMP informed the Board that his attorneys recommended that ACL not be part of any servicing agreement, and that the prices proposed by the Company to compensate Litai for servicing of the policies in the Trusts were unacceptable to Litai's management.

8. JMP further stated in this email that he was "conflicted" and requested that APC deal directly with Litai.

9. I formalized this understanding in an email to JMP in which I questioned the appropriateness of defining Litai in the Servicing Agreement as an "independent" contractor.

10. The first time I informed Mr. Erich Bonnet of this email exchange, or my understanding of JMP's possible direct or indirect interest in Litai, was in the year 2016, as Mr. Bonnet informed me he was going to file a criminal complaint against JMP in connection with JMP's wrongful concealment of his ownership of Litai. I have never spoken or corresponded with Mr. Bataillon.

2

11.   I am aware that this Declaration will be used in litigation in the United States and
potentially other countries, and that a false declaration may expose me to criminal sanctions.

12.   For the purpose of completeness, attached hereto as Exhibit A is a true and correct
copy of a Luxembourg declaration concerning similar topics, but with additional technical
details, wherein each fact is based upon a written or email correspondence I possess. I submitted
this document in another related Luxembourg matter, handwritten, as I am advised is the
protocol there. Additionally, the declaration is in French, my native language, and a formal
translation into English is included.

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under
the laws of the United States of America this 18th day of April, 2016.

Alain Reinhold

3

Case 1:16-mc-00044-JGK Document 4-1 Filed 02/06/18 Page 346 of 372

# EXHIBIT A

Alain REINHOLD
118 avenue de la Celle St Cloud
92420 Vaucresson,
FRANCE

Le 23 Mars 2016.

Je soussigné, REINHOLD Alain, né le 7 juin 1947 à
Boulogne Billancourt (92-F) demeurant 118 avenue
de la Celle St Cloud, 92420 Vaucresson FRANCE,
Retraité - consultant, sans lien de parenté ni d'alliance
avec aucune des parties, déclare que :

Jusqu'au 30 juin 2008, j'ai été salarié d'ADI dirigé par
Erich Bonnet. Je suis parti en retraite le 1er Juillet 2008
et à compter de cette date, je suis sans lien de
parenté ni d'alliance avec aucune des parties.

J'ai été nommé Administrateur d'Acheron Portfolio
Corporation (Luxembourg) «APC» début 2008 (de
mémoire), et j'ai démissionné le 24 décembre 2010
en même temps que d'autres administrateurs
suite à des divergences de vue avec l'"Investment
Manager (Acheron Capital Limited, «ACL») sur la
gestion des risques de la Société'.

Au cours du deuxième semestre 2008, le prospectus
de la Société a été mis à jour et indique qu'ACL
était l'Investment Manager désigné d'APC, ainsi que
des Trusts détenant les polices (dont les produits nets

1

de charges reviennent à APC).

Le prospectus décrit la mission des Tracking et Servicing Agent, à savoir conserver les polices, et suivre le paiement des primes et la perception des indemnités après décès. Il est à noter que le prospectus indique que le Tracking and Servicing Agent contracte avec les Trusts, mais qu'il sera prévu qu'APC puisse rompre le contrat à son initiative.

A la date de ce prospectus (mi 2008), le Tracking and Servicing Agent est désigné comme étant = " Asset Servicing Group-LLC, and Viatical Services Inc, or such other appointee as is appointed by the Trust and/or the Company to act as Tracking and servicing agent from Time To Time ... "

Mi 2009, l'Investment Manager fait savoir au Board d'APC que Viatical Services Inc "VSI" est en difficulté. Jean Michel Paul nous indique alors la nécessité de sécuriser ce service provider et son objectif de participer directement ou indirectement à la reprise de VSI dans un objectif d'Intégration verticale de la chaîne du Life Settlement.

Lors d'une mini due diligence, le Board a demandé des précisions sur Litai, envisagé comme nouveau Tracking and Servicing Agent. La réponse obtenue est =
" Litai is the business name of the old VSI, it was started in situ in Pompano Beach by Tom and Euch".

2

Le Board en a déduit que la reprise de VSE, renommée Litai, n'aurait pas d'impact opérationnel.

La première version du projet de Service Agreement avec Litai (version 5.03) traduisait l'implication directe ou indirecte d'ACL, puisque de manière inhabituelle, elle liait la Tarification du service provider au maintien d'ACL comme Investment Manager des Trusts et de la Société, point explicitement observé par le Board et jugé inacceptable dans la forme présentée, en particulier par rapport aux règles de best execution imposées par la réglementation.

