# EXHIBIT 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

```
-----------------------------------------------------------X
                                        )
In re:                                  )    Case no. 16 – mc – 60266-Bloom
                                        )
FURSTENBERG FINANCE SAS and             )
MARC BATAILLON                          )
                                        )
                                        )
-----------------------------------------------------------X
```

DECLARATION OF YVES MERTZ
IN SUPPORT OF LITAI ASSETS LLC'S RESPONSE TO APPLICANTS'
MEMORANDUM OF LAW AND CROSS-MOTION TO COMPEL

I, Yves Mertz, hereby declare under penalty of perjury of the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      I make this declaration in support of Litai Assets LLC's Response to Applicants' Memorandum of Law in Opposition to Litai Assets LLC's Motions to Quash and for a Protective Order and Cross-Motion to Compel Production with Incorporated Memorandum of Law filed on April 18, 2016 ("Applicants' Response") filed by Furstenberg Finance SAS and Marc Bataillon's ("Applicants").

2.      I am currently the Chairman of the Board of Directors of Acheron Portfolio Corporation Luxembourg S.A. ("Acheron"). I have been a member of the Board of Directors of Acheron (the "Board") since February 24, 2010.

3.      It is my understanding that Alain Reinhold, who has now provided a declaration on behalf of the Applicants alleging that the 2009 Litai contract contains non-commercial terms, was closely involved in the negotiation, review, and drafting of the 2009 Litai contract. Mr. Reinhold's concerns regarding Jean-Michel Paul and his role in the Litai contract are surprising,

80429897v6

considering his resignation letter of December 23, 2010 failed to mention any specific problems or concerns but for difference of view with the majority of shareholders on the audit committee role. (Ex. 1 ). It is common in Luxembourg for those who resign from corporate boards to point out any wrongdoing or concern they believe is occurring because such disclosure gives them immunity from future lawsuits arising from such wrongdoing. Though he was able to officially resign, the Acheron's General Assembly of shareholders had already voted for Mr. Reinhold's dismissal in an extraordinary session on Novermber 29th, 2010 and would have formally removed him that date had meeting not been adjourned to the 27th to the December. As such, Mr. Reinhold, seeing that he was going to be forced off the board, was able to tender a resignation instead of being removed. I understand the shareholders' vote was largely motivated by a view that Mr. Reinhold had abused his role on the audit committee. [

4.     No Acheron shareholder could have been harmed by the servicing fees charged under the Litai contract. Our shareholders are not charged a separate pro-rata fee for the servicing of our policy portfolio. Rather, the cost of the servicers is part of the operating costs of Acheron. Any servicer that Acheron would do business with would charge a servicing fee. Having been involved in the 2014 Litai contract renegotiation and bidding process, I know that Litai was the lowest cost and highest quality servicer of all those who submitted bids. Contrary to what the Applicants allege, the value of their shares has benefitted because of the low cost of the Litai servicing contract.

Dated:  May 12, 2016                       _____
                                            Yves Mertz
                                            Chairman, Acheron Portfolio Corporation
                                            Luxembourg S.A.

Case 1:18-mc-00041-JGK Document 4-2 Filed 02/06/18 Page 1 of 155

# EXHIBIT 1

FREE TRANSLATION

Letter of Resignation of Alain Reinhold

Object: Resignation

Mister President of the Board

By this letter, I confirm my decision to resign my functions as administrator, as of 24 December 2010.

This choice is linked to the recognition of the difference of view with a majority of shareholders as to the role and functioning of the audit committee on which I participate.

I thank you in advance to communicate to the Board my decision and its motivation at the next Board meeting.

Please accept, Mr. President, my respectful salutations.


Alain Reinhold

Alain REINHOLD
Administrateur de la société Acheron Portfolio Corporation (Luxembourg) S.A.
118 avenue de la Celle Saint Cloud
92420   Vaucresson
FRANCE

> Monsieur Yves Mertz,
> *Président du conseil d'administration de Acheron*
> *Portfolio Corporation (Luxembourg) S.A.*
>  Acheron Portfolio Corporation (Luxembourg)
> S.A.
> 5 avenue Gaston Diderich
> L-1420 Luxembourg

> Paris, le 23 décembre 2010

Objet : démission
**Lettre recommandée avec accusé de réception**

Monsieur le Président du conseil d'administration,

Par cette lettre, je vous confirme ma décision de démissionner de mes fonctions
d'administrateur, à compter du 24 décembre 2010

Ce choix est lié au constat de divergences de point de vue  avec une majorité d'actionnaires
sur le rôle et le fonctionnement du Comité d'Audit auquel je participe.

Je vous remercie par avance de bien vouloir informer les membres du Conseil
d'Administration de ma décision et de sa motivation lors de la prochaine séance du Conseil
d'Administration.

Je vous prie d'agréer, Monsieur le Président, mes respectueuses salutations.

Alain Reinhold

# EXHIBIT 34

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

-----------------------------------------------------X
                             )

**In re:**                        )   **Case no. 16 – mc – 60266-Bloom**
                             )

**FURSTENBERG FINANCE SAS and**   )
**MARC BATAILLON**              )
                             )
                             )
-----------------------------------------------------X

## DECLARATION OF JEAN-MICHEL PAUL
### IN SUPPORT OF LITAI ASSETS LLC'S RESPONSE TO APPLICANTS' MEMORANDUM OF LAW AND CROSS-MOTION TO COMPEL

I, Jean-Michel Paul, hereby declare under penalty of perjury of the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.    I make this declaration in support of Litai Assets LLC's Response to Applicants' Memorandum of Law in Opposition to Litai Assets LLC's Motions to Quash and for a Protective Order and Cross-Motion to Compel Production with Incorporated Memorandum of Law filed on April 18, 2016 ("Applicants' Response") filed by Furstenberg Finance SAS and Marc Bataillon's ("Applicants").

2.    The Applicants continue to claim that they are shareholders in Acheron Portfolio Corporation Luxembourg S.A. ("Acheron") and that they seek discovery from a third party, Litai Assets LLC ("Litai"), to support claims they plan to bring against me, in my role as a director of Acheron, based upon their unfounded allegation that I have been the owner and in control of Litai since 2009, when Litai first contracted with Acheron.

3. I have already provided a declaration refuting the Applicants' previous claims and provide this declaration to provide further support to Litai's motion to quash the subpoenas served against them. (Dkt. 12).

4. I submit this Declaration to explain the following:

a) The 2009 negotiations between Litai and Acheron were conducted by multiple directors on Acheron's board, including Applicants' declarant Alain Reinhold, at a time during which I was not a board member. In 2009 I assisted the negotiations by coordinating with the involved directors, gathering information to respond to Litai's questions, acting as a conduit, and providing what insight I could to all of the parties if and when requested.

b) I still have, and always had, the emails that the Applicants claim I deleted.

c) The Applicants have a long history of harassing me and many of my colleagues. This history has involved lawsuits, slander, threats of physical violence, and attempted extortion. The Applicants' request for discovery from Litai is just another action in their global campaign designed to coerce me into buying Applicants' shares of Ahmose and Acheron at inflated prices.

**The Contract Negotiations Between Acheron And Litai Involved Independent Directors And Was An Open And Transparent Process**

5. Alain Reinhold, a declarant for the Applicants, and Tom Sharp were the primary Acheron board members who negotiated the 2009 Litai contract.

6. In 2009 Mr. Reinhold was very active in not just defining the substance of the Litai contract, but also involved in crafting the wording of the final product, including a clause he now calls an "unusual provision." Specifically, Mr. Reinhold stated in his emails that, for the benefit of Acheron, Acheron Capital Limited ("ACL") should remain in its role as investment manager of

Acheron's trusts and that Litai had a substantial business interest in keeping ACL in its role as well.

7.    The Litai contract provision that Mr. Reinhold was instrumental in drafting, and now claims is unusual, linking ACL, Litai, and Acheron, was specifically highlighted to the Acheron board in the resolution approving the Litai contract. (Ex. 1, 3rd and 5th resolutions). The resolution was unanimously agreed to by all directors and no one registered any objection.

### I Have And Always Had The Allegedly Deleted Emails

8.    Applicants, through Mr. Charles Meeus, an employee in several of Mr. Bonnet's companies, as well as a director of Furstenberg Sarl. and Ahmose SA, present four notices of email deletion. The four notices refer to only two different emails. As such, the Applicants are claiming that two emails were each deleted twice. I still have and always had the emails and immediately provided them to my attorneys upon receiving the Applicants' allegations. They are completely unrelated to the Applicants' claims against me in this case, but I provide hereto to respond to their allegations. (Ex. 2).

9.    All of Acheron's email messages are regularly backed-up and secured.

### Applicants' Request For Discovery Is Just Another Ploy In Their Longstanding Desire To Discredit And Destroy Me And Harm My Colleagues

10.    Through a company named Tomson Pte Ltd., I own 40% of Furstenberg Sarl., a company that is 60% owned by Mr. Erich Bonnet through one of his companies. I was a member of the Furstenberg Sarl. board until 2015, when I raised a series of corporate governance questions including serious issues of the use of corporate assets for personal gain. These questions, what I believe to be governance and compliance abuse, led to pressure for me to resign, and the convocation of an extraordinary shareholder meeting by Mr. Bonnet to have me and another director removed from the board. I, together with the other director, ultimately resigned just

before this shareholder meeting where Mr. Bonnet would have had the majority votes to remove us no matter the facts, and, in my letter of resignation, pointed out the problems I saw with Furstenberg Sarl. and Furstenberg Capital S.C.A., including what I believed to be Mr. Bonnet's failure to follow the mandate of the company, and possible misappropriation of corporate resources by Mr. Bonnet. (See Dkt. 12-1 Ex. 4).

      11.    Ahmose is a company of which Furstenberg Capital S.C.A., Mr. Bataillon, and I, among others, are shareholders.

      12.    Ahmose's sole purpose is to own stock in Acheron Class B shares. The indirect ownership provides some tax advantages to its shareholders. The bylaws of Ahmose entitle ACL to set forth a list of candidates for election as directors of that company. Minority shareholders, predominantly U.S. persons, demanded the inclusion of this clause as a condition of their participation because they were concerned that larger shareholders would use their controlling share to dominate the board. The shareholders are required to select board members from ACL's proposed list. Without the protection of controlling the pool of potential board members, the minority shareholders would never have joined Ahmose. In May of 2015, after a failed attempt to amend these bylaws, Furstenberg Capital S.C.A. and Mr. Bataillon removed all the directors except for Mr. Meeus, and, refusing to follow the bylaws, appointed directors who had been proposed by Mr. Bataillon. In effect, Mr. Bonnet and Mr. Bataillon did exactly what the minority shareholders feared they would and overrode the very security mechanism that minority investors had been relying upon when making their investment decision.

      13.    I believe Mr. Bataillon and Mr. Bonnet wished to take over the Ahmose board in order to use the assets of Ahmose, inter alia, to pursue their personal vendetta against me.

14.     In addition to violating its bylaws, it is my understanding Mr. Bonnet and Mr. Bataillon had close associates illegally use voting rights of shares they had already sold when they attempted to modify Ahmose's bylaws. Mr. Carlo Toller, who was then an Ahmose director, acted on behalf of many of Ahmose's shareholders that had entrusted him with their voting proxies by postponing the shareholder meeting. He then proceeded to warn Ahmose's bank that the Applicants' had breached the bylaws, which resulted in the freezing of the account, thus preventing any abuse of the power and assets of the company. This caused Mr. Bonnet through Furstenberg Capital S.C.A., Ahmose, and Mr. Bataillon, personally, to file an action in Luxemburg against Mr. Toller, Tomson Pte Ltd., and ACL. In this action, they accused Mr. Toller of fraud and argued that the defendants had no right to postpone Ahmose's shareholders meeting and that he failed to disclose conversations with, and advice of, lawyers. After warning Ahmose's bank of the situation with some investors, Mr. Toller provided documents in the action proving the illegal voting had taken place.

15.     Mr. Bataillon's hostility towards me originates from a number of joint projects we undertook, but has its genesis in the "Mariah" transaction.

16.     In 2012-13 Mr. Bataillon and I collectively purchased certain catastrophe bonds, a type of reinsurance for severe storm damage in the Midwest United States. It was our belief that bond-holders' investments had wrongfully been appropriated by the payee of the bonds. Together, we purchased a majority of the bonds from the various bondholders in order to bring suit against the insurance company, as payee, and the processors. Instead of honoring our joint agreement, Mr. Bataillon, as an advisor of ACL, abused his authority by ordering ACL's lawyers to purchase, for his sole interest, the entity that issued the bonds, Mariah. Mr. Bataillon then used Mariah to sue the insurer and processors without me, trying to deprive me or ACL of any

potential recovery. Mr. Bataillon's complaint against the insurer and processors was dismissed, with prejudice and he recovered nothing, despite his appeal. See *Mariah Re Ltd. v. American Family Mut. Ins.*, 52 F. Supp. 3d 601 (S.D.N.Y. 2014); *aff'd.* 607 Fed. Sppx. 123 (2nd Cir. 2015).

17.    Because of Mr. Bataillon's purchase of Mariah and his subsequent underhanded actions in the catastrophe bond suit, he has been dismissed as an advisor of ACL. Mr. Bataillon has since led a harassment campaign against ACL, including alleging that the administrator of one of the funds that ACL advised was corrupt and incompetent, that the auditor (Deloitte) was incompetent, and that the custodian bank was corrupt and had abused assets in concert with ACL. I also received distressing accounts of Mr. Bataillon threatening physical violence against a director of one fund advised by ACL. (Ex. 3). In 2013, Mr. Bataillon subsequently filed a complaint with the Financial Ombudsman Service in the UK, even though as a professional investor, Mr. Bataillon was not entitled to file such a complaint. Every claim in this 2013 filing was found to be groundless. (Ex. 4).

18.    Mr. Bataillon has attacked me personally, telling my colleagues and clients libelous allegations, including that I, somehow, controlled the board of Acheron. I responded by demanding, through my attorney, that Mr. Bataillon issue a full apology and clarify that his allegations were untruthful. (Ex. 5).

19.    It appears that all of these allegations, the harassment, and the discovery sought in this action, are designed to pressure me to purchase the Applicants' shares in Ahmose and Acheron. Mr. Bataillon and Mr. Bonnet have used their intermediaries to demand that I repurchase shares of Ahmose and Acheron for millions of U.S. dollars, setting a price that was a significant multiple above the market rate. I believe this would be illegal and, among other things, in breach of market manipulation laws governing shares traded on the Luxembourg Stock

Exchange with respect to the shares of Acheron, a publicly traded company. I have ignored these requests, but I believe this latest action against Litai is designed to further their demands that I buy their shares at a grossly inflated price.

Dated: 5 / 12 /2016

Jean-Michel Paul

Case 1:18-mc-00041-JGK Document 4-2 Filed 02/06/18 Page 15 of 155

# EXHIBIT 1

Acheron Portfolio Corporation (Luxembourg) S.A.
*Société Anonyme*
(the « **Company** »)
Registered office:
14 rue du Marché aux Herbes, L-1728 Luxembourg
R.C.S. Luxembourg: B129880

---

| CIRCULAR RESOLUTIONS OF THE BOARD OF DIRECTORS |

The undersigned:

- Ms Claudia Schweich
- Mr Renaud Labye
- Mr Marcel Stephany
- Mr Erich Bonnet
- Mr Lindsay Thomas Sharp
- Mr Eric Kalfon
- Mr Alain Jean René Reinhold
- Mr Thierry Grosjean

Being all the members of the board of directors of the Company (the "**Directors**")

**WHEREAS** the Company is the sole beneficiary of the Acheron Portfolio Trust, a Massachusetts (United Sates of America) common law trust (the "**AP Trust**") formed pursuant to the trust agreement of Acheron Portfolio Trust dated as of 22 November 2006, as amended and restated by and between the Company, as Beneficiary and Mr. Steven Schreckinger, as Trustee (the "**AP Trust Agreement**").

**WHEREAS** on 27 August 2009, Mr Steven L. Schreckinger resigned from his mission of trustee of the AP Trust and Mr Robert H. Edelstein accepted to be appointed as successor trustee thereto

**WHEREAS**, as a consequence of the resignation of Mr Steven Schreckinger the AP Trust Agreement needs to be amended and restated substantially in the form attached hereto as Schedule 1 (the "**Amended and Restated AP Trust Agreement**").

**WHEREAS,** the entry into a new servicing agreement by and between the AP Trust and Litai Assets LLC, in the form attached hereto as Schedule 2 with a view to replacing the existing servicing agreements would benefit the Company by consolidating the servicing with a sole service provider thus resulting in a simplification of the servicing process for the Company, an increase in the efficiency of the servicing process and its safety, economies of scale and would avoid the difficulties the AP Trust may have faced in the past with Asset Servicing Group (the "**AP Trust Servicing Agreement**")

**WHEREAS**, the Company is the sole beneficiary of the Lorenzo Tonti 2006 Trust, a New York (United Sates of America) common law trust (the "**Lorenzo Tonti 2006 Trust**") formed pursuant to the trust agreement of Lorenzo Tonti 2006 Trust dated as of 19 January 2006, as amended and restated by and between the Company, as Beneficiary and Mr R Edelstein, as Trustee (the "**Lorenzo Tonti 2006 Trust Agreement**")

3391125-V1

**WHEREAS**, the Lorenzo Tonti 2006 Trust Agreement needs to be amended and restated so as to modify several operational provisions in order to mirror the Amended and restated AP Trust Agreement and consequently simplify the maintenance of the two trusts in the form attached hereto as Schedule 3 (the "**Amended and restated Lorenzo Tonti 2006 Trust Agreement**").

**WHEREAS**, the entry into a new servicing agreement by and between the Lorenzo Tonti 2006 Trust and Litai Assets LLC in the form attached hereto as Schedule 4 with a view to replacing the existing servicing agreements would benefit the Company by consolidating the servicing with a sole service provider thus resulting in a simplification of the servicing process for the Company, an increase in the efficiency of the servicing process and its safety, economies of scale and would avoid the difficulties the Lorenzo Tonti 2006 Trust may have faced in the past with Asset Servicing Group (the "**Lorenzo Tonti 2006 Trust Servicing Agreement**").

**WHEREAS**, the Directors hereby deem it in the best corporate interest of the Company to (i) appoint Mr. Robert H. Edelstein as successor trustee of the AP Trust, (ii) approve and to the extent applicable to ratify the Amended and restated AP Trust Agreement and the Amended and restated Lorenzo Tonti 2006 Trust Agreement (iii) approve and to the extent applicable to ratify the AP Trust Servicing Agreement and the Lorenzo Tonti 2006 Trust Servicing Agreement and (iv) instruct the trustee of the AP Trust and Lorenzo Tonti 2006 Trust to execute and enter into the AP Trust Servicing Agreement and the Lorenzo Tonti 2006 Trust Servicing Agreement.

**NOW THEREFORE**, after due and careful consideration, the directors, in accordance with article 8 of the articles of incorporation of the Company, unanimously take the following resolutions:

### First resolution

The Directors hereby unanimously approve the resignation of Mr Steven L. Schreckinger on August 27, 2009 as trustee of the AP Trust and the appointment of Mr Robert H. Edelstein as successor trustee.

### Second resolution

As a consequence of the resignation of Mr. Steven L. Schreckinger as trustee of AP Trust and appointment of Mr Robert H. Edelstein as successor trustee, the Directors hereby unanimously approve the Amended and Restated AP Trust Agreement in the form attached hereto as Schedule 1.

### Third resolution

The Directors hereby unanimously acknowledge the following key terms of the AP Trust Servicing Agreement:

- A per policy annual fee equal to       per policy, representing and     of the agreed upon market value of : for annual per policy administrative fees for the initial term of the contract

- A per policy annual fee                   ) of the agreed upon market value for annual policy fees for this kind as of the first day of each renewal term.

3391125-V1

- A provision whereby in the event the trustee terminates the Acheron investment management agreement during the initial term of the servicing contract or any renewal term in effect the parties to the servicing agreement shall renegotiate the per policy administrative fee discount.

The Directors further approve the AP Trust Servicing Agreement and resolve to instruct and authorise Mr. Robert H. Edelstein, as trustee of the AP Trust, to execute the AP Trust Servicing Agreement with such changes thereto as may be approved by any two directors of the Company.

### Fourth resolution

The Directors hereby unanimously approve the Amended and Restated Lorenzo Tonti 2006 Trust Agreement in the form attached hereto as Schedule 3.

### Fifth resolution

The Directors hereby unanimously acknowledge the following key terms of the Lorenzo Tonti 2006 Trust Servicing Agreement:

- A per policy annual fee equal to        per policy, representing and :                of the agreed upon market value       for annual per policy administrative fees for the initial term of the contract.

- A per policy annual fee equal to                  of the agreed upon market value for annual policy fees for this kind as of the first day of each renewal term.

- A provision whereby in the event the trustee terminates the Acheron investment management agreement during the initial term of the servicing contract or any renewal term in effect the parties to the servicing agreement shall renegotiate the per policy administrative fee discount.

The Directors further approve the Lorenzo Tonti 2006 Trust Servicing Agreement and resolve to instruct and authorise Mr. Robert H. Edelstein, as trustee of the Lorenzo Tonti 2006 Trust, to execute the Lorenzo Tonti 2006 Trust Servicing Agreement with such changes thereto as may be approved by any two directors of the Company.

3391125-V1

| Director | Date | Signature |
|---|---|---|
| • Ms Claudia Schweich | October____, 2009 | |
| • Mr Renaud Labye | October____, 2009 | |
| • Mr Marcel Stephany | October 15, 2009 | |
| • Mr Erich Bonnet | October 14, 2009 | |
| • Mr Lindsay Thomas Sharp | October____, 2009 | |
| • Mr Eric Kalfon | October 14, 2009 | |
| • Mr Alain Jean René Reinhold | October 14, 2009 | |

3391125-V1

- Mr Thierry Grosjean     October_____, 2009     _____

# EXHIBIT 2

80416219v1

**Zachary Farley**

| | |
|---|---|
| **From:** | Charles Meeus <charles.meeus@furstenbergcapital.lu> |
| **Sent:** | Wednesday, November 2, 2011 6:22 AM |
| **To:** | 'Jean-Michel Van Lippevelde'; jmvl@accelior.com; Jean-Michel Paul; ebonnet@furstenberg-finances.com; c.monot@icebergfinance.com; 'Maroun Edde'; Maroun.EDDE@murex.com |
| **Cc:** | Yves Mertz; virginie.jouniaux@accelior-consulting.com; Chrystel Leclaire; julien poncelet |
| **Subject:** | Furstenberg Capital SCA/SARL - Conseil de gérance du 25 novembre 2011 |
| **Importance:** | High |

Bonjour Messieurs,

Le conseil de gérance se tiendra le vendredi 25 novembre 2011 à 9h30 à l'adresse suivante :

**Iceberg Finance Luxembourg**
32-36 Boulevard d'Avranches
L-1160 Luxembourg

Pourriez-vous nous faire part de votre présence ou absence.

Restant à votre entière disposition,

Cordialement,

Charles Meeus

## Furstenberg Capital

Email : charles.meeus@furstenbergcapital.lu
Tel:      +352 26 49 60
Cell :    +352 621 201 501
Web :   www.furstenbergcapital.lu

5, avenue Gaston Diderich
L-1420 Luxembourg
Luxembourg

The Information contained in this communication is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it. It may contain confidential or legally privileged information. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this email and then delete it from your system. Furstenberg Capital S.C.A. is neither liable for the proper and complete transmission of the Information contained in this communication nor for any delay in its receipt.

## Zachary Farley

| | |
|---|---|
| From: | Charles Meeus <charles.meeus@furstenbergcapital.lu> |
| Sent: | Wednesday, November 2, 2011 6:22 AM |
| To: | 'Jean-Michel Van Lippevelde'; jmvl@accelior.com; Jean-Michel Paul; ebonnet@furstenberg-finances.com; c.monot@icebergfinance.com; 'Maroun Edde'; Maroun.EDDE@murex.com |
| Cc: | Yves Mertz; virginie.jouniaux@accelior-consulting.com; Chrystel Leclaire; julien poncelet |
| Subject: | Furstenberg Capital SCA/SARL - Conseil de gérance du 25 novembre 2011 |
| Importance: | High |

Bonjour Messieurs,

Le conseil de gérance se tiendra le vendredi 25 novembre 2011 à 9h30 à l'adresse suivante :

**Iceberg Finance Luxembourg**
32-36 Boulevard d'Avranches
L-1160 Luxembourg

Pourriez-vous nous faire part de votre présence ou absence.

Restant à votre entière disposition,

Cordialement,

Charles Meeus

## Furstenberg Capital

Email : charles.meeus@furstenbergcapital.lu
Tel : +352 26 49 60
Cell : +352 621 201 501
Web : www.furstenbergcapital.lu

5, avenue Gaston Diderich
L-1420 Luxembourg
Luxembourg

The information contained in this communication is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it. It may contain confidential or legally privileged information. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this email and then delete it from your system. Furstenberg Capital S.C.A. is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt.

