# EXHIBIT 41

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-mc-60266-Bloom**

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON,
                              Applicants.

_____/

**DECLARATION OF ERICH BONNET IN FURTHER SUPPORT OF APPLICANTS'**
**CROSS-MOTION TO COMPEL**

     I, Erich Bonnet, hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

**Introduction**

     1.     I respectfully submit this Declaration in further support of Applicants' motion to compel compliance with the subpoenas for documents and deposition testimony of Litai Assets LLC ("**Litai**") [D.E. #16] that were served pursuant to an *Ex Parte* Order of this Court issued on February 9, 2016 that authorized discovery pursuant to 28 U.S.C. § 1782. [D.E. #7].

     2.     Furstenberg Finance SAS ("**FF**") has made a formal application to this Court to seek basic disclosure from Litai, a company within this Court's jurisdiction, because FF and I have received credible information that Jean-Michel Paul ("**JMP**") has committed a crime that has damaged Acheron Portfolio Corporation Luxembourg S.A. ("**APC**" or "**Acheron**"), FF and myself.

     3.     From the outset of this dispute until today, I have been advised by Luxembourg legal counsel that FF maintains the direct right to commence a criminal proceeding against JMP.

     4.     I am aware that the burden to ensure criminal prosecution in Luxembourg is appropriately set. That is why FF has sought to present the Luxembourg criminal court with the disclosure sought in this action, so that this burden can be met.

     5.     Litai claims that FF, despite unequivocal statements under oath concerning FF's intention to institute the Luxembourg criminal proceedings, has not demonstrated that the

Luxembourg criminal proceedings are "reasonably contemplated," now, because no timeline is set in respect of the same. Therefore, I further resolve that, in addition to maintaining the confidentiality of the discovery obtained in this matter until such proceeding is commenced (at which point it will be shared with the other current and former shareholders of APC), the Luxembourg criminal action will be commenced within 45 days of completing the requested discovery exercise. This will be the case unless it is FF's opinion that the discovery obtained exonerates JMP, in which case, of course, no criminal action will be filed, confidentiality will remain in place and the records otherwise destroyed.

      6.     I further make this Declaration to rebut the serious inaccuracies contained in Litai's opposition papers and declarations.

### When I Learned of JMP's Covert Interest and the Tactics of JMP and Litai

      7.     On the final page of the Arendt & Medernach S.A. Declaration [D.E. # 21-5], in what appears to be paragraph 17 but is not numbered, Mr. Pierre Beissel makes the very surprising contention that my statement as to learning of JMP's interest in Litai in the summer of 2015 is "*contradicted*" (emphasis supplied) by the email from Eric Kalfon, sent in the winter of 2015 (i.e. well after the summer of 2015), that he resigned from the APC board of directors due to JMP's control of Litai.

      8.     It is on the basis of this alleged contradiction that Mr. Beissel, allegedly an attorney presenting Luxembourg law, makes the following statement: "This just adds to the inconsistencies and belief that the Applicants are only using this proceeding to harass Mr. Paul, and have neither the intention nor the ability to institute a civil or criminal action against him." [D.E. # 21-5, at 9].

      9.     I bring this point to the Court's attention for a number of reasons. First, it demonstrates how alleged "facts" presented by Litai and JMP are routinely stretched and contorted beyond recognition. It appears that Mr. Beissel, with absolutely no factual basis or support, makes the "inference" (his word) that Mr. Kalfon told me that he resigned from the board of directors of APC in 2010 due to JMP's covert ownership of Litai in 2010, or that JMP covertly owned Litai in 2010. To be absolutely clear, that inference is absolutely, entirely and unconditionally untrue – as

stated in my first declaration, the very first time I learned of JMP's criminal act, his covert ownership of Litai, was the summer of 2015 – at which point I immediately commenced further investigation.

10.     From this entirely unfounded "inference," Mr. Beissel contends that: (i) the email "contradicts" my statement as to when I learned of JMP's covert ownership, and (ii) that these alleged inconsistencies then somehow prove purported harassment of JMP by the Applicants.

11.     In this regard, I would simply ask the Court to review the submissions in this matter carefully. The court will see that the Applicants have been forthright and direct from the outset of this matter. We have sought and continue to seek evidence of a crime committed against us in connection with Luxembourg criminal proceedings that will be brought. We have used unconditional and straightforward language, and each statement made is directly supported by the relevant document or testimony. This careful attention to detail and the desire to present a strong presentation to the Luxembourg criminal court serves as the impetus for the subject application. We wish to present our allegation that JMP covertly owns and controls Litai based upon documentary and testimonial evidence.

12.     Consider next, for example, the issue of JMP's deletion of emails. As the Applicants presented to the Court in a sworn witness statement, within days of the Applicants' service of the subpoena in this matter, Mr. Charles Meeus received notifications of JMP's deletion of emails which contained a subject line that referred to Furstenberg, when Mr. Meeus had never before received any email deletion notifications from JMP.

13.     In his "explanation" of this episode, JMP merely states that "I still have and always had the emails and immediately provided them to my attorneys upon receiving the Applicants' allegations. They are completely unrelated to Applicants' claims against me in this case, but I provide hereto to respond to their allegations. (Ex 2) All of Acheron's email messages are regularly backed-up and secured." [D.E. # 21-3, at 3].

14.     I bring this language to the Court's attention not only because of the continuing concern that emails relevant to this case have been deleted, but because the tortured language in

3

JMP's statement typifies Litai's overall response to our straightforward discovery request, rendering it difficult to accept any component of Litai's response at face value.

15. For example, at no point does JMP deny the <u>act</u> of deleting the emails. He simply states that he "still" and "always" has them. Of course, it is generally possible to retrieve deleted files from the recycle bin folder or otherwise, especially when the deletion is recent.

16. JMP contends that the emails are not relevant to the dispute before this Court. I am not certain that is true. Litai contends that the emails relate to other disputes between JMP and FF. However, these arguments miss the larger point: Mr. Meeus was, by definition, only alerted to the deletion of emails that he was involved in. JMP does not deny that <u>other relevant</u> emails were similarly deleted. He also offers no response to the issue of the timing of the email deletions in relation to the subpoena service.

17. JMP similarly claims that all of Acheron's email messages are regularly backed-up and secured. JMP does not describe Acheron's document retention policy (i.e. deletion policy), which Acheron entity he is referring (Acheron Capital Limited, Acheron Portfolio Corp, etc.), which email address he is referring to, JPaul@acheroncapital.com, or jmpaul@acheroncapital.com , to say nothing of personal accounts such as GMAIL or YAHOO!.

18. In view of this, I find Litai's statements at page 15 of their opposition brief surprising. [D.E. # 21] Litai hyperbolically calls the JMP email deletion issue a "prime example of [Applicants'] harassment," but nothing could be further from the truth. We alleged, backed by sworn witness statements and documentary evidence of email deletion notifications, that JMP engaged in the act of deleting emails <u>within days</u> of Litai being served with the subpoenas in this case, when Mr. Meeus, the relevant witness, has <u>never</u> previously received email deletion notifications from JMP. A careful reading of JMP's declaration reveals that JMP has not denied <u>any portion</u> of this allegation. Neither has JMP denied <u>any portion</u> of the inference, which Applicants were careful to label as such, that other emails may have been similarly deleted, given that Mr. Meeus only receives notifications on emails where he is an addressee.

4

19.     I brought this matter to this Court's attention out of an obvious concern that, directly in response to the discovery this Court has ordered, evidence was being destroyed. That concern remains absolutely live and valid. Moreover, any deletion of emails or destruction of evidence in response to this proceeding (and notice of the impending Luxembourg criminal proceedings) gives further support that the allegation that JMP covertly owns and controls Litai.

20.     Of course, I also believe that the issue of email deletions diminishes JMP's credibility as a declarant in this matter. To the extent that Litai contends that the email issue is a "prime example" of a purpose of this action other than to obtain the precise evidence requested, then I believe Litai's credibility is similarly damaged.

21.     At this juncture, I also add that JMP and Acheron's heavy involvement in Litai's opposition to Applicants' disclosure request seems to only buttress the allegation that JMP secretly owns and controls Litai. I understand that the cost of copying emails onto a thumb drive and even sitting for a corporate deposition is far less than the substantial opposition Litai has made to this Court.

22.     JMP and Litai point to other litigation and corporate disputes between FF, myself, Mr. Marc Bataillon and JMP in a seeming attempt to show that the Applicants' engage in unfounded litigation, or that this discovery is actually for use in those disputes.

23.     Neither of those statements are true in the slightest. As to the use of the information in other disputes, first and foremost, it is not relevant. Next, I ask the Court to consider the Applicants' unqualified statements that the Luxembourg proceedings will be filed, in conjunction with the Applicants' unqualified commitment that any discovery obtained in this proceeding be confidential until the Luxembourg proceedings are filed and underway, as evidence that Litai's contentions have absolutely no truth.

24.     Moreover, JMP's characterization of the legal and corporate actions in Luxembourg involving Ahmose SA ("**Ahmose**") (D.E. # 21-3, at ¶¶ 12-14) is categorically misleading, as JMP omitted the critical details – including the court's resolution. First, no portion of any conduct was illegal, as adjudged by the Luxembourg court. Second, when it was JMP and Jan-Eric Samuel, via

5

Acheron and Tomson Pte Ltd., who brought the action in the Luxembourg court to cancel the nomination of Ahmose's board, and asked Ahmose to be managed by an external administrator, the Luxembourg court ruled against them. A copy of the judgment is annexed hereto as Exhibit 1.

25.      There is no question that the Applicants are engaged in a broad dispute with JMP. That does not mean that we are not victims of a crime or do not have the right to execute and engage in a Luxembourg criminal proceeding.

IN WITNESS WHEREOF, I have executed this Declaration under penalty of perjury under the laws of the United States of America this 2nd day of June, 2016.

Erich Bonnet

6

# EXHIBIT 1

*170*

**No. Rôle: 170337 + 172398**
**Réf. no. 94/2016**
**du 19 février 2016**

Audience publique extraordinaire des référés du vendredi, 19 février 2016, tenue par Nous Carine FLAMMANG, Vice-Présidente au tribunal d'arrondissement de Luxembourg, siégeant comme juge des référés, en remplacement du Président du tribunal d'arrondissement de Luxembourg, assistée du greffier assumé Pit SCHROEDER.

<u>I.</u>

<u>**DANS LA CAUSE**</u>

**E N T R E**

1. la société de droit anglais Acheron Capital Ltd, établie et ayant son siège social à 20-22 Bedford Row, WC1R 4JS London, inscrite au registre de commerce et des sociétés d'Angleterre (Companies House) sous le numéro 05588630, représentée par son représentant légal actuellement en fonctions ;

2. la société Tomson PTe Limited, établie et ayant son siège social à 111 North Bridge Road, #08-10 Peninsula Plaza, 179098 Singapore, immatriculée au registre des sociétés de Singapour sous le numéro 199907653N, représentée par son représentant légal actuellement en fonctions ;

élisant domicile en l'étude de Maître Max MAILLIET, avocat, demeurant à Luxembourg,

<u>parties demanderesses</u> *comparant par Maître Max MAILLIET, avocat, demeurant à Luxembourg,*

**E T**

1. la société anonyme de droit luxembourgeois Ahmose SA, établie et ayant son siège social à L-8367 Hobscheid, 1, rue Steinfort, inscrite au registre de commerce et des sociétés de Luxembourg sous le numéro B.146129, représentée par son conseil d'administration actuellement en fonctions, dont la composition est cependant formellement contestée ;

2. Charles MEEUS, demeurant professionnellement à L-1930 Luxembourg, 62, avenue de la Liberté ;

3. Claude FAVRE, demeurant professionnellement à L-2550 Luxembourg, 38, avenue du X Septembre ;

4. Sébastien VACHON, demeurant professionnellement à L-2550 Luxembourg, 38, avenue du X Septembre ;

**partie défenderesse sub 1)** *comparant par Maître Sabrina MARTIN, avocat, demeurant à Luxembourg,*

**parties défenderesses sub 2) à sub 4)** *comparant par LOYENS & LOEFF Luxembourg SARL, représentée par Maître Annie ELFASSI, avocat, en remplacement de Maître Véronique HOFFELD, avocat, les deux demeurant à Luxembourg,*

**en présence de** :

1. Marc BATAILLON, demeurant au 59 Warwick Square, SW1V 2AL, Londres ;

2. la société à commandite par actions Furstenberg Capital S.C.A., établie et ayant son siège social à L-1930 Luxembourg, 62, avenue de la Liberté, inscrite au registre de commerce et des sociétés de Luxembourg sous le numéro B 150.655, représentée par son associé commandité, la société à responsabilité limitée Furstenberg SARL, établie et ayant son siège social à L-1930 Luxembourg, 62, avenue de la Liberté, inscrite au registre de commerce et des sociétés de Luxembourg sous le numéro B 150.636, représentée par son conseil de gérance actuellement en fonctions ;

**intervenant volontairement,** *comparant par LOYENS & LOEFF Luxembourg SARL, représentée par Maître Annie ELFASSI, avocat, en remplacement de Maître Véronique HOFFELD, avocat, les deux demeurant à Luxembourg.*

## II.

## DANS LA CAUSE

### E N T R E

1. la société de droit anglais Acheron Capital Ltd, établie et ayant son siège social à 20-22 Bedford Row, WC1R 4JS London, inscrite au registre de commerce et des sociétés d'Angleterre (Companies House) sous le numéro 05588630, représentée par son représentant légal actuellement en fonctions ;

2. la société Tomson PTe Limited, établie et ayant son siège social à 111 North Bridge Road, #08-10 Peninsula Plaza, 179098 Singapore, immatriculée au registre des sociétés de Singapour sous le numéro 199907653N, représentée par son représentant légal actuellement en fonctions ;

élisant domicile en l'étude de Maître Max MAILLIET, avocat, demeurant à Luxembourg,

**parties demanderesses** *comparant par Maître Max MAILLIET, avocat, demeurant à Luxembourg,*

-3-

# E T

1. la société anonyme de droit luxembourgeois Ahmose SA, établie et ayant son siège social à L-8367 Hobscheid, 1, rue Steinfort, inscrite au registre de commerce et des sociétés de Luxembourg sous le numéro B.146129, représentée par son conseil d'administration actuellement en fonctions, dont la composition est cependant formellement contestée ;

2. Charles MEEUS, demeurant professionnellement à L-1930 Luxembourg, 62, avenue de la Liberté ;

3. Claude FAVRE, demeurant professionnellement à L-2550 Luxembourg, 38, avenue du X Septembre ;

4. Sébastien VACHON, demeurant professionnellement à L-2550 Luxembourg, 38, avenue du X Septembre ;

**partie défenderesse sub 1)** *comparant par Maître Sabrina MARTIN, avocat, demeurant à Luxembourg,*

**parties défenderesses sub 2) à sub 4)** *comparant par LOYENS & LOEFF Luxembourg SARL, représentée par Maître Annie ELFASSI, avocat, en remplacement de Maître Véronique HOFFELD, avocat, les deux demeurant à Luxembourg.*

# F A I T S :

ORIGINAL



**TAPELLA & NILLES**
HUISSIERS DE JUSTICE

Yves TAPELLA
Tom NILLES
Nanou TAPELLA

B.P. 358
L-4004 Esch/Alzette
14-16 rue du Canal
L-4050 Esch/Alzette

T (+352) 26 53 50-1
F (+352) 26 53 50 50
huissiers@tapella-nilles.lu
www.tapella-nilles.lu

MD/153630

**ASSIGNATION EN REFERE**

**DOSSIER: VOL14346**

L'an deux mil quinze, le *deux et cinq* OCTOBRE ,

A la requête de :

COUT :
Droit: 60,00
Voy. : 64,40
Adres: 6,00
Prk. : 2,00
TVA : 22,17
------
TOTAL:154,57

Copie:105,00
TVA : 17,85
Port : 4,00
------
TOTAL:281,42

1. la société de droit anglais **Acheron Capital Ltd**, établie et ayant son siège social à 20-22 Bedford Row, WC1R 4JS London inscrite au registre de commerce et des sociétés d'Angleterre (Companies House) sous le numéro **05588630**, représentée par son représentant légal actuellement en fonctions , (ci-après « **Acheron** »);

2. la société **Tomson PTe Limited**, établie et ayant son siège social à 111 North Bridge Road, #08-10 Peninsula Plaza, 179098 Singapore, immatriculée au registre des sociétés de Singapour sous le numéro 199907653N) représentée par son représentant légal actuellement en fonctions, (ci-après « **Tomson** »);

**EXEMPT**

comparant par **Maître Max Mailliet**, avocat à la Cour, demeurant à L-2342 Luxembourg, 52, rue Raymond Poincaré, en l'étude duquel domicile est élu ;

Je soussigné(e)*, [ ] Yves TAPELLA [ ] Tom NILLES [X] Nadine dite Nanou TAPELLA, Huissier de Justice, demeurant à L-4050 ESCH/ALZETTE, 14-16, rue du Canal, immatriculé(e) près le tribunal d'arrondissement de et à Luxembourg,
{* [ ] **Michèle WANTZ**, Huissier de Justice suppléant, en remplacement de}
*est réputé non écrit ce qui n'est pas coché*

ai donné assignation à :

1. la société anonyme de droit luxembourgeois **Ahmose S.A.**, établie et ayant son siège social à L-8367 Hobscheid, 1, rue de Steinfort, inscrite au registre de commerce et des sociétés de Luxembourg sous le numéro B146129, représentée par son conseil d'administration actuellement en fonctions, dont la composition est cependant formellement contestée ;

2. **Monsieur Charles Meeus**, sans état connu, demeurant professionnellement à L-1930 Luxembourg, 62, avenue de la Liberté ;

3. **Monsieur Claude Favre**, sans état connu, demeurant professionnellement à L-2550 Luxembourg, 38, avenue du X Septembre ;

4. **Monsieur Sébastien Vachon**, sans état connu, demeurant professionnellement à L-2550 Luxembourg, 38, avenue du X Septembre

à comparaître le **lundi 12 octobre 2015 à 14.30 heures** devant Madame le Président du Tribunal d'arrondissement de et à Luxembourg, siégeant comme juge des référés, dans la salle TL.1.04 du Tribunal d'Arrondissement de et à Luxembourg, à la Cité Judiciaire, Plateau du Saint Esprit à Luxembourg-Ville;



VOL14346

*avec déclaration que si la signification est faite à personne et que les parties assignées ne comparaissent pas, l'ordonnance à intervenir sera réputée contradictoire et non susceptible d'opposition, conformément aux articles 79 et 80 du Nouveau Code de Procédure Civile.*

*Les parties assignées sont également informées de la teneur de l'article 935 du Nouveau Code de Procédure Civile :*

*Les parties seront tenues de comparaître en personne ou par le ministère d'un avocat.*
*Les parties peuvent se faire assister ou représenter par un avocat, leur conjoint, ou leur partenaire au sens de la loi du 09/07/2004 relative aux effets légaux de certains partenariats, leurs parents ou alliés en ligne directe ou en ligne collatérale jusqu'au troisième degré inclus, ainsi que par les personnes exclusivement attachées à leur service personnel ou à leur entreprise. Le représentant, s'il n'est avocat, doit justifier d'un pouvoir spécial.*

**POUR** :

1. **En fait**

   a. **Ahmose S.A.**

Ahmose S.A. est une société dont le capital social souscrit est de USD 4.075.308 (pièce n°1 - statuts coordonnés de Ahmose S.A.).

Le principal investissement d'Ahmose est un investissement dans une société cotée à la Bourse de Luxembourg, Acheron Portfolio Corporation (Luxembourg) S.A..

Ahmose était, jusqu'au 10 juin 2015, administrée par un conseil d'administration composé de trois administrateurs : M. Charles Meeus, Mme Caroline Verhaeven et M. Carlo Toller.

Le capital d'Ahmose est représenté par plusieurs classes d'actions, d'une valeur nominale de 0,10 USD chacune et détenues comme suit par les requérantes (pièces n°2 et 3) :

| Classe | Nombre d'actions | Acheron | Tomson |
|--------|------------------|---------|--------|
| A | 5.094.135 | 55.154 | 1.359.097 |
| B | 5.094.135 | 55.154 | 1.359.097 |
| C | 5.094.135 | 55.154 | 1.359.097 |
| D | 5.094.135 | 55.154 | 1.359.097 |
| E | 5.094.135 | 55.154 | 1.359.097 |
| F | 5.094.135 | 55.154 | 1.359.097 |
| G | 5.094.135 | 55.154 | 1.359.097 |
| H | 5.094.135 | 55.154 | 1.359.097 |
| Total | 40.753.080,00 | 441.232 | 10.872.776,00 |

Acheron détient donc environ 1,08 % du capital de Ahmose et Tomson en détient environ 26,68 %. Elles détiennent donc ensemble 27,76 % du capital.

Parmi les autres actionnaires d'Ahmose se trouvent un certain Marc Bataillon (21,86 %) et une société Furstenberg Capital SCA (30,52 %), qui est une société de droit luxembourgeois.

2

~ 6 ~

La société Furstenberg Capital SCA est gérée par son associé commandité, Furstenberg S.à r.l, une société qui appartient à 60% à Monsieur Erich Bonnet et pour 40% à Monsieur Jean-Michel Paul (qui est actionnaire des deux parties requérantes).

La société Furstenberg Capital SCA est un véhicule d'investissement qui regroupe bon nombre d'investisseurs en son sein, dont un certain nombre de résidents luxembourgeois.

Monsieur Bonnet a récemment pris de manière hostile le contrôle de Furstenberg S.à r.l. et par conséquent aussi de Furstenberg Capital SCA.

Aujourd'hui, il est devenu clair que Messieurs Erich Bonnet et Marc Bataillon ont joint leurs forces pour prendre, de manière hostile, le contrôle d'Ahmose.

### b. Les statuts d'Ahmose

Les statuts d'Ahmose comprennent, depuis 2012 (qui est l'année où la société a été restructurée et nouveaux actionnaires ont fait leur apport), une rédaction assez spéciale, à savoir que les administrateurs sont élus à partir d'une liste proposée par Acheron :

L'article 10 des statuts de Ahmose S.A. prévoit ainsi que « *La Société sera administrée par un conseil d'administration composé de **trois membres au moins** [...]* ».

Le même article prévoit encore :

« *Les administrateurs seront **élus à partir d'une liste de noms fournie par Acheron Capital Limited**, à une majorité simple des voix valablement exprimées et comptabilisées Chaque administrateur est révocable à tout moment, avec ou sans cause par l'assemblée générale des actionnaires à une majorité simple des voix valablement exprimées.*

*Dans l'hypothèse où un poste d'administrateur devient vacant à la suite d'un décès, d'une démission ou autrement, un administrateur peut être provisoirement désigné jusqu'à la prochaine assemblée générale, en suivant les dispositions légales qui s'appliquent* ».

### c. La première tentative de tour de force : l'assemblée du 13 mai 2015

Le 13 mai 2015 avait lieu une assemblée générale d'Ahmose, convoquée à la demande d'actionnaires ayant plus de 10% des actions d'Ahmose, à savoir Monsieur Marc Bataillon (pièce n° 4 – demande de convocation de l'assemblée et pièce n°5 - convocation de ladite assemblée).

Le but déclaré de cette assemblée était de remettre en cause la disposition spécifique des statuts relative à l'obligation de choisir les administrateurs de Ahmose S.A. à partir d'une liste proposée par Acheron, et ensuite de modifier le conseil d'administration pour pouvoir permettre à MM. Bataillon, soutenu par Mr Bonnet, de prendre le contrôle de la société.

Par conséquent, l'ordre du jour comprenait un projet de modification des statuts (par suppression du bout de phrase relatif à la liste proposée par Acheron) et ensuite une nomination de nouveaux administrateurs (pièce n°6 - Procès-verbal de l'assemblée du 13 mai 2015)

Cette assemblée a été prorogée à 4 semaines à la demande d'un groupe d'actionnaires détenant plus de 20% du capital social. La nouvelle assemblée a partant été convoquée pour le 10 juin (pièce n°7 – convocation de l'assemblée du 10 juin 2015).

### d. La deuxième tentative de tour de force : l'assemblée du 10 juin 2015

En date du 10 Juin 2015 s'est tenue une assemblée générale extraordinaire des actionnaires de la société Ahmose S.A. au cours de laquelle deux membres du conseil d'administration ont été révoqués, à savoir Monsieur Carlo Toller et Madame Caroline Verhaeven. Le vote s'est fait à 52,4% -47,6%, l'ensemble des petits actionnaires se ralliant a Tomson et Acheron.

Seul M. Meeus, employé de Mr Bonnet de son état dans diverses entreprises dont Furstenberg sarl, n'a pas été révoqué.

Or, à l'issue de cette assemblée, les administrateurs révoqués précités n'ont pas été remplacés. Acheron a lors de la réunion produit une liste, mais l'avocat de Mr Bataillon a refusé de les regarder, arguant qu'il était trop tard, et l'avocat de Furstenberg SCA a dit qu'il la consulterait avec son client ultérieurement, ceci de sorte que le conseil d'administration de la société Ahmose S.A. s'est retrouvé composé d'un seul et unique administrateur n'ayant pas été démis.

La seule raison en est que M. Bataillon et ses « complices » ont refusé de choisir un administrateur figurant sur la liste présentée par Acheron.

Dans l'hypothèse où aucun des candidats proposé par Acheron ne convenait aux majoritaires, il leur appartenait pour le moins de demander à Acheron de proposer d'autres candidats éventuellement plus neutres, voire de formellement proposer eux-mêmes des candidats à Acheron, ce qui n'a pas été fait.

Cette assemblée a été tenue en présence de nombreux avocats, de deux huissiers et d'un notaire.

Le procès-verbal de cette assemblée est versé comme pièce n°8.

### e. Le tour de force : la cooptation du 10 juin

Voyant que leur plan de modification des statuts avait échoué, MM. Bataillon et Bonnet ont demandé au seul administrateur restant, Monsieur Charles Meeus, de compléter le conseil d'administration de Ahmose S.A. par cooptation, alors que les solutions propres auraient été soit de demander la nomination d'un administrateur provisoire, soit de convoquer une nouvelle assemblée générale. De plus dans l'intérim, les administrateurs démis auraient dû continuer à prêter fonction jusqu'à ce que leur remplaçant soient dument choisis.

Le jour même de l'assemblée, Monsieur Meeus a donc pris les devants et a décidé, en totale violation des modalités d'élection des administrateurs telles que prévues par les statuts de Ahmose S.A., de coopter deux autres administrateurs aucunement inscrits sur la liste établie par la société Acheron Capital Limited (cf. infra), à savoir Monsieur Claude Favre et Monsieur Sébastien Vachon, eux aussi proches de MM. Bataillon et Bonnet (pièce n°9 – cooptation du 10 juin 2015).

4

Ceci représente un abus de majorité caractérisé et prémédité, notamment en prenant en considération la réelle volonté des majoritaires, révélée par la cooptation immédiatement subséquente des candidats du majoritaire, en violation totale de la loi et des statuts, cooptation qui avait bien évidemment déjà été planifiée par les majoritaires préalablement à l'AG litigieuse dont ils savaient pertinemment qu'elle ne recueillerait pas les votes nécessaires pour mener à bien leurs plans.

Immédiatement, les administrateurs cooptés et Monsieur Meeus ont commencé à porter des actes de gestion en prenant soin de ne pas en informer les anciens administrateurs qui, se croyant encore en fonction pour régler la gestion courante de la société jusqu'à la nomination de nouveaux administrateurs, ont découvert la cooptation sur le site internet du Registre de Commerce et des Sociétés.

Les actionnaires minoritaires ont, eux aussi, été tenus dans le noir le plus complet de cette cooptation jusqu'à sa publication au registre de commerce et des sociétés.

L'idée était clairement de s'arracher, de manière hostile, le contrôle de Ahmose S.A. et d'utiliser les actifs de la societe à de nouvelles fins.

### f. Le référé en suspension des effets de la cooptation

Par assignation en référé du 22 juin 2016 les requérantes ont agi en suspension des effets de ladite cooptation (pièce n°10).

Par une assignation libellée en termes similaires, les requérantes ont agi au fond en nullité de ladite cooptation (pièce n°11).

Ces deux affaires sont pendantes au moment de l'introduction de la présente assignation.

### g. La tentative de faire ratifier ce tour de force par la convocation d'une nouvelle assemblée

Malgré le référé pendant entre parties, dont les administrateurs (celui restant et les deux cooptés) étaient pleinement au courant vu qu'ils y sont visés comme parties, ces derniers ont convoqué les actionnaires d'Ahmose à une nouvelle assemblée générale par convocation du 9 juillet 2015 (pièce n°12).

Cette nouvelle assemblée était convoquée pour le 17 juillet 2015 (donc avec le délai minimal de 8 jours, pas un de plus), avec pour ordre du jour (propre surlignage):

1. Approval of the Company's annual accounts for the financial year started on 1 January 2014 and ended on 31 December 2014; allocation of the company's results
2. Discharge to the Company's directors for the period started on 1 January 2014 and ended on 31 December 2014
3. Discharge to the Company's statutory auditor for the period started on 1 January 2014 and ended on 31 December 2014;
4. Approval of a Director's fee for the financial year 2014: USD 4.171,34
5. **Ratification and cooptation of Mr Vachon and Mr Favre as directors of the Company, and**
6. Any other business.

5

Cette convocation a été émise par le prétendu conseil d'administration d'Ahmose; elle a été signée par M. Meeus au nom de celui-ci.

Or, le conseil d'administration, tel que résultant de la cooptation, est irrégulièrement composé, et les membres de ce conseil sont au courant des contastations afférentes de la part des requérantes.

Malgré cela, ils n'hésitent pas à convoquer une assemblée, pour tenter de faire ratifier la cooptation.

De plus, il faut savoir que les comptes annuels de 2014 n'avaient pas encore été arrêtés par le conseil d'administration d'Ahmose S.A. avant le 10 juin 2015, date de la révocation de deux membres du conseil d'administration (cf. supra).

Par conséquent, ces comptes ont donc été arrêtés et la convocation à l'assemblée générale lancée par un conseil d'administration dont la composition est en violation flagrante avec les statuts de la société, et fait objet aujourd'hui d'une demande de nullité judiciaire.

Par courrier du 15 juillet 2015 le mandataire des requérantes a soulevé la nullité de cette convocation et le fait que les requérantes se présenteraient à ladite assemblée sous la réserve expresse de cette nullité (pièce n°13).

Par un deuxième courrier du 15 juillet 2015, Acheron a proposé une liste d'administrateurs en application de l'article 10 des statuts (pièce n°14).

Les requérantes se sont donc présentées à ladite assemblée sous la réserve expresse faire valoir la nullité et ont exprimé clairement leurs réserves.

L'assemblée a été tenue malgré ces réserves (pièce n°15).

Marc Bataillon et Furstenberg Capital SCA ont ensuite voté pour la ratification de la cooptation, tandis que Tomson et Acheron ont voté contre.

En procédant de la sorte, Marc Bataillon et Furstenberg ont mis en place trois administrateurs qui leur étaient proches.

A la liste proposée par Acheron, ils ont répondu que ce point ne figurait pas à l'ordre du jour (alors qu'il y figurait implicitement, vu l'illégalité flagrante de la cooptation et aurait donc pu être traité sous divers) et que les administrateurs proposés ne seraient pas neutres, argument qui ne tient pas la route, vu qu'eux ont mis en place un conseil d'administration qui leur est proche à 100% et sous leur contrôle.

De plus, Il y a aussi lieu de noter que lors de cette assemblée, les deux administrateurs cooptés n'ont même pas eu la décence d'être présents.

Ils n'ont pas été présentés non plus.

Les requérantes sollicitent donc, en complément de l'assignation en référé sollicitant la suspension des effets de la cooptation, la suspension des effets de l'assemblée générale du 17 juillet 2015, sinon la suspension des effets de la cooptation et en tout état de cause la nomination d'un administrateur provisoire de la société Ahmose S.A.

6

## 2. En droit

### A. Quant à la suspension des effets de l'assemblée

La cooptation des administrateurs du 10 juin 2015 est entachée de nullité, tel que cela a été démontré dans les assignations en référé et au fond en suspension / nullité de la cooptation (pièce n°10 et 11). Il est expressément renvoyé à ces développements, qui sont censés faire partie intégrante de la présente assignation.

En effet, la cooptation a été faite en violation flagrante de l'article 10 des statuts de la société Ahmose S.A. lequel dispose que :

« *Les administrateurs seront élus à partir d'une liste de noms fournie par Acheron Capital Limited, à une majorité simple des voix valablement exprimées et comptabilisées* »

En l'espèce, les administrateurs qui ont, par la suite, été cooptés par l'administrateur restant ne figuraient pas sur la liste de noms fournie par Acheron Capital Limited.

M. Bataillon et ses acolytes ont ensuite tenté de rectifier le tir en convoquant l'assemblée générale du 17 juillet ayant pour objet la prétendue ratification.

Or, ce procédé est impossible car il constitue une fraude aux statuts d'Ahmose S.A.: dans la mesure où en vertu des statuts, l'assemblée générale ne peut nommer les administrateurs que sur la base d'une liste fournie par Acheron, il ne saurait fait être échec à la convention sociale exprimée par les statuts par la cooptation d'administrateurs non issus d'une liste fournie par Acheron.

La conséquence immédiate de la nullité flagrante de la cooptation du 10 juin 2015 est que le conseil d'administration de la société Ahmose S.A. n'était plus régulièrement composé suite à cette cooptation et que partant il ne pouvait convoquer une assemblée générale de ladite société en vue de tenter de faire approuver des comptes qu'il a arrêté et surtout de faire ratifier sa composition actuelle, faite en violation des statuts de la société.

\*\*\*

Partant, compte tenu de ce qui précède, il y a lieu de suspendre les effets de l'assemblée jusqu'à ce qu'une décision définitive sur le fond relative à la nullité de la cooptation du 10 juin 2015 et de l'assemblée du 17 juillet 2015 soit rendue.

### B. Quant à la nomination d'un administrateur provisoire

Au vu de la suspension des effets de la cooptation et de l'assemblée générale subséquente, la société n'aura plus qu'un seul administrateur et ne sera donc pas valablement représentée.

Afin d'éviter un péril imminent pour la société il y a donc lieu de nommer un administrateur provisoire avec la mission plus amplement reprise au dispositif de la présente.

7

### C. Quant à l'urgence

La doctrine admet l'intervention du juge des référés, dans la vie des sociétés chaque fois qu'il y a menace de ruine ou péril grave pour l'existence ou le fonctionnement de la société.

A ce sujet, il a été décidé « *qu'il y a urgence, toutes les fois que le retard apporté à une solution provisoire et ne préjugeant en rien le fond met en péril les intérêts de l'une des parties (...) il y a urgence lorsque la lenteur de la justice ne permet pas à une partie d'obtenir en temps utile du juge du fond la mesure sollicitée et que de ce fait les intérêts de cette partie risquent d'être mis en péril* » (Cour d'appel, 13 mars 1989 ; KRANCHER c/ BODSON, n°11106 du rôle, citée par Emile PENNING, Bull Cercle FR. Laurent, II, 1991, n°7).

En l'espèce, il y a urgence au vu du fait que le conseil d'administration actuellement en fonctions suite à la cooptation initiée par l'administrateur restant peut, à tout moment, prendre des décisions qui s'avèreraient dramatiques pour les requérantes et la société Ahmose S.A..

Plus exactement, il y a urgence au vu du fait que les administrateurs actuellement en fonctions peuvent ainsi à tout moment prendre les actions nécessaires afin de vider la société Ahmose S.A. de sa substance et toutes autres mesures que pourrait alors prendre les requérantes en vue de faire valoir leurs droits seraient alors vaines.

Bien plus encore, il y a lieu de ne pas perdre de vue que la cooptation litigieuse d'administrateurs par l'administrateur restant, alors même qu'elle est en principe formellement exclue, ainsi que la prétendue ratification subséquente, montrent d'ores et déjà l'extrême mauvaise foi de l'administrateur restant et de M. Bataillon et ses acolytes tournée vers la volonté de prendre le contrôle du conseil d'administration respectivement de la société Ahmose S.A.

### 3. Pièces

La présente demande est basée sur les pièces suivantes :

1. Status de Ahmose S.A.
2. Certificat représentatif des actions nominatives de Ahmose détenues par Acheron
3. Extrait du registre des actionnaires de Ahmose pour Tomson
4. Demande de convocation d'une assemblée de la part de Monsieur Marc Bataillon
5. Convocation à l'assemblée du 13 mai 2015
6. Procès-verbal de l'assemblée du 13 mai 2015
7. Convocation à l'assemblée du 10 juin 2015
8. Procès-verbal de l'assemblée du 10 juin 2015
9. Publication de la cooptation
10. Assignation en référé suspension de la cooptation
11. Assignation au fond en nullité de la cooptation
12. Convocation à l'assemblée générale du 17 juillet 2015
13. Courrier du 15 juillet 2015 soulevant la nullité de la convocation
14. Courrier du 15 juillet 2015 soumettant une liste d'administrateurs proposés par Acheron
15. Procès-verbal de l'assemblée générale du 17 juillet 2015

8

**A CES CAUSES**

**PLAISE AU TRIBUNAL**

Les parties au principal se voir renvoyer devant qui de droit mais dès à présent et par provision :

voir suspendre les effets de l'assemblée générale de la société Ahmose S.A. du 17 juillet 2015, jusqu'à ce qu'une décision définitive sur le fond relative à la nullité de ladite assemblée générale soit intervenue ;

Voir encore nommer un administrateur provisoire de la société Ahmose S.A. avec pour mission de :

*« gérer et administrer la société suivant les lois et usages du commerce, de prendre possession de tous documents et autres livres comptables de la société jusqu'à ce qu'une décision définitive au fond sur la validité la validité de la cooptation du 10 juin 2015 et de l'assemblée générale d'Ahmose S.A. du 17 juillet 2015 soit intervenue » ;*

voir dire que les frais et honoraires promérités par l'administrateur provisoire sont à prélever sur l'actif de la société Ahmose S.A.. ;

voir condamner solidairement les parties assignées au paiement d'une indemnité de procédure d'un montant de 5.000,- € sur base de l'article 240 NCPC ;

voir ordonner l'exécution provisoire de l'ordonnance à intervenir et nonobstant opposition appel sur minute et sans caution et la partie assignée se voir condamner à tous les frais et dépens de l'instance

voir réserver à la partie requérante tous autres droits, dus, moyens et actions, dont notamment le droit de demander des dommages-intérêts à l'encontre des assignés.

Dont acte et sous toutes réserves.

9



TAPELLA & NILLES
HUISSIERS DE JUSTICE

**MODALITÉS DE REMISE D'EXPLOIT CONTENANT AVIS DE PASSAGE**

L'an deux mille ....quinze, le .... *deux Octobre*

Le présent exploit a été remis par l'huissier de justice soussigné dans les conditions indiquées à la rubrique marquée d'une croix et selon les déclarations recueillies, pour le destinataire en

○ son domicile   ○ sa résidence   ☒ son siège

○ son domicile élu chez .................................................

...........................................................................

○ .......................................................................

...........................................................................

comme il est dit ci-dessous.

Vérifications faites sur l'exactitude de l'adresse

○ auprès du bureau de population   ☒☒☒ auprès du registre de commerce   ○ sur la sonnette / boîte aux lettres

| Destinataire de l'exploit |
|---|
| **AHMOSE S.A.**<br>**Société anonyme**<br>**1, rue de Steinfort**<br>**L-8367 HOBSCHEID** |

**A) SIGNIFICATION À PERSONNE**

○ Personne physique
au destinataire lui-même

☒ Personne morale
à Nom/Prénom(s) *Mme Kazurava Annastasice*
qui a déclaré être habilité(e) à recevoir copie

○ Au domicile élu, au mandataire lui-même

ainsi déclaré(e), laquelle personne a accepté l'exploit

**B) SIGNIFICATION À DOMICILE**

B.I.) Ayant trouvé ................................................................................................ demeurant à
(Nom/Prénom(s))                                    (Qualité)

○ la même adresse

ainsi déclaré(e), laquelle personne a accepté de recevoir copie et de donner récépissé, sur quoi l'huissier de justice soussigné lui a remis copie de l'exploit sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli; en outre, une copie de l'exploit sur papier libre avec l'avis prévu par l'alinéa 5 de l'art. 155 N.C.P.C. a été laissée sur les lieux, le tout sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli.

Visa de la personne rencontrée dans les lieux

B.II.) N'ayant pu trouver personne ayant qualité de recevoir la copie de l'acte et donner récépissé ou qui ait accepté de recevoir la copie de l'acte et de donner récépissé, étant donné

○ qu'il n'y avait personne

○ que la personne présente a refusé l'acceptation de l'exploit dans les conditions requises par la Loi

○ que la personne présente n'avait pas atteint l'âge de 15 ans

○ que la personne présente était le(a) requérant(e)

et après diligences effectuées et vérifications faites sur l'exactitude de l'adresse

l'huissier de justice soussigné a laissé sur les lieux une copie de l'exploit ainsi qu'un avis de passage renseignant sur les modalités de signification de l'exploit, le tout sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli, et il a en outre envoyé par lettre simple une copie de l'exploit et de l'avis de passage au destinataire dans le délai prévu par la Loi.

Il est porté à la connaissance du destinataire du présent avis que l'huissier de justice s'est présenté à la date et à l'adresse reprises ci-dessus pour lui signifier un exploit. Le destinataire lui-même n'ayant pu être trouvé,

○ copie du prédit exploit a été remise sous enveloppe fermée à la personne préqualifiée sub B.I) ; une deuxième enveloppe contenant copie de l'exploit et le présent avis a été laissée sur les lieux.

○ copie du prédit exploit et le présent avis ont été laissés à l'adresse du destinataire sous enveloppe fermée ; une deuxième copie du prédit exploit et le présent avis ont été envoyés, dans le délai prévu par la Loi, par lettre simple au destinataire.

Date qu'en tête.

Avec déclaration que la présente est faite, conformément aux dispositions prévues par l'article 155 et s. du Nouveau Code de Procédure Civile. Tous les paragraphes non marqués d'une croix sont réputés non écrits.

signature de l'huissier de justice

Remarques: ..............................................................................

**TAPELLA & NILLES**
HUISSIERS DE JUSTICE

**MODALITÉS DE REMISE D'EXPLOIT CONTENANT AVIS DE PASSAGE**

L'an deux mille ....quinze, le .....*(deux) october* ..............................,

Le présent exploit a été remis par l'huissier de justice soussigné dans les conditions indiquées à la rubrique marquée d'une croix et selon les déclarations recueillies, pour le destinataire en

○ son domicile  ○ sa résidence  ○ son siège

○ son domicile élu chez ...............................................

☒ *adresse professionnelle* ........................................

comme il est dit ci-dessous.

┌─────────────────────────────────────────┐
│              Destinataire de l'exploit     │
│                                            │
│ **Monsieur MEEUS Charles**                 │
│ **sans état connu**                        │
│ **62, avenue de la Liberté**               │
│ **L-1930 LUXEMBOURG**                      │
│                                            │
└─────────────────────────────────────────┘

Vérifications faites sur l'exactitude de l'adresse

○ auprès du bureau de population   ○ auprès du registre de commerce   ○ sur la sonnette / boîte aux lettres   ○ ..................

┌──────────────────────────────────────────────────────────────────────────────────┐
│ **A) SIGNIFICATION À PERSONNE**                                                     │
│                                                                                    │
│ ○ Personne physique        ○ Personne morale               ○ Au domicile élu, au mandataire lui-même │
│    au destinataire lui-même    à Nom/Prénom(s) ...................................  │
│                                qui a déclaré être habilité(e) à recevoir copie     │
│ ainsi déclaré(e), laquelle personne a accepté l'exploit                            │
└──────────────────────────────────────────────────────────────────────────────────┘

┌──────────────────────────────────────────────────────────────────────────────────┐
│ **B) SIGNIFICATION À DOMICILE**                                                     │
│ B.I.) Ayant trouvé  *Mme Perr Giovanna*          *employée*           demeurant à  │
│                      (Nom/Prénom(s))                (Qualité)                       │
│ ○ la même adresse   *A D-5393 ort*                                                 │
│                                                                                    │
│ ainsi déclaré(e), laquelle personne a accepté de recevoir copie et de donner récépissé, sur quoi l'huissier de justice soussigné lui a remis copie de l'exploit sous enve- │
│ loppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli; en │
│ outre, une copie de l'exploit sur papier libre avec l'avis prévu par l'alinéa 5 de l'art. 155 N.C.P.C. a été laissée sur les lieux, le tout sous enveloppe fermée ne portant │
│ que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli. │
│                                                                                    │
│                                          Visa de la personne rencontrée dans les lieux │
└──────────────────────────────────────────────────────────────────────────────────┘

┌──────────────────────────────────────────────────────────────────────────────────┐
│ B.II.) N'ayant pu trouver personne ayant qualité de recevoir la copie de l'acte et donner récépissé ou qui ait accepté de recevoir la copie de l'acte et de donner │
│         récépissé, étant donné                                                      │
│ ○ qu'il n'y avait personne                                                         │
│ ○ que la personne présente a refusé l'acceptation de l'exploit dans les conditions requises par la Loi │
│ ○ que la personne présente n'avait pas atteint l'âge de 15 ans                     │
│ ○ que la personne présente était le(a) requérant(e)                                │
│                                                                                    │
│ et après diligences effectuées et vérifications faites sur l'exactitude de l'adresse │
│ l'huissier de justice soussigné a laissé sur les lieux une copie de l'exploit ainsi qu'un avis de passage renseignant sur les modalités de signification de l'exploit, le tout │
│ sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture │
│ du pli, et il a en outre envoyé par lettre simple une copie de l'exploit et de l'avis de passage au destinataire dans le délai prévu par la Loi. │
└──────────────────────────────────────────────────────────────────────────────────┘

┌──────────────────────────────────────────────────────────────────────────────────┐
│ Il est porté à la connaissance du destinataire du présent avis que l'huissier de justice s'est présenté à la date et à l'adresse reprises ci-dessus pour lui signifier un │
│ exploit. Le destinataire lui-même n'ayant pu être trouvé,                          │
│                                                                                    │
│ ☒ copie du prédit exploit a été remise sous enveloppe fermée à la personne préqualifiée sub B.I) ; une deuxième enveloppe contenant copie de l'exploit et le pré- │
│   sent avis a été laissée sur les lieux.                                           │
│                                                                                    │
│ ○ copie du prédit exploit et le présent avis ont été laissés à l'adresse du destinataire sous enveloppe fermée ; une deuxième copie du prédit exploit et le présent avis │
│   ont été envoyés, dans le délai prévu par la Loi, par lettre simple au destinataire. │
│                                                                                    │
│ Date qu'en tête.                                                                   │
└──────────────────────────────────────────────────────────────────────────────────┘

Avec déclaration que la présente est faite, conformément aux dispositions
prévues par l'article 155 et s. du Nouveau Code de Procédure Civile.
Tous les paragraphes non marqués d'une croix sont réputés non écrits.

┌──────────────────────────────┐
│  signature de l'huissier de justice │
└──────────────────────────────┘

Remarques: ...............................................

**TAPELLA & NILLES**
HUISSIERS DE JUSTICE

### MODALITÉS DE REMISE D'EXPLOIT CONTENANT AVIS DE PASSAGE

L'an deux mille .... *quinze*, le .... *(deux) Octobre* ..

Le présent exploit a été remis par l'huissier de justice soussigné dans les conditions indiquées à la rubrique marquée d'une croix et selon les déclarations recueillies, pour le destinataire en

◯ son domicile   ◯ sa résidence   ◯ son siège
◯ son domicile élu chez ...........................................
⊗ *adresse professionnelle* ...........................
...........................................

comme il est dit ci-dessous.

Vérifications faites sur l'exactitude de l'adresse
◯ auprès du bureau de population   ◯ auprès du registre de commerce   ◯ sur la sonnette / boîte aux lettres   ◯ ...............

**Destinataire de l'exploit**

**Monsieur FAVRE Claude**
**sans état connu**
**38, avenue du X Septembre**
**L-2550 LUXEMBOURG**

---

**A) SIGNIFICATION À PERSONNE**

◯ Personne physique au destinataire lui-même   ◯ Personne morale à Nom/Prénom(s) ..................
qui a déclaré être habilité(e) à recevoir copie   ◯ Au domicile élu, au mandataire lui-même
ainsi déclaré(e), laquelle personne a accepté l'exploit

---

**B) SIGNIFICATION À DOMICILE**

B.I.) Ayant trouvé *M. Vachon Sebastien* *associé* demeurant à
(Nom/Prénom(s))   (Qualité)

⊗ la même adresse   ◯ ...........................

ainsi déclaré(e), laquelle personne a accepté de recevoir copie et de donner récépissé, sur quoi l'huissier de justice soussigné lui a remis copie de l'exploit sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli; en outre, une copie de l'exploit sur papier libre avec l'avis prévu par l'alinéa 5 de l'art. 155 N.C.P.C. a été laissée sur les lieux, le tout sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli.

Visa de la personne rencontrée dans les lieux

B.II.) N'ayant pu trouver personne ayant qualité de recevoir la copie de l'acte et donner récépissé ou qui ait accepté de recevoir la copie de l'acte et de donner récépissé, étant donné

◯ qu'il n'y avait personne
◯ que la personne présente a refusé l'acceptation de l'exploit dans les conditions requises par la Loi
◯ que la personne présente n'avait pas atteint l'âge de 15 ans
◯ que la personne présente était le(a) requérant(e)

et après diligences effectuées et vérifications faites sur l'exactitude de l'adresse
l'huissier de justice soussigné a laissé sur les lieux une copie de l'exploit ainsi qu'un avis de passage renseignant sur les modalités de signification de l'exploit, le tout sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli, et il a en outre envoyé par lettre simple une copie de l'exploit et de l'avis de passage au destinataire dans le délai prévu par la Loi.

---

Il est porté à la connaissance du destinataire du présent avis que l'huissier de justice s'est présenté à la date et à l'adresse reprises ci-dessus pour lui signifier un exploit. Le destinataire lui-même n'ayant pu être trouvé,

⊗ copie du prédit exploit a été remise sous enveloppe fermée à la personne préqualifiée sub B.I) ; une deuxième enveloppe contenant copie de l'exploit et le présent avis a été laissée sur les lieux.

◯ copie du prédit exploit et le présent avis ont été laissés à l'adresse du destinataire sous enveloppe fermée ; une deuxième copie du prédit exploit et le présent avis ont été envoyés, dans le délai prévu par la Loi, par lettre simple au destinataire.

Date qu'en tête.

Avec déclaration que la présente est faite, conformément aux dispositions prévues par l'article 155 et s. du Nouveau Code de Procédure Civile.
Tous les paragraphes non marqués d'une croix sont réputés non écrits.

signature de l'huissier de justice

Remarques: ...........................................

**TAPELLA & NILLES**
HUISSIERS DE JUSTICE

## MODALITÉS DE REMISE D'EXPLOIT CONTENANT AVIS DE PASSAGE

L'an deux mille .... *quinze*, le .... *cinq octobre*

Le présent exploit a été remis par l'huissier de justice soussigné dans les conditions indiquées à la rubrique marquée d'une croix et selon les déclarations recueillies, pour le destinataire en

◯ son domicile  ◯ sa résidence  ◯ son siège

◯ son domicile élu chez ........................................

.......................................................................

*⊗ adresse professionnelle*

.......................................................................

comme il est dit ci-dessous.

Vérifications faites sur l'exactitude de l'adresse

◯ auprès du bureau de population  ◯ auprès du registre de commerce  ◯ sur la sonnette / boîte aux lettres  ◯ ..................................

| Destinataire de l'exploit |
| --- |
| **Monsieur VACHON Sébastien**<br>**Sans état connu**<br>**38, avenue du X Septembre**<br>**L-2550 LUXEMBOURG** |

### A) SIGNIFICATION À PERSONNE

◯ Personne physique  ◯ Personne morale  ◯ Au domicile élu, au mandataire lui-même
au destinataire lui-même  à Nom/Prénom(s) ....................................
qui a déclaré être habilité(e) à recevoir copie

ainsi déclaré(e), laquelle personne a accepté l'exploit

### B) SIGNIFICATION À DOMICILE

B.I.) Ayant trouvé ................................................................................................ demeurant à .........
         (Nom/Prénom(s))                                                   (Qualité)

◯ la même adresse

ainsi déclaré(e), laquelle personne a accepté de recevoir copie et de donner récépissé, sur quoi l'huissier de justice soussigné lui a remis copie de l'exploit sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli; en outre, une copie de l'exploit sur papier libre avec l'avis prévu par l'alinéa 5 de l'art. 155 N.C.P.C. a été laissée sur les lieux, le tout sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli.

| | Visa de la personne rencontrée dans les lieux |
| --- | --- |

B.II.) N'ayant pu trouver personne ayant qualité de recevoir la copie de l'acte et donner récépissé ou qui ait accepté de recevoir la copie de l'acte et de donner récépissé, étant donné

◯ qu'il n'y avait personne

◯ que la personne présente a refusé l'acceptation de l'exploit dans les conditions requises par la Loi

◯ que la personne présente n'avait pas atteint l'âge de 15 ans

◯ que la personne présente était le(a) requérant(e)

et après diligences effectuées et vérifications faites sur l'exactitude de l'adresse
l'huissier de justice soussigné a laissé sur les lieux une copie de l'exploit ainsi qu'un avis de passage renseignant sur les modalités de signification de l'exploit, le tout sous enveloppe fermée ne portant que l'indication des nom, prénom(s), qualité et adresse du destinataire et le cachet de l'huissier de justice apposé sur la fermeture du pli, et il a en outre envoyé par lettre simple une copie de l'exploit et de l'avis de passage au destinataire dans le délai prévu par la Loi.

Il est porté à la connaissance du destinataire du présent avis que l'huissier de justice s'est présenté à la date et à l'adresse reprises ci-dessus pour lui signifier un exploit. Le destinataire lui-même n'ayant pu être trouvé,

◯ copie du prédit exploit a été remise sous enveloppe fermée à la personne préqualifiée sub B.I) ; une deuxième enveloppe contenant copie de l'exploit et le présent avis a été laissée sur les lieux.

◯ copie du prédit exploit et le présent avis ont été laissés à l'adresse du destinataire sous enveloppe fermée ; une deuxième copie du prédit exploit et le présent avis ont été envoyés, dans le délai prévu par la Loi, par lettre simple au destinataire.

Date qu'en tête.

Avec déclaration que la présente est faite, conformément aux dispositions
prévues par l'article 155 et s. du Nouveau Code de Procédure Civile.
Tous les paragraphes non marqués d'une croix sont réputés non écrits.

| | signature de l'huissier de justice |
| --- | --- |

Remarques: ..................................................................................................

A l'appel de la cause à l'audience publique ordinaire des référés du 25 janvier 2016, Maître Max MAILLIET donna lecture de l'assignation ci-avant transcrite et exposa ses moyens.

Maître Sabrina MARTIN et Maître Annie ELFASSI répliquèrent.

Le juge des référés prit l'affaire en délibéré et rendit à l'audience publique extraordinaire des référés de ce jour l'

# O R D O N N A N C E

## qui suit:

### Rétroactes

Le 29 avril 2009 la société AHMOSE SA est constituée, l'article 10, alinéa 2 des statuts étant à cette époque libellé comme suit : « *Les administrateurs seront élus par l'assemblée générale des actionnaires à la majorité simple des voix valablement émises. Tout administrateur peut être démis de ses fonctions à tout moment avec ou sans justification par l'assemblée générale des actionnaires à la majorité simple des voix valablement émises.* ».

Différents investisseurs ayant par après fait leur entrée dans le capital social d'AHMOSE, les statuts ont été modifiés à plusieurs reprises et, depuis le 29 octobre 2012, l'article 10 alinéa 2, était de la teneur suivante: « *La Société sera administrée par un conseil d'administration composé de trois membres au moins ......Les administrateurs seront élus à partir d'une liste de noms fournie par ACHERON Capital Limited, à une majorité simple des voix valablement exprimées et comptabilisées. Chaque administrateur est révocable à tout moment, avec ou sans cause par l'assemblée générale des actionnaires à une majorité simple des voix valablement exprimées. Dans l'hypothèse où un poste d'administrateur devient vacant à la suite d'un décès, d'une démission ou autrement, un administrateur peut être provisoirement désigné jusqu'à la prochaine assemblée générale, en suivant les dispositions légales qui s'appliquent*».

A l'heure actuelle, sont notamment actionnaires d'AHMOSE SA i) la société ACHERON CAPITAL Ltd détenant 1,08 % du capital social, ii) TOMSON PTe Ltd,- qui a fait son entrée dans le capital social d'AHMOSE, le 2 juin 2015, en acquérant les actions, détenues jusqu'alors par la société CORRADO INVESTMENTS Ltd-, représentant 26,68% du capital social, iii) Marc BATAILLON détenant 21,86 % du capital social, iv) FURSTENBERG CAPITAL SCA détenant 30,52% du capital social, v) le surplus des actions représentant le capital social d'AHMOSE étant détenu par d'autres investisseurs. Jusqu'en 2015, les personnes suivantes faisaient partie du conseil d'administration d'AHMOSE : Carlo TOLLER, Charles MEEUS et Caroline VERHAEVEN.

Suivant courrier du 9 avril 2015, Marc BATAILLON a demandé à voir convoquer une assemblée générale extraordinaire (AGE), pour voir délibérer de l'ordre du jour suivant :

"*1. Removal of the words "from a list of names proposed by Acheron Capital Limited" from article 10 of the articles of association of the Company (the Articles);*

*2. Subsequent amendment of the second paragraph of article 10 of the Articles to reflect the above resolution and which shall now read as follows: 'Art. 10. The directors shall be elected at a simple majority of the votes validly cast. Any director may be removed at any time with or*

*without cause by the general meeting of shareholders at a simple majority of the votes validly cast'*

*3. Dismissal of the current members of the board of directors of the Company; and*

*4. Appointment of Mr. Claude Favre, Mr. Sebastien Vachon and Mr. Marc Bataillon as new members of the board of directors of the Company for a 6 year period."*

Par convocation du 4 mai 2015, le conseil d'administration d'AHMOSE, par le biais de Carlo TOLLER, a fait convoquer l'AGE pour le 13 mai 2015, avec à l'ordre du jour, outre les susdits points 1-4, les points suivants:

*« 5. As a consequence of item 3 above, subsequent discharge to be given to the dismissed directors of the Company for the exercise of their mandate up to the date of this extraordinary general meeting;*

*6. Dissolution and liquidation of the Company in compilance with articles 141 to 151 of the law of 10 August 1915 on commercial companies, as amended;*

*7. Appointment of a liquidator and détermination of the remuneration of such liquidator;*

*8. Obligation for the liquidator appointed under item 7 above to distribute the shares held by the Company in Acheron Portfolio Corporation (Luxembourg) S.A. in kind to the shareholders of the Company;*

*9. Miscellaneous."*

Le 13 mai 2015, l'AGE s'est réunie, un bureau ayant été constitué, l'assemblée ayant commencé à délibérer sur les différents points inscrits à l'ordre du jour : les cinq (5) premiers points ont été adoptés tandis que le point 6 (dissolution et liquidation de la société) a été rejeté à la majorité. Sur base de ce constat, l'AGE a été prorogée à quatre semaines, en application de l'article 67 point 5 de la loi du 10 août 1915.

Par courrier du 15 mai 2015, Caroline VERHAEVEN a informé la société AHMOSE SA de sa décision de démissionner de ses fonctions d'administrateur du conseil d'administration, avec effet à partir de la date du courrier.

Le 2 juin 2015, TOMSON PTe Limited (ci-après TOMSON) fait son entrée dans le capital social d'AHOMSE, la société Corrado Investments Limited détenant des actions représentant 26,66% du capital d'AHMOSE, lui cédant ses actions.

Le 10 juin 2015, l'AGE des actionnaires de la société AHMOSE s'est réunie une nouvelle fois et il y a notamment été décidé que i) l'article 10, alinéa 2 des statuts est modifié en recevant la formule telle que proposée dans l'ordre du jour (cf ce qui est dit ci-avant : points 1 et 2 de l'ordre du jour ), ii) Carlo TOLLER et Caroline VERHAEVEN sont révoqués, avec effet immédiat, de leur fonction d'administrateurs, Charles MEEUS étant le seul à rester dans ses fonctions d'administrateur, celui-ci ayant procédé à la cooptation de deux adminstrateurs en les personnes de Claude FAVRE et Sébastien VACHON, ceux-ci restant en fonctions jusqu'à la prochaine assemblée générale, au cours de laquelle il serait délibéré sur leur nomination définitive comme membres du conseil d'administration.

Suivant courrier du 9 juillet 2015, le conseil d'administration d'AHMOSE a fait convoquer une assemblée générale (AG) pour le 17 juillet 2015, avec, à l'ordre du jour:

« *1. Approval of the Company's annual accounts for the financial year started on 1 January 2014 and ended on 31 December 2014; allocation of the company's results*

*2. Discharge to the Company's directors for the period started on 1 january 2014 and ended on 31 December 2014*

*3. Discharge to the Company's statutory auditor for the period started on 1 January 2014 and ended on 31 December 2014;*

*4. Approval of a Director's fee for the financial year 2014: USD 4.171,34*

*5. Ratification and cooptation of Mr Vachon and Mr Favre as directors of the Company, and*

*6. Any other business.* »

Suivants deux courriers du 15 juillet 2015, le mandataire de TOMSON et d'ACHERON CAPITAL informe les mandataires d'AHMOSE SA, de Charles MEEUS, de Claude FAVRE et de Sébastien VACHON, que i) lesdites sociétés assisteront à l'assemblée générale du 17 juillet 2015, sous la réserve expresse d'en requérir ultérieurement la nullité, ii) une liste de candidats en vue des deux postes d'administrateurs est proposée et jointe au courrier.

Au cours de l'AG du 17 juillet 2015, la cooptation telle que résultant de l'AGE du 10 juin 2015 a été ratifiée, les trois administrateurs Charles MEEUS, Claude FAVRE et Sébastien VACHON étant partant restés en fonction.


**Actes de procédure et décision de justice antérieurs :**

- Par **exploit d'huissier du 22 juin 2015**, ACHERON CAPITAL ltd et TOMSON PTe Ltd (ci-après ACHERON CAPITAL et TOMSON) ont fait donner assignation à AHMOSE SA (ci-après AHMOSE), Charles MEEUS, Claude FAVRE et Sébastien VACHON pour, dès à présent et par provision, i) voir suspendre les effets de la cooptation de Claude Favre et Sébastien Vachon intervenue en date du 10 juin 2015, jusqu'à ce qu'une décision définitive sur le fond sur la nullité de cette cooptation d'administrateurs soit intervenue, ii) par conséquent entendre faire défense à AHMOSE de prendre une quelconque décision, par l'intermédiaire de son conseil d'administration actuellement en fonction,- suite à la cooptation de Claude Favre et Sébastien Vachon-, ce jusqu'à ce qu'une décision définitive sur le fond de la demande en nullité de ladite cooptation d'administrateurs soit intervenue, iii) voir condamner solidairement les parties assignées à leur payer une indemnité de procédure de 5.000,00 euros, iv) voir ordonner l'exécution provisoire de l'ordonnance à intervenir, nonobstant opposition appel sur minute et sans caution, v) se voir réserver tous autres droits, dus, moyens et actions, dont notamment le droit de demander des dommages intérêts à l'encontre des parties assignées.


- Faisant valoir que i) elles sont également actionnaires de la société AHMOSE SA, ce à concurrence d'un pourcentage total de 52,08% du capital social, ii) elles ont un intérêt légitime, personnel et suffisant, direct et matériel, à intervenir à l'instance, la décision à intervenir pouvant avoir des conséquences à leur égard, notamment par rapport aux

-20-

participations détenues dans la société AHMOSE, Marc BATAILLON et FURSTENBERG CAPITAL SCA ont demandé à **intervenir volontairement** dans l'instance engagée suivant exploit d'huissier du 22 juin 2015. Les parties défenderesses Charles MEEUS, Claude FAVRE et Sébastien VACHON ont soulevé l'exception de caution judicatum solvi et ont demandé à voir ordonner, par ordonnance séparée, à la société TOMSON PTe Limited de consigner le montant de 20.000 euros à titre de caution (montant auquel l'indemnité de procédure, droit qu'ils se sont réservé, a été évalué). Charles MEEUS, Claude FAVRE et Sébastien VACHON, ont, quant au fond, conclu à voir débouter ACHERON CAPITAL et TOMSON de leur demande et ont sollicité, en ordre subsidiaire, la nomination de deux administrateurs ad'hoc jusqu'à ce qu'une décision au fond sur la demande en nullité de la cooptation de Claude FAVRE et Sébastien VACHON, intervienne.

- Par **ordonnance de référé** rendue en date du 27 novembre 2015, i) l'intervention volontaire de Marc BATAILLON et de FURSTENBERG CAPITAL S.C.A., a été reçue en la forme, ii) l'exception de caution judicatum solvi soulevée par Charles MEEUS, Claude FAVRE et Sébastien VACHON a été déclarée recevable et fondée, iii) il a été ordonné à TOMSON de fournir, avant tout autre progrès en cause, dans le mois de la signification de l'ordonnance, auprès de la Caisse de Consignation, la somme de 20.000,00 euros à titre de caution judicatum solvi afin de garantir les frais résultant du procès, iv) l'affaire a été refixée pour continuation des débats à une audience ultérieure, v) le surplus a été réservé, vi) l'exécution provisoire de l'ordonnance nonobstant toutes voies de recours et sans caution, a été ordonnée.

- En exécution de la susdite décison de justice, la caution telle que judiciairement fixée a été consignée par TOMSON en date du 10 décembre 2015.

- Par exploit d'huissier du 1er juillet 2015, ACHERON CAPITAL et TOMSON ont fait assigner AHMOSE SA, Chrales MEEUS, Claude FAVRE et Sébastien VACHON devant le tribunal d'arrondissement de Luxembourg, siégeant en matière commerciale, aux fins de voir déclarer nulle et non avenue la cooptation intervenue le 10 juin 2015, de Claude FAVRE et de Sébastien VACHON en tant qu'administrateurs d'AHMOSE SA.

- Par exploit d'huissier du 15 septembre 2015, FURSTENBERG CAPITAL SCA, Marc BATAILLON et AHMOSE SA ont fait assigner Carlo TOLLER, ACHERON CAPITAL et TOMSON devant le tribunal d'arrondissement de Luxembourg, siégeant en matière commerciale, aux fins, notamment, de i) voir déclarer nulles les résolutions prises lors de l'assemblée générale des actionnaires prorogée du 10 juin 2015 et voir déclarer valables les résolutions prises lors de l'assemblée générale des actionnaires du 13 mai 2015, ii) voir dire que Carlo TOLLER et ACHERON CAPITAL, assistés par TOMSON, ont abusé de leur droit en vertu de l'article 67, point 5 de la loi du 10 août 1915 et ont violé l'article 172-1 de cette même loi et partant les voir condamner à payer à chacune des parties requérantes, le montant de 500.000,00 euros au titre du préjudice matériel subi, outre le montant de 100.000,00 euros, au titre du préjudice moral subi.

- L'instance relative aux prédites assignations est actuellement pendante devant la section commerciale du tribunal d'arrondissement de Luxembourg, les parties s'accordant à dire que débats sont fixés au mois de mars de l'année 2016.

**Actes de procédure ultérieurs : droits et moyens des différentes parties à l'instance**

Prétentions et moyens de ACHERON CAPITAL et de TOMSON

Par **exploits d'huissier des 2 et 5 octobre 2015**, ACHERON CAPITAL et TOMSON ont fait donner assignation à AHMOSE SA, Charles MEEUS, Claude FAVRE et Sébastien VACHON pour, dès à présent et par provision, i) voir suspendre les effets de l'assemblée générale de la société Ahmose S.A. du 17 juillet 2015, jusqu'à ce qu'une décision définitive au fond relative à la demande en nullité de ladite assemblée générale soit intervenue, ii) voir nommer un administrateur provisoire d'AHMOSE, avec pour mission de: « gérer et administrer la société suivant les lois et usages du commerce, de prendre possession de tous documents et autres livres comptables de la société jusqu'à ce qu'une décision définitive au fond sur la validité de la cooptation du 10 juin 2015 et de l'assemblée générale d'Ahmose du 17 juillet 2015 soit intervenue », iii) voir dire que les frais et honoraires proméritées de l'administrateur provisoire sont à prélever sur l'actif de la société Ahmose, iv) voir condamner solidairement les parties assignées à leur payer une indemnité de procédure de 5.000,00 euros, v) voir ordonner l'exécution provisoire de l'ordonnance à intervenir et nonobstant opposition appel sur minute et sans caution.

A l'appui des leurs demandes (suspension de la cooptation/supsension des effets de l'AG), quant aux faits et rétroactes, ACHERON CAPITAL et TOMSON font exposer que, quant à la société AHMOSE SA, i) celle-ci dispose d'un capital social souscrit de USD 4.075.308, ii) elle a principalement investi dans une société (cotée à la Bourse de Luxembourg) Acheron Portfolio Corporation (Luxembourg) SA, iii) jusqu'au 10 juin 2015, elle était administrée par un conseil d'administration composé de trois administrateurs,- Charles MEEUS, Caroline VERHAEVEN et Carlo TOLLER, iv) le capital social d'AHMOSE est représenté par plusieurs classes d'actions, d'une valeur nominale de 0,10 USD chacune, détenues à concurrence de 1,08 % par ACHERON CAPITAL et à concurrence de 26,68% par TOMSON, soit un total de 27,76 % du capital social, v) parmi les autres actionnaires, se trouvent Marc BATAILLON (21,86 %) et la société FURSTENBERG CAPITAL SCA (30,52 %), gérée par son associé commandité, FURSTENBERG sàrl (appartenant à concurrence de 60% à Erich BONNET et de 40% à Jean-Michel PAUL, également actionnaire d'AHMOSE et de TOMSON).

Elles font encore exposer que i) FURSTENBERG CAPITAL SCA est un véhicule d'investissement regroupant un certain nombre d'investisseurs, dont un certain nombre de résidents luxembourgeois, ii) Erich BONNET a récemment pris, de manière hostile, le contrôle de FURSTENBERG sàrl et par conséquent aussi celui de FURSTENBERG CAPITAL SCA, iii) Erich BONNET et Marc BATAILLON ont joint leurs forces pour prendre, de manière hostile, le contrôle d'AHMOSE.

Elles poursuivent en soulignant que i) au cours de l'année 2012, AHMOSE a fait l'obet d'une restructuration, de nouveaux actionnaires ayant fait leur apport, les statuts comprenant depuis lors, une clause selon laquelle les administrateurs sont élus à partir d'une liste proposée par ACHERON, l'article 10 des statuts ayant été modifié (à ce titre il est renvoyé à ce qui a été dit ci-avant dans les rétroactes), ii) le 13 mai 2015 s'est tenue une assemblée générale extraordinaire d'AHMOSE, convoquée à la demande de Marc BATAILLON, le but de cette assemblée ayant été de remettre en cause la disposition spécifique des statuts relative à l'obligation de choisir les administrateurs à partir d'une liste proposée par ACHERON CAPITAL, de modifier ensuite le conseil d'administration, afin de permettre à Marc BATAILLON,-soutenu par Erich BONNET-, de prendre le contrôle de la société (pour l'ordre du jour de l'AGE il est renvoyé à ce qui a été dit ci-avant dans les rétroactes), iii) à la demande d'un groupe

d'actionnaires détenant plus de 20% du capital social, l'assemblée a été prorogée à quatre semaines, l'assemblée ultérieure ayant été convoquée pour le 10 juin 2015.

Elles font relever qu'au cours de l'AGE du 10 Juin 2015, i) deux membres du conseil d'administration, Carlo TOLLER et Caroline VERRHAEVEN, ont été révoqués,- le vote s'étant fait à raison de 52,4% contre 47,6%, l'ensemble des petits actionnaires s'étant ralliés à TOMSON et ACHERON CAPITAL-, le seul adminstrateur n'ayant pas été révoqué étant Charles MEEUS (qui serait un employé d'Erich BONNET « *de son état dans diverses entreprises dont FURSTENBERG sàrl* »), ii) les administrateurs révoqués n'ont pas été remplacés, nonobstant le fait qu'ACHERON CAPITAL avait, lors de la réunion, produit une liste d'administrateurs potentiels, l'avocat de Marc BATAILLON ayant refusé de la prendre en considération, iii) à partir de ce moment, le conseil d'administration n'était plus que composé d'un seul et unique administrateur, Charles MEEUS, iv) voyant leur plan de modification des statuts échouer, Marc BATAILLON et Erich BONNET ont demandé à celui-ci (unique administrateur restant) de compléter le conseil d'administration, par cooptation.

ACHERON CAPITAL et TOMSON donnent à considérer que i) l'unique motif de cette manière de procéder était lié au fait que Marc BATAILLON et « ses complices », refusaient de choisir un administrateur parmi la liste présentée par ACHERON CAPITAL, ii) dans l'hypothèse où aucun des candidats proposé par celle-ci ne convenait aux majoritaires, il aurait fallu lui demander de proposer d'autres candidats,- éventuellement plus neutres-, sinon de proposer eux-mêmes des candidats pour compléter la liste d'ACHERON CAPITAL, ce qui n'a pourtant pas été fait, iii) au lieu de procéder par la cooptation, il aurait été préférable, soit de demander la nomination d'un administrateur provisoire, soit de convoquer une nouvelle assemblée générale, iv) les administrateurs démis auraient dû rester en fonction, jusqu'à ce que leurs remplaçants soient dûment désignés et choisis.

Ce serait dès lors en violation totale des modalités d'élection des administrateurs, telles que prévues par les statuts, que Charles MEEUS a décidé de coopter deux autres administrateurs (non inscrits sur la liste établie par ACHERON CAPITAL), à savoir Claude FAVRE et Sébastien VACHON, qui seraient tous les deux des proches de Marc BATAILLON et de Erich BONNET.

Cette manière de procéder serait constitutif d'un abus de majorité caractérisé, prémédité, la cooptation ayant manifestement été planifiée par les actionnaires majoritaires, préalablement à l'AG litigieuse, dont ils auraient pertinemment su, qu'elle ne recueillerait pas les votes nécessaires pour mener à bien leurs plans.

ACHERON CAPITAL et TOMSON font relever que les actionnaires minoritaires ont été tenus « dans le noir le plus complet de cette cooptation », jusqu'à sa publication au Registre de Commerce et des Sociétés (RCS) et que suite à la cooptation, les trois administrateurs ont aussitôt commencé à poser des actes de gestion, en prenant soin de ne pas en informer les anciens administrateurs (qui, se croyant encore en fonction pour régler la gestion courante de la société jusqu'à la nomination de nouveaux administrateurs, ont découvert la cooptation sur le site internet du RCS).

L'idée aurait été de s'arracher, de manière hostile, le contrôle de AHMOSE SA et d'utiliser les actifs de la société à de nouvelles fins.

Elles font finalement encore souligner que i) par assignation du 1er juillet 2015, elles ont agi au fond en nullité de la cooptation litigieuse, ii) nonobstant l'instance de référé pendante entre parties (introduite suivant exploit d'huissier du 22 juin 2015),- ce dont les administrateurs (en place suite à la cooptation) étaient pleinement au courant-, ceux-ci ont fait convoquer une

nouvelle assemblée générale pour le 17 juillet 2015, suivant convocation du 9 juillet 2015 (donc sous respect du délai minimal de 8 jours, mais sans un jour de plus), avec, à l'ordre du jour (cf ce qui a été dit ci-avant dans les rétroactes).

La convocation du 9 juillet 2015 serait irrégulière pour avoir été émise et signée par Charles MEEUS, au nom du conseil d'administration, alors que suite à la cooptation, le conseil d'administration serait irrégulièrement composé, ses membres étant par ailleurs au courant des contestations afférentes d'ACHERON CAPITAL et de TOMSON ; ce serait dans le but de faire ratifier la cooptation, que l'assemblée a été convoquée.

Les parties requérantes font encore préciser que i) avant le 10 juin 2015, (date de la révocation de deux membres du conseil d'administration), les comptes annuels de 2014 n'avaient pas encore été arrêtés par le conseil d'administration, ii) ces comptes ont dès lors été arrêtés, alors que la convocation à l'assemblée générale a été lancée par un conseil d'administration composé irrégulièrement, iii) par courrier du 15 juillet 2015, le mandataire d'ACHERON CAPITAL et de TOMSON a fait valoir la nullité de ladite convocation, en insistant sur le fait que lesdites sociétés se présenteraient à ladite assemblée sous la réserve expresse de ladite nullité, iv) par un deuxième courrier du 15 juillet 2015, ACHERON CAPITAL a proposé une liste d'administrateurs (conformément à l'article 10 des statuts), v) ACHERON CAPITAL et TOMSON se sont présentées à l'assemblée, sous la réserve expresse faire valoir la nullité de la convocation, v) nonobstant l'existence desdites réserves l'assemblée a été tenue.

Elles font préciser qu'au cours de l'assemblée du 17 juillet 2015, i) Marc BATAILLON et FURSTENBERG CAPITAL SCA ont voté pour la ratification de la cooptation, tandis que TOMSON et ACHERON CAPITAL ont voté contre, ii) Marc BATAILLON et FURSTENBERG ont ainsi mis en place trois administrateurs qui leur étaient proches et, quant à la liste proposée par Acheron, ils ont fait valoir que, d'une part, ce point ne figurait pas à l'ordre du jour et que, d'autre part, les administrateurs proposés ne seraient pas neutres (argument « ne tenant pas la route », iii) lors de l'assemblée, les deux administrateurs cooptés n'étaient même pas présents ni représentés.

En droit, quant au volet de leur demande tendant à voir suspendre les effets de la cooptation, ACHERON CAPITAL et TOMSON font valoir que i) la cooptation a été faite en violation de l'article 10 des statuts d'AHMOSE, alors que les administrateurs cooptés par l'administrateur restant ne figuraient pas sur la liste fournie par ACHERON CAPITAL, ii) suivant les termes même de l'article 51 de la loi du 10 août 1915, dans l'hypothèse où il ne reste qu'un administrateur en fonction au conseil d'administration, ce dernier ne peut avoir recours à la cooptation, l'article 51 disposant de façon expresse qu'en cas de vacance, « les administrateurs restant ainsi nommés » peuvent y pourvoir provisoirement, iii) au vu de cette disposition, il ne ferait aucun doute que la cooptation ne se conçoit que pour autant qu'il y ait deux administrateurs au moins, iv) l'article 51 dispose que les administrateurs ont le droit de pourvoir provisoirement à la vacance « d'une place d'administrateur », la décision de cooptation ne pouvant dès lors viser qu'un seul administrateur à la fois, alors que toutefois en l'espèce, Charles MEEUS a procédé, par une même résolution, à la cooptation de deux nouveaux administrateurs, v) d'après la jurisprudence et la doctrine luxembourgeoises la cooptation ne serait plus possible, lorsqu'est convoquée une assemblée d'actionnaires ayant à l'ordre du jour, la nomination d'administrateurs aux fins de compléter le conseil d'administration, alors que pourtant tel fût le cas en l'espèce, vi) en pareille hypothèse, la cooptation d'administrateurs par le conseil d'administration serait exclue et toute nomination faite dans de telles conditions devrait être considérée comme nulle et non avenue.

Elles font finalement encore relever que i) en vertu de l'article 51 de la loi du 10 août 1915, l'assemblée générale procède par la suite, à l'élection définitive de l'administrateur coopté, ii) dans la mesure où en vertu des statuts, l'assemblée générale ne peut nommer les administrateurs que sur la base d'une liste fournie par Acheron Capital Limited, il ne saurait être fait être échec aux stipulations conventionnelles que sont les statuts, par une cooptation d'administrateurs non issus d'une liste fournie par ACHERON CAPITAL, ii) la cooptation d'administrateurs non issus de cette liste, contreviendrait au pacte social et serait en tant que telle nulle et non avenue, iii) AHMOSE ne se trouverait ainsi pas valablement représentée, la composition du conseil d'administration étant, suite à la cooptation, irrégulière.

Quant au volet de la demande tendant à voir suspendre les effets de l'assemblée du 17 juillet 2015, ACHERON CAPITAL et TOMSON font pareillement valoir que i) la cooptation des administrateurs du 10 juin 2015 est entachée de nullité, alors qu'elle a été faite en violation de l'article 10 des statuts d'AHMOSE, ii) une ratification de la cooptation est impossible, comme constituant une fraude aux statuts, iii) la conséquence immédiate de la nullité de la cooptation du 10 juin 2015, est que le conseil d'administration d'AHMOSE n'était plus régulièrement composé, suite à la cooptation, de sorte qu'il ne pouvait régulièrement convoquer une assemblée générale, en vue de faire approuver des comptes, arrêtés et de faire ratifier sa nouvelle composition, faite en violation des statuts de la société. Sur base des susdits constats, il y aurait partant lieu de suspendre les effets de l'assemblée jusqu'à ce qu'une décision définitive sur le fond relative à la nullité de la cooptation du 10 juin 2015 et de l'assemblée du 17 juillet 2015 soit rendue.

Quant au volet de la demande tendant à voir nommer un administrateur provisoire, ACHERON CAPITAL et TOMSON font valoir que i) au vu de la suspension des effets de la cooptation et de l'assemblée générale subséquente, la société n'aura plus qu'un seul administrateur et ne sera donc pas valablement représentée, ii) afin d'éviter un péril imminent pour la société il y a lieu de nommer un administrateur provisoire en lui confiant la mission telle que décrite ci-avant.

Quant à la condition tenant, en tout état de cause, à l'urgence, après avoir souligné que la doctrine admet l'intervention du juge des référés, dans la vie des sociétés chaque fois qu'il y a menace de ruine ou péril grave pour l'existence ou le fonctionnement de la société, la jurisprudence retenant qu'il y a urgence, toutes les fois que le retard apporté à une solution provisoire et ne préjugeant en rien le fond met en péril les intérêts de l'une des parties (...) ou encore lorsque la lenteur de la justice ne permet pas à une partie d'obtenir en temps utile du juge du fond la mesure sollicitée et que de ce fait les intérêts de cette partie risquent d'être mis en péril, les parties ACHERON CAPITAL et TOMSON donnent à considérer que l'urgence serait en l'espèce donnée en raison du fait que i) le conseil d'administration actuellement en fonctions, suite à la cooptation initiée par l'administrateur restant, peut, à tout moment, prendre des décisions qui s'avéreraient dramatiques tant pour les parties requérantes, que pour AHMOSE elle-même, ii) les administrateurs actuellement en fonctions peuvent à tout moment prendre les actions nécessaires afin de vider AHMOSE de sa substance, toute autre mesure que pourraient prendre les parties requérantes en vue de faire valoir leurs droits, étant dès lors vaines.

La cooptation litigieuse,- en principe formellement exclue-, ainsi que la prétendue ratification subséquente, démontreraient, d'ores et déjà, l'extrême mauvaise foi tant dans le chef de l'administrateur restant, que dans le chef de Marc BATAILLON et de ses consorts, ceux-ci voulant manifestement prendre le contrôle d'AHMOSE, par le biais d'un conseil d'administration composé selon leur vouloir.

Elles font finalement encore souligner que i) au moment de son investissement, Marc BATAILLON connaissait la teneur des statuts d'AHMOSE, ii) les statuts, et notamment la clause litigieuse, ont été rédigés par les parties adverses, l'article 10, alinéa 2 ayant cette tenur afin de protéger les petits actionnaires contre les grands, iii) cette clause serait parfaitement valable.

Prétentions et moyens de Marc BATAILLON, FURSTENBERG CAPITAL SCA, Charles MEEUS, Claude FAVRE et Sébastien VACHON

Faisant valoir que, tel que décrit ci-avant, elles ont un intérêt légitime personnel et suffisant, direct et matériel à intervenir volontairement dans le cadre de la procédure introduite par ACHERON et TOMSON suivant exploits d'huissier des 2 et 5 octobre 2015, la décision à intervenir pouvant avoir des conséquences à leur égard, notamment par rapport aux participations détenues dans la société AHMOSE, Marc BATAILLON et FURSTENBERG CAPITAL SCA ont demandé à intervenir volontairement dans l'instance engagée suivant les sudits exploits d'huissier. Les parties défenderesses Charles MEEUS, Claude FAVRE et Sébastien VACHON concluent à voir débouter ACHERON et TOMSON de leur demande; en orde subsidiaire, ceux-ci et les parties intervenantes sollicitent la nomination de deux administrateurs ad'hoc jusqu'à ce qu'une décision au fond intervienne.

A l'appui de leurs prétentions et moyens, les parties intervenantes, ainsi que les administrateurs Charles MEEUS, Claude FAVRE et Sébastien VACHON exposent, tout d'abord, quant à la structure d'AHMOSE, que i) à l'heure actuelle, la société est détenue, entre autres, par ACHERON et par TOMSON, d'une part, et par Marc BATAILLON et FURSTENBERG CAPITAL, d'autre part, ce à concurrence de 79,82% du capital social (dont 27,74% des actions détenues par Acheron Capital Ltd (1.08% du capital) et Tomson PTe Limited (26.66% du capital)), ii) Tomson PTe Limited a acquis, en date du 2 juin 2015,- de l'ancien actionnaire Corrado Investments Limited-, 26,66% du capital d'AHMOSE, iii) AHMOSE détient 4,201,746 actions de classe B, dans la société anonyme de droit luxembourgeois ACHERON PORTFOLIO CORPORATION Luxembourg SA (ci-après ACHERON PORTFOLIO), dont les actions sont cotées à la Bourse de Luxembourg, iii) un montage aurait été effectué par un certain Jean Michel PAUL,- au détriment des autres actionnaires et investisseurs-, en sa qualité de bénéficiaire économique principal des sociétés ACHERON CAPITAL et TOMSON.

Les prédites parties renvoient à la rédaction de l'alinéa 2 de l'article 10 des statuts d'AHMOSE au moment de sa constitution et font souligner que ce n'est que dans la suite, lorsque d'autres investisseurs sont entrés dans le capital social d'AHMOSE,- ce à travers Jean Michel PAUL, que les statuts ont été modifiés, l'article 10 alinéa 2, ayant eu, à partir de ce moment, un nouveau libellé (à ce titre il est renvoyé à ce qui a été dit ci-avant dans les rétroactes) ; par le biais de cette clause statutaire, le contrôle d'AHMOSE serait assuré à ACHERON CAPITAL.

Elles font valoir que i) les trois administrateurs Carlo TOLLER, Charles MEEUS et Caroline VERHAEVEN, en fonction jusqu'au 10 juin 2015, avaient été présentés par ACHERON CAPITAL (Carlo TOLLER ayant travaillé exclusivement pour cette société depuis 2008 et ayant agi exclusivement dans son intérêt, tandis que Charles MEEUS a toujours été neutre, tout comme le fut Caroline VERHAEVEN, celle-ci ayant démissionné de sa fonction d'administrateur en date du 15 mai 2015), ii) ACHERON PORTFOLIO dispose d'une majorité d'administrateurs émanant du "clan Jean Michel PAUL" (notamment Robert EDELSTEIN, Jean Michel PAUL, Marco STERZI et Jean Michel VAN LIPPEVELDE), iii) ACHERON CAPITAL perçoit des « management fees » de la société ACHERON PORTFOLIO, le montant de ces fees étant calculé sur la valeur des actifs sous gestion (à ce titre, la société Acheron Capital Ltd aurait perçu en 2013, la somme de USD 1,972,365, et en 2014, la somme de USD 1,976,434), iv) ACHERON CAPITAL aurait ainsi un intérêt à voir contrôler la société AHMOSE et la société

ACHERON PORTFOLIO, pour se voir maintenir et assurer les « management fees», v) par ailleurs, ACHERON CAPITAL et « ses personnes » auraient un conflit d'intérêts latent, dans la mesure où ils siègent non seulement dans le conseil d'administration d'ACHERON CAPITAL, mais également dans celui d'AHMOSE et d'ACHERON PORTFOLIO.

Quant aux faits intéressant le présent litige, les susdites parties font exposer que i) c'est en application de l'article 70 alinéa 2 de la loi du 10 août 1915 sur les sociétés commerciales que Marc BATAILLON a, suivant courrier du 9 avril 2015, demandé à voir convoquer une assemblée générale extraordinaire d'actionnaires, pour voir délibérer de l'ordre du jour (tel que décrit ci-avant, dans le cadre des rétroactes), ii) AHMOSE a fait convoquer, en date du 4 mai 2015, une AGE pour le 13 mai 2015 afin de délibérer, outre sur les points 1 à 4, inscrits à l'ordre du jour joint au courrier du 9 varil 2015, sur cinq autres points (à ce titre il est encore renvoyé à ce qui a été dit ci-avant).

Le 13 mai 2015, l'AGE s'est réunie et il a été délibéré et voté tel que dit ci-avant (les cinq premiers points ayant été votés, tandis que le sixième point de l'ordre du jour,-dissolution et liquidation de la société-, a été rejeté à la majorité). Suite auxdits votes, i) Carlo TOLLER,- en sa qualité de porteur d'une procuration d'ACHERON CAPITAL-, a demandé la prorogation de l'assemblée générale des actionnaires, à quatre semaines, sur base de l'article 67, 5 de la Loi, ii) le mandataire de Marc BATAILLON a contesté cette demande de prorogation en faisant valoir qu'une telle demande doit être soulevée séance tenante et avant toute délibération, iii) il a été demandé au président du bureau de prendre position, qui après avoir pris conseil auprès des avocats d'AHMOSE, a déclaré accepter de proroger l'assemblée des actionnaires à quatre semaines, iv) l'assemblée a dès lors à nouveau été convoquée pour le 10 juin 2015, avec à l'ordre du jour, les mêmes points que ceux prévus pour l'assemblée du 13 mai 2015.

Les susdites parties font souligner que i) entremps, en date du 13 mai 2015, une offre d'acquisition de l'intégralité des actions détenues par la société FURSTENBERG CAPITAL SCA dans le capital d'AHMOSE, a été faite par une société de droit de Anguilla dénommée Jade Ltd, ii) suite à la demande d'informations par FURSTENBERG CAPITAL, sur l'identité des bénéficiaires économiques de l'offrant (FURSTENBERG trouvant étrange, cette offre intervenue à l'issue de l'assemblée des actionnaires d'AHMOSE, étant donné précisément que le « clan Jean Michel PAUL » n'a pas pu faire voter les points relatifs à la dissolution et la liquidation de la société, cette résolution ayant été le seul moyen d'éviter que le « clan Jean Michel PAUL » perde le contrôle de l'administration d'AHMOSE et par voie de conséquence, risque la perte de contrôle au sein de la société ACHERON PORTFOLIO, et, par ricochet, la perte des « management fees » qu'ACHERON CAPITAL empoche tous les ans), la révélation de l'identité des bénéficiaires économiques a été refusée par l'offrant (qui aurait déclaré ne faire ces révélations qu'une fois que l'offre d'acquisition était acceptée), iii) le « clan Jean-Paul MICHEL » n'étant pas parvenu à ses fins, dont notamment celle de voir la société FURSTENBERG CAPITAL céder les actions qu'elle détenait dans le capital d'AHMOSE, il a fait une autre offre portant sur la vente d'actions représentant 26,66% du capital, détenues par la société Corrado Investments Limited, à la société TOMSON, celle-ci ayant acquis lesdites actions, en date du 2 juin 2015,- soit 8 jours avant l'assemblée générale des actionnaires devant voter sur la modification statutaire et notamment sur le retrait de la disposition stipulant que les administrateurs sont nommés parmi une liste présentée par ACHERON CAPITAL-, ce pour un prix supérieur à la valeur de marché, et uniquement afin de disposer du pourcentage requis permettant de bloquer la résolution relative à la modification statutaire (relative à la nomination des administrateurs).

Elles poursuivent en soulignant que lors de l'assemblée du 10 juin 2015, i) le point 1, de l'ordre du jour (concernant la modification statutaire) a été rejeté, faute du quorum requis par la loi, ii)

le point 3 de l'ordre du jour (prévoyant la révocation des membres du conseil d'administration) a été adopté, en la révocation de Carlo TOLLER (Caroline VERHAEVEN ayant déjà démissionné antérieurement), iii) Charles MEEUS était dès lors le seul administrateur restant, iv) le notaire Hellinckx a attiré l'attention de l'assemblée, sur le fait que le conseil d'administration devait être composé d'au moins trois membres.

En droit, les parties Charles MEEUS, Claude FAVRE et Sébastien VACHON concluent, à titre liminaire, à l'irrecevabilité des demandes adverses, en l'absence d'indication de base légale ; il leur serait impossible de déterminer le fondement juridique des demandes et, par conséquent, de déterminer si ces demandes sont susceptibles d'être déclarées recevables et fondées.

Dans l'hypothèse où le tribunal venait à considérer que les demandes sont recevables, les parties intervenantes et les parties défendresses font principalement plaider que la cooptation de Claude FAVRE et de Sébastien VACHON est régulière et conforme à la loi et aux statuts, l'alinéa 3, de l'article 10 des statuts d'AHMOSE stipulant que « Dans l'hypothèse où un poste d'administrateur devient vacant à la suite d'un décès, d'une démission ou autrement, un administrateur peut être provisoirement désigné jusqu'à la prochaine assemblée générale, en suivant les dispositions légales qui s'appliquent » et l'article 51, alinéas 5 et 6 de la Loi, disposant que « qu'en cas de vacance d'une place d'administrateur nommé par l'assemblée générale, les administrateurs restants ainsi nommés ont, sauf disposition contraire dans les statuts, le droit d'y pourvoir provisoirement. Dans ce cas, l'assemblée générale, lors de la première réunion, procède à l'élection définitive ».

Elles soulignent que, dès lors, tant la loi que les statuts donnent au conseil d'administration le droit, en cas de vacance d'un siège, de désigner lui même l'administrateur appelé à l'occuper, sauf ratification par la plus prochaine assemblée générale, ce pouvoir n'étant assorti d'aucune limite ou condition et la  ratification ayant, en l'espèce, été portée à l'ordre du jour de la prochaine assemblée générale.

Les prédites parties font relever que i) la voie de fait se définit comme étant constituée par une atteinte manifestement illicite et intolérable à un droit certain et évident d'autrui par des actes matériels posés par leur auteur en vue d'usurper un droit qu'il n'a pas ou pour se rendre justice soi même, ii) le juge des référés n'est plus compétent s'il existe une contestation sérieuse au fond, iii) les troubles doivent être manifestement illicites, ce qui présume que leur caractère illicite doit précisément ne pas faire l'objet de contestation sérieuse, iv) en vertu de l'article 932 alinéa premier du nouveau code de procédure civile, la contestation sérieuse fait obstacle aux pouvoirs du juge des référés, celle-ci existant dès lors que l'un des moyens de la défense opposés à la prétention de celui qui s'appuie sur un droit, n'est pas manifestement vain.

Elles font valoir que i) même si les statuts prévoient que « les administrateurs seront élus à partir d'une liste de noms fournis par ACHERON CAPITAL », les actionnaires n'ont aucune obligation de nommer les administrateurs à partir d'une telle liste, si ces personnes ne leur semblent pas neutres et indépendants, ii) au vu de tous les éléments de la cause, les investisseurs ont un intérêt légitime à voir préserver leur mise dans la société, notamment en évitant que le « clan Jean Michel PAUL » maintienne son contrôle dans la société, ce, malgré le conflit d'intérêts latent avec les sociétés dans lesquelles il a des intérêts, iii) face aux contestations de Marc BATAILLON et de FURSTENBERG CAPITAL, ceux-ci estimant que la cooptation satisfait aux conditions légales et statutaires, et en présence des textes légaux et statutaires prévoyant que le conseil d'administration a le droit de coopter des membres, le tribunal saisi devrait analyser si le conseil d'administration a commis un abus de droit, un détournement de pouvoir ou un excès de pouvoir, alors que pourtant le juge des référés est sans pouvoir pour exercer un tel contrôle.

Elles font finalement encore relever que si ACHERON et TOMSON n'avaient rien à se reprocher, il faut se demander pourquoi elles refusent d'accepter la cooptation, ainsi opérée, par le biais de la nomination de deux membres du conseil d'administration neutres et indépendants (tant Claude FAVRE que Sébastien VACHON seraient connus sur la place luxembourgeoise pour leur sérieux et correction, et ils n'auraient de surcroît aucun lien avec les actionnaires). La seule crainte du « clan Jean Michel PAUL» serait que les deux administrateurs cooptés ne soient pas maniables, comme l'aurait été Carlo TOLLER (salarié d'ACHERON CAPITAL depuis 2008), Caroline VEERHAEVEN ayant d'ailleurs démissionné, afin de ne pas avoir de pression exercée sur elle, tandis que Charles MEEUS a toujours conservé une neutralité dans le cadre de ses fonctions sans se laisser impressionner par Jean Michel PAUL.

En ordre subsidiaire, il y aurait lieu de procéder à la nomination de deux administrateurs ad'hoc, avec pour mission de remplacer les deux membres manquants du conseil d'administration et d'administrer la société AHMOSE S.A. jusqu'à ce qu'une décision de justice au fond intervienne définitivement, ce sous le contrôle du juge les nommant, en agissant en toute indépendance et neutralité et dans l'intérêt exclusif de la société.

Les parties Charles MEEUS, Claude FAVRE et Sébastien VACHON font finalement encore relever que i) le fait de savoir si l'article 10, alinéa 2 est une clause équitable ou non relève du fond et échappe dès lors au juge des référés, ii) après l'AG du 10 juin 2015, ACHERON PORTFOLIO/Carlo TOLLER a demandé à la banque de bloquer les comptes, mais la banque a continué à exécuter les ordres de paiement.


Moyens d'AHMOSE SA

AHMOSE donne en premier lieu à considérer qu'il faut se poser la question de savoir si i) en l'espèce la compétence du juge des référés est donnée, le débat portant sur le fait de savoir si la clause litigieuse des statuts, article 10, alinéa 2 est valable ou non, ii) il est légitime qu'un actionnaire minoritaire puisse fournir une liste d'administrateurs, alors que l'assemblée des actionnaires doit disposer d'un choix effectif pour procéder à la nomination des membres du conseil d'administration.

Au vu des questions à résoudre touchant le fond, le litige échapperait à la compétence du juge des référés.

Quant au fait de savoir si la cooptation est ou non régulière, AHMOSE se rallie aux conclusions des parties MEEUS-FAVRE-VACHON, en souligant d'une part, la teneur de l'article 51 de la loi du 10 août 1915 et d'autre part, le fait qu'en l'espèce, les statuts n'empêchent pas de procéder par le biais de la cooptation. La cooptation serait partant valable.

La condition de l'urgence serait par ailleurs pas donnée, aucune décision critiquable n'ayant été prise, et le fond du litige allant être débattu dès mars 2016.

AHMOSE conclut partant à voir débouter ACHERON CAPITAL et TOMSON de leurs demandes.

ACHERON CAPITAL et TOMSON font répliquer que leurs demandes sont basées sur les articles 933, alinéa 1er et 932, alinéa 1er du nouveau code de procédure civile, en faisant souligner que le défaut d'indication de base légale dans les exploits introductifs d'instance est sans incidence sur la recevabilté des demandes.

-29-

**Motifs de la décision**

Dans l'intérêt d'une bonne administration de la justice, il y a lieu de joindre l'assignation faite suivant exploits d'huissier des 2 et 5 octobre 2015 à celle du 22 juin 2015, étant précisé qu'il en va de même de l'intervention volontaire faite par Marc BATAILLON et par FURSTENBERG CAPITAL suite à la dernière assignation, cette intervention étant identique à celle faite suite à l'assignation du 22 juin 2015.

En ce qui concerne le défaut d'indication de base légale quant aux demandes formulées par ACHERON CAPITAL et par TOMSON, le tribunal ne peut que constater que dans la mesure où l'exposé des motifs énonce exhaustivement l'objet et la cause de la demande, étant précisé qu'aucune disposition légale n'oblige le demandeur de mentionner expressément le texte légal sur lequel il base sa demande-, et où les parties assignées n'ont pu se méprendre sur la portée de la demande dirigée à leur encontre, le moyen d'irrecevabilité laisse d'être fondé et il y a partant lieu d'analyser le litige à la lumière des articles 933, alinéa 1er et 932, alinéa 1er du nouveau code de procédure civile.

Tant les demandes faites suivant exploits d'huissier du 22 juin 2015 et des 2 et 5 octobre 2015, que l'intervention volontaire sont dès lors recevables en la forme.

Il est rappelé qu'aux termes de l'article 933, alinéa 1 du Nouveau Code de procédure civile, le président, ou le juge qui le remplace, peut toujours prescrire en référé les mesures conservatoires ou de remise en état qui s'imposent, soit pour prévenir un dommage imminent, soit pour faire cesser un trouble manifestement illicite, étant précisé que i) le trouble manifestement illicite peut se définir comme « toute perturbation résultant d'un fait matériel ou juridique qui, directement ou indirectement, constitue une violation évidente de la règle de droit » à laquelle le juge des référés peut mettre un terme à titre provisoire, ii) le trouble consiste dans un acte ou une abstention s'inscrivant en méconnaissance de l'ordre juridique établi, qu'il faut faire cesser puisqu'il est inadmissible pour constituer une illicéité manifeste (JurisClasseur Procédure civile, fasc. 471, n° 61 et 62 ; TAL référé 6 avril 2012, rôle n° 143510), iii) le dommage imminent consiste en un « dommage qui n'est pas encore réalisé, mais qui se produira sûrement si la situation présente doit se perpétuer » ; il suppose une illicéité, ou tout au moins, du fait de l'urgence inhérente à l'imminence, qu'il apparaisse comme potentiellement illicite. En effet, un dommage n'est subi que par la méconnaissance du droit et ne peut être prévenu en référé s'il est légitime (JurisClasseur Procédure civile, fasc. 471, n° 67 et suivants).

Aux termes de l'article 932, alinéa 1er du Nouveau Code de procédure civile « dans les cas d'urgence le président du tribunal, ou le juge qui le remplace, peut ordonner en référé toutes les mesures urgentes qui ne se heurtent à aucune contestation sérieuse ou que justifie l'existence d'un différend », étant précisé, qu'il y a urgence toutes les fois que le retard apporté à une solution provisoire met en péril les intérêts d'une des parties, l'urgence s'appréciant à la date de la décision.

Tel qu'il sera dit ci-après, les demandes d'ACHERON CAPITAL et de TOMSON sont vouées à l'échec, ce tant sur base de l'article 933, alinéa 1er que de l'article 932, alinéa 1er du nouveau code de procédure civile, les éléments factuels de la cause ne caractérisant ni la matérialité d'un dommage imminent ou d'un trouble manifestement, ni l'urgence et ne justifiant partant pas l'intervention du juge des référés dans la vie sociale.

L'intervention du juge des référés dans la vie des sociétés se fonde sur des critères très réticents: l'urgence, le provisoire, l'existence d'une apparence de droit et l'absence d'immixtion du juge dans la vie sociale (cf E. Pottier et M. De Roeck, L'administration provisoire: bilan et

perspectives, RDCB, 1997, p.204, n°5), étant précisé que les trois premières conditions découlent du fait que le fondement en droit du juge en matière de sociétés doit être recherché dans les conditions de droit commun du référé des articles 932 et 933 du nouveau code de procédure civile.

En ce qui concerne le premier critère, l'intervention du juge des référés ne saurait se justifier que lorsqu'il y a urgence, c'est-à-dire quand le moindre retard peut causer un préjudice irréparable. D'une manière générale, la jurisprudence est pratiquement unanime à considérer qu'il y a toujours urgence dans tous les cas où la gestion sociale n'est plus assurée par suite de la disparition, de la carence ou de la paralysie de l'un ou de plusieurs des organes sociaux (cf. Nico EDON, "L'intervention du juge des référés dans la vie des sociétés", Diagonales à travers le droit luxembourgeois, 1986, p.189).

Lorsqu'en revanche, les organes sont encore en état de fonctionner, l'urgence devra être démontrée par les circonstances de l'espèce, étant souligné qu'il s'agira essentiellement de démontrer que la non-intervention du juge produirait des suites irréparables, d'apporter la preuve du péril que courent les droits de quelqu'un si les choses sont laissées en l'état en attendant que la contestation au fond soit vidée (cf. Trib. arr. Luxembourg (référé), 28 juillet1986, n° 832/86; cf. Trib. arr. Luxembourg (référé), 27 juillet 1987, n° 811/87; cf. Trib. arr. Luxembourg (référé), 3 novembre 1988, n° 1331/88).

Quant à la condition du provisoire, celle-ci a été, selon la doctrine, petit à petit vidée de sa substance pour ne plus constituer aujourd'hui qu'une interdiction faite au juge des référés de rendre une ordonnance dont le dispositif serait déclaratif ou constitutif de droits (cf. E. POTTIER et M. DE ROECK, op.cit., p. 205, n° 9), la Cour de cassation belge ayant, à ce sujet, décidé dans un arrêt du 14 juin 1991 que la seule limite du juge des référés est que ce dernier ne peut modifier la situation juridique des parties de manière définitive et irréversible rendant inutile ou sans intérêt une décision du juge du fond en sens opposé (cf. Cass.b., 14 juin 1991, Pas.b., 1991, I, p. 99).

En ce qui concerne le troisième critère, à savoir l'apparence de droit, celui-ci découle tout naturellement du libellé de l'article 933 du nouveau code de procédure civile qui permet au juge des référés de fonder sa décision sur "une situation de fait ou de droit qui n'est ou ne peut être sérieusement contestée" (cf. Cour, 26 juin 1985, Pas. 26, p.354).

Il est enfin de principe que les juridictions n'ont à intervenir que de façon très circonspecte dans la vie sociale des sociétés commerciales et d'associations sans but lucratif tant que les organes de ces personnes morales sont en état de fonctionner (cf. E. PENNING, "Le référé ordinaire en droit luxembourgeois", Bull. Cercle Fr. Laurent, IV, 1989, p.55, n° 45) ; il appartient en effet aux seuls organes de la société tels qu'ils sont institués par la loi, de gérer la société et de mettre tout en oeuvre pour assurer son fonctionnement, cette règle ne pouvant fléchir que dans des circonstances exceptionnelles, lorsque le fonctionnement normal n'est plus assuré et que la société est menacée dans son existence. Le juge des référés doit en effet refuser son intervention dans le cas où tous les organes de la société sont en place et fonctionnent, son rôle n'étant pas d'apprécier ou de prendre des décisions qui relèvent de la politique commerciale d'une société (cf. Trib. arr. Luxembourg (référé), 1er juillet 1981, n° 303/81).

L'efficacité du rôle du juge des référés dans son intervention dans la vie des sociétés est non seulement subordonnée au fait de trouver un remède à une situation dommageable déjà née, mais encore d'en prévenir la naissance (cf. Cour d'appel, 26 octobre 1993, nos 15376 et 15377 du rôle), étant précisé que pour que l'intervention du juge des référés dans la vie des sociétés se justifie, il faut que les droits de la société ou de certains de ses membres soient

sérieusement menacés et que l'intervention du juge soit rigoureusement nécessaire pour pourvoir à leur protection.

Il convient dès lors d'analyser si les faits dont se prévalent les parties ACHERON CAPITAL et TOMSON constituent des irrégularités justifiant l'intervention du juge ds référés, au regard des principes ci-avant dégagés, étant, à ce stade, d'ores et déjà précisé, que i) le débat portant sur la question de savoir si l'article 10, alinéa 2 des statuts d'AHMOSE (version 2012) est ou non valable, touche le fond et échappe partant à la compétence du juge des référés, ii) il en va de même quant au fait de savoir si la cooptation a été faite sous le resect de l'article 10, alinéa 2 (version 2012), cette question relevant du fond et échapant dès lors à la compétence du juge des référés.

Quant aux principes relatifs à la cooptation, il est rappelé qu'en cas de vacance d'un siège d'administrateur, le conseil d'administration peut procéder, dans l'attente d'une assemblée générale, à une cooptation en nommant une personne à titre provisoire (art. 51, paragraphe 5 loi 10 août 1915), étant précisé que i) la cooptation est obligatoire lorsque le nombre d'administrateurs tombe en dessous du minimum statutaire ou du minimum légal, ii) le droit de cooptation peut être interdit dans les statuts, de sorte que dans cette hypothèse les administrateurs restants devront immédiatement convoquer une assemblée des actionnaires en vue de la nomination d'un nouvel administrateur (A. STEICHEN, Précis de droit des sociétés, Ed. St Paul, 2014, n° 780).

Si la loi ne vise que la cooptation en cas de vacance d'une place d'administrateur, ce qui pourrait amener à penser que si deux ou plusieurs administrateurs venaient à cesser leur mandat en cours d'exercice social, la cooptation ne serait pas possible, il n'en reste pas moins que ce que le législateur vise à éviter par le mécanisme de la cooptation, c'est la paralysie de la gestion sociale, le risque de la paralysie étant plus grand encore en cas de vacance de plusieurs places d'administrateur, qu'en cas de vacance unique. Il n'y a dès lors pas de motif de refuser la cooptation dans ce cas. Le souci de préserver le fonctionnement régulier de la société justifie que le pouvoir de cooptation soit également accordé au seul administrateur subsistant, suite à la démission par exemple des deux autres administrateurs de la société (A. STEICHEN, Précis de droit des sociétés, Ed. St Paul, 2014, n° 780).

Lorsqu'elle est possible ou obligatoire, la cooptation ne présente qu'une valeur provisoire et requiert la ratification (l'élection définitive) par l'assemblée des actionnaires à la première occasion qui se présente. A défaut de ratification, les délibérations prises et accomplis antérieurement par le conseil d'administration n'en demeurent pas moins valables (A. STEICHEN, Précis de droit des sociétés, Ed. St Paul, 2014, n° 780).

La cooptation est une mesure essentiellement temporaire destinée à faire provisoirement fonctionner le conseil d'administration en attendant que les actionnaires ratifient la cooptation. De ce fait, le conseil d'administration se limitera à ne prendre que des décisions de gestion journalière, en attendant la ratification par les actionnaires, à défaut de s'exposer à la nullité des décisions prises excédant la gestion sociale journalière (A. STEICHEN, Précis de droit des sociétés, Ed. St Paul, 2014, n° 780).

Dans la mesure où en l'espèce i) la cooptation a été faite dans le respect de la loi du 10 août 1915, étant précisé qu'il se dégage des considérations qui précèdent que par souci de préserver le fonctionnement régulier de la société, il est admis que l'administrateur procède par voie de cooptation en cas de vacance du poste de deux autres administrateurs, un tel procédé étant partant à considérer comme régulier, ii) le procédé de la cooptation n'est pas interdit par les statuts d'AHMOSE, le tribunal ne peut que constater qu'une irrégularité justifiant

l'intervention du juge des référés dans la vie sociale n'est, à ce titre, pas donnée, étant souligné que par voie de conséquence, les développements faits par ACHERON CAPITAL et par TOMSON en rapport avec l'irrégularité de la convocation, au motif d'un conseil d'administration irrégulièrement composé-suite à la cooptation- tombent à faux et ne portent pas à conséquence, le tribunal ne s'y attardant dès lors pas.

Etant donné que la convocation de l'assemblée générale extraordinaire a été faite sur base de l'ordre du jour tel que ci-avant décrit qui tendait non pas à la nomination d'administrateurs dans le but de compléter le conseil d'administration, mais aux fins de procéder, d'abord, à la démission des membres du conseil d'administration et, ensuite, à la nomination de trois nouveaux administrateurs (étant à ce titre rappelé que si, sur base de l'ordre du jour ainsi fixé, deux administrateurs ont en effet été révoqués, le troisième, en la personne de Charles MEEUS n'a pas été révoqué), l'hypothèse visée par ACHERON CAPITAL et par TOMSON, suivant laquelle la cooptation n'est plus possible lorsqu'une assemblée d'actionnaires a été convoquée, avec à l'ordre du jour, la nomination d'administrateurs pour compléter justement le conseil d'administration, n'est pas donnée, de sorte que l'argumentation faite en ce sens par les susdites parties tombe à faux et ne porte pas à conséquence.

Eu égard au fait que la cooptation ainsi mise en œuvre de manière provisoire a fait l'objet d'une ratification par l'assemblée des actionnaires qui s'est tenue en date du 17 juillet 2015, une irrégularité justifiant l'intervention du juge des référés n'est, à ce titre, pas d'avantage donnée, étant précisé qu'aucun élément probant de la cause ne permet d'admettre que les administrateurs cooptés ne soient pas neutres et qu'il en va par ailleurs de même du prétendu risque que le conseil d'administration ainsi composé prenne des décisions contraires à l'intérêt de la société, l'affirmation faite en ce sens par ACHERON CAPITAL et par TOMSON laissant d'être établie et restant partant à l'état d'allégation dépourvue d'effet.

Dans ces conditions, tant la demande tendant à voir suspendre les effets de la cooptation intervenue en date du 10 juin 2015 et à voir faire défense à AHMOSE de prendre une quelconque décision, par l'intermédiaire de son conseil d'administration en fonction suite à ladite cooptation, que celle tendant à voir suspendre les effets de l'assemblée générale du 17 juillet 2015, requièrent un rejet.

Quant au volet de la demande tendant à voir nommer un administrateur provisoire pour la société AHMOSE, il est tout d'abord renvoyé aux principes ci-avant développés par rapport à l'intervention du juge des référés dans la vie des sociétés.

Il est ensuite rappelé que l'intervention judiciaire dans la vie des sociétés par le biais d'un administrateur provisoire est d'origine prétorienne, l'idée étant qu'il appartient aux tribunaux d'exercer une sorte de tutelle sur les sociétés en état de crise, afin de prévenir la dissolution et la liquidation de la société. Le fondement d'une telle intervention judiciaire est à rechercher dans le péril que courent, par exemple, les droits d'un associé/actionnaire si les choses restaient en l'état. Ce n'est, dès lors, qu'en cas de défaillance ou de paralysie des organes sociaux rendant l'intervention judiciaire rigoureusement nécessaire et lorsqu'il y a urgence à intervenir, que le principe de la non-intervention est susceptible de céder le pas (E. PENNING op cit, pages 8 et 9), la jurisprudence admettant des exceptions au principe de la non-intervention, notamment dans le cas où il y a dysfonctionnement des organes de la société, à savoir disparition, carence ou paralysie d'un des organes de la société (Cour d'Appel 30.4.1990 no. rôle 12181).

Pour pouvoir prétendre à la nomination d'un administrateur provisoire, il faut prouver la matérialité d'un fait justifiant cette désignation ainsi que l'existence d'un péril grave pour la

société, tel étant par exemple le cas si la preuve d'une mésentente entre associés ou entre organes sociaux, conduisant à la paralysie et au blocage de la vie sociale et menaçant la société dans son existence, est établie (E. PENNING, op cit pages 17 et 16).

Dans la mesure où ACHERON CAPITAL et TOMSON restent en défaut de rapporter la preuve de la matérialité de faits rendant la nomination d'un administrateur provisoire nécessaire, il s'ensuit qu'indépendamment de toute autre considération quant aux conditions requises par les deux textes légaux sur lesquels s'appuie la demande,- étant en tout état de cause précisé que la preuve de l'existence d'un trouble manifestement illicite sinon d'un dommage imminent, ainsi que la preuve tenant à l'urgence font défaut-, la demande formulée à ce titre requiert un rejet.

Eu égard aux considérations qui précèdent et en considération du fait que la demande des parties intervenantes et des parties Charles MEEUS, Claude FAVRE et Sébastien VACHON tendant à la nomination d'un administrateur ad hoc, n'a été formulée qu'en ordre subsidiaire, il n'y a pas lieu de s'y attarder autrement, étant précisé qu'au vu du sort réservé aux demandes principales, les demandes en intervention subissent le même sort

Les demandes en obtention d'une indemnité de procédure formulées par les parties ACHERON CAPITAL et TOMSON sont à rejeter, l'iniquité requise pour l'application de l'article 240 du nouveau code de procédure civile n'étant pas donnée.

# P A R   C E S   M O T I F S

Nous Carine FLAMMANG, Vice-Président, siégeant comme juge des référés, en remplacement du Président du tribunal d'arrondissement de et à Luxembourg, statuant contradictoirement;

statuant en continuation de l'ordonnance rendue en date du 27 novembre 2015,

au principal renvoyons les parties devant qui de droit mais dès à présent et par provision,

recevons en la forme, la demande introduite par ACHERON CAPITAL et TOMSON suivant exploit d'huissier du 22 juin 2015,

recevons en la forme, la demande introduite par ACHERON CAPITAL et TOMSON suivant exploits d'huissier des 2 et 5 octobre 2015,

les joignons,

recevons la demande en intervention en la forme,

Nous déclarons compétent pour en connaître;

rejetons les demandes principales,

rejetons les demandes en intervention,

rejetons la demande de ACHERON CAPITAL et TOMSON tendant à l'allocation d'une indemnité sur base de l'article 240 du Nouveau Code de procédure civile, comme non fondée;

condamnons ACHERON CAPITAL et TOMSON aux frais et dépens de l'instance,

34

ordonnons l'exécution provisoire de la présente ordonnance nonobstant toute voie de recours et sans caution.



# EXHIBIT 42

Case 1:18-mc-80041-JCK   Document 1-3   Filed 03/06/18   Page 44 of 281

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 16-mc-60266-BLOOM**

In re:
 FURSTENBERG FINANCE SAS and
 MARC BATAILLON

      Applicants
_____/

ORDER ON MOTION TO QUASH SUBPOENAS
AND MOTION TO COMPEL PRODUCTION

**THIS CAUSE** is before the Court upon Respondent, Litai Assets, LLC's ("Litai") Motion to Quash certain subpoenas, ECF No. [10] ("Motion to Quash"), and Applicants, Furstenberg Finance SAS's and Marc Bataillon's (collectively, the "Applicants") Cross-Motion to Compel Production, ECF Nos. [16], [17] ("Cross-Motion to Compel"). The Court has carefully reviewed the Motions, all supporting and opposing submissions, the record in this case, and applicable law. For the reasons set forth below, Respondent's Motion to Quash is denied and Applicants' Cross-Motion to Compel is granted.

**I. BACKGROUND**

On February 9, 2016, Applicants petitioned this Court pursuant to 28 U.S.C. § 1782 ("Section 1782") for an order compelling Litai, a company existing and organized under the laws of the State of Florida, to produce discovery for use in reasonably contemplated civil and criminal foreign proceedings against Jean-Michael Paul ("Paul"), director of Acheron Portfolio Corporation Luxembourg S.A. ("APC"). *See* Application, ECF No. [1] (the "Section 1782 Application").

On February 10, 2016, this Court entered an order granting the Section 1782 Application, authorizing Applicants to issue and serve subpoenas upon Litai for business records, deposition testimony, electronically stored information, and any other electronic communications relating to any communication between Litai, Jan-Eric Samuel ("Samuel") (in his capacity as Chairman and CEO of Litai or in relation to Litai) and Paul, and any communications between Litai, Acheron Capital Limited ("ACL"), and/or APC. *See* Application at 1; *see also* Order Granting *Ex Parte* Application, ECF No. [7] (the "Order"). Samuel is the Chairman and CEO of Litai, and Applicants allege that Samuel is a close friend and business associate of Paul, which forms the basis for the improper business relationships alleged in the Application. *See* Application at 3-4; *see also* Sabatier Decl. ¶¶ 26, 31. Applicants allege, *inter alia*, that Paul committed violations of the Luxembourg Companies Law for fraud, misuse of corporate assets, and managerial misconduct by using his position as a director of APC, to enrich Litai. *See* Application at 3-4. Applicants sought discovery from Samuel (in his capacity as Chairman and CEO of Litai or in relation to Litai) and Paul. Applicants contend that Paul also served as the "undisclosed owner, beneficial owner, or controller of Litai," and through this concealed ownership of Litai, Paul abused his role as director of APC to its detriment. *Id*. Applicants also claim that since 2009, APC has paid ACL more than $10 million in "management fees," which Applicants later contend was grossly higher than the standard rate. *Id*.

On March 24, 2016, Litai moved to quash the subpoenas pursuant to Rule 45 of the Federal Rules of Civil Procedure and Local Rule 26.1, arguing that Applicants do not satisfy the elements of Section 1782. *See* Mot. to Quash. In their response filed April 18, 2016, Applicants moved to compel production pursuant to the Order granting the Section 1782 Application,

contending that they have satisfied the conditions of Section 1782. Litai and Applicants timely filed their corresponding replies.

## II. LEGAL STANDARD

### A. Section 1782

This Court, in granting the Section 1782 Application, recognized that Section 1782 allows for a district court to assist in the discovery phase of a civil or criminal proceeding in a foreign or international tribunal. Applicants sought and were granted authority to issue and serve subpoenas on Respondents pursuant to the 1782 Application. *See* Order. Under Section 1782:

> a district court has the authority to grant an application for judicial assistance if the following statutory requirements are met: (1) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance; (2) the request must seek evidence which is either the testimony or statement of a person or the production of a document or other thing; (3) the evidence must be *for use in a proceeding in a foreign or international tribunal*; and (4) the request must be made by an *interested person*.

28 U.S.C. § 1782 (emphasis added).

"Substantively, so long as the district court fashions its order in accordance with the 'twin aims' of § 1782, providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts, . . . it acts within its discretion." *Application of Esses*, 101 F.3d 873, 876 (2d Cir. 1996) (internal quotation marks and citations omitted). However, "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004) (citation omitted). "'[F]actors that bear consideration in ruling' on an application include 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign . . . agency abroad to U.S. federal-court judicial assistance,' and

'whether the . . . [application] conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.'" *In re Kivisto,* 521 F. App'x 886, 888 (11th Cir.2013) (quoting *Intel,* 542 U.S. at 264–65). "The district court also may consider whether the application contains unduly intrusive or burdensome requests, is made in bad faith, for the purpose of harassment, or is part of a fishing expedition." *Id.* (quoting *Intel,* 542 U.S. at 265; *Euromepa S.A. v. R. Esmerian, Inc.,* 51 F.3d 1095, 1101, n. 6 (2d Cir.1995); *In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago,* 848 F.2d 1151, 1156 (11th Cir.1988), *abrogated on a different ground by Intel,* 542 U.S. at 259)) (internal quotations and formatting removed).

### B.  Motion to Quash

Rule 45 of the Federal Rules of Civil Procedure governs motions to quash subpoenas. The Rule permits a court to modify or quash a subpoena where it, *inter alia*, "subjects a person to undue burden" or implicates the "disclosure of privileged or protected matter, if no exception or waiver applies[.]" Fed. R. Civ. P. 45(d)(3)(A).

### C.  Motion to Compel

Rule 37 of the Federal Rules of Civil Procedure governs motions to compel discovery, providing in pertinent part, "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). Further, this section provides for attorney's fees to the prevailing party:

> If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the

opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(A).

Rule 37 "was toughened in 1970 to mandate that expenses be awarded *unless* the conduct of the losing party or person is found to have been *substantially justified.*" *DeVaney v. Cont'l Am. Ins. Co.*, 989 F.2d 1154, 1159 (11th Cir. 1993) (emphasis added) (citing Fed. R. Civ. P. 37 Advisory Committee Notes (West 1991 Revised)). The Supreme Court developed criteria to determine whether such party's conduct is "substantially justified"—if it is a response to a "genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *Id.* at 1163 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 2550, 101 L. Ed. 2d 490 (1988)); *see also Maddow v. P&G*, 107 F.3d 846, 853 (11th Cir. 1997). Moreover, the burden of establishing such "substantial justification" is on the losing party. *Procaps S.A. v. Patheon Inc.*, No. 12-24356-CIV, 2013 WL 6238647, at *5 (S.D. Fla. Dec. 3, 2013). Notably, there is no requirement that a court find that a party acted in bad faith before awarding attorney's fees pursuant to Rule 37. *Devaney*, 989 F.2d at 1162 ("The language 'advising such conduct' in Rule 37 does not incorporate either heightened procedural requirements or a bad faith test into that rule.").

### III. DISCUSSION

Litai argues that Applicants do not satisfy the statutory prerequisites for a Section 1782 Application. Specifically, Litai contends that Applicants' subpoenas should be quashed for three reasons: (1) Applicants are not "interested persons" within the meaning of Section 1782; (2) no "proceedings are reasonably contemplated in a foreign tribunal"; and (3) the discovery is not "for use" in such foreign proceeding. *See* Mot. to Quash.

Applicants have moved this Court to compel production, maintaining that they intend to file criminal actions to commence Luxembourg criminal proceedings against Paul.[1] *See* Applicants' Resp. and Cross-Mot. to Compel ("Applicants' Resp.") at 6. Applicants have offered that all discovery in this matter be subject to a confidentiality order that restricts its use until the criminal proceedings are filed in Luxembourg. *Id.* at 6; *see* Bataillon Decl. ¶ 8, ECF No. [16-3]; Bonnet Decl. ¶ 14, ECF No. [16-2].

### A. Applicants are "interested persons."

Litai argues that Applicants have not satisfied the "interested persons" element of Section 1782. Litai asserts that Applicants do not have standing to bring suit because they waived such right to do so at the 2015 APC annual shareholder meeting by voting to discharge all APC directors from any claims of wrongdoing. *See* Mot. to Quash at 10-11. Applicants respond that such a waiver would only apply to civil claims, not to a criminal complaint. *See* Applicants' Resp. at 10 (citing to Luxembourg case law that holds directors cannot escape *criminal* liability on the basis of a waiver given by the shareholders.). The Court notes that such a determination of Applicants' standing in a potential suit reaches further into the underlying merits of their claims than this court is required to contemplate under Section 1782, and the merits of their claims are not to be heard and decided before this Court. *See Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262 (11th Cir. 2014); *Application of Esses*, 101 F.3d 873 (2d Cir. 1996). A similar issue arose in *Esses*, wherein a party opposing a 1782 discovery application argued that the applicant had contractually relinquished his claim and thus was not an "interested person." 101 F.3d at 875. The Second Circuit held that

---

[1] In the 1782 Application, Applicants state the potential for civil or criminal proceedings, but later specified that the purpose of the discovery pursuant to the 1782 Application is for use in a criminal, not a civil, proceeding against Paul. *See* Applicants' Resp. at 3.

whether the applicant had a rightful claim or had relinquished it was for the courts in the foreign tribunal (Hong Kong)—not the domestic court—to determine. *Id*. The Eleventh Circuit in *Consorcio* similarly held that the domestic court has no occasion to address "whether any other underlying dispute among the parties and related persons has merit" as they will likely be resolved in the foreign tribunal. *Application of Consorcio*, 747 F.3d at 1268 (11th Cir. 2014). This Court is similarly disinclined to consider the underlying merits of any criminal or civil case Applicants may have against Paul.

Litai further argues that Applicants have not satisfied the "interested persons" element of Section 1782, maintaining that, in order to be "interested persons," Applicants must be private parties to a criminal proceeding, and to be a private party, they must have suffered "direct" injuries. *See* Litai's Resp. in Opposition to Mot. to Compel and Reply in Further Support of Cross-Mot. to Quash, ECF No. [21] at 14 ("Litai Reply"). Litai asserts that the nature of the Applicants' injuries is "indirect," and APC itself—not Applicants—would suffer the "direct" injury as a result of any director misconduct alleged by Applicants specifically due to gross overpayment of servicing fees to Litai. *Id*. In contrast, Applicants, as minority shareholders of APC, have suffered only "indirect injuries" related to the depreciated value of their shares in APC. *Id*. Litai cites to the Declaration of François Prum, a Luxembourg attorney, regarding the elements of a "direct injury" and the requisite damages for a party to be an "interested person." *See* Litai Reply at 14; *see also* Prum Decl., ECF No. [21-6] ¶¶ 18-29. Scrutinizing and comparing different types of potential damages in order to determine the presence or absence of a "direct injury" is reaching further into the underlying merits of the Applicants' claims than this Court is required on a 1782 Application. It is not the job of this Court to consider the underlying

merits of such a claim, including the nature and extent of the injuries, particularly in light of the Supreme Court's encompassing definition of "interested person" in *Intel*, *infra*.

Further, Applicants are "interested persons" within the meaning of Section 1782 because Applicants are parties and complainants with "participation rights" to the would-be criminal investigation and proceeding. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256, 124 S. Ct. 2466, 2478, 159 L. Ed. 2d 355 (2004). In *Intel*, the Supreme Court held that a complainant who triggers a foreign investigation has a significant role in the process, or "participation rights." 542 U.S. at 256. The Supreme Court rejected "Intel's contention that 'interested person[s]' does not include complainants, but encompasses only litigants . . . ." *Id.* at 242; *see also id.* at 256 (noting that in addition to prompting an investigation, the complainant had the right to submit information to be used as consideration for the would-be person or entity to be investigated, "and [could] proceed to court if [the investigative authority] discontinue[d] the investigation . . . ."). As such, where complainants are given these participation rights, they are held to "'possess[] a reasonable interest in obtaining [judicial] assistance,' and therefore qualify as an 'interested person' within any fair construction of that term.'" *Id.* (citing H. Smit, International Litigation under the United States Code, 65 Colum. L. Rev. 1015 (1965) at 1027 ("any interested person" is "intended not only to include litigants before foreign or international tribunals, but also . . . any other person . . . [who] possess[es] a reasonable interest in obtaining the assistance."))[2]; *see also Certain Funds, Accounts &/Or Inv. Vehicles Managed By Affiliates Of Fortress Inv. Grp. L.L.C. v. KPMG, L.L.P.*, 798 F.3d 113, 118 (2d Cir. 2015) ("The applicant's 'participation rights' in *Intel*, on which the Court relied in finding that the applicant

---

[2] The Second Circuit in *Certain Funds*, *infra*, also recognized the expansive definition provided by Hans Smit, a leading commentator on the statute who played a role in its drafting. *Certain Funds*, 798 F.3d at 119.

was an 'interested person,' prominently included the applicant's ability to use the evidence it sought in the U.S. courts before the foreign administrative tribunal and courts by submitting the evidence to the investigating agency in the foreign proceedings."). Here, Applicants have provided an expert who states that under Luxembourg law, Applicants can bring a criminal action against JMP. *See* Declaration of Rosario Grasso, ECF No. [25-1] ("Grasso Decl."). When criminal actions are commenced in which Applicants are complainants, they would possess these "participation rights" upon which the Court relied in *Intel* to determine the applicants in that case were "interested persons." Accordingly, because Applicants will be parties in a criminal action against JMP, thus possessing the "participation rights" relied upon by the Supreme Court, this Court finds that Applicants satisfy the "interested persons" element of Section 1782.

**B. Proceedings are "reasonably contemplated" in a foreign tribunal.**

Litai also argues that Applicants cannot establish that any proceeding is "reasonably contemplated." Specifically, Litai asserts that Applicants cannot directly file criminal actions against Paul, and therefore any action filed against Paul would not constitute a "proceeding in a foreign tribunal." *See* Litai Reply at 2. Rather, they argue, Applicants' only option is to file a criminal complaint, or "police report,"[3] with the hope that a prosecutor will commence a criminal action. *Id*. Applicants respond by setting forth the three types of criminal proceedings that can be commenced by private parties in Luxembourg: (i) a criminal complaint with claim for damages; (ii) a direct summons with claim for damages;[4] and (iii) a denunciation, or complaint to a State Prosecutor. *See* Applicants' Reply at 2; *see also* Grasso Decl. ¶¶ 5.1.6, 5.2, 5.3. Types (i) and (ii)

---

[3] What Litai refers to as a "police report," Applicants claim is a mischaracterization of what is known as a "denunciation." *See* Applicants' Reply at 1. A denunciation in Luxembourg is a formal complaint to a State Prosecutor. *Id*. at 2.

[4] Applicants state that a direct summons with a claim for damages is used for more severe crimes with longer prison terms, so Applicants will pursue the filing of a criminal complaint with a claim for damages. *See* Applicants' Reply, ECF No. [25] at 3.

are initiated either in front of an investigating magistrate judge or a criminal court.[5] Applicants assert that they can and will file direct criminal actions in Luxembourg against Paul. *See* Applicants' Reply. Applicants maintain that at the completion of the Litai discovery, Rosario Grasso, the Chairman of the Luxembourg Bar Association and criminal law expert, will file criminal actions against Paul on the Applicants' behalf.[6] *Id.*

The courts have transitioned from a narrow interpretation of the "for use in a foreign proceeding" element of Section 1782, to a far more liberal construction today. Indeed, the Supreme Court has interpreted the 1964 and 1996 amendments to Section 1782 as providing great leniency in the district courts' discretion to grant 1782 Applications with regard to the "for use in a foreign proceeding" element. *See Intel*, 542 U.S. 241. In *Intel*, the Supreme Court rejected the prior view that Section 1782 applies only when foreign proceedings are "pending" or "imminent." *Id.* at 259 (rejecting the Second Circuit's interpretation, expressed in *In re Ishihara Chem. Co.*, 251 F.3d 120, 125 (2d Cir. 2001), that "imminent" means "very likely to occur and very soon to occur"). Rather, the Supreme Court determined that Section 1782 requires only that such proceeding be within reasonable contemplation. *Id.* at 259 (citing *In re Letter of Request from Crown Prosecution Serv. of United Kingdom,* 870 F.2d, 686, 691 (D.C. Cir. 1989); Smit, International Litigation at 1026 ("It is not necessary . . . for the [adjudicative] proceeding to be *pending* at the time the evidence is sought, but only that the evidence is *eventually* to be used in such a proceeding.") (emphasis added)).

---

[5] "When a criminal complaint is submitted to the investigating judge, it constitutes criminal proceedings where the plaintiff and victim is a party with specific rights defined and regulated by the Luxembourg Code of Criminal Procedure." Applicants' Reply at 3, n. 2 (quoting Grasso Decl. ¶ 5.2.3).

[6] "[A]ssuming that the evidence sought from Litai confirms the allegations at bar, I will personally be filing one of the 'direct' criminal actions in Luxembourg on the Applicants' behalf." Grasso Decl. ¶ 4.1.

The Eleventh Circuit and courts in this District have further held that Section 1782 "does not purport to impose a requirement that a foreign proceeding be at a certain stage prior to discovery being granted." *In re NRC Holding, Ltd.*, No. 14-MC-61962, 2015 WL 541770, at *2 (S.D. Fla. Feb. 10, 2015) (citing to Eleventh Circuit holding in *Consorcio*, which affirmed the district court's decision to grant a 1782 discovery request where that application was made before the applicant commenced litigation in the foreign tribunal, finding that the foreign proceeds were within reasonable contemplation). In *Consorcio*, the Eleventh Circuit provided further interpretation of a proceeding to be within "reasonable contemplation," stating that "[t]he future proceedings must be more than speculative . . . and a 'district court must insist on reliable indications of the likelihood that proceedings will be instituted within a reasonable time.'" 747 F.3d at 1270 (citing *Crown Prosecution Serv.*, 870 F.2d at 692; *id.* at 691 (describing the "decisive" question as whether there was "sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially")).

Litai argues that the court should deny a Section 1782 Application unless the district judge is satisfied "that a proceeding is very likely to occur." *See* Mot. to Quash at 11. Although the Eleventh and Second Circuits may have relied on this standard in the past, the Court in *Intel* expressly rejected such standard, and interpreted the "for use in a foreign proceeding" element much more liberally in its rejection of the imminence requirement. Therefore, Litai's argument that a proceeding need be very likely to occur is without merit.

Litai also contends that Applicants' purported only option—to file a "police report"—fails the "reasonable contemplation" requirement of Section 1782 because a private individual cannot just "commence" a criminal investigation—only the State can do this. *See* Litai Reply at 4. Litai asserts that the 1782 Application is, therefore, merely a "fishing expedition," arguing that

the Application was undertaken only in the "off chance" the Applicants "get lucky" and find something to support the filing of a lawsuit they otherwise have no proof to support. *See* Mot. to Quash at 7 (citing to Luxembourg criminal procedure, which purportedly does not require that a complainant gather all possible evidence before making a criminal complaint). Litai contends that such a "police report," which a Luxembourg prosecutor would investigate before deciding whether to bring charges, does not satisfy the requirements set forth in Section 1782. *Id.* at 7-8.

Applicants, however, maintain that they will commence a criminal complaint with a claim for damages—but, even if forced to file a denunciation, Applicants would still nonetheless satisfy the elements of Section 1782. *See* Applicants' Reply at 8. Applicants note that a denunciation is made to a State Prosecutor, not merely the police. According to Applicants, in Luxembourg, a State Prosecutor is a member of the judicial branch of the Luxembourg government—analogous to a magistrate judge in the United States—wherein the decision whether to prosecute is appealable. *See id.*; Grasso Decl. ¶ 6.1.6. Indeed, the Supreme Court in *Intel* also noted that the 1996 amendment "clarifies that § 1782(a) covers criminal *investigations* conducted *before* formal accusation." 542 U.S. at 243 (emphasis added).

Further, the Court is not persuaded by the argument that the subpoenas sought are a "fishing expedition" pursued under the guise of legitimate discovery. Litai relies upon *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, wherein the Second Circuit held "the proceedings cannot be merely speculative[; a]t a minimum, a § 1782 applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." 798 F.3d 113, 124 (2d Cir. 2015). However, as discussed *supra*, the Supreme Court has set forth a much more liberal interpretation of Section 1782, rejecting the requirement of imminency of the foreign proceedings. *See Intel*,

Case 0:16-mc-60266-BB Document 43 Filed 02/06/18 Page 56 of 281
Case 0:16-mc-60266-BB Document 30 Entered on FLSD Docket 07/27/2016 Page 13 of 15

Case No. 16-mc-60266-BLOOM

542 U.S. 241. As such, because there is no temporal requirement under Section 1782, this Court finds that the direct criminal actions to be filed in Luxembourg against Paul constitute a foreign proceeding as within "reasonable contemplation" because Applicants' intention to file such actions is "sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially." *Consorcio*, 747 F.3d at 1270. Thus, this Court is satisfied that a foreign proceeding will "eventuate"—specifically, Applicants state that they will commence the criminal actions against Paul, to be filed by the President of the Luxembourg Bar Association, Rosario Grasso, no later than 45 days after the completion of the Litai discovery. *See* Applicants' Reply at 5.

In light of the liberal construction of Section 1782 and the Applicants' intention to file criminal charges within just 45 days from the completion of the Litai discovery, this Court is inclined to agree that the evidence sought here will "eventually . . . be used in such a proceeding." *Intel*, 542 U.S. at 259 (quoting Smit, International Litigation 1026). Here, a foreign proceeding need only be within "reasonable contemplation," and it is the finding of this Court that such a proceeding is indeed reasonably contemplated.

**C. The discovery is "for use" in a foreign proceeding.**

Because the Court has found that there is reasonable contemplation that a foreign proceeding will eventuate, this Court necessarily finds that the discovery sought in the Section 1782 Application is "for use" in such foreign proceeding. *See* Litai Reply at 5 (stating that the phrase "for use in proceeding in a foreign or international tribunal" has two "related requirements"—the "for use" requirement and the requirement that the "proceeding in a foreign or international tribunal" be a proceeding that is at least "reasonably contemplated").

**D. Applicants' Motion for Attorney's Fees is granted because there is no sound basis for Litai's arguments.**

Under Rule 37, a court must award the prevailing party in a motion to compel their attorney's fees unless the losing party can show a substantial justification (or other exception) for the conduct in failing or refusing to produce discovery. Fed. R. Civ. P. 37. This Court finds there is no sound basis for Litai's arguments that repeatedly cite to Second Circuit precedent expressly rejected by Supreme Court in *Intel*, 542 U.S. at 259. Accordingly, and pursuant to Fed. R. Civ. P. 37(a)(5)(A), Applicants shall be awarded attorney's fees and costs, the amount to be determined at a later date.

## IV. CONCLUSION

Litai has failed to establish that the Court's granting of the 1782 Application was contrary to law. At this stage of the proceeding, Applicants have sufficiently shown that they indeed satisfy the statutory conditions of Section 1782. Moreover, and consistent with Eleventh Circuit precedent, it is not the role of this Court to address the underlying merits of an action at the discovery-seeking stage before us. Thus, Applicants satisfy the "interested persons" prong of Section 1782 as complainants who will prompt a foreign investigation and who "possess a reasonable interest in obtaining [judicial] assistance." *Intel*, 542 U.S. at 256.

Further, the 1782 Application is not a "fishing expedition" and the foreign proceedings are within "reasonable contemplation" for the reasons set forth herein. Accordingly, this Court finds "sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially" and such evidence will "eventually be used in such a proceeding." *Consorcio*, 747 F.3d at 1270; (quoting *Intel*, 542 U.S. at 259).

It is therefore **ORDERED AND ADJUDGED** that Litai's Motion to Quash, **ECF No. [10]**, is **DENIED** and Applicants' Cross-Motion to Compel Production, **ECF No. [17]**, is

Case 1:18-mc-00041-JGK   Document 4-3   Filed 02/06/18   Page 58 of 281

Case No. 16-mc-60266-BLOOM

**GRANTED**. As outlined above, the Court **GRANTS** Applicants' request for attorney's fees and costs, but reserves ruling as to the amount of such fees and costs.

      **DONE AND ORDERED** in Miami, Florida this 26th day of July, 2016.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

# EXHIBIT 43

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-mc-60266-BLOOM

In re: Application of FURSTENBERG FINANCE
SAS and MARC BATAILLON For an Ex Parte
Order Granting DISCOVERY PURSUANT TO 28
U.S.C. 1782

_____/

## NOTICE OF APPEAL

Notice is hereby given that Litai Assets LLC ("Respondent") hereby appeals to the

United States Court of Appeals for the Eleventh Circuit from the Order on Motion to Quash

Subpoenas and Motion to Compel Production granting discovery pursuant to 28 U.S.C. section

1782, entered in this action on the 26th day of July, 2016 [DE 30].


Respectfully submitted,
**AXS Law Group PLLC**
*Attorneys for Respondent*
1850 Purdy Avenue
Miami, Florida 33139
Telephone:  (305) 389-3646

By:____/s/ *Jeffrey W. Gutchess*____
**Jeffrey W. Gutchess**
Florida Bar No. 702641
jeff@axslawgroup.com

**Daniel Tropin**
Florida Bar No. 100424
dan@axslawgroup.com

1

Case 1:18-mc-00044-JGK    Document 4-3    Filed 02/06/18    Page 61 of 281
Case 0:15-mc-60206-JER    Document 95    Entered on FLSD Docket 08/23/2016    Page 2 of 2
Case: 16-15664    Date Filed: 08/24/2016    Page: 2 of 2

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel for Plaintiffs via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Jeffrey W. Gutchess*_____

# EXHIBIT 44

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 16-mc-60266-BLOOM

In re:
 FURSTENBERG FINANCE SAS and
 MARC BATAILLON

      Applicants

_____/

## ORDER ON MOTION TO STAY

**THIS CAUSE** is before the Court upon Litai Assets LLC's ("Litai") Motion to Stay Discovery Pending Appeal, ECF No. [32]. Litai seeks to stay discovery pursuant to Federal Rule of Civil procedure 62(c) pending Litai's appeal, *see* ECF No. [31], of the Court's Order on Motion to Quash Subpoenas and Motion to Compel Production, ECF No. [30]. The Court has carefully reviewed the Motion, all supporting and opposing submissions, the record in this case, and applicable law. For the reasons set forth below, the Motion is denied.

In determining whether to issue a stay pending appeal, "a court considers four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 426, 129 S. Ct. 1749, 1756, 173 L. Ed. 2d 550 (2009) (quoting *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)). "Ordinarily the first factor is the most important." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). "But the movant may also have his motion granted upon a lesser showing of a 'substantial case on the merits' when 'the balance of the equities [identified in factors 2, 3,

and 4] weighs heavily in favor of granting the stay.'" *Id.* (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565–66 (5th Cir. 1981)). Because the Court has already twice determined that the statutory requirements are met here, the Court will first examine the equities of the remaining three factors to determine whether a lesser showing of a "substantial case" is appropriate.

With regard to the second factor, Litai argues that without a stay pending the appeal, the Applicants will be able to proceed with discovery before the Eleventh Circuit would have time to address the appeal, thus depriving Litai of its right to meaningful appellate review. Mot. at 12 (citing *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 348 (S.D.N.Y. 2007) ("[L]oss of appellate rights is a 'quintessential form of prejudice.' Thus, where the denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error, the irreparable harm requirement is satisfied.") (emphasis in original). Specifically, Litai states that if it is "forced to search its records, its electronic systems, and produce a representative for deposition prior to a decision by the Eleventh Circuit, Litai will have already suffered its injury and be deprived of its right to appeal." Mot. at 13. In *Adelphia*, however, the Court recognizes that "[a] majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm[,]" 361 B.R. at 348, and Litai has not "endeavored to show that the Eleventh Circuit embraces the minority view." *McDermott Gulf Operating Co. v. Con-Dive, LLC*, No. CIV A 09-0206-WS-B, 2009 WL 1855929, at *10 (S.D. Ala. June 29, 2009).

To counteract direct harm beyond the issue of mootness, Applicants Furstenberg Finance SAS and Marc Bataillon (collectively, "Applicants") have "unconditionally bound themselves to commence the direct criminal actions within 45 days after the completion of discovery granted by this Court, or otherwise destroy the information and further preserve its confidentiality." Resp., ECF No. [34] at 17. In light of this proffered protective order, and the fact that a "majority

2

of courts" do not find that risk of mootness alone constitutes irreparable harm, the Court does not find that Litai will be irreparably injured absent a stay.

Litai further argues that, in contrast to the potential for irreparable harm to Litai, a stay would at most result only in a delay to Applicants, which, by itself, does not constitute substantial harm. Litai avers that in 2009, Applicants participated in the negotiation of the contracts that form the basis of the discovery sought and, therefore, have already waited six years before filing their Application. Litai cites to *In re Clerici*, in which the Court entered a stay pending appeal of its section 1782 determination, finding that the balance of equities weighed heavily in favor of staying discovery. The Court reasoned that the respondent would suffer irreparable injury if the stay was not granted because "a decision of the Eleventh Circuit in favor of [the respondent] could not undue the injury to him" once the United States obtained that evidence. 1:05-cv-22689-PCH, slip op. at *2 (S.D. Fla. Mar. 10, 2006). The Court, however, went on to balance the relative equities and found that the petitioners would not be subject to any harm—let alone "substantial harm"—if discovery proceedings were stayed because any evidence gathered would be of no use to the petitioners until concurrent proceedings in Panama and Florida were resolved. *Id.* The Court further determined that the "public's interest would be furthered by granting the stay until the concurrent proceedings . . . were resolved." *Id.* at *2-3. In contrast, here, Applicants assert that Dr. Jean Michael Paul remains in his position as director of the company, Litai remains as a servicer of the company, and Applicants remain shareholders, against whom "crimes with ongoing harm have been committed . . . ." Resp. at 19. Applicants further assert that there is evidence of the deletion of relevant emails and a lack of a sufficient document retention policy.

Regarding the final factor, Litai argues that the public interest weighs in favor of granting a stay by ensuring that litigants are afforded a meaningful right to appeal. Applicants, on the other hand, argue that public policy "favors open and timely disclosure between shareholders, investors, and corporations[,]" as well as immediate transparency. Resp. at 20. Although both arguments indeed present interests of the public, as stated above, the majority of courts have held that the risk of mootness alone is not sufficient.

The equities here do not weigh strongly in favor of a stay and, therefore, Litai is not entitled to a lesser showing of a "substantial case." Litai largely reiterates the same arguments that this Court previously rejected and has not demonstrated a likelihood of success on the merits.

Litai also appears to request reconsideration as to the Court's determination that an award of attorney's fees was appropriate pursuant to Rule 37. *See* Reply, ECF No. [35] at 10 ("Litai respectfully requests the Court enter the requested stay and correct its opinion on fees."). To the extent that Litai seeks reconsideration on the issue of fees, it has not appropriately presented this argument and it will not be considered. To the extent Litai argues that any purported error on the part of the Court in granting fees provides a basis for a stay, this has no bearing on whether or not the Court should grant the stay. However, the Court will reserve on the issue of attorney's fees pending mandate from the Eleventh Circuit.

Accordingly, for the reasons stated above, Litai's Motion to Stay, **ECF No. [32]**, is **DENIED**.

Case No. 16-mc-60266-BLOOM

**DONE AND ORDERED** in Miami, Florida, this 30th day of September, 2016.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:     Counsel of Record

5

# EXHIBIT 45

Case 1:18-mc-00041-JGK Document 4-3 Filed 02/06/18 Page 69 of 281

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-cv-60266-BLOOM

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON

          Applicants.

_____/

ORDER ON SECOND MOTION TO COMPEL AND
MOTION FOR A PROTECTIVE ORDER

THIS CAUSE is before the Court upon Furstenberg Finance SAS and Marc Bataillon's

(the "Applicants") Second Motion to Compel, ECF No. [43], and Jan-Eric Samuel's ("Samuel")

Motion for a Protective Order, ECF No. [64]. The Court has carefully reviewed the motions, all

supporting and opposing submissions, the record in this case, and applicable law. For the

reasons set forth below, Applicants' Second Motion to Compel is granted and Samuel's Motion

for a Protective Order is denied.

I.      BACKGROUND

On February 9, 2016, Applicants petitioned this Court under 28 U.S.C. § 1782 ("Section

1782") for an order compelling Litai Assets LLC ("Litai"), a company existing and organized

under the laws of the State of Florida, to produce discovery for use in reasonably contemplated

criminal foreign proceedings against Jean-Michael Paul ("Paul"), a director of Acheron Portfolio

Corporation Luxembourg S.A. ("APC"). See ECF No. [1] (the "Section 1782 Application").

On February 10, 2016, this Court entered an order granting the Section 1782 Application,

authorizing Applicants to issue and serve subpoenas upon Litai for business records, deposition

testimony, electronically stored information, any other electronic communications relating to any

communication between Litai, Samuel (in his capacity as Chairman and CEO of Litai or in relation to Litai) and Paul, and any communications between Litai, Acheron Capital Limited ("ACL"), and/or APC. *See* Order Granting *Ex Parte* Application, ECF No. [7].

Samuel is the Chairman and CEO of Litai, and Applicants allege that Samuel is a close friend and business associate of Paul, which forms the basis for the improper business relationships alleged in the Section 1782 Application. *See* ECF No. [1] at 3–4; *see also* ECF No. [3], Sabatier Decl. ¶¶ 26, 31. Applicants allege, *inter alia*, that Paul committed violations of the Luxembourg Companies Law for fraud, misuse of corporate assets, and managerial misconduct by using his position as a director of APC to enrich Litai. *See* ECF No. [1] at 3–4. Applicants sought discovery from Samuel, in his capacity as Chairman and CEO of Litai or in relation to Litai, and Paul. Applicants contend that Paul also served as the "undisclosed owner, beneficial owner, or controller of Litai," and through this concealed ownership of Litai, Paul abused his role as director of APC to its detriment. *See id.* Applicants also claim that since 2009, APC has paid ACL more than $10 million in "management fees," which Applicants contend was grossly higher than the standard rate. *See id.*

On March 24, 2016, Litai moved to quash the subpoenas under Rule 45 of the Federal Rules of Civil Procedure and Local Rule 26.1, arguing that Applicants did not satisfy the elements of Section 1782. *See* ECF No. [10]. In their response filed April 18, 2016, Applicants moved to compel production in accordance with the Order granting the Section 1782 Application. *See* ECF No. [16]. On July 27, 2016, after Litai and Applicants timely filed their

corresponding replies, the Court denied Litai's motion to quash and granted Applicants' motion to compel.[1]  *See* ECF No. [30].

On July 14, 2017, Applicants submitted their Second Motion to Compel, alleging that Litai has failed to meet its discovery obligations.  *See* ECF No. [43]. After the issues were fully briefed by the parties, ECF Nos. [54], [61], Samuel filed a Motion for a Protective Order, ECF No. [64]. In the motion, Samuel argues that service of the subpoena upon Litai for his deposition testimony was ineffective and invalid.  *See id*.  Applicants and Samuel have timely filed their responses.  *See* ECF Nos. [68], [69].  Both the Second Motion to Compel and the Motion for a Protective Order are ripe for adjudication.  As the motions concern related issues, the Court will address each.

## II.   LEGAL STANDARD

### A.  Motion to Compel

Rule 37 of the Federal Rules of Civil Procedure governs motions to compel discovery, providing in pertinent part that "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery."  Fed. R. Civ. P. 37(a)(1).  Further, this section provides for attorney's fees to the prevailing party on a motion to compel:

> If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.  But the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust.

---

[1] Litai appealed the Court's order, ECF No. [31], and sought to stay discovery pending the appeal, ECF No. [32].  This Court, as well as the Eleventh Circuit Court of Appeals, denied Litai's motion to stay pending appeal.  *See* ECF No. [36]; *see also Furstenberg Finance SAS v. Litai Assets LLC*, No. 16–15664–DD (11th Cir. Feb. 8, 2017).

Fed. R. Civ. P. 37(a)(5)(A). Rule 37 "was toughened in 1970 to mandate that expenses be awarded *unless* the conduct of the losing party or person is found to have been *substantially justified.*" *DeVaney v. Cont'l Am. Ins. Co.*, 989 F.2d 1154, 1159 (11th Cir. 1993) (emphasis added) (citing Fed. R. Civ. P. 37 Advisory Committee Notes (West 1991 Revised)). The Supreme Court developed criteria to determine whether such party's conduct is "substantially justified"—if it is a response to a "genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *Id.* at 1163 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 2550, 101 L. Ed. 2d 490 (1988)); *see also Maddow v. P&G*, 107 F.3d 846, 853 (11th Cir. 1997). Moreover, the burden of establishing such "substantial justification" is on the losing party. *Procaps S.A. v. Patheon Inc.*, No. 12–24356–CIV, 2013 WL 6238647, at *5 (S.D. Fla. Dec. 3, 2013). Notably, there is no requirement that a court find that a party acted in bad faith before awarding attorney's fees pursuant to Rule 37. *Devaney*, 989 F.2d at 1162 ("The language 'advising such conduct' in Rule 37 does not incorporate either heightened procedural requirements or a bad faith test into that rule.").

## B. Motion for a Protective Order

Rule 26(c) of the Federal Rules of Civil Procedure protects those deposed from "annoyance, embarrassment, oppression, or undue burden or expense," but not from mere inconvenience. Fed. R. Civ. P. 26(c). The party making the motion must show that "good cause" exists for the protective order. *See id.* In addition to good cause, the court must also satisfy itself that, on balance, the interests of those seeking the protective order outweigh the interests of the opposing party. *See McCarthy v. Barnett Bank of Polk County*, 876 F.2d 89, 91 (11th Cir. 1989). The interests involved are confidentiality versus access to information. *See Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2003).

Protective orders prohibiting depositions, however, are rarely granted.  *See Baratta v. Homeland Housewares, LLC*, 242 F.R.D. 641, 642 (S.D. Fla. 2007) (citing *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir.1979) ("It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error.")).

## III.   DISCUSSION

Applicants seek the Court's enforcement and supervision of the discovery process due to Litai's refusal to correct its document production deficiencies, as well as the fees and costs incurred in making their Second Motion to Compel.  Litai maintains that the motion should be denied because it forces Litai to prove a negative, and because the discovery burden is disproportionate to the issues in the potential foreign criminal proceedings against Paul.  In addition, Samuel has moved the Court to enter a protective order finding that the service of the subpoena upon Litai for Samuel's deposition testimony was ineffective and invalid.  The Court will address each of the motions in turn.  In order to better ascertain the reasonableness of Litai's production, however, the Court will first detail the discovery that has taken place so far.

### A.  Discovery to date.

On February 9, 2016, the Court authorized Applicants to conduct discovery to determine whether Paul, allegedly a close friend and business associate of Samuel, has an undisclosed interest in Litai.[2]  ECF No. [7]. The subpoena, which was issued by the Clerk of Court on February 18, 2016, authorized discovery into:

(1) All documents concerning any communications between Litai or Samuel (in his capacity as Chairman and CEO of Litai or in relation to Litai, regardless of whether such communications were made via Litai email addresses or personal addresses) and any entity owned or controlled by Samuel and Paul, or any entity known to be affiliated, owned, or controlled by Paul concerning the ownership, beneficial ownership, ultimate beneficial ownership, or distribution of profits or revenues of Litai;

---

[2] According to Applicants, this undisclosed interest would be a criminal offense under Luxembourg law. *See* ECF No. [25–1].

5

(2) All business records concerning the ownership, beneficial ownership, ultimate beneficial ownership, or distribution of profits or revenues of Litai;

(3) All documents and electronically stored information concerning any direct or indirect ownership or controlling interest of Paul in Litai or any entity that controls or owns Litai, and any assets held in formal or informal trust by Litai or Samuel or Paul;

(4) Any other electronic communications concerning the ownership, beneficial ownership, ultimate beneficial ownership, or distribution of profits or revenues of Litai;

(5) All documents, business records, and communications concerning the direct or indirect sources of investment in Litai;

(6) All documents, communications, and business records concerning any past, current, or contemplated agreements between Litai and APC, Ahmose S.A., the Lorenzo Tonti 2006 Trust, the Avernus Portfolio Trust, or ACL, and any negotiations associated therewith;

(7) Without limiting the foregoing, all emails concerning or in any way referencing Paul or any entity known to be affiliated, owned, or controlled by Paul concerning the ownership, beneficial ownership, ultimate beneficial ownership, or distribution of profits or revenues in Litai, sent or received from five email addresses associated with Samuel; and

(8) Without limiting the foregoing, all documents concerning Horo Holdings SA and Tomson Pte. Ltd.'s investment in Litai or the payment of money from Litai.

*See* "Requested Documents," ECF No. [45–1].  On or about February 22, 2016, Applicants served subpoenas on Litai's registered agent for depositions under Rules 30(b)(1) and 30(b)(6) of Samuel (in his official capacity as Litai's Chairman and CEO) and a Litai representative, respectively.  *See* ECF No. [55–8].

The parties agreed that Litai would provide its initial production within 14 days of the Eleventh Circuit's denial of Litai's request for a stay of discovery.  *See* ECF No. [54–2] at 10, 12.  The Eleventh Circuit denied Litai's stay on February 8, 2017.  *See Furstenberg Finance SAS v. Litai Assets LLC*, No. 16–15664–DD (11th Cir. Feb. 8, 2017).  Thus, Litai was to make its initial production on February 22, 2017.  Prior to producing its discovery documents, however, Litai sought a protective order from Applicants without the Court's intervention.  Litai then responded to Applicants' proposed protective order by requesting an "attorneys eyes only"

provision. *See* ECF No. [54–2] at 10. On March 9, 2017, Applicants sent further revisions to the protective order and sought to meet with Litai to discuss its search methodology. *See id*. at 7–8. Litai did not respond. Accordingly, on March 13, 2017, Applicants asked Litai to make its initial production by March 15, 2017 and Litai agreed to do so. *See id* at 7.

On the day production was due, Applicants circulated a signed copy of the approved protective order and again requested to meet to discuss Litai's search methods. *See id*. at 6. The next day, Litai sent a countersigned protective order and, following a third request by Applicants to discuss Litai's search procedures, refused to disclose its methodology, indicating that it was under no obligation to do so. *See id*. at 4–5. After a few email exchanges, Litai agreed to consider proposed search terms. *See id*. at 4. On March 20, 2017, Applicants provided Litai with 32 proposed search terms.[3] *See id*. at 2–3. Two days later, Litai rejected all 32 of the proposed search terms, stating that the "proposed terms bear no relation whatsoever to either what was authorized by the court or what was set forth in the subpoenas." *Id*. at 2. Litai then stated that the terms that do bear some relation to the subpoenas would generate too many "hits." *See id*. Litai suggested that Applicants propose connectors to avoid excessive "hits." *See id*. On March 28, 2017, the Court entered the agreed-upon protective order. *See* ECF No. [39].

On April 1, 2017, Litai produced 173 pages of information, comprised of redacted bank documents, wire transfer records, IRS documents, formal corporate documents, and roughly five e-mails. *See* ECF No. [44] at 6. According to Applicants, Litai failed to produce any documents

---

[3] The terms are: "5m"; "Acheron"; "Ahmose"; "APC"; "Avernus"; "Brix"; "Bui"; "Carlo Toller"; "Colonial Palms"; "Horo"; "jan-eric.samuel@alpcap.com"; "jan.eric.samuel@gmail.com"; "jan-eric.samuel@horo-holdings.com"; "jan.eric.samuel.realtor@gmail.com"; "Jean-Michel"; "JMP"; "JPaul@acheroncapital.com"; "Kalfon"; "Litai Properties"; "Litai Real Estate"; "Lorenzo"; "Mukamal"; "Neptune"; "Nordland"; "Palm Village"; "Paul"; "Seychelles"; "Tanamur"; "Tomson"; "Tonti"; "Vietnam"; and "Wiking." *See* ECF No. [54–2] at 2-3.

regarding its distribution of profits or revenues. *See* ECF No. [43] at 5. Also missing from Litai's initial production were any emails to, from, or concerning Paul. *See id.* at 6.

After further disputes between the parties regarding the proposed search terms' relevance and how to limit them, Applicants sent Litai a chart containing brief descriptions of the relevance of each search term. *See* ECF No. [44–2]. In the same correspondence, Applicants again asked Litai for the amount of "hits" each search term generated "so that [their] efforts to add connectors or otherwise limit the scope of terms make sense." ECF No. [44–1] at 2. On May 31, 2017, Litai informed Applicants that it had searched 12 of the terms, but that the searches yielded no responsive documents. *See* ECF No. [54–3]. Litai did not state how many "hits" each of the 12 terms produced. It did, however, return Applicants' chart with its own comments, noting the "Requested Documents" section of the subpoena that each term (if relevant) might correspond to. *See* ECF No. [44–4]. Litai then asked Applicants to indicate which section of the subpoena they believed each proposed term was relevant to and to provide connectors for the remaining terms. *See* ECF No. [54–3].

The additional searches did produce some results: after searching "Alpcap,"[4] Litai produced two pages containing a single page of e-mail correspondence. *See* ECF No. [44–6].

Since then, the parties have corresponded multiple times in efforts to resolve the issues between them without the Court's intervention. While a few matters have been resolved, the parties continue to disagree about the scope of the Court's authorized discovery, the relevance of certain search terms, and transparency regarding Litai's search methods.

---

[4] Applicants included this additional search term when they sent Litai their chart briefly describing the relevance of each term. *See* ECF No. [44–2]. On June 9, 2017, Applicants indicated to Litai that the term "Vespera" should be searched as well. *See* ECF No. [44–6] at 2.

### B. Litai's production has been deficient.

Litai has failed to adequately comply with the subpoena authorized by the Court. First, the Court notes that absent the entry of a stay on appeal—which Litai failed to obtain—the Court retains jurisdiction to enforce its orders. *See Sergeeva v. Tripleton International Limited*, 834 F.3d 1194, 1202 (11th Cir. 2016).

Given the scope of authorized discovery in this case, the roughly 175 pages produced by Litai cast doubt on the reasonableness of Litai's production and search methodologies. To begin, it is worth noting that 31 pages in Litai's production were effectively a redaction log of the information produced. *See* ECF No. [44] at 8. Litai's total production of responsive information has thus amounted to approximately 145 pages of information.

The subpoena, moreover, authorizes the discovery of communications between Litai or Samuel and any entity owned or controlled by Samuel and Paul (and even entities known to be affiliated with or owned by Paul) concerning the ownership or distribution of profits and revenues of Litai. ACL, which is owned by Paul, manages the investments of APC, where Paul is a director. Litai—whose Chairman and CEO is Samuel—services APC's life insurance policies. Beyond the business ties between the entities owned or controlled by Samuel and Paul, both men are alleged to be close friends. Nevertheless, Litai did not produce any emails to, from, or even referencing Paul.[5] In fact, Litai produced approximately six emails total. That Litai has not produced *any* emails between Litai or Samuel and Paul makes it difficult to conclude that its search efforts or methods have been reasonable.

Indeed, Litai's supplemental production lends further support to Applicants' contention that Litai's production has been deficient. After searching the term "Alpcap," Litai produced an

---

[5] This, despite Litai conceding that searching for "Paul" generated more than 20,000 "hits." *See* ECF No. [53–1] ¶ 42. That all these communications failed to produce a single meaningful email concerning Paul is difficult to accept.

email containing the terms "Samuel," "owns," and "Litai." *See* ECF No. [44–6] at 2. These three terms are undoubtedly responsive to the subpoena authorized by the Court. As such, it is untenable that an email containing these three terms was not produced earlier.

The subpoena also authorizes the production of business records regarding the distribution of profits or revenues of Litai. Yet Applicants allege that Litai has not produced any documents regarding its profits and revenues, and Litai has not denied the allegation.

Furthermore, and despite continued requests by Applicants, Litai has failed to produce unredacted copies of any documents marked as "attorneys' eyes only" (as mandated by the Court's protective order, ECF No. [39] ¶ 3(k), or to designate a corporate representative to be deposed.[6]

Litai asserts that the reason why it has produced such few responsive documents is due to the fact that these documents simply do not exist. In other words, Litai has not produced documents indicating that Paul has direct or indirect ownership interests in Litai because Paul has no direct or indirect ownership in Litai. *See* ECF No. [54] at 4–6. Because Litai cannot "prove a negative," any further discovery will not yield any more documents.[7] Litai also contends that the proposed search terms are "irrelevant to any issues set forth" in the subpoena and are "significantly overbroad in that they return an inordinate number of 'hits' to be reviewed for responsiveness." *See id*. at 6.

The Eleventh Circuit Court of Appeals, however, has rejected such "all-or-nothing" approaches to discovery requests that seek to remove a party from the burden of "having to

---

[6] In its opposition to the Second Motion to Compel, Litai conceded that Applicants served a subpoena on Litai for the deposition of a corporate representative, and that it "is fully prepared to present" one. ECF. No. [54] at 20. Litai did not, however, provide any justification for its failure to present one over the past few months despite repeated requests from Applicants.

[7] Litai also asserts that any "new" discovery will result in "diminishing returns." ECF No. [54] at 9-11. Applicants, though, are not seeking new discovery—only discovery that is due under the subpoena and has yet to be produced by Litai.

produce *any* documents or deposition testimony, even those that seem unambiguously relevant." *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1272–73 (11th Cir. 2014) (emphasis in original). It is possible that Litai has produced the only relevant documents in its possession. Yet all Litai has said regarding its search methods is that "[t]he terms used to search emails have been derived from the language of [the 'Requested Documents' section under the subpoena]." ECF No. [54–6] at 6. By refusing to provide meaningful details about its search processes, the Court is not in a position to dispel any concerns Applicants or the Court might have regarding the reasonableness of Litai's production.

To be fair, Litai has identified some of the terms it deems to be overly broad or irrelevant.[8] *See* ECF No. [44–4]. Nonetheless, Litai has refused other requests by Applicants to narrow discovery. Applicants, for example, attempted to meet Litai somewhere in the middle by agreeing to provide connectors if Litai provided information about its search results. *See* ECF No. [61] at 4. After all, information regarding "hit" counts could shed light on the relevance of Applicants' search terms or the reasonableness of Litai's searches. In an email dated June 20, 2017, counsel for Litai claimed that Litai "searched all proposed terms that generate 3,000 hits" but that the "large majority of the remaining terms generate between 6,000 and 14,000 hits each." *See* ECF No. [54–5]. Yet the email did not specify the number of "hits" each term was generating. Nevertheless, Litai continued to ask Applicants for connectors without ever providing the requested "hit" information or explaining how Litai's approach was reasonable.

---

[8] Specifically, Litai presented 12 terms in its response to Applicants' Second Motion to Compel that it believes are irrelevant. *See* ECF No. [54] at 6–7. Litai claimed that it nevertheless "ran these additional search terms, and reviewed all of the documents that included the search terms, none of which were remotely responsive to the Subpoena." *Id.* at 7. Such overarching statements by Litai without any evidence as to its search processes make it difficult to assess the reasonableness of the searches. Similarly, rather than also asserting how the scope of Applicants' proposed order should be narrowed, Litai only argued that the proposed order should be rejected in full. *See* ECF No. [54] at 18–21; *see also Consorcio*, 747 F.3d at 1273 (describing all-or-nothing discovery challenges as "problematic").

Litai has expressed concerns that the authorized discovery is unduly burdensome and costly.[9]  *See* ECF No. [54] at 10–15.  The nature of Applicants' inquiry—attempting to uncover undisclosed ownership interests in Litai—necessarily entails a good deal of discovery.  It is doubtful that sophisticated corporate entities would document secret ownership interests in its formal business records.  It therefore makes sense that the authorized discovery in this case seeks information that goes beyond Litai's official documents.[10]  Further, had Litai provided clear statements and justifications regarding its production efforts, the Court would be in a better position to allay any concerns Litai may have regarding excessive discovery costs.  In any case, Applicants have expressed that they are "willing to pay their fair share of a reasonable portion of disclosure costs to mitigate" such burdens.  ECF No. [61] at 15.

In sum, the Court finds that Litai has not met its obligation to faithfully respond to the authorized discovery, despite numerous, reasonable attempts by Applicants to narrow the scope of the requests and otherwise address production issues without the Court's intervention.  As a result, Applicants' Second Motion to Compel is granted.

## C.  Attorneys' fees are warranted.

The Court finds that Applicants are entitled to attorneys' fees.  Under Rule 37, a court must award the prevailing party in a motion to compel their attorney's fees unless the losing party can show a substantial justification (or other exception) for the conduct in failing or refusing to produce discovery.  *See* Fed. R. Civ. P. 37(a)(5)(A).

---

[9] Litai's attempts to link the reasonableness of the authorized discovery to the economic interests of Applicants, such as the number of APC shares they own, are inapposite in this case given that Applicants are contemplating *criminal* foreign proceedings against Paul.

[10] According to Applicants, even the few corporate records that Litai has provided raise questions about its ownership: Litai's production revealed offshore ownership of Litai by Swiss and Singapore entities, as well as shifts in the chain of ownership that purportedly conflict with other records and representations by Samuel.  *See* ECF No. [43] at 5; *see also* ECF No. [44] ¶¶ 39–42.

Litai contends that there is no legal or factual justification for attorneys' fees. Unless other provisions are made, however, discovery in a Section 1782 action is governed by the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 1782(a). Thus, the statute itself strongly suggests that the Court has the authority to issue subpoenas and, in the event of noncompliance, orders for fees or sanctions. This is plain from *Sergeeva v. Tripleton International Limited*, where the Eleventh Circuit suggested, without explicitly deciding, that the imposition of sanctions in a Section 1782 action was appropriate. *See Sergeeva*, 834 F.3d 1194 (11th Cir. 2016) (affirming the district court's contempt order in a Section 1782 action after the respondent had ample opportunity to show cause as to why it should not be sanctioned); *see also In re FG Wilson (Engineering) Ltd.*, No. 10–20843–MC, 2011 WL 5361073 (S.D. Fla. Nov. 7, 2011) (awarding expenses in a Section 1782 action pursuant to the provisions of Rule 37).

District Courts are given considerable discretion under the Federal Rules of Civil Procedure to specify the conditions for discovery. One of the Court's primary ways of ensuring these conditions are abided is through its power to impose fees and sanctions. Without this authority, it would be difficult for the Court to follow through on one of Section 1782's primary aims: to provide *efficient* means of assistance to participants in international litigation in our federal courts. *See Application of Malev Hungarian Airlines*, 964 F.2d 97, 99 (2d Cir. 1992) (citing S.Rep. No. 1580, 88th Cong., 2d Sess. (1964), reprinted in 1964 U.S.C.C.A.N. 3782, 3792–94) (emphasis added).

In light of the foregoing, the Court finds that attorneys' fees are warranted. Litai has not established that its deficient production was substantially justified in any way, let alone that it occurred despite its reasonable efforts to comply with the Court's subpoena. Beyond its deficient production, Litai has not shown good cause for its failure to provide Applicants with

meaningful information regarding the number of "hits" for Applicants' proposed terms or its search methodologies. Accordingly, and pursuant to Rule 37(a)(5)(A), Applicants shall be awarded attorneys' fees and costs, the amount to be determined at a later date.

**D. Samuel has not established good cause for a protective order.**

Samuel seeks a protective order from the Court holding that the service of the subpoena upon Litai for Samuel's deposition was ineffective and invalid because the subpoena: (1) was beyond the scope of the subpoenas authorized by the Court; (2) was not issued by the Clerk; (3) was not personally served upon Samuel; and (4) was not accompanied by a check for witness fees in accordance with Fed. R. Civ. P. 45. Applicants argue that Litai must produce Samuel for deposition under Rule 30(b)(1). The Court finds that a protective order is unwarranted in this case as Litai was properly noticed under Rule 30(b)(1) to produce Samuel for deposition.

Samuel first argues that the subpoena issued for his deposition testimony is invalid because the Court only authorized Applicants to serve subpoenas for deposition testimony upon Litai, and not Samuel.[11] Applicants contend that, given the hybrid nature of Section 1782 actions, Applicants and Litai should be considered "parties" to this Section 1782 proceeding. Thus, a subpoena noticed upon Litai under the auspices of Rule 30(b)(1) would compel Litai to produce Samuel for deposition in his capacity as an officer of Litai. Samuel disagrees, claiming that Litai is a non-party subject to Rule 45's requirements for serving subpoenas. In support of their proposition, Applicants rely on *In re Ex Parte Application of Porsche Automobil Holding, SE*, No. 15–mc–417 (LAK), 2016 WL 702327, at *2 (S.D.N.Y. Feb. 18, 2016), where the court

---

[11] Samuel relies on the Court's February 20, 2016 Order for his second argument that only the Clerk was authorized to issue subpoenas. *See* ECF No. [64] at 3. However, the Court's February 10, 2016 Order only required the Clerk to issue subpoenas "relating to *communication* between [Litai] . . . [Samuel] . . . and [Paul], and any *communication* between Litai, [ACL] and/or [APC]." *See* ECF No. [8] (emphasis added). On the other hand, the Court's Order granting Applicants' Section 1782 application authorized Applicants to "issue and serve subpoenas upon [Litai] for . . . deposition testimony . . . ." *See* ECF No. [7]. Applicants, therefore, did not violate the Court's orders when they issued subpoenas for deposition.

stated that "[I]n a formal sense, the parties to this [Section 1782] proceeding are [the applicant], which obtained leave from this Court to serve subpoenas on eight entities, and the eight subpoena recipients."

As previously mentioned, Section 1782 actions are governed by the Federal Rules of Civil Procedure.  Thus, if Litai is considered a formal party to this Section 1782 action, then notice pursuant to Rule 30(b)(1) would suffice to compel Litai to produce Samuel for a deposition.  The Federal Rules of Civil Procedure permit two types of corporate depositions.  First, a party may notice a particular officer or agent of the corporation via Rule 30(b)(1).  *See Stelor Prods., Inc. v. Google, Inc.*, No. 05–80387–CIV, 2008 WL 4218107, at *3 (S.D. Fla. Sept. 15, 2008).  Second, a party may notice the deposition of a corporation without naming a specific person to be deposed, instead describing the information sought via Rule 30(b)(6).  *See id*.  Under this approach, the corporation must designate someone to testify on the corporation's behalf.  *See id*.  "A party may use both types of discovery when attempting to elicit information about a corporation."  *Id*.

In the present case, there is no doubt that: (1) Samuel, Litai's Chairman and CEO, is an officer of Litai; or (2) Litai was properly noticed of the subpoena under Rule 30(b)(6).[12]  By conceding that it was properly noticed under Rule 30(b)(6), Litai has effectively conceded that it was properly noticed under Rule 30(b)(1) as well.  After all, "a subpoena [under Rule 45] need not be issued if the person to be deposed is a party, officer, or managing agent of a party."  *Calixto v. Watson Bowman Acme Corp.*, No. 07–60077–CIV, 2008 WL 4487679, at *2 (S.D. Fla. Sept. 29, 2008).  Litai contends that under Rule 30(b)(6), it has the right to designate its corporate representative.  Litai is correct.  Rule 30(b)(6), however, "does not preclude a

---

[12] Litai has admitted as much, stating that it "is fully prepared to present" its corporate representative for deposition testimony.  ECF. No. [54] at 20.  While Litai has not disclosed who it intends to designate as its representative, it seems highly doubtful that it will select Samuel.

15

deposition by any other procedure allowed by [the] rules." Fed. R. Civ. P. 30(b)(6). Thus, "a party who wishes the deposition of a specific officer . . . of a corporation may still obtain it and is not required to allow the corporation to decide for itself whose testimony the other party may have." *United States v. One Parcel of Real Estate at 5860 N. Bay Rd., Miami Beach, Fla.*, 121 F.R.D. 439, 440 (S.D. Fla. 1988) (citing 8 Wright & Miller, Fed. Practice and Proc: Civil § 2103 p. 375 (2d ed.1970).

Applicants have repeatedly stated that they intend to depose Samuel in his capacity as Chairman and CEO of Litai. Typically, if a party wants to depose a high-ranking principal of a corporation, the party should demonstrate that the principal has unique personal knowledge of the matter at issue. *See Stelor Prods., Inc.*, 2008 WL 4218107 at *4. A deposition is thus unlikely to be allowed where the information is obtainable through interrogatories, the deposition of a designated spokesperson, or deposition testimony of lower-ranking officials. *See Baine v. General Motors Corp.* 141 F.R.D. 332, 334–36 (M.D. Ala. 1991) (summarizing the approach of courts in various jurisdictions).

But here, Applicants claim that Samuel has direct, unique, and personal knowledge that he alone possesses, namely: the beneficial ownership of Litai; Paul's involvement with Litai; Samuel's discussions and correspondence with Paul concerning Litai; and, how Samuel, a foreign national with no prior insurance experience, was named CEO of a Florida-based insurance company.[13] *See* ECF No. [68] at 2. Litai could prepare a lower-ranking official to testify about such matters, and Applicants could then depose Samuel on any questions that remain unanswered. *See Stelor Prods., Inc.*, 2008 WL 4218107 at *4. Yet given that Samuel is

---

[13] The information Applicants seek in relation to the deposition under Rule 30(b)(6) regards Litai's production efforts and search methodology. *See* ECF No. [43–1] at 1–2. Thus, it is unlikely that Litai's corporate representative will also be able to speak on matters surrounding Litai's ownership and the business relationships between Samuel and Paul.

in sole possession of information relevant to Applicants' Section 1782 inquiry into whether Paul is a secret or undisclosed owner of Litai, there are certain to be unanswered questions following the deposition of a lower-ranking official that lacks personal knowledge. Such an effort seems inefficient and a waste of the parties' resources. Because the information sought after is not obtainable by other methods, the Court finds that Applicants may depose, and Litai must produce, Samuel under Rule 30(b)(1).

The Court finds that good cause has not been established for Samuel's Motion for a Protective Order. On balance, Samuel's concerns do not outweigh Applicants' need for access to information that only Samuel possesses. The Court is of the opinion that Litai has been properly noticed under Rule 30(b)(1) to produce Samuel for deposition. Samuel's Motion for a Protective Order is therefore denied.

## IV. CONCLUSION

Applicants have established that Litai's discovery has been deficient, particularly in light of Litai's reluctance to narrow the document requests under the subpoena or to provide any meaningful details about its search methodologies despite repeated appeals. Accordingly, Applicants have also shown that they are entitled to attorneys' fees. Further, Samuel has not succeeded in showing good cause for a protective order because Litai received proper notice of the subpoena under Rule 30(b)(1).

It is therefore **ORDERED AND ADJUDGED** that

1. Applicants' Second Motion to Compel, ECF No. [43], is **GRANTED;** and

2. Samuel's Motion for a Protective Order, ECF No. [64], is **DENIED**.

3. The parties shall comply with the following deadlines:

a.    **On or before November 17, 2017**, pursuant to the Protective Order, ECF No. [39] at ¶ 3(k), Litai shall produce unredacted copies of the documents that it produced that were marked as Attorneys' Eyes Only.

b.    **On or before November 17, 2017**, Litai shall provide details concerning its document preservation efforts sufficient to determine whether responsive documents are being properly preserved.

c.    **On or before December 4, 2017**, Litai shall produce a Rule 30(b)(6) designee regarding Litai's search methodology and the integrity of Litai's search and production efforts, including, but not limited to:

   1. Litai's search for documents responsive to the scope of discovery ordered by the Court;

   2. The dates of Litai's search efforts;

   3. The custodians that Litai identified as having potentially responsive information;

   4. Litai's electronic storage and information management systems;

   7. Litai's electronically stored information;

   8. Litai's document preservation efforts;

   9. Litai's search terms used;

   10. Litai's production of documents; and

   11. Litai's determination of responsiveness.

d.    **On or before November 17, 2017**, Litai shall produce all non-privileged documents and communications in its possession, custody, or control:

   1. related to the titular, direct, or beneficial ownership of Litai;

18

2.  demonstrating direct or indirect ownership or control of Litai by Samuel or an entity owned or controlled by Samuel;

3.  demonstrating direct or indirect ownership or control of Litai by Paul or an entity owned or controlled by Paul;

4.  demonstrating direct or indirect ownership or control of Litai by Horo Holdings, S.A.;

5.  sufficient to determine the ownership and control of Horo Holdings, S.A.;

6.  demonstrating direct or indirect ownership or control of Litai by Alpcap Pte. Ltd.;

7.  sufficient to determine the ownership and control of Alpcap Pte. Ltd.;

8.  related to payments, including commissions, to Litai from Paul, Samuel, or an entity owned or controlled by Paul or Samuel;

9.  related to payments, including commissions, from Litai to Paul, Samuel, or an entity owned or controlled by Paul or Samuel;

10. related to Litai board or leadership meetings that Paul attended or in which Paul participated, in person or otherwise;

11. related to negotiations between Paul, Samuel, and Barry Mukamal for the purchase of Viatical Services, Inc.;

12. related to the transfer of Litai's ownership from Horo Holdings, S.A. to Alpcap Pte. Ltd. on September 22, 2011;

13.    related to the transfer of Litai's ownership from Alpcap Pte. Ltd. to Samuel on March 31, 2016.

e.    **On or before November 17, 2017**, Litai shall provide the number of hits associated with each of the following search terms:

1.    "Carlo Toller"

2.    "Colonial Palms"

3.    "Jean-Michel"

4.    "Mukamal"

5.    "Neptune"

6.    "Nordland"

7.    "Palm Village"

8.    "Wiking"

9.    "Vespera"

f.    **On or before November 17, 2017**, Litai shall produce all non-privileged communications in its possession, custody, or control to, from, or including Paul regarding the following topics:

1.    Litai's direct and indirect ownership;

2.    Payments from Litai;

3.    Paul's direct, indirect, and/or beneficial ownership of Litai and his direct or indirect receipt of payments from Litai;

4.    Litai's relationship with entities known to be affiliated with, owned or controlled by Paul and Samuel and those entities' direct or indirect receipt of payments from Litai; and

20

      5.       direct or indirect sources of investment in Litai.

g.      **On or before December 4, 2017**, Litai shall produce Samuel for

deposition as an officer, director, or managing agent of Litai.

h.      Magistrate Judge Alicia Valle shall supervise Litai's compliance with its

discovery obligations if necessary.

i.      The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in Miami, Florida this 30th day of October, 2017.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

21

# EXHIBIT 46

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 16-cv-60266-BLOOM

In re:
FURSTENBERG FINANCE SAS and
MARC BATAILLON

          Applicants.

_____/

## <u>ORDER ON APPLICANTS' THIRD MOTION TO COMPEL AND FOR CONTEMPT</u>

**THIS CAUSE** is before the Court upon Applicants' Third Motion to Compel Discovery

and For Contempt (the "Motion"). *See* ECF No. [82]. The Court has carefully reviewed the

Motion, all supporting and opposing submissions, the record in this case, and applicable law.

For the reasons set forth below, Applicants' Motion is granted.

## I.  BACKGROUND[1]

On February 9, 2016, Applicants petitioned this Court under 28 U.S.C. § 1782 ("Section

1782") for an order compelling Litai Assets, LLC ("Litai"), a company existing and organized

under the laws of the State of Florida, to produce discovery for use in reasonably contemplated

criminal foreign proceedings against Jean-Michael Paul ("Paul"), a director of Acheron Portfolio

Corporation Luxembourg S.A. ("APC"). *See* ECF No. [1].

On February 10, 2016, the Court entered an order granting the Section 1782 Application,

("Section 1782 Order"), authorizing Applicants to issue and serve subpoenas upon Litai for

business records, deposition testimony, electronically stored information, any other electronic

communications relating to any communication between Litai, Jan-Eric Samuel (in his capacity

---

[1] For a more detailed recitation of the underlying facts supporting Applicants' Section 1782 Application,
see ECF Nos. [7], [73], [89].

as Chairman and CEO of Litai or in relation to Litai) and Paul, and any communications between Litai, Acheron Capital Limited ("ACL"), and/or APC.  *See* ECF No. [7].

On March 24, 2016, Litai moved to quash the subpoenas under Rule 45 of the Federal Rules of Civil Procedure and Local Rule 26.1, arguing that Applicants did not satisfy the elements of Section 1782.  *See* ECF No. [10]. In their response filed April 18, 2016, Applicants moved to compel production in accordance with the Section 1782 Order.  *See* ECF No. [16].  On July 27, 2016, after Litai and Applicants timely filed their corresponding replies, the Court denied Litai's motion to quash and granted Applicants' motion to compel.  *See* ECF No. [30].

Litai appealed, ECF No. [31], and sought to stay discovery pending the appeal, ECF No. [32].  This Court, as well as the Eleventh Circuit Court of Appeals, denied Litai's motion to stay pending appeal.  *See* ECF No. [36]; *see also Furstenberg Finance SAS v. Litai Assets LLC*, No. 16–15664–DD (11th Cir. Feb. 8, 2017).  On December 15, 2017, the Eleventh Circuit affirmed the Court's denial of Litai's motion to quash.  *See Application of Furstenberg Finance SAS v. Litai Assets LLC*, 877 F.3d 1031 (11th Cir. 2017).

On July 14, 2017, Applicants filed a second motion to compel production in accordance with the Section 1782 Order.  *See* ECF No. [43]. Litai responded to the second motion to compel and, on September 21, 2017, Samuel filed a motion for a protective order.  *See* ECF No. [64]. On October 30, 2017, the Court granted Applicants' second motion to compel and denied Samuel's motion for a protective order.[2]  *See* ECF No. [73]. Pursuant to that order, Litai was ordered to produce Samuel for deposition as an officer of Litai. *See Id*. at 21.

On December 12, 2017, Litai and Samuel filed a motion to amend the Section 1782 Order to provide for reciprocal recovery, *see* ECF No. [80], which the Court denied on January

---

[2] Litai and Samuel also appealed the Court's order granting Applicants' second motion to compel and denying Samuel's motion for a protective order.  *See* ECF No. [74]. Pursuant to Movants' motion for voluntary dismissal, the Eleventh Circuit dismissed the appeal on January 5, 2018.  *See* ECF No. [88].

10, 2018, *see* ECF No. [89]. On December 21, 2017, Applicants filed the present Motion. *See* ECF No. [82]. The parties have timely filed their respective response and reply. *See* ECF Nos. [87], [90]. The Motion is ripe.[3]

## II.    DISCUSSION

The sole issue before the Court is whether Litai has complied with the Court's orders, in particular the Court's October 30, 2017 Order granting Applicants' second motion to compel (the "Order"). A review of the record demonstrates that Litai continues to flout its discovery obligations pursuant to the Court's orders.

In the Order, the Court held that "Litai ha[d] not established that its deficient production was substantially justified in any way." ECF No. [73], at 13. Specifically, the Court noted that it was "difficult to accept" that the over 20,000 "Paul"-related hits failed to produce a single meaningful email concerning Paul. *See Id.* at 9 n.5. Accordingly, the Court ordered Litai to "produce all non-privileged communications in its possession, custody, or control to, from, or including Paul regarding" the following five topics:

1.    Litai's direct and indirect ownership;
2.    Payments from Litai;
3.    Paul's direct, indirect, and/or beneficial ownership of Litai and his direct or indirect receipt of payments from Litai;
4.    Litai's relationship with entities known to be affiliated with, owned or controlled by Paul and Samuel and those entities' direct or indirect receipt of payments from Litai; and
5.    Direct or indirect sources of investment in Litai.

*See Id.* at 20–21. Nevertheless, Litai has once again failed to produce a single email to, from, or including Paul. This basis alone is sufficient to warrant the granting of Applicants' Motion.

Litai's reasons for its continued failure to produce any Paul-related emails are unavailing. First, Litai has admittedly failed to even review the more than 20,000 hits generated by searching

---

[3] Litai and Samuel have also moved for a hearing in relation to Applicants' Motion. *See* ECF No. [94].

the term "Paul."[4]  Although Litai searched 85 terms, only 3 of those terms contained a direct reference to Paul,[5] and none of the terms contained a Paul email address.  *See* ECF No. [83–1].

Further, none of the search terms were designed to generate hits in French, even though Paul and Samuel seemingly use French when communicating with one another.  Litai submits three arguments in response.  The first is that "the first time that Applicants ever raised the issue of using French-language words in search terms was at the Rule 30(b)(6) deposition on November 29, 2017.  Applicants never raised this issue before with Litai, its lawyers, or with this Court."  ECF No. [87], at 8.  However, it was Litai, and most obviously Samuel, who was in the best position to know and determine that potentially relevant correspondence between Samuel and Paul occurred in a different language, and that searches in English would not retrieve any correspondence conducted in a different language.

Second, Litai argues that "Samuel does not *typically* communicate in French when conducting Litai business."  *Id*. (emphasis added).  This admission, of course, leaves open the possibility that Samuel conducts some Litai business in French.  Samuel's affidavit submitted in support of Litai's response further undermines Litai's position: Samuel stated that "I typically

---

[4] Applicants cite to the deposition of Litai's corporate representative in support of this contention.  The pertinent exchange is as follows:

Q: How many of those 20,000 documents were reviewed by Litai?
A: When they were reviewed within the search that we did.
Q: But they weren't reviewed as a whole as the 20,000 documents in one search; is that correct?
A: Correct.

ECF No. [83–2], at 13–14.  Litai has not refuted that it did not review these 20,000 hits.  Instead, Litai states that its "searches were run across its entire system containing 941,800 documents—not just that subset of 20,000 documents—such that any responsive documents that would have been produced in searching the subset were necessarily discovered through the far broader searches."  ECF No. [87], at 7.  The Court, however, is not convinced that conducting far broader searches is more reasonable or productive than searches directly tailored to the individual at the core of these Section 1782 proceedings.
[5] The terms searched were: "26. Pay* OR commission* AND Paul OR Samuel OR Jean-Michel OR Jes OR Jan"; "28. (Litai AND meet* OR minutes*) AND (Paul OR Jean*)"; "29. Litai AND Paul AND Samuel AND Mukamal AND purchase*").  ECF No. [83–1], at 3.

only write emails relating to Litai's business in French on the rare occasions when I am responding to an email that is directed to me and written in French." ECF No. [87–4].

Conspicuously missing from Samuel's affidavit is a statement regarding what language he uses when communicating with Paul. Record evidence, however, clearly demonstrates that Samuel and Paul do in fact communicate using the French language. *See* ECF Nos. [84], [84–1]. By Samuel's own admission, he writes emails in French, particularly when he receives emails in that language. Thus, it is highly likely that Paul sent emails to Samuel in French regarding Litai's business, and Samuel responded in kind. Such communications, however, would not be retrieved by English-only search terms. Litai and Samuel must be aware of this.

Litai's third argument relating to the use of French-language terms is that Litai came up with and conducted searches in French. *See* ECF No. [87], at 8–9. This is true. As with the 85 search terms, however, only one of the eleven searches directly mentioned Paul. *See Id.* at 9.

As a result of Litai's production deficiencies, Applicants have moved for sanctions to be entered against Litai. Civil contempt is "an area where the district court has extremely broad and flexible powers." *F.T.C. v. Leshin*, 719 F.3d 1227, 1231 (11th Cir. 2013). District courts have "wide discretion in fashioning an equitable remedy for . . . civil contempt." *Id.* "[S]anctions in civil contempt proceedings may be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 443 (1986). "A coercive contempt sanction comes with some limitations; for instance, once a contemnor's contumacious conduct has ceased or the contempt has been purged, no further sanctions are permissible." *Leshin*, 719 F.3d at 1231. On the other hand, "the district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that

5

they be compensatory." *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir.1990). Indeed, the Supreme Court has observed that district courts possess particularly expansive and flexible powers in these circumstances: "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949); *see also AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1316 (11th Cir.2004) ("[W]hen the public interest is involved . . ., [the district court's] equitable powers assume an even broader and more flexible character." (alterations in original) (internal quotation marks omitted)).

The Court has ordered Litai on three previous occasions to produce relevant Paul-related correspondence.[6]  Yet it is undisputed Litai has failed to produce a single meaningful communication to, from, or including Paul.[7]  As the Court observed in the Order, "It is possible that Litai has produced the only relevant documents in its possession."  ECF No. [73], at 11.  Yet by only searching three terms that directly reference Paul (and only one in French even though it is a primary language used by Samuel and Paul when communicating with each other) and failing to review the 20,000 hits generated when searching "Paul," the Court is in no better

---

[6] *See* ECF No. [7] (order granting application for discovery under Section 1782); ECF No. [30] (order denying Litai's motion to quash subpoenas and granting Applicants' motion to compel); ECF No. [73] (order denying Samuel's motion for protective order and granting Applicants' second motion to compel).
[7] Litai spends much of its response describing its various efforts to comply with the Court's orders.  The Court recognizes those efforts, and does not intend to disparage them.  And, as Litai correctly points out, it has complied with some of the Court's directives.  *See* ECF No. [73], at 18–21; ECF No. [75].  The problem, of course, is that those efforts still failed to address the crux of Applicants' motions to compel, their Section 1782 Application, or the Court's orders—that is, the discovery of communications between Litai or Samuel and Paul (that Applicants contend will shine a light on Paul's concealed ownership in Litai).  The fact that Litai has not produced *any* Paul-related correspondence—even though Samuel and Paul are close friends and business associates—is the clearest evidence that Litai's searches, notwithstanding all its other discovery efforts, have been deficient in this crucial respect.

6

position to dispel its concerns regarding the reasonableness of Litai's production of Paul-related correspondence.[8]

In sum, the Court finds, as it did in the Order, that Litai's search process and ensuing failure to produce any meaningful emails from Paul is neither reasonable nor justified. In fact, Litai's efforts may be more unreasonable now, as they were conducted after and in spite of the Court's clear and specific directions provided in the Order. Litai has not given the Court reason why it should find otherwise. Applicants are thus entitled to sanctions. *See Sergeeva v. Tripleton International Limited*, 834 F.3d 1194, 1202 (11th Cir. 2016) (affirming district court's issuance of sanctions of $500 a day and attorney's fees for company's failure to produce documents responsive to a subpoena in a Section 1782 proceeding).[9]

## III. CONCLUSION

Applicants have established that Litai's discovery as it pertains to Paul-related correspondence continues to be deficient, particularly in light of this Court's October 30, 2017 Order delineating Litai's discovery obligations. For the foregoing reasons, it is therefore **ORDERED AND ADJUDGED** that

---

[8] In its response, Litai states that it should not be held to a "standard of perfection." ECF No. [87], at 12. There is a wide gap, however, between a "perfect" search and declining to review the 20,000 "Paul" hits, for example.

[9] Litai argues that Applicants' Motion should be denied because Applicants failed to comply with the Court's Local Rule 7.1(a)(3). *See* ECF No. [87], at 13–15. The Court notes, however, that Applicants have engaged in numerous reasonable attempts to confer and resolve issues absent judicial intervention throughout these proceedings. *See* ECF No. [73], at 12. In addition, Applicants' counsel engaged in an email exchange, though terse, and a telephone conversation with Litai's counsel prior to filing the Motion several days later. *See* ECF Nos. [83–3]; [83–4]; [82], at 11. Finally, Local Rule 7.1(a)(3) gives the Court discretion impose a penalty for a party's failure to comply. *See* S.D. Fla. L.R. 7.1(a)(3) ("Failure to comply with the requirements of this Local Rule *may be cause* for the Court . . . .") (emphasis added). Thus, the Court, in its discretion, declines to find that Applicants' conferral constitutes a violation of Local Rule 7.1(a)(3). *Alequin v. Darden Restaurants, Inc.*, No. 12–61742–CIV, 2013 WL 3939373, at *9 (S.D. Fla. July 12, 2013) ("Yet even where a violation of Local Rule 7.1 occurs, the Court enjoys discretion to decide whether to deny the motion because of the violation.")

1.  Applicants' Third Motion to Compel Discovery and For Contempt, **ECF No. [82]**, is **GRANTED**.[10]

2.  As a compensatory sanction, Applicants are awarded their reasonable fees and expenses incurred in making the Motion based on Litai's noncompliance with the Court's two previous orders granting Applicants' motions to compel.

3.  **On or before February 5, 2018**, the parties are to agree on a set of search terms as they pertain to the five categories focusing directly on Paul-related correspondence as detailed by the Court in its October 30, 2017 Order. *See* ECF No. [73], Part IV(3)(f).

4.  **On or before February 16, 2018**, Litai shall certify to the Court its efforts to comply with the five categories detailed by the Court in its October 30, 2017 Order. *See* ECF No. [73], Part IV(3)(f).

5.  As a coercive sanction, if Litai fails to comply with the present Order, Litai shall pay $500.00 per day until Litai complies.

6.  Magistrate Judge Alicia Valle shall continue to supervise Litai's compliance with its discovery obligations if necessary.

**DONE AND ORDERED** in Miami, Florida this 30th day of January, 2018.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

---

[10] Accordingly, Litai's Motion for Hearing in relation to Applicants' Third Motion to Compel, **ECF No. [94]**, is denied as **MOOT**.

8

# EXHIBIT 47

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  16-15664-DD

_____

FURSTENBERG FINANCE SAS,
MARC BATAILLON,

Plaintiffs-Appellees,

versus

LITAI ASSETS LLC,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

Before: WILSON, WILLIAM PRYOR, and JULIE CARNES, Circuit Judges.

BY THE COURT:

Appellant's motion for a stay is **DENIED**, as it has not made the requisite showing.  *See In re Federal Grand Jury Proceedings*, 975 F.2d 1488, 1492 (11th Cir. 1992).

The Clerk is directed to treat any motion for reconsideration of this order as a non-emergency matter.

# EXHIBIT 48

No. 16-15664-D
Lower Ct. Case No. 16-mc-60266-Bloom

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

In re: Application of FURSTENBERG FINANCE SAS
and MARC BATAILLON, for an Ex Parte Order Granting
Discovery Pursuant to 28 U.S.C. 1782
(LITAI ASSETS LLC, Intervenor-Appellant)

_____

On Appeal from the United States District Court
for the Southern District of Florida

_____

_____

Brief of Appellant Litai Assets LLC
_____

Jeffrey W. Gutchess                     Thomas R. Julin
Daniel Tropin                           Fla. Bar No. 325 376
Fla. Bar Nos. 702641& 100424

AXS Law Group                           Gunster Yoakley & Stewart PA
*Attorneys for the Respondents*         600 Brickell Avenue Suite 3500
1850 Purdy Avenue                       Miami, FL 33131
Miami, Florida 33139                    305-376-6007 Fax 6010
(305) 389-3646                          tjulin@gunster.com
jeff@axslawgroup.com
dan@axslawgroup.com

Furstenberg Finance SAS v. Litai Assets LLC
Case No. 16-15664-D

## CERTIFICATE OF INTERESTED PERSONS
## & CORPORATE DISCLOSURE STATEMENT

Counsel for Appellants, Litai Assets LLC, hereby certify, to the best of their knowledge, that the following is a complete list of the persons and entities that have an interest in the outcome of this case:

Acheron Capital Limited

Acheron Portfolio Corporation (Luxembourg) S.A.

Ahmose S.A.

Arendt & Medernach

AXS Law Group PLLC

Bataillon, Marc

Beissel, Pierre

Bloom, Beth, Hon., United States District Court Judge

Bonnet, Erich

Furstenberg Capital SCA

Furstenberg Finance SAS

Furstenberg Sarl

Gluck, Warren E.

Grasso, Rosario

Gunster Yoakley & Stewart, P.A.

Furstenberg Finance SAS v. Litai Assets LLC
Case No. 16-15664-D

Gutchess, Jeffrey W.

Holland & Knight

Julin, Thomas R.

Kalfon, Eric

Kleyr Grasso

Litai Assets LLC

Nauta Dutilh

Paul, Jean-Michel

Quattromani, Lauren

Rothschild, Philip E.

Prum, Francois

Samuel, Jan-Eric

Sabatier, Roman

Tropin, Daniel E.

Turk & Prum

No publicly traded company or corporation has an interest in the outcome of the case or appeal.

*s/ Jeffrey W. Gutchess*
Jeffrey W. Gutchess

## STATEMENT REGARDING ORAL ARGUMENT

Appellant, Litai Assets LLC, requests oral argument in this case involving an interpretation of 28 U.S.C. § 1782. The District Court decision gives Section 1782 a broader interpretation than any Court ever has given the statute and, by doing that, opens the federal courts in this Circuit to numerous applications for orders compelling discovery which may be used for improper purposes rather than to aid foreign and international tribunals in the adjudication of disputes. This order is only the most recent of many orders. Applications are now regularly being sought for tactical reasons to coerce private parties to settle disputes that are not and that never would or could become proceedings in a foreign or international tribunal. The Court should use this case to restrict the use of Section 1782 for such improper and unauthorized purposes. Federal courts are courts of limited jurisdiction. Congress did not authorize, through Section 1782, our federal courts to be used as they are now being used in this case and others.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS
& CORPORATE DISCLOSURE STATEMENT ................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CITATIONS .......................................................................iv

PRELIMINARY STATEMENT ...............................................................1

JURISDICTIONAL STATEMENT ..........................................................3

ISSUES PRESENTED FOR REVIEW .....................................................4

STATEMENT OF THE CASE.................................................................5

STATEMENT OF THE FACTS .............................................................7

     The Applicants Allegations Regarding Litai's Fees.......................9

     Negotiation of the Servicing Agreement ......................................10

     Mr. Bonnet's Resignation From Acheron's Board .......................11

     The Applicants' Release of Civil Claims Against Dr. Paul ...........11

     The Renewal of the Litai Contract ..............................................12

     Dr. Paul's Complaints Against Furstenberg.................................12

     The Kalfon Email .......................................................................13

     The Section 1782 Application ......................................................15

     Litai's Motion to Quash...............................................................16

     The Applicants Concede No Civil Action is "Reasonably
     Contemplated" .............................................................................17

     The Applicants Show No Criminal Action Is "Reasonably
     Contemplated" .............................................................................18

     The Real Reason For The 1782 Application ................................19

     The Court's Order........................................................................19

STANDARD OF REVIEW ..................................................................20

SUMMARY OF THE ARGUMENT ....................................................21

ARGUMENT ................................................................................................23

    I.    Section 1782 Does Not Permit Discovery to Investigate if a
          Claim is Possible ...........................................................................29

    II.   Hearsay and "Suspicions" of Minority Shareholders,
          Contradicted by the Company's Chairman, Do Not Provide a
          "Reasonable Indication" that Criminal Proceeding Will Ever
          Commence.....................................................................................32

    III.  Applicants Made No Showing that a Luxembourg  Prosecutor
          Will Ever Start an Investigation Let Alone a Criminal
          Proceeding ....................................................................................37

    IV.  If Applicants Were to File a Criminal Complaint With a
          Claim for Civil Damages It Likely Would Be Held
          Inadmissible and Not Even Trigger an Investigation..........................41

    V.   Seeking Discovery to Ask a Prosecutor to Open a Criminal
          Investigation Does Not Satisfy the Requirement that the
          Discovery is "For Use" in a Foreign Proceeding ...............................45

    VI.  The Applicants are Not "Interested Persons".....................................47

CONCLUSION .............................................................................................47

TABLE OF CITATIONS

<u>Cases</u>

*Application of Consorcio Ecuatoriano de*
  *Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,*
  747 F.3d 1262 (11th Cir. 2014)................................................................... *passim*

*Belleri v. U.S.,*
  712 F.3d 543 (11th Cir. 2013).................................................................42

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.,*
  798 F.3d 113 (2d Cir. 2015)..................................................... 21, 29, 45

*Euromepa, S.A. v. R. Esmerian, Inc.,*
  154 F.3d 24 (2d Cir. 1998).......................................................................21

*Heraeus Kulzer, GmbH v. Biomet, Inc.,*
  633 F.3d 591 (7th Cir. 2011) ..............................................................4

*In re Application of Gov't of Lao People's Democratic Republic for an Order*
  *Pursuant to the United Nations Convention Against Corruption,*
  No. 1:15-MC-00018, 2016 WL 1389764 (D. N. Mar. I. Apr. 7, 2016)..............30

*In re Asia Mar. Pac. Ltd.,*
  No. 15-CV-2760 VEC, 2015 WL 5037129 (S.D.N.Y. Aug. 26, 2015)..............30

*In re Clerici,*
  481 F.3d 1324 (11th Cir. 2007).........................................................20

*In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions,*
  No. 15-MC-127, 2015 WL 4040420 (S.D.N.Y. June 29, 2015).........................30

*In re Luxalpha SICAV Liquidation,* Nos. 309/10, 312/10, 318/10 (Lux. Dist. Ct.
  Mar. 4, 2010), *confirmed,* Dkt. No. 36516, (Lux. App. July 15, 2014),
  *confirmed,* Decision No. 67/15, Dkt. No. 3509 (Lux. Ct. de Cassation July 2,
  2015) .........................................................................................43

*In re Request for Assistance from Ministry*
  *of Legal Affairs of Trinidad & Tobago,*
  848 F.2d 1151 (11th Cir. 1988)..........................................................24

*In re Request from Czech Republic Pursuant to Treaty Between U.S. & Czech*
  *Republic on Mut. Assistance in Criminal Matters in Matter of Koblizek*,
  No. 3:08MC001J33TEM, 2008 WL 179263 (M.D. Fla. Jan. 17, 2008)..............37

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ..................................................................... *passim*

*In re Letter of Request from Crown Prosecution Serv. of United Kingdom*,
  870 F.2d 686 (D.C. Cir. 1989)....................................................... 25, 28

*Sergeeva v. Tripleton Int'l Ltd.*,
  No. 15-13008, 2016 WL 4435616 (11th Cir. Aug. 23, 2016).............................20

*Weber v. Finker*,
  554 F.3d 1379 (11th Cir. 2009) ...........................................................37

Statutes

28 U.S.C. § 1291 ..................................................................................4

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 1782 ....................................................................... *passim*

Rules

Fed. R. App. P. 32(a)(5)......................................................................49

Fed. R. App. P. 32(a)(6)......................................................................49

Fed. R. App. P. 32(a)(7)(B) ...............................................................49

Fed. R. App. P. 32(a)(7)(B)(iii)..........................................................49

Fed. R. Civ. P. 44.1 ............................................................................42

Other Authorities

S. Rep. No. 1580 ................................................................................26

*Ordonnance de Non Informer 30013/15/CD*
  (Cabinet d'Instruction Feb. 22, 2016) ................................................43

Gaston Vogel & Frédéric Mioli, *Lexique de Procédure Pénale de Droit Luxembourgeois* (Larcier 3d ed. 2009) .........................................................42

PRELIMINARY STATEMENT

Over the years, Section 1782, 28 U.S.C., has been given a broad construction by U.S. courts in order to assist "foreign and international tribunals," in their effort to adjudicate disputes.[1]    The statute and this approach to its construction are designed to encourage foreign and international tribunals to help U.S. courts when they seek aid in their adjudication of domestic matters.    It is equally clear that Section 1782 was never intended by Congress to make U.S. courts mere aides to foreign prosecutors or, worse, those who claim they need evidence to lobby foreign prosecutors to launch criminal investigations which might lead to adjudicative proceedings in a foreign or international tribunal.

The mere claim of a foreign citizen that a foreign crime may have occurred plainly falls far short of what Section 1782 requires to unlock the courthouse door and with good reason.    If that were the test, U.S. courts could be inundated with applications for help from private persons seeking oppressive discovery from their adversaries – or, as here, third parties who merely do business with their adversaries – solely to coerce private settlements of private disputes.

The Supreme Court recognized this threat in *Intel Corp. v. Advanced Micro*

---

[1]    *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 254-55 & n. 9 (2004) (Ginsburg, J., for the majority), and 542 U.S. at 267-73 (Breyer, J., dissenting).

*Devices, Inc.*, 542 U.S. 241 (2004), and provided standards for lower courts to apply which prevent this sort of abuse of a law that had been enacted with an entirely distinct objective.

Can Section 1782 really authorize, as the Court's Order does, any shareholder, of any publicly traded company in Europe or any other foreign location – i.e. hundreds of millions of shareholders around the world – which shareholder cannot file civil claims against the company's board of directors, to seek discovery from any US entity or third party, to develop evidence to ask a public prosecutor to start an investigation of one member of the company's board, particularly when the allegations made in the shareholder's application is rebutted by the chairman of the company's board of directors?  If so, then the Court will have opened up Section 1782 to millions of shareholders around the world.

In this case, the district court not only failed to apply the *Intel* standards correctly, it gave Section 1782 the broadest interpretation ever given it by any court, allowing shareholders of a publicly traded foreign company, who themselves have no standing to bring civil claims on behalf of the company in which they hold shares against one of the company's directors, to compel a Florida-based Delaware company, Litai Assets, LLC, the appellant here, to produce evidence which the shareholders claim they might be able to use to persuade a foreign prosecutor to start a criminal investigation against one member of the board, which then might

morph into an adjudicative proceeding which perhaps could recover for the company damages that would benefit the shareholders. Under these circumstances, the district court is not giving aid to foreign or international tribunals, it is lending its power to private persons who, as will be shown, are attempting to gain an advantage in a purely private – non adjudicatory – dispute concerning the price at which certain shares should be sold from one party to another. Section 1782 clearly was not enacted to allow federal courts to do this.

Appellant Litai Assets LLC ("Litai") respectfully appeals the denial of its Motion to Vacate Ex Parte Order and Quash Ex Parte Subpoena, or for a Protective Order, by the United States District Court for the Southern District of Florida, Judge Beth Bloom in *In re: Application of FURSTENBERG FINANCE SAS and MARC BATAILLON for an Ex Parte Order Granting DISCOVERY PURSUANT TO 28 U.S.C. 1782*, NO. 0:16-mc-60266-bb on July 27, 2016 (the "Order").

<u>JURISDICTIONAL STATEMENT</u>

The applicants alleged that 28 U.S.C. §§ 1331 and 1782(a) conferred jurisdiction upon the District Court, but as will be discussed, these statutes did not in fact create jurisdiction over the type of application submitted to the District Court.

Appellants appeal to this Court from a Memorandum Order dated July 27, 2016. Appellants timely filed their Notice of Appeal on August 25, 2016.

3

Jurisdiction is conferred on this Court by 28 U.S.C. § 1291.  An order granting or denying a Section 1782 application is final and appealable because "[t]he court is finished with the matter—as the only matter is discovery—and when no further proceedings are contemplated, the court's last order, even if it is a discovery order, is an appealable final order." *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,* 747 F.3d 1262 (11th Cir. 2014) (quoting *Heraeus Kulzer, GmbH v. Biomet, Inc*., 633 F.3d 591, 596 (7th Cir. 2011)).

<u>ISSUES PRESENTED FOR REVIEW</u>

This appeal presents six issues for review:

I.    Does Section 1782 confer jurisdiction on a District Court to order discovery to enable a foreign private party, who has no standing to file civil claims, to investigate if it can develop evidence that might enable it to attempt to trigger a criminal investigation, not even a criminal proceeding?

II.    Have the Applicants demonstrated "reliable indications of the likelihood that proceedings will be instituted within a reasonable time" when they are minority shareholders of a publicly traded company, without standing to file civil claims, who claim an intent to trigger a criminal investigation, but who are relying on hearsay and "suspicions" to allege a crime by one member of the board of directors, which hearsay and suspicions are contradicted by the chairman of the

company's board of directors?

III.    Does Section 1782 confer jurisdiction on a District Court to issue subpoenas when the applicant, who admits it has no standing to file civil claims, makes no showing that a foreign prosecutor will ever start an investigation let alone a criminal proceeding?

IV.    Does Section 1782 confer jurisdiction on a District Court when the applicants' claim that it can trigger a criminal investigation in Luxembourg by filing a criminal complaint with a request for civil damages is contradicted by the leading treatise on Luxembourg criminal law?

V.    Does Section 1782 confer jurisdiction on a District Court when the applicants are seeking discovery merely to ask a foreign prosecutor to open a criminal investigation?

VI.    Are shareholders publicly traded foreign company "interested persons" under Section 1782?

<u>STATEMENT OF THE CASE</u>

Furstenberg Finance SAS and Marc Bataillon ("the Applicants") applied to the U.S. District Court for the Southern District of Florida on February 9, 2016, for an *ex parte* order pursuant to 28 U.S.C. § 1782 to conduct discovery in support of what they claimed were "reasonably contemplated foreign criminal and civil proceedings." DE-1 at 2.

5

The Applicants explained that they were shareholders in Acheron Portfolio Corporation (Luxembourg) SA ("Acheron"), and they hoped to discover evidence that would allow them to file civil and criminal proceedings against a member of Acheron's Board of Directors, Dr. Jean-Michel Paul ("Dr. Paul"), based upon their suspicion that Dr. Paul had a secret ownership interested in Litai, a Florida-based Delaware company which sells services to Acheron.

On February 10, 2016, the district court granted the *ex parte* application, writing: "The Applicants are authorized to issue and serve subpoenas upon Litai for business records, deposition testimony, electronically stored information and any other electronic communications relating to any communication between Litai, Jan-Eric Samuel … and Dr. Paul, and any communications between Litai, Acheron Capital Limited and/or Acheron Portfolio Corporation Luxembourg S.A."  DE 7.[2]

Upon being served, Litai filed a motion to quash the subpoenas.  The Applicants cross-moved to compel responses to the subpoenas.  On July 27, 2016, the district court denied Litai's motion to quash and granted the Applicants' cross motion to compel.  This appeal followed.

---

[2]  This appellate brief is submitted only on behalf of Litai.  The Applicants have not served any subpoenas on Mr. Jan-Eric Samuel and the district court's order did not authorize service of such a subpoena on Mr. Samuel.

6

## STATEMENT OF THE FACTS

The following diagram shows the most significant entities involved in this matter. The parties to this appeal are in bold.



Erich Bonnet
(owns 94% of Furstenberg Finance)

**Marc Bataillon**
(owns 22% of Ahmose S.A.)

**Furstenberg Finance SAS**
(2% Acheron shareholder)

Ahmose S.A.
(6% Acheron shareholder)

Acheron Portfolio Corporation (Luxembourg) S.A.
(publicly listed company in Luxembourg)

Acheron Capital Limited
(manages Acheron's investments)
(owned by Dr. Jean-Michael Paul)

**Litai Assets, LLC**
(independent third party servicer of policies held by Acheron)
(owned by Jan-Eric Samuel)

Appellee/Applicant Furstenberg Finance SAS ("Furstenberg"), is a French company that is a shareholder in Acheron, a Luxembourg company publicly traded on the Luxembourg stock exchange. Furstenberg owns approximately 2 percent of Acheron's shares. Mr. Erich Bonnet beneficially owns 94 percent of the shares of Furstenberg and is the sole Director of Furstenberg UK Ltd whose registered nature of business is "Fund Manager." DE-16-2 at ¶ 3. Mr. Bonnet was a member of Acheron's Board of Directors in 2009 and 2010.

Mr. Bonnet resigned from Acheron's board in 2010 because "another entity

in the Furstenberg family, Furstenberg Capital S.C.A., was considering purchasing a block of shares in [Acheron] and [he] did not want to be in any way subjected to the argument of wrongful insider behavior." DE-16-2 at ¶ 6.  In fact, Mr. Bonnet's company did make significant purchases of Acheron stock in 2010 and thereafter. *See* DE 12 at ¶¶ 25-26; DE 11 at ¶ 11.

Appellee/Applicant Marc Bataillon is a former shareholder of Acheron. Bataillon traded his shares of Acheron for shares of a Luxembourg company called Ahmose S.A. ("Ahmose"), which is a shareholder in Acheron.  DE-3 at 4. Ahmose is not one of the Applicants.

Acheron is an investment company that seeks to achieve capital appreciation by investing in life settlements.  A life settlement is a transaction in which the owner of a life insurance policy sells the policy to a third party such as Acheron for more than the cash value offered by the life insurance company.  The purchaser becomes the new beneficiary of the policy and is responsible for all subsequent premium payments.

Acheron's investments in the life settlements are managed by Acheron Capital Limited ("ACL"), a UK based company, and its owner, Dr. Jean-Michel Paul.  DE-3 at ¶ 21.  Acheron pays ACL a fee for managing its investment portfolio.

Acheron maintains the life insurance policies it purchases by paying the

monthly premiums, managing the paperwork, monitoring the deaths of beneficiaries, and making the claims. DE-3 at ¶ 29. To do that, Acheron enters into servicing agreements with third party service providers. Acheron has three service providers, one of which is Litai, which is based in Pompano Beach, Florida.

The Applicants claim that (1) the fees paid to Litai are too high, and (2) Acheron's Servicing Agreement with Litai contains unusual terms that benefit ACL. The Applicants suspect the reason for both is that ACL's owner, Jean-Michel Paul, has a secret, non-disclosed ownership interest in Litai. The Applicants further claim that if Dr. Paul has such a secret ownership interest, they could cause the Luxembourg prosecutor to begin a criminal investigation.

<u>The Applicants Allegations Regarding Litai's Fees</u>

The Applicants allege that as of 2009, Acheron had "contracted with Litai to service in excess of 70% of its existing policies." DE-3 at ¶ 32. The Applicants further allege that Acheron had paid Litai fees ranging from $1,549,527.29 in 2009 to $1,858,093.00 in 2014. DE-3 at ¶ 30. The Applicants have never raised with Acheron any concern over the fees that Acheron pays its service providers, and, in fact, that fees that the Applicants list as being paid to Litai are not based on any personal knowledge of the Applicants and are wildly incorrect.

In contrast, when Litai presented to Acheron the allegations that the

9

Applicants were making in this proceeding, the Chairman of the Board of Directors of Acheron, Mr. Yves Mertz, submitted a declaration noting that Litai was only one of three servicers it uses, that Litai "is by far the least expensive and provides Acheron with the best service,"  and that the fees listed by the Applicants as paid to Litai were "grossly overstated."  DE 11 at ¶ 19-21.

Negotiation of the Servicing Agreement

The Applicants allege that the Servicing Agreement negotiated in 2009 contains "unusual and non-commercial terms which serve to APC's detriment." DE-3 at ¶ 31.  Those terms linked the prices Litai charged Acheron to "ACL continuing to serve as the Investment Manager for the Trusts and APC."  DE-16-5 at 5.

The Chairman of Acheron's Board of Directors submitted a declaration stating that the provisions at issue "ensure a lower price charged by Litai in exchange for the performance of certain tasks by ACL that Litai cannot duplicate." He further stated that "[t]hese provisions were clearly noted and explained in the Board's resolution that was signed by both Erich Bonnet and Eric Kalfon." DE 21-3 at ¶ 7 & Ex. 1, 3rd & 5th Resolutions).  Thus, as an Acheron director in 2009, Mr. Bonnet had full knowledge of the Servicing Agreement between Acheron and Litai, and the very provision he now claims is suspicious, and he voted to approve it, not to reject it.

<u>Mr. Bonnet's Resignation From Acheron's Board</u>

Luxembourg law requires directors to report any claims of wrongdoing upon their resignation, and Mr. Bonnet's resignation – submitted shortly after the servicing contract with Litai was approved by the board of Acheron – did not claim any knowledge of any wrongdoing by Acheron in connection with its Servicing Agreement with Litai or based upon the allegedly "unusual and non-commercial terms" in the Servicing Agreement.  DE-11 at ¶ 6-7; DE-12 at ¶¶ 18-22; DE-14 at ¶¶ 29-31.

In fact, far from believing that Dr. Paul had engaged in any wrongdoing, Mr. Bonnet continued to buy shares in Acheron and do other business with Dr. Paul for the next five years.  In 2012, Mr. Bonnet appointed Dr. Paul as Executive Director and Compliance Officer of his UK regulated investment management company, SB Partners (since renamed Smart Lenders).  DE-12 at ¶ 27 & Ex. 3 thereto.

<u>The Applicants' Release of Civil Claims Against Dr. Paul</u>

Under Luxembourg law, public companies hold an annual shareholder meeting at which the shareholders are asked, if they approve the conduct of the board for the prior year, to vote to discharge the Board of Directors from any civil claims of wrongdoing.  A validly granted discharge is effectively a release of all claims the shareholders may have against the board or any of its individual directors.  In each year from 2010 through 2015, Furstenberg and Mr. Bonnet, as

well as Ahmose (the company through which Mr. Bataillon holds shares in Acheron) voted to discharge all Acheron directors – including Dr. Paul – from any civil claims of wrongdoing.  In fact, the discharge was granted in each of those years.  DE-11 at ¶¶ 11-12; DE-12 at ¶¶ 9-12; DE-14 at ¶¶ 18-21.

## The Renewal of the Litai Contract

In 2013, Acheron's Board solicited proposals from many life insurance servicers, including Litai. Dr. Paul informed the board that, since he was a friend of Litai's owner, Jan-Eric Samuel, and had other business relationships with Mr. Samuel, he wanted to avoid any appearance of impropriety and recused himself from reviewing or analyzing any of the proposals. DE-11 at ¶¶ 14. Accordingly, Acheron's board tasked two of its members who had no relationship with Mr. Samuel to review each bid independently.  Litai's capabilities exceeded Acheron's service requirements and the cost to Acheron was lower than every other service provider investigated.  The Acheron Board, without any input from Dr. Paul, decided to renew its contract with Litai.  DE-11 at ¶¶ 13-19.

## Dr. Paul's Complaints Against Furstenberg

Relations between Dr. Paul and Messrs. Bonnet and Bataillon soured in 2014 and 2015, resulting in three lawsuits being filed in the Luxembourg courts concerning the internal affairs of other companies they jointly owned.  The first lawsuit between Mr. Bonnet and Mr. Bataillon, on the one hand, and Dr. Paul and

his companies ACL and Tomson Pte ("Tomson"), was filed in June 2015. That lawsuit concerns the election of directors to the board of Ahmose SA, which is one of Acheron's shareholders. DE-12 at ¶ 46.

The second, related, lawsuit was filed when Messrs. Bonnet and Bataillon caused their companies Furstenberg Capital S.C.A and Ahmose to file an action against Dr. Paul's companies (ACL and Tomson), complaining, among other things, that those companies had caused the postponement of a shareholders meeting for Ahmose SA. DE -2 at ¶ 47.

In addition, Dr. Paul, through Tompson, is a 40-percent minority shareholder of Furstenberg SARL, a company whose controlling shareholder with 60 percent of the voting rights is the applicant Furstenberg Finance SAS. By letter dated May, 26, 2015, Dr. Paul resigned his position as Director of Furstenberg SARL, listing a number of problems and irregularities in both Furstenberg SARL and Furstenberg Capital SCA. In October 2015, Dr. Paul's company, Tomson, filed a lawsuit against Mr. Bonnet and Furstenberg SARL based upon the governance issues listed in Dr. Paul's resignation letter. DE-12 at ¶ 43, 44, 48.

<u>The Kalfon Email</u>

One month later, with these three actions pending as of October, 2015, Mr. Bonnet sent an email to Eric Kalfon, another former director of Acheron with whom he maintains close familial and business ties. The email is dated November

13

12, 2015, and states:

> Dear Eric,
>
> I am getting in touch with you because I would like to have confirmation we were on the board together of Acheron Portfolio Corp Lux in 2010. We both quit the board that year. Can you please confirm to me that you quit the board owing to the conflict of interest that Jean-Michel Paul's effective control of Litai, the company that services the life insurance policies managed by Acheron Capital Limited, represented?

In response, Mr. Kalfon, wrote back: "Hello Eric, Yes absolutely. Have a nice day and speak to you later. Eric" DE-3 at 12-13.

Mr. Kalfon's email is contradicted by the contemporaneous record. First, as an Acheron director in November 2009, he voted to approve the Litai contract. DE 11 at ¶ 6. Second, when he resigned as a director in August 2010, he did not complain about any alleged conflict of interest involving Litai and Dr. Paul as he was required to under Luxembourg law.[3] Rather, the following month, in September 2010 for a shareholder vote, Mr. Kalfon wrote: "Let's make it simple: I

---

[3] Pursuant to Luxembourg law, directors are required, upon their resignation from a company such as Acheron, to announce at the next annual general meeting of shareholders any corporate wrong-doing that led to their resignation in case such wrong-doing constitutes a breach of the articles of association of the company or a breach of Luxembourg law. By so doing, a director can avoid joint and several civil liability for the wrongdoing detailed in their resignation. Failure to report such wrongdoing would be grounds for liability against them. Thus, the failure of a director to report any potential wrongdoing or illegal transactions upon their resignation in 2010 is strong evidence that he never believed there was any wrongdoing or illegal transactions. DE 14 at ¶¶ 29-31.

14

give my proxy to JM (Jean-Michel Paul) and I completely trust him." DE-12 at ¶ 25 & Ex. 2.  Mr. Kalfon did not submit any declarations supporting the Applicants' Section 1782 Application.

The Section 1782 Application

On February 9, 2016, the Applicants filed an *Ex Parte* Application For Discovery Pursuant to 28 U.S.C. § 1782.  DE-1.  The Application was supported solely by the Declaration of a Luxembourg corporate (not criminal) lawyer, Romain Sabatier, and the sole evidence attached to Mr. Sabatier's declaration was the email between Mr. Bonnet and Mr. Kalfon.  DE-3 at 2.  The Applicants argued that "initial evidence has emerged that Litai … is in fact covertly owned and controlled by [Dr. Paul]," citing the Kalfon Email.  DE-3 at 2-3, ¶ 7.[4]

Mr. Sabatier argued "if JMP utilized his director's position to cause APC and/or the trusts to enter into an unfavourable contract with Litai, a company he beneficially owns and controls, this would constitute substantial managerial misconduct …"  DE-3 at 11 ¶ 47-48.  He further explained that "[i]n this case, the information obtained herein [this Section 1782 action] … will be presented to the general meeting of shareholders of APC and/or Ahmose, who will be requested to

---

[4]  The fundamental premise of the Application is incorrect.  Dr. Paul does not own or control Litai.  Mr. Samuel is Litai's sole owner.  *See* DE-12 at ¶ 30; DE 13 at ¶¶ 2-4.

take action against JMP for mismanagement." DE-3 at ¶¶ 44-45. The Applicants

noted that they needed the discovery "in connection with reasonably contemplated

criminal and civil litigation in Luxembourg, which Applicants will commence

themselves, or will otherwise cause to be commenced by the general meeting of

shareholders." DE-3 at 2 ¶ 6.[5]

<u>Litai's Motion to Quash</u>

On March 28, 2016, Litai filed a motion to quash the subpoenas. Among

other things, Litai argued that the Applicants could not demonstrate that a civil

action was "reasonably contemplated" as required to obtain discovery under 28

U.S.C. § 1782.

First, Litai argued that the Applicants were not contemplating filing any

action, but only asking a third party to file an action because, under Luxembourg

law, a shareholder cannot sue a company director, but rather may only ask the

company, acting through a majority vote at a general meeting of shareholders, to

file such a claim.

---

[5] The Applicants noted that: "assuming that information initially obtained
– that JMP directly or indirectly owns and controls Litai, and that the APC-Litai
relationship improperly favours Litai – is borne out through the requested
discovery, it is apparent that JMP would be subject to prosecution under the above-
stated Luxembourg Companies Law provisions, because he would have used APC
and Ahmose's assets for personal gain and exercised his power and voting rights
for the same wrongful purpose." DE-3 at ¶ 42

Second, Litai argued that any such claim by a majority of the shareholders would be barred since at every annual general meeting of shareholders of Acheron held in the years 2010 to 2015, a very large majority of the shareholders – including the companies through which the Applicants here hold their Acheron interests – approved the directors' actions and "discharged" them from any liability for acts taken in those years.

Third, Litai argued that the Applicants were merely seeking to "use § 1782 to investigate whether litigation is possible in the first place," which was "not an appropriate use of Section 1782."

The Applicants Concede No Civil
Action is "Reasonably Contemplated"

In response, the Applicants conceded they "**are well-aware of the restrictions on civil actions against JMP … in Luxembourg based upon the size of their current and former holdings**" and that, therefore, "the basis of this 1782 Application is to obtain evidence for Applicants to use in a criminal, not a civil proceeding against JMP in Luxembourg."  DE-16 5 at ¶ 6 (emphasis added). As of the date of both their initial application and their brief in opposition to the motion to compel, however, the Applicants had not retained a criminal lawyer but rather were still proceeding solely based upon the Declaration of their Luxembourg corporate lawyer, Mr. Sabatier, whose expertise is in corporate law and mergers &

17

acquisitions as shown on the profile published by his employer.[6]

The Applicants Show No Criminal
Action Is "Reasonably Contemplated"

Litai then submitted the Declaration of Mr. Francois Prum, the current Chairman of the Luxembourg Bar Association and a recognized expert on Luxembourg criminal law.   Mr. Prum explained that, under Luxembourg law, it was highly speculative that the Applicants would even be able to convince a Luxembourg public prosecutor to commence a criminal investigation and that, even if an investigation were commenced, it was highly speculative whether such investigation would ever lead to the public prosecutor filing a criminal proceeding.

In response, the Applicants for the first time retained a criminal lawyer, Richard Grasso, who submitted a competing declaration.   Mr. Grasso disagreed with Mr. Prum's conclusion that the Applicants would lack the direct injury necessary to trigger a criminal investigation by filing a criminal complaint with a request for civil damages.  However, Mr. Grasso largely agreed with Mr. Prum that even if an investigation were commenced, there would remain multiple steps, and uncertainties, before a criminal proceeding could start in Luxembourg.

---

[6]   http://www.nautadutilh.com/en/page-daccueil/annuaire/personnes/s/sabatier-romain/

18

<u>The Real Reason For The 1782 Application</u>

Given the weakness of the Applicants' claimed intention to file any action, Litai also explained the real reason they had filed the Section 1782 Application was something else.  Dr. Paul concluded that:

> It appears that all of these allegations, the harassment, and the discovery sought in this action, are designed to pressure me to purchase the Applicants shareholding interest in Ahmose and Acheron.  Mr. Bataillon and Mr. Bonnet have used their intermediaries to demand that I repurchase shares of Ahmose and Acheron for millions of U.S. dollars, setting a price that was a significant multiple above the market rate. . . .  I have ignored these requests, but I believe this latest action against Litai is designed to further their demands that I buy their shares at a grossly inflated price.

DE-21-3 at ¶ 19.

<u>The Court's Order</u>

On July 27, 2016, the District Court entered its order denying Litai's motion to quash.  DE-30.  It held that the Applicants were "interested persons" based solely on their claim that, if the Section 1782 discovery confirmed their suspicions, they would be able file a criminal complaint with a claim for civil damages, which would cause a public prosecutor to begin an investigation, and as part of that investigation, they would have participation rights.

In response to Litai's argument that the Applicants could not even trigger such a criminal investigation with a claim for civil damages since the Applicants, as shareholders, did not claim to suffer direct injury necessary for such a claim, the

District Court held that it was "disinclined to consider the underlying merits of any criminal or civil case Applicants may have against Paul." The Court further held that "[s]crutinizing and comparing different types of potential damages in order to determine the presence or absence of a "direct injury" is reaching further into the underlying merits of the Applicants' claims than this Court is required on a 1782 Application."

In terms of the "for use" requirement, the District Court held that the "courts have transitioned from a narrow interpretation of the "for use in a foreign proceeding" element of Section 1782, to a far more liberal construction today" and "[i]n light of the liberal construction of Section 1782" the Court found the "for use" requirement was satisfied solely by the Applicants' bald assertion of their claimed "intention to file criminal charges within just 45 days from the completion of the Litai discovery," and therefore, "this Court is inclined to agree that the evidence sought here will "eventually . . . be used in such a proceeding."

<u>STANDARD OF REVIEW</u>

The "District Court's construction of § 1782 … is reviewed de novo." *Sergeeva v. Tripleton Int'l Ltd.*, No. 15-13008, 2016 WL 4435616, at *2 (11th Cir. Aug. 23, 2016) (*citing In re Clerici*, 481 F.3d 1324, 1331 (11th Cir. 2007) (the court "reviews *de novo* the district court's interpretation of a treaty or a federal statute such as § 1782")).   Because the Court's Order was based upon its

interpretation of the statutory requirements of Section 1782, it should be reviewed de novo. *Id.; see also Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015) ("Because the district court here denied the Funds' § 1782 application solely on statutory grounds, and did not reach the discretionary factors, our review is *de novo.*"); *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998) ("we review de novo the district court's determination as to whether the statutory requirements of § 1782 are met, and if we are satisfied that these requirements are met, we review the district court's decision on whether to grant discovery for abuse of discretion").

## SUMMARY OF THE ARGUMENT

The Applicants have fallen far short demonstrating (1) "reliable indications of the likelihood that proceedings will be instituted within a reasonable time," (2) that the evidence they seek is "for use" in a foreign proceeding, or (3) that they are "interested persons" with respect to a potential foreign criminal proceedings.

First, the Applicants here are not planning to even attempt to trigger a criminal investigation, let alone file any proceedings, unless the Section 1782 discovery supports their suspicions. That is an improper use of Section 1782, and it is an admission that there are no "reliable indications" that any proceeding will ever be filed.

Second, the evidence the Applicants have provided to support their

21

"suspicions" that any law has been violated is not reliable. In fact, the Applicants' double hearsay evidence is contradicted by sworn testimony from the Chairman of Acheron's Board of Directors, the very company the Applicants claim is a victim of their suspected crime.

Third, there are no "reliable indications" that a Luxembourg public prosecutor will ever either (a) commence an investigation, or (b) find evidence in such investigation sufficient to file a criminal proceeding.

Fourth, the Applicants desire to assure that an investigation is triggered by filing a criminal complaint with a claim for civil damages does not provide "reliable indications" because such a complaint likely will be held "inadmissible" for lack of standing because the Applicants do not claim to have suffered any direct damage or injury, but rather claim only that the Company, Acheron, has suffered direct injury, and the shareholders indirect, if any, injury.

Fifth, Section 1782 does not authorize discovery in order to obtain evidence that might be used to interest a prosecutor in initiating a criminal investigation.

Finally, shareholders of a publicly traded foreign company, who have no standing to file civil claims against the company's board members, who claim an intent to trigger a criminal investigation but admit they lack evidence to do so, which evidence they hope to obtain through a Section 1782 petition, but which cannot show any level of likelihood that a foreign prosecutor will ever either start

22

an investigation or a proceeding, cannot be "interested persons" as that term is used in Section 1782.

In evaluating each of these points, the Court must keep in mind that Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign "tribunals." *Intel Corp.*, 542 U.S. at 248. Where an applicant fails to establish that this is the objective of the application, it must be denied because Section 1782 does not on its face and was never intended to authorize federal courts simply to aid private parties in their investigation of potential claims.

<u>ARGUMENT</u>

Section 1782 provides in pertinent part: "The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing *for use in a proceeding in a foreign or international tribunal*.... The order may be made ... upon the application of any interested person...." 28 U.S.C. 1782 (emphasis added).[7]  The language –

---

[7]  Section 1782 has four mandatory requirements that must be met before a district court is authorized to grant an application for discovery under the statute: (1) the request must be made by an "interested person", (2) the request must seek evidence in the form of testimony or documents or other things; (3) the evidence must be "for use in a proceeding in a foreign or international tribunal"; and (4) the person from whom discovery is sought must reside or be found in the district. *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A.,* 747 F.3d at 1269.

"for use in a proceeding in a foreign or international tribunal" – has been construed by the Eleventh Circuit and the D.C. Circuit in opinions that were later cited and relied upon by the Supreme Court in *Intel Corp.*, 542 U.S. at 247.

In *In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*, 848 F.2d 1151, 1155 (11th Cir. 1988), *abrogated by Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the public prosecutor for Trinidad and Tobago had already commenced a criminal *investigation* but had not yet filed a *proceeding* before a tribunal.[8] Despite the fact that the request was made prior to the prosecutor instituting the proceeding, the Court allowed the discovery, but cautioned that

> Congress has given the district courts a great responsibility to determine whether to grant judicial assistance in foreign litigation. To prevent abuse, the district judge should carefully examine and give thoughtful deliberation to any request for assistance submitted by an "interested person" before a judicial proceeding has begun. **The district judge should satisfy himself that a proceeding is very likely to occur**. If the judge doubts that a proceeding is forthcoming, or suspects that the request is a "fishing expedition" or a vehicle for harassment, the district court should deny the request.

---

[8]   The Court also addressed the issue of whether a public prosecutor was an "interested person" within the meaning of the statute.  It held that: "[a]n 'interested person,' … can also be a foreign official. While a private individual may need to be a litigant in a pending proceeding in order to be an 'interested person,' a foreign official properly designated under foreign law may fall within the definition of 'interested person' even when a proceeding is not pending at the time of the request." *Id.* at 1155.

24

*Id.* at 1155 (emphasis added).

A year later, then-Judge Ruth Bader Ginsburg wrote the opinion in *In re Letter of Request from Crown Prosecution Serv. of United Kingdom*, 870 F.2d 686, 691 (D.C. Cir. 1989) (Ginsburg, J.).  There, as in *Trinidad and Tobago*, the public prosecutor for the United Kingdom had an ongoing criminal proceeding, but had not yet filed a criminal proceeding, and filed the Section 1782 application itself. Justice Ginsburg relied on the *Trinidad and Tobago* opinion, citing it six times. On the key issue, she wrote: "In *Trinidad*, the Eleventh Circuit stated: 'The district judge should satisfy himself that a proceeding is very likely to occur.'" *Id.* at 691.

The Court concluded by noting its agreement with the *Trinidad* opinion: "we agree that, to guard against abuse of section 1782, the district court must insist on reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *Id.* at 692.  At the conclusion of the opinion, the Court wrote: "Proceedings in court need not be pending for a foreign prosecutor to obtain assistance as an 'interested person' under section 1782. Court proceedings were within reasonable contemplation here, and the district court therefore properly denied Ward's motion to quash." *Id.* at 694.

Fifteen years later, in *Intel Corp.*, 542 U.S. 241, the Supreme Court cited with approval both the *Trinidad and Tobago* and *Crown Prosecution Service* opinions in addressing a related issue.  In *Intel*, the Directorate-General for

Competition of the Commission of the European Communities (European Commission) had begun an antitrust investigation of Intel Corporation (Intel) based upon a complaint filed by Advanced Micro Devices, Inc. (AMD). AMD then sought to invoke Section 1782 to get evidence in the United States from Intel to submit to the European Commission. Intel opposed the application arguing that European Commission's ongoing investigation was not sufficient to invoke Section 1782 prior to the commencement of an "adjudicative proceeding" before a court.

The Supreme Court held that Section 1782 could be invoked not just during criminal investigations but also during other adjudicative governmental investigations including those of a "'civil, administrative, or other nature.'" *Id.* at 259 (quoting S. Rep. No. 1580, at 9). Of critical importance to the Supreme Court was that the European Commission, as Europe's primary antitrust enforcer, had the adjudicative power of a tribunal in that it was "authorized to enforce the EC Treaty with written, binding decisions, enforceable through fines and penalties" and its "decisions are appealable to the Court of First Instance and then to the [European] Court of Justice." *Id.* at 252. The Commission was not simply a law enforcement authority, a civil investigative body, or, as in this case, private citizens claiming that they might eventually interest a tribunal in their alleged plight, it had the sort of governmental authority to adjudicate matters qualifying it as a foreign or international tribunal. The Supreme Court held that this is what opened the doors

26

to the federal courthouse even though more formal proceedings had yet to begin.

Accordingly, because there was already an ongoing adjudicative proceeding in *Intel*, the Court held "that § 1782(a) requires only that a dispositive ruling by the Commission, reviewable by the European courts, be within reasonable contemplation." *Intel Corp.*, 542 U.S. at 259 (citations omitted).  In so holding, the Court rejected "the view … that § 1782 comes into play only when adjudicative proceedings are 'pending' or 'imminent,'" *Id.* at 259, but reaffirmed the fundamental principle that Section 1782 is available solely to provide assistance to foreign or international tribunals, and not to others such as private parties.

Since *Intel*, a number of courts have granted Section 1782 discovery where the applicant presented reliable indications that a proceeding would commence in a foreign tribunal soon.    In *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A.*, 747 F.3d at 1270*,* the applicant, a telecommunications company, planned to file a civil complaint and claimed it would pursue a criminal complaint if it were successful in the civil action.  *Id.* at 1266 ("Then, if successful in a civil action, CONECEL could, under Ecuadorian law, pursue a private criminal action against its former employees").  The applicant did not itself claim to have the sort of adjudicatory powers that the *Intel* decision had required of an applicant.  In allowing the discovery, this Court therefore pushed the boundaries of Section 1782 further, but in so doing established that the statute must have some

27

stopping point, that it should not be viewed as giving federal courts such expansive jurisdiction that any potential foreign litigant could use the power of federal courts to extract discovery from potential adversaries.   The boundary that this Court adopted, in reliance on a D.C. Circuit opinion rendered prior to *Intel,* was that the "future proceedings must be more than speculative, however, and a 'district court must insist on *reliable indications* of the *likelihood* that proceedings will be instituted within a *reasonable time.*'" *Id.* (*quoting In re Letter of Request from Crown Prosecution Service of United Kingdom*, 870 F.2d at 691).

Litai Assets contends that the language and history of Section 1782 as well as the Supreme Court's decision in *Intel* do not support such a broad construction of the statute.   But the Court need not overrule *Consorcio* in order to reverse the district court decision in this case which treats the Section 1782 as imbuing federal courts with even greater jurisdiction than the *Consorcio* court did.

*Consorcio* held that "reliable indications" had been shown based upon very specific, competent evidence.  *Id.,* 747 F.3d at 1270.  That evidence came from the company that was allegedly harmed, CONECEL – not a minority shareholder of CONECEL.   The company presented the evidence through its Legal and Compliance Director, who had detailed personal knowledge and who explained that the company had retained an auditor whose investigation revealed that CONECEL's own employees had colluded with a Miami company in creating false

28

invoices.  The declaration attached samples of the invoices for the court's review.

I.

Section 1782 Does Not Permit
Discovery to Investigate if a Claim is Possible

In determining whether the requested discovery is "for use in a proceeding in a foreign or international tribunal" numerous courts have emphasized the need to guard "against the potential that parties may use § 1782 to investigate whether litigation is possible in the first place, putting the cart before the horse.  The latter situation is not an appropriate one for a court to compel discovery."  *In re Certain Funds, Accounts, &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC*, No. 14 CIV. 1801 NRB, 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014), *aff'd sub nom. Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015).

Affirming, the Second Circuit held that because "all that the Funds alleged before the district court was that they had retained counsel and were discussing the possibility of initiating litigation," the District Court was correct in holding that the Funds had not made "an objective showing that the planned proceedings were within reasonable contemplation."  *Certain Funds, Accounts and/or Investment Vehicles*, 798 F.3d 113.

Numerous courts have since followed the *Certain Funds* decision.  As one court held:

> If the discovery Petitioner seeks confirms the existence of these bank accounts, it appears that Petitioner will then commence confirmation proceedings in those countries to enforce the arbitral award against the Arbitral Respondents' assets there. If the discovery does not confirm the existence of these bank accounts, it appears that Petitioner will not commence such proceedings. In short, this is a fishing expedition.

*In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*, No. 15-MC-127, 2015 WL 4040420, at *8 (S.D.N.Y. June 29, 2015), *appeal withdrawn* (Jan. 6, 2016). *See also, e.g., Jiangsu Steamship Co. v. Success Superior Ltd.*, No. 14 CIV. 9997 CM, 2015 WL 3439220, at *5 (S.D.N.Y. Feb. 5, 2015) ("The only thing that the contemplated § 1782 discovery would assuredly be 'in aid' of is Jiangsu's decision-making, and the statute is not designed to provide potential litigants with information that will help them decide whether and where to commence proceedings"); *In re Asia Mar. Pac. Ltd.*, No. 15-CV-2760 VEC, 2015 WL 5037129, at *5 (S.D.N.Y. Aug. 26, 2015) (the fact that Petitioner is contemplating "the *possibility* of initiating litigation" falls far short of an "objective showing" that the proceedings are within "reasonable contemplation").[9]

---

[9]    *In re Application of Gov't of Lao People's Democratic Republic for an Order Pursuant to the United Nations Convention Against Corruption*, No. 1:15-MC-00018, 2016 WL 1389764 at *7 (D. N. Mar. I. Apr. 7, 2016), the Government of Lao was the applicant, and it had its own criminal investigation open, and claimed it intended to institute a formal criminal proceeding. The Government noted that it "lack[ed] sufficient evidence to proceed with a criminal prosecution until it can access Bridge Capital's books" to determine whether money "transferred from the Savan Vegas to Bridge Capital and other entities owned by Mr. Baldwin were legitimate or nefarious." Id. Despite that, the Court denied the

Here, the Applicants have themselves submitted declarations admitting that they are not going to trigger any criminal investigation if the documents obtained here do not provide evidence of a crime.    According to Mr. Bonnet, a "Luxembourg criminal action will be commenced within 45 days of completing the requested discovery exercise … *unless it is FF's opinion that the discovery obtained exonerates JMP*."    Bonnet Dec. at 5. (DE-25-4 at 5) (emphasis added). Similarly, the declaration of the Applicant's Luxembourg criminal lawyer, Mr. Rosario Grasso, also admits that it is only "*assuming that the evidence sought from Litai confirms the allegations at bar*, I will personally be filing one of the 'direct' criminal actions in Luxembourg on the Applicant's behalf."    (DE-25-1 at 4.1) (emphasis added).  Mr. Grasso later stresses that point again: "*Depending on the nature of the evidence obtained from Litai* . . . both a criminal complaint with a civil claim … as well as a … direct proceeding in criminal court *are possible*." *Id.* at 5.3.5 (emphasis added).

In sum, the Applicants themselves have admitted over and over again that their very ability to trigger a criminal investigation in Luxembourg is wholly dependent upon the Section 1782 discovery confirming their suspicions.    The "possibility" of triggering such a criminal investigation "depending on the nature

---

application, noting that "Such uncertainty in GOL's criminal investigation fails to show how any dispositive decision could be within reasonable contemplation." *Id.*

of the evidence obtained from Litai" is "investigat[ing] whether litigation is possible in the first place," which is "putting the cart before the horse" and therefore "not … appropriate." *In re Certain Funds*, 2014 WL 3404955, at \*6. Moreover, it is a far cry from what this Court requires, which are "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *Consorcio,* 747 F.3d at 1270. Accordingly, the District Court erred in not holding that the Applicants had failed to satisfy Section 1782 and in not quashing the subpoenas.

## II.

### Hearsay and "Suspicions" of Minority Shareholders, Contradicted by the Company's Chairman, Do Not Provide a "Reasonable Indication" that Criminal Proceeding Will Ever Commence

In *Consorcio*, the Court found that there were "reliable indications" based upon very specific, competent evidence. *Id.,* 747 F.3d at 1270. That evidence came from the company that was allegedly harmed, CONECEL – not a shareholder of the company. The company presented the evidence through its Legal and Compliance Director, who had detailed personal knowledge and who explained that the company had retained an auditor whose investigation revealed that CONECEL's own employees had colluded with a Miami company in creating false invoices. The declaration attached samples of the fraudulent invoices for the court's review.

Here, the Applicants have not provided any reliable evidence of the sort provided in *Consorcio*. First, the Applicants did not even bother to provide any notice to Acheron – the alleged victim of the alleged "crime" by Dr. Paul – of their claim of any wrongdoing by Dr. Paul against Acheron. That alone should raise questions as to the Applicants' true motivation, which is not to protect the rights of Acheron, but rather to gain leverage in their negotiations seeking to have Dr. Paul purchase their Acheron and Ahmose shares. DE 21-3 at ¶ 19.

Second, when Litai presented the Applicants' allegations to Acheron's Board members, the Board examined those allegations and found them faulty. In fact, the Chairman of the Board of Directors of Acheron submitted a declaration stating that the Applicants' "suspicion" that Dr. Paul has committed any kind of wrongdoing against Acheron was completely unfounded. He has explained that (a) the contractual provisions upon which the Applicants' base their suspicions are appropriate and favorable to Acheron and were fully vetted and approved by its Board, (b) Dr. Paul fully disclosed to the Board his friendship and other business dealings with Litai's owner when Dr. Paul recused himself from taking any part in Acheron's negotiation of its contract with Litai. DE 11; DE 21-1.

Thus, in stark contrast to *Consorcio*, here the very company whom the Applicants claim is the victim of Dr. Paul's alleged "crime" submitted evidence refuting the Applicants' allegations, providing reliable indications that no

33

proceeding will ever be filed.

Furthermore, the evidence the Applicants provide is not reliable. First, the initial Application was based solely upon double hearsay. The only declaration was by an attorney who attached as an exhibit an email to which he was not even a party. The email was between one of the Applicants' principals, Mr. Erich Bonnet, and Mr. Eric Kalfon, both former Acheron board members who resigned six years ago, in 2010, not in protest but rather to purchase even more shares in Acheron. In the email, Mr. Bonnet asks "Can you please confirm to me that you quit the board owing to the conflict of interest that Jean-Michel Paul's effective control of Litai, the company that services the life insurance policies managed by Acheron Capital Limited, represented?" In response, Mr. Kalfon, wrote back: "Hello Eric, Yes absolutely. Have a nice day and speak to you later. Eric." DE-3 at 12.

Aside from it being hearsay, the statements in Mr. Kalfon's email – that he resigned because he believed Dr. Paul had a secret conflict of interest with Acheron – are contradicted by contemporaneous evidence. First, Mr. Kalfon did not raise any such conflict upon his resignation in 2010, something Luxembourg law required him to do. DE-12 at ¶ 19-20. Second, only a month after he allegedly resigned in protest over Dr. Paul's "effective control of Litai," Mr. Kalfon in a shareholder vote stated: "Let's make it simple: I give my proxy to JM [Jean-Michel Paul] and I completely trust him." DE-12 at ¶ 25 & Ex. 2. It is

inconceivable that Mr. Kalfon would resign in protest over Dr. Paul and then a month later provide him a proxy to vote his shares because "I completely trust him." It is certainly not a "reliable indication" that the Applicants will ever trigger a criminal investigation or that a criminal proceeding will ever be filed against Dr. Paul.

The Applicants subsequently submitted a declaration from an additional former board member, Mr. Alain Reinhold, who also resigned in 2010. He writes that in 2009, Dr. Paul "stated in this email that he was 'conflicted' and requested that APC [Acheron] deal directly with Litai." DE-16-5 at ¶ 8. Far from being evidence of potential wrongdoing, Mr. Reinhold confirms that Dr. Paul acted appropriately in advising Acheron's Board to negotiate and agree to terms with Litai without the involvement of Dr. Paul due to the potential of a conflict of interest due to his friendship with Litai's owner. Of course, recusing himself from negotiating the Litai contract on behalf of Acheron is proper behavior, not an indication of criminal activity. It is certainly not a "reliable indication" that the Applicants will ever trigger a criminal investigation or that a criminal proceeding will ever be filed against Dr. Paul.

Third, both Mr. Reinhold and Mr. Bonnet claim the Litai contract contained an "unusual" term that provided Litai with the right to renegotiate prices if Dr. Paul's company ceased acting as Acheron's investment advisor, and that they

35

believe such term was "unacceptable." Mr. Bonnet's and Mr. Reinhold's declarations appear to be based upon "foggy" memories as Acheron's Chairman attached the Board's Resolutions proving that the clause in question was specifically brought to the attention of the board of directors and unanimously approved by board resolution the "provision whereby in the event the trustee terminates the Acheron investment management agreement during the initial term of the servicing contract or any renewal term in effect the parties to the servicing agreement shall renegotiate the per policy administrative fee discount." DE-21-4 at 4. He also explained that the provision benefits Acheron by providing lower prices to Acheron and in no way harmed Acheron or its shareholders. Thus, a clause specifically disclosed to Acheron's Board of Directors, and unanimously approved by the Board does not provide a "reliable indication" that a criminal proceeding will ever be commenced.

In sum, the evidence the Applicants have submitted is weak. It is old and stale – based at best on recollections today of the negotiation of a contract seven years ago and, at worst, intentionally distorted. The evidence has been shown to be incorrect by documents submitted by the Chairman of Acheron. If there was ever a case where the Applicants have failed to show "reliable indications" based upon the evidence they have submitted, this is it.

36

III.

Applicants Made No Showing that a
Luxembourg Prosecutor Will Ever Start
an Investigation Let Alone a Criminal Proceeding

While courts have granted Section 1782 discovery where there was an ongoing foreign criminal investigation,[10] no court has granted Section 1782 discovery where the applicant admits it has no ability to file foreign civil claims and where there is no ongoing foreign criminal investigation. That is the situation here.

The Applicants disavowed any intent to file a civil complaint, explaining that "the Applicants are well-aware of the restrictions on civil actions … based upon the size of their current and former holdings" and that "[t]he sole reason there is any reference to any civil action … was to inform the Court that the Applicants,

---

[10] There are many cases where ongoing criminal investigations supported Section 1782 discovery *See, e.g., In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 460 (2d Cir. 2014) (a Swiss investigating magistrate was already overseeing a criminal inquiry related to a Bernard Madoff "feeder fund" in Switzerland); *Weber v. Finker*, 554 F.3d 1379, 1385 (11th Cir. 2009) (applicant was plaintiff in an ongoing Cypriot civil case and a defendant in an ongoing Swiss criminal case and sought discovery for use in both proceedings); *In re Request from Czech Republic Pursuant to Treaty Between U.S. & Czech Republic on Mut. Assistance in Criminal Matters in Matter of Koblizek*, No. 3:08MC001J33TEM, 2008 WL 179263, at *2 (M.D. Fla. Jan. 17, 2008) ("A foreign tribunal, specifically the Supreme Public Prosecutor's Office in the Czech Republic, has requested evidence for use in a criminal proceeding, being conducted by the District Attorney's Office of Prague 2, from an entity located in the Middle District of Florida").

once the criminal complaint is filed, intend to share the information obtained with the other shareholders of APC which, as a group, would have the right to take civil action…."  DE 16-1 at ¶ 6.

As of the time the Applicants made that concession, they still had not retained a criminal lawyer to analyze or prepare any criminal action.  Instead, they were still proceeding solely with their Luxembourg corporate lawyer, Mr. Sabatier. Other than making the bald statement that he planned to file a criminal complaint, Mr. Sabatier did not explain what ability, if any, the Applicants had to "file a criminal complaint," or what it meant to file a criminal complaint in Luxembourg.

In fact, instead of hiring a criminal lawyer, both Applicants expressly admitted "I am not certain how FS can demonstrate its intention to file a criminal complaint against JMP in the Luxembourg Criminal Court beyond the above statement [of his intent to file the action]."  DE 16-2 at ¶¶ 12-13; DE 16-3 at ¶6.

Litai then obtained the declaration of Mr. Francois Prum, a recognized expert in Luxembourg criminal law, who explained that even if the Applicants did file either (a) a police report or (b) a criminal complaint with the Luxembourg police, there as a high likelihood that the Luxembourg public prosecutor would not even open up an investigation, let alone a proceeding.  Less than 50 percent of

criminal complaints result in prosecution.  DE-21-6 at ¶ 11.[11]

In fact, the Applicants have presented no evidence or precedent showing that a Luxembourg public prosecutor would be interested in devoting public resources to pursue an investigation championing the cause of a small minority of shareholders of a publicly traded company when the majority of shareholders and the company itself have not filed such a case.  Moreover, the Applicants do not even claim to have lost any money due to the alleged crime!  Rather, they claim only that they believe the returns on their investments would have been greater if the fees paid to Litai had been even lower.  There was no evidence that a Luxembourg public prosecutor has ever opened an investigation under similar circumstances.

In response, the Applicants argued that if they file a "criminal complaint

---

[11]  A private individual in Luxembourg cannot just "commence" a criminal investigation or a criminal proceeding.  Only the state can do this.  Moreover, the filing of a criminal complaint does not automatically trigger an investigation.  Rather, it is merely a request to the public prosecutor to start an investigation.  *See* DE 21-6 at ¶¶ 5-6; 21 at ¶¶ 6-12.  The public prosecutor will review the report/complaint and decide whether to open an investigation or whether the matter should be archived without opening an investigation.  If the prosecutor declines to open an investigation (*classement sans suite*), the claimants have no further ability to request the commencement of a criminal investigation on the same facts.  *See id.* at ¶¶ 8-10.  In other words, the most a private individual can do is try to provoke a criminal investigation by petitioning the Luxembourg prosecutor to commence a criminal investigation.   Whether Luxembourg would actually bring a proceeding is highly speculative.  *See id.* at ¶ 11.

with a claim for civil damages," and it is held to be "admissible" by the public prosecutor – a matter in dispute – then at the very least a criminal investigation would be opened by the public prosecutor.  Even assuming the Applicants could file such a claim that would be held admissible – a matter in dispute and addressed in the section below – the parties' Luxembourg criminal experts both agreed that even if such a claim succeeded in triggering a public prosecutor to start an investigation, there still would be no reliable indications that a criminal proceeding would ever be commenced.

According to the Applicant's own expert, Mr. Grasso, upon receipt of a "criminal complaint with civil action," the State Prosecutor then "opens" a "criminal <u>investigation</u>" that is conducted by an "investigating judge."  DE-25-1 at ¶ 5.2.3 (emphasis added).  The investigating judge eventually reports back to the State Prosecutor, who decides whether there are "sufficient charges" to proceed. "If not, he could request to dismiss the proceedings."  DE-25-1 at ¶ 5.2.4.

If the State Prosecutor is satisfied there are "sufficient charges," he still cannot file formal criminal proceedings but rather makes a "request" to "the Chamber of Counsel of the District Court" to file the criminal proceedings.  *Id.* The Chamber of Counsel will then "check whether there are sufficient charges against the indicted person so that the criminal proceedings could be continued on the merits in front of the "Chambre Correctionnelle" (misdemeanors) or 'Chambre

40

Crimnelle' (felonies)." DE-25-1 at ¶ 5.2.4. If the Chamber of Counsel declines to file a criminal proceeding, the Applicants can appeal to the "Chamber of Counsel for the court of Appeal who will have the final decision whether the proceeding will be continued … on the merits or dismissed." DE-25-1 at ¶ 5.2.5.

In sum, the Applicants claim they are seeking evidence through Section 1782 in the hopes of triggering a third party, the Luxembourg public prosecutor, to institute an investigation, not a criminal proceeding.    There are no reliable indications that the Applicants can even trigger such an investigation.  But even if they could trigger an investigation, there still are no reliable indications that a criminal proceeding would ever be filed.  Accordingly, the Applicants have failed to satisfy the mandatory requirements for Section 1782 discovery.

IV.

If Applicants Were to File a Criminal Complaint
With a Claim for Civil Damages It Likely Would
Be Held Inadmissible and Not Even Trigger an Investigation

The Applicants sole hope of causing an investigation in which they would have "participation rights" is by filing a criminal complaint with a claim for civil damages.  However, the Applicants here have no standing to assert such a claim because they do not claim to have suffered any direct damage or injury, but rather claim only that the Company, Acheron, has suffered direct injury, and the shareholders indirect, if any, injury.

41

As set forth in the leading treatise on Luxembourg Criminal Procedural Law, "private act for compensation … is an exceptional right which, because of its nature, has to be strictly contained …"[12] Therefore, the "civil action can only be initiated by the victim of the infraction"[13] who "shall demonstrate a damage resulting from the alleged offense"[14] "if the criminal act alleged is not such as having caused the prejudice or that the fact is not of a nature to allow a right of compensation, the civil action is inadmissible (no standing)."

The Lexique discusses the exact example presented here and states: "It is for the lack of personal damage that the shareholders of a company have no standing to constitute themselves as a plaintiff in the claims targeted against the directors of a company because it is to the company itself, as legal entity, that these acts have caused harm."[15]

The case law is the same. Luxembourg courts consistently affirm that "the

---

[12] *See* Gaston Vogel & Frédéric Mioli, *Lexique de Procédure Pénale de Droit Luxembourgeois* at 20 (Larcier 3rd ed. 2009, ISBN 9782804433376). Translated copies of the cited portions are attached to DE 26 as DE 26-2. *See also, e.g.* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.") *cited in Belleri v. U.S.,* 712 F.3d 543, 548 (11th Cir. 2013).

[13] *Id.* at 21.

[14] *Id.* at 24.

[15] *Id.* at 26.

*action mandati* cannot be introduced by a shareholder individually. The company benefits from its own legal personality, different from the personality of its shareholders and has sole right for standing in a liability matter against its directors for compensation of a damage suffered by the company itself.......".  (Lux. Dist. Ct. Feb. 15, 2012).

This principle has been reaffirmed multiple times by the Courts including in a proceeding decided in 2010 arising from the Bernie Madoff matter.  In that case the District Court of Luxembourg reaffirmed that the shareholders have no standing to file a claim that belongs to the company itself. The District Court reminded that "each time the shareholders have suffered a damage *ut universi*, it is to the collectivity of the shareholders that belong the right to ask for compensation, and in this case the procedure must be refused to the *ut singulus* shareholder..." *In re Luxalpha SICAV Liquidation,* Nos. 309/10, 312/10, 318/10 (Lux. Dist. Ct. Mar. 4, 2010), *confirmed*, Dkt. No. 36516, (Lux. App. July 15, 2014), *confirmed*, Decision No. 67/15, Dkt. No. 3509 (Lux. Ct. de Cassation July 2, 2015).[16]

In fact, it is consistently held by Luxembourg courts that the criminal offense of misuse of company assets only causes prejudice to the company itself. *Ordonnance de Non Informer 30013/15/CD* (Cabinet d'Instruction Feb. 22, 2016).

---

[16] Litai plans to include translated copies of the referenced Luxembourg opinions in its appendix.

The loss of value of the shareholders' ownership in the company *is not considered* under Luxembourg law to be a personal prejudice suffered by the shareholders, but a prejudice suffered by the company itself. Dkt. No. 36517 (Lux. App. July 15, 2014).

In sum, a shareholder such as Furstenberg Finance SAS – claiming to have suffered damage in that the value of its shares would have increased more if not for the allegedly higher expenses associated with servicing contracts – would not meet the criteria for actual damage or direct injury. As a consequence, such a criminal complaint including a complaint for compensation launched by claimants would be dismissed.

Accordingly, the Applicants cannot show that any criminal investigation or proceeding is being "reasonably contemplated" or any "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." The reason is simple –the opening of an investigation is not within the control of the Applicants. Rather, the Applicants are merely "contemplating" asking a third party to "contemplate" opening an investigation. Section 1782 does not authorize discovery in that situation.

V.

Seeking Discovery to Ask a Prosecutor to Open a
Criminal Investigation Does Not Satisfy the Requirement
that the Discovery is "For Use" in a Foreign Proceeding

The Applicants cannot themselves file a criminal proceeding. The most the Applicants can do is request that a public prosecutor in Luxembourg institutes an investigation. Section 1782 does not authorize discovery for the purpose of asking a prosecutor to open a criminal investigation.

The Second Circuit has held that seeking evidence for the purpose of asking a third party to use in a proceeding "does not establish that the information is 'for use' in a foreign proceeding; it establishes, at best, that the Funds can furnish information *in the hope* that it might be used." *Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.,* 798 F.3d 113, 123 (2d Cir. 2015). The reason: "That is no different from a third party providing information to a private litigant that it believes might be useful in a lawsuit, or a witness approaching a prosecutor's office claiming to have knowledge of a crime. Such information might be relevant or interesting to the recipient, but it is not 'for use' in any proceeding in which the *recipient* is a party ...." *Id.*

The same thing is true here. While the Applicants claim they intend to submit evidence to the public prosecutor, that only establishes their "hope that it might be used" by a public prosecutor. Moreover, the hope at this stage is not that

45

it will be used by the public prosecutor in an existing proceeding, and not even in the hope that it will be used to institute a proceeding, but rather only in the hope that it will be used by the public prosecutor to institute an investigation, or as seems to be the case that they can use the discovery to achieve their own objectives without the involvement of a prosecutor or tribunal at all. In fact, as the Applicants have admitted, their "hope" at this stage is that they will find evidence that will convince themselves that they have a basis for file a criminal complaint. This is not "for use" in a proceeding in which the Applicants are parties. The evidence before the district court showed that the Applicants were motivated to press for the discovery nevertheless in order to achieve leverage to coerce Dr. Paul to purchase the Applicants' shares in Ahmose and Acheron. This is an abuse of Section 1782.

Accordingly, the Applicants here cannot meet the "for use" requirement of Section 1782.[17]

_____

[17]  The Second Circuit used the exact situation the Applicants present to this Court as the prime example of when a Section 1782 application must be denied. Here, the Applicants, shareholders of Acheron, claim to be witnesses to an alleged crime against Acheron, where Acheron is the alleged victim. They claim they intend to approach a prosecutor's office claiming to have knowledge of a crime against Acheron, not against themselves. If the Prosecutor agrees, the Prosecutor may commence an investigation, not a criminal proceeding. That is not "for use" in a proceeding in which they Applicants are parties. Accordingly, the Applicants here cannot meet the "for use" requirement of Section 1782.

46

## VI.

### The Applicants are Not "Interested Persons"

In *Intel*, where AMD had already filed the antitrust complaint that triggered an adjudicatory proceeding, the Supreme Court held that AMD was an "interested person" under the statute because it had "participation rights" and could submit evidence to the European Commission. *Intel,* 542 U.S. at 256. The Supreme Court did not hold, however, that shareholders of AMD were interested persons under the statute. That is the situation here. Moreover, the Supreme Court did not hold that shareholders of AMD who were merely hoping to trigger an antitrust investigation of Intel on behalf of AMD were interested persons. That too is the situation here.

Here, this court should hold that these Applicants – one a shareholder of Acheron and the other a shareholder of a shareholder of Acheron – a publicly traded foreign company, who have no standing to file civil claims against Acheron's board members, who have previously "discharged" any claims they have against Acheron's board members, and who lack any evidence to attempt to trigger a criminal investigation without obtaining such evidence through a Section 1782 petition, are not "interested persons" within the meaning of the statute.

### CONCLUSION

The Court should vacate the judgment of the District Court and remand the case with directions to deny the application.

47

Respectfully submitted,

AXS Law Group
*Attorneys for the Respondents*

By: _____ /s/ *Jeffrey W. Gutchess* _____
      **Jeffrey W. Gutchess**
      Florida Bar No. 702641
      jeff@axslawgroup.com
      **Daniel Tropin**
      Florida Bar No. 100424
      dan@axslawgroup.com
      1850 Purdy Avenue
      Miami, Florida 33139
      Telephone:  (305) 389-3646

Thomas R. Julin
Fla. Bar No. 325 376
Gunster Yoakley & Stewart PA
600 Brickell Avenue Suite 3500
Miami, FL 33131
305-376-6007 Fax 6010
tjulin@gunster.com

48

<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a) and 27(d)</u>

This motion complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: this brief uses a monospaced typeface and contains 11,256 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this motion has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/  *Jeffrey W. Gutchess*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel for the Applicants via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/  *Jeffrey W. Gutchess*

# EXHIBIT 49

No. 16-15664

# United States Court of Appeals

*for the*

# Eleventh Circuit

FURSTENBERG FINANCE SAS, MARC BATAILLON,

*Plaintiffs-Appellees,*

– v. –

LITAI ASSETS LLC,

*Respondent-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA IN CASE NO. 2:16-MC-60266-BLOOM
HONORABLE BETH BLOOM

## BRIEF FOR PLAINTIFFS-APPELLEES

PHILIP E. ROTHSCHILD
HOLLAND & KNIGHT LLP
515 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
(954) 525-1000

WARREN E. GLUCK
SAMUEL SPITAL
SEAN P. BARRY
STOSH SILIVOS
ELLIOT MAGRUDER
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
(212) 513-3200

*Attorneys for Plaintiffs-Appellees*

Furstenberg Finance Sas, et al. v. Litai Assets, LLC, No. 16-15664

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Counsel for Appellees, Marc Bataillon and Furstenberg Finance SAS,
hereby certifies that, to the best of their knowledge, the following is a complete list
of the persons and entities that have an interest in the outcome of this case:

Acheron Capital Limited

Acheron Portfolio Corporation (Luxembourg) SA

Ahmose S.A.

Arendt & Medernach

AXS Law Group PLLC

Barry, Sean

Bataillon, Marc

Beissel, Pierre

Bloom, Beth, Hon., United States District Court Judge

Bonnet, Erich

Furstenberg Capital SCA

Furstenberg Finance SAS

Furstenberg SARL

Furstenberg UK Ltd.

Gluck, Warren E.

Grasso, Rosario

C-1

Furstenberg Finance Sas, et al. v. Litai Assets, LLC, No. 16-15664

Gunster Yoakley & Stewart, P.A.

Gutchess, Jeffrey W.

Holland & Knight LLP

Julin, Thomas R.

Kalfon, Eric

Kleyr Grasso

Litai Assets LLC

Magruder, Elliot

Nauta Dutilh

Paul, Jean-Michel

Quattromani, Lauren

Rothschild, Philip E.

Prum, Francois

Samuel, Jan-Eric

Sabatier, Roman

Silivos, Stosh

Spital, Samuel

Tropin, Daniel E.

Turk & Prum

C-2

Furstenberg Finance Sas, et al. v. Litai Assets, LLC, No. 16-15664

<u>Parent Companies:</u>    Counsel for Applicants-Appellees, Marc Bataillon and Furstenberg Finance SAS, certify that Furstenberg UK Ltd. is the parent company of Applicant-Appellee Furstenberg Finance SAS.

<u>Publicly Held Corporations:</u>  No publicly held corporation owns more than 10% of Applicant-Appellee Furstenberg Finance SAS' or Furstenberg UK Ltd.'s stock.

C-3

# **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .......................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .............................................i

TABLE OF AUTHORITIES ...............................................................................iv

COUNTERSTATEMENT ON JURISDICTION ................................................. viii

COUNTERSTATEMENT OF THE ISSUES.........................................................ix

STATEMENT OF THE CASE...............................................................................1

A.    Introduction............................................................................................1

B.    Background...........................................................................................3

C.    Proceedings Below ...............................................................................5

D.    Standard Of Review............................................................................21

SUMMARY OF THE ARGUMENT ..................................................................24

ARGUMENT ......................................................................................................27

I.    The District Court Did Not Abuse Its Discretion In Finding That There
      Are "Reliable Indications Of The Likelihood That Proceedings Will Be
      Instituted Within A Reasonable Time." ........................................................27

      A. Furstenberg Is Not "Investigating Whether A Claim Is Possible.".........28

      B. Litai's Attack On The Merits Of Furstenberg's Underlying Claims Is
         Both Ineffectual And, More Importantly, Inappropriate.........................32

II.   Furstenberg Can And Will Initiate A "Proceeding In A Foreign Or
      International Tribunal." ..................................................................................35

      A. A Criminal Complaint With Damages Claim Would Institute A
         Proceeding In A Foreign Tribunal, And The Record Is Clear That
         Furstenberg Can And Will File Such A Complaint. ...............................36

         1.    A Criminal Complaint With Damages Claim Institutes A
               "Proceeding In A Foreign Or International Tribunal.".................37

         2.    Furstenberg Can And Will File A Criminal Complaint With
               Damages Claim. .............................................................................42

  (a) The U.S. Court Ought Not Resolve Whether Furstenberg's Injuries Are Direct Under Luxembourg Law. ................................................................42

  (b) Furstenberg Has Individualized Damages Under Luxembourg Law. ........................................45

 B. The Undisputed Availability Of A Denunciation Independently Shows That A Foreign Proceeding Is Reasonably Contemplated ......................49

III. The Furstenberg Applicants Are "Interested Persons." ................................54

CONCLUSION ........................................................................56

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

*Access Now, Inc. v. Sw. Airlines Co.,*
  385 F.3d 1324 (11th Cir. 2004) ........................................................54

*In re Berlamont,*
  No. 14-mc-001900, 2014 WL 3893953 (S.D.N.Y. Aug. 4, 2014) ....................51

*In re Application of Accent Delight Int'l Ltd.,*
  No. 16-mc-125, 2016 WL 5818597 (S.D.N.Y. Oct. 5, 2016) ...........................51

*In re Application of Bracha Found.,*
  --- Fed. Appx. ----, No. 15-14913, 2016 WL 5219862 (11th Cir.
  Sept. 22, 2016) ...............................................................*passim*

*Barnett v. Bailey,*
  956 F.2d 1036 (11th Cir. 1992) ........................................................ vii

*Butterworth v. Bowen,*
  796 F.2d 1379 (11th Cir. 1986) ........................................................47

*Certain Funds, Accounts and/or Inv. Vehicles v. KPMG,*
  798 F.3d 113 (2d Cir. 2015) .......................................................30, 51

*In re Clerici,*
  481 F.3d 1324 (11th Cir. 2007) ................................................*passim*

*Clark v. Coats & Clark, Inc.,*
  929 F.2d 604 (11th Cir. 1991) ........................................................48

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v.*
  *JAS Forwarding (USA), Inc.,*
  747 F.3d 1262 (11th Cir. 2014) ................................................*passim*

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v.*
  *JAS Forwarding (USA), Inc.,*
  685 F.3d 987 (11th Cir. 2012) ........................................................44

iv

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v.*
    *JAS Forwarding (USA), Inc.*,
    Dkt No. 1:10-mc-22320-DLG (S.D. Fl. Apr. 18, 2011)....................................44

*In re Letter of Request from the Crown Prosecution Serv. of the U.K.*,
    870 F.2d 686 (D.C. Cir. 1989)...........................................................................45

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995) ...............................................................42, 44, 45

*In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*,
    No. 15-MC-127, 2015 WL 4040420 (S.D.N.Y. Jun. 29, 2015)........................30

*Herring v. Sec'y, Dep't of Corr.*,
    397 F.3d 1338 (11th Cir. 2005) ........................................................................48

*In re Imanagement Servs., Ltd.*,
    No. Misc. 05-89, 2005 WL 1959702 (E.D.N.Y. Aug. 16, 2005)......................43

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004)...............................................................................*passim*

*Jiangsu Steamship Co., Ltd. v. Success Superior Ltd.*,
    No. 14-cv-9997, 2015 WL 3439220 (S.D.N.Y. Feb. 5, 2015)....................30, 31

*John Deere Ltd. v. Sperry Corp.*,
    754 F.2d 132 (3d Cir. 1985) .............................................................................43

*In re Ex Parte Application of Jommi*,
    No. C 13–80212 CRB (EDL), 2013 WL 6058201 (N.D. Cal. Nov.
    15, 2013) ..........................................................................................................41

*In re Letter of Request for Judicial Assistance from Tribunal Civil de*
    *Port-Au-Prince, Republic of Haiti*,
    669 F. Supp. 403 (S.D. Fla. 1987) ....................................................................40

*In re Kasper-Ansermet*,
    132 F.R.D. 622, 631 (D.N.J. 2011)...................................................................44

*In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*,
    385 F.2d 1017 (2d Cir. 1967) ...........................................................................38

*Norelus v. Denny's, Inc.*,
    628 F.3d 1270 (11th Cir. 2010) ...........................................................22

*In re Application for an Order for Judicial Assistance in a Foreign
    Proceeding in the Labor Court of Brazil*,
    466 F. Supp. 2d 1020 (N.D. Ill. 2006) ...............................................41

*In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct
    Discovery for Use in Foreign Proceedings*,
    773 F.3d 456 (2d Cir. 2014) .................................................22, 39, 51

*In re Request for Assistance from Ministry of Legal Affairs of
    Trinidad & Tobago*,
    848 F.2d 1151 (11th Cir. 1988) ..........................................................39

*Sergeeva v. Tripleton Int'l Ltd.*,
    834 F.3d 1194 (11th Cir. 2016) ..........................................................22

*In re Application of Setraco Nigeria Ltd.*,
    No. 13-mc-1632, 2013 WL 3153902 (M.D. Fla. Jun. 19, 2013).........41

*United States v. Adams*,
    316 F.3d 1196 (11th Cir. 2003) ..........................................................27

*In re Viega*,
    746 F. Supp. 2d 8 (D.D.C. 2010) ........................................................34

*Weber v. Finker*,
    554 F.3d 1379 (11th Cir. 2009) ..........................................................56

STATUTES

28 U.S.C. § 1782.....................................................................*passim*

Act of May 24, 1949, Chapter 139 § 93
    63 Stat. 103 .......................................................................................37

Act of Oct. 3, 1964, Pub. L. 88-619 § 9
    78 Stat. 997 .......................................................................................38

National Defense Authorization Act for Fiscal Year 1996,
    Pub. L. 104-106 § 1342(b), 110 Stat. 486 .........................................39

vi

**OTHER AUTHORITIES**

Hans Smit, *International Litigation under the United States Code*, 65
    Colum. L. Rev. 1015 (1965) ..........................................................................38, 55

Hans Smit, *Recent Developments in International Litigation*, 35 S.
    Tex. L. Rev. 215, 235 (1994).............................................................................44

S. Rep. No. 1580, 88th Cong., 2d Sess. 7,
    *reprinted in* 1964 U.S.C.C.A.N. 3782 ........................................................37, 38

## <u>COUNTERSTATEMENT ON JURISDICTION</u>

Pursuant to 28 U.S.C. §§ 1331 and 1782(a), the District Court had jurisdiction to entertain this application for discovery in aid of a foreign proceeding.  Appellant's assertion that the District Court lacked jurisdiction due to "the type of application submitted," Litai Br. 3, conflates the concept of jurisdiction with the underlying merits of Appellant's application.  *See Barnett v. Bailey*, 956 F.2d 1036, 1040-42 (11th Cir. 1992).  Appellant timely filed a notice of appeal, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>COUNTERSTATEMENT OF THE ISSUES</u>

Although Appellant has presented six issues on appeal, Appellees submit they are properly distilled into three:

1.    Did the District Court abuse its discretion in finding that a foreign proceeding is reasonably contemplated, where Appellees unequivocally asserted their intent to initiate criminal proceedings in Luxembourg based on the misuse of corporate assets and presented detailed factual allegations, supported by objective evidence, in support of their claims?

2.    Do the Luxembourg criminal proceedings that Appellees intend to commence, which include <u>either</u> a direct criminal action in a Luxembourg court brought by Appellees as parties, or, alternatively, a "denunciation" to a State Prosecutor, who is a member of the Luxembourg judicial branch, qualify as "proceeding[s] in a foreign or international tribunal, including criminal investigations conducted before formal accusation" for purposes of § 1782?

3.    Do Appellees, who will have substantial participation rights in the Luxembourg criminal action they intend to file, qualify as "interested persons" under § 1782?

## STATEMENT OF THE CASE

### A.    Introduction

This case involves a routine, and entirely proper, order authorizing discovery for use in foreign proceedings pursuant to 28 U.S.C. § 1782.  Appellees Furstenberg Finance SAS and Marc Bataillon (collectively "the Furstenberg Applicants" or "Furstenberg") are current and former shareholders in Acheron Portfolio Corporation (Luxembourg) S.A. ("Acheron" or "APC").    The Furstenberg Applicants have received information from multiple sources indicating that Jean-Michel Paul ("Paul"), an Acheron director, has an undisclosed ownership interest in Pompano Beach-based Litai Assets LLC ("Litai"), a service provider for Acheron. The Furstenberg Applicants intend to file a criminal action against Paul in Luxembourg arising out of his undisclosed conflict of interest.  They requested, and were granted, an order authorizing them to serve discovery requests on Litai for use in that Luxembourg criminal proceeding.  That is precisely what § 1782 is designed for.

In an effort to make this case something it is not, Litai claims the District Court gave § 1782 "the broadest interpretation ever given it by any court."  Litai Br. 2.  In fact, far from breaking new ground, the District Court applied controlling precedent to the circumstances of this case.  Litai's appeal is premised on its failure to accept two principles of settled law: (a) an applicant may obtain discovery under

1

§ 1782 "for use in a proceeding in a foreign . . . tribunal" so long as that proceeding is <u>reasonably contemplated</u>, even if it is not pending or imminent; and (b) a "criminal investigation[] conducted before formal accusation" <u>is</u> a "proceeding in a foreign . . . tribunal" within the meaning of § 1782.

In this case, the Furstenberg Applicants submitted sworn declarations that they intend to file a criminal complaint in Luxembourg and presented detailed information about the evidence they will submit in support of that complaint. Moreover, the Furstenberg Applicants have shown that this complaint will initiate a "proceeding in a foreign . . . tribunal" within the meaning of § 1782 because, as a matter of Luxembourg law, their complaint will commence direct criminal proceedings before a *juge d'instruction*, or, at a minimum (i.e., according to Litai's incorrect view), before a State Prosecutor who is a member of Luxembourg's judicial branch. Finally, contrary to Litai's assertions that the Furstenberg Applicants have ulterior motives for seeking the information that is the subject of this action, Applicants affirmed that they would agree to a protective order requiring them to file a criminal action in Luxembourg with 45 days of receiving the discovery or destroy it. Under these circumstances, the District Court correctly recognized that the discovery the Furstenberg Applicants seek is for use in a reasonably contemplated proceeding before a foreign tribunal. Its order should be affirmed.

**B.** __Background__

The parties' underlying dispute concerns the conduct of Dr. Jean-Michel Paul, in his role as a director of a Luxembourg entity, Acheron. Acheron is a public limited liability company that invests in life insurance policies, which are held for Acheron via three trusts based in the United States. A1-18-19. Two of the trusts are managed by Acheron Capital Limited ("Acheron Capital" or "ACL"). A1-19 ¶ 19. Acheron has paid millions of dollars to Acheron Capital for investment management services since 2009. A1-20 ¶ 24. Paul is a director of Acheron and the owner of Acheron Capital. A1-19 ¶ 17.

Acheron relies on other companies to administer the policies, and, since 2009, it has directed more than 70% of that business to a Florida-based company, Litai, pursuant to a service agreement. A1-21 ¶ 32. Although the exact amount is contested, Acheron has paid Litai millions of dollars in servicing fees. A1-19 ¶ 23; A1-21 ¶ 33. The service agreement contains unusual and non-commercial terms, notably, that Acheron's receipt of an "administrative fee discount" from Litai depends upon Acheron's keeping Acheron Capital as investment manager of the trusts. A1-21 ¶ 31; A1-182 ¶ 5; A-208.

The Appellees here are Furstenberg Finance SAS and Bataillon. Erich Bonnet is the principal beneficial owner of Furstenberg Finance SAS, which is a minority shareholder of Acheron. A1-18 ¶ 16; A1-160 ¶¶ 3-4. Bataillon is a former minority

shareholder of Acheron, and a current minority shareholder of a Luxembourg company called Ahmose S.A. ("Ahmose"), whose performance is dependent on the performance of Acheron. A1-18 ¶ 16; A1-170 ¶ 2. Ahmose was founded by Jan-Eric Samuel ("Samuel"), and Ahmose is indirectly controlled by Paul and his company Acheron Capital. A1-18 ¶ 16. Samuel is also the chief executive officer of Litai. A1-20 ¶ 26. Samuel and Paul are close friends, who own and operate multiple businesses together. *Id*.

In 2015, Bonnet learned from a former Acheron Capital employee that Paul has an undisclosed beneficial ownership interest in, and control over, Litai. A1-161 ¶ 7. Bonnet shared this information with Bataillon, and they then conducted a further investigation. A1-170-71 ¶¶ 3-4. As a result of that investigation, Bonnet and Bataillon learned that a former member of Acheron's Board had resigned in 2010 because of Paul's undisclosed beneficial ownership interest in Litai. A1-161 ¶ 7; *see also* A1-21 ¶ 36; A1-27-28. In addition, Bonnet learned from a former Acheron administrator that Paul's role in negotiations between Acheron and Litai in 2009 indicated Paul had an undisclosed interest in Litai. A1-182 ¶¶ 7-9. Although Bonnet had been on the Acheron Board at that time, he did not know of Paul's interest in Litai. *See* A1-161 ¶¶ 7-8.

In light of the foregoing, the Furstenberg Applicants intend to file a complaint in the Luxembourg Criminal Court. A1-162-63 ¶¶ 12-13; A1-171-72 ¶¶ 6-8. Under

Luxembourg law, a conflict of interest constitutes criminal misconduct if there is a misuse of corporate assets, fraud, or managerial misconduct. A1-23-25 ¶¶ 42-48.

## C.    **Proceedings Below**

In connection with the criminal proceedings they intend to file in Luxembourg, the Furstenberg Applicants filed this § 1782 action to obtain discovery from Litai, and its chief executive officer Samuel, concerning Litai and its undisclosed relationship with Paul. A1-16 ¶¶ 4-6. In the course of the District Court proceedings, the Furstenberg Applicants filed ten sworn declarations from six separate individuals in support of their discovery request.[1] Those declarations provided a detailed description of the underlying dispute from individuals with personal knowledge of it. The declarants also included Luxembourg law experts, who described the criminal actions that the Furstenberg Applicants will file in Luxembourg. And the declarations included unequivocal statements by the Furstenberg Applicants that they will commence criminal actions within 45 days of completion of the discovery ordered by the District Court or destroy the documents and forever maintain their confidentiality. A2-327 ¶ 5. The District Court found

---

[1] *See* A1-15-28 (Romain Sabatier); A1-150-57 (Sabatier); A1-158-68 (Bonnet); A1-169-72 (Bataillon); A1-173-79 (Charles Meeus); A1-180-92 (Alain Reinhold); A2-245-53 (Rosario Grasso); A2-254-59 (Sabatier); A2-260-325 (Bataillon); A2-326-66 (Bonnet).

5

this evidence to be persuasive and held that the Furstenberg Applicants were entitled to § 1782 discovery.  A2-389-403.

### *The Furstenberg Applicants' Initial Application*

On February 9, 2016, the Furstenberg Applicants filed the instant § 1782 Application in the United States District Court for the Southern District of Florida, where the corporate discovery subject, Litai, is headquartered (the "Application"). A1-6-14.   The Application provided considerable support for the requested discovery assistance, including a 2015 email from Eric Kalfon, stating that he had resigned from the Acheron Board in 2010 because of Paul's undisclosed interest in Litai.   A1-27-28.   The Application also presented a declaration from Romain Sabatier, an experienced Luxembourg attorney, who, as is typical in § 1782 applications, presented documents and information related to the foreign proceeding. In his declaration, Sabatier noted that Samuel—who is Ahmose's founder and Paul's close friend and business partner—had been appointed Litai's Chairman and CEO, even though Samuel does not have any insurance experience. A1-22 ¶ 37. Sabatier's declaration also explained that Paul "has appeared to be making a concerted effort to promote the business of Litai, as well as investment opportunities offered by entities affiliated with Litai." *Id.*

The Application further detailed the proceedings the Furstenberg Applicants contemplate bringing in Luxembourg, the intended claims to be brought therein, and

the need for discovery from Litai.  DE 4:5-9.  Specifically, the Application expressed the Furstenberg Applicants' "plan to file criminal proceedings, and potentially civil proceedings, in Luxembourg against [Paul]."  DE 4:8.

The District Court granted the application, A1-29-30, and issued an order authorizing the Furstenberg Applicants to serve subpoenas for business records regarding Litai's finances and ownership, deposition testimony of Samuel as a Litai representative and as an officer of Litai, and electronically stored information relating to communications between Litai, Acheron, and Acheron Capital.  *Id.*  On February 18, 2016, the subpoenas were issued.  DE 8; DE 9.

### *Litai's Motion To Quash*

On March 24, 2016, Litai filed a motion to quash the subpoenas.  DE 10. Despite acknowledging that "Applicants claim that if they find evidence that Dr. Paul has a secret ownership interest in Litai, they will then file civil <u>and criminal</u> lawsuits against Dr. Paul in Luxemburg," DE 10:2 (emphasis added), Litai's memorandum addressed the contemplated criminal proceedings only in two footnotes.  DE 10:17 n.9 ("The Applicants' claim that they also contemplate some sort of criminal action suffers from the same defects [that allegedly would apply to a civil action] and is improper under Luxembourg law."); 10:18 n.10 (same).

In a declaration, however, Litai's Luxembourg law expert, Pierre Beissel, recognized that, under Luxembourg law,  "[a]ny person that considers itself being

the victim of a criminal offence . . . can . . . file a criminal complaint together with a civil action for damages . . . with the competent investigating magistrate." A1-143 ¶ 43. Beissel further explained that "[s]uch a complaint results in the opening of a criminal investigation, unless the investigating magistrate holds the civil action for damages inadmissible," and that "[t]he investigating magistrate's decision is subject to appeal." *Id*.

### *The Furstenberg Applicants' Opposition And Cross-Motion To Compel*

On April 18, 2016, the Furstenberg Applicants responded to Litai's motion and cross-moved to compel production, presenting five declarations in support. These declarations, *inter alia*, rebutted statements in declarations Litai had submitted from Paul and Acheron Chairman Yves Mertz, and provided additional information regarding the Furstenberg Applicants' investigation into the suspicious relationship between Paul and Litai. A1-160-62 ¶¶ 5-11; A1-170-71 ¶¶ 3-4.

Bonnet explained in his declaration that, although he was a director at Acheron from 2008 through 2010, "at no time during that period did I know or suspect that [Paul] was the covert owner of Litai." A1-160 ¶ 5. Bonnet "only learned about [Paul's] undisclosed and covert beneficial ownership and control of Litai in or about the summer of 2015, when I was discussing [Acheron]/Litai with a former employee of [Acheron Capital]." A1-161 ¶ 7. Then, in December 2015, Kalfon disclosed to Bonnet that he decided to resign from Acheron's Board "due to [Paul's]

undisclosed and covert beneficial ownership and control of Litai." A-161 ¶ 7. Bonnet further stated that he "possess[ed] certain confidential knowledge concerning what I now know to be a significantly detrimental contract provision," in the 2009 Litai service agreement, "the existence of which I learned while serving on [Acheron's] board (at a time when I was unaware of [Paul's] covert ownership of Litai)." A1-161 ¶ 10. Bonnet offered to share that information *in camera* or by way of a sealed declaration so as not to violate any duties of confidentiality, and Bonnet rebutted Mertz's attempt to minimize the significance of that "non-commercial provision." *Id*. Bonnet further explained that Mertz's comparison of the rates Litai charges Acheron to market rates described in a trade publication was improper because Acheron owns fractions of policies, not entire policies. A1-161-62 ¶¶ 10-11.

Bataillon also filed a declaration, explaining that he did not know about Paul's alleged interest in Litai until he spoke with Bonnet in the summer of 2015, and that, "[s]ince that time, I have worked to investigate these allegations, sharing expenses with [Furstenberg Finance SAS] both in Europe and the United States." A1-170-71 ¶¶ 3-4. Bataillon stated that, contrary to Paul's assertion, the Application was "certainly not a fishing expedition with no purpose," but rather was "based upon actionable intelligence received from both a former employee of [Acheron Capital] and a former board member of [Acheron]." A1-171 ¶ 6.

Bonnet and Bataillon also both referred the Court to the declaration of Alain Reinhold, and explained that they planned to present Reinhold's testimony to the Luxembourg Criminal Court.  A1-162-63 ¶ 13; A1-171 ¶ 6.  In his declaration, Reinhold, a former Acheron administrator, explained that Paul appeared to have a link to Litai at the time the 2009 service agreement between Acheron and Litai was drafted.  A1-182 ¶ 7.  Specifically, Paul reported that Litai's management would not accept prices proposed by Acheron for servicing the policies, and Paul also described himself as "conflicted," such that he should not be involved in further communications between Acheron and Litai.  A1-182 ¶¶ 8-9.  Reinhold also noted that, during the course of the contract negotiations, he emailed Paul to question whether it was appropriate to characterize Litai as an "'independent' contractor" in the service agreement.  A1-182 ¶ 9.  Finally, Reinhold (who had not worked for Bonnet since July 2008), stated that "[t]he first time I informed Mr. Erich Bonnet of this email exchange, or my understanding of [Paul's] possible direct or indirect interest in Litai, was in the year 2016, as Mr. Bonnet informed me he was going to file a criminal complaint against" Paul in connection with Paul's "wrongful concealment of his ownership of Litai."  A1-182 ¶ 10.

Finally, Bonnet and Bataillon affirmed their unequivocal intent to file a criminal complaint in Luxembourg.  *See* A1-162 ¶ 12 (Bonnet) ("I can state . . . without any qualification or equivocation, that [Furstenberg Finance SAS] intends

to and will file a criminal complaint against [Paul] in the Luxembourg Criminal Court."); A1-172 ¶ 8 (Bataillon) ("In sum, I do not believe that my intent to bring the criminal proceedings against [Paul] in Luxembourg is subject to meaningful dispute."). As Bonnet further explained, "[t]he purpose of this application is to obtain evidence concerning both [Paul's] covert ownership in Litai, as well as the Litai-[Acheron] negotiation process, to present to the Luxembourg Criminal Court." A1-162 ¶ 12.

### *Litai's Reply And Opposition To Furstenberg's Cross-Motion*

On May 12, 2016, Litai filed its reply and opposition to Fustenberg's cross-motion to compel. DE 21; A1-193-244. Litai presented a brief additional declaration from Mertz, which suggested that Reinhold should have raised his concerns about Litai in his Acheron resignation letter, but did not specifically dispute any of the facts in Reinhold's declaration. A1-193-94. Litai also presented an additional declaration from Paul, which, *inter alia*, presented a lengthy discussion of other disputes and litigation between the parties and claimed that "Applicants' request for discovery from Litai is just another action in their global campaign designed to coerce me into buying Applicants' shares of Ahmose and Acheron at inflated prices." A1-199 ¶ 4c; *see* A1-200-04.

Litai's reply also contained a new Beissel declaration, A1-228-36, and a declaration from a second Luxembourg attorney, François Prum. A1-237-44. Prum

11

stated that, under Luxembourg law, a criminal complainant who files what (as described below) is known as a "denunciation," may submit evidence directly to a public prosecutor, who then decides whether to commence a formal investigation. A1-239 ¶ 8. Prum further admitted that a complainant may also "launch a direct action in the criminal court" if he has suffered personal damages. A1-239 ¶ 10. Prum stated that shareholders are not considered to suffer direct damages if the only harm they allege is by virtue of their ownership in the company. A1-242 ¶ 23. But Prum also admitted that shareholders <u>can</u> file a direct criminal complaint with claim for damages if "they demonstrate a personal and direct damage other than the one suffered by the company itself." *Id*.

### *The Furstenberg Applicants' Reply*

On June 2, 2016, the Furstenberg Applicants filed their reply in support of their cross-motion. DE 25; A2-245-366. The reply was supported by four additional declarations rebutting assertions made by Litai's declarants in support of Litai's reply and opposition to the cross-motion.

The Furstenberg Applicants filed a declaration from Rosario Grasso—the then-Chairman of the Luxembourg Bar Association and a practicing Luxembourg lawyer since 1991, who principally handles criminal cases—to respond to the Prum declaration filed with Litai's reply. A2-245 ¶¶ 2-3. Consistent with what Prum himself had recognized, Grasso explained that parties who allege direct prejudice

12

may file a criminal complaint with damages claim directly in the Luxembourg Criminal Court before an investigating magistrate judge, and they are then direct parties to such proceedings. A2-248 ¶ 5.2.1. Direct prejudice is broadly defined and includes "material, financial, reputational, or even moral" harm. A2-251 ¶ 6.1.2. Thus, "[w]hether shareholders of the company may be considered as direct injured parties . . . depends on the circumstances." *Id*.

Grasso explained that, here, it is clear that "both Applicants can allege material, financial, reputational and/or moral damages in relation to the allegations against [Paul]," including "their reputational damages that will come from their associations with [Paul] and Acheron in Luxembourg and in London, as director of Acheron and advisor of Acheron (London), respectively, or even a mere moral prejudice." A2-251-52 ¶ 6.1.2. Sabatier, the other Luxembourg lawyer supporting Applicants, also filed another declaration expressing his agreement with Grasso on these points. Sabatier explained that "it is clear and obvious that Applicants have suffered economic, moral and reputational damages in relation to the crimes committed by [Paul]," which "arise not only as a result of their trading in [Acheron] shares on behalf of clients, but also due to the significant former relationships between [Acheron] and the Applicants." A2-256 ¶ 8. Specifically, "Erich Bonnet is a former [Acheron] board member, while Marc Bataillon was formerly an advisor to [Paul] with respect to Acheron (London)." *Id*.

13

In addition, Grasso explained that in Luxembourg, parties who have not suffered direct prejudice from an offense are still entitled to lodge a denunciation with the State Prosecutor.  A2-247 ¶ 5.1.6.  State Prosecutors are member of the judiciary branch and are magistrates under the Luxembourg division of power, as opposed to mere representatives of the State.  A2-252 ¶ 6.1.4.1; A2-259 ¶ 26.  "As such, presenting before a State Prosecutor can be looked upon as akin to presenting directly to a judge in the United States."  A2-252 ¶ 6.1.4.1.  Further, if the State Prosecutor declines to open a formal investigation, the complaining party may appeal that decision to the General State Prosecutor.  A2-253 ¶ 6.1.4.2.  Grasso further affirmed that he personally intends to file a direct criminal action on behalf of the Furstenberg Applicants in Luxembourg.  A2-246 ¶ 4.1.

Bonnet and Bataillon also filed declarations.  They stressed that, contrary to Paul's assertion of ulterior motives, their § 1782 Application has nothing to do with the other disputes and litigation involving the parties.  A2-263 ¶¶ 13-14; A2-330 ¶¶ 22-23.  (Bonnet and Bataillon also refuted Litai's characterization of those disputes.  A2-261-62 ¶¶ 8-11; A2-330-31 ¶¶ 24-25).  Bonnet reaffirmed his unqualified commitment that any discovery in this proceeding will be kept confidential until Luxembourg criminal proceedings are filed.  A2-261-262 ¶¶ 8-14; A2-330 ¶ 23.  Bonnet further

> resolve[d]   that,   in addition   to   maintaining   the
> confidentiality   of   the   discovery   obtained   until   such

14

> proceeding is commenced (at which point it will be shared
> with the other current and former shareholders of
> [Acheron]), the Luxembourg criminal action will be
> commenced within 45 days of completing the requested
> discovery exercise.   This will be the case unless it is
> [Furstenberg Finance SAS's] opinion that the discovery
> obtained exonerates [Paul], in which case, of course, no
> criminal action will be filed, confidentiality will remain in
> place and the records otherwise destroyed.

A2-327 ¶ 5 (emphasis in original).  Bataillon echoed these points.  A2-260-61 ¶¶ 2-

4.  Bataillon also explained that he requested Paul to purchase his shares in Ahmose

in connection with the parties' other disputes because it "would provide efficiencies

to both sides in a way that a simple cash deal would not," which Bataillon understood

to be a "perfectly lawful transaction" that he "would never pursue" if he "was to ever

receive information that a share-premium transaction was not lawful."  A2-262-63

¶ 12.  In any event, Bataillon noted that the parties' other disputes were irrelevant to

this action, the sole purpose of which is to obtain evidence in support of a

Luxembourg criminal proceeding.  A2-263 ¶¶ 13-14.  Bataillon pointed out: "Given

the safeguards that Applicants have <u>volunteered</u> (and any additional safeguards this

Court deems appropriate), there can be no misuse of the discovery requested."  A2-

263 ¶ 14 (emphasis in original).

Finally, Bataillon also noted that additional evidence indicating Paul's

undisclosed interest in Litai had come to light.  Bataillon explained that, according

to documents on the website of the Florida Secretary of State, in 2013, a company

called Neptune Assets, LLC provided an annual report listing itself as managed by Paul and having a principal place of business at 1180 SW 36th Avenue, Ste 100, Pompano Beach, FL, 33609—the same address Litai operated out of at that time. A2-263 ¶ 15. The same documents revealed that, in October 2013, Samuel took over from Paul as manager of Neptune, and stated that correspondence regarding the manager change at Neptune was to be directed to an employee at Litai. *Id.*

### *The District Court Denies Litai's Motion To File A Sur-reply*

Litai moved for leave to file a sur-reply and submit what would have been the seventh declaration on Luxembourg law in this proceeding, but the District Court denied that request, explaining that Litai had sufficient opportunity to submit evidence in its two prior briefs:

> The Court appreciates the need to educate the Court and present authority upon issues of applicable foreign law. Respondents, however, were provided the opportunity to do so upon [their] combined Response in Opposition to Motion to Compel Production, ECF No. [16], and Reply in Further Support of Motion to Quash Subpoenas, ECF No. [10]. As such, Respondents have presented no justification of new law or argument which would warrant the filing of a sur-reply.

DE 29:1. Thus, Litai's sur-reply and the exhibits attached thereto are not part of the record, and Litai has not appealed the District Court's order denying Litai's request for leave to file a sur-reply. *See* Br. 3; DE 31.

### *The District Court Denies Litai's Motion And Grants Applicants' Fees*

On July 26, 2016, the District Court issued an order rejecting Litai's motion to quash the § 1782 subpoenas, granting the Furstenberg Applicants' motion to compel compliance with the subpoenas, and granting the Furstenberg Applicants attorneys' fees because Litai's arguments lacked "sound basis" in applicable law. A2-389-403.

First, the District Court held that the Furstenberg Applicants were "interested persons" for purposes of § 1782. A2-394-397. Litai had argued that the Furstenberg Applicants failed to satisfy this standard because they had voted to discharge Acheron directors from claims of wrongdoing (even though the resulting waiver would apply to civil shareholder claims, not criminal claims under Luxembourg law), and because—according to Litai—the Furstenberg Applicants had not suffered the kind of "direct injury" necessary to be private parties to a criminal proceeding. A2-394-96. The District Court, however, explained that these arguments were beside the point. Applying precedent from this Court and the Second Circuit, the District Court explained that such issues went to the underlying merits of the Furstenberg Applicants' claims under Luxembourg law, and "[i]t is not the job of this Court to consider the underlying merits, of [the Furstenberg Applicants'] claim, including the nature and extent of the injuries . . ." A2-395-96; *see also* A2-394-95; A2-402.

17

Instead, the District Court explained that, under the broad definition of an "interested person," set forth by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), an applicant is an "interested person" if he has participation rights in the foreign proceeding or a reasonable interest in obtaining judicial assistance.  A2-396.  As the District Court recognized, here, "Applicants have provided an expert who states that under Luxembourg law, Applicants can bring a criminal action against [Paul]," and that they would have "'participation rights'" in such an action.  A2-397.  As a result, "Applicants are 'interested persons' within the meaning of Section 1782."  A2-396.

Second, the District Court held that the requested discovery was for use in a reasonably contemplated foreign proceeding within the meaning of § 1782, as interpreted in *Intel*.  A2-397.  The court considered each of the three types of criminal proceedings that can be commenced by private parties in Luxembourg: (i) a criminal complaint with claim for damages; (ii) a direct summons with claim for damages; and (iii) a denunciation.  A2-397.  Litai argued that the Furstenberg Applicants could not file a direct criminal action (i.e., one of the first two types) because it had not suffered direct injury, and that a denunciation would not constitute a "proceeding in a foreign tribunal" within the meaning of the statute.  *Id*.  The court disagreed. Having already held that the issue of whether the Furstenberg Applicants' injuries were direct was to be decided by the Luxembourg court, the court stressed that the

18

Furstenberg Applicants had unequivocally asserted that they intended to file a direct criminal action (namely, a criminal complaint with damages claim) in Luxembourg. A2-397-98 & nn. 4-6.

In any event, the District Court also held that the third option, a denunciation, would also be sufficient for purposes of § 1782. A2-400. The court looked past Litai's mischaracterization of a denunciation as merely a "police report," to the actual procedure of a denunciation, which may be made to a State Prosecutor, a member of the judicial branch, and whose decision to prosecute is appealable by complainants. A2-400. The court therefore concluded that Luxembourg denunciations constitute the type of proceeding which the 1996 amendment to §1782 recognized as sufficient, i.e., "criminal *investigations* conducted *before* formal accusation." A2-400 (emphasis in original) (citing *Intel*, 542 U.S. at 242). Relying on the Furstenberg Applicants' assurance that they will file a criminal action within 45 days unless the discovery exonerated Paul, the court also rejected Litai's argument that this § 1782 proceeding is merely a "'fishing expedition' pursued under the guise of legitimate discovery." A2-400. This factual determination, much like the appropriateness of an attorneys' fees award, was based upon the extensive record described above.

Finally, the District Court noted that Litai had repeatedly misstated the law. A2-402. Specifically, while Litai had argued "that the court should deny a Section

1782 Application unless the district judge is satisfied 'that a proceeding is very likely to occur,'" that standard was based on outdated precedent that was expressly rejected in *Intel*, which instead requires only that such a proceeding is within reasonable contemplation. A2-399; *see* A2-398. And the District Court determined that it was proper under the circumstances to order attorneys' fees and costs to the Furstenberg Applicants. A2-402.

In summary, the District Court explained:

- "Applicants have sufficiently shown that they indeed satisfy the statutory conditions of Section 1782";

- "Applicants satisfy the 'interested persons' prong of Section 1782 as complainants who will prompt a foreign investigation and who 'possess a reasonable interest in obtaining [judicial] assistance.'" (citing *Intel*, 542 U.S. at 256.);

- "[T]he 1782 Application is not a 'fishing expedition' and the foreign proceedings are within 'reasonable contemplation'"; and

- "Accordingly, this Court finds 'sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially' and such evidence will 'eventually be used in such a proceeding.'" (citing *Application of Consorcio Ecuatoriano de*

20

*Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1270 (11th Cir. 2014)).

A2-402.

### Litai's Unsuccessful Motion To Stay

On August 23, 2016, Litai noticed this appeal, DE 31, and filed a motion for a stay discovery pending appeal.  DE 32.  Despite the District Court's rebuke of Litai's attempt to rely on antiquated precedent that had been rejected by *Intel*, A2-402, Litai again argued for the "very likely to occur" standard and insisted "[t]here is little, if any, difference" between that standard and the "reasonable contemplation" standard set forth in *Intel* and applied in *Consorcio*.  DE 32:10.  The District Court denied the motion, explaining, *inter alia*, that "Litai largely reiterates the same arguments that this Court previously rejected and has not demonstrated a likelihood of success on the merits."  DE 36:4.

Litai then filed a motion for stay of discovery pending appeal to this Court on October 11, 2016, bringing the same arguments for the fourth time.  This motion has not yet been ruled on.

### D.   **Standard Of Review**

"Because 'Congress has given the district courts such broad discretion in granting judicial assistance to foreign countries, this court may overturn the district court's decision only for abuse of discretion.'"  *In re Clerici*, 481 F.3d 1324, 1331

(11th Cir. 2007) (citation omitted); *accord Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1198 (11th Cir. 2016) (citation omitted). This abuse-of-discretion standard is "extremely limited and highly deferential"; it "is identical to that used in reviewing the district court's ordinary discovery rulings." *In re Clerici*, 481 F.3d at 1331 (internal quotation marks omitted). Although this Court reviews interpretations of law *de novo*, *see id.*, a district court's application of a properly interpreted rule of law will only be reversed if the court makes a clear error of judgment. *See Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1280 (11th Cir. 2010).

Thus, contrary to Litai's suggestion, Br. 20-21, review is not *de novo* whenever the district court's analysis is grounded in § 1782's statutory factors. A district court's <u>interpretation</u> of the statutory language is reviewed *de novo*, but its <u>application</u> of a properly interpreted statutory factor is reviewed for abuse of discretion. *See, e.g.*, *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 459 (2d Cir. 2014) (distinguishing between a district court's "interpretation of the language of the statute," which is reviewed *de novo*, and a district court's "decision to grant discovery on the facts before it," which is reviewed for abuse of discretion).

Here, the District Court's determinations discussed in Argument Part I below, *viz.*, (i) that the Luxembourg criminal proceedings are "within reasonable contemplation" and (ii) that Appellees' § 1782 application is not a fishing

22

expedition, involve fact-based judgments, rather than issues of statutory interpretation, and are therefore reviewed for abuse of discretion. *See In re Application of Bracha Found.*, --- Fed. Appx. ----, No. 15-14913, 2016 WL 5219862, at *7 (11th Cir. Sept. 22, 2016) ("We hold that the district court did not abuse its discretion in determining that future proceedings in the BVI were 'within reasonable contemplation[.]'"). The remaining issues raise primarily questions of statutory interpretation, which are reviewed *de novo*. In any event, under any standard of review, the District Court did not err in granting Appellees' request for discovery under § 1782.

## SUMMARY OF THE ARGUMENT

The Furstenberg Applicants brought this § 1782 action in order to obtain discovery for use in a Luxembourg criminal proceeding that is within reasonable contemplation.  The District Court thus appropriately exercised its discretion to grant Furstenberg's application.  Litai's arguments to the contrary are unavailing.

First, notwithstanding Litai's assertions, there are "reliable indications" that Furstenberg will initiate criminal proceedings in Luxembourg.  Indeed, the Furstenberg Applicants not only have presented detailed factual allegations— backed by objective evidence—in support of their underlying claims, but have also unequivocally stated their intention to commence a criminal action within 45 days of obtaining the discovery.  Litai incorrectly argues that the evidence supporting Furstenberg's underlying claims is "weak," but that argument is, in any event, irrelevant.  Section 1782 proceedings are not intended to be mini-trials on the merits; those issues are reserved for the foreign tribunal.

Second, the criminal proceeding that Furstenberg will initiate constitutes "a proceeding in a foreign or international tribunal."  Furstenberg will file a criminal complaint with damages claim, which triggers an investigation by a *juge d'instruction*, a member of the Luxembourg judiciary.  The plain language of § 1782—which defines foreign proceedings to include "criminal investigations conducted before formal accusation"—as well as binding precedent from this Court

and the Supreme Court, make clear such proceedings before a *juge d'instruction* qualify as "proceeding[s] in a foreign . . . tribunal."  Litai argues that any criminal complaint with damages claim filed by the Furstenberg Applicants will be deemed inadmissible for lack of direct damages.  But, the record is clear that the Furstenberg Applicants have alleged the type of direct injury (which, under Luxembourg law, is broadly defined and includes reputational damage) that will permit them to file a criminal complaint with damages.  In any event, this is an issue of Luxembourg law to be resolved by the Luxembourg courts; it is not properly part of the § 1782 inquiry.

Moreover, Litai concedes that Furstenberg is entitled to file a denunciation under Luxembourg law.  A denunciation is filed before a State Prosecutor, and it would allow the Furstenberg Applicants to present evidence directly to the State Prosecutor.  Unlike prosecutors in this country, under Luxembourg law, the State Prosecutor is also a member of the judicial branch.  Further, while the State Prosecutor would have discretion in deciding whether to open a formal investigation, if the prosecutor declines to open an investigation, that decision is appealable.  For all these reasons, Furstenberg's ability to file a denunciation independently supports the District Court's finding that a "proceeding before a foreign . . . tribunal" is "reasonably contemplated."

Finally, the District Court also correctly concluded that the Furstenberg Applicants are "interested persons" for purposes of § 1782.  The Supreme Court has

broadly interpreted the "interested person" standard to include not only litigants, but also any person that "possesses a reasonable interest in obtaining judicial assistance." *Intel*, 542 U.S. at 257 (citation and alterations omitted). Here, the Furstenberg Applicants clearly possess a reasonable interest in obtaining judicial assistance as they will not only initiate the contemplated foreign proceeding, but will have significant "participation rights" therein.

## **ARGUMENT**

Litai's brief presents six questions for review; however, those questions can be broken down into three issues: (1) whether there are reliable indications that the Furstenberg Applicants will initiate an action in Luxembourg (Litai's Questions I and II); (2) whether that action will constitute a "proceeding in a foreign or international tribunal" as contemplated by § 1782 (Litai's Questions III, IV, and V); and (3) whether the Furstenberg Applicants will be "interested persons" in that proceeding (Litai's Question VI). This brief will address each of those three issues in turn.

**I.    The District Court Did Not Abuse Its Discretion In Finding That There Are "Reliable Indications Of The Likelihood That Proceedings Will Be Instituted Within A Reasonable Time."**

Section 1782 authorizes federal courts to order discovery for use in foreign proceedings, but it does not require that a foreign proceeding be "pending" or "imminent" at the time of the application. *See Intel*, 542 U.S. at 258-59. Rather, a district court need only satisfy itself that the foreign proceeding is within "reasonable contemplation," meaning there are "reliable indications of the likelihood that proceedings will be instituted within a reasonable time." *Consorcio*, 747 F.3d at 1270 (internal citation and quotation marks omitted). And, while Litai disagrees with the standard set forth in *Consorcio*, *see* Br. 28, it is, of course, binding here. *See, e.g.*, *United States v. Adams*, 316 F.3d 1196, 1197 n.1 (11th Cir. 2003) ("'The

law of this circuit is "emphatic" that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision.'").

Here, the District Court found the *Consorcio* standard satisfied.  *See* A2-401 ("[A] foreign proceeding need only be within 'reasonable contemplation,' and it is the finding of this Court that such a proceeding is indeed reasonably contemplated.").  That finding is fully supported by the record and was not an abuse of discretion.  As set forth above, *supra* at 5, 9-10, 16, Furstenberg provided detailed declarations indicating that Paul has an undisclosed ownership interest in, or control of, Litai, and that, under Luxembourg law, Furstenberg can initiate criminal proceedings based on the information contained in the declarations.  Particularly in light of this evidence, the District Court did not abuse its discretion in crediting the Furstenberg Applicants' representation that "they will commence the criminal actions against Paul, to be filed by the President of the Luxembourg Bar Association, Rosario Grasso, no later than 45 days after the completion of the Litai discovery." A2-401.

## A.    Furstenberg Is Not "Investigating Whether A Claim Is Possible."

Litai argues that there are not reliable indications that a proceeding will be instituted because the Furstenberg Applicants purportedly "admitted over and over again that their very ability to trigger a criminal investigation in Luxembourg is

wholly dependent upon the Section 1782 discovery confirming their suspicions."
Br. 31.  But the Furstenberg Applicants made no such admission.

On the contrary, Erich Bonnet, the majority beneficial owner of Furstenberg
Finance SAS, unequivocally stated that Furstenberg <u>will</u> commence a criminal
action within 45 days of obtaining the discovery, unless that discovery <u>exonerates</u>
Paul.  *See* A2-327 ¶ 5 ("I further resolve that . . . the Luxembourg criminal action
will be commenced within 45 days of completing the requested discovery exercise.
This will be the case unless it is [Furstenberg's] opinion that the discovery
exonerates [Paul], in which case, of course, no criminal action will be filed."); *see
also* A-162 ¶ 12.  This statement shows the Furstenberg Applicants are seeking to
buttress the evidence in relation to criminal proceedings they have a right and ability
to file, and they would not proceed only if the substance of the U.S. discovery clearly
contradicted the evidence they have already obtained.  That is entirely appropriate,
and does not mean that Furstenberg is engaged in a "fishing expedition."  Br. 4.

Equally unavailing is Litai's reliance on a statement by Furstenberg's legal
expert (Grasso) that, "[d]epending on the nature of the evidence obtained from Litai
… both a criminal complaint with a civil claim . . . as well as a [direct summons] are
possible."  Br. 31 (citing A2-251 ¶ 5.3.5).  Grasso was not, as Litai suggests, saying
that it was only "possible" that Furstenberg would file a direct criminal action in
Luxembourg.  Instead, he was explaining that different kinds of criminal actions are

possible depending on the exact nature of the offense (i.e., while a criminal complaint with damages claim can be filed regardless of the seriousness of the offense, a direct summons can be filed only if the offense is classified as a misdemeanor). *See* A2-250-51.[2]

In light of the foregoing, Litai's reliance on *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG*, 798 F.3d 113 (2d Cir. 2015), is clearly misplaced. In *Certain Funds*, "all that the [applicants] alleged before the district court was that they had retained counsel and were discussing the possibility of initiating litigation." *Id.* at 124 (emphasis in original). As explained, this is not a case where Furstenberg is simply "discussing the possibility" of initiating litigation—instead, Furstenberg has resolved to initiate the Luxembourg criminal proceedings within 45 days of obtaining discovery in this action.[3]

---

[2] Litai also highlights Grasso's statement that "'assuming that the evidence sought from Litai confirms the allegations at bar, I will personally be filing one of the 'direct' criminal actions in Luxembourg on the Applicant's behalf.'" Br. 31 (quoting A2-245 ¶ 4.1). This indicates that Grasso would like to see the § 1782 discovery before personally filing an action on the Furstenberg Applicants' behalf, not that the Furstenberg Applicants think their ability to file is "wholly dependent" on the discovery. Br. 31.

[3] The district court cases cited by Litai are similarly inapposite. Those cases involved blind attempts to locate assets for security/enforcement purposes, and implicated other considerations not present here, such as an effort to circumvent a federal judge's order, *see In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*, No. 15-MC-127, 2015 WL 4040420, at *7-8 (S.D.N.Y. Jun. 29, 2015), and an effort to use § 1782 discovery simply to see if an adversary had sufficient assets to make bringing an arbitration worthwhile, *see Jiangsu Steamship Co., Ltd.*

Notwithstanding the foregoing, even if (counterfactually) Furstenberg's decision to file the Luxembourg criminal action depended on the outcome of this proceeding, this Court has confirmed that that would be an entirely appropriate use of § 1782 discovery. In *Bracha*, 2016 WL 5219862, at *7, the intervenors argued that a foreign proceeding was not "within reasonable contemplation" because the applicant had an outstanding judgment against it, which it would have to pay before proceeding with any new action in the contemplated foreign forum. Addressing that argument, this Court noted that it "suspect[ed] that the decision to satisfy the judgment and pursue new litigation in the [foreign forum] may depend on [the applicant's] success in the instant § 1782 discovery proceedings." *Id.* Far from being improper, however, this Court made clear that § 1782 authorizes discovery so that an applicant may determine whether to pursue litigation in the foreign forum. *See id.* The Court held that "it [was] clear the district court did not err in finding that the requested discovery is for use in a proceeding in a foreign or international tribunal." *Id.*

Notably, the intervenors in *Bracha* filed a petition for rehearing for the sole purpose of requesting that the Court remove the sentence stating it suspected the applicant's decision to pursue foreign litigation might depend on its success in the

---

*v. Success Superior Ltd.*, No. 14-cv-9997, 2015 WL 3439220, at *7 (S.D.N.Y. Feb. 5, 2015).

§ 1782 action. *See* Dkt # 15-14913, Petition filed 10/11/2016. The intervenors argued that the sentence was unnecessary and that § 1782 should not be used to allow an applicant to determine whether to file a claim in a foreign forum. *Id.* The Court denied the motion. *Id.*, Order dated 11/02/216.

For the foregoing reasons, Litai's "fishing expedition" argument is not only inconsistent with the record, it is foreclosed by this Court's precedent.

## B.    Litai's Attack On The Merits Of Furstenberg's Underlying Claims Is Both Ineffectual And, More Importantly, Inappropriate.

Litai also contends that there are no reliable indications that a proceeding will be instituted because, in Litai's self-serving view, "[t]he evidence the Applicants have submitted [in support of their underlying claims] is weak." Br. 36. As a threshold matter, Litai is wrong. As set forth above, the Furstenberg Applicants provided detailed declarations describing, *inter alia*: the information they received from a former Acheron Capital employee and a former Acheron Board member about Paul's undisclosed relationship with Litai, which caused the Board member to resign; the unusual provision in the Litai-Acheron service agreement that stood to benefit Paul's company Acheron Capital; and the close and overlapping business relationships between Paul and Samuel (the chief executive officer of Litai), including evidence showing that, as recently as 2013, Paul managed an entity at the same Pompano Beach address as Litai, whose management was then transferred to Samuel. *See supra* at 5, 7, 9-10, 16-17.

32

In arguing that Furstenberg's evidence on the underlying merits is weak, Litai ignores this last category of evidence entirely.   Litai insists that Paul should be commended for disclosing that he was "conflicted" to Acheron's Board, Br. 35, but Litai fails to address Paul's concealment of the nature of that conflict as alleged by the Furstenberg Applicants (i.e., Paul's undisclosed ownership interest in Litai). Litai also stresses that Kalfon stated he trusted Paul in the context of giving Paul his proxy after resigning from the Board.  *See* Br. 34.  But, although the record does not reveal Kalfon's motives for giving Paul his proxy, that fact surely does not prove Kalfon was lying when he said he resigned from the Board because of Paul's undisclosed interest in Litai.  Finally, Litai emphasizes that the unusual provision concerning Paul's company Acheron Capital in the Litai servicing agreement was approved by Acheron's board.  *See* Br. 36.  But, the significance of that clause only becomes clear in light of the fact that Paul has an ownership interest in, or control over, <u>both</u> Litai (a party to the contract) and Acheron Capital (which stands to benefit from the contract).  Paul's interest in Litai was <u>not</u> disclosed to the Board and, as a result, Bonnet did not realize the risk this provision posed to Acheron.  *See* A1-161 ¶¶ 7-8.

More importantly, Litai's merits arguments are inappropriate here.  Questions regarding the merits of the underlying dispute are reserved for the foreign tribunal. *See, e.g., Bracha*, 2016 WL 5219862, at *2  ("The merits of the underlying

commercial dispute . . . are not presently before the Court and we do not attempt to resolve the underlying issues."); *see also In re Viega*, 746 F. Supp. 2d 8, 18 (D.D.C. 2010) ("Their resistance, at its core, reduces to a quarrel as to . . . the underlying validity of the claims . . ., supported by little more than alternative interpretations of the evidence relied upon by Applicants.  These objections are better left for the foreign tribunals to resolve.").

Indeed, Litai cites only one case for the proposition that a court should examine the merits of an applicant's underlying claims in determining whether there are reliable indications that a proceeding will be instituted.  *See* Br. 32-33.  But that case—*Consorcio*—stands for the opposite proposition.  While Litai argues that the merits of the underlying claims in *Consorcio* were stronger, this Court could not have been clearer that the merits are not at issue under §1782:

> We emphasize . . . that this appeal is <u>not</u> about whether JASE actually overbilled CONECEL . . .; or whether CONECEL owes JASE any money under the contracts between the parties; or, finally, whether any other underlying dispute among the parties and related persons has merit.  Like the district court, we have no occasion to address any of these issues, which will likely be resolved in various tribunals in Ecuador.

747 F.3d at 1268 (emphasis in original).  Thus, Litai's merits arguments are not only unpersuasive, they are not properly considered in this § 1782 action.

**II.    Furstenberg Can And Will Initiate A "Proceeding In A Foreign Or International Tribunal."**

For the reasons stated above, the District Court properly found that Furstenberg intends to file a criminal complaint in Luxembourg within 45 days of completing the discovery sought in this action.  In parts III through V of its brief, however, Litai argues that the criminal complaint Furstenberg intends to file will not institute the kind of foreign proceeding that is contemplated by § 1782.  *See* Br. 37-46.  Litai is wrong.

Section 1782 authorizes a district court, upon the application of any interested person, to order discovery "for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation."  As discussed, it is not necessary that the proceeding be pending at the time of the application; "[r]ather, the proceeding for which discovery is sought need only be 'within reasonable contemplation.'"  *Clerici*, 481 F.3d at 1333 (quoting *Intel*, 542 U.S. at 259).

Here, Furstenberg has unambiguously stated its intention to file a *plainte pénale avec constitution de partie civile*, i.e., a criminal complaint with damages claim, directly, in a Luxembourg criminal court.  Litai cannot seriously dispute that such a complaint would institute a "proceeding in a foreign . . . tribunal," and Litai's argument that the complaint could be dismissed for lack of direct damages is both misdirected and incorrect.  Moreover, Litai does not dispute that Furstenberg could

file a denunciation, which would also trigger a "proceeding in a foreign . . . tribunal" within the meaning of § 1782.

In its brief, Litai tellingly fails to clearly distinguish between these two different types of procedures (i.e., a criminal complaint with damages claims, on the one hand, and a denunciation on the other), or explain which of its arguments are directed to which type of complaint.[4]  Consistent with the District Court's analysis, Furstenberg will separately discuss both sets of proceedings and explain why, under settled precedent, both support the District Court's order granting § 1782 discovery.

A.    **A Criminal Complaint With Damages Claim Would Institute A Proceeding In A Foreign Tribunal, And The Record Is Clear That Furstenberg Can And Will File Such A Complaint.**

As all of the foreign law experts below agreed, under Luxembourg law, any person who alleges to have suffered prejudice as a result of a criminal offense is entitled to file a criminal complaint with damages claim.  A2-248 ¶¶ 5.1.9, 5.2.1 (Grasso); A2-255 ¶ 5 (Sabatier); A1-143 ¶ 43 (Beissel); A1-241 ¶ 18 (Prum).  Such a complaint is brought before a *juge d'instruction*, a member of the judiciary.  A2-247, 249 ¶¶ 5.1.4, 5.2.3 (Grasso); A1-23 ¶¶ 40-41 (Sabatier); A1-143 ¶ 43 (Beissel).

---

[4] There are actually three different types of criminal claims available to private parties in Luxembourg: a denunciation, a criminal complaint with damages claim, and a direct summons.  *See* A2-246 ¶ 4.1. The criminal complaint with damages claim and the direct summons are each "direct" actions, but, while a criminal complaint with damages claim can be filed regardless of the seriousness of the offense, a direct summons can be filed only if the offense is classified as a misdemeanor.  *See* A2-248 ¶ 5.1.9.

The filing of a criminal complaint with damages claim institutes "criminal proceedings where the plaintiff and victim is a party with specific rights defined and regulated by [the Luxembourg Code of Criminal Procedure]."  A2-249 ¶ 5.2.3 (Grasso).  A criminal complaint with damages claim unquestionably qualifies as "a proceeding in a foreign or international tribunal," within the meaning of § 1782, and, contrary to Litai's arguments, the record is clear that Furstenberg may bring such an action in Luxembourg.

### 1.    A Criminal Complaint With Damages Claim Commences A "Proceeding In A Foreign Or International Tribunal."

Litai suggests that, for purposes of § 1782, a foreign proceeding will not be commenced until formal criminal charges are brought against Paul in an in-court, adjudicative proceeding.  *See* Br. 1, 3, 25-26, 40-41.  That is unmistakably wrong.  A criminal investigation before a *juge d'instruction*, which will be triggered by the Furstenberg Applicants' filing of a criminal complaint with damages claim, itself constitutes a "proceeding in a foreign . . . tribunal" for purposes of § 1782.

Before 1964, § 1782 authorized district courts to order certain discovery "to be used in any judicial proceeding pending <u>in any court</u> in a foreign country with which the United States is at peace."  Act of May 24, 1949, ch. 139, § 93, 63 Stat. 103 (emphasis added); *see also Intel*, 542 U.S. at 248.  Congress, however, amended the statute in 1964 to "liberalize existing . . . procedures."  *See* S. Rep. No. 1580, 88th Cong., 2d Sess. 7 (hereinafter, "Senate Report"), *reprinted in* 1964

U.S.C.C.A.N. 3782, 3788. As part of the amendment, Congress deleted the words "in any judicial proceeding pending in any court in a foreign country," and replaced them with the phrase "in a proceeding in a foreign or international tribunal." *See* Act of Oct. 3, 1964, Pub. L. 88-619, § 9, 78 Stat. 997; *see also Intel*, 542 U.S. at 248-49. The purpose of this change was "to ensure that 'assistance is not confined to proceedings before conventional courts,' but extends also to 'administrative and quasi-judicial proceedings.'" *Intel*, 542 U.S. at 249 (citing Senate Report).

Among the proceedings the amendment sought to cover were "proceedings pending before investigative magistrates in foreign countries." Senate Report, 1964 U.S.C.C.A.N. 3782; *see also Intel*, 542 U.S. at 258 ("[T]he term 'tribunal' includes investigating magistrates.") (alteration omitted) (citing Hans Smit, *International Litigation under the United States Code*, 65 Colum. L. Rev. 1015, 1026 n.71 (1965)). Indeed, it appears that one of the major impetuses for the amendment was to ensure that proceedings before *juges d'instruction* in countries such as France (or, here, Luxembourg) fell within the statute. *See generally In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*, 385 F.2d 1017, 1020 (2d Cir. 1967) (Friendly, J.), *disagreed with on other grounds by Clerici*, 481 F.3d at 1333 n.10; *see also* A1-242 ¶ 22 (Prum) (noting that Luxembourg law is modeled on French law).

If there were any doubt as to Congress's intent to include a foreign investigating magistrate's criminal investigation within the scope of "proceedings,"

for purposes of § 1782, that doubt was dispelled in 1996.  In that year, Congress further amended the statute to add, after the reference to "a proceeding in a foreign or international tribunal," the words "including criminal investigations conducted before formal accusation."  National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106, § 1342(b), 110 Stat. 486.  Tellingly, in quoting the statute, Litai omits this language.  *See* Br. 23.

In sum, a foreign tribunal's "criminal investigation conducted before formal accusation" is a "proceeding" for purposes of the statute.  *See Consorcio*, 747 F.3d at 1269 ("[I]n 1996, Congress broadened the statute further still, adding that proceedings in a foreign or international tribunal 'includ[e] criminal investigations conducted before formal accusation.'") (Court's alteration).

Consistent with the statutory language, courts have consistently found that an investigating magistrate's investigation is a "proceeding" for purposes of § 1782. *See, e.g., In re Application for an Order Pursuant to 28 U.S.C. 1782*, 773 F.3d at 461 (footnote omitted) ("The criminal inquiry is a 'proceeding' and an 'investigation' being conducted by a Swiss magistrate."), *reh'g en banc denied* (2d Cir. Mar. 19, 2015); *In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*, 848 F.2d 1151, 1153 (11th Cir. 1988) ("[T]o permit district courts to assist in proceedings before foreign investigating magistrates . . . Congress only required that the evidence be for use in a 'foreign tribunal' rather than for use

in a 'court.'") (footnote omitted), *abrogated on other grounds by Intel*, 524 U.S. 241;

*In re Letter of Request for Judicial Assistance from Tribunal Civil de Port-Au-*

*Prince, Republic of Haiti*, 669 F. Supp. 403, 405-06 (S.D. Fla. 1987) (concluding

that a *juge d'instruction*'s investigation was a proceeding under § 1782).

Indeed, this Court has expressly considered and rejected the argument that a

"proceeding" for purposes of § 1782 must be an "adjudicative proceeding." *Clerici*,

481 F.3d at 1333.  In *Clerici*, the Court described that argument as "without merit

for several reasons," stressing that "the statute specifically provides that the evidence

obtained through § 1782 can be used in 'criminal investigations conducted *before*

formal accusation,' even though such investigations are not adjudicative

proceedings." *Id.* (Court's emphasis).  It is thus clear that Furstenberg's filing of a

criminal complaint with damages claim before a Luxembourg *juge d'instruction*

would institute a "proceeding in a foreign . . . tribunal" within the meaning of § 1782.

Litai also makes much of the fact that the criminal investigation in

Luxembourg is not yet pending.  *See* Br. 24-35, 37 & n.10.  That, however, is

irrelevant under *Intel*, which held that a proceeding need only "be within reasonable

contemplation."  *Intel*, 542 U.S. at 259; *see also Consorcio*, 747 F.2d at 1270.  To

the degree Litai suggests that a criminal proceeding must be pending even though a

civil one need not, *see* Br. 37, nothing in § 1782 or *Intel* supports any such

distinction.

On the contrary, consistent with both the text of § 1782 and *Intel*, this Court has affirmed a § 1782 discovery order based on contemplated (but not yet filed) civil and criminal proceedings, making no distinction between them. *See Consorcio*, 747 F.3d at 1262 ("[Applicant] claims that it seeks the requested discovery for use in contemplated civil and <u>criminal</u> proceedings in Ecuador against its former employees. We agree that <u>these</u> contemplated proceedings satisfy section 1782.") (emphases added); *see also In re Application of Setraco Nigeria Ltd.*, No. 13-mc-1632, 2013 WL 3153902, at *2-3 (M.D. Fla. Jun. 19, 2013) ("Section 1782 is designed to support such contemplated claims, including civil and criminal proceedings to be initiated by a private party in a foreign tribunal, even when said proceedings are contemplated but have not yet commenced."); *In re Ex Parte Application of Jommi*, No. C 13–80212 CRB (EDL), 2013 WL 6058201, at *3 (N.D. Cal. Nov. 15, 2013) (granting § 1782 application for private complainant in a suspended Swiss criminal investigation); *In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020, 1028 (N.D. Ill. 2006) (noting that § 1782 "treats criminal and non-criminal proceedings identically because it says '*including* criminal investigations'") (citing statute) (court's emphasis).

### 2.  Furstenberg Can And Will File A Criminal Complaint With Damages Claim.

Litai's experts acknowledge that a party who alleges prejudice as a result of a criminal offense is entitled to file a criminal complaint with damages claim.  *See* A1-143 ¶ 43 (Prum) ("Any person that considers itself being the victim of a criminal offence (i.e., having suffered a prejudice resulting from such criminal offence) can, pursuant to Article 56 CIC file a criminal complaint together with a civil claim for damages . . . with the competent investigating magistrate.").  Litai is therefore relegated to arguing that Furstenberg has not suffered any direct damage or injury and that, as a result, its criminal complaint with damages claim will be dismissed. *See, e.g.,* Br. 44.  Litai's argument is, once again, both misdirected and incorrect.

### (a)  The U.S. Court Ought Not Resolve Whether Furstenberg's Injuries Are Direct Under Luxembourg Law.

As the District Court correctly recognized, the question of whether Furstenberg has suffered a sufficiently direct injury to maintain a criminal complaint with damages claim concerns the merits of the underlying action, which are properly resolved by the courts of Luxembourg, not in a § 1782 application.  A2-395-96.  Indeed, as discussed, this Court has explained that federal courts are not to consider the merits of the foreign dispute in a § 1782 action.  *See Consorcio*, 747 F.3d at 1268; *Bracha*, 2016 WL 5219862, at \*2; *see generally Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) ("We think that it is unwise—as

well as in tension with the aims of section 1782—for district judges to try to glean accepted practices and attitudes of other nations from what are likely to be conflicting and, perhaps, biased interpretations of foreign law."), *disagreed with on other grounds by Clerici*, 481 F.3d at 1333 n.10.

Nor does it matter that Litai attempts to characterize the directness of Furstenberg's damages as a procedural issue concerning Furstenberg's ability to maintain a criminal action in Luxembourg. *See* Br. 41-42. However characterized, the determination of whether Furstenberg's damages are direct or indirect raises questions of Luxembourg law to be decided by the Luxembourg courts. As such, it "reach[es] further into the underlying merits of the Applicants' claims than [federal courts are] required on a 1782 Application." A2-395 (District Court's decision). As the Third Circuit has stated, federal courts considering § 1782 applications "should neither decide technical questions of foreign law related to the subject-matter jurisdiction of foreign tribunals, nor determine the admissibility before such tribunals of evidence sought." *John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 136 (3d Cir. 1985) (citation and internal quotation marks omitted); *see also In re Imanagement Servs., Ltd.*, No. Misc. 05-89, 2005 WL 1959702, at *2 (E.D.N.Y. Aug. 16, 2005) (rejecting interpretation of § 1782 that would "require district courts to predict or construe the procedural substantive law of the foreign jurisdiction [to determine whether evidence would be admissible in a foreign forum], which would

place a 'significant burden on litigants and the federal district courts' and 'would seem to exceed the proper scope of section 1782'") (quoting *Euromepa*, 51 F.3d at 1099).

Indeed, in *Consorcio* itself, the district court declined to consider whether, as the respondent asserted, the applicant's contemplated criminal proceeding was time-barred under Ecuadorian law. In so doing, the district court stressed the "inherent danger of error in construing foreign laws." Dkt No. 1:10-mc-22320-DLG, Doc. 21, at 8 (S.D. Fla. Apr. 18, 2011) (quoting *In re Kasper-Ansermet*, 132 F.R.D. 622, 631 (D.N.J. 2011)). On appeal, neither did this Court examine the statute of limitations issue. *See* 747 F.3d 1262.

In sum, precedent is clear that courts should not consider the underlying merits of a § 1782 applicant's claims in the foreign forum, including the potentially abstruse questions of foreign substantive and procedural law that may be raised by such claims. That rule also reflects Congress's intent when it revised § 1782 in 1964. As the principal drafter of the 1964 amendments has explained, "making the extension of American assistance dependent on foreign law would open a veritable Pandora's box," and the drafters "definitely did not want to have a request for cooperation turn into an unduly expensive and time-consuming fight about foreign law." Hans Smit, *Recent Developments in International Litigation*, 35 S. Tex. L. Rev. 215, 235 (1994); *see also In re Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS*

*Forwarding (USA), Inc.*, 685 F.3d 987, 995 n.4 (11th Cir. 2012) (quoting *In re Letter of Request from the Crown Prosecution Serv. of the U.K.*, 870 F.2d 686, 689 (D.C. Cir. 1989) (citing Smit as "the dominant drafter of, and commentator on," the 1964 revisions)), *vacated on other grounds by* 747 F.3d 1262 (11th Cir. 2014). In short, Litai's attempt to mire Furstenberg's application in a "costly, time-consuming, and inherently unreliable" "foray into legal territories unfamiliar to [U.S. courts] . . . cannot possibly promote [the aims of Section 1782]." *Euromepa*, 51 F.3d at 1099-1100.

### (b)   Furstenberg Has Direct Damages Under Luxembourg Law.

Although it is not the proper inquiry under § 1782, the record is any event clear that the Furstenberg Applicants have direct damages under Luxembourg law such that they may maintain a criminal complaint with damages claim.

Under Luxembourg law, an <u>allegation</u> of direct prejudice is all that is needed to file the criminal complaint and initiate the criminal investigation. *See* A2-248-49 ¶ 5.2.1 (Grasso) (explaining that "the Luxembourg legislature clearly states that <u>it is sufficient to allege a prejudice</u> at this stage of the procedure") (emphasis in original) (discussing article 56 of the Luxembourg Code of Criminal Procedure). Indeed, even if the Furstenberg Applicants could not ultimately prove their damages, that would be no bar to the maintenance of the criminal proceeding. Under Luxembourg law, "companion civil claims and the criminal prosecutions run on different tracks,"

45

and "the criminal action will move forward regardless of the outcome of the civil claims." A2-252 ¶ 6.1.3.

Litai contends that Furstenberg's criminal complaint will be dismissed because, under Luxembourg law, shareholders do not have a claim for direct damages when the sole harm is to the company itself. *See* Br. 42-44. That principle is undisputed, but it is inapposite here. As Litai's own expert acknowledged, shareholders are entitled to bring a criminal complaint with damages claim for misuse of corporate assets "if they demonstrate a personal and direct damage other than the one suffered by the company itself." A1-242 ¶ 23 (Prum); *see also* A1-231 (Beissel). And it is undisputed that, under Luxembourg law, a shareholder suffers direct damages—separate from the injury to the corporation—if he suffers either reputational or moral harm. A2-251 ¶ 6.1.2 (Grasso) ("Whether shareholders of the company may be considered as direct injured parties . . . depends on . . . the evidence they may bring with regard to their personal and direct damage other than the one suffered by the company itself. . . . [S]uch prejudice may be material, financial, reputational, or even moral."); *see also* A2-255 ¶ 6 (Sabatier).

Here, the Furstenberg Applicants have suffered precisely such direct damages. As Grasso explained:

> In this case, it is clear to me that both Applicants can allege material, financial, reputational and/or moral damages in relation to the allegations against [Paul]. This will include not merely the act of purchasing and selling shares at

46

> wrongful prices, but also <u>the reputational damages that</u>
> <u>will come from their associations with [Paul] and Acheron</u>
> <u>in Luxembourg and in London, as director of Acheron and</u>
> <u>advisor of Acheron (London)</u> . . . .

A2-251-252 ¶ 6.1.2 (emphasis added); *see also* A2-256 ¶ 8 (Sabatier).

As such, Litai mischaracterizes the record when it states that the Furstenberg Applicants' only claim to damages is based on the valuation of their shares. *See* Br. 39, 44. In the proceedings below, the Furstenberg Applicants specifically alleged that they had suffered reputational damages based on their associations with Paul and Acheron (*see, e.g.,* DE 25:3), and they supported their position with the declarations of Grasso and Sabatier. Whether or not they can ultimately prove them, the Furstenberg Applicants have a valid basis for alleging direct damages, which is all that is necessary for their criminal complaint with damages claim to proceed. A2-252 ¶ 6.1.3.

Litai cannot point to anything in the record that contradicts Furstenberg's experts' conclusions. On appeal, Litai relies principally on materials it did not properly submit to the District Court, including: (a) excerpts from a treatise on Luxembourg criminal procedure submitted with Litai's sur-reply, even though the sur-reply was rejected by the District Court as procedurally improper, *see supra* at 16; and (b) translations of certain Luxembourg cases that it included in the Appendix to this Court, but which it never submitted to the District Court. *See* Br. 41-43. These new materials should not be considered. *See Butterworth v. Bowen*, 796 F.2d

47

1379, 1387 (11th Cir. 1986) ("This court generally will not consider material that has not been considered by the court below, especially when a party has submitted such material without requesting leave to do so or filing a motion to supplement the record."). However, even if they were considered, the new materials would be of no help to Litai.

The treatise and the translated cases merely echo the principle that shareholders must suffer a harm distinct from the company. To the extent Litai suggests that shareholders of a company may never bring a criminal complaint with damages claim against the company's directors, that results from Litai's misquoting its own certified translation of the treatise. *Compare* A2-381 (treatise) ("Without any personal harm the shareholders of a company are not admitted to be a civil party in an investigation against the administrators . . . ") *with* Br. 42 ("'It is for the lack of personal damage that the shareholders of a company have no standing to constitute themselves as a plaintiff in the claims targeted against the directors of a company . . . .'") (misquoting treatise).

Litai also presented a second Prum declaration with its sur-reply. Litai clearly cannot rely on that declaration, however, both because "[a]ffidavits outside the record cannot be considered on appeal," *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 609-10 (11th Cir. 1991), and because Litai did not rely on the affidavit in its opening brief. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005)

48

("As we repeatedly have admonished, 'arguments raised for the first time in a reply brief are not properly before a reviewing court.'") (citation and alterations omitted). In any case, the second Prum declaration appears to acknowledge that shareholders who suffer a reputational injury may file a criminal complaint with damages claim. *See* A2-375 ¶ 12.  Prum merely contended that Furstenberg's expert "fails to explain what these damages are, or how they differ from the damages suffered by the collectivity of the shareholders and/or the company itself."  *Id*.  However, Furstenberg (and its expert) <u>did</u> explain that they have suffered reputational damages, which are individualized in nature because they stem from their personal associations "with [Paul and Acheron] in Luxembourg [and] London."  A2-251 ¶ 6.1.2; *see also* A2-256 ¶ 8.

In sum, the Furstenberg Applicants have alleged the type of direct injury that will permit them to file a criminal complaint with damages claim under Luxembourg law.  And, the direct criminal action initiated by such a complaint constitutes a "proceeding in a foreign or international tribunal" for purposes of § 1782.

### B.   The Undisputed Availability Of A Denunciation Independently Shows That A Foreign Proceeding Is Reasonably Contemplated.

Even if Litai were correct that Furstenberg cannot maintain a criminal complaint with damages claim, all experts agree—and Litai concedes—that Furstenberg is entitled to file a *dénonciation*, i.e., a denunciation, under Luxembourg law.  *See, e.g.*, A2-247, 252-53 ¶¶ 5.1.6, 6.1.4.2 (Grasso); A2-255 ¶ 3 (Sabatier);

A1-231 ¶ 6 (Beissel); A1-238 ¶ 5 (Prum). As the District Court concluded, Furstenberg's ability to file a denunciation independently supports a finding that a "proceeding in a foreign . . . tribunal" is "reasonably contemplated." *See* A2-400-01.

Litai likens a denunciation to a police report, but that analogy is inapt and ignores the fundamentally participatory nature of the Luxembourg criminal system. *See* A2-256 ¶ 25 (Sabatier). A denunciation may be filed directly before a State Prosecutor, *see* A2-247 ¶ 5.1.6 (Grasso), who, under the Luxembourg criminal system, is a member of the judiciary. A2-259 ¶ 26 (Sabatier); *see also* A2-252 ¶ 6.1.4.1 (Grasso) (explaining that the State Prosecutor "is a member of the magistrates under the Luxembourg division of power" and "presenting before a State Prosecutor can be looked upon as akin to presenting directly to a judge in the United States"). In addition, if the State Prosecutor declines to open a formal investigation as a result of the denunciation, the decision is appealable. A2-253 ¶ 6.1.4.2 (Grasso); *see also* A2-400 (District Court opinion). On the other hand, if the State Prosecutor opens an investigation, such an investigation is carried out by a *juge d'instruction*. *See* A1-240 ¶¶ 12-13 (Prum).

Because a State Prosecutor in the Luxembourg criminal justice system is in several respects akin to a magistrate in the U.S. criminal justice system and indeed is classified as a magistrate under Luxembourg law, the State Prosecutor's initial

inquiry qualifies as a "proceeding in a foreign . . . tribunal" for purposes of § 1782. *See Intel*, 542 U.S. at 258 ("[T]he term 'tribunal' includes investigating magistrates."); *In re Berlamont*, No. 14-mc-001900, 2014 WL 3893953, at *1 (S.D.N.Y. Aug. 4, 2014) (Rakoff, J.) ("A complaining witness's presentation of evidence to an investigating magistrate satisfies the 'for use' prong of § 1782."), *aff'd sub nom In re Application for an Order Pursuant to 28 U.S.C. 1782,* 773 F.3d 456.

Litai argues that this case is similar to the Second Circuit's decision in *Certain Funds* because "[w]hile the Applicants claim they intend to submit evidence to the public prosecutor, that only establishes their 'hope that it might be used' by the public prosecutor."  Br. 45-46 (citing *Certain Funds*, 798 F.3d at 123).  *Certain Funds*, however, "turned on the fact that the [applicants] were one step removed from the foreign proceedings" in that "they were not themselves parties to the proceedings and they had no right to submit evidence directly to the tribunal."  *In re Application of Accent Delight Int'l Ltd.*, No. 16-mc-125, 2016 WL 5818597, at *2 (S.D.N.Y. Oct. 5, 2016).  Here, by contrast, the Furstenberg Applicants will be submitting evidence directly to the magistrate, not relying on a third party to furnish the information to the magistrate.

In any case, even if the State Prosecutor's initial inquiry were not itself a "proceeding in a foreign . . . tribunal" for purposes of § 1782, such a foreign

proceeding is still "within reasonable contemplation."   The Supreme Court's decision in *Intel* is instructive.  There, the § 1782 applicant had filed an antitrust complaint against Intel with the Directorate-General for Competition ("DG-Competition") of the European Commission (the "Commission").  542 U.S. at 250. Upon receipt of a complaint, the DG-Competition conducts a "preliminary investigation," during which it "may take into account information provided by a complainant."   *Id.* at 254.   "'Ultimately, [the DG-Competition's] preliminary investigation results in a formal written decision whether to pursue the complaint.'" *Id.* (citation omitted).  If the DG-Competition declines to proceed, that decision is subject to appeal; if it decides to pursue the complaint, it makes a recommendation to the Commission, which "may 'dismiss the complaint, or issue a decision finding infringement and imposing penalties.'"  *Id.* at 255 (citation omitted).

Through its § 1782 application, the applicant in *Intel* sought discovery "[i]n pursuit of [its] complaint."  *Id.* at 246.  Contrary to Litai's mischaracterization, there was no "ongoing adjudicative proceeding" before the Commission at the time of the application in *Intel*.  *See* Br. 27.  Rather, the complaint had not progressed beyond the preliminary investigative stage (conducted by the DG-Competition).  *See Intel*, 542 U.S. at 258.  Nevertheless, the Supreme Court concluded that § 1782 authorized discovery assistance.

Noting the statutory history outlined above and the fact that "Congress understood the [1964 amendments] to 'provide the possibility of U.S. judicial assistance in connection with [administrative and quasi-judicial proceedings abroad]," the Court held that "to the extent it acts as a first-instance decisionmaker" on the DG-Competition's recommendation, the Commission is a tribunal for purposes of the statute. *Id.* at 258 (citation and alterations omitted). While a proceeding before that tribunal was not yet pending, the Court explained that such a proceeding need not be pending or even imminent, but rather need only "be within reasonable contemplation." *Id*. at 259.

The analogy between a denunciation in the present case and the complaint in *Intel* is straightforward. The State Prosecutor is (at a minimum) akin to the DG-Competition; each conducts a preliminary investigation and each decides whether or not to pursue the claim. In both cases, a decision not to proceed is appealable by the complainant. And, in both cases, a decision to proceed also unquestionably leads to a "proceeding before a foreign or international tribunal"—the *juge d'instruction* here, the Commission in *Intel*. Thus, application of *Intel* inevitably leads to the conclusion that "a proceeding before a foreign or international tribunal" is "within reasonable contemplation" in this case. As the dissent in *Intel* recognized, "[s]ome countries allow a private citizen to ask a court to review a criminal prosecutor's decision not to prosecute. On the majority's reading, that foreign private citizen

53

could ask an American court to help the citizen obtain information, even if the foreign prosecutor were indifferent or unreceptive."  542 U.S. at 267 (Breyer, J., dissenting).

## III.   The Furstenberg Applicants Are "Interested Persons."

The District Court correctly held that the Furstenberg Applicants are "interested persons" for purposes of § 1782.  A2-394-97.  Litai's cursory challenge to that conclusion, Br. 47, lacks merit.

Litai contends that the Furstenberg Applicants are not "interested persons" because Applicants supposedly do not have standing to file civil shareholder claims against Acheron's board members, and previously discharged such claims.  Br. 47. Those points are irrelevant, however, because the Furstenberg Applicants have made clear that they do not intend to bring a civil case, and, in Luxembourg, any waiver (assuming *arguendo* it is valid) would not apply to the criminal complaint they intend to file.  A1-156 ¶ 16.

Equally unavailing is Litai's other argument, *viz.*, that the Furstenberg Applicants are not interested parties because they "lack any evidence to attempt to trigger a criminal investigation without obtaining such evidence through a Section 1782 petition."  Br. 47.  First, Litai did not advance this argument below, so it is waived.  *See, e.g.*, *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).  Second, Litai's assertion mischaracterizes the record, which already

contains substantial evidence supporting Furstenberg's allegations of Paul's wrongdoing, evidence discussed at length above. *See supra* at 4, 6, 8-10, 13.  Third, this Court has in any event already held that § 1782 may be used to allow an applicant to determine whether to initiate foreign proceedings, *see Bracha Found.*, 2016 WL 5219862, at *7; and, fourth, the amount of evidence the Furstenberg Applicants already possess is simply irrelevant to whether they are "interested person[s]" within the meaning of § 1782.

The Supreme Court has broadly interpreted the term "interested person," holding that it "plainly reaches beyond the universe of persons designated 'litigant.'" *Intel*, 542 U.S. at 256.  The Court explained that § 1782's reference to "any interested person" is intended to include "'. . . not only litigants . . . , but also . . . any other person . . . [that] merely possess[es] a <u>reasonable interest</u> in obtaining the [§ 1782 discovery] assistance.'" *Id*. at 256-57 (quoting Smit, *International Litigation*, *supra*, at 1027) (emphasis added).  As Litai concedes, a party meets this standard if it has "'participation rights' and could submit evidence" in the foreign proceeding.  Litai Br. 47 (quoting *Intel*, 542 U.S. at 256).  That does not mean, however, that any particular type of "participation rights" are required for a party to be an "interested person."  As the Second Circuit has observed, *Intel* "did not lay down minimum requirements or tests to be met in determining whether the party seeking discovery is an 'interested person' or whether the discovery is sought 'for use' in a foreign

proceeding"; rather "[t]he Court appeared to regard the case before it as an easy one." *Certain Funds*, 798 F.3d at 118.

This, like *Intel*, is ultimately an easy case, because as the District Court recognized, "Applicants have provided an expert who states that under Luxembourg law, Applicants can bring a criminal action against [Paul]," and that they would have "participation rights" in such an action. A2-397.[5] As such, they are "interested persons" within the meaning of § 1782. *Intel*, 542 U.S. at 246; *see also Weber v. Finker*, 554 F.3d 1379, 1384 (11th Cir. 2009) ("Congress clearly intended for § 1782 to facilitate discovery by individuals for use in foreign criminal actions.").

## CONCLUSION

The District Court's order should be affirmed.

Dated:  December 12, 2016

Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ *Philip E. Rothschild*
Philip E. Rothschild, Esq.
HOLLAND & KNIGHT LLP

---

[5] Further, even if (counterfactually) the Furstenberg Applicants could only file a denunciation, they would still have the right to submit evidence to the State Prosecutor—a type of magistrate under Luxembourg law—and could appeal any adverse decision by the State Prosecutor as to whether to open a formal investigation. *See* A2-253 ¶ 6.1.4.2; A2-400.

515 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 525-1000
Fax: (954) 463-2030
Email: phil.rothschild@hklaw.com

*/s/ Warren E. Gluck*
Warren E. Gluck, Esq.
Samuel Spital, Esq.
Sean Barry, Esq.
Stosh Silivos, Esq.
Elliot Magruder, Esq.
HOLLAND & KNIGHT LLP
31 W. 52nd St.
New York, NY 10019
Tel: (212) 513-3200
Fax:(212) 385-9010
Email:    warren.gluck@hklaw.com
          samuel.spital@hklaw.com
          sean.barry@hklaw.com
          stosh.silivos@hklaw.com
          elliot.magruder@hklaw.com

*Attorneys for Applicants-Appellees*
*Furstenberg Finance SAS and Marc*
*Bataillon*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of the Court's Order of December 9, 2016 (docket text granting Appellees' motion to file brief under prior rules governing word limits) because this brief contains a total of 13,129 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on this 12th day of December, 2016.

*/s/ Philip E. Rothschild*
Philip E. Rothschild

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel for the Appellant via transmission of Notices of Electronic Filing generated by CM/ECF.


<u>/s/ Philip E. Rothschild</u>
Philip E. Rothschild

# EXHIBIT 50

No. 16-15664-D
Lower Ct. Case No. 16-mc-60266-Bloom

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

In re: Application of FURSTENBERG FINANCE SAS
and MARC BATAILLON, for an Ex Parte Order Granting
Discovery Pursuant to 28 U.S.C. 1782
(LITAI ASSETS LLC, Intervenor-Appellant)

_____

On Appeal from the United States District Court
for the Southern District of Florida
_____

_____

Reply Brief of Appellant Litai Assets LLC
_____

Jeffrey W. Gutchess                     Thomas R. Julin
Daniel Tropin                           Fla. Bar No. 325 376
Fla. Bar Nos. 702641& 100424

AXS Law Group                           Gunster Yoakley & Stewart PA
*Attorneys for the Respondents*         600 Brickell Avenue Suite 3500
1850 Purdy Avenue                       Miami, FL 33131
Miami, Florida 33139                    305-376-6007 Fax 6010
(305) 389-3646                          tjulin@gunster.com
jeff@axslawgroup.com
dan@axslawgroup.com

Furstenberg Finance SAS v. Litai Assets LLC
Case No. 16-15664-D

CERTIFICATE OF INTERESTED PERSONS
<u>& CORPORATE DISCLOSURE STATEMENT</u>

Counsel for Appellants, Litai Assets LLC, hereby certify, to the best of their

knowledge, that the following is a complete list of the persons and entities that

have an interest in the outcome of this case:

Acheron Capital Limited

Acheron Portfolio Corporation (Luxembourg) S.A.

Ahmose S.A.

Arendt & Medernach

AXS Law Group PLLC

Bataillon, Marc

Beissel, Pierre

Bloom, Beth, Hon., United States District Court Judge

Bonnet, Erich

Furstenberg Capital SCA

Furstenberg Finance SAS

Furstenberg Sarl

Gluck, Warren E.

Grasso, Rosario

Gunster Yoakley & Stewart, P.A.

C-1-of-2

Furstenberg Finance SAS v. Litai Assets LLC
Case No. 16-15664-D

Gutchess, Jeffrey W.

Holland & Knight

Julin, Thomas R.

Kalfon, Eric

Kleyr Grasso

Litai Assets LLC

Nauta Dutilh

Paul, Jean-Michel

Quattromani, Lauren

Rothschild, Philip E.

Prum, Francois

Samuel, Jan-Eric

Sabatier, Roman

Tropin, Daniel E.

Turk & Prum

No publicly traded company or corporation has an interest in the outcome of the case or appeal.

s/ *Jeffrey W. Gutchess*
Jeffrey W. Gutchess

C-2-of-2

## STATEMENT REGARDING ORAL ARGUMENT

Appellant, Litai Assets LLC ("Litai"), previously requested oral argument because applications for discovery pursuant to 28 U.S.C. 1782 are regularly being sought for tactical reasons to coerce private parties to settle disputes that are not and that never would or could become proceedings in a foreign or international tribunal. Litai renews this request.

<u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS
& CORPORATE DISCLOSURE STATEMENT ..........................................C1-of-2

STATEMENT REGARDING ORAL ARGUMENT .................................................i

TABLE OF CONTENTS......................................................................... ii

TABLE OF CITATIONS .........................................................................iv

INTRODUCTION .................................................................................1

I.  The Applicants brought this Proceeding to Pressure Dr. Paul to Purchase
    their Shares at an Inflated Price. .....................................................3

II.  The Applicants Have Conceded that, as Shareholders,
     They Do Not Have Direct Financial Damages that Would Allow
     Them to File a Criminal Complaint with a Claim for Civil Damages ............5

III.  The Applicants Have Not Suffered Any
      Reputational Damages that Would Enable
      Them to Trigger a Criminal Investigation.......................................7

IV.  The Applicants Ability to File a Denunciation – a Police Report –
     Does Not Support Their Obtaining Discovery Under Section 1782.............10

V.  The Luxembourg State Prosecutor Does Not Qualify as a Tribunal.............13

VI.  This Court Must Consider Relevant
     Luxembourg Law that Bears Upon Whether There
     are Reliable Indications that a Proceeding Can be Filed...............................14

VII.  The Applicants Misstate the Standard of Review .........................................19

VIII. The Applicants Have Failed to Show Reliable
      Indications of the Likelihood that Proceedings
      Will be Instituted within a Reasonable Time .................................20

CONCLUSION....................................................................................22

ii

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) and 27(d)......................23

CERTIFICATE OF SERVICE ...............................................................................23

TABLE OF CITATIONS

Cases                                                                    Page(s)

*907 Whitehead St., Inc. v. Sec. of U.S. Dept. of Agric.*,
    701 F.3d 1345 (11th Cir. 2012) ........................................................20

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS
    Forwarding (USA), Inc.*,
    747 F.3d 1262 (11th Cir. 2014) ................................................. 15, 17

*Butterworth v. Bowen*,
    796 F.2d 1379 (11th Cir. 1986) ........................................................18

*F.D.I.C. v. Schuchmann*,
    235 F.3d 1217 (10th Cir. 2000) ........................................................18

*Garza v. Hudson*,
    436 Fed. Appx. 924 (11th Cir. 2011) ...............................................20

*Gilliland v. Air Line Pilots Ass'n Intern.*,
    741 F. Supp.2d 1334, (N.D. Ga., 2009) ............................................18

*Harris v. Schonbrun*,
    773 F.3d 1180 (11th Cir. 2014) ................................................. 19, 20

*Heraeus Kulzer, GmbH v. Biomet, Inc.*,
    633 F.3d 591 (7th Cir. 2011) .............................................................4

*In re Application for an Order Pursuant to 28 U.S.C. 1782
    to Conduct Discovery for Use in Foreign Proceedings*,
    773 F.3d 456 (2d Cir. 2014) .............................................................19

*In re Kivisto*,
    521 Fed. Appx. 886 (11th Cir. 2013) .................................................4

*In re Letter of Request from Crown Prosecution Serv. of United Kingdom*,
    870 F.2d 686 (D.C. Cir. 1989).............................................................3

*In re Pinchuk*,
    2014 WL 1328484 (S.D. Fla. March 31, 2014) .................................17

iv

*In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*,
848 F.2d 1151 (11th Cir. 1988) ................................................................3

*Meyers v. Kishimoto*,
--- F.Supp.3d ----, 2016 WL 6818380 (D. Conn. Nov. 17, 2016) ........................18

*Royalty Network, Inc. v. Harris*,
756 F.3d 1351 (11th Cir. 2014) ................................................................20

*United States v. Booker*,
2009 WL 1608289 (N.D. Fla. June 9, 2009) ...........................................19

*United States v. Cruickshank*,
837 F.3d 1182 (11th Cir. 2016) ................................................................20

*Warth v. Seldin*,
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) .........................................16

*Williams v. Homestake Mortg. Co.*,
968 F.2d 1137 (11th Cir.1992) ................................................................20

Statutes

28 U.S.C. § 1782 ................................................................ *passim*

Rules

Fed. R. App. P. 32(a)(5) ................................................................23

Fed. R. App. P. 32(a)(6) ................................................................23

Fed. R. App. P. 32(a)(7)(B) ................................................................23

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................................23

Fed. R. Civ. P. 44.1 ................................................................18

<u>INTRODUCTION</u>

Section 1782, 28 U.S.C., was never intended by Congress to open up U.S. companies to intrusive, invasive, expensive discovery merely to aid foreign nationals who claim they need evidence to lobby foreign prosecutors to launch criminal investigations.  And it certainly was never intended to aid foreign nationals engage in frivolous and vexatious litigation and abuse of process – against the very target of the discovery they claim to be seeking in the United States – to seek information in this country in the hopes of filing frivolous actions abroad. Yet that is exactly what is happening here.

The Applicants, minority (<1%) shareholders in a publicly traded Luxembourg company, admit they cannot file civil claims against the company's director in Luxembourg because they cannot claim any damages distinct from the company or other shareholders.  They have now additionally admitted that, for the same reason, they cannot trigger a criminal investigation by filing a criminal complaint with a claim for civil damages based upon any alleged monetary harm.

Having admitted that they cannot file a civil or criminal proceeding for damages, Applicants' now claim that they can allege they have suffered "reputational" injury by – in one case being minority (<1%) shareholders in a publicly traded company and in the other case being a minority shareholder of a minority shareholder of a publicly traded company – that has a director with an

alleged conflict of interest, which they plan to disclose if the discovery they seek pursuant to section 1782 confirms their suspicions.

They do not explain how that "reputational" injury is distinct from the "reputational" damage that would be suffered by the company or other shareholders, nor how they could suffer such damage unless inflicted upon themselves by making these baseless allegations. They cite not a single authority supporting their position, and the case law in Luxembourg clearly states any claim they file on the basis that as shareholders they suffered reputational damages will be dismissed out of hand without even triggering an investigation.

The Applicants' back-up argument is that any foreign national who intends to file a police report is entitled to use section 1782 in order to determine if they can develop evidence that would support filing such a report. Dr. Jean-Michel Paul is a director of the publicly traded Luxembourg company in which applicant Furstenberg Finance SAS owns shares, and in which applicant Marc Bataillon is a shareholder-once-removed, and is the ultimate target of the section 1782 discovery. These are the Applicants that have admitted they are pressuring Dr. Jean-Michel Paul to pay them above market prices for Applicants' shares in the companies they jointly own. This is classic abuse of section 1782.

Applicants have failed to demonstrate any reliable indications that they will, or will be able to, trigger any criminal proceeding in Luxembourg and there is

ample evidence that this action is being used for improper purposes. Accordingly, this Court should vacate the judgment of the District Court and remand the case with directions to deny the application.

I.

The Applicants' brought this Proceeding to Pressure Dr. Paul
to Purchase their Shares at an Inflated Price

Justice Ginsburg warned that, when section 1782 discovery is sought prior to the filing of an action, the district court must take special precautions to "guard against abuse of section 1782…"[1] This Court likewise has emphasized a section 1782 petition filed before any foreign action is commenced should be denied if "the judge doubts that a proceeding is forthcoming, or suspects that the request is a 'fishing expedition' or a vehicle for harassment …."[2] This Court recently quoted that same language again and reaffirmed its holding that, to prevent abuse: "We expect 'the district [court] [to] carefully examine and give thoughtful deliberation to any request for assistance submitted by an interested person' and 'deny the

---

[1]  *In re Letter of Request from Crown Prosecution Serv. of United Kingdom*, 870 F.2d 686, 692 (D.C. Cir. 1989) (Ginsburg, J.).

[2]  *In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*, 848 F.2d 1151, 1155 (11th Cir. 1988) (hereinafter "*Trinidad & Tobago*"), *abrogated by Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).

-3-

request' when it 'suspects that the request is … a vehicle for harassment.'"[3]

This case presents even greater danger of abuse since the Applicants are minority shareholders (owning less than 1%)[4] of a publicly-traded Luxembourg company, Acheron Portfolio Company S.A. (Acheron), who admit that they have no standing to file civil claims in Luxembourg against one of Acheron's directors, Dr. Jean-Michel Paul ("Dr. Paul").

In its opening brief, Litai argued that the Applicants had no true intention – or ability – to file a criminal complaint against Dr. Paul but were rather abusing section 1782 as part of a broader effort that included three actions in Luxembourg involving Dr. Paul and his related entities, all intended to "pressure" Dr. Paul into "purchas[ing] the Applicants shareholding interest in Ahmose and Acheron" at "a price that was a significant multiple above the market rate," something that Dr. Paul rejected because, among other reasons, he believed it to be illegal. *See* Brief of Appellant Litai Assets LLC ("Litai Br.") at 19.

---

[3] *In re Kivisto*, 521 Fed. Appx. 886, 887 (11th Cir. 2013) (*quoting Trinidad and Tobago*, 848 F.2d at 1156). The Seventh Circuit also has recently cautioned that "district courts must be alert for potential abuses that would warrant a denial of an application to be allowed to take such discovery." *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591 (7th Cir. 2011).

[4] Applicant Bataillon is not a direct shareholder of Acheron. He is one of a number of shareholders of Amhose s.a., and it is Amhose s.a. that owns shares in Acheron. Bataillon is therefore one extra step removed from having any damage claim.

In response, the Applicants did not contest that they had pressured Dr. Paul to purchase their shares at above-market prices. Instead, they admitted that, as part of that litigation, they were demanding that Dr. Paul purchase their shares at above-market prices, but claimed that if they were "to ever receive information that a share-premium transaction was not lawful, [they] would never pursue the same." *See* Brief for Plaintiffs-Appellees ("Applicants' Br.") at 15.

This Court should "guard against abuse of section 1782" and to "carefully examine and give thoughtful deliberation" to the Applicants' claims. That necessarily includes examining the Applicants' claims (a) that they have any ability to file a criminal complaint with a civil claim for damages, or (b) that the mere filing of a "denunciation" is sufficient to warrant section 1782 discovery.

## II.

### The Applicants Have Conceded that, as Shareholders, They Do Not Have Direct Financial Damages that Would Allow Them to File a Criminal Complaint with a Claim for Civil Damages

Litai has explained that the Applicants do not have the ability to even trigger a criminal investigation in Luxembourg because they, as minority shareholders, have not suffered any "direct damage" that would enable them to trigger a criminal investigation by filing a "criminal complaint with a claim for civil damages" because such a claim would be dismissed by the Luxembourg courts. Litai Br. at 41-45.

-5-

In support of that argument, Litai submitted four judicial opinions from Luxembourg courts holding that shareholders do not, as a matter of law, suffer the type of injury that provides them with any standing to file a criminal complaint with a civil claim for damages.[5] Litai also submitted copies of Luxembourg's leading treatise on criminal procedure.[6]

In response, the Applicants do not cite a single judicial opinion or a single treatise or article supporting their claim that they could file a criminal complaint with a claim for civil damages. Instead, the Applicants concede the point. In the Applicants' own words:

> Litai contends that Furstenberg's criminal complaint will be dismissed because, under Luxembourg law, shareholders do not have a claim for direct damages when the sole harm is to the company itself. *See* Br. 42-44. **That principle is undisputed**, but it is inapposite here.

Applicants' Br. at 46.

This concession is consistent with the Applicants' pattern of making unsupported claims and then backing off them when confronted with the actual

---

[5]    *See* A. 404-442 (Ordonnance de Non Informer 30013/15/CD (Cabinet d'Instruction Feb. 22, 2016); Dkt. No. 36517 (Lux. App. July 15, 2014); (Lux. Dist. Ct. Feb. 15, 2012); *In re Luxalpha SICAV Liquidation*, Nos. 309/10, 312/10, 318/10 (Lux. Dist. Ct. Mar. 4, 2010), confirmed, Dkt. No. 36516, (Lux. App. July 15, 2014), *confirmed*, Decision No. 67/15, Dkt. No. 3509 (Lux. Ct. de Cassation July 2, 2015)).

[6]    *See Gaston Vogel & Frédéric Mioli, Lexique de Procédure Pénale de Droit Luxembourgeois* at 20 (Larcier 3rd ed. 2009, ISBN 9782804433376).

law.  The Applicants first claimed they intended to file "civil and criminal claims."

When confronted with the law, they admitted they had no basis for civil claims, but

claimed they could trigger a criminal investigation by filing a criminal complaint

with a request for civil damages.  When confronted with the case law saying a

shareholder's financial damages are not direct and not distinct from the company's

damages, and so cannot support such a claim, the Applicants abandoned that

argument too.

III.

The Applicants Have Not Suffered Any Reputational
<u>Damages that Would Enable Them to Trigger a Criminal Investigation</u>

Instead of arguing that they suffered any financial damage from Dr. Paul's

alleged conflict of interest, the Applicants now argue that they will suffer

"reputational damages that will come from their associations with [Dr. Paul] and

Acheron in Luxembourg and in London, as director of Acheron and advisor of

Acheron (London) . . ."  They argue that these damages are "individualized in

nature because they stem from their personal associations "with [Dr. Paul and

Acheron] in Luxembourg [and] London."  Applicants' Br. at 49.

The Applicants have not explained how they suffered any reputational

injury, let alone how these damages would be separate and distinct from

reputational damages suffered by the company, Acheron, and its other

shareholders.    Like their claim of financial damages, shareholders suffer no

-7-

reputational damages that are different from the company and so, to use the Applicants' own words: "Furstenberg's criminal complaint will be dismissed because, under Luxembourg law, shareholders do not have a claim for direct damages when the sole harm is to the company itself."  Applicants' Br. at 46.

In fact, that was exactly the result that was reached in the *In re Luxalpha SICAV Liquidation,* case that Litai already cited.  A. 434-442. There, the plaintiff, a French company, as a shareholder of a Luxembourg company, brought an action before the *Tribunal d'arrondissement de Luxembourg* sitting in commercial matters, against the directors of the Luxembourg investment company.  The plaintiff claimed both, (i) loss of value of the shares owned in the investment company and (ii) a moral damage linked to the loss of reputation among financial professionals, clients and investors.

The Court held that a shareholder who is suing a director of a company claiming reputational damages really is claiming that the damage made to a commercial company's reputation resulted in customers fleeing or turning away, which is a financial loss, and so the reputational damage claim cannot be distinguished from the financial damage claim.  See A. 442.

On that basis, the *Tribunal d'arrondissement de Luxembourg* held that a claim of reputational damage, in the context of the alleged loss in the investments made in the company, does not "have a sufficiently concrete and autonomous

existence from the inconvenience linked to the material losses." A. 442. The court therefore held the claim inadmissible and dismissed it on the ground that the plaintiff failed to allege how such damage could be distinguished from the damage to the company. *Id.* *See also* A. 431 (likewise dismissing claim of reputational damage).

The Applicants here likewise have not specified what their claimed reputational damages are or how those damages would be different from any reputational damages that would be suffered by the company or other shareholders, and so the claim they say they will make will likewise be held inadmissible and dismissed.

Second, the Applicants have not suffered any reputational damage as no one other than the Applicants has alleged any wrongdoing by Dr. Paul. In other words, there is no reputational damage currently from being associated with Dr. Paul. Instead, the Applicants seek to create "reputational damage" by filing a criminal complaint against Dr. Paul. Hypothetically, they could suffer reputational damage only by obtaining evidence through this proceeding, using it to file a criminal complaint, persuading a Luxembourg prosecutor to begin a criminal investigation, obtaining thereafter permission to file a criminal action, and subsequently winning a conviction. It is only at that hypothetical point, some many years in a hypothetical distant future, that the Applicants could allege they "suffered" some

sort of reputational injury by having been minority shareholders in Acheron.

Since the Applicants have not suffered any reputational damages, they cannot use the claim that at some point in the future they may suffer such damages to support a criminal complaint with a civil claim for damages. That likewise would be held inadmissible and dismissed.

IV.

The Applicants' Ability to File a Denunciation – a Police Report –
Does Not Support Their Obtaining Discovery Under Section 1782

With no right to file a non-frivolous criminal complaint with a claim to civil damages, the Applicants' entitlement to section 1782 discovery depends entirely on their argument that they intend to file a "denunciation" if they discover evidence of wrongdoing through this proceeding.

A "denunciation" is simply an act by which a person brings to the attention of the authorities an infraction to which he was witness but that does not concern him directly as a victim. As the Applicants admit, the filing of a "denunciation" does not open or begin a criminal investigation. In fact, the Applicants agree that most denunciations do not result in the opening of an investigation, let alone the filing of any criminal charges. DE 25-8.

Instead, the prosecutor examines the denunciation and makes a decision as to whether they will begin an investigation. Often if the prosecutor decides not to open an investigation, the person making the denunciation is not even informed of

-10-

that decision.   For example, if the person making the denunciation is deemed to merely be a witness to the claimed crime, having suffered no direct damages, that person will not be informed of any decision.  It is only if the person making the denunciation is a "victim" of the crime that the said person will be informed of whether an investigation is begun. A. 247-48 (Grasso). Here, as demonstrated above, having no claim to have suffered damages as minority shareholders that are distinct from the company, the Applicants are not victims of the crime they hope to show occurred through the 1782 discovery.[7]

The Applicants assert that filing a "denunciation" would "allow them to present evidence directly to the State Prosecutor."  Applicants' Br. at 52.  The Applicants provide no citation for that statement nor is there any. To the contrary, as the Applicants' expert conceded, while a person "may make a denunciation of a criminal offense to the police or to the State Prosecutor[,] [s]uch person **will not be entitled to intervene in the criminal proceedings"** and, at most, "may be

_____

[7]    Thus, this is the primary example of how no action, and no investigation, is even "reasonably contemplated." The only person who could even start such an investigation, the Luxembourg prosecutor, has never even heard of Dr. Paul, let alone is contemplating starting an investigation of him.   The fact that the Applicants claim to hope to discover information from Litai that will enable them to convince some prosecutor to do so does not change the fact that no action or investigation is reasonably contemplated by any prosecutor at this point.

AXS LAW GROUP / GUNSTER YOAKLEY & STEWART PA

summoned to appear as a witness." A 247. [8]

The Applicants also wrongly argue that "if the State Prosecutor declines to open a formal investigation as a result of the denunciation, the decision is appealable." Applicants' Br. at 50. That also is wrong. If the Applicants are not even informed of the decision not to investigate, they will have no way to appeal.

There is no formal mechanism for a person who makes a denunciation to file an appeal of a decision not to investigate. Rather, the Applicants' Luxembourg Counsel merely stated that the person making the denunciation could "write or even meet the magistrate in charge of the public prosecutor's office in order to get a favourable decision to set in motion public prosecution" or appeal to the "General State Prosecutor" who has "authority over all the prosecution magistrates, the latter could order the State Prosecutor to prosecute." A. 253 (Grasso 6.1.4.2).

In other words, once the Applicants make a denunciation, they can keep seeking to meet with the State prosecutor, the magistrates in charge or the "General State Prosecutor" trying to convince them to open an investigation. No one ever

---

[8]    The Applicants also argue that the "Luxembourg criminal system" has a "fundamentally participatory nature," citing paragraph 25 of their civil law expert's declaration. See A2-256 ¶ 25 (Sabatier)). However, the cited paragraph of the Sabatier Declaration says nothing about the "participatory nature of" a denunciation. Likewise, the Applicants' criminal expert, Mr. Grasso, said nothing about the Applicants' ability to intervene in an investigation after filing a denunciation, or to participate in an investigation after filing a denunciation.

-12-

said that the Applicants could not make pests of themselves in begging a third party to start a criminal investigation, but that ability does not support a section 1782 order for discovery.

## V.

### The Luxembourg State Prosecutor Does Not Qualify as a Tribunal

The Applicants argue that their mere filing of a "denunciation" with a public prosecutor satisfies section 1782 because a public prosecutor is a "member of the magistrates under the Luxembourg division of power" and therefore, "presenting before a State Prosecutor can be looked upon as akin to presenting directly to a judge in the United States…" Applicants' Br. at 50 (citing A2-252 ¶ 6.1.4.1).

The Applicants then cite the *Intel* decision, which noted that the EU Commission was akin to a Tribunal. *Id.* at 53. However, in *Intel*, the EU Commission was similar to a Tribunal because it had authority not only to investigate but also to "**issue a decision finding infringement and imposing penalties**…" *Intel* at 255. Here, the Luxembourg public prosecutor has no comparable authority. In fact, the only authority the state prosecutor has is to decide whether to open an investigation. At the conclusion of an investigation, the state prosecutor does not even have the authority to file charges against a criminal defendant. Rather, the state prosecutor can only issue a recommendation as to whether to prosecute. As both of the Parties' Luxembourg criminal experts

-13-

explained, if the prosecutor recommends charges, then "the matter is then reviewed by the Chamber of Counsel of the District Court (Chambre du Conseil) made up of three judges. Only after the criminal Complaint passes through these two levels of review will a criminal action on the merits be initiated against the accused. A. 249 (Grasso Decl 5.2.4-5.2.6).

Thus, a Luxembourg prosecutor is nothing like a tribunal. Not only do they make no decisions on the merits, they cannot even file charges on their own. As Litai's Luxembourg criminal law expert Mr. Prum explained, "in Luxembourg, as in most places, it is impossible to prevent people from filing spurious actions or making false denunciations." A. 372. For that reason, "there are safeguards that prevent frivolous criminal Complaints resulting in actual criminal actions against the accused." *Id.* Here, Luxembourg's system of making sure that frivolous criminal complaints do no result in actual prosecutions is fatal to Applicants' arguments and reveals that they are seeking the discovery in hope of engaging in abusive and vexatious litigation against Dr. Paul.

VI.

This Court Must Consider Relevant
Luxembourg Law that Bears Upon Whether There
are Reliable Indications that a Proceeding Can be Filed

The Applicants make three arguments as to why the Court should not consider the controlling Luxembourg case law, and Luxembourg's leading treatise

-14-

on criminal procedure, cited by Litai.

First, the Applicants argue that "whether Furstenberg has suffered a sufficiently direct injury to maintain a criminal complaint with damages claim concerns the merits of the underlying action, which are properly resolved by the courts of Luxembourg, not in a §1782 application." Applicants' Br. at 44.  This argument is curious given that the Applicants themselves concede that Litai is correct that any claim they file as shareholders based upon alleged financial damage will be dismissed.  Applicants' Br. at 46.

Nevertheless, Litai is not challenging the underlying merits of any potential criminal action, i.e., what will happen at the end of such an action.  Rather, the authority Litai cites demonstrates that the Applicants, as minority shareholders, do not have the ability to even begin or trigger a foreign criminal action because they have not, as a matter of law, suffered any direct injury separate and apart from the company and so their claim will be held "inadmissible" and dismissed.

Thus, the Luxembourg case law goes to the very heart of the requirement that this Court "insist on *reliable indications* of the *likelihood* that proceedings will be instituted within a *reasonable time*.'" *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc*., 747 F.3d 1262, 1270 (11th Cir. 2014).  Even if the hoped for information is discovered, Applicants have absolutely no ability to trigger a proceeding because their claim will be held

-15-

inadmissible and dismissed. Applicants cannot predict with any degree of certainty or probability that an investigation would be started if the information were provided to a public prosecutor, particularly in light of the lack of damages, and additional prejudicial facts.[9] In these circumstances, there are no "*reliable indications* of the *likelihood* that proceedings will be instituted within a *reasonable time*." *Id.*[10]

The Applicants' argument that this Court should not examine Luxembourg law is also contrary to their own filings in this case, which were supported by four declarations focusing on Luxembourg law. Those declarations, however, fail to cite a single case showing that they have suffered any direct damage that could trigger a criminal investigation. That is why they seek to prevent this Court from considering the judicial opinions cited by Litai. Thus, this is not a situation where

---

[9]    Here, the alleged contract with Litai in which Applicants' claim Dr. Paul has an interest was negotiated and entered into before Dr. Paul became a member of the board of Acheron. A. 32; A. 73. In fact, Applicant Furstenberg Finance SAS's principal was on the board of Acheron at the time the contract was entered and specifically examined the clause Applicants' now question and approved the Litai contract. A. 32. Acheron's board of directors also appointed a committee to independently investigate the charges levied by Applicants and that committee found no evidence of any conflict of interest or other wrongdoing by Dr. Paul.

[10]    The Applicants also confuse an analysis of the merits with an analysis of standing to file a claim, and "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

-16-

"it is difficult to select one expert's opinion as more credible than the others based solely on the submission of competing declarations from attorneys who all appear to be competent and experienced." *In re Pinchuk*, 2014 WL 1328484 (S.D. Fla. March 31, 2014). Here, the Court need only review the Luxembourg case law. Litai cited Luxembourg's leading treatise on criminal law, and four cases directly on point, showing no such standing whereas the Applicants cited zero case law and zero treatises.[11] That is why the Applicants conceded this point.

The Applicants also ask this Court not to review the Luxembourg case law and treatise on the grounds that Litai sought to submit the case law in the district court in a motion to file a sur-reply, which was rejected by that court.[12] But this

---

[11] The Applicants cite *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262 (11th Cir. 2014) ("CONECEL") for the proposition that this court should not delve into the merits of a potential Luxembourg criminal action. But in CONECEL, the target pointed to a lawsuit that had been filed in Ecuador by the employee claiming the allegations of embezzlement were baseless, and referenced that lawsuit to claim that the section 1782 application was likewise baseless. Id., at 1274. Here, in contrast, Litai has presented unrefuted case law and academic treatises. Moreover, Litai's case law and treatise shows more than just that the Applicant's claimed intent to trigger a criminal investigation is meritless and baseless – it shows that the Applicants lack standing to even trigger such an investigation.

[12] The reason Litai sought to submit the case law as part of a sur-reply was because the Applicants first submitted a declaration from a criminal lawyer as part of their reply, but they cited no legal authority. It was necessary to refute the Applicants' expert's statements, which were not supported by case law, with the applicable definitive treatise on the subject and case law cited therein.

-17-

Court is not restricted to reviewing only the foreign case law that the district court reviewed. Fed. R. Civ. P. 44.1 states that, "[i]n determining foreign law, **the court may consider any relevant material or source**, including testimony, **whether or not submitted by a party** or admissible under the Federal Rules of Evidence." Thus, even if Litai had not submitted the case law to the District Court, it can still submit it to this Court. In fact, even if Litai did not submit the case law, this Court could on its own have reviewed the relevant precedents.

The Applicants cite *Butterworth v. Bowen*, 796 F.2d 1379, 1387 (11th Cir. 1986), for the proposition that this "court generally will not consider material that has not been considered by the court below," but that applies to evidence, not to case law. New case law supporting arguments already made can be considered for the first time by appellate courts or by any court in a reply brief. *See, e.g., F.D.I.C. v. Schuchmann*, 235 F.3d 1217, 1223 n. 2 (10th Cir. 2000) ("Additional legal authority cited by FDIC in its Reply Brief supports, rather than undermines, the accuracy of the instructions given"); *Meyers v. Kishimoto*, --- F.Supp.3d ----, 2016 WL 6818380 (D. Conn. Nov. 17, 2016) ("Although Defendants cited additional case law in their reply briefing regarding Plaintiff's procedural due process claim, the Court does not consider any arguments made by Defendants to be "new," and accordingly considers them"); *Gilliland v. Air Line Pilots Ass'n Intern.*, 741 F. Supp.2d 1334, (N.D. Ga., 2009) ("Defendants did not assert any new arguments in

AXS Law Group / Gunster Yoakley & Stewart PA

their reply brief; they simply buttressed previously–made arguments with new legal authority."); *United States v. Booker*, 2009 WL 1608289 (N.D. Fla. June 9, 2009) ("Petitioner has filed a reply and additional legal authority").

Of course, there are reasons for this rule, and the reason is that it is important for the Court to understand the law. Any request for the Court not to consider the controlling case law is tantamount to a request for an erroneous decision.

VII.

The Applicants Misstate the Standard of Review

If there was any doubt that the Applicants, by asking the Court not to review relevant Luxembourg law, are hoping to induce the Court into making an incorrect decision, such doubt should be erased from a simple review of the Applicants' argument regarding this Court's own standard of review. The Applicants argue that the "application of a properly interpreted statutory factor is reviewed for abuse of discretion," citing the Second Circuit case of *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 459 (2d Cir. 2014). Not only does the foregoing Second Circuit case not stand for that proposition, but the Applicants promulgation of this supposed standard is directly contrary to decades of Eleventh Circuit case law, where it has long been held that the Court reviews "*de novo* 'a district court's rulings on the interpretation **and application of a statute**.'" *Harris v. Schonbrun*, 773 F.3d 1180,

-19-

AXS LAW GROUP / GUNSTER YOAKLEY & STEWART PA

1182 (11th Cir. 2014) (emphasis added) (quoting *Williams v. Homestake Mortg. Co.,* 968 F.2d 1137, 1139 (11th Cir.1992); *accord Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1354 (11th Cir. 2014); *907 Whitehead St., Inc. v. Sec. of U.S. Dept. of Agric.*, 701 F.3d 1345, 1349 (11th Cir. 2012) ("We also review *de novo* the interpretation and application of a statute."). *See also, e.g., Untied States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016) ("We review a district court's interpretation and application of a statute concerning its subject-matter jurisdiction de novo"); *Garza v. Hudson*, 436 Fed. Appx. 924, 925 (11th Cir. 2011) ("application of the statute of limitations are reviewed *de novo"*).

The Applicants' bold willingness to attempt to misrepresent to this Court its own well-established standards of review should put the Court on high alert when the Applicants claim they have the ability to trigger a criminal investigation under Luxembourg law while urging the Court not to consider the very law under which they claim they will proceed.

## VIII.

### The Applicants Have Failed to Show Reliable Indications of the Likelihood that Proceedings will be Instituted within a Reasonable Time

These Applicants – Furstenberg and Bataillon –admit in this proceeding that they have no standing to file civil claims against Dr. Paul in his role as a director of Acheron because, as shareholders, they cannot claim to have suffered any direct financial damage that are different from Acheron or any other shareholders.  They

-20-

have now admitted that the same fundamental principle of Luxembourg law prohibits them from triggering a criminal investigation by filing a criminal complaint with a claim for civil damages. Applicants now claim they can trigger a criminal investigation merely by alleging "moral" or "reputational" damages but again they offer nothing more than a conclusory statement to support the argument; they offer no explanation for how their alleged "reputational" damages are different from the company or any other shareholder, and their argument is contrary to Luxembourg case law.

They next claim they are entitled to section 1782 discovery merely because they intend to file a "police report" and they support that argument by claiming a Luxembourg prosecutor, who will examine their police report and decide whether to start an investigation, is akin to a court in the United States. They gloss over the fact that the Luxembourg prosecutor can merely decide not to investigate, and not even inform them of that decision and, even if the prosecutor did decide to investigate, the prosecutor would not have the authority to file a criminal charge but rather must seek permission first. This is a far cry from the EU Commission in *Intel*, which had already begun an investigation and had the authority not only to investigate but also levy fines and penalties.

To cover up the weaknesses in their claims, the Applicants urge this Court not to consider controlling case law or the leading treatise from Luxembourg, and

they misrepresent to this Court its own standards of review.  If ever there was a case where the Applicants had failed to show "*reliable indications* of the *likelihood* that proceedings will be instituted within a *reasonable time*," this is it.

## CONCLUSION

The Court should vacate the judgment of the District Court and remand the case with directions to deny the application.

Respectfully submitted,

AXS Law Group
*Attorneys for the Respondents*

By: _____ /s/ *Jeffrey W. Gutchess* _____
    **Jeffrey W. Gutchess**
    Florida Bar No. 702641
    jeff@axslawgroup.com
    **Daniel Tropin**
    Florida Bar No. 100424
    dan@axslawgroup.com
    1850 Purdy Avenue
    Miami, Florida 33139
    Telephone:  (305) 389-3646

    **Thomas R. Julin**
    Fla. Bar No. 325 376
    Gunster Yoakley & Stewart PA
    600 Brickell Avenue Suite 3500
    Miami, FL 33131
    305-376-6007 Fax 6010
    tjulin@gunster.com

<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a) and 27(d)</u>

This motion complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: this brief uses a monospaced typeface and contains 6,016 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this motion has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/  *Jeffrey W. Gutchess*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel for the Applicants via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/  *Jeffrey W. Gutchess*

-23-

# EXHIBIT 51

**ACHERON PORTFOLIO CORPORATION (Luxembourg) S.A.**
*Société Anonyme*
Registered office:
37, rue d'Anvers L-1130 Luxembourg
R.C.S. LUXEMBOURG B-129.880
(the "**Company**")

Luxembourg, January 26, 2018

---

| NOTICE OF MEETING |
|:-:|

Dear Shareholder,

We hereby wish to convene you to an extraordinary general meeting of shareholders of the Company proposing the liquidation of the Company (the "**Liquidation**").

The Liquidation is proposed in the following context:

We have been assessing over the last months the possibility for the Company to enter into a sale process (the "**Acquisition**") which would lead to the rollover of the Company's assets into Life Settlement Assets PLC, a public limited company incorporated under the laws of England and Wales (registered number 10918785) whose registered office is at 1 Great Cumberland Place, London, W1H 7AL ("**LSA**"), whose shares will be admitted to trading on the specialist fund segment of the London Stock Exchange's main market for listed securities (the "**SFS**") and which will seek to qualify as a UK investment trust.

## I° OBJECTIVE AND PROPOSED STEPS FOR THE LIQUIDATION

The objective of the Liquidation and the resulting Acquisition is to:

- improve the liquidity which investors have experienced in respect of the Company's shares through the admission to trading of the LSA's shares on the SFS ;

- improve the regulatory and tax treatment of the Company's business; and

- re-establish the Company's business in another business-friendly jurisdiction which is close to the life settlement industry and to the Company's investors.

The scenario we now suggest to implement the Liquidation consists in the following steps:

1) <u>Step 1</u>: Establishment of LSA.

2) <u>Step 2</u>: Opening of the liquidation proceedings of the Company, appointment of a liquidator (the "**Liquidator**") and the granting of full discretion to the Liquidator to implement the Acquisition.

3) <u>Step 3</u>: Delisting of the Company's class A shares and class B shares from the Luxembourg Stock Exchange.

4)    <u>Step 4</u>: Contribution to LSA of:

- all of the Company's net assets tracked by the Company's class A shares and class CA shares in exchange for (i) the issue by LSA to the Company (or as it may direct) of class A ordinary shares (the "**LSA Class A Shares**") tracking the foregoing assets and (ii) a claim against LSA to be settled in cash as and when agreed with LSA (the "**LSA Class CA Claim**"). The LSA Class A Shares shall be attributable to the holders of the Company's class A shares in accordance with article 18 of the Company's articles of association. The LSA Class CA Claim shall be attributable to the holders of the Company's class CA shares in accordance with article 18 of the Company's articles of association;

- all of the Company's net assets tracked by the Company's class B shares and class CB shares in exchange for (i) the issue by LSA to the Company (or as it may direct) of class B ordinary shares (the "**LSA Class B Shares**") tracking the foregoing assets and (ii) a claim against LSA to be settled in cash as and when agreed with LSA (the "**LSA Class CB Claim**"). The LSA Class B Shares shall be attributable to the holders of the Company's class B shares in accordance with article 18 of the Company's articles of association. The LSA Class CB Claim shall be attributable to the holders of the Company's class CB shares in accordance with article 18 of the Company's articles of association;

- all of the Company's net assets tracked by the Company's class D shares, class CD Shares and class F shares in exchange for (i) the issue by LSA to the Company (or as it may direct) of class D ordinary shares (the "**LSA Class D Shares**") tracking the foregoing assets and (ii) a claim against LSA to be settled in cash as and when agreed with LSA (the "**LSA Class CD Claim**"). The LSA Class D Shares shall be attributable to the holders of the Company's class D shares and class F shares pro rata to the respective net asset value of the assets and liabilities relating to the class D shares and class F shares and, in respect of each such class, pro rata to the number of shares of such class held by them. The LSA Class CD Claim shall be attributable to the holders of the Company's class CD shares in accordance with article 18 of the Company's articles of association;

- all of the Company's net assets tracked by the Company's class E shares, class CE shares and class G shares in exchange for (i) the issue by LSA to the Company (or as it may direct) of class E ordinary shares (the "**LSA Class E Shares**" tracking the foregoing assets and (ii) a claim against LSA to be settled in cash as and when agreed with LSA (the "**LSA Class CE Claim**"). The LSA Class E Shares shall be attributable to the holders of the Company's class E shares and class G shares pro rata to the respective net asset value of the assets and liabilities relating to the class E shares and class G shares and, in respect of each such class, pro rata to the number of shares of such class held by them. The LSA Class CE Claim shall be attributable to the holders of the Company's class CE shares in accordance with article 18 of the Company's articles of association. The LSA Class E Shares together with the LSA Class A Shares, the LSA Class B Shares and the LSA Class D Shares will form the "**LSA Shares**").

    (the "**Contribution**").

It is expected that the assets portfolios of the Company being transferred in the context of this step 4 will be valued by an independent external appraiser, Mazars LLP, London, having its registered office at Tower Bridge House, St Katharine's Way, London E1W 1DD, which shall allow the Liquidator to determine (i) the relative proportion of LSA Class A Shares to be issued to the holders

of class A shares, (ii) the amount of the LSA Class CA Claim, (iii) the relative proportion of LSA Class B Shares to be issued to the holders of class B shares, (iv) the amount of the LSA Class CB Claim, (v) the relative proportion of LSA Class D Shares to be issued to the holders of class D shares and class F shares of the Company, (vi) the amount of the LSA Class CD Claim, (vii) the relative proportion of LSA Class E Shares to be issued to the holders of class E shares and class G shares of the Company and (viii) the amount of the LSA Class CE Claim. The economic rights of the Company's class CA shares, class CB shares, class CD shares and class CE shares shall be determined in accordance with an interim balance sheet as of 31 December 2017 prepared by the board of directors of the Company.

It is further expected that, with effect as of the Contribution, LSA will fully and effectively indemnify and hold harmless the Company in respect of all and any liability, whether known or unknown, that the Company may suffer or incur, including, without limitation, any claims, actions, demands, investigations, proceedings or judgments asserted against the Company as well as all costs, charges or expenses including, without limitation, any liquidation fees, legal fees and tax related fees.

5) <u>Step 5</u>: As part of or following such transfer, the LSA Shares shall be distributed by the Liquidator to the shareholders of the Company as a liquidation distribution (either interim or final) in the manner set out above and in accordance with article 18 of the Company's articles of association among classes of shares and, within a share class, pro *rata* to the shareholders' interest in each such class of the Company. All LSA Shares will be admitted to trading on the SFS.

6) <u>Step 6</u>: Once the Company's assets are all realised and its liabilities are settled, finalization and closing of the liquidation of the Company.

For information purposes only, the following materials are expected to be available on our website at www.acheronportfolio.lu/ on or around the date of this notice:

- the final  prospectus for LSA prepared in connection with the admission to trading of the shares of the LSA Class A Shares, LSA Class B Shares, LSA Class D Shares and LSA Class E Shares on the SFS;

- a valuation report in respect of the Company's assets, which are being transferred to LSA; and

- LSA's memorandum and Articles of Association.

In addition to the approval of the Acquisition, we would like to propose to the Company's shareholders to vote on a prior distribution out of the special equity reserve account of the Company as follows:

- an aggregate amount of up to USD 2,500,000 shall be paid to the holders of class A shares of the Company;

- an aggregate amount of up to USD 6,000,000 shall be paid to the holders of class D shares of the Company;

- an aggregate amount of up to USD 3,000,000 shall be paid to the holders of class E shares of the Company.

**II° NOTICE OF EXTRAORDINARY GENERAL MEETING**

We are consequently pleased to invite you to the extraordinary general meeting of the Company (the "**Meeting**") to be held at its registered office on February 26, 2018 at 10:00 for the purpose of considering the following agenda:

**Agenda**

1.  Reimbursement of an amount of up to zero point zero fifty-five US dollar (USD 0.055) per class A share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

2.  Reimbursement of an amount of up to zero point seven thousand eight hundred ninety-five US dollar (USD 0.7895) per class D share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

3.  Reimbursement of an amount of up to one US dollar and nine thousand six hundred seventy-two cent (USD 1.9672) per class E share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

4.  Dissolution and opening of the liquidation of the Company.

5.  Appointment of COMPAGNIE EUROPEENNE DE REVISION S.à r.l. as the Company's liquidator.

6.  Determination of the powers and duties of the liquidator.

7.  Determination of the remuneration of the liquidator.

8.  Miscellaneous.

**A.      Resolutions to be submitted to the Meeting**

1. Proposed first resolution: distribution in relation to the class A shares from the proceeds available in the dedicated special equity reserve account of the Company.

"*The general meeting of shareholders resolves to reimburse an amount of up to zero point zero fifty-five US dollar (USD 0.055) per class A share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.*"

*The availability of the relevant equity reserves is shown in the annual accounts of the Company for the financial year ended 31 December 2016 and in the interim financial situation as at 30 June 2017.*

2. Proposed second resolution: distribution in relation to the class D shares from the proceeds available in the dedicated special equity reserve account of the Company.

"*The general meeting of shareholders resolves to reimburse an amount of up to zero point seven thousand eight hundred ninety-five US dollar (USD 0.7895) per class D share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.*"

*The availability of the relevant equity reserves is shown in the annual accounts of the Company for the financial year ended 31 December 2016 and in the interim financial situation as at 30 June 2017.*

3. Proposed third resolution: distribution in relation to the class E shares from the proceeds available in the dedicated special equity reserve account of the Company.

"*The general meeting of shareholders resolves to reimburse an amount of up to one US dollar and nine thousand six hundred seventy-two cent (USD 1.9672) per class E share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.*"

*The availability of the relevant equity reserves is shown in the annual accounts of the Company for the financial year ended 31 December 2016 and in the interim financial situation as at 30 June 2017.*

4. Proposed fourth resolution: liquidation and dissolution of the Company.

"*In accordance with Articles 1100-1 to 1100-15 of the law of 10 August 1915 on commercial companies, as amended, (the "**Law**") the general meeting of shareholders resolves to dissolve and liquidate the Company.*".

5. Proposed fifth resolution: appointment of the liquidator of the Company.

"*The general meeting of shareholders resolves to appoint COMPAGNIE EUROPEENNE DE REVISION S.à r.l., a private limited liability company (société à responsabilité limitée) incorporated and existing under the laws of the Grand Duchy of Luxembourg, registered with the Luxembourg Trade and Companies' Register under number B37039, having its registered office at 15, Rue des Carrefours, L - 8124 Bridel, represented by Yves Mertz, born in Arlon, Belgium, on 19 September 1957, professionally residing at 37, rue d'Anvers L-1130 Luxembourg, as liquidator of the Company (the "**Liquidator**").*".

6. Proposed sixth resolution: determination of the powers and duties of the liquidator.

"*The general meeting of shareholders resolves that the Liquidator shall have the broadest powers as provided for by Articles 1100-4 to 1100-10 of the Law.*

*The Liquidator is hereby expressly empowered to carry out all such acts as provided for by Article 1100-5 of the Law without requesting further authorisations of the general meeting of shareholders.*

*In particular, the general meeting of shareholders resolves that the liquidator is hereby expressly authorized and instructed, without requesting further authorisations of the general meeting of shareholders to:*

    *1.    transfer, assign, contribute or otherwise dispose of:*

        *all of the Company's net assets tracked by the Company's class A shares and class CA shares in exchange for (i) the issue by LSA to the Company (or as it may direct) of class A ordinary shares (the "**LSA Class A Shares**") tracking the foregoing assets and (ii) a claim against LSA to be settled in cash as and when agreed with LSA (the "**LSA Class CA Claim**"). The LSA Class A Shares shall be attributable to the holders of the Company's class A shares in accordance with article 18 of the Company's articles of association. The LSA Class CA Claim shall be attributable to the holders of the Company's class CA shares in accordance with article 18 of the Company's articles of association;*

5

- *all of the Company's net assets tracked by the Company's class B shares and class CB shares in exchange for (i) the issue by LSA to the Company (or as it may direct) of class B ordinary shares (the "**LSA Class B Shares**") tracking the foregoing assets and (ii) a claim against LSA to be settled in cash as and when agreed with LSA (the "**LSA Class CB Claim**"). The LSA Class B Shares shall be attributable to the holders of the Company's class B shares in accordance with article 18 of the Company's articles of association. The LSA Class CB Claim shall be attributable to the holders of the Company's class CB shares in accordance with article 18 of the Company's articles of association;*

- *all of the Company's net assets tracked by the Company's class D shares, class CD Shares and class F shares in exchange for (i) the issue by LSA to the Company (or as it may direct) of class D ordinary shares (the "**LSA Class D Shares**") tracking the foregoing assets and (ii) a claim against LSA to be settled in cash as and when agreed with LSA (the "**LSA Class CD Claim**"). The LSA Class D Shares shall be attributable to the holders of the Company's class D shares and class F shares pro rata to the respective net asset value of the assets and liabilities relating to the class D shares and class F shares and, in respect of each such class, pro rata to the number of shares of such class held by them. The LSA Class CD Claim shall be attributable to the holders of the Company's class CD shares in accordance with article 18 of the Company's articles of association;*

- *all of the Company's net assets tracked by the Company's class E shares, class CE shares and class G shares in exchange for (i) the issue by LSA to the Company (or as it may direct) of class E ordinary shares (the "**LSA Class E Shares**" tracking the foregoing assets and (ii) a claim against LSA to be settled in cash as and when agreed with LSA (the "**LSA Class CE Claim**"). The LSA Class E Shares shall be attributable to the holders of the Company's class E shares and class G shares pro rata to the respective net asset value of the assets and liabilities relating to the class E shares and class G shares and, in respect of each such class, pro rata to the number of shares of such class held by them. The LSA Class CE Claim shall be attributable to the holders of the Company's class CE shares in accordance with article 18 of the Company's articles of association. The LSA Class E Shares together with the LSA Class A Shares, the LSA Class B Shares and the LSA Class D Shares will form the "**LSA Shares**").*

2. *take any actions required and enter into any agreements and/or documents necessary for the purpose of delisting the class A shares and the class B shares of the Company from the Luxembourg Stock Exchange.*

3. *distribute in kind, in the form of advance payments on future liquidation proceeds or final liquidation proceeds, to the Company's shareholders the LSA Shares and the LSA Claims in the manner set out above in accordance with article 18 of the Company's articles of association among classes of shares and, within a share class, pro rata to their interest in each such class of the Company.*

*The Liquidator is relieved from drawing-up inventory and may refer to the accounts of the Company.*

*The Company will be bound by the sole signature of the Liquidator.*

*The Liquidator may, under its responsibility, for special or specific operations, delegate to one or more proxyholders such powers as it determines and for the period as it thinks fit.*

*The Liquidator may distribute the Company's assets to the shareholders in cash and/or in kind in its sole discretion.".*

7. Proposed seventh resolution: determination of the remuneration of the liquidator.

*"The general meeting of shareholders resolves that the Liquidator shall receive a compensation of USD 50,000 for the accomplishment of its duties."*

**B. Formalities for the participation at the Meeting**

*Important Information*

The Prospectus and associated documents will be made available to shareholders for information purposes only. Neither this document nor the Prospectus constitutes an offer to sell, or the solicitation of an offer to subscribe for or buy, LSA Shares to any person other than the Company or in any jurisdiction in which the distribution of LSA Shares to shareholders by the Company is unlawful.

In relation to LSA, relevant clearances have not been, and will not be, obtained from the securities commission (or equivalent) of any province of Australia, Canada, Japan or the Republic of South Africa, the United States or any other jurisdiction where local law or regulations may result in a risk of civil, regulatory, or criminal exposure or prosecution if information or documentation concerning the issue or the Prospectus is sent or made available to a person in that jurisdiction (each a "Restricted Jurisdiction") and, accordingly, unless an exemption under any relevant legislation or regulations is applicable, none of the *LSA* Shares may be offered, sold, renounced, transferred or delivered, directly or indirectly, in any Restricted Jurisdiction.

Shareholders should inform themselves about, and observe, any applicable legal requirements in connection with the proposals outlined in this document, including the distribution of LSA Shares by the Company to them as part of the Acquisition. It is the responsibility of shareholders to satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the proposals, including the obtaining of any governmental or other consents which may be required, compliance with necessary formalities and the payment of any issue, transfer or other taxes due to such jurisdiction.

Shareholders who are unable to access the Prospectus due to the abovementioned restrictions and/or to acquire or hold the LSA Shares that they will receive as part of the Acquisition due to the aforementioned restrictions should contact the Company either via mail (to the Company at its registered office, attn. M Yves Mertz) or by fax (+352/26.33.42.52) or via e-mail (contact@acheronportfolio.lu) as soon as possible.

*Taxation*

The Company has not taken advice in relation to taxation other than in Luxembourg in connection with the Acquisition. Shareholders who are subject to taxation outside of Luxembourg should consult their tax advisers as to the tax effect of the Acquisition on them.  If you are in any doubt as to your tax position as a result of the Acquisition, you are recommended to seek immediately your own personal tax advice from an independent professional adviser.

*Total Voting Rights*

The share capital of the Company is on the date hereof represented by of 25,000 class CA shares having a par value of USD 0.01 each, 25,000 class CB shares having a par value of USD 0.01 each, 1,000 class CD

shares having a par value of USD 0.01 each, 1,000 class CE shares having a par value of USD 0.01 each, 45,446,946 class A shares having a par value of USD 0.01 each, 14,596,098 class B shares having a par value of USD 0.01 each, 7,600,000 class D shares having a par value of USD 0.01 each, 1,525,000 class E shares having a par value of USD 0.01 each, 1,014,000 class F shares having a par value of USD 0.01 each and 126,750 class G shares having a par value of USD 0.01 each.

The authorized share capital of the Company including the issued capital of the Company is set at USD 500,000,000. All shares carry voting rights in general meetings on an unrestricted "one share one vote" basis.

*Right to Participate to the Meeting*

Any shareholder who holds one or more shares of the Company shall be admitted to the Meeting and may vote in person or by appointing another person in writing, who needs not be a shareholder, as its proxy. Any shareholder and/or proxyholder participating in the Meeting shall carry a valid proof of identity.

*Record Date*

The right of a shareholder to attend the Meeting and to participate in the vote will be determined on the fourteenth day (being February 12, 2018) at midnight, preceding the Meeting (the Record Date). Anyone not being a shareholder at the Record Date may not attend or vote at the Meeting.

*Procedures for attending and voting at the Meeting*

Shareholders wishing to exercise their right to vote at the Meeting shall declare themselves in the manner set forth hereunder:

**a)  Shareholders wishing to attend the Meeting in person**:

Any shareholder must declare its intent to attend the Meeting in person prior to or on the Record Date at the latest. Additionally, the following formalities need to be completed:

- Any shareholder holding shares through fungible securities accounts (custodian banks) wishing to attend the Meeting in person must not later than 72 hours prior to the Meeting, deliver by fax (+352/26.33.42.52) with the original to follow by mail to the attention of Yves Mertz  at the registered office of the Company located at 37 rue d'Anvers, L-1130 Luxembourg, a certificate issued by the financial institution or professional  depositary (custodian bank) holding such shares, evidencing deposit of the shares and certifying the number of shares recorded in the relevant account as of the Record Date.

**and**

- Any shareholder must in addition to the above, no later than 72 hours prior to the Meeting (i) have their custodian bank send SWIFT instruction (Attendance confirmation) to Clearstream / Euroclear and (ii) have a copy of said SWIFT instruction sent by their custodian bank to Banque Internationale à Luxembourg, Luxembourg (SWIFT code: BILLLULL), along with the attendance confirmation sent to Banque Internationale a Luxembourg to the attention of Biagio Grasso, by fax (+352/45.90.42.27) or e-mail (biagio.grasso@bil.com) and to the Company to the attention of Yves Mertz, by fax (+352/26.33.42.52) or e-mail

(contact@acheronportfolio.lu) with the original to follow by mail to the attention of Yves Mertz at the registered office of the Company located at 37 rue d'Anvers, L-1130, Luxembourg.

Certificates issued by financial institutions or professional depositaries (custodian banks) certifying the number of shares recorded in the relevant account as of a date other than the Record Date will not be accepted and such shareholders will not be admitted to the Meeting.

The shareholders may use only attendance confirmations provided by the Company.

Any shareholder of registered shares having been duly registered in the shareholder's register of the Company is allowed to attend the Meeting upon presentation of a valid document evidencing its identity.

In the event of shares owned by a corporation or any other legal entity, individuals representing such entity who wish to attend the Meeting in person and vote at the Meeting on behalf of such entity, must present evidence of their authority to attend, and vote at, the Meeting by means of a proper document (such as a general or special power-of-attorney) issued by the relevant entity. A copy of such power of attorney or other proper document must be filed with the Company not later than 72 hours prior to the Meeting, at the Company s registered office in Luxembourg. The original documentation evidencing the authority to attend, and vote at, the Meeting, or a notarized and legalized copy thereof, must be presented at the Meeting.

**b) Shareholders wishing to vote through proxy:**

- Any shareholder holding shares through fungible securities accounts (custodian banks) wishing to vote through proxy at the Meeting must not later than 72 hours prior to the Meeting, deliver by fax (+352/26.33.42.52) with the original to follow by mail to the attention of Yves Mertz at the registered office of the Company located at 37 rue d'Anvers, L-1130 Luxembourg, a certificate issued by the financial institution or professional depositary (custodian bank) holding such shares, evidencing deposit of the shares and certifying the number of shares recorded in the relevant account as of the Record Date.

- Any shareholder must no later than 72 hours prior to the Meeting (i) have their custodian bank send SWIFT instruction to Clearstream / Euroclear and (ii) have a copy of said SWIFT instruction sent by their custodian bank to Banque Internationale a Luxembourg, Luxembourg (SWIFT code: BILLLULL), along with the proxy sent to Banque Internationale à Luxembourg to the attention of Biagio Grasso, by fax (+352/45.90.42.27) or e-mail (biagio.grasso@bil.com) and to the Company to the attention of Yves Mertz, by fax (+352/26.33.42.52) or e-mail (contact@acheronportfolio.lu ) with the original to follow by mail to the attention of Yves Mertz at the registered office of the Company located at 37 rue d'Anvers, L-1130, Luxembourg.

Certificates issued by financial institutions or professional depositaries (custodian banks) certifying the number of shares recorded in the relevant account as of a date other than the Record Date will not be accepted and such shareholders will not be admitted to the Meeting.

The shareholders may only use the proxy provided by the Company.

*Amendments to the Agenda*

One or more shareholders owning together at least 5% of the share capital of the Company have the right to add items on the agenda of the Meeting and may deposit draft resolutions regarding items listed in the agenda or proposed to be added to the agenda. This request will need to be received at the latest the twenty–second day (i.e. February 4, 2018) preceding the Meeting and made in writing via mail (to the Company at its registered office, attn. M Yves Mertz) or by fax (+352/26.33.42.52) with the original to follow by mail to the attention of Yves Mertz at the registered office of the Company) and will need to include a justification or draft resolution to be adopted at the Meeting. The written request will need to include a contact address (mail or fax) to which the Company can confirm receipt within 48 hours from the receipt of the request.

At the latest fifteen days (being February 11, 2017) preceding the Meeting, the Company will then publish a revised agenda.

*Quorum and majority*

The extraordinary general meeting of the Company's shareholders will validly deliberate on the resolutions on its agenda provided that a quorum of 50% of the Company's issued share capital is present or represented. The resolution with respect to item 4 of the agenda will be validly adopted by at least two-thirds of the votes validly cast. The resolution with respect to items 1, 2, 3, 5, 6 and 7 of the agenda will be validly adopted at least by a simple majority of the votes validly cast.

Copies of the convening notice, proxy and attendance confirmation as well as the draft listing prospectus of LSA are available on our website at www.acheronportfolio.lu/ or at the free disposal of the shareholders at registered office of the Company during normal working hours.

Yours faithfully,

For and on behalf of the Board of Directors of the Company,

_____          _____
By:                       By:
Director                  Director

## <u>ATTENDANCE CONFIRMATION</u>

The undersigned,

*In case of a natural person*
 Name: ……………………………………………………………..
 Professional address: ……………………………………………...
 Date of birth: ………………………………………………………


*In case of a corporation or other legal entity*

 Corporate denomination: ………………………………………...
 Corporate seat: …………………………………………………….
 Place of registration: ……………………………………………...
 Registration number: ……………………………………………...
 Authorized representative: ……………………………………….

 Being the holder of …………………………..     A Shares (LU0327662697)
 Being the holder of …………………………..     B Shares (LU0338952244)
 Being the holder of…………………………..     D Shares
 Being the holder of …………………………..     E Shares
 Being the holder of …………………………..     F Shares
 Being the holder of …………………………..     G Shares
 Being the holder of …………………………..     CA Shares
 Being the holder of …………………………..     CB Shares
 Being the holder of …………………………..     CD Shares
 Being the holder of …………………………..     CE Shares

of ACHERON PORTFOLIO CORPORATION (LUXEMBOURG) S.A., a *société anonyme* organised and existing under the laws of Luxembourg having its registered office at, 37 rue d'Anvers L-1130 Luxembourg, registered with the Luxembourg Trade and Companies Register under the number B 129880 (the **Company**),

hereby confirms that he/she will attend the extraordinary general meeting of the shareholders of the Company to be held on February, 26 2018 at 10:00, at the registered office of the Company (the Meeting).

The undersigned declares that:

*In case it holds shares through fungible securities accounts (custodian banks):*

- he/she has, not later than 72 hours prior to the Meeting, delivered by fax (+352/26.33.42.52) with the original following by mail to the attention of Yves Mertz at the registered office of the Company located at  37 rue d'Anvers,  L-1130, Luxembourg,  a  certificate issued by the financial institution  or

11

professional depositary (custodian bank) holding such shares, evidencing deposit of the shares and certifying the number of shares recorded in the relevant account 14 days prior to the Meeting; and

- he/she has, not later than 72 hours prior to the Meeting (i) had his/her custodian bank send SWIFT instruction to Clearstream / Euroclear and (ii) had a copy of said SWIFT instruction sent by his/her custodian bank to Banque Internationale a Luxembourg, Luxembourg (SWIFT code: BILLLULL), along with the present attendance confirmation sent to Banque Internationale à Luxembourg to the attention of Biagio Grasso, by fax (+352/45.90.42.27) or e-mail (biagio.grasso@bil.com) and to the Company to the attention of Yves Mertz, by fax (+352/26.33.42.52) or e-mail (contact@acheronportfolio.lu ) with the original to follow by mail to the attention of Yves Mertz at the registered office of the Company located at 37 rue d'Anvers, L-1130, Luxembourg.

*In case of registered shares:*

- he/she has been duly registered in the shareholder's register of the Company and will present a valid document evidencing its identity.

*In case of shares owned by a corporation or any other legal entity*:

- a copy of the evidence of his/her authority to attend, and vote at, the Meeting by means of a proper document (such as a general or special power-of-attorney) issued by the relevant entity has been filed with the Company not later than 72 hours prior to the Meeting, at the Company's registered office in Luxembourg; and

- he/she will present at the Meeting the original documentation evidencing his/her authority to attend, and vote at, the Meeting, or a notarized and legalized copy thereof.

Signature


_____
By:
Title:
Date:

**PROXY**

The undersigned,

*In case of a natural person*
Name: ……………………………………………………………..
Professional address: …………………………………………………...
Date of birth: ……………………………………………………………

*In case of a corporation or other legal entity*

Corporate denomination: …………………………………………...
Corporate seat: ……………………………………………………….
Place of registration: …………………………………………………...
Registration number: …………………………………………………...
Authorized representative: ………………………………………………

Being the holder of …………………………..    A Shares (LU0327662697)
Being the holder of …………………………..    B Shares (LU0338952244)
Being the holder of…………………………..    D Shares
Being the holder of …………………………..    E Shares
Being the holder of …………………………..    F Shares
Being the holder of …………………………..    G Shares
Being the holder of …………………………..    CA Shares
Being the holder of …………………………..    CB Shares
Being the holder of …………………………..    CD Shares
Being the holder of …………………………..    CE Shares

of ACHERON PORTFOLIO CORPORATION (LUXEMBOURG) S.A., a *société anonyme* organised and existing under the laws of Luxembourg having its registered office at, 37 rue d'Anvers L-1130 Luxembourg, registered with the Luxembourg Trade and Companies Register under the number B 129880 (the Company),

hereby appoints with full power of substitution (please check box where relevant) :

o Mr. Yves Mertz, having his professional address at 37 rue d'Anvers L-1130 Luxembourg, or

o Mr/Mrs ………………………………………, having his/her  professional address at ……………………………………….............. (the Proxyholder),

in order to represent the undersigned at the extraordinary general meeting of the shareholders to be held at the registered office of the Company on February 26, 2018 at 10:00 CET and in its/her/his  name and on its/his/her behalf to act and vote on the following agenda :

13

**Agenda**

1. Reimbursement of an amount of up to zero point zero fifty-five US dollar (USD 0.055) per class A share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

2. Reimbursement of an amount of up to zero point seven thousand eight hundred ninety-five US dollar (USD 0.7895) per class D share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

3. Reimbursement of an amount of up to one US dollar and nine thousand six hundred seventy-two cent (USD 1.9672) per class E share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

4. Dissolution and opening of the liquidation of the Company.

5. Appointment of COMPAGNIE EUROPEENNE DE REVISION S.à r.l. as the Company's liquidator.

6. Determination of the powers and duties of the liquidator.

7. Determination of the remuneration of the liquidator.

8. Miscellaneous.

**Resolutions**

1. Reimbursement of an amount of up to zero point zero fifty-five US dollar (USD 0.055) per class A share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

   **The Proxyholder is hereby instructed to**

   ❑ **vote in favour of**
   ❑ **abstain from voting**
   ❑ **vote against**

   **the above mentioned resolutions of the Agenda (\*).**

2. Reimbursement of an amount of up to zero point seven thousand eight hundred ninety-five US dollar (USD 0.7895) per class D share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

   **The Proxyholder is hereby instructed to**

   ❑ **vote in favour of**
   ❑ **abstain from voting**
   ❑ **vote against**

   **the above mentioned resolutions of the Agenda (\*).**

14

3.  Reimbursement of an amount of up to one US dollar and nine thousand six hundred seventy-two cent (USD 1.9672) per class E share of the Company to the shareholders from the proceeds available in the dedicated special equity reserve account of the Company.

    **The Proxyholder is hereby instructed to**

 9.  **vote in favour of**
      ❑    **abstain from voting**
      ❑    **vote against**

    **the above mentioned resolutions of the Agenda (*).**

4.  Dissolution and opening of the liquidation of the Company.

    **The Proxyholder is hereby instructed to**

      ❑    **vote in favour of**
      ❑    **abstain from voting**
      ❑    **vote against**

    **the above mentioned resolutions of the Agenda (*).**

5.  Appointment of COMPAGNIE EUROPEENNE DE REVISION S.à r.l.  as the Company's liquidator.

    **The Proxyholder is hereby instructed to**

      ❑    **vote in favour of**
      ❑    **abstain from voting**
      ❑    **vote against**

    **the above mentioned resolutions of the Agenda (*).**

6.  Determination of the powers and duties of the liquidator.

    **The Proxyholder is hereby instructed to**

      ❑    **vote in favour of**
      ❑    **abstain from voting**
      ❑    **vote against**

    **the above mentioned resolutions of the Agenda (*).**

7.  Determination of the remuneration of the liquidator.
    **The Proxyholder is hereby instructed to**

      ❑    **vote in favour of**
      ❑    **abstain from voting**
      ❑    **vote against**

    **the above mentioned resolutions of the Agenda (*).**

(*) Please check off as appropriate. A proxy without indication of instruction to the Proxyholder will be deemed to be nil and will not be taken into account.

The Proxyholder is furthermore authorized to make any statement, cast all votes, sign all minutes of meetings and other documents, do everything which is lawful, necessary or simply useful in view of the accomplishment and fulfillment of the present proxy, and to proceed, in accordance with the requirements of the Luxembourg law, to any registration with the Luxembourg Trade and Companies Register and to any publication on the *Recueil électronique des sociétés et associations*, while the undersigned promises to ratify all said actions taken by the proxyholder whenever requested.

This proxy shall be governed by Luxembourg law. Any dispute arising from the interpretation, validity or performance of this proxy or any of its terms and provisions shall be submitted to the courts of Luxembourg-City, Grand Duchy of Luxembourg.

The present proxy will remain in force if the above-mentioned general meeting, for any reason whatsoever, is to be adjourned or postponed

Given and signed in                      , on


Signature(s)