Ma compréhension d'un lien (contractuel ou capitalistique, direct ou indirect), a été confirmée par un mail de Jean Michel Paul du 11/09/09 au Board, informant le Board que ses avocats recommandaient qu'ACL ne figure pas dans le contrat, et faisant savoir d'autre part que les prix proposés au regard des services à fournir n'étaient pas acceptables par le management de Litai – Jean Michel Paul a indiqué qu'il est "conflicté" et invite les administrateurs à traiter directement avec Litai.
J'avais formalisé ma compréhension dans un mail à Jean Michel Paul où je m'interrogeai s'il était approprié de définir dans le Service Agreement Litai comme un "Independent" contractor.

3

J'ai connaissance que la présente déclaration est établie en vue de sa production en justice, et qu'une fausse déclaration de ma part m'exposerait à des sanctions pénales.

Je joins à la présente copie de ma Carte Nationale d'Identité.

Fait à Vaucresson le 23 Mars 2016.



[handwritten]

Alain REINHOLD
118 avenue de la Celle St-Cloud
92420 Vaucresson
FRANCE

March 23, 2016

I the undersigned REINHOLD Alain, born on June 7, 1947 in Boulogne-Billancourt (92-F), residing at 118 avenue de la Celle St-Cloud, 92420 Vaucresson, FRANCE, retired consultant, without family ties nor alliance with any of the parties, declare that:

Until June 30, 2008, I was employed by ADI managed by Erich Bonnet. I entered retirement on July 1, 2008 and with effect from that date I have been without family ties or alliance with any of the parties.

I was appointed Administrator of Acheron Portfolio Corporation (Lux [illegible]) "APC" at the beginning of 2008 (from memory), and I resigned on December 24, 2010 at the same time as other administrators as the result of differences of opinion with the Investment Manager (Acheron Capital Limited "ACL") regarding the company's risk management.

During the last half of 2008, the company's prospectus was updated indicating that ACL had been appointed the Investment Manager for APC, and for the Trusts holding the policies (with

1

the net profits from fees going to APC).

The prospectus describes the assignment of the Tracking & Servicing Agent, i.e. to retain the policies, and to monitor the payment of premiums and the collection of indemnities after death. It should be noted that the prospectus indicates that the Tracking & Servicing Agent contracts with the Trusts, but it will be [illegible] that APC may break the contract at its own initiative.

At the time the prospectus was issued (mid-2008), the Tracking & Servicing Agent was indicated as being "Asset Servicing Group LLC, and Viatical Services Inc., or such other appointee as is appointed by the Trust and/or the Company to act as Tracking & Servicing Agent from time to time. …"

In mid-2009, the Investment Manager informed the Board of APC that Viatical Services Inc. "VSI" was having difficulties. Jean Michel Paul informed us at that time of the necessity to secure this service provider and his objective of participating directly or indirectly in the take-back of VSI with the objective of vertical integration of the Life Settlement chain.

During a mini due-diligence the Board asked for more information on Litai, considered as a new Tracking & Servicing Agent. The response they obtained was: "Litai is the business name of the old VSI. It was visited in situ in Pompano Beach by Tom and Erich".

2

The Board inferred that the take-back of VSI, renamed Litai, would have no operational impact.

The first version of the draft Service Agreement with Litai (version 5-09) translated the direct or indirect involvement of ACL, since, in an unusual step, it linked the setting of prices for the service provider to the maintenance of ACL as Investment Manager for the Trusts and for the Company; a point explicitly observed by the Board and judged inacceptable in the form presented, in particular in relation to the rules of best execution imposed by regulations.

My understanding of a link (contractual or capital, direct or indirect) was established by an email from Jean Michel Paul dated 09/11/2009 to the Board, informing the Board that its attorneys recommended that ACL not be part of the contract, and furthermore letting it be known that the prices proposed with regard to the services to be provided were not acceptable to the management of Litai. Jean Paul indicated that he was "conflicted" and asked the administrators to deal directly with Litai.

I formalized my understanding in an email to Jean Michel Paul in which I wondered whether it were appropriate in the Service Agreement to define Litai as an "independent" contractor.

3

Case 1:19-cr-00064-JGK   Document 4-1   Filed 02/06/18   Page 354 of 372

I am aware that the present declaration is drafted in view of its presentation in court, and that a false declaration on my part may expose me to criminal sanctions.

I have enclosed with the present a copy of my national identity card.