1

**Zachary Farley**

| | |
|---|---|
| From: | Charles Meeus <charles.meeus@furstenbergcapital.lu> |
| Sent: | Wednesday, January 4, 2012 3:20 AM |
| To: | ebonnet@furstenberg-finances.com; Jean-Michel Paul; c.monot@icebergfinance.com; 'Maroun Edde'; Maroun.EDDE@murex.com; jmvl@accelior.com; 'Jean-Michel Van Lippevelde' |
| Cc: | Julien poncelet; Yves Mertz; virginie.jouniaux@accelior-consulting.com |
| Subject: | Furstenberg Capital SCA - Conseil de gérance du 20 janvier 2012 |
| | |
| Importance: | High |

Bonjour Messieurs,

Veuillez trouver ci-dessous l'agenda du conseil de gérance de Furstenberg Capital SCA qui se tiendra le **20 janvier 2012 à 14 heures** à l'adresse et avec comme agenda suivants :

Adresse

**Iceberg Finance Luxembourg**
32-36 Boulevard d'Avranches
L-1160 Luxembourg

Agenda

1. Revue des opportunités d'investissements et en cours d'acquisition
2. Revue du portefeuille
3. Divers

**Merci de nous confirmer votre absence ou présence.**

Restant à votre entière disposition,

Cordialement,

Charles Meeus

**Furstenberg Capital**

Email : charles.meeus@furstenbergcapital.lu
Tel: +352 26 49 60
Cell : +352 621 201 501
Web : www.furstenbergcapital.lu

5, avenue Gaston Diderich
L-1420 Luxembourg
Luxembourg

1

The information contained in this communication is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it. It may contain confidential or legally privileged information. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this email and then delete it from your system. Furstenberg Capital S.C.A. is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail contains information for the intended recipient only. It may contain proprietary material or confidential information. If you are not the intended recipient you are not authorised to distribute, copy or use this e-mail or any attachment to it. Murex cannot guarantee that it is virus free and accepts no responsibility for any loss or damage arising from its use. If you have received this e-mail in error please notify immediately the sender and delete the original email received, any attachments and all copies from your system.

## Zachary Farley

| | |
|---|---|
| From: | Charles Meeus <charles.meeus@furstenbergcapital.lu> |
| Sent: | Wednesday, January 4, 2012 3:20 AM |
| To: | ebonnet@furstenberg-finances.com; Jean-Michel Paul; c.monot@icebergfinance.com; 'Maroun Edde'; Maroun.EDDE@murex.com; jmvl@accelior.com; 'Jean-Michel Van Lippevelde' |
| Cc: | julien poncelet; Yves Mertz; virginie.jouniaux@accelior-consulting.com |
| Subject: | Furstenberg Capital SCA - Conseil de gérance du 20 janvier 2012 |
| Importance: | High |

Bonjour Messieurs,

Veuillez trouver ci-dessous l'agenda du conseil de gérance de Furstenberg Capital SCA qui se tiendra le **20 janvier 2012** à **14 heures** à l'adresse et avec comme agenda suivants :

### Adresse

**Iceberg Finance Luxembourg**
32-36 Boulevard d'Avranches
L-1160 Luxembourg

### Agenda

1. Revue des opportunités d'investissements et en cours d'acquisition
2. Revue du portefeuille
3. Divers

### Merci de nous confirmer votre absence ou présence.

Restant à votre entière disposition,

Cordialement,

Charles Meeus


## Furstenberg Capital

Email : charles.meeus@furstenbergcapital.lu
Tel: +352 26 49 60
Cell : +352 621 201 501
Web : www.furstenbergcapital.lu

5, avenue Gaston Diderich
L-1420 Luxembourg
Luxembourg

1

The information contained in this communication is intended solely for the use of the individual or entity to whom it is addressed and others authorized to receive it. It may contain confidential or legally privileged information. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by responding to this email and then delete it from your system. Furstenberg Capital S.C.A. is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt.

*******************************

This e-mail contains information for the intended recipient only. It may contain proprietary material or confidential information. If you are not the intended recipient you are not authorised to distribute, copy or use this e-mail or any attachment to it. Murex cannot guarantee that it is virus free and accepts no responsibility for any loss or damage arising from its use. If you have received this e-mail in error please notify immediately the sender and delete the original email received, any attachments and all copies from your system.

Case 1:12-mc-00044-JGK   Document 1-3   Filed 02/06/18   Page 28 of 155

# EXHIBIT 3

B0416219v1

## Jean-Michel Paul

| | |
|---|---|
| **From:** | David McNaughtan <dpmcn1010@yahoo.com> |
| **Sent:** | Thursday, October 10, 2013 9:44 PM |
| **To:** | Jean-Michel Paul |
| **Subject:** | Fwd: NRF |

Am travelling today but will try to phone tomorrow.  Here are my notes.

Marc Bataillon(MB) phoned me on Wednesday 9th October at 3pm.
The call lasted almost half an hour.

We remembered meeting several months ago at the Halkin Hotel on the introduction of Jean Michel Paul(JMP). MB said his relationship with JMP has deteriorated very seriously as JMP had stolen over US 1$million fro him in a recent transaction.He is demanding immediate payment on his redemption from NRF in full as he believes JMP is a crook and out to rob him. He totally disagrees with what is proposed and terms of calculating various fees as proposed by the manager.  I pointed out to him that I had seen various emails between different parties and it seems that the Administrator and our accountants agree with what has been proposed. They have reviewed the issue you raise and their recommendation was that the manager was acting correctly as per the PPM and other relevant docs. He disagreed and said JMP had promised before immediate payment on a redemption and that there was no need for a 10% holdback as costs were capped?The calculation of management fees and performance fees was also wrong.  He repeated I was wrong to rely on our auditors as they were not competent  as in the Arthur Anderson affair!  He claims JMP has mismanaged the fund to his personal benefit and again asserted that JMP had cheated him in another transaction .  He also accused Deltec of bungling a forex deal some time in the past that ended up being a cost to the investors when it should have been an expense of the management company.  ( I know nothing of this matter as it relates to Deltec). He attacked the other director of the fund as being nothing more than JMP's puppet and I should not take any account of him!

> He emphasised that I should be aware of my liabilities as I was now on notice  of the mismanagement of the fund and must take action to correct.He threatened that having lived in New York he knew how to take physical action...using a baseball bat against anyone who he believes had done him harm! " I am ready to pull out the baseball club and use it" (verbatim).

Dictated Thursday 10th October2013.

David P. McNaughtan
Chairman
Deltec Bank & Trust
P.O. Box N3229
Nassau
Bahamas

Begin forwarded message:

1

# EXHIBIT 4

**Financial
Ombudsman
Service**

our ref   **1479-9992/JOK/CD50**
your ref   **Bataillon, Mark**

please write to   **Financial Ombudsman Service**
South Quay Plaza
183 Marsh Wall
London
E14 9SR

Acheron Capital Ltd
1 Great Cumberland Place
6th Floor - Suite 2
London
W1H 7AL

dx   141280 Isle of Dogs 3
website   www.financial-ombudsman.org.uk

8 October 2013

Dear Sir/Madam

**Mr M Bataillon's complaint about Acheron Capital Ltd**

A customer of yours has been in touch with us about a complaint.

**what we know about the complaint**

| | |
|---|---|
| customer name(s): | Mr M Bataillon |
| address and phone number: | Mr M Bataillon<br>Flat 4 20 Eaton Place<br>London<br>SW1X 8AE<br>07584 681 984 |

Date of Birth:

| | |
|---|---|
| your reference | Policy No: Bataillon, Mark |
| product/service the complaint is about | Share Dealings |
| summary of the complaint | The President of the Firm indicated in an email sent 25/12/10 that redemption proceeds were wired to redeeming investors "in practice +/- 15 days after the redemption date" |
| Settlement requested by Mr M Bataillon: | Firm to honour the email detailed above |

**what you need to do**

Please get in touch with your customer to confirm that you are dealing with the complaint. If you need more information, you should ask for it at the same time.

You need to send a final response to your customer within eight weeks of receiving this letter – or within eight weeks of the date they first complained to you, if this was earlier.

E200f


**Acheron**
CAPITAL LTD

**Acheron Capital Ltd.**
*1 Great Cumberland Place*
*Sixth Floor, Suite 2*
*London W1H 7AL*

London, 22nd November 2013

**Financial Ombudsman Service**
South Quay Plaza
183 Marsh Wall
London E14 9SR

Your ref: 1479-9992/JOK/CD50

Dear Sirs,

FAO Jo Kebbie, Consumer Consultant

**Re: Mr M Bataillon: Complaint about Acheron Capital Limited**

Further to your letter relating the above dated 8 October 2013 I write to confirm that following receipt of your letter the matter has been investigated.

Although Mr Bataillon is an Elective Professional Client of Acheron Capital Limited, in which capacity we have dealt with Mr Bataillon as prescribed by the regulatory rules and guidance, and was formerly associated as an adviser to Acheron Capital Limited, we can advise that apart from your letter of 8 October 2013 we have received no complaint, verbal or in writing, from Mr Bataillon although we are aware, as Investment Manager of the Fund into which Mr Bataillon is an investor, that he has been in communication with both the Directors of the Fund and the Administrator, under whose authority we act and in which capacity we have been in communication with Mr Bataillon.

As a result of our investigation we have today written to Mr Bataillon confirming that the position of which his communications have been based will be concluded within the timescale both contained in the Fund Documentation without detriment to Mr Bataillon, the Fund or any other investor.

From our perspective the matter is now concluded.

Yours sincerely

Dr Jean-Michel Paul
Director

Acheron Capital Limited is authorised and regulated by the Financial Conduct Authority, registered number 443685 and is a Company registered in England and Wales, number 5588630. Registered Office: 20-22 Bedford Row, London WC1R 4JS.



**Acheron Capital Ltd.**
*1 Great Cumberland Place*
*Sixth Floor, Suite 2*
*London W1H 7AL*

London, 22nd November 2013

Via e-mail and Post

Mr Marc Bataillon
20 Eaton Place
London SW1X 8AE

Dear Mr Bataillon,

### Re: Your communication with the Financial Ombudsman Service

This letter is written in response to your verbal communication to the Financial Ombudsman Service and the letter we received as a result, dated 8 October 2013.

In writing there are a number of points which should be highlighted in this matter.

1  When you became a client of Acheron Capital Limited in December 2010 Acheron Capital Limited carried out an assessment into your expertise, experience and knowledge. Acheron Capital Limited also carried out the qualitative test and, as a result, concluded that you were capable of making your own investment decisions and also of understanding the risks involved and therefore that it would treat you as an Elective Professional Client. This was followed by the letter dated 22 December 2010 confirming this assessment and seeking your agreement, in the form of a Declaration and Warranty. This completed agreement was received, also dated 22 December 2010, confirming your agreement that as a Professional Client you would have less protection than retail clients as that you may have no right to complain to the Financial Services Authority, now the Financial Conduct Authority, or the Financial Ombudsman Service or have rights to receive compensation from the Financial services Compensation Scheme.

2  In the transactions you effected through Acheron Capital Limited into the Natural Risk Fund, Acheron Capital Limited acts as Investment Manager. Correspondence sent to the Natural Risk Fund or to the Administrators, Tromino Financial Services Ltd, has been dealt with by either the Directors of the Fund directly or in correspondence directly with the Administrator. As the Investment Manager Acheron Capital Ltd has no authority to engage in correspondence with

Acheron Capital Limited is authorised and regulated by the Financial Conduct Authority, registered number 443685 and is a Company registered in England and Wales, number 5588630. Registered Office: 20-22 Bedford Row, London WC1R 4JS.



**Acheron Capital Ltd.**
*1 Great Cumberland Place*
*Sixth Floor, Suite 2*
*London W1H 7AL*

you on its own account. Any correspondence, email or otherwise, between you and Acheron Capital Limited occurred where correspondence was sent to you by Dr Jean-Michel Paul using Acheron Capital Limited's email address in his capacity as a Director of the Natural Risk Fund or with the full knowledge and authority of the Administrator.

3   The relationship Dr Paul has with the Natural Risk Fund and any other entities has been fully disclosed to the Directors and Managers of the Fund.

4   On 10 June 2011 you accepted a position as an advisor to Acheron Capital Limited which position was, as a result of the breakdown of relations between you and Acheron Capital Limited, terminated on 7 October 2013.

The correspondence entered into with you has been to facilitate your withdrawal from the Natural Risk Fund as expeditiously as possible on terms designed not to detriment either you or any other investor into the Fund and on terms no more nor no less than any other investor so that all investors are treated equally. This has been communicated to you in writing.

In accordance with the provisions of the Offering Memorandum, Natural Risk Fund has paid 90% of the redemption proceeds payable to you and has withheld 10% of the redemption proceeds pending completion of the year end audit of the Fund's financial statements. We confirm that payments will be made to you as quickly as possible on the condition that such payments do not detriment any other investor and are within the authority granted to Acheron Capital Limited either by the Natural Risk Fund or the Administrator under whose authority Acheron acts.

We trust the above clarifies matters.

We have written to the Financial Ombudsman Service advising that we have responded to the verbal communication you have had with them.

Yours sincerely.

Carlo Toller
Director
for Acheron Capital Ltd

Acheron Capital Limited is authorised and regulated by the Financial Conduct Authority, registered number 443685 and is a Company registered in England and Wales, number 5588630. Registered Office: 20-22 Bedford Row, London WC1R 4JS.

# EXHIBIT 5

80416219v1

Watson, Farley & Williams LLP
15 Appold Street
London EC2A 2HB

Your reference:
Our reference: KISJ1/25681.50003/49301244v1

Tel +44 20 7814 8000
Fax +44 20 7814 8141/2
CDE box 530

**VIA E-MAIL and POST**

Mr. Marc Bataillon
20 Eaton Place
London SW1X BAE

14 October 2013

Dear Sir,

## Cease and desist slander / Dr. Jean-Michel Paul and Acheron Capital Limited

We represent Dr. Jean-Michel Paul in this matter. We also represent Acheron Capital Limited ("Acheron") which is a company owned principally by Dr Paul and which is the manager of the Natural Risk Fund ("the Fund"). We have been instructed to address your recent slanderous statements made to a business associate of Dr. Paul.

We have been informed that on October 9 at 3:00 pm you telephoned Mr. David McNaughtan, Chairman of Deltec Bank & Trust and a director of the Fund.    In a conversation lasting approximately thirty minutes you made numerous slanderous statements, including that "Dr. Paul is a crook out to rob you" and that "Dr. Paul mismanaged the Fund for his personal benefit". You ended the conversation by threatening physical violence, stating that having lived in New York you know how to use a baseball bat against anyone who has done you harm. You then stated "I am ready to pull out the baseball club and use it."

We understand that you have a separate business dispute with Dr. Paul and/or Acheron that has nothing to do with the Fund. The malicious statements you have made concerning Dr. Paul and/or Acheron published to his/its business associate are clearly false, impute criminal conduct by Dr Paul and are designed to  disparage Dr. Paul and/or Acheron in his/its business, office or profession and will, as a matter of course, injure and prejudice our clients' reputation.  These statements are therefore slanderous per se and would subject you to payment of compensatory damages. You are also interfering with the contractual relations of Acheron and the Fund.

We require you to make a written apology to Dr Paul and to Acheron with respect to these false and slanderous statements you made to Mr. McNaughtan. We also demand that you undertake to our clients that you will not repeat these slanderous statements or make other slanderous statements against them. Furthermore, we demand that you refrain from making further threatening statements or take part in any other like conduct which has the effect of intimidating our clients or their business associates.

We set out below the text of the apology which should be addressed to both of our clients:

QUOTE

I, Marc Bataillon, hereby sincerely and unreservedly apologise to Dr Jean Michel Paul and Acheron Capital Limited for making certain statements to Mr David McNaughtan, Chairman of Deltec Bank & Trust and a director of the Natural Risk Fund. In these statements I falsely accused Dr Jean-Michel Paul of stealing from me, said that he was a "crook" and was out to rob me and further said that Dr Paul had mismanaged the Fund for his own benefit.

Watson, Farley & Williams LLP is a limited liability partnership registered in England and Wales with registered number OC312252. It is authorised and regulated by the Solicitors Regulation Authority and its members are solicitors or registered foreign lawyers. A list of members of Watson, Farley & Williams LLP and their professional qualifications is open to inspection at the above address. Any reference to a 'partner' means a member of Watson, Farley & Williams LLP, or a member or partner in an affiliated undertaking, or an employee or consultant with equivalent standing and qualification.

Watson, Farley & Williams LLP or an affiliated undertaking has an office in each of the cities listed.

London • New York • Paris • Hamburg • Munich • Frankfurt • Rome • Milan • Madrid • Athens • Piraeus • Singapore • Bangkok • Hong Kong

I fully acknowledge that there is absolutely no truth to these statements and I hereby undertake that in future I will not repeat make or publish these or other like statements to anyone. Furthermore I will refrain from making statements or engage in conduct which amount to physical threats against Dr Paul.

UNQUOTE

Our Clients fully reserve all of their rights including the right to seek damages and injunctive relief from the courts.


Yours Faithfully

*Watson Farley & Williams LLP*

**Watson, Farley & Williams LLP**

# EXHIBIT 35

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

```
-----------------------------------------------------------X
                                            )
In re:                                      )    Case no. 16 – Misc. - 60266
                                            )
FURSTENBERG FINANCE SAS and                 )
MARC BATAILLON                              )
                                            )
                                            )
                                            )
-----------------------------------------------------------X
```

## DECLARATION OF ARENDT & MEDERNACH S.A.

     I, Pierre Beissel, hereby declare as a duly authorized representative of the Luxembourg law firm Arendt & Medernach S.A., making this declaration under penalty of perjury of the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

     1.    This declaration is made (the "**Declaration**") in support of Litai Assets LLC ("**Litai**" or "**Respondents**") Objection to Applicants Furstenberg Finance SAS ("**Furstenberg**") and Marc Bataillon's ("**Mr. Bataillon**" and, together with Furstenberg, the "**Applicants**") *Ex Parte Application for Discovery Pursuant to 28 U.S.C. § 1782* (the "**Discovery Request**") filed on February 9, 2016, and in response to Applicants' Memorandum of Law in opposition to Litai Assets LLC's Motions to Quash and for a Protective Order filed on April 18, 2016 (the "**Memorandum of Law**". Reference is also made to the expert declaration of Me François Prüm for the Respondents dated May 11, 2016 (the "**Prüm Declaration**").

     2.    I have studied the documents that comprise the Memorandum of Law and will hereby reaffirm the position that the Applicants do not have standing to start any civil or criminal proceedings in respect of the alleged facts.

3.      First of all, in response to the allegations contained in item n°6 of the New Sabatier Declaration, the declaration of Romain Sabatier (Exhibit A to the Memorandum of Law) (the "**New Sabatier Declaration**"), I am quite surprised about the apparently very detailed knowledge that Romain Sabatier has about my professional experience, in particular as far as litigation is concerned. Note also that the declaration is signed by me in the name of Arendt & Medernach S.A., the largest Luxembourg full service law firm, including a team of lawyers specialized in litigation & criminal matters.

Please allow me to cite an extract Mr. Sabatier's cv taken from the Nauta Dutilh website: "*Romain Sabatier is a partner in our corporate practice. He provides corporate, securities and structuring advice on financial restructuring matters, typically for hedge fund, private equity firm and financial institution clients. His practice also involves traditional M&A work, usually involving middle-market sized private companies. He has experience working in a wide variety of jurisdictions, including Belgium, the Netherlands, France, England, the United States and more recently, Brazil.*

*Romain has experience litigating before both the trial and appellate courts and handles domestic and cross-border cases with an emphasis on complex shareholder disputes, acquisition agreements, financing agreements and commercial contracts.*"

Given the very limited amount of Luxembourg litigation relating to complex shareholders' agreements, acquisition agreements and financing arrangements, his experience can hardly be extensive and the cv does not make any mention of criminal litigation, which is the litigation relevant to this case.

4.      My Initial Declaration still stands, but I have been asked to prepare the present memorandum in respect of Luxembourg law in reply to the New Sabatier Declaration, and I will

take the opportunity to counter each of the answers of Romain Sabatier in the New Sabatier Declaration.

### *Restrictions on civil actions*

5.      The New Sabatier Declaration acknowledges the existence of restrictions on civil actions against JMP and APC, as I have set out in my Intitial Declaration, and further confirms the intention of the Applicants to commence criminal proceedings in Luxembourg after which the information would be shared with "*the other shareholders of APC, which as a group, would have a right to take civil action, as Litae admits*" (n° 6 of the New Sabatier Declaration). This is an incorrect representation of Luxembourg law. As set out in our Initial Declaration (n° 23 of the Initial Declaration), neither the creditors, nor shareholders directly, but only the <u>company</u> (*i.e.* APC in the case at hand), acting through the general meeting of shareholders as the competent corporate body, has a right to invoke the civil liability of one or more directors. This shows how inaccurately the New Sabatier Declaration sets out Luxembourg law. In any event, any hypothetical civil liability has been discharged, as set in more detail in our Initial Declaration (n° 29 of the Initial Declaration).

### *Restrictions on criminal actions*

6.      The New Sabatier Declaration now argues that from the outset, the primary purpose of the Applicants was in support of <u>criminal</u> proceedings to be brought under Luxembourg law (n° 3 and n° 7 of the New Sabatier Declaration). In this respect, it is important to note that there are two main possibilities under Luxembourg law for a third party to <u>try to start </u>a criminal investigation in respect of a misuse of corporate assets.

First of all, any person is always entitled to report any facts to the police or the public prosecutor or, if such person is a victim of the alleged facts, a criminal complaint (*plainte*). Such report or criminal complaint would take the form of a simple declaration in front of a police officer or the public prosecutor. However, such report or criminal complaint does not start official criminal proceedings under Luxembourg law, and the decision of the public authorities to start an investigation (which may eventually lead to an official criminal proceeding being started, but which in itself does not start any criminal proceedings) or to classify the matter without effect (*classement sans suite*) is a purely administrative decision[1].

7.      Secondly, an official criminal complaint together with a civil action for damages (*plainte pénale avec constitution de partie civile*) in respect of a misuse of corporate assets can also be lodged by a person, but such person must prove that he or she has an actual (and not only potential) personal prejudice which directly (and not only indirectly) results from such misuse of corporate assets (n°44 of the Initial Declaration and n°19-21 of the Prüm Declaration).

8.      An official criminal complaint together with a civil action for damages (*plainte pénale avec constitution de partie civile*) will generally lead to an investigating magistrate (*juge d'instruction*) being appointed to start an investigation to investigate the facts and circumstances, unless the investigating magistrate considers the claim for compensation inadmissible.

9.      If an investigation is started, once such investigation is complete, the investigating judge renders an order closing his investigation and communicates the file to the public prosecutor. The public prosecutor then submits a report to the Chamber of Counsel of the District Court (*chambre du conseil*) either requesting that a proceeding be opened for the matter be judged by the criminal court (*chambre correctionnelle*) or recommending that no further action be taken.

---

[1] M. Franchimont, A. Jacobs and A. Masset, Manuel de procédure pénale, Larcier, Bruxelles, 2012, p. 69, n°3.

The Chamber of Counsel of the District Court then decides whether or not to transfer the case to a criminal court for a formal criminal proceeding. The Chamber of Counsel of the District Court may decide to transfer the case to court for a formal criminal proceeding or it may decide not to do so if, for example, the allegations do not constitute an offence or if there is insufficient evidence against the defendant following the investigation, or the claimants have not suffered any damages.

10.     However, based on our reasoning above and as confirmed in the Prüm Declaration (n° 22 - 30 of the Prüm Declaration), the Applicants do not have standing to pursue any civil claim for reparation of damages in respect of the alleged facts. As a result, any official criminal complaint together with a civil action for damages (*plainte pénale avec constitution de partie civile*) would therefore in our view be inadmissible for lack of standing.

11.     Furthermore, I reiterate the position under Luxembourg law as set out in the Initial Declaration (n° 41 – 58 of the Initial Declaration) that considering that (i) under Luxembourg law, the conduct of proof-gathering procedures in criminal matters falls within the power, responsibility and discretion of the investigating magistrate (*juge d'instruction*) and that (ii) based on the Treaty on Mutual Legal Assistance dated 13 March 1997 (the "**MLAT**"), the Luxembourg investigating magistrate would have extensive means of seeking assistance from the U.S. authorities to gather any evidence deemed necessary or useful in the context of criminal proceedings in Luxembourg, I take the view that the Applicants' Discovery Request is being used as a means of bypassing and circumventing internal Luxembourg procedural laws and general principles regarding the collection of evidence in criminal matters.