Done in Vaucresson on March 23, 2016

[signature]

4

# EXHIBIT 32

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 0:16-mc-60266-bb

In re: Application of FURSTENBERG FINANCE
SAS and MARC BATAILLON For an Ex Parte
Order Granting DISCOVERY PURSUANT TO 28
U.S.C. 1782

_____/

### MEMORANDUM IN OPPOSITION CROSS MOTION TO COMPEL PRODUCTION [DE 16] AND IN FURTHER SUPPORT OF MOTION TO QUASH SUBPOENAS [DE-10]

    Litai Assets LLC ("Litai") submits this memorandum both in further support of its motion to quash [DE 10] the subpoenas issued by Furstenberg Finance SAS and Marc Bataillon (collectively, the "Applicants") (collectively, the "Subpoenas") that were served pursuant to 28 U.S.C. §1782 and this Court's ex parte order of February 9, 2016 [DE 7], and in opposition to the Applicants' cross-motion to compel production of documents [DE-16].[1]

## INTRODUCTION

    The Applicants have withdrawn their claim that they have a civil action in Luxemburg that is "reasonably contemplated" such that they can seek discovery pursuant to Section 1782. The reason the Applicants withdrew that claim is their acknowledgement that they, as minority shareholders in Acheron Portfolio Corporation ("Acheron"), could not themselves commence such an action against one of Acheron's directors, but rather could only request that the majority of shareholders commence the action.

---

[1] This memorandum once again is being submitted only on behalf of Litai as the Applicants have not served the subpoena on Mr. Jan-Eric Samuel.

The Applicants now claim that the sole action they are "reasonably contemplating" is the filing of a criminal action in Luxembourg.  The same reasoning, however, that caused the Applicants to withdraw civil claims as a basis for Section 1782 discovery applies with even more force to their "hope" that a criminal action will be filed by a third party at their urging.

In fact, the Applicants have absolutely no ability to "commence" a criminal investigation or proceeding.  They can only request that a Luxembourg public prosecutor open an investigation.  They have no ability to force the public prosecutor to open an investigation or to commence a proceeding. There is a critical difference between a party's own "reasonably contemplated" action and the "hope" that a third party will file the action.  Section 1782 is not intended to, and does not, empower private parties to fish for documents to use in trying to convince a third party -- a public prosecutor -- to start a criminal investigation.  The subpoenas must be quashed and the Applicants' motion to compel discovery must be denied.

## THE ABANDONED CLAIMS OF FILING A CIVIL ACTION

While the Applicants now claim that all along they <u>only</u> contemplated a criminal action, a quick review of their Application confirms they referred throughout to "Foreign Proceedings" that they defined as "reasonably contemplated foreign **criminal and civil** proceedings." [DE 7 at 2] In addition to the defined term, they repeatedly referenced "criminal legal proceedings … **and civil actions** for damages" (*id.* at 9), and "criminal legal proceedings … in conjunction with **a civil action** for damages" (*id.* at 15).   Their Luxemburg lawyer also repeatedly referenced "reasonably contemplated criminal **and civil litigation**," and "reasonably contemplated criminal **and civil proceedings**." *Id.* Sabatier Dec. at 6 & 9.[2]

---

[2] In fact, Mr. Sabatier devoted numerous paragraphs of his declaration to explaining exactly how those civil proceedings would be implemented (by presenting their arguments to the general meeting of the shareholders) and

The Applicants' initial claim that they were planning a civil action was significant because the **only** way the Applicants can effectively cause – as opposed to request -- a criminal investigation to be commenced is by also filing a civil action for damages. Thus, in its motion to quash, Litai devoted significant detail to explaining that the Applicants, as shareholders of Acheron, did not have standing to file any civil action and that the Applicants had already effectively released or discharged any claims for which they purported to be seeking discovery.

In response, the Applicants have admitted they have no "reasonably contemplated" civil action and have withdrawn that as a grounds supporting their Section 1782 application:

> To be clear: **the Applicants are well-aware of the restrictions on civil** actions against JMP and Acheron Portfolio Corporation Luxembourg S.A ('APC') in Luxembourg based upon the size of their current and former holdings. **The sole reason there is any reference to any civil action** in Luxembourg in the 1782 Application … **was to inform the Court that the Applicants**, once the criminal complaint is filed, **intend to share the information obtained with the other shareholders of APC which, as a group, would have the right to take civil action**, as Litai admits.

Sabatier Dec. ¶ 6.

Based on that, the Applicants now assert that "the basis of this 1782 Application is to obtain evidence for Applicants to use in a criminal, not a civil proceeding against JMP in Luxembourg." DE 16 at 5

If the Applicants do not also file the civil action at the same time they file a criminal report, however, then they cannot cause the public prosecutor to start a criminal investigation. Instead, the very opening of any criminal investigation is entirely dependent upon the wide discretion of a third party, the public prosecutor.