12.     The New Sabatier Declaration has further selected five (5) arguments from our Initial Declaration, which I will refute one by one.

13.     First of all, the New Sabatier Declaration (n° 10) alleges that:

"*Good corporate practice would require a director having a conflict of interest with respect to a particular arrangement entered into before he took office to disclose it as soon as he takes office, otherwise this would go against that director's duty of care and loyalty (Trib. Arr. Luxembourg, 13 Mai 2002, Mme XX No 66466 and 66486)*"

Even if we have no reason to believe that Mr Paul would have had a conflict of interest in respect of past dealings with APC upon taking up office as a director on 27 December 2010, the statement above from the New Sabatier Declaration is a statement which in our considered opinion is incorrect under Luxembourg law as it currently stands. A director of a Luxembourg corporation in the form of a *société anonyme* (such as APC) has a duty to disclose a conflict of interest in respect of a transaction falling within the competence of the board of director, at a meeting of the board of directors during which a decision is to be taken on the matter and to abstain from voting on the matter. There is in our considered opinion no obligation under Luxembourg law as it currently stands to make a similar statement in respect any past decisions taken by the same company, and certainly no reason to believe that any criminal sanctions could be imposed. In this respect, the reference in the New Sabatier Declaration to the court precedent "*Trib. Arr. Luxembourg, 13 Mai 2002, Mme XX No 66466 and 66486*" (the "**Court Precedent**") is not relevant, in the sense that the facts of such matter related to an employee of a Luxembourg company also sitting on the board of directors of such company, was accused of breaching her duty of loyalty towards the company by taking up a position at a competitor of the initial company and trying to poach away other employees of the initial company, and this after she had resigned as employee but was still a member of the board of directors of the initial company. At no

occasion does the Court Precedent, which deals with duty of loyalty and the resulting obligation not to compete with the corporation in which a person is a director, come even close to setting out a principle according to which a director should disclose any conflicts of interest he may have in past dealings with the company of which he becomes a director.

14.     Secondly, in the New Sabatier Declaration (n° 11), it is alleged that:

"*I believe that any decision JMP took to recuse himself from the renewal obligations in inconsistent with JMP's simultaneous claim that his (sic) does not beneficially own or control Litai*".

Such statement which is inappropriate in a declaration which should only contain an analysis under the laws of Luxembourg and comment on how those laws affect Applicants' contemplated lawsuit. There are multiple reasons why a director would prefer to recuse himself from discussions on a particular decision to be taken by the board of directors. In this particular case, Mr. Paul, who is a close friend of Mr. Samuel, the owner of Litai, it is simply good corporate governance, despite the absence of a formal conflict, to avoid any doubt as to his neutrality in respect of the decision concerning the Litai contract. Therefore, contrary to what Mr Sabatier asserts, such recusal is not something that a normally loyal and diligent director placed in like circumstances would have never done and is far from being a proof of "bad faith".

In this respect, I also respectfully note that the allegations and insinuations of Mr Sabatier that JMP would have "*made use of powers he possesses… that he knows to be contrary to the company's interests for personal purposes or to favor another company or undertaking in which they have a director or indirect interest*" (see in this respect, the subtle underling of the words "make use of powers they possess" in the reference to article 171-1 of the Luxembourg

7

Companies Act) in respect of the renewal of the contract with Litai, have no place in a declaration describing Luxembourg laws and regulations as this is mere second guessing.

Again, we refer to our Initial Declaration, which sets out in detail why we take the view that a claim against Mr. Paul for misuse of corporate assets under the Companies Law would lack merits (n° 23 - 28 of the Initial Declaration).

15.     In reply to the third and fourth arguments advanced in the New Sabatier Declaration (n°12 and n°13 of the New Sabatier Declaration), we refer to our answer above, that the Applicants in our view do not have any standing whatsoever to start any criminal proceedings by means of the filing of an official criminal complaint together with a civil action for damages (*plainte pénale avec constitution de partie civile*). At most, the Applicants would be entitled to report certain facts to the police or the public prosecutor, but this in itself will under no circumstances lead to any "Criminal Court" being automatically seized by means of such report. The references in the New Sabatier Declaration to the "Criminal Court" are therefore incorrect.

16.     In reply to the fifth argument advanced in the New Sabatier Declaration (n°15 of the New Sabatier Declaration) regarding the capacity of the Applicants as shareholders of APC, we refer again to our Initial Declaration (n°13 of our Initial Declaration). We reiterate our view that the Applicants do not have standing to start any criminal proceedings in Luxembourg.

17.     Finally, R. Sabatier argues that the waiver given by the shareholders does not apply to criminal claims. While this may be true, a waiver given by the shareholders' meeting would meant that the shareholders as a whole have no damages claim and so any criminal complaint filed in conjunction with a civil claim for damages (*plainte pénale avec constitution de partie civile*) would be held inadmissible. We further reiterate our view that the Applicants simply do not have standing to start any criminal proceedings in Luxembourg (see n° 6 - 10 above).

In this respect, the statement that the "Applicants only became aware of rumors surrounding JMP's interest in Litai in the summer of 2015" is, as already mentioned in our Initial Declaration (n° 31 of the Initial Declaration), contradicted by the fact that in the exchange of e-mails between Mr. Erich Bonnet and Mr. Eric Kalfon that took place in November 2015, which is appended to, and are claimed to support some of the allegations made in, the Sabatier Declaration, Mr. Eric Kalfon pretends that he resigned from his position as a member of the board of directors of APC in 2010 owing to the "conflict of interest" arising from Mr. Paul's alleged control of Litai. One might infer from the terms of such exchange that Mr. Erich Bonnet was also aware of such alleged "conflict" in 2010 at the latest. This just adds to the inconsistencies and belief that the Applicants are only using this proceeding to harass Mr. Paul, and have neither the intention nor ability to institute a civil or criminal action against him.

Dated: 12/05 2016

_____

For Arendt & Medernach S.A.
Name: Pierre Beissel
Title: Partner and authorized representative

# EXHIBIT 36

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

------------------------------------------------------------X

In re:

FURSTENBERG FINANCE SAS and
MARC BATAILLON

)
)    Case no. 16 – Misc. - 60266
)
)
)
)
)
)

------------------------------------------------------------X

### DECLARATION OF FRANÇOIS PRUM

I, François Prum, hereby declare as a duly authorized representative of the Luxembourg law firm TURK & PRUM , making this declaration under penalty of perjury of the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.       This declaration is made (the "**Declaration**") in support of Litai Assets LLC ("**Litai**") ("**Respondents**") Objection to Applicants Furstenberg Finance SAS ("**Furstenberg**") and Marc Bataillon's ("**Mr. Bataillon**" and, together with Furstenberg, the "**Applicants**") *Ex Parte Application for Discovery Pursuant to 28 U.S.C. § 1782* (the "**Discovery Request**") filed on February 9, 2016.

2.       I hold a master degree in law from the University of Montpellier (France), and am registered at the Luxembourg Bar since March 4th, 1988. I am managing and founding partner of the law firm TURK & PRUM, based in Luxembourg. I regularly advise bankers, private investments funds and institutional and public administrations on criminal law, white collar crime, corporate matters and professional liability cases. I also assist and represent these clients before all jurisdictions of Luxembourg.

3.     For more than 20 years I have been recognized as an expert in criminal financial matters and assisted clients in Luxembourg criminal courts and also in Paris. I have handled dozen of white collar criminal matters.  In that process, I have garnered extensive experience in how public prosecutors handle both criminal matters and requests by private citizens to begin criminal matters.

4.     Furthermore, I am the Vice Chairman of the Luxembourg Bar association, and a licensed ombudsman at the Mediation center of the Luxembourg Bar. I was the former vice-president of the disciplinary and administrative Council of lawyers in Luxembourg and a former member of the Luxembourg Grace Commission.

### The Process for Requesting a Criminal Investigation

5.     A person may, pursuant to articles 11 and 23 of the Luxembourg Code of Criminal Procedure (*Code d'Instruction Criminelle* or "**CIC**"), file a criminal complaint (in the case the person is a victim of a crime) or simply report a crime either with the police or the public prosecutor. If the complaint or the report is made with the police, the police will without delay inform the public prosecutor.  The police act under the supervision and surveillance of the public prosecutor.

6.     A report/complaint that is not accompanied by a civil claim for compensation does not trigger either a proceeding or an investigation.  Rather, the filing is merely a request to the public prosecutor to start an investigation.

7.     To introduce a criminal complaint, the plaintiff may attach evidence to prove the alleged facts, but this is not a requirement under Luxembourg law. If for any reasons the plaintiff does not hold all written evidence, he usually requests the public prosecutor to seek an order from the investigating magistrate to look for and seize all types of evidence.  It should be noted that the

plaintiff may also attach an affidavit of a witness and encourage the investigators to interrogate this witness.

8.     The public prosecutor will then review the report/complaint and decide whether to open an investigation or whether the matter should be archived without opening an investigation.

9.     If they are victims of the alleged crime, the complainants are entitled to know whether the prosecutor agreed to, or has declined to, open an investigation.  However, if the prosecutor declines to open an investigation (*classement sans suite*), the complainants have no further ability to request the commencement of a criminal investigation on the same facts.

10.     A complainant may however still launch a direct action in the criminal court if such action is properly accompanied by a civil claim for damages.  However, as detailed in the following section, such a criminal action may only be properly instituted by a victim of the crime that has suffered damages.

11.     The public prosecutor does not make available statistics on the proportion of criminal complaints that result in prosecution.  In my experience, however, I have found that less than 50% of the reports result in investigations being opened.  There are a variety of reasons why a public prosecutor may decline to open an investigation, including:

> a)  The public prosecutor may decline to open an investigation if he or she determines merely from the report that there is not sufficient evidence that a crime has been committed, or that the alleged facts do not constitute a criminal offense.
>
> b)  The public prosecutor may decline to investigate merely because he or she determines that the complainants' "beliefs" or "arguments" that wrongdoing has occurred are simply not persuasive.

3

FP

12.     Even if the public prosecutor decides to open an investigation, this does not mean that after the investigation of the case, it will automatically end up in criminal court.

13.     Rather, the public prosecutor will request the investigating judge to open an investigation. The investigating judge will then take all the measures he deems necessary and useful to obtain all necessary evidence.

14.     Once the investigation is complete, the investigating judge renders an order closing his investigation and communicates the file to the public prosecutor.

15.     The public prosecutor then submits a report to the Chamber of Counsel of the District Court (*chambre du conseil*) either requesting that the matter be judged by the criminal court (*chambre correctionnelle*) or recommending that no further action be taken.

16.     The Chamber of Counsel of the District Court may decide to transfer the case to court for a formal criminal proceeding or it may decide not to do so if, for example, the allegations do not constitute an offence or if  there is insufficient evidence against the defendant following the investigation, or the complainants have not suffered any damages.

17.     If the Chamber of Counsel of the District Court decides not to transfer the criminal case to the criminal court, only the public prosecutor, the indicted person and the plaintiff who claimed for compensation (*partie civile*) (if any – see below for the restrictions in this respect) can appeal that decision before the Chamber of Counsel of the Court of Appeal.  No other party will be able to appeal the decision.

### Criminal Complaint and Civil Complaint for Damages

18.     As mentioned previously, a victim of a crime may, pursuant to Article 56 CIC, file a criminal complaint.   If the criminal complaint is coupled with a civil complaint for compensation (*plainte pénale avec constitution de partie civile*), it generally results in the opening of a criminal investigation, unless the investigating magistrate considers the claim for compensation inadmissible.

19.     Under Luxembourg law, a complaint is inadmissible if the plaintiff did not suffer an actual (and not only potential) personal prejudice as a direct consequence of the alleged criminal offence. The Chamber of Counsel of the Court of Appeal consistently reminds this fundamental principle as follows:

> "*For being admissible, the applicant of a criminal complaint including a complaint for compensation shall substantiate having suffered an actual and personal prejudice which shall directly result from the alleged criminal offense*" (see Arrêt n°717/14 2 octobre 2014 Chambre du Conseil de la Cour d'Appel de Luxembourg notice 34289/13/CD).

20.     Any plaintiff not having suffered a damage meeting these criteria cannot initiate a criminal complaint including a complaint for compensation in Luxembourg, but can merely report a criminal offense with the police or the public prosecutor and will not be allowed to intervene in the criminal proceedings nor request that payment of damages to be ordered (*e.g.* damages to be granted to a third party victim).

21.     In misuse of corporate assets cases, French judges have consistently held that the prejudice is incurred by the company; the shareholders are not considered direct victims of the criminal offense. The Luxembourg criminal offence of misuse of corporate assets is in substance identical to the French text, and Luxembourg courts would generally look towards French case law when judging misuse of corporate assets cases.

FP

22.     As stated above, Luxembourg Courts ground their jurisprudences on the French precedents so that it is consistently held by Luxembourg Courts that the criminal offense of misuse of company assets only causes prejudice to the company itself and in certain very restrictive conditions to its shareholders (see *Ordonnance de non informer 30013/15/CD du Cabinet d'instruction 22 février 2016*). The creditors or third parties in such case only suffer a damage which, even if proven, is qualified as an indirect prejudice. The criminal courts have no jurisdiction to deal with the compensation for an indirect prejudice suffered by a creditor in relation with a misuse of company assets. This compensation shall be submitted to civil jurisdictions.

23.     Moreover, as under Luxembourg law, shareholders of the company are not considered as direct victims of the misuse of company assets, they can only file a criminal complaint including a complaint for compensation (*plainte avec constitution de partie civile*) if they demonstrate a personal and direct damage other than the one suffered by the company itself (the loss of value of the shareholders' ownership in the company **is not considered** under Luxembourg law as a personal prejudice suffered by the shareholders, but a prejudice suffered by the company itself, please see *Cour d'appel Luxembourg, n°36517 du role, 15 juillet 2014*). As a consequence, such a criminal complaint including a complaint for compensation launched by complainants would be dismissed.

24.     In my opinion, a shareholder such as Mr. Bataillon, who I understand owns shares in a company, which company owns shares in a second company, in which company he claims wrongdoing occurred in the form of undisclosed ownership in a servicing company, would even less meet the criteria for either actual damage or direct injury.

25.     Similarly, in my opinion, a shareholder such as Furstenberg Finance SAS, which claims to have suffered damage to the value of its shares based upon a claim of an undisclosed ownership interest in a servicing company, also would not meet the criteria for actual damage or direct injury.

26.     To assert a civil claim, a shareholder who claims wrongdoing would have to present his complaints to a full meeting of shareholders, and only the general meeting of shareholders could decide, at a majority of more than half of the shareholders present or represented, to institute a civil action.

27.     As the Applicants' Luxemburg counsel, Mr. Romain Sabatier, explicitly admits that in paragraph 6 of his declaration:

> "To be clear: the Applicants are well-aware of the restrictions on civil actions against JMP and Acheron Portfolio Corporation Luxembourg S.A ('APC') in Luxembourg based upon the size of their current and former holdings.  The sole reason there is any reference to any civil action in Luxembourg in the 1782 Application … was to inform the Court that the Applicants, once the criminal complaint is filed, intend to share the information obtained with the other shareholders of APC which, as a group, would have the right to take civil action, as Litai admits."

28.     Thus, based upon Mr. Sabatier's declaration, the Applicants have admitted that they have no grounds to file a criminal complaint including a complaint for compensation.

29.     Considering my declarations under points 5 to 28 and the background of the matter of which I have knowledge (see Ex Parte Application for Discovery and memorandum in law in support of the Ex Parte Application), in my opinion, if FURSTENBERG and/or Marc Bataillon lodged a criminal complaint with either the police, public prosecutor, investigating magistrate or to started their own criminal action for misuse of a company's assets in which they hold shares, such a complaint would be dismissed (a) because the allegations don't create a sufficient inference that a crime has occurred since the party alleged to have the conflict of interest was not

FP

a board member when the contract was initially entered into in 2009, and recused himself from the contract vetting and vote on the renewal in 2014, and (b) because the Applicants, as shareholders, could not have suffered any direct damage and do not have standing as a victim.

Dated: _May 11_ , 2016

_____
François Prum

# EXHIBIT 37

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-mc-60266-Bloom**

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON,

                    Applicants.

_____/


**APPLICANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**<u>CROSS-MOTION TO COMPEL PRODUCTION</u>**

Case 1:18-mc-00041-JGK   Document 42   Filed 03/06/18   Page 59 of 155

<u>T</u><small>ABLE OF</small> <u>C</u><small>ONTENTS</small>

<u>Page</u>

I.   THE DIRECT CRIMINAL ACTIONS EASILY MEET 1782'S REQUIREMENTS......2

    A.   The Applicants Can And Will Bring Direct Criminal Actions in Luxembourg ................................................................................2

    B.   The Direct Criminal Actions in Luxembourg are Reasonably Contemplated......4

II.   A DENUNCIATION WOULD MEET SECTION 1782'S REQUIREMENTS.................6

III.   LITAI'S ATTEMPT TO THROW MUD IS UNAVAILING ...................8

IV.   AN AWARD OF ATTORNEYS' FEES AND COSTS IS WARRANTED .......................9

CONCLUSION ....................................................................................11

CERTIFICATE OF SERVICE .................................................................12

SERVICE LIST ...................................................................................12

Applicants Furstenberg Finance SAS ("**FF**") and Marc Bataillon ("**Bataillon**") (collectively, the "**Applicants**"), by and through their undersigned counsel, Holland & Knight LLP, submit this reply memorandum, the Declaration of Rosario Grasso dated June 2, 2016 ("**Grasso Decl.**"), the Third Declaration of Romain Sabatier, dated June 1, 2016 ("**Sabatier 3d**"), the Second Declaration of Erich Bonnet, dated June 2, 2016 ("**Bonnet 2d**"), and the Second Declaration of Marc Bataillon, dated June 2, 2016 ("**Bataillon 2d**"), in further support of Applicants' Cross-Motion to Compel Production (D.E. #16) by Litai Assets LLC ("**Litai**").

The Applicants' Motion to Compel should be granted and attorneys' fees awarded because the requirements of 28 U.S.C. § 1782, as well as the discretionary factors, are clearly met, and have been from the outset of this case. Once again, Litai's briefing has <u>widely</u> missed the mark and its central contentions concerning Luxembourg law are incomplete and incorrect. Litai's opposition is entirely premised on the <u>flat-out-wrong</u> argument that the Applicants are not able to file any direct criminal proceedings (the "**Direct Criminal Actions**") in Luxembourg. But the Applicants <u>can and will</u> file Direct Criminal Actions in Luxembourg. Indeed, Mr. Grasso, the Applicants' criminal lawyer and president of the Luxembourg Bar Association, will represent the Applicants in connection with that filing. Because the Applicants will be filing the Direct Criminal Actions, virtually no part of Litai's opposition is on point and the Applicants' Motion to Compel should be granted. Moreover, even if the Applicants were going to file a "Denunciation," – a third type of criminal action Litai concedes is available (the "**Denunciation**") and misleadingly characterizes as a "Police Report" – the Applicants would have a right to discovery pursuant to 28 U.S.C. § 1782 in connection with a Denunciation.

The confidentiality protections and strict timing in relation to the Litai discovery and Luxembourg Direct Criminal Actions, to which the Applicants have already agreed, also wholly vitiate Litai's arguments that the Luxembourg proceedings are not reasonably contemplated. Once again, matters like timing and confidentiality, share ownership and Jean-Michel Paul's ("**JMP**") participation, should be handled by phone, not motion practice.

Finally, Litai's conduct in relation to the subpoenas in this case has not been substantially justified. Rather, driven by Acheron Portfolio Corporation Luxembourg S.A. ("**APC**") and JMP, Litai's resistance has been predicated on money-wasting attempts at confusion, incorrect and misleading statements of law,

and clearly erroneous factual allegations. All this was done by Litai, under JMP's direction, for the purpose of avoiding basic document discovery and two depositions, the execution of which would have been far less expensive than the motion practice at bar.

## I.     THE DIRECT CRIMINAL ACTIONS EASILY MEET 1782's REQUIREMENTS

Litai's entire opposition is predicated on its Luxembourg declarants' contentions that the Applicants cannot file any Direct Criminal Actions in Luxembourg, which procedures are described in the Grasso Decl. and Sabatier 3d in detail. Grasso Decl. ¶¶ 5.2, 5.3; Sabatier 3d ¶ 5. Rather, according to Litai, the Applicants can file a Denunciation, which is a separate, third type of criminal proceeding. Litai claims that a Denunciation is not a foreign proceeding within the meaning of Section 1782 and that an eventual proceeding by the State Prosecutor in Luxembourg in connection with a Denunciation is not reasonably contemplated because the State Prosecutor could decline the prosecution. However, Litai does not even attempt to argue that the Direct Criminal Actions do not meet the requirements of Section 1782.[1]

The central premise of Litai's argument is simply wrong. The Applicants (i) can and will bring the Direct Criminal Actions in Luxembourg, (ii) the damages associated with the civil component of such Direct Criminal Actions is present, and in any event, (iii) the criminal and civil components of actions in Luxembourg proceed on wholly different tracks. Once the Litai discovery is complete, the Direct Criminal Actions will be filed against JMP by the sitting President of the Luxembourg Bar Association and criminal law expert Mr. Rosario Grasso, on the Applicants' behalf.

### A.     *The Applicants Can And Will Bring Direct Criminal Actions in Luxembourg*

There are three types of criminal proceedings that can be commenced by private parties in Luxembourg: (i) a criminal complaint with claim for damages, (ii) a direct summons with claim for damages, and (iii) a Denunciation, or complaint to a State Prosecutor. Grasso Decl. ¶¶ 5.1.6, 5.2, 5.3. The first two types are made either in front of the investigating magistrate judge or a criminal court, and are referred to herein as the Direct Criminal Actions. *Id.* ¶¶ 5.1.8, 5.2; Sabatier 3d ¶ 2. The principal

---

[1] Litai incorrectly presumes that because the Applicants agree that shareholder derivative suits cannot be filed in Luxembourg, there is no other basis for the civil component of the Direct Criminal Actions.

distinction between the criminal complaint[2] and the direct summons is that the former is for more severe crimes with longer prison terms. Grasso Decl. ¶ 5.1.9. Litai does not and cannot dispute that the Direct Criminal Actions meet the requirements of Section 1782. Rather, Litai argues that there is no possibility for the Applicants to pursue the Direct Criminal Actions. Litai and its Luxembourg declarants are wrong.

Litai and its Luxembourg declarants are incorrect for the following two principal reasons:

(i) Litai construes the type of damages necessary to file the Direct Criminal Actions too narrowly, omits the critical fact that the Applicants' economic, reputational and moral damages can both be alleged and are sufficient for the Direct Criminal Actions to proceed, and therefore incorrectly presumes that the Direct Criminal Actions are unavailable; and

(ii) Litai ignores the fact that once the Direct Criminal Actions are filed, the criminal and civil components follow wholly different and independent tracks, and even if the Applicants' civil component were to fail (and the Applicants deny that it would fail), the criminal component is unaffected. Grasso Decl. ¶ 6.1.5. For these reasons, even if the Applicants' civil claims were to be dismissed, the Applicants' criminal action would continue.

To the contrary, as noted by Mr. Grasso: "[i]n this case, it is clear to me that both Applicants can allege material, financial, reputational and/or moral damages in relation to the allegations against JMP. This will include not merely the act of purchasing and selling shares at wrongful prices, but also their reputational damages that will come from their associations with JMP and Acheron in Luxembourg in London, as director of Acheron and advisor of Acheron (London), respectively, or even a mere moral prejudice." Grasso Decl. ¶ 6.1.4.

Simply stated, the Applicants (i) can and will bring the Direct Criminal Actions in Luxembourg, (ii) the damages associated with the civil component of such direct criminal proceedings are present for the Applicants, and in any event, (iii) the criminal and civil components proceed on wholly different tracks. *See id.* ¶¶ 6.1.5, 6.1.6; Sabatier 3d ¶ 12. Once the Litai discovery is complete, the Direct Criminal Actions will be filed against JMP by the sitting President of the Luxembourg Bar Association and criminal

---

[2] When a criminal complaint is submitted to the investigating judge, it constitutes criminal proceedings where the plaintiff and victim is a party with specific rights defined and regulated by the Luxembourg Code of Criminal Procedure. *See* Grasso Decl. ¶ 5.2.3.

law expert Mr. Rosario Grasso on the Applicants' behalf. Grasso Decl. ¶ 4.1 ("I will personally be filing one of the "direct" criminal actions in Luxembourg on Applicants' behalf.").

It is black letter law that the Direct Criminal Actions are foreign proceedings within the meaning of 28 U.S.C. § 1782. *See, e.g., In re Application of Consorcio Ecuatoriano de Telecomunicaciones S.A*, 747 F.3d 1262, 1268 (11th Cir. 2014) ("Consorcio"); *Weber v. Finker*, 554 F.3d 1379, 1384 (11th Cir. 2009) ("The district court determined that [Applicant] had 'established the civil <u>and criminal</u> actions are within reasonable contemplation.'") (emphasis added); *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 458 (2d Cir. 2014) (rejecting argument a Swiss investigating magistrate is not a "foreign or international tribunal" for purposes of Section 1782).