---

what laws supported such civil claims. *See* Sabatier Dec. at 11, 44, 45, 46. Moreover, Mr. Sabatier is a civil lawyer, not a criminal lawyer. As he explains in his declaration, "My practice in Luxembourg primarily focuses on corporate, securities and structuring advice on financial restructuring matters or traditional M&A transactions." His biography makes no mention of Mr. Sabatier ever having filed a criminal complaint. http://www.nautadutilh.com/en/home/our-people/people/s/sabatier-romain/

## THE APPLICANTS CANNOT COMMENCE A CRIMINAL INVESTIGATION

A private individual in Luxembourg cannot just "commence" a criminal investigation or a criminal proceeding. Only the state can do this. Moreover, the filing of a criminal complaint does not automatically trigger an investigation. Rather, it is merely a request to the public prosecutor to start an investigation. *See* Declaration of Francois Prum, dated May 11, 2016 at ¶¶ 5-6 ("Prum Dec."); *see also* Declaration of Pierre Beissel, dated May 12, 2016, at ¶¶ 6-12 (Beissel Dec.").

The public prosecutor will review the report/complaint and decide whether to open an investigation or whether the matter should be archived without opening an investigation. If the prosecutor declines to open an investigation (*classement sans suite*), the claimants have no further ability to request the commencement of a criminal investigation on the same facts. *See id.* at ¶¶ 8-10.

In other words, the most a private individual can do is try to provoke a criminal investigation by petitioning the Luxembourg prosecutor to commence a criminal investigation. Whether Luxembourg would actually bring a proceeding is highly speculative. In fact, it appears that more than half of such petitions never result in the opening of an investigation. *See id.* at ¶ 11. Applicants have no indication that Luxemburg is interested.

Even if the public prosecutor decides to open an investigation, this does not mean that a criminal proceeding will be filed. Rather, the public prosecutor submits a report to the Chamber of Counsel of the District Court (*chambre du conseil*) either requesting that the matter be judged by the criminal court (*chambre correctionnelle*) or recommending that no further action be taken. The Chamber of Counsel of the District Court then decides whether or not to transfer the case to a criminal court for a formal criminal proceeding. *See id.* at ¶¶ 13-17.

In sum, the Applicants are not contemplating a legal proceeding. Instead, the Applicants are contemplating asking someone else to bring a legal proceeding. Section 1782, however, is not intended to empower private parties to fish for documents to use in trying to convince a third party or a government to start an investigation.

## ARGUMENT

### A. The Subpoenas Should Be Quashed Because The Applicants Do Not Satisfy The Mandatory Requirements For Section 1782.

Section 1782 provides that a federal district court "may order" a person residing or found in the district to give testimony or produce documents "**for use in a proceeding in a foreign or international tribunal** ..." 28 U.S.C. § 1782 (2012). This phrase has two related requirements. The first is the "for use" requirement, and the second is that the "proceeding in a foreign or international tribunal" be a proceeding that is at least "reasonably contemplated." The Applicants fail to meet either requirement.

#### 1. The Applicants Are Not Seeking Evidence "For Use In a Proceeding."

In *Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123 (2d Cir. 2015), there was an ongoing proceeding to recover a lost investment. The applicants seeking Section 1782 discovery were investors who had lost their investment, and their interests were being represented in the proceeding by the Delegate. They did not have the ability to control the Delegate's actions in the proceedings. As the Court noted, the applicants there were "not in a position to <u>direct</u> the Delegate to consider their evidence or submit that evidence to the tribunal." *Id.* at 121. The Court held: "**Even assuming that the Funds have the ability to submit information to the Delegate, who can then decide whether or not to use that information, that does not establish that the information is "for use" in a foreign proceeding; it establishes, at best, that the Funds can furnish information *in the hope* that it**

- 5 -

**might be used**." *Id.* The same thing is true here. While the Applicants claim they intend to submit evidence to the public prosecutor, that only establishes their "hope that it might be used" by a third party opening a proceeding and not that it is "for use in a proceeding."

In fact, the Second Circuit went on to explain: "That is no different from a third party providing information to a private litigant that it believes might be useful in a lawsuit, **or a witness approaching a prosecutor's office claiming to have knowledge of a crime**. Such information might be relevant or interesting to the recipient, but it is not 'for use' in any proceeding in which the *recipient* is a party unless the recipient takes some further, independent action to introduce it." *Id.*

Thus, the Second Circuit used the exact situation the Applicants present to this Court as the prime example of when a Section 1782 application must be denied. Here, the Applicants, shareholders of Acheron, claim to be witnesses to an alleged crime against Acheron, where Acheron is the alleged victim. They claim they intend to approach a prosecutor's office claiming ot have knowledge of a crime against Acheron, not against themselves. That is not "for use" in an proceeding in which they Applicants are parties. Accordingly, the Applicants here cannot meet the "for use" requirement of Section 1782.