### B.   The Direct Criminal Actions in Luxembourg are Reasonably Contemplated

Litai makes three basic arguments in support of its contention that the Applicants' criminal actions in Luxembourg are not reasonably contemplated.

The first argument is based upon Litai's incorrect assertion that the Applicants can only file the Denunciation and not the Direct Criminal Actions. As described in more detail below, in a Denunciation, the victim of a crime makes a complaint to the police or a State Prosecutor, who then determines whether to pursue criminal charges. Grasso Decl. ¶ 5.1.6. Litai therefore contends that because the actual decision as to whether to commence the action is up to a third party, the Denunciation is too speculative to be "reasonably contemplated."

Of course, this argument fails on its face because Litai's premise is incorrect. The Applicants will be filing the Direct Criminal Actions, not the Denunciation. In the context of the Direct Criminal Actions, the Applicants are "parties to the action itself," and there is binding precedent in this Circuit, as well as the Second Circuit, that the Direct Criminal Actions to which the Applicants will be a party are "foreign proceedings" within the meaning of 28 U.S.C. § 1782. *See* Grasso Decl. ¶ 6.1.6.4.

For these reasons, Litai's first argument on the issue of whether the proceedings are reasonably contemplated fails, and the cases it cites are irrelevant. The Applicants are in full control of whether the Direct Criminal Actions are brought.

Litai's second argument seems to be that, despite having made sworn declarations averring that the Direct Criminal Actions would be commenced, the Applicants did not say <u>WHEN</u> the Direct Criminal Actions would be commenced.

This frivolous contention is as silly as Litai's initial objections to the discovery based upon: (i) the now discredited contention that FF is not a shareholder of APC, (ii) the contention that JMP would be prejudiced if he could not participate in the discovery, and (iii) the discredited contention that the Applicants did not intend to file the proceeding. It could have been solved with a phone call.

To be clear: the Applicants have <u>already</u> pledged that all discovery shall remain confidential unless and until the Luxembourg Direct Criminal Actions have been filed, and have agreed to furnish copies of the discovery obtained to JMP in the event he does not already possess that right. Bonnet 2d ¶ 5; Bataillon 2d ¶ 3. Furthermore, the Applicants have unconditionally[3] bound themselves to commence the Direct Criminal Actions within 45 days after the completion of discovery, or otherwise destroy the information and further preserve its confidentiality. *Id.* It is difficult to even imagine stronger objective indicia of reasonable contemplation. *Cf. Consorcio* (the Eleventh Circuit upheld the applicant's request for discovery in relation to a reasonably contemplated criminal action which would commence upon <u>winning</u> a not-yet-filed civil action).

Third, Litai has seems to argue that JMP has not committed a crime, and therefore criminal actions could not be within reasonable contemplation because they will fail.

As an initial matter, in making this argument <u>once again</u>, Litai <u>once again</u> ignores binding Eleventh Circuit precedent which stands for the proposition that this Court should not address the underlying merits of the foreign litigation. *See Consorcio*, 747 F.3d at 1268 ("We emphasize, however, that this appeal is not about whether JASE actually overbilled CONECEL, with or without the collusion of CONECEL's former employees; or whether CONECEL owes JASE any money under the contracts between the parties; or, finally, whether any other underlying dispute among the parties and related persons has merit. Like the district court, we have no occasion to address any of these issues, which will likely be resolved in various tribunals in Ecuador.").

---

[3] Unless, of course, the Litai discovery wholly exonerates JMP, in which case it will be destroyed and shall otherwise remain subject to strict confidentiality. Bonnet 2d ¶ 5.

Moreover, Litai is simply wrong as to the criminal merits. That JMP has committed a serious crime is not based upon idle speculation by the Applicants. Rather, it is supported by the written statements of two former members of the APC board of directors who resigned as a result of JMP's conduct, as well as a former APC employee. *See* Bonnet 2d ¶ 9. It is further supported by JMP's admission that he (allegedly) recused himself from the Litai contract negotiations. To this, Litai merely speculates that JMP's recusal "could" have been for other reasons, without specifying any such reasons.

That the Litai contract contains non-commercial provisions is admitted by APC, and that the Litai contract contains provisions detrimental to APC is alleged by two former APC board members, including the principal of Applicant FF, Mr. Erich Bonnet.

Moreover, as set forth in the Bataillon 2d Declaration, JMP actually seems to have (i) advertised his ownership of Litai in Acheron Capital Limited ("**ACL**") materials he distributed to potential investors in a fund ACL launched to invest in Korean assets, and (ii) owns other Florida entities allegedly involved in real estate named "Litai Real Estate," via the shadow "Neptune" entities located at the same address in Florida as Litai. *See* Bataillon 2d ¶ 15. JMP has also appeared in the Panama Papers disclosures as a secret beneficial owner of offshore vehicles, which, at a minimum, points to JMP's capability to conceal ownership interests. *Id.* Indeed, the serious and substantiated nature of the allegations are, in part, why the sitting President of the Luxembourg Bar Association has agreed to file the Direct Criminal Actions on the Applicants' behalf.

Meanwhile, all of these issues, from JMP's concealed ownership and control of Litai, to his (alleged) recusal from the Litai contract negotiations, to the provisions of the Litai contract, are precisely the subjects on which the Applicants are seeking discovery from Litai.

In sum, Litai's attempt to interject a foreign proceeding merits objection into the "reasonable contemplation" analysis has been expressly rejected in this Circuit as a matter of law and is wholly obviated by the Applicants' confidentiality and timing representations. And, to the extent relevant, Litai's criminal merits defense to reasonable contemplation also fails.

## II.    A DENUNCIATION WOULD MEET SECTION 1782's REQUIREMENTS

As set forth in detail herein and in the accompanying Declarations, the Applicants intend to file Direct Criminal Actions against JMP. However, even assuming *arguendo* that the Applicants were going

to file a Denunciation, the Applicants respectfully submit that this action would similarly satisfy 28 U.S.C. §1782's requirements. In particular, Litai's comparison of a Denunciation to a "police report" is not accurate. Sabatier 3d ¶¶ 21-22. In fact, it is so inaccurate that Mr. Grasso took pains to point out the errors and omissions in Litai's submission concerning Luxembourg law beginning at paragraph 6.1 of his Declaration.

Consistent with the Supreme Court's liberal interpretation of the term "interested persons" *in Intel v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), courts routinely find that non-litigants whose interests align with anticipated parties qualify as "interested persons." *See, e.g., Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) (holding that the agent of a foreign bankruptcy trustee was an "interested person" under § 1782); *In re Oxus Gold PLC*, Misc. No. 06-82-GEB, 2007 WL 1037387, at *7 (D.N.J. Apr. 2, 2007) (holding that parent corporation was an "interested person" based on its close relationship with the subsidiary and events giving rise to the proceedings); *In re Pinchuk*, No. 2:13–CV–00251–ABJ, 2014 WL 348110, at *2 (D. Wyo. Jan. 31, 2014) (holding that owner of investment companies that brought foreign proceedings in Cyprus "possesses a reasonable interest in obtaining judicial assistance" and therefore was an "interested person" under the statute).

In support of its argument that the Applicants are not interested persons in the context of a Denunciation action, Litai relies heavily upon the Second Circuit's *Certain Funds* decision. 798 F.3d 113 (2d Cir. 2015). However, that decision is inapposite for a number of reasons.

First, as a general matter, the Luxembourg criminal law system is different from the common-law system in that victims are far more involved in the process, and are a party to the action, in addition to the state. Grasso Decl. ¶ 6.1.6. Therefore, the Applicants would be a party to and have an interest in the Denunciation in a manner simply absent from the case of the creditors seeking the discovery in *Certain Funds*.

Second, a Denunciation may be made to a State Prosecutor, not merely the police. Unlike in the United States, where prosecutors are merely agents of the state, in Luxembourg, a State Prosecutor is a member of the judiciary branch of the Luxembourg government. Grasso Decl. ¶ 6.1.6. Presenting before a State Prosecutor in Luxembourg is far more analogous to presenting to a magistrate judge in the United States – indeed, the decision to prosecute or not is appealable. *Id.* The distinction between the creditor's

committee at issue in *Certain Funds* and a State Prosecutor and member of the Luxembourg judiciary is wide.

Third, in contrast to the *Certain Funds* creditor's committee, any decision by the State Prosecutor not to pursue the action can be appealed in front of the General State Prosecutor. *Id.* As to the likelihood that the State Prosecutor would pursue the action, Luxembourg has a public interest in maintaining its status as a corporate capital of the world. Sabatier 3d ¶ 24. While it is true as a general proposition that many Denunciations (covering the span of potential criminal offenses from burglary to assault, and made to both the police and State Prosecutor) are not prosecuted, the facts of this case and the serious nature of the allegations against JMP strongly suggest that however the action is brought, it will be prosecuted. *Id.*; Grasso Decl. ¶ 6.1.6.4.

For these reasons, a Denunciation would meet the requirements of 28 U.S.C. § 1782, as the evidence would be for use in a reasonably contemplated foreign proceeding and submitted to a Luxembourg State Prosecutor towards the commencement of a criminal action. In such a proceeding, the Applicants are "interested persons" as that term is used in 28 U.S.C. § 1782. In this regard, Litai's proffered "significant participation rights" standard is incorrect.

In conclusion, *Certain Funds* is not necessarily inconsistent with a finding in the context of a Denunciation that the Applicants are interested persons in a reasonably contemplated foreign proceeding. However, it is also important to note that the Second Circuit has, on the whole, interpreted 28 U.S.C. § 1782 more narrowly than this Circuit has. For example, in the context of whether the statute can assist persons involved in foreign arbitrations, the Second Circuit has held that it cannot, whereas this Circuit has held the opposite. In this regard, it is respectfully submitted that the *Certain Funds* court interpreted "interested person" too narrowly. Congress chose the word "interested person" as opposed to the word "party" for a reason.

### III.  LITAI'S ATTEMPT TO THROW MUD IS UNAVAILING

In a desperate attempt to avoid both the discovery and the Applicants' attorneys' fees, Litai, controlled by JMP, attempts to throw mud at the Applicants and shockingly contends that JMP's intentional spoliation of evidence somehow reflects improper conduct by the Applicants. The Applicants simply request that this court review the Bonnet 2d and Bataillon 2d Declarations, which utterly refute

the distorted assertions made by Litai and JMP. In particular, JMP, not the Applicants, lost on the merits of the Ahmose dispute in Luxembourg (and JMP was ordered to pay the Applicants' legal fees), and Mr. Bataillon was never deemed to have made a wrongful complaint in London; rather it was justified under the circumstances. *See* Bonnet 2d ¶ 24; Bataillon 2d ¶ 9. In the larger sense, the fact that the Applicants and JMP are involved in civil litigation does not mean that JMP is innocent of a crime, that the Applicants are not victims of that crime, or that their right to file a criminal complaint in Luxembourg is forfeited.

Turning to JMP's intentional spoliation of evidence, it is important to note that JMP has not denied the act. He has not denied that other emails were deleted, or that the deletions occurred directly as a result of the Litai subpoena. He has merely stated that the particular emails that the Applicants were alerted had been deleted (necessarily a subset of the total emails), have always been in his possession. This is meaningless, as deleted files can be "undeleted." Similarly, the fact that APC backs up its servers is meaningless given that JMP employs multiple email accounts (including non-APC email accounts). *See* Bonnet 2d ¶ 17. JMP's deletion of emails is directly relevant not merely because he is Litai's declarant and the act goes to his credibility, but because the central allegation made by the Applicants is that he controls Litai and its Chairman and CEO in title only Jan-Eric Samuel, and they may have taken similar actions. Those concerns remain live.

## IV.    AN AWARD OF ATTORNEYS' FEES AND COSTS IS WARRANTED

From the outset, the Applicants have sought discovery in support of Luxembourg criminal proceedings. Nothing has changed. The Applicants seek discovery from Litai in support of the reasonably contemplated Direct Criminal Actions. Litai does not dispute that the Direct Criminal Actions satisfy the requirements of 28 U.S.C. § 1782 and the Applicants have voluntarily offered (i) strict confidentiality, (ii) to furnish copies of the discovery to JMP, and (iii) to effect prompt filing measures so as to provide both additional objective indicia that the Direct Criminal Actions are reasonably contemplated, and to provide maximal protections to JMP and Litai. The Applicants' Motion to Compel should clearly be granted. The remaining question is whether Litai's opposition was "substantially justified." If it was not, then the Applicants' attorneys' fees associated with this exercise should be reimbursed.

In its initial Motion to Quash, Litai simply chose to ignore the primary basis of this discovery request: criminal proceedings. In that Motion, Litai further posited unsupportable and now-abandoned

arguments, including but not limited to, allegations that: (i) FF is not a shareholder of APC, (ii) JMP would be prejudiced in Luxembourg by virtue of the discovery (when all criminal proceedings in Luxembourg are initially commenced *ex parte*), and that (iii) only Mutual Legal Assistance Treaties, as opposed to Section 1782 actions, may be used to take discovery in respect of foreign criminal proceedings. These arguments were not substantially justified and were not supported by fact or law. In both its Motion to Quash and current opposition, Litai has further attempted to present (incorrect) "merits" arguments concerning the criminal actions alleged, even though the binding precedent of this Circuit expressly counsels that courts deciding Section 1782 applications are not empowered to determine or rule upon the merits of the foreign action.

In its latest opposition, Litai presented an incomplete rendition of applicable Luxembourg criminal law, omitted the various bases upon which damages could be alleged and wrongly <u>presumed</u> that the Applicants would be filing a Denunciation as opposed to Direct Criminal Actions. The Applicants never contended that they would file a Denunciation, and have always maintained that they would file criminal actions before the investigating magistrate.[4] An off-base objection cannot be "substantially justified."

As the Declarations accompanying this reply make clear, the Applicants can and will file Direct Criminal Actions, and not a Denunciation. If there was genuine concern as to the procedural mechanisms of Luxembourg criminal law or the Applicants' intent in respect of the same, Litai merely needed to ask the Applicants what type of action they would be filing. Like the confidentiality issue, the JMP discovery access issue, the Direct Criminal Actions timing issue, and the FF share ownership issue, Litai's concerns were resolvable with a phone call. That is the way discovery is supposed to work.

Instead, Litai filed two objections that are both almost entirely irrelevant and without legal or factual support. While the question of whether a Denunciation would qualify as a foreign proceeding is at least close, the issue is irrelevant under circumstances where Direct Criminal Actions are being filed.

For these reasons, Litai's conduct was not substantially justified and the Applicants' attorneys' fees and costs should be awarded.

---

[4] An additional option, the "direct summons" is also available depending on the length of JMP's potential prison term in relation to the final charges.

## CONCLUSION

For the foregoing reasons, Litai's Motion to Quash should be denied, the Applicants' Cross Motion to Compel should be granted, and the Applicants' attorneys' fees and costs should be assessed against Litai.

Dated:      June 2, 2016

         Respectfully submitted,

         HOLLAND & KNIGHT LLP

         /s/ *Philip E. Rothschild*
         Philip E. Rothschild, Esq.
         HOLLAND & KNIGHT LLP
         515 East Las Olas Boulevard
         Suite 1200
         Fort Lauderdale, FL 33301
         Tel: (954) 525-1000
         Fax: (954) 463-2030
         Email: phil.rothschild@hklaw.com

         */s/ Warren E. Gluck*
         Warren E. Gluck, Esq.
         HOLLAND & KNIGHT LLP
         31 W. 52nd St.
         New York, NY 10019
         Tel: (212) 513-3200
         Fax:(212) 385-9010
         Email:  warren.gluck@hklaw.com

         *Attorneys for Furstenberg Finance SAS and Marc Bataillon*

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that on June 2, 2016, a true and correct copy of the foregoing was sent via electronic mail through the Court's CM/ECF system to the individuals listed below.

By: _____ /s/ Phil Rothschild_____

**SERVICE LIST**

Jeffrey W. Gutchess, Esq.
jeff@axslawgroup.com

Daniel Tropin, Esq.
dan@axslawgroup.com

Lauren Quattromani, Esq.
lauren@axslawgroup.com

AXS Law Group
1850 Purdy Avenue
Miami, Florida 33139

*Attorneys for the Respondents*

# EXHIBIT 38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

------------------------------------------------------------x
                                                            :
In re:                                                      :        Case No. 16 Misc. 60266
                                                            :
FURSTENBERG FINANCE SAS and                                 :
MARC BATAILLON                                              :
                                                            :
REQUEST FOR DISCOVERY PURSUANT                              :
TO 28 U.S.C. § 1782.                                        :

------------------------------------------------------------x

**DECLARATION OF ROSARIO GRASSO**

I, Rosario GRASSO, hereby declare as a duly authorized representative of the Luxembourg law firm KLEYR GRASSO, making this declaration under penalty of perjury of the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

**1.**     This declaration is made (the "Declaration") in further support of Applicants Furstenberg Finance SAS ("Furstenberg") and Marc Bataillon ("Mr. Bataillon") and, together with Furstenberg, the "Applicants") motion to compel discovery from Litai Assets LLC ("Litai") in relation to the *Ex Parte Application for Discovery Pursuant to* 28 *U.S.C. § 1782* served on February 9, 2016.

**2.**     I hold a master degree in law from the University of Catania (Italy), and am registered at the Luxembourg Bar since February 1991. I am the founding partner of the law firm KLEYR GRASSO, based in Luxembourg since December 1994. I regularly advise clients, bankers and institutional and public administrations on criminal law, white collar crime, tort law, professional liability cases and corporate criminal law. I assist and represent these clients before all jurisdictions of Luxembourg.

**3.**     Since I have been registered at the Luxembourg bar in February 1991, I have handled criminal cases which are my main area of activity, and have represented both victims and alleged perpetrators of crime. I also assist and train institutions and clients with regard to their antimoney laundering and anticorruption policies. During all these years, I have handled hundreds of criminal cases: financial frauds, tax frauds, corruption cases, money laundering and white collar crimes. I have represented the victims of such crimes as well as the alleged perpetrators or accomplices. I am the Chairman of the Luxembourg Bar Association, and took this office in September 2014.

**4**. **Summary of Conclusions**

**4.1.**  I have reviewed the memoranda and declarations submitted in this proceeding. In my view Applicants are clearly able to file each of the three types of criminal proceedings against Jean-Michel Paul ("JMP") set forth below. Two of these types of proceedings are "direct" actions, in front of an investigating magistrate judge or a criminal court judge, respectively, wherein the Applicants are

parties to the action itself and will submit the evidence obtained in this proceeding directly to the relevant court. These types of actions are precisely what Mr. Sabatier described in his Declarations (the "Direct Crimnal Actions").

I have reviewed the Declaration of Mr. Prum, and I disagree with his contention that Applicants are not able to file any criminal actions. Furthermore, assuming that the evidence sought from Litai confirms the allegations at bar, I will personally be filing one of the "direct" criminal actions in Luxembourg on the Applicants' behalf.

I describe the reasons the Direct Actions, a criminal complaint with a civil claim for damages *(plainte pénale avec constitution de partie civile)*, or a proceeding as a direct party criminal jurisdictions by the way of a "**direct summons**" *(citation directe)*, may be filed by Applicants in detail below.

I also take objection to the statements by Mr. Prum indicating that the merits of the criminal allegations are insufficient to warrant prosecution. While it is of course true that many criminal cases are dismissed, the allegations in this case, supported by two former members of the Company's board of directors are very serious. I believe when the Direct Criminal Actions are filed, supported by evidence from Litai, that the Applicants' "private" criminal prosecution against JMP will absolutely move forward

**5.** **Criminal Proceedings**

    **5.1.** Public prosecution, reports and complaints

    **5.1.1.** Pursuant to article 1[1] of the Luxembourg Code of Criminal Procedure ("CCP"), **public prosecution** *(action publique)* for the enforcement of punishments is set in motion and conducted by magistrates or public officials to whom such prosecution is entrusted by law.

    Public prosecution can also be initiated by **the injured party** *(partie lésée)* of the crime under the conditions determined by CCP or special laws.

    **5.1.2.** Pursuant to article 16 CCP, **the public prosecutor** *(Ministère Public)* exercises public prosecution and requires the application of the law:

    The public prosecutor's office is (i) represented at both district courts: the one in Luxembourg and the other one in Diekirch; and (ii) composed by different independent magistrates each headed by a State Prosecutor *(procureur d'Etat)*, who are all under the authority of the General State Prosecutor *(procureur général d'Etat)*, according to article 20 CCP.

    **5.1.3** Pursuant to article 2 CCP, paragraph 2, **the civil claim for compensation for damages** *(action publique pour la réparation du dommage)* may be brought against the defendant and alleged perpetrator of the offense.

---

[1] Please note that all the articles from the CCP or other laws mentioned in this declaration are freely translated from French to English. .



**5.1.4.** Pursuant to article 3 CCP, paragraph 1, such action may be brought at the same time and before the same judges as the public prosecution, except if the latter is time-barred. In such case, the civil claim may be filed before the civil jurisdictions, which will examine the claim only from the mere civil liability aspects.

**5.1.5.** The law of 6 October 2009 strengthening the rights of victims of criminal offenses introduced a new article 4-1 in our CCP and the specific status of **"victim."**

The difference between an injured party (article 1 CCP) and the victim resides only in the fact that the latter is automatically informed if his complaint would be dismissed with the indication of the reason of such decision. Upon request, the victim is informed about the public prosecutor's decision to transfer the file to the investigating magistrate (*juge d'instruction),* and/or the summons against the alleged author of a crime to appear in front of the jurisdiction of the merits.

Every victim is an injured party who will acquire this specific status if the conditions set forth by article 4–1 CCP are given:

"*Art. 4-1 (1) Acquires the status of victim whoever claims to have suffered damage resulting from an offense.*

*(2) The complaint is made by written declaration, either personally or by counsel. The complaint indicates:*

*a) the full name, date and place of birth, profession and address of the complainant;*

*b) the event causing the damage suffered by the complainant;*

*c) the nature of the damage. The complaint is attached to the application.*

*(3) The victim has the right to be assisted or represented by a lawyer. She may attach to the file any document it considers useful. She is informed automatically in case the prosecution is dismissed and the reason of it, and, upon request, about the transfer of the file to the investigating magistrate (juge d'instruction), and about the summons against the alleged author of a crime to appear in front of the jurisdiction of the merits.*"

**5.1.6.** Any person who has not suffered a damage resulting from an offense will not be entitled to lodge a criminal complaint, but may make a **denunciation of a criminal offense** *(denonciation)* to the police or to the State Prosecutor. Such person will not be entitled to intervene in the criminal proceedings in order to lodge a civil claim, but may be summoned to appear as a witness. Any complaint addressed to the police, acting under the supervision and surveillance of the State Prosecutor, has to be communicated to the latter without any delay.

**5.1.7.** On the other hand, any person who suffered a damage resulting from an offense is entitled to lodge a **criminal complaint** *(plainte).* Such plaintiff has to describe the

factual elements together with the circumstances of time and place, which allow the recipient to understand whether these (i) may be qualified as a crime or offense according to Luxembourg penal code or special laws, (ii) are not time-barred, and (iii) are subject to the territorial competence of the Luxembourg jurisdictions. The plaintiff may also indicate all eventual evidence at his disposal and communicate the name of witnesses or even attach their affidavit in order to make it possible to progress successfully with the investigations. Such plaintiff could either act as a "victim" in compliance with the provisions of article 4 CCP, or as an injured party.

**5.1.8.** Such criminal complaint may be addressed directly to the public prosecutor's office or filed in front of the police who will make its report and communicate it to the State Prosecutor. The latter will review the report in order to decide whether to start an investigation or not, as pursuant to article 23 CCP he receives the complaints and denunciations and appreciates the follow-up of them *(Le procureur d'Etat reçoit les plaintes et les dénonciations et apprécie la suite à leur donner)*.

This article is the foundation of the **principle of 'the opportunity of criminal proceedings'** *(principe de l'opportunité des poursuites)*, according to which the State Prosecutor has a discretionary power to assess whether it is advisable to initiate prosecution or simply to drop the case if there is no sufficient evidence to identify the author of a crime, or if the alleged facts do not constitute a criminal offense, or because there is no territorial competence for criminal investigation and proceedings, or for any other reason.

**5.1.9.** Alternatively, the plaintiff and victim or injured party of a crime could either file a **criminal complaint with a civil claim for damages** *(plainte pénale avec constitution de partie civile),* or even act directly in front of the criminal jurisdictions by the way of a "***direct summons***" *(citation directe)* coupled with a civil claim for damages. This last possibility is only given for minor offenses *(contraventions)*, for correctional offendings or misdemeanour *(délits)* punished with imprisonment up to five years and/or fines from 251 EUR (minimum) up.