### 2. No Criminal Proceedings Are "Reasonably Contemplated"

In addition to failing to meet the "for use" requirement, the Applicants also cannot establish that any proceeding is "reasonably contemplated." In the Eleventh Circuit, "reasonably contemplated" means "**very likely to occur**"[3] and, in addition, there must be "**reliable indications** of the **likelihood** that proceedings will be instituted within a **reasonable time**."

---

[3] *In Re Request for Assistance for Ministry of Legal Affairs of Trinidad and Tobago,* 848 F.2d 1151, 1156 (11th Cir. 1988), *abrogated on other grounds by Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004)).

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,* 747 F.3d 1262, 1270 (11th Cir. 2014).

Here, the Applicants make no effort to demonstrate either that a criminal proceeding is "very likely to occur" or provide any "reliable indications" that it is "likely" to start "within a reasonable time."

Instead, the Applicants merely submit identical statements attesting only their alleged intent to, in effect, file a "police report." According to Mr. Bonnet, he states: "I can state that without any qualification or equivocation, that FS intends to and will file a criminal complaint" but then admits that "I am not certain how FS can demonstrate its intention to file a criminal complaint against JMP in the Luxembourg Criminal Court beyond the above statement." *See* [DE 16-2] (Bonnet Dec. at 12-13).[4]

Both statements, of course, fall woefully short of the standards imposed by the Eleventh Circuit. If such statements were sufficient, any foreign party could access intrusive discovery of their adversaries' information merely by stating a bald intent to file a police report.

In fact, it is remarkable just how far the Applicants are from any proceeding being commenced. First, the Applicants have yet to file a police report. Apparently, they have no plans to file a police report unless their fishing expedition here turns up some favorable evidence. That alone is grounds to quash their subpoenas.[5] Here, there is nothing stopping the Applicants

---

[4] Bataillon also states: "I am not certain how I can demonstrate my intention to file a criminal complaint against JMP in the Luxembourg Criminal Court beyond the above statement." See [DE 16-1] (Bataillon Dec. at 6).

[5] *See, e.g., In re Certain Funds, Accounts, and/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Group LLC,* , 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014) (noting the need to guard "against the potential that parties may use § 1782 to investigate whether litigation is possible in the first place, putting the cart before the horse. The latter situation is not an appropriate one for a court to compel discovery.") *Aff'd sub nom. Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.,* 798 F.3d 113 (2d Cir. 2015). Similarly, in *In re Application of the Government of the Lao People's Democratic Republic,* 1:15-MC-00018, 2016 WL 1389764, at *7 (D.N. Mar. Is. Apr. 7, 2016), the Government of Lao was the

from asking the Luxemburg prosecutor to investigate.  There is no requirement that a complainant gather all possible documentary evidence before making a criminal complaint. Rather, if the Applicants have a witness to an alleged crime, they should simply have that witness meet with the prosecutor.

Second, the Applicants have presented no evidence or precedent showing that a Luxemburg public prosecutor would be interested in devoting public resources to pursue an investigation championing the cause of minority, and former, shareholders when the majority of shareholders and the company itself have not filed such a case.  The Applicants do not present any precedent showing that the Luxemburg public prosecutor has ever opened an investigation under similar circumstances.  The Applicants also do not present any evidence demonstrating what percent of complaints result in the opening of an investigation.

Third, as minority shareholders, the Applicants cannot be considered the victim of any alleged crime.  *See* Prum Dec. at 20-24.  Not only are the Applicants not "victims" of any alleged crimes, they also are not even "witnesses" to any alleged crimes.  Rather, the Applicants are relying on hearsay evidence from others, i.e., Mr. Kalfon, who the Applicants claim are witnesses but who have not submitted declarations under penalty of perjury.

---

applicant, and it had its own criminal investigation open, and claimed it intended to institute a formal criminal proceeding.  The Government noted that it "lack[ed] sufficient evidence to proceed with a criminal prosecution until it can access Bridge Capital's books" to determine whether money "transferred from the Savan Vegas to Bridge Capital and other entities owned by Mr. Baldwin were legitimate or nefarious." *Id.*  Despite that, the Court denied the application, noting that "**Such uncertainty in GOL's criminal investigation fails to show how any dispositive decision could be within reasonable contemplation**." *Id.  See also, e.g., In re Asia Mar. P. Ltd.,* 15-CV-2760 VEC, 2015 WL 5037129, at *5 (S.D.N.Y. Aug. 26, 2015) (the fact that Petitioner is contemplating "the *possibility* of initiating litigation" falls far short of an "objective showing" that the proceedings are within "reasonable contemplation"); *In re Nat'l Syndicate for Elec. Energy,* No. 1:13-MC-20 GBL/TCB, 2014 WL 130973, at *4 (E.D. Va. Jan. 14, 2014) ("a conciliation is not a 'foreign or international tribunal' within the meaning of § 1782 because the conciliator 'cannot issue a first-instance binding decision on the merits that is subject to judicial review' and therefore is not a first-instance decisionmaker").