In case of felonies or crimes *(crimes)* punished with imprisonment from five years up and/or fines from 251 EUR (minimum) up, it is mandatory to proceed via an investigating magistrate.

**5.2.** Criminal Complaint with Civil Claim for Damages

**5.2.1.** Pursuant to article 56 CCP, any person who alleges to have suffered a prejudice because of a felony or misdemeanour may, by lodging a criminal complaint with civil action, claim damages in front of the investigating magistrate *(Toute personne qui se prétend lésée par un crime ou un délit peut en portant plainte se constituer partie civile devant le juge d'instruction competent)*.

By using the terms "*toute personne qui se pretend lésée par un crime ou un délit",* the Luxembourg legislature clearly states that **it is sufficient to allege a prejudice** at this



stage of the procedure.

**5.2.2.** After the deposit of such criminal complaint with a civil claim for compensation, *(plainte pénale avec constitution de partie civile)* the investigating judge orders that a bail *(caution)* for judicial costs has to be paid within a certain delay under penalty of inadmissibility of the claim.

Should such claim be declared inadmissible because of a default of payment, a new criminal complaint with a civil claim for compensation could be lodged, as long as there is no statute of limitation with regard to the offense.

If the bail has been paid within the fixed delay, the complaint together with the file is transferred to the State Prosecutor who has to request the opening of a criminal investigation. In this case, he has no discretionary power to decline the opening of a criminal investigation.

**5.2.3.** Should the investigating judge, who is independent and neutral, come to the conclusion that the investigation is complete, he will render a closing order of his investigation and transfer the file to the state Prosecutor. The investigating judge is a member of the judiciary and is distinct from the police or the State Prosecutor. When a criminal complaint is submitted to the investigating judge, it constitutes criminal proceedings where the plaintiff and victim is a party with specific rights defined and regulated by CCP.

**5.2.4.** Further to the closing order, the State Prosecutor then requests the Chamber of Counsel of the District Court *(chambre du conseil)* in the so called "*procédure de règlement*" to transfer the file in front of the "*Chambre Criminelle*" of the District Court in case of crimes or felonies, or in front of the "*Chambre Correctionnelle*" in case of misdemeanours, should he estimate that there are sufficient charges against the indicted. If not, he could request to dismiss the proceedings.

In this "*procédure de règlement,*" all the other parties, the indicted person and the civil claimer *(partie civile)* may submit their briefs to the Chamber of Counsel of the District Court. These three judges do not decide on the merits of the case, but have only competence to check whether there are sufficient charges against the indicted person so that the criminal proceedings could be continued on the merits in front of the "*Chambre Correctionnelle*" (misdemeanours) or "*Chambre Criminelle*" (felonies).

**5.2.5.** The decision of the Chamber of the District Court is subject to appeal by any of the parties: State Prosecutor, indicted person and the civil claimer *(partie civile)*.

The appeal is lodged in front of the Chamber of Counsel of the Court of Appeal who will have the final decision whether the proceedings will be continued in front of the jurisdiction of the merits or dismissed.

**5.2.6.** With regard to the civil claimer, it will be finally up to the jurisdiction of the merits to decide whether or not the alleged prejudice he pretends to have suffered is personal,

actual and a direct consequence of the offense and if so, to fix the compensation which is duly proven.

**5.3.** "Direct Summons"

**5.3.1** It may be useful for a better understanding that, according to Luxembourg law, any injured party who suffered damages may claim for compensation before civil jurisdictions and if the prejudice is caused by a crime or offense, it is then also possible to claim for damages before the criminal jurisdictions.

In such case, the civil claimer could intervene in criminal proceedings started by the State Prosecutor or initiate such proceedings personally and directly in front of the criminal jurisdiction via "direct summons" (*citation directe)*, a criminal complaint coupled with a civil claim for damages as mentioned before.

**5.3.2.** Pursuant to article 182 CCP, the civil claimer (*partie civile*) is entitled to summon directly the accused in front of the "*Chambre Correctionelle,"* which is the criminal jurisdiction having competences *rationae materiae* in misdemeanour matters.

**5.3.3** Pursuant to article 183 CCP, the civil claimer has to present in his summons the factual elements, and such summons are considered as a complaint.

**5.3.4** To be admissible to summon directly in front of the criminal jurisdictions, the claimer may allege to have personally suffered a prejudice which results from the offense, the object of the public prosecution.

He has to "argue" that he may have been the victim of an offense, a circumstance which the jurisdictions of the merits will appreciate sovereignly.

Regarding the admissibility of direct summons, it is sufficient that the prejudice is possible in order that the claim is admissible, even if the question of whether the claim for compensation is founded or not shall be examined with the merits.[2]

A moral interest is sufficient to make the direct summons admissible on the condition that it is personal and directly caused by the offense.

In order to get the claim declared admissible, the claimer needs to bring evidence that he has been injured in his person, his reputation, or his goods.[3]

**5.3.4.** It has to be stressed that in case of direct summons (*citation directe*), the claimer has the burden of proof.

Not only has he to bring evidence that the factual elements he considers as a misdemeanour have been committed by the accused defendant and that all circumstances of his criminal liability match, but he has also to prove that this offense

---

[2] R. THIRY, Précis d'Instruction Criminelle en Droit luxembourgeois ; T. I et II, n°223

[3] Sentence 575/2004 rendered on 12th February 2004 by the « Chambre Correctionnelle » of the Luxemburg District Court.



caused an actual and personal prejudice to him as a direct result from the offense.

As mentioned before, this prejudice can be financial, material, moral or reputational.

If the claimer brings the requested and necessary evidence which will be souvereignly appreciated by the judges of the merits, he will be successful with his proceedings.

**5.3.5.** As for the injured party or victim of an offense, it is not always easy or possible to bring all the requested evidence, and therefore it is quiet common to lodge a criminal complaint with a civil claim for damages as described under point 5.2.

Depending on the nature of the evidence obtained from Litai and the seriousness of the offenses, both a criminal complaint with a civil claim (determined by the magistrate judge as set forth in Mr. Sabatier's declaration) as well as a *"citation directe"* (direct proceeding in criminal court) are possible.

**6.** **Misuse of corporate assets**

**6.1.1.** The law of 21 July 1992, inspired from French law, introduced a new article 171 – 1 of the law of 10 August 1915 on commercial companies, as amended:

"*Shall be subject to a jail term of one to five years and a fine of "500 to 25,000 euros" or either one of these penalties, the legally appointed or de facto directors, who, in bad faith,*

- *will have made a use of the assets or the credit of the company which they knew was contrary to its interests, for personal purposes or for the benefit of another company or undertaking in which they were directly or indirectly interested in;*

- *will have made a use of the power they had or the votes they could cast, in that capacity, which they knew was contrary to its interests, for personal purposes or for the benefit of another company or undertaking in which they were directly or indirectly interested in.*"

**6.1.2.** Whether shareholders of the company may be considered as direct injured parties or victims of the misuse of company assets depends on the circumstances, and the evidence they may bring with regard to their personal and direct damage other than the one suffered by the company itself.

As mentioned before, such prejudice may be material, financial, reputational, or even moral.

In this case, it is clear to me that both Applicants can allege material, financial, reputational and/or moral damages in relation to the allegations against JMP. This will include not merely the act of purchasing and selling shares at wrongful prices, but also their reputational damages that will come from their associations with JMP and Acheron in Luxembourg and in London, as director of Acheron and advisor of Acheron



(London), respectively, or even a mere moral prejudice.

**6.1.3**. Even if it is correct to say, as Mr. Prum does, that the Chamber of Counsel of the Court of Appeal consistently reminds the following principle:

> *"For being admissible, the applicant of a criminal complaint including a complaint for compensation shall substantiate having suffered an actual and personal prejudice which shall directly result from the alleged criminal offense"* see Arrêt n0717114 2 octobre 2014 Chambre du Conseil de la Cour d'Appel de Luxembourg notice 34289113/CD).

it is, with regard to this subject, important to mention that the same judges dismissed recently an appeal lodged by an indicted person who asked the civil claims filed by different parties to be declared inadmissible, grounding their decision as follows:

> "*A distinction has to be made between the question regarding the admissibility of the civil claim (action civile) or of the party claiming civil damages in criminal proceedings (constitution de partie civile) with the one regarding the admissibility of the compensation request.*

> *A civil claim is not reduced to a compensation request. It has a mixed nature, civil and repressive. A party claiming civil damages in criminal proceedings (constitution de partie civile) may be admissible even if the request for compensation is not. In such case, the claim of the victim may validly be motivated by the sole intention to corroborate public prosecution. The right to introduce a civil claim for damages in criminal proceedings mainly aims to get public prosecution started in order to establish the author's culpability of the offense which caused a prejudice to the plaintiff regardless of the compensation of the damage".*

For these reasons, it is important to understand that the companion civil claims and the criminal prosecutions run on different tracks, and that the criminal action will move forward regardless of the outcome of the civil claims.

**6.1.4.** I also disagree with Mr. Prum's declaration for a number of reasons.

**6.1.4.1.** The Luxembourg criminal system generally maintains a particular criminal action structure that is simply different from the common law system – one in which the victim is far more of a party in the action as compared to one where only the state or government is involved.

Unlike what I understand to be the United States system, our State Prosecutor is a member of the magistrates under the Luxembourg division of power, as opposed to a mere representative of the state. As such, presenting before a State Prosecutor can be looked upon as akin to presenting directly to a judge in the United States.

**6.1.4.2.** The third type of criminal action, which Mr. Prum concedes is available to Applicants, is an action that derives from the filing of a formal complaint with the State

Prosecutor.

As emphasized, Applicants intend to pursue the "direct" action, but even if they would lodge a criminal complaint with the State Prosecutor, for which the latter would decline to open an investigation *(classement sans suite),* it is not correct to say the complainants have no further ability to request the commencement of a criminal investigation on the same facts.

Such a decision not to start criminal investigation and/or proceedings is nor a decision on the merits nor a final decision that would render criminal proceedings impossible and/or inadmissible.

This is why it is possible to write or even meet the magistrate in charge of the public prosecutor's office in order to get a favourable decision to set in motion public prosecution, by either stressing out or explaining certain points, or by producing complementary evidence.

Such decision is also subject to be appealed in front of the General State Prosecutor. Having authority over all the prosecution magistrates, the latter could order the State Prosecutor to prosecute.

**6.1.4.3.** With regard to the criminal complaint with a civil claim for damages that the Applicants are entitled to file, it also seems to me that Mr. Prum has too narrowly characterized the type of damage that must be alleged to the investigating magistrate judge and the criminal court.  As mentioned before, it has also to be stressed that *"an actual and personal prejudice which shall directly result from the alleged criminal offense"* may be material, financial, moral or reputational.

**6.1.4.4.** For these reasons, it is absolutely clear to me that the Applicants are not merely "interested persons" in respect of the Luxembourg criminal proceedings, but with respect to the two criminal complaint plus civil damages actions contemplated, are REAL PARTIES. As such, they have an active role and specific regulated rights, amongst which include the right to get public prosecution started in order to establish the author's culpability of the offense which caused a prejudice to them.

Dated: June 2, 2016,

Rosario GRASSO

**KLEYR | GRASSO | ASSOCIES**

Avocats à la Cour
31-33 rue Ste Zithe
(Immeuble Marivaux)
L-2763 Luxembourg
www.kckg.com

# EXHIBIT 39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

-------------------------------------------------------------x
                                       :

In re:                                :     Case No. 16 Misc. 60266

                                       :

FURSTENBERG FINANCE SAS and      :

MARC BATAILLON                 :

                                       :

REQUEST FOR DISCOVERY PURSUANT  :

TO 28 U.S.C. § 1782.                   :

-------------------------------------------------------------x

## DECLARATION OF ROMAIN SABATIER
## IN FURTHER SUPPORT OF APPLICANTS' MOTION TO COMPEL

I, Romain Sabatier, hereby declare as a duly authorized representative of the Luxembourg

law firm NautaDutilh Avocats Luxembourg S.à r.l., under penalty of perjury under the laws of the

United States of America, that the following is true and correct to the best of my knowledge and belief:

### Introduction

1.    I respectfully submit this Declaration in opposition to Litai Assets LLC's ("**Litai**" or

the "**Respondents**") motion to quash, and in further support of Applicants Furstenberg Finance SAS

and Marc Bataillon's (collectively, the "**Applicants**") motion to compel compliance with the

subpoenas for documents and deposition testimony of Litai that were served pursuant to an *Ex Parte*

Order of this Court issued February 9, 2016, authorizing discovery pursuant to 28 U.S.C. § 1782.

This Declaration is also in response to the declaration of Arendt & Medernach dated 12 May 2016

(the "**Second Beissel Declaration**") and the declaration of François Prum dated 11 May 2016 (the

"**Prum Declaration**" and, collectively with the Second Beissel Declaration, the "**Litai**

**Declarations**"). Terms not otherwise defined in this Declaration shall have the meaning ascribed to

them in the previous declarations of the declarant.

2.    I respectfully incorporate my previous declarations in this matter by reference herein.

As noted in those submissions, the primary purpose of the 1782 Application is to support criminal

proceedings in Luxembourg. Those contemplated proceedings will be filed by Applicants directly



before an investigating magistrate or the criminal court (the "**Direct Criminal Proceedings**"), not the State Attorney or police as the Litai Declarations contend, which is referred to hereinafter as a "**Denunciation**."

### *Applicants Can and Will File the Direct Criminal Proceedings*

3.      The Litai Declarations acknowledge that a Denunciation is possible, but claim that Applicants cannot file the Direct Criminal Proceedings. The Litai Declarations are intentionally deceptive and incomplete in relation to their statements of the law, which is why their conclusions are simply incorrect.

4.      The Litai Declarations incorrectly contend that Applicants do not have standing to pursue any civil claim in respect of the criminal offence of abuse of corporate assets because, as minority shareholders, they do not have an actual, personal and direct damage. The Litai Declarations argue that the mere loss of value in the shares of the Applicants is not considered under Luxembourg law as a personal and direct damage, but a damage suffered by Acheron Portfolio Corporation Luxembourg S.A. ("**APC**") as a company. Whilst that is correct as a general proposition, they have not considered the various claims that are available to Applicants that will support Direct Criminal Proceedings, which is, once again, the primary purpose of this discovery exercise.

5.      First, under Luxembourg law, "any person who alleges to have suffered a damage as a result of a crime or an offence" may claim damages before the investigating magistrate (see article 56 of the Luxembourg Code of Criminal Procedure). By using the term "any person who alleges to have suffered a damage as a result of a crime or an offence," it is unquestionable that the Luxembourg legislator intended that it was sufficient to allege a damage at this stage of the proceedings.

6.      Second, the damage suffered does not have to be financial, but may also well be economic, moral or reputational. A moral damage is also admissible on the condition that it is personal and directly caused by the crime or the offence (*see declaration of Mr. Rosario Grasso*).

2



7.      Neither the Applicants nor I ever alleged that the damage they suffered was purely financial. Rather, it was simply stated that criminal proceedings, to wit the Direct Criminal Proceedings, were the primary purpose of the discovery sought.

8.      In this case, it is clear and obvious that Applicants have suffered economic, moral and reputational damages in relation to the crimes committed by JMP. These damages arise not only as a result of their trading in APC shares on behalf of clients, but also due to the significant former relationships between APC and the Applicants. To wit, Erich Bonnet is a former APC board member, while Marc Bataillon was formerly an advisor to JMP with respect to Acheron (London).

9.      Under the circumstances, and as Mr. Grasso concurs in his declaration, there is absolutely no question that the Direct Criminal Proceedings may be filed. Moreover, Mr. Grasso, current president of the Luxembourg Bar Association and a criminal law specialist, will be acting for Applicants in relation to the filing.

10.     Next, contrary to the Litai Declarations' contentions, the Applicants' Direct Criminal Proceedings will be admissible provided the Applicants bring sufficient factual elements to support the existence of a criminal offence, without consideration at this stage to the admissibility of the Applicants' potential civil claims.

11.     In this respect, the Litai Declarations omit two more crucial details. First, any liability under the civil claim is a question of fact to be assessed by the Luxembourg courts and the nature, materiality and evidence of said damage cannot be pre-judged by the Respondents or discussed in this Declaration. At this early stage of proceedings, the allegations of harm as set forth herein are more than sufficient to bring and continue the Direct Criminal Proceedings.

12.     Second, it is important to understand that the companion civil claims and the criminal prosecutions run on different tracks, and the criminal action will move forward regardless of the outcome of the civil claims (*see item 6.1.5 in the declaration of Mr. Rosario Grasso*).

13.     Luxembourg criminal law is applied for the benefit of society and will not depend on the capability of the claimant to demonstrate a personal and direct damage. Restrictions in this

3



respect will never impact the ability of a criminal case to be brought to court as long as a criminal offence can be established.

14.    Article 57 (3) of the Luxembourg Code of Criminal Procedure provides for the grounds to reject a complaint with an immediate application for civil damages, and these do not relate to the existence or not of a criminal offence. In no manner can the admissibility of a civil complaint can have an influence on the admissibility of the criminal complaint. This is because any criminal prosecution is in the interest of society as a whole and not necessarily linked to private interests. For example, if during an investigation, an alleged perpetrator is found to have committed a serious crime, there is no question that his criminal prosecution would go ahead, irrespective of whether the civil claim of an applicant linked to the case succeeds.

15.    For these reasons, the (intentional) confusion made in the Litai Declarations between the admissibility of a criminal complaint and the admissibility of a civil claim is utterly misleading.

## *The Criminal Merits*

16.    I also take objection to the statements made in both Litai Declarations indicating that the merits of the criminal allegations are insufficient to warrant prosecution, and I concur with the conclusion in the declaration of Mr. Rosario Grasso (*see item 4 in declaration of Mr. Rosario Grasso)* that the Applicants' criminal prosecution against JMP will absolutely move forward when their actions are filed and supported by the evidence from Litai. Once again, this opinion holds regardless of whether any companion civil claims of the Applicants move forward or are dismissed.

17.    Sufficient elements show that there has been a misuse of APC's corporate assets which warrant the engaging of a criminal investigation. The existence of factual elements demonstrating a possible criminal offence will inevitably lead to the commencement of criminal investigations (*action publique*).

18.    On the merits, the Litai Declarations effectively make three arguments. First, they contend that because JMP was not a board member of APC when the Litai contract was first negotiated, there can be no crime. Second, they contend that JMP could have recused himself in respect of the Litai contract renegotiation for reasons other than a concealed ownership (but fail to

4

79004176 M 18799841 / 1



state what that reason is). Third, they presume such recusal was effected, when some of the precise issues in this case is whether he covertly acted on behalf of Litai in such renegotiations.

19.     I refer the Court to my previous Declarations in which I demonstrated the continuing obligation of disclosure in detail. The Litai Declarations do not meaningfully rebut this.

20.     As to the contract renegotiations, the Litai Declarations do not contest that if JMP was the covert owner of Litai, then his failure to disclose this fact during the negotiations was a crime – regardless of whether he allegedly recused himself for "other reasons."

### *A Denunciation is not Accurately Described as a "Police Report"*

21.     Finally, I believe that the Litai Declaration have mischaracterized the third type of criminal action - which is distinct from the two types of Direct Criminal Proceedings that will be filed - as a "Police Report."

22.     Once again, I stress that Applicants will be filing Direct Criminal Proceedings, and therefore this section is simply to address the mischaracterizations of the Denunciation in the Litai Declarations, assuming *arguendo* that Applicants were to file a Denunciation.

23.     The hasty conclusion of the Litai Declarations is that if the Denunciation is filed in relation to the abuse of corporate assets committed by JMP, the action should surely go unpunished.

24.     This light-hearted conclusion is not likely. The argument of JMP's (or perhaps Litai's) choice of Luxembourg criminal counsel does not comport with the assertion that the criminal charges are frivolous (quite the opposite). While it is true than many reported crimes are not prosecuted, Luxembourg is a corporate capital of the world and takes corporate crime very seriously. Both Mr. Grasso and I are in concurrence that whichever of the three criminal actions is filed, either the Direct Criminal Proceedings or the Denunciation, the matter will be prosecuted.

25.     Next, the analogy of a Denunciation to a "Police Report" in the United States is inaccurate. The Luxembourg criminal system generally maintains a particular criminal action structure that is simply different from the common law system – one in which the victim is far more of a party in the action as compared to one where only the state or government is involved.

5



26.     Moreover, unlike in the United States, the prosecutor is a member of the judiciary. Once again, the prosecutor to whom a Denunciation can be made is a judge in the Luxembourg judicial system, and therefore a member of the magistrates under Luxembourg division of power, as opposed to a mere representative of the state. Although their roles are similar in many respects, the public prosecutor in Luxembourg cannot be compared to the district attorney in the United States because their statuses are different. As such, presenting before a public prosecutor in Luxembourg is far more analogous presenting directly to a judge in the United States.

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under the laws of the United States of America this 1st day of June 2016.

Romain Sabatier

NautaDutilh Avocats Luxembourg S.à.r.l.
2, rue Jean Bertholet
L-1233 Luxembourg

6

# EXHIBIT 40

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 16-mc-60266-Bloom

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON,

                              Applicants.

_____/

### DECLARATION OF MARC BATAILLON IN FURTHER SUPPORT OF
### APPLICANTS' CROSS-MOTION TO COMPEL

      I, Marc Bataillon, hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

### Introduction

      1.     I respectfully submit this Declaration in further support of Applicants Furstenberg Finance SAS and Marc Bataillon's (collectively, the "**Applicants**") cross-motion to compel compliance with the subpoenas for documents and deposition testimony of Litai Assets LLC ("**Litai**") [D.E. # 16] that were served pursuant to an *Ex Parte* Order of this Court issued on February 9, 2016 that authorized discovery pursuant to 28 U.S.C. § 1782 [D.E. # 7].

      2.     As an initial matter, I am in complete agreement with and incorporate by reference paragraphs 3-6 and 9-25 of the Declaration of Erich Bonnet (the "**Bonnet Declaration**").  I do not wish to burden the Court with additional, identical information and opinions.  Suffice it to say, this action is absolutely undertaken in good faith, the Applicants have been upfront and direct at all times with this Court, and I urge the Court to carefully review the language used by Litai's Declarants in virtually all components of its opposition, as I believe it to be deceptive and misleading at nearly every turn.

      3.     Furthermore: (i) I solemnly undertake to preserve the confidentiality of any and all discovery obtained in this action until the Luxembourg criminal action is filed; and (ii) I undertake to

file the Luxembourg criminal action within 45 days of the completion of discovery in this matter or otherwise destroy all information obtained and further preserve its confidentiality.

4.       With these safeguards in place, I respectfully submit that it is not even possible for this discovery exercise to take place for any purpose other than in support of Luxembourg criminal proceedings.  I further submit that Litai's crocodile tears in relation to Jean-Michel Paul ("**JMP**") are completely unfounded.  Rather, Litai's curiously vigorous opposition to this simple discovery request is a desperate appeal by JMP to prevent evidence of his criminal actions from being produced to the Luxembourg criminal court.  Moreover, it is ironic that his control over Litai is both the precise crime in question and the mechanism of Litai's opposition here.

5.       Whereas many inaccuracies of the Litai opposition are covered in the accompanying Bonnet Declaration, I simply take this opportunity to both correct the record and present a few facts within my personal knowledge to the Court.

6.       First, I never physically threatened any employee of Acheron Capital Limited ("**ACL**") or anyone else, and I have never used physical violence against anyone.

7.       Second, I repeat my allegation that JMP controls the board of Acheron Portfolio Corporation Luxembourg S.A. ("**APC**").  I believe the statement was truthful then and I believe it is truthful now.

8.       Third, in relation to the "Mariah" litigation referenced in JMP's latest declaration (D.E. # 21-3, at ¶¶ 15-16 ), he omitted the only relevant fact.  I, via a special purpose vehicle called MYW Assets Ltd. ("**MYW**"), provided funding to conduct the Mariah litigation.  The funding contract (attached hereto as Exhibit A), <u>expressly</u> provided MYW an option to purchase the entire project for a price equal to 10% of the net profits, an option which MYW exercised (attached hereto as Exhibit B).  Moreover, once the option was exercised, it was ACL (100% owned by JMP) that acted in a fundamentally dishonest fashion by representing to the court-appointed liquidators that it owned the Mariah interests <u>after</u> the option had been exercised, which necessitated the involvement of legal counsel.  A true and correct copy of a letter sent by legal counsel is attached hereto as Exhibit C.  It is true that MYW did not profit as a result of the Mariah transaction, but this was not

JMP's fault.  It was simply an investment that did not profit – a risk and circumstance I am always willing to live with when the playing field is fair.  Additionally, I take this opportunity to note that I was made aware of the untrue contents of an email authored by Mr. McNaughtan, and immediately responded to that fictitious account of our conversation.  A true and correct copy of this response is attached hereto as Exhibit D.