Fourth, even assuming the Applicants' allegations are true, they do not amount to a crime. A crime could have occurred only if Dr. Paul had operated in his capacity as a director. The undisputed facts demonstrate, however, that Dr. Paul was not on the board when the original Litai contract was executed, and recused himself when the Litai contract was renewed.

In sum, the Applicants cannot show that any criminal investigation or proceeding is being "reasonably contemplated," is "very likely to occur" or any "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." The reason is simple –the opening of an investigation is not within the control of the Applicants. Rather, the Applicants are merely "contemplating" asking a third party to "contemplate" opening an investigation. Section 1782 does not authorize discovery in that situation.

3.  **The Applicants Overstate The Holdings Of The Cases They Rely Upon**

The Applicants' characterization of US law is also wildly misleading, arguing that "this Court and the Eleventh Circuit have on numerous occasions previously granted Section 1782 discovery for use in" … "reasonably contemplated criminal proceedings." [DE 16 at 6]. That is simply not true. In fact, far from it.

The first case the Applicants cite is *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1273 (11th Cir. 2014). They characterize it as granting Section 1782 discovery to a company wishing to pursue a criminal action against its former employees in Ecuador. In *JAS Forwarding,* however, the Applicant sought to file a <u>civil complaint</u>, the filing of which the applicant controlled itself without dependence on any third party. Moreover, the applicant in *JAS Forwarding* was not contemplating filing a criminal case at that point in time. Rather, it would pursue the criminal complaint only if successful in the civil complaint. *See id* at 1266 ("Then, if successful in a civil

action, CONECEL could, under Ecuadorian law, pursue a private criminal action against its former employees.") That is not the case here. The Applicants have admitted they cannot file civil claims. They also cannot institute a criminal proceeding either. They can only ask a third party, the Luxembourg public prosecutor, to do that. Thus, *JAS Forwarding* does not support the Applicants' case here.

In the second case, *Weber v. Finker*, 554 F.3d 1379, 1385 (11th Cir. 2009), the applicant, Galina Weber, was the plaintiff in an <u>ongoing Cypriot civil case</u> and a defendant in an <u>ongoing Swiss criminal case</u>. She filed a Section 1782 petition seeking discovery to assist her in both ongoing proceedings. There was no issue as to whether a criminal proceeding was reasonably contemplated. Thus, the *Weber* case is completely inapplicable.

The Applicants characterize the third case they cite, *In re Wilson (Eng'g) Ltd.*, 2011 WL 111, 4311 at *5 (S.D. Fla. Jan. 4, 2012) as "Section 1782 relief given to applicant seeking discovery in <u>future criminal</u> proceedings in Colombia." The case simply does not support that statement. Instead, in that case, the applicant sought the discovery in connection with three pending Columbian proceedings regarding Columbian trademark registrations. There is no reference in the opinion to any "criminal" proceedings that were "reasonably contemplated." Rather, the only reference to any criminal proceedings was the applicant's argument that its requests were not overly broad because they were limited to "those subjects relevant to Lopez and his involvement in the unauthorized trademark filing scheme and the initiation of the customs and criminal proceedings." *Id.* at *5. Thus, it does not appear that the applicants there were contemplating criminal proceedings but rather, Lopez, than the target, had previously

initiated criminal proceedings of which the applicant sought discovery.[6]

### 4. Luxembourg Law Does Not Require All Documentary Evidence Be Submitted With A Police Report or Criminal Complaint

The Applicants are also wrong in their statement that in Luxemburg "documentary evidence of the criminal complaint must be submitted at the time of the complaint." [DE 16 at 18]. The Applicants do not even cite Luxembourg law for that proposition. Rather, they cite the JAS Forwarding opinion in which the Eleventh Circuit noted that documentation was a requirement of Ecuadorian civil law prior to filing a civil complaint. Id. In Luxembourg criminal law, to "introduce a criminal complaint, the plaintiff may attach evidence to prove the alleged facts, but this is not a requirement under Luxembourg law. If for any reasons the plaintiff does not hold all written evidence, he usually requests the public prosecutor to seek an order from the investigating magistrate to look for and seize all types of evidence." Prum Dec. at ¶ 7.