9.      Fourth, I did make a complaint to the UK Financial Ombudsman Service when ACL (100% owned by JMP) refused to honor my redemption request from the Natural Risk Fund (a fund that ACL used to manage and which has now been liquidated), despite the fact that the fund was only holding cash.  I should also note that JMP was a shareholder of Deltec Bank & Trust, the custodian bank of the Natural Risk Fund, and I believe that JMP exercised his influence at that bank and with the fund's administrators so that my redemption request would be delayed.  I believe that complaint was justified under the circumstances.  Moreover, JMP provides only self-serving documents written by ACL in support of his contention that my complaint to the UK Financial Ombudsman Service did not have merit, rather than any such document from the Ombudsman Service itself.  There is good reason for this.  My complaint absolutely had merit, and when I finally received my entitled redemption, the complaint was simply mooted.

10.     Like Mr. Bonnet, I would ask this Court to carefully consider paragraphs three and four above, and consider how JMP and Litai's opposition omits the most crucial of details.

11.     The same applies in relation to JMP's contentions in paragraph 19 of his latest declaration. [D.E. # 21-3]

12.     As Mr. Bonnet has forthrightly admitted, as do I, there is litigation pending between myself and JMP, including entities controlled by him.   I would never condone or request any activity or settlement of that dispute, which is illegal.  In connection with that civil dispute, I have requested that my shares in Ahmose SA ("**Ahmose**") be purchased by JMP as a resolution of that litigation that would provide efficiencies to both sides in a way that a simple cash deal would not.  However, I understood then and understand now that this is a perfectly lawful transaction.  Indeed, precisely in connection with the Ahmose board of directors dispute that is discussed in the Bonnet Declaration in

detail, the entity Tomson Pte Ltd. acquired shares in Ahmose at a significant premium to the market price as part of JMP's efforts to undo the board reconstitution, which effort further culminated in the Luxembourg court denying JMP's petition to appoint an external administrator over Ahmose. If I was to ever receive information that a share-premium transaction was not lawful, I would never pursue the same.

13.     Clearly, there is a history of business and civil disputes between the parties, but none of that is relevant to this action. It does not mean that JMP has not committed a crime in relation to APC and Litai, or that I am not entitled to bring a criminal complaint against JMP in the Luxembourg criminal court as a former APC shareholder.

14.     The sole purpose of this action is to obtain evidence in support of that criminal proceeding, which as noted above will be filed in the immediate future. Given the safeguards that Applicants have volunteered (and any additional safeguards this Court deems appropriate), there can be no misuse of the discovery requested.

15.     Finally, I make this Declaration to sponsor three pieces of information that I believe the Court will find relevant to this Application. First, I attach hereto as Exhibit E a PowerPoint presentation disseminated by ACL (100% owned by JMP), which describes ACL as having five employees in Florida (i.e. at Litai) and asserts that one of the funds that ACL manages is, curiously, called Litai Properties. Second, I attach hereto as Exhibit F and G two documents which I found on the website of the Florida Secretary of State. Exhibit F is a 2013 Foreign Limited Liability Company Annual Report for a company called Neptune Assets, LLC ("**Neptune**"), which lists a principal place of business at 1180 SW 36th Avenue, Ste 100, Pompano Beach, FL 33069, and which is managed by JMP. In this document, JMP listed his address as being the same as Neptune. It should be noted that this address was the address out of which Litai operated at the time. Exhibit G is an Affidavit By Foreign Limited Liability Company To Change Manager(s) or Managing Member(s). This document shows that, as of 21 October 2013, Jan-Eric Samuel ("**JES**") took over from JMP as manager of Neptune and that all correspondence regarding the manager change at Neptune was to be directed to Mr. Oral Beason at ***Litai Assets LLC***, 1180 SW 36th Avenue, Ste 100, Pompano Beach, FL 33069. It

4

should be noted that Mr Beason is currently listed on Litai's website as Litai's chief legal officer. Third, I note that both JMP and JES have been listed as covert beneficial owners of offshore entities in connection with the Panama Papers disclosures. *See, e.g.,*

https://offshoreleaks.icij.org/nodes/12039003 (information on JES' involvement in the Panama Papers); https://offshoreleaks.icij.org/nodes/12098853 (information on JMP's involvement in the Panama Papers). While this would be meaningless in a vacuum, within the context of this Application it does serve to demonstrate that both JMP and JES have actual knowledge and experience in relation to the concealment of ownership interests.

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under the laws of the United States of America this 2nd day of June, 2016.

_____

Marc Bataillon

Case 1:18-mc-00044-JGK   Document 4-2   Filed 02/06/18   Page 95 of 155

# EXHIBIT A

Execution Version



## Acheron Capital Ltd
1 Great Cumberland Place
London W1H 7AL
United Kingdom

MYW Assets Ltd
Geneva Place, Waterfront Drive
P.O. Box 3469, Road Town,
Tortola, British Virgin Islands

June 25, 2012

Dear Sirs,

As you are aware, Acheron Capital Limited, a company incorporated in England ("**we**", "**us**" or "**our**"), in reliance upon, among other things, the promise of MYW Assets Ltd, a British Virgin Islands company ("**you**"), to bear or reimburse us for certain costs and expenses in connection therewith, purchased and acquired from certain holders of Series 2010-1 Principal At-Risk Variable Rate Notes due January 8, 2014 that were issued by Mariah Re Ltd (ISIN US566631AA54) (the "**Notes**") and were redeemed on or about February 29, 2012 all of such holders' rights, title and interests to the Notes (including without limitation any accrued and unpaid interest thereon) and under the Indenture dated as of November 15, 2010 among Mariah Re Ltd, Deutsche Bank Trust Company Americas and Deutsche Bank AG, London Branch (the "**Indenture**") and the Basic Documents (as defined in the Indenture) and all affiliated rights arising thereunder, including without limitation (i) all claims, actions, demands and rights against third parties pursuant to any contract or under any representations, warranties, covenants, conditions, guarantees, indemnities or duties, based upon, arising out of or relating to the Notes, the Indenture and the Basic Documents (including without limitation any rights pursuant to Section 5.8 (*Restoration of Rights and Remedies*) or other provisions under the Indenture and any claims that such holders had arising out of or relating to (x) the transfer to and/or possession of the Notes' principal by American Family Mutual Insurance Company or any of its affiliates, or (y) any and all wrongful conduct engaged in or acquiesced by ISO Services, Inc., AIR Worldwide Corporation or other third parties or any of their affiliates that furthered, facilitated or permitted the transfer of the Notes' principal to American Family Mutual Insurance Company), (ii) the benefit of all sums to which such holders may have been entitled from the issuer of the Notes, insurers or other third parties under the Indenture or the Basic Documents or in respect of the Notes, whether by contract or pursuant to any loss or damage based upon, arising out of or relating to the Notes, and (iii) all of each such holder's or its affiliates' right to obtain proxies or other authorizations from the Depositary Trust Company, its participants, any applicable custodian banks or other persons to exercise any rights of a holder or take any other actions which a holder is entitled to take under the Indenture, the Basic Documents or the Notes (collectively, the "**Rights**"). Your promise to bear or reimburse us for these costs and expenses was made in reliance upon our promise to execute and deliver a letter agreement addressing the matters herein addressed by no later than July 1, 2012. We are

80037806v11
25681.50001



executing and delivering this letter agreement in satisfaction of our promise and to set forth our agreement and understanding relating to such matters.

You hereby agree to bear directly, or reimburse us for, in an aggregate amount not to exceed US$3,000,000 (the "**Cap**"), (i) all costs and expenses, including without limitation legal fees and expenses and brokerage fees, relating to the purchase and acquisition of the Rights by us, and (ii) all legal costs and expenses relating to any litigation, arbitration and/or other proceedings commenced by us or on our behalf against Mariah Re Ltd and other third parties (the "**Proceedings**") relating to or in connection with the Notes and their redemption, including without limitation the costs and expenses of Dickstein Shapiro LLP and Watson, Farley & Williams (New York) LLP. You will reimburse us for all such costs and expenses within one week of receipt of a written request for such reimbursement.

You will establish with us a US$100,000 retainer against which we will have access and are permitted pay all such costs and expenses, if necessary. The retainer will be held by us in a commercial bank account and may be commingled with other of our funds. To the extent that any such costs and expenses are drawn against the retainer, at our request, you agree to promptly remit additional sums up to the initial amount of the retainer (unless and until you have paid an aggregate amount of such costs and expenses that equals the Cap). When there has been a conclusion, judgment, award or settlement of the Proceedings, and all such fees and expenses have been paid, we will return to you any remaining amounts in the retainer.

From any settlement, judgment, award or other cash payment we receive from the conclusion, judgment, award or settlement of the Proceedings commenced by or on behalf of us, we will first deduct (x) any payments that we are obligated to pay to third parties in accordance with profit sharing agreements entered into with them relating to the Proceedings and (y) amounts reimbursable or otherwise payable to us by you pursuant to this letter agreement, and we hereby agree to pay any amounts remaining from such settlement, judgment, award or cash payment after the deductions to you as follows:

1.  we will pay you until you receive an aggregate amount equal to all of the costs and expenses you incurred relating to the purchase and acquisition of the Rights by us and all legal costs and expenses relating to the Proceedings, including any amounts you previously reimbursed to us pursuant to this letter agreement, and

2.  in addition to any amounts provided in subparagraph 1 above but only after you first recoup one hundred percent (100%) of your costs and expenses referenced in such subparagraph, we will then pay you an amount equal to 90% of all such remaining cash amounts.

For the avoidance of doubt, if there is no cash remaining from any settlement, judgment, award or other cash payment we receive from the conclusion, judgment, award or settlement of the Proceedings after the deductions referenced above, then no payment shall be made by us to you.

Without limiting the foregoing, you hereby agree that any amounts owing to us hereunder, including but not limited to any of your indemnification or reimbursement obligations hereunder, may be offset against any amounts we may owe you pursuant to the foregoing paragraph. Such right of set-off shall be separate and apart from any and all other rights and remedies we or our indemnified parties may have against you or your successors hereunder, at law, in equity or otherwise.

2

25681.50001

You hereby also agree to indemnify us, our employees, officers and agents (other than you) and keep us and them indemnified against any costs, claims, demands or proceedings made or threatened by any person and in any way arising from the purchase of the Rights, any Proceedings or our or their conduct pursuant to this letter agreement, unless due to the willful default, gross negligence or fraud on the part of us or our employees, officers or agents (other than you). Without limiting the foregoing sentence, neither we nor our employees, officers or agents (other than you) shall have any liability to you for any loss, costs or damages that may arise in connection with the purchase of the Rights, or of any Proceedings or our or their conduct pursuant to this letter agreement, unless due to the willful default, gross negligence or fraud on our or their (other than your) part.

For the avoidance of doubt, you hereby acknowledge that you will bear all costs and expenses in connection with the negotiation of and entry into this letter agreement by all parties hereto.

We hereby grant to you an irrevocable option to purchase from us all of the Secured Property (as defined below), subject to the terms and conditions of this paragraph. You may exercise this option in full but not in part by delivering a written notice to us at any time on or after the date hereof. The aggregate purchase price to be paid by you to us in connection with the exercise of this option shall be an amount equal to 10% of the net profits of any settlement, judgment, award or other payment you receive following the date of your purchase of the Secured Property from the conclusion, judgment, award or settlement of the Proceedings commenced by or on behalf of us. You hereby acknowledge and agree that except for our returning any unused amounts in the retainer, no other amounts will be payable by us to you in connection with your exercise of this option and that the provisions of this letter agreement shall remain in full force and effect following such exercise, including without limitation your indemnification or reimbursement obligations hereunder.

To secure the prompt and complete payment and performance of all of our obligations to you hereunder, we hereby grant you security interest in all of our right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired, wherever located, and whether now or hereafter existing or arising: (i) the Rights; (ii) the Notes; (iii) all general intangibles and instruments related to the Rights or to the Notes; and (iv) all accessions to, substitutions for and replacements, proceeds, insurance proceeds and products of, and all profits relating to, the foregoing, together with all books and records, litigation files and related documentation, computer files, programs, printouts and other computer materials and records related, and all rights now or hereafter existing in and to all supporting obligations for, in and to the foregoing property (collectively, the "**Secured Property**"). We hereby authorize you to file one or more financing statement(s) or other documents evidencing the foregoing security interests in the appropriate offices and locations; provided that if you exercise the option set forth in the foregoing paragraph, you shall promptly terminate all such financing statements. Terms defined in Article 9 of the Uniform Commercial Code as in effect, from time to time, in the State of New York are used in this paragraph as such terms are defined in such Article 9 of the Uniform Commercial Code.

THIS LETTER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE WHOLLY PERFORMED IN SUCH STATE WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE

3

25681.50001

APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION OTHER THAN THE STATE OF NEW YORK.

We and you hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court sitting in the County of New York, New York over any dispute arising out of or relating to this letter agreement or any of the transactions contemplated hereby and each of us and you hereby irrevocably agree that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts. We and you hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. We and you agree that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. We and you consent to process being served by any party to this letter agreement in any suit, action or proceeding in New York by the mailing of a copy thereof by certified mail in accordance with the provisions of the following paragraph of this letter agreement.

All communications under this letter agreement shall be in writing and shall be deemed given when delivered in person or mailed by certified mail, return receipt requested, to us or you, as applicable. If to us, then all communications shall be sent to Acheron Capital Ltd, at the address of the top of the first page of this letter agreement, Attention: Dr Jean-Michel Paul, or via electronic email to jpaul@acheroncapital.com. If to MYW Assets Ltd, then all communications shall be sent to the address of MYW Assets Ltd set forth on the first page of this letter agreement, or via electronic mail to bataillon@hotmail.com. Notices so given shall be effective upon the earlier of (i) receipt by the party to which notice is given and (ii) the fifth day following mailing.

All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

This letter agreement is not assignable unless agreed by all other parties hereto and any rights, remedies, obligations or liabilities under or by reason of this letter agreement shall only inure to the benefit of us and you and us and your permitted successors and assigns. Nothing herein, whether express or implied, is intended to or shall confer upon any person other than the parties hereto any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this letter agreement.

We and you hereby agree that we and you shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as we or you may reasonably request in order to carry out the intent and accomplish the purposes of this letter agreement and the consummation of the transactions contemplated hereby.

*[Signature Page Follows]*

4

80037806v11

25681.5000

Please confirm that the foregoing is in accordance with your understanding and agreement with us by signing the duplicate copy of this letter agreement and returning it to the undersigned (which may be in electronic form), thereby constituting this a binding agreement between us.

**ACHERON CAPITAL LIMITED**

By: _____
Name:  Jean-Michel Paul
Title:   Director

Accepted and agreed as of the
date first set forth above:

**MYW ASSETS LTD**

By: _____
Name:  Marc Bataillon
Title:   Director

5

Please confirm that the foregoing is in accordance with your understanding and agreement with us by signing the duplicate copy of this letter agreement and returning it to the undersigned (which may be in electronic form), thereby constituting this a binding agreement between us.

**ACHERON CAPITAL LIMITED**

By: _____
Name: Jean-Michel Paul
Title: Director

Accepted and agreed as of the
date first set forth above:

**MYW ASSETS LTD**

By: _____
Name: Marc Bataillon
Title: Director

5

# EXHIBIT B

**MYW Asset Ltd**
**Geneve Place, Waterfront Drive**
**PO Box 3469, Road Town**
**Tortola, British Virgin Islands**

Acheron Capital Ltd.
1 Great Cumberland Place
London
W1H 7AL
United Kingdom

By courier and e-mail

26 July 2013

Dear Sirs,

### Re: Agreement with Acheron Capital Ltd

We refer to our letter agreement with you dated 25 June 2012 (the **Funding Agreement**).

We hereby exercise our option to purchase all of the Secured Property (as defined in the Funding Agreement) in accordance with the terms set out in the Funding Agreement. This letter serves as our written notice as required pursuant to the Funding Agreement.

Please confirm the sum of any unused retainer which will be returned to us in accordance with the Funding Agreement.

Upon completion of the transfer of the Secured Property to us, we will terminate any financing statements in accordance with and as anticipated by the Funding Agreement. Following completion of the transfer of the Secured Property, the Funding Agreement shall terminate.

We look forward to discussing with you the mechanics for transferring the Secured Property to us.

Please note that the e-mail address for correspondence as set out in the Funding Agreement has changed to contactus@ims.ky. Please address all e-mail correspondence to this address.

Please acknowledge receipt of this letter.

Yours faithfully,

GARY BUTLER
Director.
**N.D. Nominees Ltd**
for and on behalf of
**MYW Assets Ltd**

# EXHIBIT C



Proskauer»  Proskauer Rose LLP  One International Place  Boston, MA 02110-2600

October 17, 2013

**VIA FEDEX & EMAIL**

Timothy W. Mungovan
Member of the Firm
d 617.526.9412
f 617.526.9899
tmungovan@proskauer.com
www.proskauer.com

John Kissane, Esq.
Watson, Farley & Williams LLP
1133 Avenue of the Americas
New York, NY 10036
jkissane@wfw.com

Re:     *Mariah Re Ltd (in Liquidation) v. American Family Mutual Ins. Co.*

Dear Mr. Kissane:

Proskauer Rose LLP represents MYW Assets Ltd. ("MYW"). We understand that you represent Acheron Capital Ltd. ("Acheron").

We are writing with regard to the letter from Carlo Toller, at Acheron, to Jess Shakespeare, at Kinetic Partners (Cayman) Limited ("Kinetic"), dated August 13, 2013, a copy of which is enclosed. As you know, Mr. Shakespeare and his colleague, Geoff Varga, are the joint liquidators of Mariah Re Ltd. ("Mariah"). In his letter to Mr. Shakespeare, Mr. Toller states that Acheron "holds approximately 57% of the outstanding interests in the notes issued by Mariah." Mr. Toller's statement is not accurate and appears intended to mislead the joint liquidators.

As Acheron knows, MYW and Acheron entered into an agreement dated June 25, 2012 (the "Funding Agreement"). Under the terms of the Funding Agreement, Acheron granted to MYW an irrevocable option (the "Option") to purchase from Acheron "all of the Secured Property" as that term is defined in the Funding Agreement. The Secured Property certainly includes, but is not limited to, the "57% of the outstanding interests in the notes issued by Mariah" that Mr. Toller referenced in his letter.

MYW exercised the Option and provided written notice of this action to Acheron by letter dated July 26, 2013 (the "Notice Letter"), in accordance with the Funding Agreement. We have enclosed a copy of the Notice Letter. Accordingly, pursuant to the terms of the Funding Agreement, as of July 26, 2013, MYW (not Acheron) was the owner of the Secured Property, including, but not limited to, the so-called "57% of the outstanding interests in the notes issued by Mariah." As the owner of the Secured Property, MYW is entitled to receive directly any payments on the interests that comprise the Secured Property. *See* N.Y. U.C.C. Law § 9-607.

Given these facts, it appears that Acheron is tortiously interfering with MYW's interest in the Secured Property. At the time that Mr. Toller sent his letter to Mr. Shakespeare, Acheron knew that: (i) MYW had exercised its option to purchase the Secured Property; (ii) MYW was the owner of the Secured Property; and (iii) Acheron had no rights in the Secured Property.



John Kissane
October 17, 2013
Page 2

Nevertheless, Acheron falsely held itself out to the liquidators of Mariah as the owner of the Secured Property.

Based on Mr. Toller's letter and other actions and conduct of Acheron, MYW believes that Acheron held itself out as the owner of the Secured Property in order to interfere wrongfully with MYW's ownership interest in the Secured Property. Accordingly, MYW demands that Acheron cease and desist holding itself out as the owner of the Secured Property or otherwise taking any action that is inconsistent with and/or detrimental to MYW's ownership interest. Furthermore, MYW demands that Acheron abide by the terms of the Funding Agreement, and satisfy all of its obligations thereunder.

If Acheron continues its wrongful conduct, including but not limited to interfering with MYW's ownership of the Secured Property, MYW is prepared to take all steps necessary to protect its interests in the Secured Property. MYW will seek its costs and expenses, including its attorneys' fees, in connection with its efforts to enforce the Funding Agreement and collect payments with respect to the Secured Property. *See* N.Y. U.C.C. Law § 9-607(d).

Please do not hesitate to contact me with any questions or to discuss further.

MYW reserves all of its rights.

Very truly yours,

Timothy W. Mungovan

Enclosures



**Acheron Capital Ltd.**
*1 Great Cumberland Place*
*Sixth Floor, Suite 2*
*London W1H 7AL*

August 19, 2013

Via E-mail: jess.shakespeare@kinetic–partners.com

Kinetic Partners (Cayman) Limited
42 Church Street, 1st Floor
The Harbour Centre,
PO Box 10387,
Grand Cayman KY1-10004
Cayman Islands

Attn: Jess Shakespeare

**Re: Mariah Re Ltd (in Liquidation) v. American Family Mutual Ins. Co.**

Dear Jess:

It was a pleasure meeting with you earlier in the week. We are pleased that you and Geoffrey Vargas are acting as the liquidators of Marian Re Ltd. ("Mariah") in the above case.

As you know, Acheron Capital Limited ("Acheron") holds approximately 57% of the outstanding interests in the notes issued by Mariah. It is our understanding that the liquidators of Mariah will be acting in the best interests of those holding an interests in these notes. Please let us know if this is not the case. Kindly also keep Acheron informed about the progress of the litigation on the notes and any other developments.

Best regards,

Acheron Capital Limited

By: _____
Carlo Toller

Acheron Capital Limited is authorised and regulated by the Financial Conduct Authority, registered number 443685 and is a Company registered in England and Wales, number 5588630. Registered Office: 20-22 Bedford Row, London WC1R 4JS.

**MYW Asset Ltd**
**Geneve Place, Waterfront Drive**
**PO Box 3469, Road Town**
**Tortola, British Virgin Islands**

Acheron Capital Ltd.
1 Great Cumberland Place
London
W1H 7AL
United Kingdom

By courier and e-mail

26 July 2013

Dear Sirs,

**Re: Agreement with Acheron Capital Ltd**

We refer to our letter agreement with you dated 25 June 2012 (the **Funding Agreement**).

We hereby exercise our option to purchase all of the Secured Property (as defined in the Funding Agreement) in accordance with the terms set out in the Funding Agreement. This letter serves as our written notice as required pursuant to the Funding Agreement.

Please confirm the sum of any unused retainer which will be returned to us in accordance with the Funding Agreement.

Upon completion of the transfer of the Secured Property to us, we will terminate any financing statements in accordance with and as anticipated by the Funding Agreement. Following completion of the transfer of the Secured Property, the Funding Agreement shall terminate.

We look forward to discussing with you the mechanics for transferring the Secured Property to us.

Please note that the e-mail address for correspondence as set out in the Funding Agreement has changed to contactus@ims.ky. Please address all e-mail correspondence to this address.

Please acknowledge receipt of this letter.

Yours faithfully,

GARY BUTLER
Director.
**N.D. Nominees Ltd**
for and on behalf of
**MYW Assets Ltd**

Case 1:18-mc-00044-JGK   Document 4-2   Filed 02/06/18   Page 109 of 155

# EXHIBIT D

**Marc Bataillon**
**20 Eaton Place**
**London SW1X 8AE**

Mr Andrew Hutcheon
Watson, Farley & Williams
15 Appold Street
London EC2A 2HB

15 October 2013

**By email**

Mr Hutcheon :

I acknowledge receipt of your letter dated October 14, 2013 to which I respond.

My recollection of the conversation I had with Mr McNaughtan is very different from what you allege. You make a number of statements that I believe are not correct. For example, I never said "Dr Paul is a crook out to rob you". I also believe I never said that "Dr Paul mismanaged the fund for his personal benefit". Moreover, I do not recall using a baseball analogy and certainly did not say "baseball club". Insofar as I expressed my well-known and justified frustration with Mr Paul's and Acheron's attitude towards me in a forceful way, I do not believe anything I said could have been reasonably construed as an actual threat of physical violence. I have never used physical violence against anybody and I believe that the protection offered to me by the British regulatory authority and/or the courts are the best ways for me to enforce my rights.

Indeed, in the context of the underlying dispute between me and Mr Paul and Acheron, it is difficult to escape the conclusion that your mischaracterization of my conversation with Mr McNaughtan is a tactic intended to divert attention away from my genuine, well-founded and serious concerns that were the very point of my call to him.

When I called Mr McNaughtan, it was to understand (i) why the Board of Directors of the Natural Risk Fund ("the Fund") to which he belongs had not directly responded to my request for clarification on the calculation of the performance fees for the side pocket of the Fund and (ii) why the Fund seemed to be enforcing liquidity terms that contradict an email Mr Paul sent me on 25 December 2010, immediately prior to my investing in the Fund.