### 5. The Applicants Cannot File A Criminal Complaint and Civil Complaint for Damages

As previously stated, the Applicants have disavowed any intent to file a civil complaint. In fact, they have affirmatively represented that "the basis of this 1782 Application is to obtain evidence for Applicants to use in a criminal, not a civil proceeding against JMP in Luxembourg" DE 16 at 5. Moreover, they have explained that their reasoning is that "**the Applicants are well-aware of the restrictions on civil** actions … based upon the size of their current and former

---

[6] The other cases the Applicants cite also concerned ongoing investigations, not investigations being reasonably contemplated by a third party. *See, e.g., In re Request from Czech Repub. Pursuant to Treaty*, No. 3:08-mc-001-J-33TEM, 2008 WL 179263, at *2 (M.D. Fla. Jan. 17, 2008) ("A foreign tribunal, specifically the Supreme Public Prosecutor's Office in the Czech Republic, has requested evidence for use in a criminal proceeding, being conducted by the District Attorney's Office of Prague 2, from an entity located in the Middle District of Florida."); *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 460 (2d Cir. 2014) (a Swiss investigating magistrate was already overseeing a criminal inquiry related to a Bernard Madoff "feeder fund" in Switzerland).

holdings" and that "[t]**he sole reason there is any reference to any civil action** … **was to inform the Court that the Applicants**, once the criminal complaint is filed, **intend to share the information obtained with the other shareholders of APC which, as a group, would have the right to take civil action**…." Sabatier Dec. ¶ 6.

These same restrictions on minority shareholders filing civil actions also prevent the Applicants from starting a criminal investigation, pursuant to Article 56 CIC, by filing a criminal complaint including a civil complaint for compensation (*plainte pénale avec constitution de partie civile*). When a civil complaint is filed along with a criminal complaint, the investigating magistrate is generally required to open a criminal investigation, unless the investigating magistrate considers the claim for compensation inadmissible.

Under Luxembourg law, the civil complaint for compensation is admissible only if the plaintiff suffered actual damage as a direct consequence of the alleged criminal offence. Any plaintiff not having suffered actual and direct damage cannot initiate a criminal complaint including a complaint for compensation in Luxembourg, but can merely report allegations of a criminal offense with the police or the public prosecutor and will not be allowed to intervene in any subsequent criminal proceedings.

In misuse of corporate assets cases, French judges have consistently held that the prejudice is incurred by the company; the shareholders are not considered direct victims of the criminal offense. The Luxembourg criminal offence of misuse of corporate assets is in substance identical to the French text, and Luxembourg courts would generally look towards French case law when judging misuse of corporate assets cases. As stated above, Luxembourg Courts ground their jurisprudences on the French precedents so that it is consistently held by Luxembourg Courts that the criminal offense of misuse of company assets only causes prejudice to the company itself and in certain very restrictive conditions to its shareholders (see *Ordonnance de*

*non informer 30013/15/CD du Cabinet d'instruction 22 février 2016*). The creditors or third parties in such case only suffer a damage which, even if proven, is qualified as an indirect prejudice. The criminal courts have no jurisdiction to deal with the compensation for an indirect prejudice suffered by a creditor in relation with a misuse of company assets. Any claims for such compensation must be submitted to civil jurisdictions.

Moreover, as shareholders of the company are not considered as direct victims of the misuse of company assets under Luxembourg law, they can only file a criminal complaint including a complaint for compensation (*plainte avec constitution de partie civile*) if they demonstrate a personal and direct damage other than the one suffered by the company itself. The loss of value of the shareholders' ownership in the company **is not considered** under Luxembourg law to be a personal prejudice suffered by the shareholders, but a prejudice suffered by the company itself. (see *Cour d'appel Luxembourg, n°36517 du role, 15 juillet 2014*). As a consequence, such a criminal complaint including a complaint for compensation launched by claimants would be dismissed).

A shareholder such as Furstenberg Finance SAS, which claims to have suffered damage to the value of its shares based upon a claim of an undisclosed ownership interest in a servicing company, also would not meet the criteria for actual damage or direct injury.

In sum, even if the Applicants had claimed that they were reasonably contemplating filing a civil claim for damages, they still would not meet the requirements of Section 1782 – for the very same reasons they disavowed that civil claim.