I also mentioned to Mr McNaughtan that I was requesting answers from the Board regarding the Fund's handling of a currency trade relating to a Euro / USD share class

1

redenomination that, according to Mr Paul, was mishandled by Deltec Bank, and whose cost I wanted to make sure the Fund's investors did not bear.

Unfortunately, Mr McNaugthan offered no educated explanation to any of my questions. He told me that he was not an investor in the Fund and that he knew virtually nothing about the Fund given that his appointment to the Board was merely due to the fact that Mr Fraser-Smith, a prior director of the Fund and employee of Deltec, had passed away and a replacement needed to be found for him.

I must admit this came as a surprise to me as I know for a fact that Jan-Eric Samuel, a close business associate of Mr Paul, who is the other director on the Board of the Fund also knows very little about the Fund and about the catastrophe bond market in general. The facts (i) that Mr Paul, as he once told me, is a part owner in Deltec Bank, Mr McNaughtan's bank (a fact that Mr McNaughtan confirmed to me when we last met in London), and (ii) that Mr Samuel is a close business associate of Mr Paul, highlights my discomfort with the "independence" of the Board and with the way with which the Board is handling the affairs of the Fund. It should be noted that Mr Paul's ownership stake in Deltec Bank is not mentioned in the Fund's prospectus, whether under the "Conflicts of Interest", "Custodian", "Director's Interests" or "Risk Factors" section or anywhere else for that matter. A disclosure of Mr Paul's business relationship with Mr Samuel is also not mentioned in the prospectus.

During the conversation I had Mr McNaughtan, I also did express my dissatisfaction with the way Mr Paul has been treating me as an investor in some of his products and in a business deal to which a company that I own is party to. Specifically, I explained to Mr McNaughtan that Mr Paul had taken my investment in the Hopewell investment vehicle and invested 100% of the money in a project that had nothing to do with what the marketing material of the investment vehicle promoted. The fact that Acheron Capital and Mr Samuel reimbursed my Hopewell capital contribution as soon as I expressed my dissatisfaction and threatened to take my case to the FCA is, in my view, proof of Acheron's blatant mishandling of my funds.

Finally, let me close by saying that, in an email dated 9 October 2013 and addressed to Mr McNaughtan, I asked the Board of the Fund to answer a number of basic questions about the Fund and about my position in the Fund. I attach a copy of this email on page 4 of this letter. I expect an answer from the Board soon.

In these circumstances, and in particular the combination of: (i) the inaccurate reporting of what I actually said; (ii) the serious and well-founded concerns I have about both Mr Paul and Acheron which justify the frustration I expressed; (iii) the related underlying dispute between me, Mr Paul and Acheron; and (iv) my concern that your allegations are a diversionary tactic, I do not consider it appropriate to provide an apology in the terms suggested.

2

Nonetheless, it very much remains my hope that all outstanding matters, including this one, can be resolved without recourse to legal proceedings.  However, for a resolution to happen, all outstanding matters must be resolved concurrently; not in isolation.

Regards,

3

**Email sent to David McNaughtan on 9 October 2013.**

From: bataillon@hotmail.com
To: dpmcn1010@yahoo.com
Subject: NRF
Date: Wed, 9 Oct 2013 23:05:03 +0000

David,

Thanks for your time on the phone today. I understand you may not be aware of everything that is going on with NRF and that is why I thought I would put in an email the questions I am asking the Board to formally respond to. In the present case, I need to reiterate that the directors are liable for any wilful misconduct on the part of the manager which they do not strive to make right. The duty of the Board is to the investors, not to the manager. As such, I expect the Board to communicate with me in writing regarding the issues laid out below.

Question 1 :
When will my redemption proceeds be paid ? Here, I want a precise date and, if applicable, a percentage of my NAV. If the manager decides to hold back 10%, I want to know the date to which he commits that the audit will be completed. Also, as I mentioned on the phone, I request that the Board certify to me that all prior redemptions were treated the same way as I am being treated (and which is very different from what the manager told me in writing in an email just before my investment).

Question 2 :
If there is a hold back, I want the Board to explain why this would be given that the manager has agreed to cap expenses. The only reason managers to do hold backs is to plan for unforeseen expenses that pop up after a redemption has taken place. In the present case, this is inapplicable as the manager has agreed to cap the expenses. Please explain.

Question 3 :
The manager communicated to me in writing that he was capping the operational expenses of the fund to 0.40% of the fund's NAV. The administrator recently wrote to me in an email that the cap was unilaterally increased by the manager to 0.50% in September 2012. I was never notified of this change and I was never given an opportunity to redeem my units before this increase was implemented. I request that I be reimbursed the 0.10% variance on my NAV for the duration this cap was increased.

Question 4 :
At the beginning of July 2012, at my request, my Euro shares were redenominated in US Dollars. The manager called me a few weeks later apologizing for a screw-up in the foreign exchange transaction that had happened at Deltec. If I recall correctly, the manager told me the screw-up was over $10k and pertained to the unwinding of some FX hedges (my recollection is fuzzy here). I request an investigation of this matter. I need to know the amount of the "screw-up" and who picked up the cost. If the cost was wholly or partially borne by the fund or, worse, me directly, such cost must be reversed as it is the manager's responsibility to execute its trades correctly.

Question 5 :
In relation to the Natural Risk Fund's side pocket, I request a formal explanation from the Board as to why, against any basic accounting principle, it accepts that the side pocket's sole investment (i.e. the Nelson G notes) was valued one way for the purpose of calculating management fees and another way for assessing the performance fee. Tromino confirmed to me in an email that this is what had happened. I will not accept an explanation that basically deflects responsibility on some auditor or administrator. I need the Board to explain the rationale.

I look forward to hearing from you on these issues shortly. I hope I will receive satisfactory answers to these questions by the time I visit you in the Bahamas in the third week of November.

Regards,

# EXHIBIT E



**High Absolute Returns, Consistently Delivered**

Acheron Capital Fund IV
Hopewell SV SCA - An Asian Private Debt Fund

Private & Confidential

• Acheron Track Record | 3

• The Current Focus – High Yielding Asian Private Debt | 7

• Appendices | 14



Acheron Track Record

# Consistently Delivering High Absolute Returns since 2006

- Unlevered consistent net annual return around **10%** since creation in 2006

- An **Adaptive Portfolio Management**: Selection of the asset class **based on the economic cycle**

- Focus on low volatility assets in high yielding special and/or distressed environments

- Partnering with local experts to implement

- London based, **7 professionals**, with **a dozen local partners** overseas for specific strategies

- **+/-USD 200MM AUM** and advisory

- **AIFM** since 2014, **FCA regulated** entity since 2006



# Proven track record in capital preservation and growth

- **Consistently delivering high returns:** 10% average net annual return since inception (unlevered)

- **Consistently growing the AUM base:** About USD 200 MM AUM & Advisory

### Outstanding Performance
### 10% IRR* or X 2.2 since inception in February 2006



Source Acheron, Bloomberg

### With a steadily growing AUM & Advisory base



Source Acheron

■ High Yielding Secured Asian Private Debt (Hopewell)

■ Distressed Gated Positions (Furstenberg)**

■ High Yield CAT Bonds (Natural Risk Fund - NRF)

■ Distressed Life Settlement (Acheron Portfolio Corporation - APC)

*Strategies detailed in appendix, audited by Grant Thornton and Deloitte & Touche*
*\* Computed based on cash distribution and audited NAV*
*\*\* Furstenberg: Co-Managed and Advised by Dr Jean-Michel Paul, CEO of Acheron Capital*



# A global network of expertise to access opportunities







The Current Focus

HOPEWELL SV SCA - HIGH YIELDING ASIAN PRIVATE DEBT

## Asian Private Debt – A Unique Opportunity for Superior Returns

(International) bank deleveraging since the 2008 crisis

+

Positive macro environment and robust legal infrastructure in N. Asia

$\Rightarrow$ Opportunities for high yielding private debt transactions with limited downside

- Efficient market access with local set up (in Korea first)
- First investment done in March 2013 with "friends and family" money, establishing track record
- Focus on self liquidating private debt structures within two main categories of opportunities:

  (i) asset backed SME financing and

  (ii) portfolio acquisition (restructured consumer credits, secured NPL)



Lending of European banks to Korea *in USDMM*

Source: BIS



Resolving insolvency
Time (years) and Recovery (%)

Source: World Bank, Macquarie Research, November 2013



Funding Gap to SMEs, Korea

Source: BOK



Private & Confidential

# Potential Asian Transactions under Consideration

## 1. Corporate Private Debt Transactions

| Client | Country | Sector | Investment Size (USD equiv of KRW) | Tenor | Transaction Type | Account Receivables | Size of Receivables to be assigned to lender | Expected Return (to Hopewell) |
|---|---|---|---|---|---|---|---|---|
| J Ind Co. Ltd | S.Korea | Engineering | USD10-20MM | 3 -5 Yrs | Asset-Backed Loan | Account Receivables from large Korean groups | KRW 30-50 BN | 12-13% p.a. |
| J Bio Co. Ltd | S. Korea | Bio & Livestock Industry | USD 3-5 MM | 3 Yrs | Asset-Backed Loan | Account Receivables from public entity | KRW 15 BN | 12-13% p.a. |
| C Co. Ltd | S. Korea | Consumer Finance | USD5-10 MM | 3 Yrs | Asset-Backed Loan | Credit Card Account Receivables from merchants | 120% over-collat. | 12-13% p.a. |
| S Co. Ltd | S. Korea | Non Ferrous Alloy | USD10-20MM | 3 Yrs | Asset-Backed Loan | Account Receivables from large Korean groups | KRW 20-30 BN | 12-13% p.a. |
| E Co. Ltd | S. Korea | Telecom Operator | USD20-30MM | 3 Yrs | Asset-Backed Loan | Account Receivables from KT | 120% over-collat. | 12-13% p.a. |
| B C Co. Ltd | S. Korea | Consumer Finance | USD20-30MM | 2-3Yrs | Asset-Backed Loan | Account Receivables from individual borrowers | 120% over-collat. | 7% p.a. |

## 2. Restructured Consumer Credits and Secured NPL Securitization

| Originator | Portfolios | Portfolio Size | Collaterals | Expected Bidding Date | Origination Method | Investment Size (USD equiv of KRW) | Investment Period | Expected Return (to Hopewell) | Format |
|---|---|---|---|---|---|---|---|---|---|
| W Bank 2014-03Program | Secured NPLs | KRW120 billion | Secured by Real-Estate Mortgages such as Apartment, Land, Factories | July 15, 2014 | Court Auction | USD 10-15 MM | 2Yrs | 12~15% p.a. | ABS (Junior Tranche) |
| S Bank 2014-01 | Secured NPLs | KRW89billion | Secured by Real-Estate Mortgages such as Apartment, Land, Factories | July 25, 2014 | Court Auction | USD 10-15 MM | 2Yrs | 12~15% p.a. | ABS (Junior Tranche) |



# HOPEWELL, an Asian Private Debt Fund - Investment Details

- Luxembourg Limited Partnership under the form of a securitization vehicle
- Initial launch Dec 2012
- Targeting a fund size of USD 100 MM
- 3,5 year lifespan with capital returned to investors around year 2,5 to 3 from regular (quarterly) cash flows obtained from investments



**Minimum Subscription**
USD 175,000

**Targeted Net Return to Investors**
10% to 12% annualized

**Management Fee**
1.5%
Hopewell Asset and Acheron Capital combined

**Performance Fee**
accrued monthly but paid "in fine"
20% over hurdle rate with catch up

**Hurdle rate**
8% annualized with catch up

**CASH GENERATING + SELF LIQUIDATING STRUCTURE**
NO ASSUMPTION OF A HYPOTHETIC EXIT PRICE NEEDED TO DELIVER THE 10%-12% NET IRR

VEHICLE CONTINUES TO RETURN QUARTERLY CASH TO INVESTORS

INITIAL CAPITAL RETURNED TO INVESTORS IN 2,5 TO 3 YEARS THROUGH QUARTERLY DISTRIBUTIONS SINCE FIRST INVESTMENT DATE

INVESTMENT OF CAPITAL

| Year 1 | Year 2 | Year 3 | Year 3,5 Dec 2017 |



# Hopewell SV SCA – High Yield Asian Credit Opportunity

## Investment Objective

The Hopewell SV SCA's investment objective is to achieve capital appreciation and pay regular distribution by investing into high income generating, self liquidating, credit opportunities in Asia. The initial focus is on the Republic of Korea to include restructured consumer credits, disposal of impaired secured debts as well as special private debt situations related to SME structured financing and opportunities to develop proprietary platforms. The Company seeks to add value in the sourcing and structuring process of opportunities selected. Acheron is rolling out this new strategy through shares issued by a Luxembourg securitization vehicle

## A Unique Opportunity for Superior Returns

- Targeting high net annual returns of 10% to 12% in USD
- Positive macro environment in Asia
- South Korea is Asia ex-Japan's most developed credit market accessible to offshore buyers
- International banks curbed lending creating investment opportunities in credit, in particular in the consumer finance and secured lending space
- Rapid return of capital invested (around 2,5 to 3 years) through quarterly distributions
- Self liquidating structure within 3,5 years
- Dedicated Korean based company (Hopewell Asset) with highly experienced staff providing direct sourcing
- Strong built-in alignment of interests (investment incentive only paid when capital and hurdle repaid to investors)

Risks (and mitigants thereof)

- Credit risk on consumer / merchants (selection process, structural security), KRW exposure (dynamic hedge over time)



Hopewell
ISIN: LU1005294670
NAV/100K shares: 1,204.10

**Estimated Performance** First investment made March end 2013



Expected distribution schedule of current investments

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Performance 2013 | | | | 1.10% | 1.02% | 0.93% | 1.01% | 1.05% | 1.13% | 0.63% | 0.61% | 0.91% | 8.6% |
| Distributions (**) 2013 | | | | | | | 2.5% | | | 2.5% | | 2.5% | 7.5% |
| Net Performance 2014 | 0.65% | 0.58% | 0.64% | 1.44% | 2.11% | 1.00% | 0.95% | 0.88% | 0.79% | | | | 9.4% |
| Distributions (**) 2014 | | | | 2.5% | | 2.5% | | | 2.5% | | | | 7.5% |

(**) Of Invested Amount

## Main Terms

- Management Fee: 1.50% pa
- Investment incentive: 20% above 8% hurdle rate with catch up
- Investment form: Shares in USD issued by Hopewell SV SCA (Luxembourg)
- Denomination: USD 0.01 per share
- Reporting: Monthly NAV, Annual Audit
- Administrator: Compagnie Européenne de Révision
- Auditor: Grant Thornton Lux Audit S.A.
- ISIN: LU1005294670

## Ongoing Capital Raising

- Given the recurrent nature of the opportunity, shares are expected to be issued regularly through successive compartments
- Minimum Investment: USD 175,000
- Managed account possible from USD 5 MM
- **ON GOING**: Many opportunities from USD5mn + in Asian high yield credit identified capable of generating 10% to 12% net annual returns with limited downside risks

Private & Confidential

11

# Hopewell SV SCA - Structural Diagram



- An efficient set up to tap into local markets, highly scalable through issuances of several classes of shares by Hopewell SV SCA

- Along the double SPV structure involving HM Asset I, allowing to tap into KRW structured deals, investments are also effected directly from Hopewell SV SCA in USD



# HOPEWELL, an Asian Private Debt Fund – Term Sheet

## Luxembourg Limited Partnership under the form of a securitization vehicle

| | |
|---|---|
| **Target Fund Raise:** | USD 100,000,000 |
| **Investment Form:** | Registered shares issued by Hopewell SV SCA in Luxembourg |
| **Currency:** | USD |
| **Commitment Period:** | TBC |
| **Expected Term:** | December 2017 |
| **Subscriptions:** | Targeted at (- 2014) for the current Class A Shares |
| **Investment Period** | Ending December 2015 for Class A Shares |
| **Redemptions:** | Based on actual cash collections from investments made by HM Asset I |
| **Redemption Notice:** | None. Distributions based on portfolio cash recovery. Paid quarterly |
| **Valuation:** | NAV provided monthly * |
| **Domicile :** | Luxembourg |
| **Targeted Net Return to Investors:** | 10% to 12% |
| **Management Fee:** | 1.5% (Hopewell Asset and Acheron Capital combined) |
| **Performance Fee:** | 20% over hurdle rate with catch up |
| **Hurdle rate** | 8% with catch up |
| **Minimum Investment:** | USD 175,000 |
| **Administrator / Accounting:** | CER Lux |
| **Legal:** | Luxembourg - Arendt & Medernach/ Republic of Korea – Barun Law |
| **Audit:** | Seoul / Luxembourg – Grand Thorton |
| **ISIN:** | LU1005294670 |



\* Monthly Performance estimated by Acheron Capital/Hopewell Asset. Quarterly Performance estimated by administrator. Annual Performance audited.



1. Acheron Fund IV: Hopewell - Selected Investment Details
2. Investment Selection & Track Record
3. Investment and Risk Management Process
4. Track Record in Asian Structured Debt Markets
5. Biographies
6. Why North East Asia?

# Appendix 1: Example 1 (Deal Executed)
## Advances to Merchants / Credit Cards Receivables
## Overview

■ Addressing inefficiencies in the Korean credit market with an IT and consumer finance platform generates a highly profitable and scalable business model

- The fragmented nature of the Korean credit card market creates an opportunity **for real time consolidation of credit cards receivables** owed by major credit cards companies to independent merchants. Furthermore, with the information on payments due by credit cards companies to merchants, **pre-financing of such payments** can be arranged with reimbursements thereof safely arranged through collections of funds paid by credit cards companies

- Hopewell Asset has identified **Clover Seven** (CS) as uniquely operating in this field. CS combines the IT expertise with the consumer financing know how to deliver a highly effective advances to merchants. By combining high interest rate allowed on consumer financing with fees for the IT solutions, this business is **uniquely very profitable with limited size of balance sheet** required to support it whilst keeping risk under tight management

- Hopewell SV SCA, directly and indirectly, has extended two medium term balloon senior **secured loans** to CS and its affiliated company CFC. The loans are closing related to the amount of short term advances to merchants (so-called QuickLoans for short terms advances to finance credit cards receivables and BizLoans for amortizing advances to the same merchants not directly linked to credit cards receivables). This first mover advantage translates into favourable terms, capable of delivering to Hopewell SV SCA high net returns

- Several **mechanisms of security**, including the oversize of collateral posted by way of continuous assignment of QuickLoans and BizLoans advances extended to the pool of eligible merchants, provide for tight control of the transaction. This is further achieved through daily monitoring through online access to the portfolio of advances financed and strong involvement of Hopewell Asset

- The following slide illustrates (top part) the current composition of the advances extended by CFC/C7 to merchants as well as (bottom part) the monitoring of the portfolio of such advances securing the loans granted directly and indirectly by Hopewell SV SCA





Pie charts above: Entire CFC/Clover7 portfolio as of 31/07/2014 consisting of advances made to 199 merchants



# Appendix 1: Example 1 - Business Diagram - QuickLoans





# Appendix 1: Example 2 (Deal Executed)
# Client Receivables Financing
# Overview

■ SME financing backed by receivables from high rated obligor clients of the SME

- Service providers to large Korean conglomerates (chaebols) are **not** always **capable of getting adequate financing for the receivables** generated in the course of their business providing services to such clients. This can be due **to limitations set by the clients to the transferability** of their obligations vis a vis their much smaller counterparts. As a result, refinancing markets such as factoring are not accessible and the financing of a **large portion of the balance sheet** of such service providers **remains constrained at the level of their corporate credit quality**

- Through a combination of **tight control exercised on cash flows** obtained under the receivables and **security mechanisms** such as pledge on accounts, it possible to get a more direct access to funds paid out by these usually high credit rated chaebols

- Hopewell Asset has identified an appropriate opportunity with **Jungjn Industrial**, an established mid sized Korean construction engineering contractor specialising in challenging items such as boiler, chimneys for facilities such as power plant, steel mill and petrochemical plants. Clients of Jungjin typically are the large industrial Korean names such as Hyundai, Samsung, Kepco, Posco, etc

- The **security package includes** (i) first ranking pledge on accounts through which funds received from currently created receivables transit, (ii) significant oversizing of the receivables versus the amount advanced to Jungjin and first ranking pledge on these receivables accompanied by pre-signed notifications to obligors, (iii) covenanted limitation of use of funds by Jungjin, (iv) redirection of cash flows upon certain triggers being hit, (v) cash monitoring agent and (vi) cash reserves



# Appendix 1: Example 3 (Considered)
# Purchase of Portfolio of Restructured Consumer Finance Credits
# Overview

■ Delivering NPL-like returns on performing assets

- The **interest of the opportunity lies in the combination of two factors**: (i) the involvement of **a quasi governmental market place non-profit corporation**, the Credit Counselling and Recovery Service (**CCRS**) and (ii) the access to portfolios of restructured consumer credits generating **stable and predictable cash flows at a discount to face value**. Both elements are highlighted below

- Delinquent Korean consumer debtors can apply for the restructuring of their obligations to the CCRS. CCRS has been set up in 2002 and has helped more than 1 million individuals to date. Provided certain **conditions** are met (existence of a salary, no tax liability, feasibility of the restructuring with lenders), CCRS mediates with the lenders and obtains key parameters of the credits to be readjusted (portion of principal written off, no interest, longer maturities) along a sustainable path. The **selection process is severe** with an approval rate of less than 25% of applications submitted to the CCRS (about 4 million individuals have thus approached the CCRS to date)

- The CCRS furthermore services the credits once restructured and monthly amounts due are debited from the obligors designated bank account. The result of (i) the initiative taken by the obligor to seek help (**willingness to pay**), (ii) the **significant screening by CCRS**, (iii) the **effective restructuring carried out** and (iv) the **servicing of the restructured credit by the CCRS** thereafter generates highly performing portfolios of restructured consumer credits with highly predictable cash flows

■ No reliance on liquidity assumptions

- Once restructured, these credits remain categorized within the **delinquency ratio** of banks and credit cards companies as carrying no interests. Strict limit for such ratio and **steep provisioning** required on such credits provide, occasionally, a regulatory and economic incentive for financial institutions to part out of portfolios of restructured consumer credits at a **significant discount to face value**. This creates the second element of interest in this opportunity

- As a result, **high yields (IRR)**, including senior financing available with domestic lenders, are achievable. As the portfolios generate cash flows from the start, the transactions are **self liquidating** within a period of 5 years, with **average life and capital paid back around 3 years**. The same rationale applies to similar portfolios restructured through Courts (Individual Debtor Rehabilitation)



# Appendix 1: Example 3 - Sensitivity Analysis – Resilience to Defaults

- Parameters provided in the tables are derived from one of the portfolios actually transacted and analysed

- The net IRR achieved on these highly granular portfolios is a function of several parameters, including purchase price, distribution of expected cash flows, re-default rate, recovery rate post re-default and the level of financing sought
- The tables below shows net IRR as a function of the re-default rate (expressed as percentage of annual collections) and the corresponding recovery rate thereof, for two levels of financing (1 equity to 1 debt and 1 to 3)

| Level ratio of 1 to 1 | | DEFAULT RATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 0.00% | 2.50% | 5.00% | 7.50% | 10.00% | 12.50% | 15.00% | 17.50% | 20.00% |
| RECOVERY RATE | 0.0% | 14.8% | 12.7% | 10.7% | 8.6% | 8.0% | 6.0% | 2.8% | -0.6% | -4.0% |
| | 10.0% | 14.8% | 12.8% | 11.0% | 9.2% | 8.0% | 7.2% | 4.6% | 1.6% | -1.4% |
| | 20.0% | 14.8% | 13.0% | 11.4% | 9.7% | 8.1% | 8.0% | 6.3% | 3.7% | 1.1% |
| | 30.0% | 14.8% | 13.2% | 11.7% | 10.2% | 8.8% | 8.0% | 7.7% | 5.8% | 3.5% |

| Level ratio of 1 to 3 | | DEFAULT RATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 0.00% | 2.50% | 5.00% | 7.50% | 10.00% | 12.50% | 15.00% | 17.50% | 20.00% |
| RECOVERY RATE | 0.0% | 20.2% | 16.7% | 13.5% | 10.3% | 8.0% | 4.6% | -1.2% | -7.7% | -15.7% |
| | 10.0% | 20.2% | 17.0% | 14.1% | 11.2% | 8.2% | 6.9% | 2.1% | -3.3% | -9.4% |
| | 20.0% | 20.2% | 17.2% | 14.6% | 12.0% | 9.4% | 8.0% | 5.1% | 0.6% | -4.3% |
| | 30.0% | 20.2% | 17.5% | 15.2% | 12.9% | 10.5% | 8.2% | 7.6% | 4.2% | 0.2% |

- Portfolios purchase prices observed range from 50 to 70% of the aggregate amount of restructured obligations