### B. The Applicants Are Not Interested Persons

The Applicants also fail to satisfy the first mandatory requirement – that they be "interested persons." While effectively admitting that under Luxemburg law as minority shareholders they have no standing to bring a civil action on behalf of Acheron against Dr. Paul,

they nevertheless argue that they are "interested persons" because the Eleventh Circuit has "held that private parties to criminal proceedings in civil law countries such as Luxembourg are interested persons within the meaning of 28 U.S.C. §1782," citing *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1270 (11th Cir. 2014).  [DE-16 at p. 14]

Here, however, the Applicants are not "private parties to criminal proceedings" or even reasonably contemplated civil proceedings.  To be a private party to a criminal proceeding in Luxemburg, the Applicants would have to have suffered "direct" injury and not "indirect" injury. The Applicants do not even claim that they have suffered "direct" injury.  Instead, as minority shareholders of Acheron, they claim that Acheron has suffered "direct" injuries by paying servicing fees to Litai that are too high.    Thus, Acheron could be a victim of the alleged crime, and a party to a criminal action in Luxemburg if it also filed a civil claim for damages along with the criminal action.  The Applicants' injuries, in contrast, are "indirect" in that they merely claim that the value of their shares has suffered as a result of Acheron's performance suffering from the allegedly higher fees.  Any civil claim for damages that the Applicants attempted to file along with a criminal complaint, therefor, would be held inadmissible. The Applicants therefore cannot be parties to either a civil or criminal action in Luxemburg. *See* Prum Dec. at ¶¶ 18-29.

That is in stark contrast to the one case the Applicants cite.  In *JAS Forwarding,* the applicant was the company, not its shareholders. The company sought to file a civil complaint, against employees who had engaged in a scheme of embezzlement, and the company would pursue the criminal complaint only if successful in the civil complaint. *See id* at 1266 ("Then, if successful in a civil action, CONECEL could, under Ecuadorian law, pursue a private criminal

action against its former employees.")[7]

### C.     The Applicants' Long History of Harassment

If the Applicants have no ability to start a criminal investigation, what is the real reason they have filed this Section 1782 action?   Harassment.   A prime example of this harassment is the Applicants' new – and totally unfounded -- allegation that Dr. Paul is destroying evidence by deleting emails.   Dr. Paul still has the emails (which he never read in the first place) and has submitted them to the court for review.   Those emails have nothing to do with this case or any other case, and so are irrelevant in any case.   Even if they were relevant, all of Acheron's email messages are regularly backed-up and secured. *See* Declaration of Jean-Michel Paul, dated May 12, 2016 at ¶¶ 8-9 & Ex. 4  ("Paul Dec.").[8]

This harassment is more than this action and the unfounded spoliation allegations.   There are several actions currently pending between these same parties in Luxembourg, none of which involve Acheron or Litai (and so none of which support a Section 1782 application), and all of which predate the alleged "discovery" of the alleged "secret ownership" interest in Litai.   In addition to those currently pending actions, Applicant Battallion also filed a complaint with the Financial Ombudsman Service in the UK, even though as a professionally licensed investor, Mr. Bataillon was not entitled to file such a proceeding.   Every claim in this 2013 filing was found to be groundless. *See* Paul Dec. at ¶¶16-17.

In addition to the legal actions, Mr. Bataillon has also threatened additional litigation against ACL, including allegations that the auditor (Deloitte) was incompetent, that the custodian

---

[7] The other case the Applicants cite did not address whether the parties were interested persons. *See In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings,* 773 F.3d 456, 458 (2d Cir. 2014).

[8] A detailed rebuttal of all of the Applicants inaccurate factual allegations is contained in the Declaration of Dr. Paul and that of Yves Mertz, the Chairman of Acheron Portfolio Corporation and a rebuttal of the various other legal arguments is contained in the Beissel Declaration.

bank was corrupt and had abused assets in concert with ACL, and that ACL's independent directors were puppets or corrupt, and that the administrator of one of the funds that ACL advised was corrupt and incompetent (*See* Paul Dec. at ¶17 & Ex. 3-4).

### III.    Request for Fees & Costs

For the reasons stated above, Applicants instituted this proceeding without basis in law or fact. Litai requests that the Court, pursuant to its inherent authority, grant its attorney's fees and costs associated with bringing this motion and relief, as Applicants' actions have needlessly caused Litai to incur significant fees and costs.

### IV.    Request For Oral Argument

Litai believes that oral argument may assist the Court and hereby requests oral argument on these Motions pursuant to Local Rule 7.1(b). The Court may have additional concerns not addressed in this Motion and the undersigned estimates that thirty (30) minutes is sufficient to address any questions and/or concerns of this Court.

### V.    Conclusion

Litai respectfully requests the Court enter an order granting its motion to quash the subpoenas in their entirety and denying the Applicants' cross motion to compel.

Respectfully submitted,

**AXS Law Group**
*Attorneys for the Respondents*
1850 Purdy Avenue
Miami, Florida 33139
Telephone: (305) 389-3646

By: /s/ *Jeffrey W. Gutchess*
**Jeffrey W. Gutchess**
Florida Bar No. 702641
jeff@axslawgroup.com

**Daniel Tropin**
Florida Bar No. 100424
dan@axslawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 12 , 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel for Plaintiffs via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Jeffrey W. Gutchess*