# Appendix 2: Adaptive Portfolio Management Proven Skills

A Dynamic and **Adaptive Portfolio Management** with expertise in **High Yielding** and **Distressed** assets:

- Experts in sourcing **on time** the next investment opportunity

- Selection of the asset class **based on the economic cycle**

- Successful execution of each strategy thanks to internal and partner expertise globally and across multiple asset classes

**PEAK OF THE ECONOMIC CYCLE**



**Distressed Life Settlement (launched in 2006)**

**High Yield CAT Bonds (launched in 2008)**

**High Yield Asian Private Debt (launched in 2013)**

**Distressed US Real Estate (launched in 2012)**

**Distressed Gated Positions & Side Pockets (launched in 2009)**

**TROUGH OF THE ECONOMIC CYCLE**



# Appendix 2: An Adaptive Portfolio Management

Initial launch December 2006

**ACHERON PORTFOLIO CORPORATION**
(LUXEMBOURG) S.A.

PURCHASE OF PORTFOLIOS
OF LIFE INSURANCE POLICIES

**USD 130,000,000**
Current Approx. AUM

**Share A**
**Share B**
**Share D launched in April 2013**

---

Initial Launch October 2008
Closed December 2013

**NATURAL RISK FUND**
(CAYMAN)

PURCHASE OF CAT BONDS

**USD 4,000,000**
Current Approx. AUM

**Share A**

---

Initial Launch December 2009

**FURSTENBERG CAPITAL SCA**
(LUXEMBOURG)

PURCHASE OF GATED POSITIONS

**USD 55,000,000**
Current Approx. AUM

**Share A**
**Share C**
**Share E**

---

**DE-CORRELATION PLAY**

Share A +115% net since inception

**DE-CORRELATION PLAY**

Share A +40% net since inception

**LIQUIDITY PLAY**

Share A +40% net since inception



# Appendix 2: An Adaptive Portfolio Management (Cont'd)

Not yet available

**LITAI PROPERTIES**
(LUXEMBOURG)

ACQUISITION OF
US DISTRESSED REAL ESTATE

**USD 5,000,000**
Current Approx. AUM

Initial Launch April 2013

**HOPEWELL SV SCA**
(LUXEMBOURG)

ORIGINATION AND ACQUISITION OF
ASIAN PRIVATE DEBT

**USD 6,000,000**
Current Approx. AUM

**Share A**

**CREDIT PLAY**

**BANK DELEVERAGING PLAY**

Share A +17% net since inception



Private & Confidential

23

# Appendix 2: Alignment of interests

- High integrity: **Managers earn no performance fees until capital and hurdle is returned to investors**

- Alignment of interest: **Managers are personally invested**

- Clients interest comes first: **Funds put in dormant and/or run-off mode as soon as opportunities to deliver around 10%+ IRR disappear.** We then go for the <u>next opportunity</u> capable of delivering risk adjusted absolute performance above 10%

> The focus opportunity today
>
> **High Yielding North-East Asian Private Debt - Bank Deleveraging Play in a still Overlooked Region**



# Appendix 3: Counterparties

| | | |
|---|---|---|
| **Administrators** | Acheron Portfolio Corporation<br>Furstenberg<br>Hopewell |  Compagnie Européenne de Révision<br><br>Our counterparty at CER LUX is Yves Mertz. Yves Mertz is member of the Luxembourg Chartered Accountants Institute (« Ordre des Experts Comptables Luxembourgeois ») and of the Luxembourg Independent Auditors' Institute (« Institut des Réviseurs d'Entreprises luxembourgeois ») since 1984. Before joining Compagnie Européenne de Révision, he was founder and partner of Mazars Luxembourg where he acquired a large experience in audit of life insurance and reinsurance companies. He holds a Master degree in finance and EDP processing from the Faculté Universitaire Catholique de Mons, Belgium |
| | NRF | <br>Tromino Financial Services Ltd. Was incorporated in Bermuda on 19 May 2005. The company is licensed as a Fund Administrator by the Bermuda Monetary Authority under the Investment Funds Act 2006 |
| **Audit** | Acheron Portfolio Corporation<br>Furstenberg<br>Hopewell |  |
| | NRF |  |
| **Lawyers** | All |  |



Private & Confidential

25



# Appendix 3: Investment Process

| Deal Sourcing | Initial Appraisal | Due Diligence | Deal Structuring | Final Review | Investment Committee | Hopewell SV SCA Decision |
|---|---|---|---|---|---|---|
| o Actively source opportunities from<br>• Clients<br>• Accountants<br>• Banks<br>• Advisers<br>• Co-investors | o Deal summary<br>• Description<br>• Obligor<br>• Originator<br>• Security<br>• Control<br>• Portfolio<br><br>o Risk/return analysis<br>o Compliance of the individual opportunity with the strategic objectives of the Fund<br><br>o Deal summary report for in principle Investment Committee support | o Financial model (portfolio acquisition)<br>o Review:<br>• Documentation<br>• Financial elements (client)<br>• Business environment<br>• Tax/accounting<br>• Organization (client)<br>o Risks review<br>o Obligors / asset class / regional concentration (portfolio acquisition)<br>o Correlation with other investments<br>o Onsite inspection<br>o Due diligence report | o Negotiate main terms and conditions<br>o Review covenants / representations / warranties / securities<br>o Opinions (legal etc) | o Preparation of the final investment report<br><br>o Final investment report to Investment Committee | o Deal submission to the Investment Committee for rejection or approval<br><br>o If approved, submission to Hopewell SV SCA<br><br>o Investment Committee Report | o Accept recommendation<br>-Or-<br>o Request additional materials<br>-Or-<br>o Reject outright<br>-Or-<br>o Request variation of terms |

Reports

REJECT

Revise ←



Private & Confidential                                    26

# Appendix 3: Monitoring, Surveillance and Risk Management Process

| | Daily | Weekly | Monthly | Quarterly | Semi annually | Annually | Ad hoc |
|---|---|---|---|---|---|---|---|
| **Monitoring and Surveillance** | Portfolio performance (collections, over-collateralisation level) | | Computation of NAV (Hopewell SV SCA and underlying acquisition vehicles) | Review of financials (clients) <br><br> Formal review of NAV by the administrator | On site visit to client / counterparty | External audit of Hopewell SV SCA and underlying acquisition vehicles | Assess market environment (micro and macro level) Require additional opinion if needed |
| **Transaction Reporting** | | | Investor monthly report | | Management report to Investment Committee and Manager of Hopewell SV SCA | Assist in closing of accounts and audit as required by the administrator and the auditor | As required |
| **Risk Management** | | Weekly review for transactions in default | Monthly review for transactions in breach of covenant or significantly underperforming | Quarterly review for transactions underperforming | Semi annual review for performing transactions | | Issue waivers, consents <br><br> Exercise early amortization <br><br> Send payment notification |



## Appendix 4: Track Record in Asian Structured Debt Markets

A wide range of markets, structures and assets classes for credit transactions successfully completed by JM Winand and his teams whilst in Asia

| Date | Originator / Client | Asset Type | Format | Market | Deal Size |
|---|---|---|---|---|---|
| 1998 | Samsung Electronics | Account Receivables | ABCP (1st Cross Border Korean Securitization) | Korea | USD 100,000,000 |
| 2000 | KDB Capital | Lease Receivables | ABS | Korea | USD 144,000,000 |
| 2001 | IFC, OUB AM | Asian Corporate Bonds | Arbitrage CBO | Pan Asia | USD 79,000,000 |
| 2001 | APLUS | Home Improvement Loans | MBS | Japan | JPY 17,000,000,000 |
| 2002 | NICE | Revolving Consumer Receivables | ABS | Japan | JPY 8,500,000,000 |
| 2002 | ORIKA | Revolving Consumer Receivables | ABS | Japan | JPY 5,000,000,000 |
| 2003 | Grand Cathay Securities | Corporate Loans | Primary CLO (1st Taiwanese CLO Securitization) | Taiwan | NTD 8,800,000,000 |
| 2003 | YOURS | Revolving Consumer Receivables | ABS | Japan | JPY 3,700,000,000 |
| 2004 | Korea First Bank | Residential Mortgages | RMBS (1st Euro-denominated Korean Securitization Deal of the Year) | Korea | EUR 550,000,000 |
| 2004 | Bank SinoPac | Corporate Loans | Primary CLO | Taiwan | NTD 4,900,000,000 |
| 2004 | ICBC (Taipei) | Corporate Loans | Primary CLO | Taiwan | NTD 5,350,000,000 |
| 2004 | CDIB (Taipei) | Corporate Loans | Primary CLO | Taiwan | NTD 5,100,000,000 |
| 2005 | Hyundai Capital | Auto Loans | ABS | Korea | EUR 300,000,000 |
| 2005 | ICBC (Taipei) | Corporate Loans and Bonds | CBO | Taiwan | NTD 10,600,000,000 |
| 2005 | Korea First Bank | Residential Mortgages | RMBS | Korea | EUR 500,000,000 |
| 2005 | Hsinchu International Bank | Residential Mortgages | RMBS (1st Cross Border Taiwanese Securitization) | Taiwan | EUR 255,000,000 |
| 2006 | Standard Chartered Bank | Residential Mortgages | RMBS | Korea | USD 650,000,000 |
| 2006 | Hsinchu International Bank | Residential Mortgages | RMBS | Taiwan | EUR 240,000,000 |
| 2006 | AIG | Commercial Real Estate | CMBS | Japan | JPY 53,200,000,000 |
| 2006 | Multi-sellers | Commercial Real Estate | CMBS | Japan | JPY 16,400,000,000 |
| 2007 | Multi-sellers | Commercial Real Estate | CMBS | Japan | JPY 25,780,000,000 |
| 2008 | Multi-sellers | Commercial Real Estate | CMBS | Japan | JPY 7,000,000,000 |

# Appendix 5: Team Biographies

**Anh Bui**
London



- Anh holds a Bachelor of Arts in European Studies from the Open University and graduated from Vietnam National Academy of Music (String department).
- She also studied Computer Science at Harvard Extension School.
- Currently in charge of the accounting as well as part of the administrative tasks.

**Carlo Toller**
London



- Carlo is the Operations Officer at the Investment Manager.
- Carlo has held various senior corporate positions in medium size businesses in Italy before joining the Investment Manager as its Operation Officer.
- He holds a Master's degree in Economics from the University of Tokyo and a Bachelor of Arts in Political Science from the University of Milan.

**Gyu-Hwan Jin**
Seoul



- Gyu-Hwan Jin has over 15 years of banking and debt capital markets experience.
- Before joining Hopewell Asset in 2011, he was an Executive Director of Capital Partners Inc. in Korea, a Corporate Restructuring Company responsible for advisory services for Corporate Restructuring and Securities Investment and Trading.
- He started his career in 1989 at Int'l Banking Dept. of Korea Merchant Banking Corp., a joint venture merchant bank where Barclays Bank and Bank of Boston were involved as foreign shareholders.
- He moved to Hong Kong in 1994 and joined Peregrine Securities as a Head of Korean Fixed Income Sales Desk. He joined ING Baring Securities, HK in 1995 as a Head of Sales-Asia responsible for Sales and Structured Finance.
- He moved to Credit Lyonnais Securities, HK in 2000 with responsibilities in Origination, Corporate Finance and Sales for Korean Corporate and Financial Institutions.
- He graduated from Kyungbook National Univ. as a B.A. of Commercial Law and Economics.



# Appendix 5: Team Biographies

**Jean-Marc Winand**
London, Hong-Kong



- Jean-Marc has over 20 years of combined banking and capital markets experience.
- Prior to recently joining Acheron Capital, Jean-Marc was a Managing Director with Credit Agricole – CIB in London with global responsibilities in Financial Solutions and Fixed Income Sales.
- Before 2008, Jean-Marc spent 12 years in Asia based in Hong Kong and Tokyo with Credit Lyonnais Securities and Calyon managing the Asian Debt Capital Markets and Japanese Corporate Finance activities of the bank.
- Jean-Marc started his banking career with Chase in Brussels and earned a Master in Tax Management and an Ingénieur Commercial degree from the Solvay Business School (ULB).

**Jean-Michel Paul**
London



- Dr. Paul founded Acheron Capital Limited in 2005.
- He has been primarily responsible for devising and modeling the investment strategy of the Company.
- Former positions held by Dr Paul include Head of Research Asia-Pacific for Rabobank and Senior Analyst at Atlas Capital group where he was managing a $500 M hedge fund portfolio.
- He is an Ingénieur Commercial of the Solvay Business School (ULB), has a PhD in Finance and Real Estate from the University of California at Berkeley and is a Chartered Financial Analyst.

**Min Shen**
London



- Min is the Quant Analyst at Acheron Capital
- Min holds a Master's degree in mathematics from University of Paris VI and a master's degree in computer science from engineering school ENSIIE in France.
- She joined Acheron Capital Ltd in 2011 and specializes in investment quantitative analysis.



Min Shen

# Appendix 5: Team Biographies

**Olivia de Posson**
London



- Olivia is responsible for Business Development and Investor Relations
- Olivia started her career in 2005 at Goldman Sachs in London as Equity Sales to European based Asset Managers and Hedge Funds.
- Prior to joining Acheron Capital she founded ODP CHASE, a London based Executive Search firm focused on Financial Markets, and lectured finance classes at ESCP Europe in London.
- Olivia graduated with an MSc from ESCP Europe in Paris where she took a major in Finance and with an Economics degree from the Universite Catholique de Louvain in Belgium.

**Soraya Huillard**
London



- Soraya is graduated from Journalism High School of Paris.
- After a 5 year experience at Agence France-Presse in London, she joined Acheron Capital Ltd. in 2007 and is supporting the staff with the administrative tasks.

**Sung-Wan Choi**
Seoul



- Sung-Wan Choi has more than 20 years experience in banking and debt capital markets.
- He started banking career at Korea Long Term Credit Bank in 1981.
- He was as a Managing Director of KLTCB, H.K. Branch and moved to Head of International Treasury and Investment Division of KB Kookmin Bank in 1999 responsible for all Treasury and Debt Capital Market operations such as Foreign Currency Funding, Management of Foreign Currency Assets, Project Financing, ABS and Structured Finance.
- He set up Leaders' Planning Co., Ltd. in 2006 after leaving banking to provide Financial Consulting Services for domestic manufacturing companies.
- He set up Hopewell Asset Co., Ltd. in 2011 together with Acheron Capital in London to focus NPL investment advisory services for both onshore and offshore investors.
- He graduated from Sung Kyun Kwan Univ. in Seoul as a B.A. of Business Administration.



## Appendix 6: Countries with Limited Risks

- **Out of the 42 largest economies in the world**

  - **Only 9 respect Maastricht Criteria**

    - 5 in Europe
      - Sweden, Norway, Switzerland, Denmark, Luxembourg, Czech
    - 3 In East Asia
      - Korea, Taiwan, Singapore

  - ➤ **The Two largest economies in the world that have the lowest macro risk (as benchmarked against the Maastricht criteria) are in North East Asia**



# Appendix 6: North East Asia - Positive Outlook

The outlook for the region remains positive with many economies relying on an intra-Asian flow of commercial activity to sustain growth less dependent on Western markets

| | Real GDP | | | Consumer Prices[1] | | | Current Account Balance[2] | | | Unemployment[3] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Projections | | | Projections | | | Projections | | | Projections | |
| | 2012 | 2013 | 2014 | 2012 | 2013 | 2014 | 2012 | 2013 | 2014 | 2012 | 2013 | 2014 |
| **Advanced Economies** | 1.5 | 1.2 | 2.0 | 2.0 | 1.4 | 1.8 | −0.1 | 0.1 | 0.2 | 8.0 | 8.1 | 8.0 |
| United States[4] | 2.8 | 1.6 | 2.6 | 2.1 | 1.4 | 1.5 | −2.7 | −2.7 | −2.8 | 8.1 | 7.6 | 7.4 |
| Euro Area[5,6] | −0.6 | −0.4 | 1.0 | 2.5 | 1.5 | 1.5 | 1.3 | 1.8 | 1.9 | 11.4 | 12.3 | 12.2 |
| Japan | 2.0 | 2.0 | 1.2 | 0.0 | 0.0 | 2.9 | 1.0 | 1.2 | 1.7 | 4.4 | 4.2 | 4.3 |
| United Kingdom[5] | 0.2 | 1.4 | 1.9 | 2.8 | 2.7 | 2.3 | −3.8 | −2.8 | −2.3 | 8.0 | 7.7 | 7.5 |
| Canada | 1.7 | 1.6 | 2.2 | 1.5 | 1.1 | 1.6 | −3.4 | −3.1 | −3.1 | 7.3 | 7.1 | 7.1 |
| Other Advanced Economies[7] | 1.9 | 2.3 | 3.1 | 2.0 | 1.5 | 2.1 | 4.3 | 4.4 | 4.2 | 4.5 | 4.6 | 4.6 |
| **Asia** | 5.1 | 5.2 | 5.3 | 3.6 | 3.8 | 4.1 | 1.2 | 1.4 | 1.6 | ... | ... | ... |
| **Advanced Asia** | 2.1 | 2.3 | 2.4 | 1.1 | 0.9 | 2.6 | 1.5 | 1.9 | 2.1 | 4.2 | 4.1 | 4.2 |
| Japan | 2.0 | 2.0 | 1.2 | 0.0 | 0.0 | 2.9 | 1.0 | 1.2 | 1.7 | 4.4 | 4.2 | 4.3 |
| Korea | 2.0 | 2.8 | 3.7 | 2.2 | 1.4 | 2.3 | 3.8 | 4.6 | 3.9 | 3.2 | 3.2 | 3.2 |
| Australia | 3.7 | 2.5 | 2.8 | 1.8 | 2.2 | 2.5 | −3.7 | −3.4 | −3.5 | 5.2 | 5.6 | 6.0 |
| Taiwan Province of China | 1.3 | 2.2 | 3.8 | 1.9 | 1.2 | 2.0 | 10.5 | 10.0 | 9.6 | 4.2 | 4.2 | 4.2 |
| Hong Kong SAR | 1.5 | 3.0 | 4.4 | 4.1 | 3.5 | 3.5 | 2.7 | 2.3 | 2.5 | 3.3 | 3.2 | 3.1 |
| Singapore | 1.3 | 3.5 | 3.4 | 4.6 | 2.3 | 2.7 | 18.6 | 18.5 | 17.6 | 2.0 | 2.1 | 2.3 |
| New Zealand | 2.7 | 2.5 | 2.9 | 1.1 | 1.1 | 2.1 | −5.0 | −4.2 | −4.2 | 6.9 | 6.0 | 5.3 |
| **Developing Asia** | 6.4 | 6.3 | 6.5 | 4.7 | 5.0 | 4.7 | 0.9 | 1.1 | 1.3 | ... | ... | ... |
| China | 7.7 | 7.6 | 7.3 | 2.6 | 2.7 | 3.0 | 2.3 | 2.5 | 2.7 | 4.1 | 4.1 | 4.1 |
| India | 3.2 | 3.8 | 5.1 | 10.4 | 10.9 | 8.9 | −4.8 | −4.4 | −3.8 | ... | ... | ... |
| **ASEAN-5** | 6.2 | 5.0 | 5.4 | 3.9 | 4.9 | 5.1 | 0.6 | −0.1 | −0.1 | ... | ... | ... |
| Indonesia | 6.2 | 5.3 | 5.5 | 4.3 | 7.3 | 7.5 | −2.7 | −3.4 | −3.1 | 6.1 | 5.9 | 5.8 |
| Thailand | 6.5 | 3.1 | 5.2 | 3.0 | 2.2 | 2.1 | 0.0 | 0.1 | −0.2 | 0.7 | 0.7 | 0.7 |
| Malaysia | 5.6 | 4.7 | 4.9 | 1.7 | 2.0 | 2.6 | 6.1 | 3.5 | 3.6 | 3.0 | 3.1 | 3.0 |
| Philippines | 6.8 | 6.8 | 6.0 | 3.2 | 2.8 | 3.5 | 2.9 | 2.5 | 2.2 | 7.0 | 7.0 | 7.0 |
| Vietnam | 5.2 | 5.3 | 5.4 | 9.1 | 8.8 | 7.4 | 5.8 | 5.6 | 3.3 | 4.5 | 4.5 | 4.5 |
| **Other Developing Asia[4]** | 6.3 | 6.0 | 6.5 | 7.0 | 7.0 | 6.5 | −2.1 | −1.6 | −1.7 | ... | ... | ... |
| *Memorandum* | | | | | | | | | | | | |
| Emerging Asia[5] | 5.8 | 5.9 | 6.2 | 4.4 | 4.5 | 4.4 | 1.8 | 2.0 | 2.1 | ... | ... | ... |

South Korea and Taiwan are some of the healthiest economies in Advanced Asia and in the World

Source: IMF



Private & Confidential

33

# Acheron Capital - Disclosure

Issued by Acheron Capital Limited, a company registered in England, no. 05588630 at 20-22 Bedford Row, London, WC1R-4JS, England.

**Acheron Capital Limited is authorised and registered by the Financial Conduct Authority ("FCA") and appears on the Financial Services Register under reference 443685.**

The investment products and services of Acheron Capital Limited are only available to professional clients and eligible counterparties; they are not available to retail clients. This document does not constitute an offer to buy or sell shares or units in any vehicle, fund or funds ("Funds") managed or advised by Acheron Capital Limited. Investors are also reminded that past performance should not be seen as an indication of future performance and that they may not get back the amount originally invested. UK Investors do not benefit from the Financial Services Compensation Scheme (FSCS). Investment in the Funds carry risks which are more fully described in the prospectus. The Funds are only suitable for sophisticated investors who are aware of the risks of investing in hedge funds.



# EXHIBIT F

**2013 FOREIGN LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# M12000005404

**Entity Name:** NEPTUNE ASSETS, LLC

**FILED**

**Mar 18, 2013**
**Secretary of State**
**CC9421843894**

**Current Principal  Place of Business:**

1180 SW 36TH AVE
STE 100
POMPANO BEACH,  FL  33069

**Current Mailing Address:**

1180 SW 36TH AVE
STE 100
POMPANO BEACH,  FL  33069  US

**FEI Number:** 46-0939542        **Certificate of Status Desired:** Yes

**Name and Address of Current Registered Agent:**

C T CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL  33324  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

| | |
|---|---|
| Electronic Signature of Registered Agent | Date |

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | PAUL, JEAN-MICHEL |
| Address | 1180 SW 36TH AVE |
| City-State-Zip: | POMPANO BEACH  FL  33069 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 608, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: JEAN-MICHEL PAUL        MANAGER        03/18/2013

Electronic Signature of Signing Authorized Person(s) Detail        Date

# EXHIBIT G

M120000054404

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP   ☐ WAIT   ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____   Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



200252686482

10/21/13--01043--010   **60.00



B. BOSTICK

OCT 2 2 2013

EXAMINER

## COVER LETTER

**TO:** Registration Section
Division of Corporations

**SUBJECT:** Neptune Assets, LLC

Name of Foreign Limited Liability Company

Dear Sir or Madam:

The enclosed Affidavit by Foreign Limited Liability Company to Change Manager(s) or
Managing Member(s) and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

Oral Beason, Esq.

Name of Person

Litai Assets LLC

Firm/Company

1180 SW 36th Avenue, Suite 100

Address

Pompano Beach, FL 33069

City/State and Zip Code

ob@litaiassets.com

E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

Oral Beason, Esq. at ( 954 ) 580-0995

Name of Person                   Area Code and Daytime Telephone Number

**STREET/COURIER ADDRESS:**         **MAILING ADDRESS:**
Registration Section                Registration Section
Division of Corporations            Division of Corporations
Clifton Building                    P.O. Box 6327
2661 Executive Center Circle        Tallahassee, Florida 32314
Tallahassee, Florida 32301

**Enclosed is a check for the following amount:**
☐ $25 Filing Fee        ☐ $30 Filing Fee &        ☐ $55.00 Filing Fee &        ■ $60 Filing Fee,
                          Certificate of Status      Certified Copy               Certificate of Status &
                                                                                   Certified Copy

CR2E123(8/07)

## AFFIDAVIT BY FOREIGN LIMITED LIABILITY COMPANY
## TO CHANGE MANAGER(S) OR MANAGING MEMBER(S)

1. The name of the limited liability company as it appears on the records of the Florida Department of State is: Neptune Assets, LLC

2. This entity was formed under the laws of: Delaware

3. This entity was authorized to transact business in Florida on 09/26/2012
and its Florida document/registration number is M12000005404

4. The name and address of each manager or managing member is as follows:

Title:
"MGR" = Manager
"MGRM" = Managing Member

Name and Address:

MGR

Jan-Eric Samuel
1180 SW 36th Avenue, Suite 100
Pompano Beach, FL 33069

Required Signature: _____

Signature of Manager, Managing Member or Member

Filing Fee: $25